08   CV      4612

Richard Hong (Trial Counsel) (RH - 4939)
Scott W. Friestad
David Frohlich
Melissa A. Robertson
Jeffrey B. Finnell
Thomas D. Manganello
Richard E. Simpson (RS - 5859)

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC  20549
Tel:  (202) 551-4431 (Hong)
Fax:  (202) 772-9246 (Hong)
E-mail:  hongr@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

**SECURITIES AND EXCHANGE COMMISSION,**    :
                                                                          :
                               **Plaintiff,**                    :
                                                                          :
                        **v.**                                       :          08 Civ. _____ (__)
                                                                          :
                                                                          :          **COMPLAINT**
**JOHN MICHAEL KELLY, STEVEN E.**      :
**RINDNER, JOSEPH A. RIPP, and**            :
**MARK WOVSANIKER,**                           :          Jury Trial Demanded
                                                                          :
                                                                          :
                               **Defendants.**              :          ECF   Case
                                                                          :
_____

        Plaintiff Securities and Exchange Commission (the "Commission") alleges as

follows:

## NATURE OF THE ACTION

        1.    This is a financial fraud case against four former senior managers of America

Online, Inc. ("AOL") and its successor corporation, AOL Time Warner Inc. (collectively,

the "Company"). From at least mid 2000 through at least 2002, John Michael Kelly, Steven E. Rindner, Joseph A. Ripp, and Mark Wovsaniker knowingly or recklessly engineered, oversaw, and executed a scheme to artificially and materially inflate the Company's reported online advertising revenue — a key measure by which investors and analysts evaluated the Company – through at least the end of 2003.

2. The Company fraudulently funded its own online advertising revenue by giving counterparties the means to pay for advertising they would not have otherwise purchased. To do so, the Company manipulated, mischaracterized, and concealed the true substance of the business transactions, including "round-trip" transactions, as described in this Complaint.

3. John Michael Kelly, the Company's former Chief Financial Officer ("CFO"), Steven E. Rindner, former senior manager in AOL's Business Affairs unit, Joseph A. Ripp, former CFO of AOL, and Mark Wovsaniker, former AOL head of Accounting Policy, as discussed below, improperly engineered, approved, implemented, and/or accounted for the round-trip transactions in order to improperly inflate AOL's online advertising revenues.

4. By their actions, knowingly or recklessly undertaken, Kelly, Rindner, Ripp, and Wovsaniker were responsible for false statements regarding the Company's revenue, income, and results of operations. These false statements were made to investors in AOL's filings with the Commission and in public remarks and releases. Kelly, Rindner, Ripp, and Wovsaniker each knew or had reason to know that the false statements would be disseminated to investors. In fact, the dissemination of inflated advertising revenue

numbers was the very reason these defendants engineered, directed, and implemented the round-trip transactions.

5.    Several of AOL's customers were public companies with securities registered with the Commission, including, at least one, Veritas Software Corporation, that used the transaction with AOL to artificially inflate its own financial results.

6.    As a result of each of the defendants' actions detailed below, the Company reported artificially inflated online advertising revenue in periodic reports and registration statements filed with the Commission and other public statements from at least October 2000 through at least the end of 2003.

7.    The Company has since restated its financial statements to account for the fraudulent transactions referenced in this Complaint and more than a dozen similarly structured transactions.    First, on January 28, 2003, the Company restated its financial statements for 2000, 2001, and 2002 to reverse $190 million in principally online advertising revenue.    On May 4, 2005, the Company again restated its financial statements for the same period to reverse an additional $489 million in advertising revenue, including revenue recognized from transactions with Bertelsmann, A.G.    On August 17, 2006, the Company announced its third restatement of its financial statements, this time for 2000 through the period ended June 30, 2006, reversing $584 million of additional advertising revenue.

8.    By engaging in the conduct alleged in this Complaint, Kelly, Rindner, Ripp, and Wovsaniker violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Exchange Act Rules 10b-5 [17 C.F.R. §§ 240.10b-5]; and

13b2-1 [§ 240.13b2-1]. Unless enjoined from doing so, Kelly, Rindner, Ripp, and Wovsaniker are likely to commit the foregoing violations in the future.

9. In addition, by engaging in the conduct alleged in this Complaint, Kelly, Rindner, Ripp, and Wovsaniker aided and abetted AOL's violations of Sections 10(b), 13(a), and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 77q(a), 78m(a) and 78m(b)(2)(A)] and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, and 13b2-1 [17 C.F.R. §§ 240.10b-5, 12b-20, 13a-1, 13a-11, 13a-13, and 13b2-1]. Unless enjoined from doing so, Kelly, Rindner, Ripp, and Wovsaniker are likely to commit the foregoing violations in the future.

10. Finally, by engaging in the conduct alleged in this Complaint, Kelly and Wovsaniker violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2]. Unless enjoined from doing so, Kelly and Wovsaniker are likely to commit the foregoing violations in the future.

11. Accordingly, the Commission is seeking injunctive relief, disgorgement of ill-gotten gains with prejudgment and post judgment interest, civil penalties, and officer and director bars against Kelly, Rindner, Ripp, and Wovsaniker.

### JURISDICTION AND VENUE

12. This Court has jurisdiction over this action under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and (e) and 78aa]. Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

13.  Venue is proper in this Court under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because the defendants and the Company, headquartered in New York, New York, did business in this judicial district and certain acts or transactions constituting the violations occurred in this district.

## DEFENDANTS

14.  **John Michael Kelly**, age 51, resides in Potomac, Maryland.  Kelly, a certified public accountant, was the CFO of AOL from 1998 until January 2001, when he became CFO of AOL Time Warner in New York, New York.  In November 2001, he became Chief Operating Officer ("COO") of AOL, Inc. and in December 2002 became the Chairman and CFO of AOL International & Web Services.  Kelly resigned from the Company in March 2005.

15.  **Steven E. Rindner**, age 39, resides in Potomac, Maryland.  Rindner, a lawyer and a member of the bar of the District of Columbia, was a Senior Vice President in AOL's Business Affairs unit, a group of high-powered dealmakers, during the relevant period.  The Company terminated its relationship with Rindner on February 21, 2003, because of his involvement with the restated transactions.

16.  **Joseph A. Ripp,** age 56, resides in Wilton, Connecticut.  Ripp, a certified public accountant, was the CFO of AOL from January 2001 until September 2002 when he became Vice Chairman and COO of AOL Time Warner.  He left the Company on December 31, 2004.

17.  **Mark Wovsaniker**, age 52, resides in Jersey City, New Jersey.  Wovsaniker, a certified public accountant, was AOL's Senior Vice President for Accounting Policy

during the relevant period. Wovsaniker remains employed by the Company as a "special advisor," although he was removed from his accounting responsibilities as a result of his involvement with the restated transactions.

## RELEVANT ENTITIES

18. **Time Warner Inc.**, headquartered in New York, New York, is the successor corporation of **AOL Time Warner Inc.**, which was formed by the merger of **America Online, Inc.** and Time Warner Inc. on January 11, 2001. AOL Time Warner changed its name to Time Warner Inc. on October 16, 2003. During the relevant time period, AOL Time Warner filed annual, quarterly, and current reports with the Commission on Forms 10-K, 10-Q, and 8-K, registered securities offerings with the Commission, and traded its stock on the New York Stock Exchange. **AOL**, now a division of Time Warner, is an Internet service provider headquartered in New York, New York. Before it became a wholly-owned subsidiary of AOL Time Warner, AOL's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange. It filed annual, quarterly, and current reports with the Commission on Forms 10-K, 10-Q, and 8-K and registered securities offerings with the Commission. The pre-merger AOL and post-merger AOL Time Warner and Time Warner are collectively referred to as the "Company" or "AOL."

19. **Ernst & Young LLP ("E&Y")** is one of the "Big Four" accounting firms, headquartered in New York, New York. During the relevant time period, E&Y served as the Company's external auditor, responsible for auditing the Company's financial statements.

## FACTUAL ALLEGATIONS

### Summary

20. In the fall of 1999, AOL entered into merger discussions with Time Warner, and the two companies announced a proposed merger in January 2000. The merger closed the next year on January 11, 2001.

21. On May 15, 2000, while the merger was still pending, the Commission issued a cease-and-desist order against AOL in connection with AOL's accounting for advertising costs in 1995 and 1996. The Commission found that AOL violated the reporting and the books and records provisions of the federal securities laws by capitalizing costs of acquiring new subscribers and reporting the costs as an asset on its balance sheet, instead of expensing them as incurred. AOL consented to a cease-and-desist order and a federal court judgment requiring it to pay a $3.5 million penalty, then the largest penalty paid by an issuer for financial reporting violations.

22. Based upon internal discussions and their respective positions within AOL, Kelly and Wovsaniker knew about the Commission investigation in connection with AOL's accounting for advertising costs in 1995 and 1996 and about the May 2000 cease-and-desist order at the time they engineered and approved AOL's entry into, and accounting for, the improper, round-trip transactions.

23. In mid-2000, with the Time Warner merger pending, AOL faced a growing crisis with regard to its advertising revenue as the market for online advertising began shrinking.

24. Kelly insisted that AOL achieve the revenue targets that he and others in AOL's executive office had set in 2000.

25. Each of the defendants, as described below, responded by knowingly or recklessly engineering a fraudulent scheme to enable AOL to recognize purported online advertising revenues by structuring, approving, implementing, and/or accounting for "round-trip" transactions – transactions in which AOL effectively funded its own advertising revenue by giving its counterparties the means to purchase AOL online advertising that the counterparties did not need or want. Defendants improperly and deceptively used this fraudulent online advertising revenue to inflate and distort the Company's reported financial results and falsely make it appear as if AOL had legitimately made or exceeded its revenue targets and, later, to minimize any quarterly revenue shortfall.

26. Each of the defendants, as described below, committed manipulative and/or deceptive acts in furtherance of the aforementioned scheme and were responsible for the resulting fraudulent inflation of reported AOL online advertising revenue and other key reported financial results.

27. Rindner and other Business Affairs senior executives played a leading role in negotiating, structuring, documenting, and implementing certain of the round-trip transactions discussed below, which came to be known as "BA Specials."

28. As described below, Kelly, Rindner, Ripp, and Wovsaniker knowingly or recklessly manipulated legitimate business transactions in order to artificially manufacture online advertising revenue and/or approved revenue recognition for the improper transactions.

29. Wovsaniker, the head of AOL's Accounting Policy, made decisions on the accounting treatment to be accorded the round-trip transactions, provided advice on how

8

to structure and document the transactions and, on occasion, with others, took part in negotiations to make sure a deal was structured to achieve the desired accounting result – recognition of online advertising revenue regardless of the true nature of the deal.

30.  Wovsaniker also directed that the contingent pieces of round-trip transactions be documented as separate, independent transactions, without any cross-referencing, thereby concealing the economic reality of those transactions from auditors.

31.  Wovsaniker substantially contributed to various public statements to investors that incorporated the fraudulent financial results, including, for example, the Company's January 31, 2001 Fourth Quarter Earnings Release, the Company's January 31, 2001 Investor Day Earnings Release Call, the Company's April 18, 2001 Earnings Release, the Company's April 18, 2001 Quarterly Results Call, the Company's July 18, 2001 Second Quarter Earnings Release, the Company's July 18, 2001 Earnings Call, the Company's October 17, 2001 Third Quarter Earnings Release, the Company's October 17, 2001 Earnings Call, and the Company's January 7, 2002 Earnings Call/Analysts' Teleconference.  These statements emanated from New York, New York, as did most of the Company's communications with the investing public.

32. Kelly, the CFO of AOL pre-merger and the CFO of the combined company post-merger, knew or was reckless in not knowing that AOL was improperly recognizing revenues from sham transactions that he had approved.  Kelly also negotiated two transactions with Bertelsmann, A.G. ("BAG"), AOL's German partner in AOL Europe, which resulted in $400 million being improperly booked as advertising revenue.  Kelly signed public filings that included the Company's materially false and misleading financial results, including Forms 10-Q for the quarterly periods ended September 30,

2000 (filed November 9, 2000); December 31, 2000 (filed March 27, 2001); March 31, 2001 (filed May 15, 2001); and June 30, 2001 (filed August 14, 2001). Kelly also signed the Company's materially false and misleading Form 10-K for the transition period from July 1, 2000 to December 31, 2000 (filed March 27, 2001). For example, the Company's Form 10-Qs for the first and second quarters of 2001 included more than $80 million in improper advertising revenue from BAG transactions over two quarters. Kelly did not disclose the improper transactions to E&Y, AOL's external auditor.

33. Kelly also made or substantially contributed to various public statements to investors that touted the fraudulent financial results, including, for example, the Company's January 31, 2001 Fourth Quarter Earnings Release, the Company's January 31, 2001 Investor Day Earnings Release Call, the Company's April 18, 2001 Earnings Release, the Company's April 18, 2001 Quarterly Results Call, the Company's July 18, 2001 Second Quarter Earnings Release, the Company's July 18, 2001 Earnings Call, the Company's October 17, 2001 Third Quarter Earnings Release, the Company's October 17, 2001 Earnings Call, and the Company's January 7, 2002 Earnings Call/Analysts' Teleconference. These statements emanated from New York, New York.

34. When Ripp became the CFO of AOL in early 2001, he was told that AOL "grossed-up" certain vendor transactions in exchange for advertising revenue coming back from the vendors in the amount of the "gross-ups." He also knowingly or recklessly took part in and approved AOL's round-trip transactions with BAG and WorldCom, Inc. as described below. Ripp did not disclose these improper transactions to E&Y.

35. Ripp also made or substantially contributed to various public statements to investors that incorporated the fraudulent financial results, including, for example, the

Company's April 18, 2001 Earnings Release, the Company's April 18, 2001 Quarterly

Results Call, the Company's July 18, 2001 Earnings Release, the Company's July 18,

2001 Earnings Call, the Company's October 17, 2001 Third Quarter Earnings Release,

the Company's October 17, 2001 Earnings Call, the Company's January 2, 2002 AOL

Time Warner Conference, and the January 7, 2002 Earnings Call/Analysts'

Teleconference. These statements emanated from New York, New York.

    36. Rindner was Wovsaniker's primary liaison within Business Affairs and was in

regular communication with Accounting Policy, headed by Wovsaniker. Rindner was

responsible for tracking AOL's advertising revenues to determine the gap between actual

revenues and internal targets, and knowingly used bogus advertising from multiple

transactions to bridge the Company's advertising revenue shortfalls. In doing so, Rindner

substantially contributed to various public statements to investors that incorporated the

Company's fraudulent financial results, including AOL's reported online advertising

revenue and other financial results. These included the Company's April 18, 2001

Earnings Release, the Company's April 18, 2001 Quarterly Results Call, the Company's

July 18, 2001 Earnings Release, the Company's July 18, 2001 Earnings Call, the

Company's October 17, 2001 Third Quarter Earnings Release, the Company's October

17, 2001 Earnings Call, and the Company's January 7, 2002 Earnings Call/Analysts'

Teleconference. These statements emanated from New York, New York.

## The Transactions

    37. From at least May 2000 through at least 2002, each of the defendants took

part in at least one of the following three types of sham advertising transactions: (i)

vendor transactions, in which AOL agreed to pay inflated prices for, or forgo discounts

11

on, goods and services it purchased in exchange for the vendors' purchases of online advertising in the amount of the markup or forgone discount; (ii) business acquisitions, in which AOL increased the price it paid to purchase businesses in exchange for the sellers' purchase of online advertising in the amount of the increase in the purchase price; and (iii) settlements of business disputes, in which AOL converted the settlements of business disputes and legal claims into online advertising revenue. Those transactions deceived the investing public until at least the end of 2003 by masking the Company's true financial results.

38. Kelly, Rindner, Ripp, and Wovsaniker then made or substantially contributed to various public statements to the investing public that incorporated the Company's fraudulent financial results, including AOL's reported online advertising revenue and other financial results.

39. The foreseeable and intended result of the defendants' conduct was to mislead the investing public who relied on the Company's financial statements by materially inflating key financial results that the investing public considered, including revenue and income, from at least the third quarter of 2000 through at least the end of 2003.

40. The recognition of revenue in connection with these transactions departed from generally accepted accounting principles ("GAAP"). The Financial Accounting Standards Board's Statement of Financial Accounting concept statements require that transactions be reported in the financial statements in a "representationally faithful" manner. These round-trip transactions were contrived to inflate revenues, lacked substance and were merely circular flows of cash in which the customers were made to

pay for goods or services they did not want or need. The accounting failed to reflect the true economic substance of these transactions and, as intended by the defendants, resulted in the artificial inflation of AOL's reported online advertising revenue and other key financial results.

41. As alleged below, each defendant knew or was reckless in not knowing that: the Company manipulated its business transactions in order to manufacture and recognize online advertising revenues; the advertising revenues from the round-trips were not real advertising revenues; and the Company took steps to conceal the true substance of the round-trip transactions.

42. As a foreseeable and intended result of each of the defendants' actions described below, the Company reported materially false and misleading financial results in periodic reports filed with the Commission and other public statements for at least the period ended September 30, 2000, through the period ended December 31, 2003.

43. The sham advertising transactions described in this Complaint had a material impact on one or more of the important metrics the investing public and analysts considered in evaluating the stock of AOL pre-merger and AOL Time Warner post merger, including AOL's reported advertising and commerce revenue, net income, operating income, and EBITDA (earnings before interest, tax, depreciation and amortization).

44. For example, from at least 2000 through at least the end of 2002, analysts and the financial press paid particular attention to AOL's advertising and commerce revenue and top executives of AOL and later AOL Time Warner, including Kelly and Ripp, touted these results on earnings and analyst calls, as well as in press releases. Most, if not

13

all, of these communications with the investing public, including analyst calls, earnings calls, and press releases, emanated from New York, New York.

45. AOL's advertising and commerce revenue was singled out in public statements and press releases issued by the Company on multiple occasions in 2001 and 2002. Kelly himself made at least three public statements to analysts referencing the growth of AOL's advertising and commerce revenue, including statements on April 18, 2001, July 18, 2001, and October 17, 2001.

46. By transmitting to corporate headquarters the division's financial results (inflated by the BAG and other deals), Ripp substantially contributed to the above statements to investors. He also made at least one statement to investors of his own, in a January 2, 2002 AOL Time Warner Conference, incorporating 2002 results and projections for revenue, advertising and commerce revenue, and EBITDA. These statements emanated from New York, New York.

47. As a result of the defendants' actions detailed in this Complaint, AOL materially inflated its advertising and commerce revenue in each of the fourteen quarters from the quarter ended September 30, 2000 through the fourth quarter of 2003. Manipulating and mischaracterizing business transactions described in this Complaint in order to artificially boost AOL's financial results also helped to close the gap between actual results and market expectations. As alleged above, Kelly, Rindner, Ripp, and Wovsaniker also made or substantially contributed to various public statements to investors that incorporated the fraudulent financial results.

### A. The Vendor Round-Trip Transactions

48. As set forth more specifically below, Kelly, Rindner, and Wovsaniker each knowingly or recklessly engineered and executed a scheme that artificially inflated AOL's online advertising revenue through round-trip transactions with AOL's vendors. Each defendant knew or was reckless in not knowing that AOL agreed to pay more for, or forgo discounts on, goods and services it purchased, in order to improperly recognize as online advertising revenue amounts equivalent to the markups paid or discounts forgone.

49. Kelly, Rindner, Ripp, and Wovsaniker knew or were reckless in not knowing that it was improper for AOL to recognize revenue on advertising deals obtained in exchange for forgone discounts.

50. In a May 3, 2000 e-mail sent to Wovsaniker, Kelly stated his knowledge of, and concern with, round-trips and aggressive revenue recognition being negotiated by AOL's Business Affairs unit, asking the head of the unit: "[w]hat other round trips do you have coming down the line?"

51. Each defendant, as described in this Complaint, materially engineered, oversaw and took part in a scheme to manipulate and mischaracterize transactions to enable AOL to improperly recognize revenue and inflate its reported online advertising revenue and other key financial results.

52. Kelly, Wovsaniker, and Ripp also received complaints about the round-trip transactions, as alleged in more detail below.

15

### 1. Sun Microsystems, Inc.

53. During the times relevant to the allegations herein, Sun Microsystems, Inc. ("Sun") was a hardware supplier that manufactured the network equipment AOL used to support its online services. In November 1998, AOL entered into an agreement to purchase at least $300 million of network equipment from Sun over three years. AOL's equipment needs exceeded expectations and, by June 2000, AOL had already purchased $300 million of equipment.

54. In June 2000, Sun asked AOL to enter into a new purchase commitment. Sun proposed that if AOL agreed to purchase a substantial amount of additional equipment from Sun, Sun would improve the significant discount AOL already enjoyed by splitting Sun's profit margin on the additional equipment purchases, which AOL knew to be about 30%.

55. In June 2000 e-mail exchanges, Kelly, Wovsaniker, and others discussed a plan to propose to Sun that AOL make a $200 million purchase commitment in return for Sun splitting its 30% profit margin with AOL and converting the incremental 15% negotiated purchase discount into a $30 million payment that AOL would recognize as online advertising revenue. In an e-mail sent to Kelly and others, a Business Affairs executive suggested that AOL should position its proposal as a momentum builder in its relationship with Sun and that AOL was simply seeking some "accounting help" from Sun.

56. Kelly and Wovsaniker understood that AOL could not recognize revenue on an advertising sale if the revenue was the result of trading a discount on its equipment purchase for the sale. Kelly and Wovsaniker nevertheless knowingly or recklessly helped

16

execute the plan to forgo the additional 15% purchase discount from Sun and convert it into a purported online advertising sale to Sun.

57. Contemporaneous June 2000 internal Sun e-mails confirmed that AOL told Sun that AOL needed revenue back from Sun -- instead of a discount -- in exchange for its equipment purchase commitment and that AOL understood the revenue back represented the forgone additional 15% discount.

58. Sun rejected AOL's first proposal to convert the discount into AOL advertising revenue. Instead, Sun offered to give free equipment that AOL could resell or lease for at least the amount of the forgone discount and thereby generate the revenues that AOL sought. When Wovsaniker learned of Sun's proposal, he intervened and told Sun that its proposed deal structure would not provide the advertising revenue AOL needed.

59. A June 19, 2000 internal Sun e-mail contemporaneously confirmed what Wovsaniker and others at AOL explained to Sun, namely that "AOL does not believe they can recognise [sic] revenue on the sale of 'free' equipment so that does not seem an option."

60. With Wovsaniker's knowledge and approval, AOL and Sun ultimately agreed that in exchange for AOL's commitment to purchase $250 million of equipment from Sun, Sun would agree to "buy" $37.5 million of advertising from AOL. (The $37.5 million was the amount of the forgone additional discounts Sun was willing to give AOL). Sun did not want to pay cash for the advertising and insisted on using the previously proposed free equipment as payment for the advertising. In or about June 2000, Wovsaniker and Kelly approved an accounting for the Sun transaction in which

17

AOL improperly recognized the converted, forgone discounts as advertising revenue and accepted free equipment from Sun *in lieu* of cash for the advertising.

61. The Sun transaction was documented in two apparently separate and independent contracts – an equipment contract and an advertising contract – neither of which reflected the fact that AOL converted the free $37.5 million worth of equipment into a purported purchase of $37.5 million of online advertising.

62. The advertising contract provided AOL, and not the purported advertising client, Sun, with nearly complete control over the advertising. It also provided AOL with absolute discretion to run the advertising "at any time AOL deems appropriate."

63. As the September 2000 quarter was nearing its close, AOL projected an advertising revenue shortfall. To close the revenue gap, Kelly and others obtained Sun's permission to exceed a contractual provision limiting AOL to running $25 million of advertising in any one quarter. In a late August 2000 e-mail, a Business Affairs executive explained that AOL viewed obtaining the additional $12.5 million in Sun advertising revenue as the "lynchpin" to AOL's ability to make its quarterly numbers.

64. In November 2000, during its September 2000 quarterly review of AOL's financial statements, E&Y learned that AOL had sought and obtained Sun's permission to exceed the contractual provision limiting AOL to running $25 million of advertising per quarter and that there was no corresponding written amendment as of the end of the September quarter. E&Y told Wovsaniker that these facts caused it to question the legitimacy of the advertising transaction and asked Wovsaniker whether he was aware of any discussion related to increasing the price of the equipment purchase in exchange for an advertising agreement. Wovsaniker denied being aware of any such discussion. He

failed to disclose to E&Y the true, contingent nature of the equipment purchase and advertising purchase.

65. E&Y proposed an audit adjustment to reverse the recognition of $12.5 million of advertising revenue because there had been no written agreement with Sun amending the advertising deal terms as of the end of the September 2000 quarter. AOL rejected E&Y's advice and did not record the proposed audit adjustment.

66. The Sun round-trip transaction, approved by Kelly and Wovsaniker, became a model for future round-trip transactions by which AOL improperly inflated its online advertising revenues.

67. In January 2003, AOL restated its financial statements to eliminate the $37.5 million inflation of its advertising revenues from Sun.

### 2. Veritas Software Corporation

68. After the Sun round-trip transaction, AOL sought to generate online advertising revenue from its vendors by forgoing discounts on other purchases. Wovsaniker and others used the Sun transaction as a model to convert forgone discounts into advertising revenue.

69. During the times relevant to the allegations herein, Veritas Software Corporation ("Veritas") created and licensed data storage software. In the summer of 2000, AOL began negotiating with Veritas to buy an unlimited license for all its software products.

70. During negotiations in late August and September 2000, AOL proposed that Veritas purchase online advertising from AOL. Veritas rejected the proposal because it

had no budget or need for AOL's online advertising at the time and Veritas doubted

whether advertising on AOL furthered its advertising objectives.

71. By mid-September 2000, AOL and Veritas had agreed on a $30 million

purchase price for the license, which represented a 65% discount. Veritas and AOL

agreed to close the transaction by quarter-end of September 30, 2000.

72. In late September, about a week before the deal was set to close, AOL's

Business Affairs unit intervened in order to try to extract advertising revenue from the

transaction. During that time, Business Affairs consulted with Wovsaniker on how to

structure the deal in order to achieve advertising revenue recognition. On the morning of

September 29, 2000, Business Affairs internally described its efforts as "trying to get

[Veritas] to trade a lower discount for an ad deal (no net benefit to anyone) . . ."

73. On or about September 29, 2000, the day the parties planned to sign the

license agreement, AOL executives, following the round-trip model employed in the Sun

transaction, contacted Veritas' CEO and proposed, as a favor to AOL, that Veritas allow

AOL to pay an additional $20 million for the license in exchange for Veritas' agreement

to purchase a comparable amount of AOL online advertising. AOL explained that it

would simply take a "shallower" (less favorable) discount on the license purchase price.

74. Shortly thereafter, Veritas agreed to accept $50 million for the license and to

enter simultaneously into a $20 million advertising contract with AOL.

75. Business Affairs implemented the round-trip transaction, changing the price

in the contract to $50 million and, following Wovsaniker's advice, drafting separate deal

summaries for the license and advertising contract to make it appear that the license and

advertising deals were two separate, *bona fide* and non-contingent transactions. The

terms of the license remained essentially unchanged despite the $20 million increase in the price.

76. On or about September 29, 2000, Wovsaniker approved the transaction. Wovsaniker advised that the purchase of software and sale of advertising should be documented as if they were two separate and unrelated transactions, when he knew or was reckless in not knowing that they were contingent pieces of a round-trip transaction used to improperly inflate AOL's advertising revenues.

77. In internal AOL e-mails sent on and around January 15, 2001, and during E&Y's year-end audit of AOL's financial statements, Wovsaniker was told that AOL still had no advertising carriage plan in place for Veritas but nonetheless had already recognized $7 million of advertising revenue from Veritas.

78. On January 17, 2001, Rindner sent an e-mail to a Business Affairs employee (with a copy to Wovsaniker), reprimanding the Business Affairs employee for stating in an e-mail to Wovsaniker that no advertising carriage plan was in place. Rindner instructed the employee to "clean this up", stating that "we are all aware that there was no carriage plan in place prior to signing the deal – it was [To Be Determined] at our discretion."

79. The next day, E&Y spoke with Wovsaniker to discuss an open item in its audit – the appropriate accounting treatment for the Veritas transaction. E&Y told Wovsaniker that it needed to test the fair value of the license and advertising transactions because they were executed simultaneously.

80. Wovsaniker lied to and/or misled E&Y, telling the auditors that the deals were fairly valued. Moreover, the license summary sign-off page that referenced the

change in price from $30 million to $50 million was withheld from the auditors. Wovsaniker knew or was reckless in not knowing that the $20 million advertising deal lacked substance and was in fact the result of AOL forgoing a discount on the license.

81. At around the time Wovsaniker met with E&Y in January 2001, he told the lead Business Affairs executive on the deal that "the documentation of the deal in moving from [a $]30 [million] to [$]50 [million] and the fact that the summaries weren't completely separate like they were supposed to be ... didn't look good." When asked if AOL would still be able to recognize the revenue, the primary objective of the transaction, Wovsaniker responded that everyone still seemed "okay" with the transaction.

82. In spite of his knowledge about the transaction and its intended purpose, Wovsaniker, in his discussions with E&Y, gave no indication that the license might be worth anything less than $50 million. He also failed to advise E&Y about the last minute $20 million price change in the license that coincided with AOL obtaining Veritas' agreement to the $20 million advertising deal – information Wovsaniker knew was material to an understanding and accounting of the transaction. Moreover, Wovsaniker did not tell E&Y that the deals were contingent, although he plainly understood that they were.

83. On or about January 24, 2001, the lead Business Affairs executive on the deal, after consultation with Wovsaniker, signed and returned to Veritas' external auditor a materially misleading audit confirmation of the purported terms of the license agreement, in which he falsely represented to Veritas' auditors that the license: reflects all the terms and conditions of the license agreement and represents the entire

22

arrangement with Veritas; was not contingent upon purchases of software or services from AOL or others; and payment owed to Veritas under the agreement was due net 30 days.

84. Wovsaniker authorized the Business Affairs executive to sign the confirmation – a confirmation Wovsaniker acknowledged was not truthful because it stated that the license was not contingent upon purchases of software or services from AOL.

85. AOL improperly recognized the $20 million as online advertising revenue, and Veritas improperly recognized the additional $20 million as license and service revenue.

86. In January 2003, AOL restated its financial statements to eliminate the $20 million inflation of its advertising revenues from Veritas, and Veritas subsequently restated its financial statements to eliminate the $20 million inflation of its revenues from AOL.

### 3. **Hewlett-Packard**

87. During the times relevant to the allegations herein, Hewlett-Packard Co. ("HP") manufactured and supplied servers that supported AOL's core computing functions.

88. Shortly after the Sun transaction, during the summer of 2000, Wovsaniker helped devise a plan to round-trip money AOL paid to HP for equipment to come back as advertising revenue. While advising others on how to structure the HP transaction to achieve this result, Wovsaniker invoked the Sun transaction as a model.

89. With Wovsaniker's advice and assistance, in November 2000, AOL entered into a transaction with HP to obtain $12 million of online advertising revenue in exchange for agreeing to forgo a similar amount of additional discounts that AOL had negotiated in connection with a commitment to purchase $200 million in hardware.

90. Following Wovsaniker's guidance, Business Affairs executives falsely documented the transaction as if AOL's hardware purchase commitment and HP's agreement to purchase advertising were separate, *bona fide* transactions. AOL "explained" to HP that AOL's accounting department would not allow the two contracts to be linked. In an internal HP e-mail dated October 12, 2000, an HP negotiator wrote that "AOL is still concerned about the SEC ruling and their accounting department will not allow them to be linked together."

91. The Business Affairs executives likewise prepared separate deal summaries for the equipment purchase and advertising sale, thereby concealing the true nature and substance of the transaction and the fact that AOL was paying a higher price for the hardware than it otherwise would have, in order to obtain contingent advertising revenue. They deleted all reference to the advertising transaction in the hardware summary, notwithstanding the fact that the conversion of discounts into advertising dollars had led to the alteration of the terms of the hardware contract. The deal summary stated that "[t]he agreement locks in and extends AOL's aggressive hardware and software discounts . . .", without disclosing that AOL had declined HP's top corporate discount.

92. While the contracts and deal summaries did not document any relationship between the two contracts, Wovsaniker knew or was reckless in not knowing that in

24

substance HP's advertising purchase was a return of the purchase discounts that AOL had obtained, but traded back to HP in exchange for advertising revenue in the same amount.

93. A member of the AOL negotiating team later acknowledged in an internal December 2001 e-mail to Rindner that the $12 million advertising deal was not based on real value and that AOL simply traded discounts back to fund advertising revenue.

94. Likewise, the HP officials who negotiated the deal made plain in a contemporaneous internal HP e-mail that "any media transacted with AOL will be funded out of negotiated HP discount dollars, not marketing expense dollars" because "it stemmed from a sales deal in which AOL offered to leave money on the table if HP agreed to spend this money on advertising (ad revenue for AOL being the goal)."

95. In or about November 2000, Wovsaniker knowingly or recklessly approved this transaction and AOL's revenue recognition despite knowing that AOL was turning down a discount on a hardware purchase in exchange for HP purchasing advertising from AOL.

96. AOL improperly recognized the $12 million as online advertising revenue.

97. In January 2003, AOL restated its financial statements to eliminate the $12 million inflation of its advertising revenues resulting from the HP transaction.

### 4. Telefonica DataCorp

98. During the times relevant to the allegations herein, Telefonica DataCorp, S.A. ("Telefonica") provided network services to a number of AOL's international affiliates.

99. In 2000, AOL sought better pricing and service from Telefonica. Telefonica agreed to give AOL its best prices in exchange for a network commitment from AOL.

100. In November 2000 e-mails, Rindner was told that Telefonica had agreed to give AOL its best prices in consideration for AOL entering into the network commitment. In contemporaneous e-mails, Rindner and his colleagues considered two options to effectuate Telefonica's best price guarantee: (1) Telefonica would provide AOL with a credit or rebate on the network deal; or (2) Telefonica would buy online AOL ads whose value reflected the difference between the prices AOL was charged and the lowest prices Telefonica guaranteed.

101. In contemporaneous internal AOL e-mails in or about November 2000, Rindner and others discussed how AOL could document and structure the transaction if it converted this credit or rebate on the network deal into advertising revenue.

102. In a November 20, 2000 e-mail to Rindner, a Business Affairs colleague proposed that the AOL affiliates that had to pay higher prices (as part of the round-trip) in order to obtain the advertising revenue should benefit from the revenue by having the advertising run on their respective local websites. Rindner responded that this raised an accounting issue and expressed concern that allowing the local AOL affiliates to enjoy the revenue benefits (of the forgone best prices) might be viewed as a "built in discount" requiring AOL to net the advertising against the expense of the network deal.

103. Rindner and his colleagues then negotiated AOL's conversion of the forgone credits and rebates on the network deal into online advertising revenue.

104. Based upon contemporaneous internal AOL discussions in and around November 2000 and the negotiations with Telefonica, Rindner understood the contingent nature of the advertising deal and network commitment. Rindner nevertheless

documented the transaction as if it was two separate deals, deleting cross-references between the deals that existed in prior drafts.

105.  During the course of internal AOL discussions, Rindner instructed a junior Business Affairs employee to promise Telefonica free, bonus advertising because AOL needed to run the Telefonica advertising before Telefonica was ready with its artwork for the ads in order to meet its revenue targets for the quarter-end of December 31, 2000. Rindner later instructed another employee not to speak to AOL's accounting department on the matter.  Telefonica agreed to the bonus ads, but the side agreement was not reflected in the contract or deal summary.

106.  In order to recognize revenue in the quarter ended December 31, 2000, AOL began running advertising before Telefonica agreed to the transaction.  Rindner knew that because there was no time for Telefonica to create ads, AOL had created its own purported ads for Telefonica, linking a misspelled company name ("Telephonica") to a dummy web page, in order to recognize revenue from the Telefonica transaction.

107.  On December 7, 2000, the day the contracts were signed, Rindner applauded the deal team's work in the following instant message exchange:

[*AOL colleague #1*]:   *Congrats to Josh for a great job under the gun.*

[*AOL colleague #1*]:   *I see a telefonica banner on e-mail. It links to web page that says nothing but "telephonica" in the middle of the page.  No graphics, no links, no nuthin!...*

[*AOL colleague #1*]:   *LOL* [laugh out loud]

[*AOL colleague #1*]:   *you da MAN*

[*AOL colleague #2*]:   *welcome to the new world of e-commerce*

[*AOL colleague #1*]:   *yesssss*

*[AOL colleague #1]:*   *I'm doing a little revenue dance at my desk now*

*[AOL colleague #2]:*   *lol* [laugh out loud]

*Rindner:*          *[AOL colleague #2] deserves an award for this one.
                    I'm not kidding.*

108.  Internally, a junior AOL employee was praised for saving the quarter with the Telefonica advertising revenue. This junior employee, who worked on the transaction with Rindner, later acknowledged that there was no real economic benefit to deals like the Telefonica transaction and that he frequently clashed with Rindner over Telefonica and similar deals.

109.  While AOL ultimately delayed revenue recognition of $5 million of the $15 million advertising revenue recorded in the quarter ended December 31, 2000, due to bonus ads running in subsequent quarters, none of the $15 million of advertising revenue should have been recognized at all since this vendor round-trip, contingent advertising deal revenue should have been netted against the network commitment contract expense.

110.  Rindner knowingly or recklessly took part in this scheme designed to artificially inflate AOL's reported online advertising revenue through the above-described improper conversion of forgone credits and rebates into purported advertising revenue. Rindner knew or was reckless in not knowing that this reported advertising revenue had no economic substance and was merely a sham return of forgone and converted credits from the network deal.

### 5.    AOL executives repeatedly complained to Kelly, Ripp, and Wovsaniker about the ad revenue gross-ups

111.  During the relevant time period, AOL's Network Operations group was responsible for purchasing the equipment and services AOL needed to run its Internet

service. As described above, in the descriptions of the Sun, Veritas, HP, and Telefonica round-trip transactions, AOL arranged to pay inflated prices for goods and services in exchange for online advertising revenue in the amount AOL overpaid.

112. Senior Network Operations executives repeatedly complained to Wovsaniker, Ripp, and Kelly about these grossed-up deals and how the payment of inflated prices negatively affected their budgets.

113. For example, in the first quarter 2001, Network Operations' new vice president of finance complained to Wovsaniker about the grossed-up transactions. The Network Operations executive was concerned that the transactions had no economic substance and told Wovsaniker that AOL ought to consider netting the transactions. If the transactions were netted, the advertising revenues would not be recognized and those amounts instead would be netted against the cost of the contingent purchase.

114. Starting in early February 2001, Ripp, while CFO of AOL, received complaints from the Network Operations group about the impact of advertising revenue gross-ups on the group. At a meeting on or about February 6, 2001, Network Operations executives gave Ripp a PowerPoint presentation describing the Veritas transaction as follows:

> •*Loading of other business unit costs into the Cost of Revenue -Advertising Revenue gross-ups*

> •*Veritas license negotiated to a $30 million 3 year unlimited license. Final contract price of $50 million dollars includes $20 million dollar ad revenue gross-up.*

> •*Other deals similarly structured include Telefonica and Sun.*

115. During this February 2001 presentation, Network Operations told Ripp that: Network Operations was concerned about the loading of other business unit costs into the

cost of operations; and, if other units could cause costs to be incurred by the Network

Operations group, it would be difficult for the Network Operations group to meet its

budget. Network Operations used the Veritas transaction as an example, telling to Ripp

that the deal could have been a $30 million software license deal, but that it ended up

being turned into a $50 million deal in order for AOL to book $20 million of advertising.

A copy of this PowerPoint presentation was found in Ripp's files.

116.   In a June 2001 meeting at AOL Time Warner offices in New York, New

York, Network Operations told Kelly about the impact the advertising revenue gross-ups

were having on the group. The Network Operations executive specifically identified and

quantified the impact of the vendor gross-up transactions, including the $20 million and

$37.5 million gross-ups from the Veritas and Sun transactions. The presentation, a copy

of which was found in Kelly's files, referenced the "Host Cost vs. Ad Revenue

Tradeoffs."

117.   Again, in an October 2001 meeting with Ripp, the Network Operations

group identified the "[c]ontinued leverage of network spend by Business Affairs

weakening ability to reduce cost" as one of two "key drivers" impacting the Network

Operations 2002 Capital Plan. The accompanying PowerPoint presentation described the

impact of these deals as constituting an "advertising surcharge" to its host cost per hour.

Kelly reviewed the PowerPoint outline in November or December 2001, after returning

to AOL as its COO.

118.   Kelly, Ripp, and Wovsaniker did not take any steps to correct the

accounting impact of these gross-ups nor did they disclose to E&Y the true, contingent

nature of these transactions. Rather, as detailed below, Kelly and Ripp provided false

and misleading representation letters to E&Y claiming that the Company's advertising revenues were being properly recognized. Wovsaniker failed to disclose to E&Y the true, contingent nature of these transactions during any of his discussions with E&Y regarding AOL's accounting, including specific inquiries by E&Y about the Sun and Veritas transactions.

### B. The Business Acquisition Transactions -- The Advertising Contracts

119. In 2001, 2002, and 2003, AOL inflated its online advertising revenue by $400 million as a result of transactions with German media company Bertelsmann, A.G.

120. In essence, BAG paid $400 million to AOL as consideration for amendments to a multi-billion-dollar agreement governing AOL's buyout of BAG's interest in AOL Europe.

121. Rather than taking the payments as a reduction in the purchase price of AOL Europe, the Company had BAG enter into online advertising contracts in amounts equal to the value of the "put/call" amendments to BAG. It then structured and accounted for the put/call amendments and advertising purchases as if they were separate, *bona fide* deals. As described below, defendants used these sham advertising deals to close the gap between its actual and projected revenues.

122. In its Form 10-K for the year ended December 31, 2004, filed in March 2005, AOL restated its financial statements to eliminate, among other things, the $400 million artificial inflation of its advertising revenues from these transactions.

### 1. **Background**

123.   AOL and BAG formed a joint venture in 1995 that created AOL Europe, which owns and operates European Internet services. In March 2000, before its merger with Time Warner, AOL agreed to purchase BAG's interest in AOL Europe in an agreement structured as a put/call option (the "put/call").

124.   Under the put/call, BAG could exercise an option to "put" its AOL Europe shares to AOL by selling those shares for $6.75 billion; AOL had an option to "call" the shares by purchasing it for $8.25 billion. BAG's put rights under the put/call had two settlement dates: January 2002 for 80% of BAG's shares, and July 2002 for the remaining 20% of BAG's shares. The put/call gave AOL the option to pay in cash or stock.

### 2. **The March and December 2001 Put/Call Amendments**

125.   Shortly after entering into the put/call, BAG tried to sell its interest in the agreement. Investment banks were unwilling to purchase BAG's interest in the put/call because of the uncertainty inherent in its terms. To reduce the uncertainty and thereby enable BAG to borrow against the put/call, BAG sought AOL's agreement to pay the put price in cash rather than in stock.

126.   In early 2001, BAG proposed to amend the put/call to require AOL to pay some or all of the $6.75 billion price in cash.

127.   BAG told Kelly that BAG would compensate AOL for the amendment with cash or a reduction in the put/call price.

128. Kelly used BAG's need for cash certainty to obtain BAG's agreement to characterize its payments for the put/call amendments as purported online advertising purchases.

129. Rather than accepting the cash or discount offered by BAG in the first quarter of 2001, Kelly proposed that BAG purchase online advertising in the amount of the value to BAG of each put/call amendment. BAG negotiators understood that AOL would not agree to the put/call amendments without the corresponding advertising deals.

130. In March 2001, in the first put/call amendment, AOL agreed to pay at least $2.5 billion in cash if BAG exercised its $6.75 billion put. In exchange, BAG agreed to sign a $125 million online advertising contract.

131. In December 2001, in the second put/call amendment, AOL agreed to pay cash for the remaining amount due when BAG exercised its put right. In exchange, BAG signed a $275 million online advertising contract.

132. Kelly, Ripp, and Wovsaniker knew during the negotiations of the put/call amendments that BAG was paying for the amendments -- which had great value to BAG -- and not for the advertising. They nevertheless structured and approved these transactions as if they were stand-alone, *bona fide* advertising purchases. Based on the transactions, they approved the recognition of $400 million in online advertising revenue.

133. Kelly negotiated the put/call amendments with BAG, including several meetings with BAG officials in New York, New York.

134. Ripp attended a key negotiation session with BAG and, along with Wovsaniker, provided advice on the value, structure, and accounting of the March and December amendment deals.

33

135. Kelly, Ripp, and Wovsaniker improperly approved recognition of the entire $400 million BAG paid for the put/call amendments as advertising revenue rather than as consideration received for amending the put/call, i.e., as a reduction in the purchase price of AOL Europe.

136. The advertising revenue the AOL division recognized from the first quarter 2001 BAG transaction was identified by Ripp as "a major factor" in helping the division meet corporate expectations about several key financial results. The division's financial results were then transmitted by Ripp's group to the parent Company in New York, New York.

137. Kelly then signed the Company's Forms 10-Q for the first and second quarters of 2001, which, together, included more than $80 million of sham advertising revenue related to the first quarter BAG deal.

138. The BAG advertising revenue also helped the Company meet or exceed targets in revenue and other key financial results and, later, to minimize any quarterly shortfalls.

139. BAG accounted for the entire $400 million as a reduction in the price of AOL Europe rather than as an advertising expense.

140. Based upon contemporaneous internal communications and negotiations with BAG in the first quarter of 2001, Kelly knew or was reckless in not knowing that the additional advertising related to the put/call amendments had little value to BAG.

141. Kelly, Ripp, and Wovsaniker knew or were reckless in not knowing that the advertising contracts associated with the put/call amendments stripped BAG of the preferred pricing and terms it enjoyed under an existing $150 million AOL advertising

34

agreement, including the means to control the content, placement, and frequency of the advertising.

142.  Throughout 2001 and the first half of 2002, Kelly, Rindner, Ripp, and Wovsaniker discussed internally how much BAG advertising revenue to recognize, based upon how much online advertising AOL needed to "close the gap" between market expectations and actual online advertising revenues. For example, a June 29, 2001 e-mail from Ripp to Kelly and Business Affairs (and forwarded to Rindner the next day), indicated, "We have had a miss in commerce and visa revenue. Looks like total ad commerce revenue is is [sic] at $760. Let me know tomroow [sic] if you need the $5 million Bag. Still don't think we should book it but Mike we should talk." The defendants used the advertising revenue to close the quarterly revenue gaps AOL faced as the online market continued to deteriorate in 2001.

143.  To conceal the significance of this sham BAG advertising to the Company's quarterly reported revenues, Kelly, Rindner, Ripp, and Wovsaniker carefully tracked their recognition of BAG advertising revenue in at least 2001 and 2002 to attempt to ensure that it would not account for more than 10% of the Company's consolidated revenue – the threshold they believed would require disclosure of this significant aspect of revenue.

144.  The sham BAG advertising artificially inflated AOL's financial results from the first quarter of 2001 through at least the end of 2003, and was reported in public statements and filings. For example, the AOL segment's advertising and commerce revenue – a key financial result that was separately reported by the Company – was materially inflated by at least $75 million in each of the first and second quarters of 2002,

and by at least $50 million in the third quarter of 2002, which materially inflated the reported advertising and commerce revenue of the AOL segment for those three quarters by an estimated range of 17% to 22%. These fraudulent financial results were included in the Company's quarterly reports filed with the Commission on Forms 10-Q on May 6, 2002, August 14, 2002, and November 14, 2002. Likewise, in the Company's earning release dated January 29, 2003, the AOL segment's advertising and commerce revenue for the fourth quarter of 2002 was materially inflated.

### C. Business Dispute Settlements Converted to Online Advertising Revenue

145. Soon after trading purchase discounts for online advertising revenue in the Sun transaction, Wovsaniker worked with others to convert settlements of business disputes with Ticketmaster Corporation and Wembley, PLC into additional online advertising revenue.

146. Ripp, Wovsaniker, and Rindner later converted settlements with WorldCom, Inc. into advertising revenue, as detailed in this Complaint.

147. In January 2003, AOL restated its financial statements, reversing online advertising revenue recognized in connection with these converted settlement transactions.

### 1. Ticketmaster & Wembley

148. In August and September 2000, Ticketmaster Corporation ("Ticketmaster") and Wembley, PLC ("Wembley") each separately agreed to settle longstanding disputes with AOL by paying AOL $12.5 million and $23.8 million, respectively.

149. The two companies offered to pay these amounts in cash to AOL to settle outstanding disputes, without regard to any advertising purchases.

150. AOL converted these settlements into online advertising revenues by having the settlement payments documented as advertising revenue. Specifically, the settlement agreements provided for mutual releases as well as the agreement of Ticketmaster and Wembley to pay AOL $12.5 million and $23.8 million, respectively, purportedly for online advertising.

151. Wovsaniker approved the terms of the transactions and the recognition of the settlement amounts as advertising revenues. Wovsaniker knowingly or recklessly assigned no value to the actual settlements of these claims, while allowing AOL to recognize the full amount of these payments as online advertising revenue, even though he knew that Wembley had acknowledged its obligation to AOL to settle the dispute and its readiness to pay approximately $25 million. Wovsaniker knew or was reckless in not knowing that an assignment of no value to the settlements was not in conformity with GAAP.

152. During E&Y's quarterly audit review, Wovsaniker discussed with E&Y the structure and accounting issues concerning the Ticketmaster and Wembley transactions. Wovsaniker did not, however, disclose to E&Y material facts regarding the transactions, including that Wembley had agreed to pay $25 million to settle its dispute with AOL.

153. In an internal AOL September 2000 e-mail, a Business Affairs executive described the Ticketmaster advertising revenue as "crap", told his team that hitting AOL's advertising revenue targets was all that mattered, and directed them to run the advertising impressions as soon as possible.

154. In or around late January or early February 2001, Rindner and other Business Affairs executives and employees were told in a series of e-mails that their team

37

ran worthless advertising without Wembley's knowledge or input to help make AOL advertising revenue numbers. Rindner also knew his team created artwork for Wembley ads and linked it to "dummy" web pages.

### 2.  WorldCom, Inc.

155. In two transactions with WorldCom, Inc. ("WorldCom"), AOL inflated its online advertising revenues by $34.2 million and $17 million in the second and fourth quarters of 2001, respectively.

156. These WorldCom transactions were not true advertising purchases, but rather, as WorldCom contemporaneously described the fourth quarter transaction, they were "money changing schemes" to help AOL meet its online advertising revenue targets.

157. Under these arrangements, AOL agreed to pay WorldCom for amounts that AOL had previously accrued as payable to WorldCom but which WorldCom had agreed to waive. AOL agreed to pay these waived amounts in exchange for WorldCom's entry into advertising agreements with AOL in the amount of the forgiven obligations. AOL's recognition of the waived payable amounts as advertising revenue was not in conformity with GAAP.

### a.  June 2001

158. In June 2000, AOL served WorldCom with a notice demanding that UUNET (a WorldCom subsidiary) reduce modem service fees based on market-pricing provisions of an existing contract between AOL and UUNET. In subsequent payments to UUNET, AOL withheld the amounts it believed it was entitled to under those provisions, but continued to accrue for the full amount in case UUNET prevailed in the matter.

159.  During the negotiations to restructure the modem service agreement in the first and second quarters of 2001, the amount accrued by AOL continued to increase.  As of the end of June 2001, AOL had accrued $39.2 million for modem service costs withheld from payments to UUNET under dispute.

160.  As part of the agreement to restructure the modem service agreement, AOL agreed to extend the agreement, forgo certain discounts, and pay WorldCom only $5 million of the amount it had withheld for the market-pricing dispute.  WorldCom agreed to these changes.

161.  Instead of reversing the $39.2 million accrual and paying WorldCom $5 million, AOL agreed to pay WorldCom the entire $39.2 million in return for WorldCom's agreement to pay AOL $34.2 million for online advertising in June 2001, thereby enabling AOL to inflate its online advertising revenue.

162.  During the negotiations, as the difference between the rate AOL was paying for the modems and the rate WorldCom was billing per the contract increased with the passage of time, AOL obtained WorldCom's agreement to a corresponding increase in the purported online advertising purchase.

163.  Ripp attended strategy meetings where AOL negotiators discussed the transaction, and he understood that WorldCom had accepted AOL's offer to pay only $5 million to settle the dispute from February through June 2001.  Based upon his participation in these meetings and discussions with deal team members, Ripp knew the details of the transaction and understood that the waived market-pricing disputed amount would be converted (minus $5 million) into an online advertising sale to WorldCom. Ripp approved the transaction and revenue recognition for the arrangement.

164. Wovsaniker was consulted and provided advice on the transaction from approximately April through June 2001. Based upon these consultations, he understood that the advertising deal was contingent on the restructured network deal and the settlement of the pricing dispute, but nevertheless approved the structure and accounting for this transaction that was not in conformity with GAAP.

165. AOL's internal deal summary, reviewed by Wovsaniker, Ripp, and others, disclosed the agreement to pay $39.2 million but not the contingent $34.2 million ad contract. The "Deal Economics" section disclosed the $39.2 million payment as a settlement, but failed to disclose the actual agreement to pay only $5 million to settle and the subsequent agreement to pay an additional $34.2 million in return for a $34.2 million advertising deal.

166. Rindner knew or was reckless in not knowing that WorldCom did not want or need this advertising. Contemporaneous e-mails sent or received by Rindner showed that WorldCom delayed its agreement to the advertising piece of the round-trip until it had extracted concessions from AOL. As a result, and in order to recognize revenue from this deal in the second quarter of 2001, Rindner ran advertising for WorldCom in June 2001, even before WorldCom agreed to enter into an advertising contract.

167. In or after July 2001, Wovsaniker learned E&Y was auditing the WorldCom network deal and had asked the Company to identify comparable costs to support the accounting. Wovsaniker did not disclose to E&Y the true, contingent nature of the transaction. He also failed to disclose the agreement by AOL to pay the otherwise waived penalty as part of the restructured network deal and WorldCom's agreement to purchase advertising for the same amount.

**b.    December 2001**

168.    During 2001, CompuServe Europe, a wholly owned subsidiary of AOL
Europe, experienced difficulties in meeting purchase commitments with UUNET, a
subsidiary of WorldCom. Failure to meet purchase commitments triggered penalties to
be paid to WorldCom under the contract. By the fall of 2001, AOL Europe owed an
estimated $17 million in penalties to WorldCom and AOL Europe had accrued a $17
million liability in anticipation of the penalty payment. AOL projected that the penalty
amount due to WorldCom would grow to $25 million by the end of 2001.

169.    In negotiations with AOL in or about the fall of 2001, WorldCom agreed to
waive $17 million in penalties in exchange for AOL adding a third year to its two-year
voice/data contract for the Time Warner units. As documented in contemporaneous
internal AOL e-mails, Rindner, Ripp, Wovsaniker, and others considered ways to convert
this waived penalty payment into online advertising revenue for AOL.

170.    In or about the fall of 2001, Rindner, Ripp, Wovsaniker, and others decided
that AOL would pay the waived penalty in exchange for WorldCom entering into an
advertising agreement in a like amount. WorldCom repeatedly told Rindner and others in
response that it did not want or need any additional online advertising.

171.    WorldCom understood the fraudulent nature of the advertising deal, but
agreed to again help AOL, as described in a November 5, 2001 WorldCom e-mail:

> *We are issuing $17 million in credits on the . . . deal. If you
> want $17 million in advertising, then pay $17 million instead of
> the credit and we will place ads, even though we don't need them.
> If you want $20 million in advertising, then pay $17 million
> instead of the credit, pay another $3 million and we will place
> ads, even though we don't need them. If you want $25 million in
> advertising, then pay $17 million instead of the credit, pay
> another $8 million and we will place the ads, even though we*

*don't need them. etc, etc . . . this has turned into a money*
*changing scheme and it can't continue . . . .*

172. AOL and WorldCom agreed to a round-trip transaction, where AOL agreed
to pay the $17 million penalty accrued by AOL that WorldCom previously offered to
waive, in exchange for WorldCom's agreement to an additional $17 million advertising
deal. As the actual shortfall and related penalty amount could not be determined until
after the calendar year-end, Rindner and others agreed to review the actual penalty in
excess of $17 million (then estimated to be $25 million) with WorldCom in January
2002. WorldCom agreed to also waive that amount, once determined, and incorporate
that value into another round-trip deal in a similar manner – namely, AOL would pay the
amount waived in exchange for another purported advertising sale.

173. Rindner, together with others, structured and negotiated the transaction,
including drafting e-mails for his boss's use in his negotiations with WorldCom and
directly negotiating with his counterpart at WorldCom, receiving e-mails such as the
November 5, 2001 e-mail referenced above, supervising the internal approval process for
the advertising deal summary, and signing the advertising contracts. Rindner therefore
knew or was reckless in not knowing that the deal summary did not reflect the true nature
of the parties' agreement – that is, that the $17 million advertising purchase was merely a
return of a $17 million penalty payment that WorldCom had waived. Rindner
nevertheless directed the drafting of the deal documents and summaries as if there were
separate, *bona fide* transactions, with AOL Europe paying $17 million of the shortfall
owed by CompuServe, AOL agreeing to extend the voice/data deal for one year, and
WorldCom entering a purportedly independent $17 million online advertising purchase
with AOL.

174. Rindner was also charged with the responsibility of obtaining WorldCom's agreement to waive the full estimated penalty ($25 million) and return that amount to AOL in the form of purported advertising purchases.

175. Ripp and Wovsaniker helped engineer and ultimately approved the final structure and accounting for the deal. Ripp and Wovsaniker advised on possible deal structures, discussed AOL's efforts to obtain online advertising revenue, knew that WorldCom did not want or need any additional AOL online advertising, and understood that AOL would pay the waived penalty and get the money back in advertising revenue. Ripp and Wovsaniker knowingly or recklessly approved the final structure and accounting for the deal, in which AOL agreed to pay the $17 million accrued penalty that had been waived and, under a simultaneous and purportedly separate agreement, WorldCom purchased $17 million in advertising from AOL. AOL's recognition of this $17 million as advertising revenue was not in conformity with GAAP.

176. In contemporaneous e-mail discussions about obtaining ad revenue instead of a reduction of the penalty, Ripp and Wovsaniker were told that WorldCom was "advertised out" and "loath to put more ad spend on [AOL]."

177. In or around the fall of 2001, Ripp and Wovsaniker also learned that WorldCom agreed to waive any penalty amount over $17 million, once that amount could be determined in January 2002, and agreed that AOL would pay the amount waived in exchange for WorldCom "purchasing" advertising in the same amount.

178. In or about November 2001, Wovsaniker told a junior AOL executive not to document this side agreement. As such, AOL ran the risk that in January 2002 WorldCom would not agree to "true-up" the shortfall amount, and then attempt to

terminate the contract for breach by AOL for failure to pay the entire shortfall. Ripp had sign-off responsibility for this risk and approved the Company's entry into the deal without any documentation of the side agreement.

179. In January 2002, the final amount of the penalty was determined to include an additional $10 million, which had been waived in principle as part of the December 2001 agreement. Business Affairs explored receiving a credit from WorldCom in return for paying the $10 million penalty. Wovsaniker advised Business Affairs not to send external communications that would link the additional $10 million penalty and the credits, because the linkage could lead AOL's outside auditors to question the transaction.

180. Based on the foregoing, Rindner, Ripp, and Wovsaniker knew the contracts and final deal summaries did not reflect: WorldCom's agreement to waive the $17 million penalty in exchange for the one-year contract extension; that the payment by AOL was made in exchange for the $17 million advertising deal; and WorldCom's agreement to resolve the actual additional shortfall penalty by buying online advertising in the same amount.

### False and Misleading Management Representation Letters

181. Kelly signed materially false and misleading management representation letters that were provided to E&Y, including a March 22, 2001 letter to E&Y regarding the Company's consolidated financial statements for the three years ended December 31, 2000, and an April 15, 2002 letter to the Company's CFO Wayne Pace regarding AOL's financial information for the period ended March 31, 2002.

182.  Ripp signed materially false and misleading management representation
letters that were provided to E&Y, including an April 11, 2001 letter to E&Y regarding
AOL's financial information included in the Company's Form 10-Q for the period ended
March 31, 2001; a January 28, 2002 letter sent to E&Y regarding AOL's consolidated
financial statements for the three years ended December 31, 2001; an April 15, 2002
letter sent to E&Y regarding AOL's financial information included in the Company's
Form 10-Q for the period ended March 31, 2002; and an October 22, 2002 letter sent to
AOL Time Warner executives regarding AOL's financial information included in the
Company's Form 10-Q for the period ended September 30, 2002.

183.  In the foregoing management representation letters, Kelly and Ripp each
represented, among other things, that:

> •the Company's financial statements had been prepared
> in conformity with GAAP;

> •"Revenue recognition for advertising and electronic
> commerce agreements is based upon the substance of the goods
> and services to be provided by the Company and results in a
> fair and reasonable allocation of the total consideration to the
> goods and services delivered" ; and

> •"Revenue and related expense associated with
> contracts involving barter have been appropriately recorded
> using the fair value of the consideration received or to be
> received . . . . The valuations obtained by the Company (and
> provided to you) for certain barter transactions represent our
> best estimate of the value received and given up in those
> circumstances."

### Fraudulent Concealment

184.  By the means alleged in this Complaint, each of the defendants took part in
a scheme designed to create fraudulently inflated advertising revenue that was reported to
the public and took affirmative steps to conceal the true nature of the fraudulent

transactions described in this Complaint by, among other means, structuring and accounting for the substantive and advertising components of the transactions as if they were separate, *bona fide* deals rather than contingent, round-trip arrangements. Additionally, Wovsaniker and Rindner instructed Business Affairs negotiators to delete or omit any cross-references to the transactions in the contracts and transaction summaries. Rindner also instructed a subordinate not to speak to AOL's accounting personnel about one particular transaction.

185. The Company, through the actions of Kelly, Ripp, Wovsaniker, and others, also took additional affirmative steps to conceal the fraudulent nature of the sham transactions described in this Complaint. For example: (1) in discussions with E&Y, the Company's external auditor, Kelly, Ripp, and Wovsaniker misrepresented or omitted material information about the transactions described above, including details about their contingent nature and the fact that, in substance, they were round-trips dependent on AOL funding its own revenues; (2) Kelly and Ripp signed and submitted false confirmations to auditors; (3) the Company publicly denied allegations contained in Washington Post articles published in July 2002 questioning AOL's accounting for certain of the transactions; (4) in response to the Washington Post articles, on July 18, 2002, Kelly and Ripp sent an e-mail to all AOL employees, stating that "We are writing to reassure you that AOL has no 'accounting issues' . . . and we are confident that our accounting, as well as our business practices generally, are fair and appropriate"; and (5) at the behest of Kelly and Ripp, on June 21, 2002, an E&Y partner sent a letter to the Company, intended for public dissemination, stating "We stand by our original view that

the accounting and related financial statement disclosures for those transactions were appropriate and in accordance with Generally Accepted Accounting Principle[s]".

186.   The Company's first public acknowledgement that its financial statements for 2000 and 2001 could no longer be relied upon was delivered on October 23, 2002. The subsequent first restatement occurred three months later on January 28, 2003, when the Company restated its financial results for 2000, 2001, and 2002 to reverse $190 million in principally online advertising revenue.

### Tolling Agreements

187.   Kelly and the Commission entered into tolling agreements, which tolled the running of any applicable statute of limitations from March 23, 2006 through March 31, 2007.

188.   Rindner and the Commission entered into tolling agreements, which tolled the running of any applicable statute of limitations from December 20, 2005 through July 31, 2007.

189.   Ripp and the Commission entered into tolling agreements, which tolled the running of any applicable statute of limitations from March 22, 2006 through March 31, 2007.

190.   Wovsaniker and the Commission entered into tolling agreements, which tolled the running of any applicable statute of limitations from January 12, 2006 through January 31, 2007.

### Defendants Profited From Their Misconduct

191.   Kelly profited by selling AOL stock at prices inflated by the fraud and by receiving bonuses from AOL based on AOL's artificially inflated financial results. Kelly

sold the AOL stock at a time when he knew about the fraud, but other AOL shareholders did not.

192.   Rindner profited by selling AOL stock at prices inflated by the fraud and by receiving bonuses and commissions from AOL based on AOL's artificially inflated financial results.  Rindner sold the AOL stock at a time when he knew about the fraud, but other AOL shareholders did not.

193.   Ripp profited by selling AOL stock at prices inflated by the fraud above and by receiving bonuses from AOL based on AOL's artificially inflated financial results.  Ripp sold the AOL stock at a time when he knew about the fraud, but other AOL shareholders did not.

194.  Wovsaniker profited by selling AOL stock at prices inflated by the fraud and by receiving bonuses from AOL based on AOL's artificially inflated financial results.  Wovsaniker sold the AOL stock at a time when he knew about the fraud, but other AOL shareholders did not.

### CLAIMS FOR RELIEF

### FIRST CLAIM
### (Fraud Violations – Offer or Sale of AOL Stock)

### Violations of Section 17(a) of the Securities Act by All Defendants

195.   Paragraphs 1 through 194 are realleged and incorporated herein by reference.

196.   By engaging in the conduct alleged above, defendants Kelly, Rindner, Ripp, and Wovsaniker, directly or indirectly, knowingly, recklessly or negligently, by use of the means or instruments of transportation or communication in interstate commerce or of the mails, in connection with the offer or sale of AOL securities: (a) employed devices,

schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material facts or omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers of the Company's securities.

197.    By reason of the foregoing, defendants Kelly, Rindner, Ripp, and Wovsaniker violated, and unless restrained will violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM
### (Fraud Violations – Purchase or Sale of AOL Stock)

#### Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 by All Defendants

198.    Paragraphs 1 through 194 are realleged and incorporated herein by reference.

199.    By engaging in the conduct alleged above, defendants Kelly, Rindner, Ripp, and Wovsaniker, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of a national exchange, in connection with the purchase or sale of AOL securities, knowingly, recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon any person.

200. By reason of the foregoing, defendants Kelly, Rindner, Ripp, and Wovsaniker violated, and unless restrained will violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

### THIRD CLAIM
### (Fraud Violations – Aiding and Abetting AOL's Fraud Violations)

### Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 by All Defendants

201. Paragraphs 1 through 194 are re-alleged and incorporated by reference. As set forth above, AOL, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of a national securities exchange, in connection with the purchase or sale of AOL securities: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon any person.

202. By engaging in the conduct alleged above, defendants Kelly, Rindner, Ripp, and Wovsaniker, knowingly or recklessly provided substantial assistance to AOL in its violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5. By reason of the foregoing, defendants Kelly, Rindner, Ripp, and Wovsaniker aided and abetted AOL's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] and, unless restrained, will continue to aid and abet these violations.

## FOURTH CLAIM
### (Record-Keeping Violations)

**Violation of Exchange Act Rule 13b2-1 by All
Defendants**

203.   Paragraphs 1 through 194 are re-alleged and incorporated by reference.
By engaging in the conduct alleged above, defendants Kelly, Rindner, Ripp, and
Wovsaniker, directly or indirectly, falsified or caused to be falsified books, records, and
accounts of AOL subject to Section 13(b)(2)(A) of the Exchange Act.

204.   By reason of the foregoing, defendants Kelly, Rindner, Ripp, and
Wovsaniker violated, and unless restrained, will violate, Exchange Act Rule 13b2-1 [17
C.F.R. § 240.13b2-1].

## FIFTH CLAIM
### (Books and Records Violations)

**Violations of Section 13(b)(5) of the Exchange Act by
Defendants Kelly & Wovsaniker**

205.   Paragraphs 1 through 194 are re-alleged and incorporated by reference.

206.   By engaging in the conduct alleged above, defendants Kelly and
Wovsaniker, directly or indirectly, knowingly falsified or caused to be falsified books,
records, and accounts of AOL subject to Section 13(b)(2)(A) of the Exchange Act.

207.   By reason of the foregoing, defendants Kelly and Wovsaniker violated, and
unless restrained will violate, Section 13(b)(5) of the Exchange Act [15 U.S.C.
§ 78m(b)(5)].

## SIXTH CLAIM

### (Lying to Auditors Violations)

### Violations of Exchange Act Rule 13b2-2 by Defendants
### Kelly and Wovsaniker

208. Paragraphs 1 through 194 are realleged and incorporated herein by reference.

209. By engaging in the conduct alleged above, defendants Kelly and Wovsaniker, directly or indirectly, made or caused to be made materially false or misleading statements or omissions to an accountant or auditor.

210. By reason of the foregoing, defendants Kelly and Wovsaniker violated, and unless restrained will violate, Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## SEVENTH CLAIM
### (Reporting Violations)

### Aiding and Abetting Violations of Section 13(a) and 13
### (b)(2)(A) of the Exchange Act and Exchange Act Rules
### 12b-20, 13a-1, 13a-11, 13a-13, and 13b2-1 by All
### Defendants

211. Paragraphs 1 through 194 are re-alleged and incorporated by reference.

212. As set forth above, AOL violated Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and Exchange Act Rules 12b-20, 13a-1, 13a-11, 13a-13, and 13b2-1 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, and 240.13b2-1].

213. By engaging in the conduct alleged above, defendants Kelly, Rindner, Ripp, and Wovsaniker, knowingly or recklessly provided substantial assistance to AOL in its violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C.

§§ 78m(a) and 78m(b)(2)(A)] and Exchange Act Rules 12b-20, 13a-1, 13a-11, 13a-13, and 13b2-1 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, and 240.13b2-1].

214.   By engaging in the conduct alleged above, defendants Kelly, Rindner, Ripp, and Wovsaniker aided and abetted AOL's violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and Exchange Act Rules 12b-20, 13a-1, 13a-11, 13a-13, and 13b2-1 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, and 240.13b2-1] and, unless restrained, will continue to aid and abet these violations.

**REQUEST FOR RELIEF**

The Commission respectfully requests that the Court enter an Order:

(i)      Permanently restraining and enjoining defendant Kelly from violating, directly or indirectly, Section 17(a) of the Securities Act, Sections 10(b) and 13(b)(5) of the Exchange Act, and Exchange Act Rules 10b-5, 13b2-1, and 13b2-2, and from aiding and abetting violations of Sections 10(b), 13(a), and 13(b)(2)(A) of the Exchange Act and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, and 13b2-1;

(ii)     Permanently restraining and enjoining defendant Rindner from violating, directly or indirectly, Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rules 10b-5 and 13b2-1 and from aiding and abetting violations of Sections 10(b), 13(a), and 13(b)(2)(A) of the Exchange Act and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, and 13b2-1;

(iii)    Permanently restraining and enjoining defendant Ripp from violating, directly or indirectly, Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rules 10b-5 and 13b2-1, and from aiding and abetting violations of Sections 10(b), 13(a), and 13(b)(2)(A) of the Exchange Act and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, and 13b2-1;

(iv)    Permanently restraining and enjoining defendant Wovsaniker from violating, directly or indirectly, Section 17(a) of the Securities Act, Sections 10(b) and 13(b)(5) of the Exchange Act and Exchange Act Rules 10b-5, 13b2-1, and

13b2-2, and from aiding and abetting violations of Sections 10(b), 13(a), and 13(b)(2)(A) of the Exchange Act and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, and 13b2-1;

(v)    Ordering all defendants to disgorge ill-gotten gains, including pre-judgment and post-judgment interest, resulting from the violations alleged in this Complaint;

(vi)    Ordering all defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] ; and

(vii)    Ordering that all defendants, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e) under Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], are prohibited from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

(viii)   Granting such other relief as the Court deems just and appropriate.

Dated:  May 19, 2008

Respectfully submitted,

Richard Hong (Trial Counsel) (RH – 4939)
Scott W. Friestad
David Frohlich
Melissa A. Robertson
Jeffrey B. Finnell
Thomas D. Manganello
Richard E. Simpson (RS -  5859)

Attorneys for Plaintiff
Securities and Exchange Commission
100 F. Street, N.E.
Washington, DC  20549-0911
Tel:   (202) 551-4431 (Hong)
Fax:   (202) 772-9246 (Hong)
E-mail: hongr@sec.gov