Mark J. Hulkower
Jonathan C. Drimmer
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036-1795
(202) 429-3000

Attorneys for Defendant
Steven E. Rindner

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| _____ )<br>SECURITIES AND EXCHANGE COMMISSION, )<br>                      )<br>          Plaintiff,     )<br>                      )<br>          v.           )<br>                      )<br>                      )<br>JOHN MICHAEL KELLY, STEVEN E. )<br>RINDNER, JOSEPH A. RIPP, and )<br>MARK WOVSANIKIER, )<br>                      )<br>          Defendants.    )<br>_____ ) | No. 08 Civ. 4612 (SWK) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT STEVEN E. RINDNER'S MOTION TO SEVER AND**
**TRANSFER CASE TO THE EASTERN DISTRICT OF VIRGINIA**

**I.  Introduction**

For the better part of this decade, the federal government, including the Securities and

Exchange Commission ("SEC"), has been unsuccessfully seeking to hold former executives of

America Online, Inc. ("AOL") liable for securities fraud. After the government suffered

resounding trial defeats in related cases in appropriate venues – the Eastern District of Virginia

and the District of Columbia – the SEC now looks to a third jurisdiction in the hopes of finding a friendly forum for its twice-rejected claims.

The decision to file this action against Steven Rindner in the Southern District of New York constitutes improper forum-shopping of the most obvious sort. The Complaint against Mr. Rindner does not allege that he committed a single act in this district. Each and every act by him is alleged to have occurred in the Eastern District of Virginia; nearly all at AOL's headquarters in Dulles, Virginia, where Mr. Rindner (like most of the other defendants) worked. Similarly, most key witnesses for Mr. Rindner, and almost assuredly for the SEC against Mr. Rindner, are located within 100 miles of the Eastern District of Virginia. Not one of Mr. Rindner's primary witnesses, and likely few or none of the SEC's important witnesses against Mr. Rindner, are located in or around the Southern District of New York. Mr. Rindner himself currently works in, and lives near, the Eastern District of Virginia. Mr. Rindner's attorneys, and the SEC lawyers assigned to the case, all live in or work near the Eastern District of Virginia. In short, every salient fact – alleged in the Complaint and outside of it – ties Mr. Rindner's case to the Eastern District of Virginia. *See Dealtime.com Ltd. v. McNulty*, 123 F. Supp. 2d 750, 754-55 (S.D.N.Y. 2000).

While the SEC may fear returning to the scene of a stinging defeat in a related case, the Eastern District of Virginia is clearly the appropriate locale to bring Mr. Rindner to trial. He respectfully requests that his case be transferred there, and severed as necessary to accomplish that transfer.[1]

---

[1] Alternatively, the case legitimately could be transferred to the District of Columbia. The SEC filed its related action against AOL-Time Warner in the District of Columbia, *SEC v. Time Warner, Inc.*, No. 05-0578; Mr. Rindner works and lives within 100 miles of the District of Columbia; his key witnesses are within 100 miles of the District of Columbia; all acts alleged against Mr. Rindner occurred within 100 miles of the District of Columbia; and the SEC is

## II.    Factual Background

### A.  Location of Relevant Events

Defendant Steven Rindner presently works in Arlington, Virginia, and lives in nearby Potomac, Maryland.  From December 1999 until February 2003, Mr. Rindner worked at AOL in its Dulles, Virginia headquarters.  At all times relevant to the allegations in the Complaint, Mr. Rindner worked in the Business Affairs unit of AOL.

The Complaint focuses on AOL advertising transactions with eight counterparties in which Business Affairs played a role – Sun, Wembley/Ticketmaster, Veritas, Hewlett-Packard ("HP"), Telefonica, WorldCom and Bertelsmann – all of which were largely, if not entirely, structured and negotiated by AOL in Dulles.  *See* AOL's Rule 21(a) Reports filed Oct. 23, 2002, Nov. 15, 2002, Nov. 22, 2002, Nov. 27, 2002, Dec. 13, 2002 and Feb. 28, 2003 (listing deal employees) (cover pages attached hereto as Ex. 1).[2]  The Complaint mentions Mr. Rindner, at times peripherally, in connection with deals involving seven of those counterparties.[3]

---

located in the District of Columbia.  In *SEC v. Johnson*, Civ. Action No. 05-36 (GK), another related proceedings brought in the District of Columbia, the SEC argued strenuously and successfully in favor of the District of Columbia as the proper forum.  That case involved two employees of AOL and three from a Nevada-based AOL partner; while no acts were alleged to have taken place in the District of Columbia, Judge Gladys Kessler nonetheless found venue to be proper.  Certainly, the ties to the District of Columbia are as strong here as they were in *Johnson*.  Indeed, as the SEC still has a related pending case in the District of Columbia before Judge Kessler, who also presided over *SEC v. Time Warner, Inc.*, the District of Columbia is also a more logical venue than this one.

[2] To avoid burdening this Court, Mr. Rindner has not attached each document cited herein.  The documents not attached are in the possession of the SEC or publicly available, and if this Court wishes to review them, will be filed under separate cover.

[3] The SEC does not allege that Mr. Rindner participated in, or had any knowledge of, the Sun transaction.  The Complaint also names Mr. Rindner only nominally in connection with some of the other transactions.  Mr. Rindner repeatedly has requested that the SEC identify which transactions it is relying on for its claims against him, but the SEC has not responded.

At all times relevant to this action, Mr. Rindner's primary job responsibility was to manage the Business Affairs "pipeline." *See, e.g.*, *United States v. Wolff*, CR 05-0398 PA, Reporter's Transcript of Proceedings, Apr. 26, 2006. That involved monitoring the status of AOL's advertising transactions with third parties and reporting on their status to AOL's accounting, finance and legal departments. *See id.*

The vast majority of the Rindner-specific allegations reflect that limited role. On the deals with three of the counterparties, the Complaint only alleges that Mr. Rindner sent or received an e-mail about the deal after it had closed. With respect to Veritas, Rindner is alleged to have "sent an e-mail to a Business Affairs employee (with a copy to [Defendant Mark] Wovsaniker)" on January 17, 2001. Compl. ¶ 78. That unnamed Business Affairs employee is Jim Patti, who, like Messrs. Rindner and Wovsaniker, worked at AOL's Dulles headquarters. *See* AOL Business Affairs/Corp Dev Department Phone List, Dec. 4, 2000 (attached hereto as Ex. 2); e-mail from S. Rindner to J. Patti, dated Jan. 17, 2001 (attached hereto as Ex. 3). The SEC also alleges that Mr. Rindner received an e-mail about the HP deal in December 2001, more than a year after the deal was executed. Compl. ¶ 93. That e-mail was sent by a "member of the AOL negotiating team" named Jeff Tyeryar, who worked in AOL Business Affairs in Dulles. *See* AOL Business Affairs and Development Office Phone Numbers, Locations, Jul. 18, 2001 (attached hereto as Ex. 4); e-mail from J. Tyeryar to E. Prince, S. Rindner, dated Dec. 14, 2001 (attached hereto as Ex. 5). In addition, on Wembley, the complaint alleges that Mr. Rindner received a series of e-mails about the "true" nature of the transaction. Compl. ¶ 154. Again, all of the individuals included on these e-mails – Greg Rigdon and Eric Keller (both in Business Affairs) as well as Diana Dunbar – worked at AOL's Dulles headquarters. *See, e.g.*, AOL Business Affairs and Development Office Phone Numbers, Locations, Jul. 18, 2001; BA/Corp

Dev Dept. List; e-mail from S. Rindner to E. Keller, G. Rigdon, D. Dunbar, dated Feb. 2, 2002 (attached hereto as Ex. 6).

Regarding the remaining deals, Mr. Rindner's alleged involvement likewise occurred in or around Dulles, Virginia. On Bertelsmann, Mr. Rindner is alleged to have participated in internal discussions about the gap between company revenue targets and actual revenue, and tracked the amount of Bertelsmann revenue. Compl. ¶¶ 142-43. Such conduct would be consistent with Mr. Rindner's normal pipeline responsibilities, which he at all times discharged in Dulles. On WorldCom, the SEC alleges, among other things, that Mr. Rindner interacted with "his counterpart at WorldCom." Compl. ¶ 173.[4] That "counterpart" was Victoria Harker, who worked at the time at MCI headquarters in nearby Arlington, Virginia. *See, e.g.,* e-mail from S. Rindner to V. Harker, dated Nov. 21, 2001 (attached hereto as Ex. 7); *see also* http://www.zoominfo.com (Victoria Harker resumé).

With respect to the Telefonica deal, Mr. Rindner is alleged to have negotiated and documented the transaction (Compl. ¶¶ 103-04), which he would have done from Dulles, and instructed Dulles-based Jim Patti to make certain promises to Telefonica (Compl. ¶105). The SEC also contends that Mr. Rindner participated in a purportedly revealing instant message exchange about the deal with three AOL lawyers – Josh Resnick, Brian Heller and Karen Litsinger – all of whom, like Mr. Rindner, worked at AOL's Dulles campus.[5] *See* Instant

---

[4] The complaint also alleges that Mr. Rindner wrote e-mails to his boss (David Colburn, the head of Business Affairs, who also worked in Dulles) about the WorldCom transaction and directed the drafting of deal documents.

[5] The same is largely true of the other defendants. At all relevant times, Mark Wovsaniker worked at AOL's Dulles, Virginia campus. *See, e.g.*, Wovsaniker Dep. 36:5-37:6, *In re AOL Time Warner, Inc. & "ERISA" Shareholder Litig.*, MDL Docket No. 1500, 02 Civ. 5575 (SWK), Jul. 24, 2006 (attached hereto as Ex. 12). Similarly, Joseph Ripp was based in Dulles during the period of time in which the SEC takes issue with his conduct. *See, e.g.*, http://www.marketwatch.com/news/story/aol-appoints-time-warner-executive/

Message exchange, dated Dec. 7, 2000 (attached hereto as Ex. 8); *see also*, *e.g.*, Siobhan Roth, "Work Hard, Have Fun, Get Rich," *Legal Times*, Aug. 14, 2000.

### B. Location Of The Relevant Witnesses

Like Mr. Rindner, the key witnesses in his case worked in AOL's headquarters in Dulles, Virginia, and most continue to reside in that area. That includes the individuals who structured and negotiated the deals in question.[6] It also includes a significant majority of the other individuals who have been identified by AOL to the SEC as the "deal employees" on the transactions at issue.[7] Also located in the Northern Virginia area at the time were most of the McLean-based Ernst & Young accountants who audited AOL's financial statements.[8] It is from that universe that the majority of Mr. Rindner's witnesses, and presumably the SEC's witnesses against him, will come.

---

story.aspx?guid=%7B2FE10438%2DEE80%2D4EB1%2D8027%2D74F47455A098%7D. And with the exception of the 10 months that John Michael Kelly worked at AOLTW headquarters in New York, he too worked on AOL's Virginia campus. *See* Kelly Dep. 29:13-32:14, *In re AOL Time Warner, Inc. & "ERISA" Shareholder Litig.*, MDL Docket No. 1500, 02 Civ. 5575 (SWK), Jul. 26, 2006 (attached hereto at Ex. 13).

[6] That group includes David Colburn, Eric Keller, James MacGuidwin, and Jay Rappaport—the four AOL executives who settled with the SEC to a contemporaneously-filed complaint containing allegations about the same transactions. *See* Complaint, *SEC v. Colburn*, 08 CV 4611, filed May 19, 2008.

[7] These include Brian Heller, Adam Lehman, Karen Litsinger, Geraldine MacDonald, Jim Patti, Edward Prince, Greg Rigdon, Jeff Tyeryar, and John Underwood. *See, e.g.*, http://www.linkedin.com.

[8] That includes Gregory Beams, Stephen Hurst, and Harry Edward Paul. *See* Beams Dep. 11:16-12:3, 12:22-13:2, *In re AOL Time Warner, Inc. & "ERISA" Shareholder Litig.*, MDL Docket No. 1500, 02 Civ. 5575 (SWK), Jun. 15, 2006 (attached hereto as Ex. 14); Hurst Dep. 22:19-25, *In re AOL Time Warner, Inc. & "ERISA" Shareholder Litig.*, MDL Docket No. 1500, 02 Civ. 5575 (SWK), Jul. 11, 2006 (attached hereto as Ex. 15).

### C.  The Prior Government Defeats

In 2005, the government brought three cases against AOL or its employees arising from interactive marketing relationships with third parties.  In the Eastern District of Virginia, the DOJ prosecuted two former AOL executives and a senior executive of an AOL business partner in a criminal securities fraud action.  *See United States v. Benyo*, Crim. No. 1:05CR12.  In February 2007, all three defendants were acquitted.  *See* Carrie Johnson, "3 Acquitted in Lengthy AOL Trial: Emotional Victory is Blow to Federal Prosecutors," *Wash. Post*, Feb. 7, 2007, at D1.

In the District of Columbia, the SEC filed two complaints, one against AOL Time Warner ("AOLTW") (*SEC v. Time Warner, Inc.*, No. 05-cv-578), and one against two former AOL executives and three employees of an AOL business partner (*SEC v. Johnson*, No. 05-cv-36 (GK)).  As the SEC argued at the time, the two cases were related because AOL's interactive marketing relationships with certain partners in 2000-2002 created common issues of fact and arose out of the same general events.  *See* SEC's Notice of Designation of Related Civil Cases, filed March 21, 2005 in *SEC v. Time Warner, Inc.*, No. 05-0578 (attached hereto as Ex. 9).  Both cases were assigned to Judge Gladys Kessler.

The case against the Company quickly settled.  The case against the individual defendants, however, ended with a well publicized trial loss for the Government.  *See* "Two Cleared of Fraud Charges," *Wash. Post*, Apr. 25, 2008, at D4.  Three of the defendants, including a former member of AOL's Business Affairs unit, went to trial in March 2008.  Two of those defendants, including the AOL employee, were found not liable on all charges.  The third defendant was found liable on just one of four counts.  The two remaining defendants, including one former AOL employee, are yet to be tried before Judge Kessler.  Accordingly, despite its resolute efforts to impose civil and criminal liability on former AOL employees, to date the

government has lost every count against all former AOL employees who have contested the charges against them arising from marketing relationships with partner entities.

Undeterred by its sad track record, and the lack of any connection between Mr. Rindner and this forum, the SEC filed this case in the Southern District of New York on May 19, 2008.  It did so after nearly seven years of investigation, and two and a half years after first notifying the defendants of its intention to bring suit.  Even after filing its Complaint, the SEC did not serve the Complaint for almost six weeks, despite Mr. Rindner's repeated indications that he was willing to waive service of process within days of the Complaint's filing.

III.    **Argument**

    **A.  Applicable Legal Principles**

Section 1404 of Title 28 of the United States Code provides:  "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  The purpose of § 1404(a) "is to prevent waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense."  *ZPC 2000 v. The SCA Group, Inc.*, 86 F. Supp. 2d 274, 278 (S.D.N.Y. 2000) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964)) (internal quotation marks omitted).  Courts look to "notions of convenience and fairness" in determining whether to transfer a case.  *Dealtime.com*, 123 F. Supp. at 754.

In deciding a motion to transfer venue, courts consider the following factors:  "(1) the convenience of the witnesses; (2) the convenience of the parties; (3) the locus of operative facts; (4) the availability of process to compel the attendance of unwillingness witnesses; (5) the location of relevant documents and the relative ease of access to sources of proof; (6) the relative

means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded

to the plaintiff's choice of forum; and (9) trial efficiency and the interest of justice, based on the

totality of the circumstances." *Dealtime.com*, 123 F. Supp. 2d at 755; *see also Platt v. Minn.*

*Mining & Mfg. Co.*,376 U.S. 240, 243-44 (1964) (listing factors); *Rubinstein v. Skyteller, Inc.*, 48

F. Supp. 2d 315, 325 (S.D.N.Y. 1999) (quoting *Purcell Graham, Inc. v. Nat'l Bank of Detroit*,

1994 U.S. Dist. LEXIS 15196, at *11 (S.D.N.Y. Oct. 24, 1994)).  No single factor "is controlling

in itself." *Tomchuck v. Union Trust Co.*, 875 F. Supp. 242, 243 (S.D.N.Y. 1995) (citing *Gulf Oil*

*v. Gilbert*, 330 U.S. 501, 508 (1947)).  Transfer is warranted when "the balance of these factors

weighs collectively in favor of the movant's proposed forum." *Purcell Graham, Inc. v. Nat'l*

*Bank of Detroit*, 1994 U.S. Dist. LEXIS 15196, at *12 (S.D.N.Y. Oct. 24, 1994).  Denial of a

motion to transfer, where transfer is warranted, is an abuse of discretion. *See D. H. Blair & Co.,*

*Inc. v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006).

### B.  Transfer Of Venue Is Warranted Because It Would Greatly Convenience Mr. Rindner And His Potential Witnesses, Would Conserve Judicial Resources, And Is In The Interest Of Justice

The SEC's choice to litigate in New York bears all the markings of gamesmanship and

forum-shopping of the most objectionable kind.  In light of the billion-dollar settlement in the

AOLTW shareholder litigation,[9] the SEC likely views the Southern District as a more hospitable

forum to charge former AOL employees, and one less familiar with the government's futility in

these matters.  Given the lack of any connection between Mr. Rindner and New York, the SEC's

motive is transparent:  avoid litigating at all costs in appropriate districts where the government

has already failed.

---

[9] While Mr. Rindner was a defendant *In re AOL Time Warner, Inc. Sec. & "ERISA"*
*Shareholder Litig.*, MDL Docket No. 1500, 02 Civ. 5575 (SWK), the consolidated shareholder
class actions, there is absolutely no overlap between the allegations made against him in that case
and the SEC's allegations here.

Indeed, not a single relevant factor weighs in favor of proceeding against Steven Rindner in the Southern District of New York. To the contrary, the vast majority of relevant factors weigh conclusively in favor of transfer to the Eastern District of Virginia. The convenience of Mr. Rindner (and the SEC), the convenience of the witnesses, the availability of process to compel unwilling witnesses, the locus of operative events, efficiency considerations, and the interests of justice all point toward transfer. None of the few remaining factors supports keeping this case in the Southern District of New York. Transfer to the Eastern District of Virginia is thus logical and wholly warranted.

### 1. Convenience of the Parties and of Potential Witnesses

"The convenience of the parties and the convenience of the witnesses are generally considered the most important factors" in determining whether to transfer venue. *Promuto v. Waste Management, Inc.*, 44 F. Supp. 2d 628, 638 (S.D.N.Y. 1999). Both weigh strongly in favor of transferring this proceeding to the Eastern District of Virginia.

### a) Convenience of Mr. Rindner and the SEC

There can be no question that the convenience of the parties suggests a need to transfer the case. The convenience inquiry starts with "consideration of the residence of the parties." *Wine Markets Int'l Inc. v. Bass*, 939 F. Supp. 178, 182 (E.D.N.Y. 1996); *Hernandez v. Graebel Van Lines*, 761 F. Supp. 983, 988 (E.D.N.Y. 1991) (citing *Heyco, Inc. v. Heyman*, 636 F. Supp. 1545, 1550 (S.D.N.Y. 1986)). Although the convenience of the parties factor does not support a decision to transfer venue where such transfer "merely shift[s] the inconvenience of litigating in a particular forum from one party to the other[,]" where "neither party resides in the chosen forum," logic dictates that the case should be transferred to the residence of one of them. *Dealtime.com*, 123 F. Supp. 2d at 756.

Neither Mr. Rindner nor the SEC is based in the Southern District of New York. Mr. Rindner works in the Eastern District of Virginia, and lives nearby with his wife and three young daughters. Transferring this case to the Eastern District of Virginia thus would limit the hardship to Mr. Rindner's employment, and not force Mr. Rindner to relocate away from his family for three or more months of trial. In addition, the SEC is headquartered in Washington, D.C., very close to the Eastern District of Virginia. No attorneys from the SEC's New York Regional Office are apparently working on the case, but all seven SEC attorneys listed on the complaint are based in Washington, D.C. *See* Complaint, *SEC v. Kelly*, 08 CV 4612 (SWK), filed May 19, 2008. That is not a surprise, since the seven-year investigation that preceded this litigation was at all times conducted out of SEC headquarters. Indeed, the SEC's lead trial counsel recently volunteered to host the parties' Fed. R. Civ. P. 26(f) Conference at the SEC's Washington headquarters for his and his colleagues' convenience.

Thus, transfer of this case to the Eastern District of Virginia will not result in shifting of inconvenience from defendants to the SEC. Instead, it will greatly increase the convenience to Mr. Rindner and the plaintiff alike.

### b) Convenience of Potential Witnesses

Courts weigh the convenience of the witnesses factor not based on the "number of prospective witnesses . . . but, rather, [by assessing] the materiality of their anticipated testimony." *Promuto*, 44 F. Supp. 2d at 639 (quoting *Dwyer v. Gen. Motors Corp.*, 853 F. Supp. 690, 693-94 (S.D.N.Y. 1994)). In this case, both the number of prospective witnesses and the materiality of their anticipated testimony weigh toward transfer.

Mr. Rindner's most important witnesses will be current and former AOL employees, such as David Colburn, Edward Prince, Eric Keller, John Underwood, Adam Lehman, Brian Heller,

Karen Litsinger, Jay Rappaport and Jeff Wilsey. All but one of these individuals has been identified by AOL to the SEC as being part of the deal team on one or more of the transactions at issue. *See, e.g.*, AOL's Rule 21(a) Reports filed Oct. 23, 2002, Nov. 15, 2002, Nov. 22, 2002, Nov. 27, 2002, and Dec. 13, 2002 (listing deal employees). On information and belief, many of these witnesses will testify that they were involved in the deals in question – and, in certain instances, the specific events alleged – but did not believe they were doing anything improper, let alone participating in a fraud.[10] *See, e.g.*, Prince Dep. 145:14-157:9, *In re AOL Time Warner, Inc. Sec. & "ERISA" Shareholder Litig.*, MDL Docket No. 1500, 02 Civ. 5575 (SWK), Aug. 31, 2006 (attached hereto as Ex. 10). Several are expected testify that Mr. Rindner's role on these transactions was limited or peripheral, and consistent with his responsibilities for managing the interactive marketing pipeline. In addition, a former Ernst & Young auditor, Harry Edward Paul, can provide critical testimony that plainly refutes the SEC's Telefonica and Bertelsmann allegations. Paul is expected to testify he was part of the team of Ernst & Young auditors who closely scrutinized the Bertelsmann and Telefonica transactions on multiple occasions and determined that the advertising revenue did not need to be restated. Paul is further expected to

---

[10] For example, the SEC alleges that the fraudulent nature of the WorldCom advertising deal was described in a November 5, 2001 e-mail that Mr. Rindner received. Compl. ¶¶ 171, 173. Edward Prince also received that e-mail, and he responded to it. Based on his testimony in another proceeding, Prince is expected to testify that he did not know what the e-mail was referring to, and sought additional input from another individual involved with the negotiation, who believed WorldCom was confused about the deal. Prince also made clear that the e-mail did not raise any concern with him about the propriety of the transaction. Prince Dep. 152:6-157:9, *In re AOL Time Warner, Inc. Sec. & "ERISA" Shareholder Litig.*, MDL Docket No. 1500, 02 Civ. 5575 (SWK), Aug. 31, 2006 (attached hereto as Ex. 10); *see also* Colburn Testimony 191:14-23, 193:9-10, *In re AOL Time Warner*, No. HO-9249, Apr. 25, 2007 (attached hereto as Ex. 16). In addition, the SEC alleges that the WorldCom advertising deal was fraudulent because Mr. Rindner and others knew that WorldCom did not want online advertising. Compl. ¶ 170. On information and belief, several witnesses, including David Colburn, believed that the author of the November 5, 2001 e-mail had a tendency to make inflammatory remarks and take things out of context. Others share the sentiment. *See, e.g.*, Colburn Testimony 191:14-23, 193:9-10, *In re AOL Time Warner*, No. HO-9249, Apr. 25, 2007 (Ex. 16).

testify that as part of its review, Ernst & Young considered many of the same documents and theories raised in the Complaint and nonetheless stood by the Bertelsmann and Telefonica revenue. *See generally*, Testimony of Harry Edward Paul, *In re AOL Time Warner*, HO-9429, Jun. 7, 2004; *see also* Memorandum to AOL Investigation Files from Eddie Paul, Nov. 6, 2002 ("Telefonica DataCorp., S.A.U. (Telefonica) December 2000 Agreements as to When Fair Value of Advertising Sold Under Umbrella Advertising Agreements Should Be Evaluated") (attached hereto as Ex. 11).

All of these witnesses presently live within 35 miles of the Alexandria, Virginia federal courthouse. Their testimony substantially undermines the SEC's case and will be critical to determining both whether Mr. Rindner in fact acted as the SEC contends, and whether he did so with scienter. Put simply, the testimony of these witnesses will be essential to Mr. Rindner's defense.

Not only is the Eastern District of Virginia a much more convenient forum for Mr. Rindner's key witnesses, it is also, on balance, considerably more convenient for the SEC's likely witnesses against Mr. Rindner. The transactions at issue were primarily negotiated on AOL's behalf in Dulles, Virginia, within the Eastern District of Virginia. Most of the individuals identified by AOL to the SEC as members of the relevant deal teams worked at AOL's headquarters. *See, e.g.*, AOL's Rule 21(a) Reports filed Oct. 23, 2002, Nov. 15, 2002, Nov. 22, 2002, Nov. 27, 2002, Dec. 13, 2002, and Feb. 28, 2003 (listing deal employees) (Ex. 1). A majority of them still currently reside in or near the Eastern District of Virginia. It seems unfathomable that the majority of AOL's witnesses against Mr. Rindner will reside outside of 100 miles of the Alexandria courthouse, and certainly many more will reside in or around the Eastern District of Virginia than the Southern District of New York.

Transfer to the Eastern District of Virginia will greatly convenience all of these witnesses and allow Mr. Rindner to present his case fairly. This factor thus also weighs heavily in favor of transfer.

### 2. Availability of Process to Compel Attendance of Unwilling Witnesses

In addition, transfer to the Eastern District of Virginia will make available process to compel these witnesses to appear at trial. This consideration is especially important. *Rubinstein*, 48 F. Supp. 2d at 325 ("the availability of process to require non-party witnesses to testify is the most compelling consideration") (quoting *Purcell Graham*, 1994 WL 15196, at *15) (internal quotation marks omitted). Nearly all of Mr. Rindner's key witnesses are non-party witnesses. Because the vast majority of these witnesses live within 100 miles of the Eastern District of Virginia, that court can compel them to appear at trial. The Southern District of New York, on the other hand, lacks any power of compulsion over these witnesses, and there is no indication that any of them would voluntarily travel to the Southern District of New York at Mr. Rindner's request. Indeed, counsel for some non-party witnesses have indicated that their clients are not willing to travel to the Southern District to testify in this case. This Court thus should ensure that the "jury . . . have the opportunity to observe these witnesses and evaluate their demeanor[.]" *Purcell Graham*, 1994 U.S. Dist. LEXIS 15196, at *19. The availability of process to compel the attendance of Mr. Rindner's key witnesses plainly warrants transfer to the Eastern District of Virginia.

### 3. The Locus of Operative Events

The location of the operative events is a "primary factor" in determining whether to transfer venue. *Dealtime.com*, 123 F. Supp. 2d at 756; *ZPC 2000*, 86 F. Supp. 2d at 279 (citing *Smart v. Goord*, 21 F. Supp. 2d 309, 216 (S.D.N.Y. 1998)). "Courts routinely transfer cases

when the principal events occurred and the principal witnesses are located in another district."

*Berman v. Informix Corp.*, 30 F. Supp. 2d 653, 658 (S.D.N.Y. 1998); *see also Mobile Video*

*Services Ltd. v. Nat'l Ass'n of Broadcast Employees and Technicians*, 574 F. Supp. 668, 670

(S.D.N.Y. 1983) (transferring case to district where, as here, the "material occurrences which

formed the factual basis for" the litigation took place). Courts also consider the "local interest in

having the controversy decided in the district." *Kelly v. MD Buyline, Inc.*, 2 F. Supp. 2d 420,

441 (S.D.N.Y. 1998).

   In this case, every single principal event underlying the SEC's allegations against Mr.

Rindner occurred in Virginia.[11]   The Complaint mentions Mr. Rindner in connection with

advertising transactions with seven AOL counterparties, each of which was structured and

negotiated on behalf of AOL in Northern Virginia.  Although the Complaint alleges minimal

involvement by Mr. Rindner in most of those transactions, his limited role primarily is alleged to

take the form of interacting with other Virginia-based AOL personnel.  Where the Complaint

alleges more substantive involvement by Mr. Rindner, such involvement occurred in the Eastern

District of Virginia, as Mr. Rindner operated out of AOL headquarters throughout his

employment with the company.  Significantly, not a single act alleged by the SEC and attributed

to Mr. Rindner occurred in the Southern District of New York.

   Furthermore, here, there is a particularly strong "local interest in having the controversy

decided in the district that is the principal locus of the transactions in question." *Kelly*, 2 F.

Supp. 2d at 441.  AOL was founded in Northern Virginia and had its headquarters in the Eastern

District of Virginia at all relevant times.  When it was founded, AOL was at the forefront of the

---

[11] The same is true for the other defendants, with the exception of the 10 months Mr. Kelly worked in New York.

technology boom on the East Coast. It brought a significant number of jobs to the Northern

Virginia area, and ultimately led the way to the development of the "Dulles Corridor," which

remains vital to Northern Virginia's job market.[12]

On the other hand, AOL's primary connection to New York is the recent transfer of its

headquarters from Virginia to New York. Although AOL merged with Time Warner in 2001,

AOL remained a subsidiary of AOLTW and continued independent operations in Dulles,

Virginia. There is simply no basis for concluding that New York has genuine local interest in

having this case – in particular the case against Mr. Rindner – especially when weighed against

the interest in Northern Virginia. The locus of events and local interest weighs very heavily in

favor of transfer.

### 4.  Trial Efficiency and the Interest of Justice

In evaluating a § 1404(a) motion, "courts should also consider the 'practical problems

that would make the trial of a case easy, expeditious and inexpensive.'" *Dwyer*, 853 F. Supp. at

694 (quoting *Ryer v. Harrisburg Kohl Bros., Inc.*, 307 F. Supp. 276, 279 (S.D.N.Y. 1969))

(internal quotation marks omitted). These practical considerations also weigh strongly in favor

of transferring this proceeding to the Eastern District of Virginia.

Transfer of the case to Virginia certainly would result in an expeditious resolution and

lower litigation costs. As a threshold matter, the Eastern District of Virginia's well known

"rocket docket" ensures that discovery moves expeditiously, and that trials are rapid and

---

[12] Transferring Mr. Rindner's case to the Eastern District of Virginia, which is the locus of all relevant facts pertaining to him, is also in the public interest. "To retain a case such as this which has no real nexus to New York would only serve to further delay adjudication of other cases brought by parties who are compelled to sue in the Southern District[.]" *Morales v. Naverias de Puerto Rico*, 713 F. Supp. 711, 713-14 (S.D.N.Y. 1994).

economical.  *See generally* Carrie E. Johnson, *Rocket Dockets: Reducing Delay in Federal Civil Litigation*, 85 Cal. L. Rev. 225 (Jan. 1997).[13]

In a case such as this – involving multiple complex transactions – the rocket docket's procedures will drastically reduce litigation costs.  Discovery and trial both would be sharply abbreviated.  Costs will be further reduced because counsel for the SEC and Mr. Rindner will not have to relocate to New York for trial, and many fewer witnesses will have to travel to testify.[14]

Of equal importance, the rocket docket is particularly appropriate for this action, given the SEC's patent indolence in bringing the case.  The SEC investigated these matters for nearly seven years before filing its Complaint, some two and a half years after notifying Mr. Rindner that it intended to sue him.  The SEC then waited six weeks to serve the Complaint after it was filed, despite Mr. Rindner's repeated offers to waive service of process.  The SEC now is proposing a trial date in late 2010, some 10 years after most of the events in question, while at the same time claiming, among other things, that Mr. Rindner and the other defendants are threats to the investing public and should be prohibited from serving as officers or directors of public companies.  Compl. at 54-55.  The dark cloud of these baseless accusations, hanging over Mr. Rindner's head for years, has been professionally detrimental and personally distressing.  He seeks and deserves the most rapid trial date available, which the Eastern District of Virginia's

_____

[13] In 2007, for civil cases in the Eastern District of Virginia for which jury trials were ultimately completed, the median time interval between filing and the start of trial was 8.2 months.  *See Judicial Business of the United States Courts, 2007 Annual Report of the Director, James C. Duff* at 191.  The median time interval between filing and disposition of civil cases by trial in the Eastern District of Virginia was 9.5 months for the same period.  *Id.* at 175.  In the Southern District of New York, the time intervals are 29 months and 25.7 months, respectively. *Id.* at 191, 175.  Among federal district courts, the Eastern District of Virginia also has one of the lowest percentages of civil cases that have been pending for two years, and the lowest percentage of civil cases that have been pending for three or more years.  *Id.* at 178-80.

[14] Having fewer witnesses testifying by deposition will also enhance the presentation of evidence to the jury.

rocket docket has a well-deserved reputation for providing.  It is thus practical and just to transfer this proceeding.

### 5.  The SEC Is Not Entitled To Deference In Choosing This Forum

In general, "a plaintiff's choice of forum is . . . entitled to substantial consideration." *ZPC 2000*, 86 F. Supp. 2d at 280 (citing *In re Warrick*, 70 F.3d 736, 741 (2d Cir. 1995)) (internal quotation marks omitted).  However, where the chosen forum "has no material connection" to the litigation, "this factor should be given little weight." *Id.* (citing *Wechsler v. Macke Int'l Trade, Inc.*, 1999 WL 1261251, at *9 (S.D.N.Y. Dec. 27, 1999)) (internal quotation marks omitted); *see also Rubinstein*, 48 F. Supp. 2d at 325 ("This deference is entitled to less consideration where, as here, the forum chosen has no substantive ties to the litigation.") (citing *Am. Marketing Enters., Inc. v. Sun Apparel, Inc.*, 1997 WL 47813, at *3 (S.D.N.Y. Feb. 6, 1997)).  In addition, where, as here, a party selects a forum as a result of naked forum shopping, the deference should receive even less weight.  *See generally Iragorri v. United Technologies Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) ("the more it appears that plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons . . . the less deference the plaintiff's choice commands").

Because the SEC's allegations against Mr. Rindner have no substantive tie whatsoever to the Southern District of New York, but are designed to avoid more logical jurisdictions where the SEC suffered embarrassing defeats, there is no reason to defer to the SEC's choice of forum here.  Likewise, the Southern District of New York has no material connection to the litigation, as every salient fact – the locus of events, parties, and witnesses – all make clear that the Eastern

District of Virginia is the most appropriate forum. The SEC's decision to file this case in the Southern District of New York should receive no deference.[15]

### C.    The claims against Mr. Rindner should be severed to facilitate transfer

To the extent necessary to facilitate the transfer of this case to a more appropriate venue, Mr. Rindner's case should be severed from the case against the other defendants. In deciding whether severance is appropriate, courts consider whether (1) the issues related to the claims against each defendant significantly differ from one another; (2) those separable issues would require different evidence or testimony; (3) the party opposing severance would be prejudiced if it is granted; and (4) the party requesting severance will be prejudiced if it is not granted. *SEC v. Pignatiello*, 1998 U.S. Dist. LEXIS 8297, *8-*9 (S.D.N.Y. 1998); Fed. R. Civ. P. 21. In this case, given the minimal overlap between the allegations against Mr. Rindner and the other defendants, and the vastly different role Mr. Rinder is alleged to have played in the deals, all four factors weigh in favor of severing Mr. Rindner's case, as may be necessary to facilitate a change of venue.

### 1.    The issues related to the claims against Mr. Rindner differ from the issues related to the claims against the other defendants and thus would require different evidence and testimony

As an initial matter, there is minimal overlap between the allegations against Mr. Rindner and the allegations against the other defendants. For most of the transactions in the Complaint, the SEC either barely mentions Mr. Rindner or does not mention him at all. The Complaint does

---

[15] The remaining two factors – each forum's familiarity with governing law, and the location of relevant documents and access to proof – do not weigh against transfer and are, at most, neutral. Because the relevant law is federal securities law, neither the Southern District of New York nor the Eastern District of Virginia is presumed to have "any greater familiarity" with the governing law than the other. *Rubinstein*, 48 F. Supp. 2d at 325. In addition, although documents related to the transactions at issue here were primarily created in Virginia, it is likely in today's environment that most, if not all, of them are stored electronically. In any event, the location of documents is "hardly a weighty factor." *United States v. Clark*, 360 F. Supp. 936, 943-44 (S.D.N.Y. 1973).

not reference Mr. Rindner in connection with the Sun transaction. It scarcely includes him in discussing the Wembley/Ticketmaster, Veritas, Bertelsmann, and HP deals. Indeed, for the Wembley/Ticketmaster, Veritas, and HP transactions, it alleges no contemporaneous involvement by Mr. Rindner, and for those transactions and Bertelsmann, it fails to allege that Mr. Rindner was aware of any flaws in the underlying accounting. Nor does the SEC suggest that Mr. Rindner played any role in negotiating or structuring those deals, or determining how revenue should be recorded. *See Compl.* ¶¶ 78, 93, 142-143, 154. In short, the skeletal allegations against Mr. Rindner make it abundantly clear that the SEC cannot, and will not, seriously attempt to establish liability against him based on these transactions.[16]

Although the allegations regarding the Telefonica transaction are more detailed, the SEC levies no allegations against any other defendant in connection with that deal. *See* Compl. ¶¶ 98-110. Accordingly, for the transactions associated with seven of the eight counterparties identified in the case, the overlap is negligible or non-existent.

Transactions with only one counterparty – WorldCom – form the bases for the SEC's claims against both Mr. Rindner and the other defendants. *See* Compl. ¶¶ 158-180. Yet the SEC's claims against Mr. Rindner in connection with WorldCom differ dramatically from its claims against the other defendants. Whereas Mr. Rindner allegedly participated in limited discussions with WorldCom and helped structure the deal, the other defendants allegedly approved the accounting for it. *See, e.g.* Compl. ¶¶ 163-66. The Complaint does not allege that Mr. Rindner participated in meetings or conversations with any other defendant in connection

---

[16] As will be further explained in Mr. Rindner's forthcoming Motion To Dismiss The Complaint, most of these transactions also took place outside the applicable limitations period, and the SEC does not even attempt to plead the elements of the applicable causes of action against Mr. Rindner in connection with these deals. Accordingly, it is highly unlikely that the SEC can or will seek liability against Mr. Rindner in connection with them.

with WorldCom, and does not suggest that there will be substantial witness or evidentiary overlap between Mr. Rindner and the other Defendants.

Indeed, that lack of overlap strongly reflects the decided difference between Mr. Rindner's position at AOL, and the positions of the other defendants. Mr. Rindner, as a mid-level member of the Business Affairs unit, is alleged to have been involved from the perspective of negotiating and executing the deals. He thus is alleged to have managed the Business Affairs "pipeline," participated in a few advertising decisions, and discussed with WorldCom and Telefonica discrete portions of their agreements with AOL. *See, e.g.*, Compl. ¶¶ 103, 105, 106, 166, 174. The other defendants allegedly were company executives. They are alleged to have set revenue targets, made accounting decisions, and communicated with auditors and the public. *See, e.g.*, Compl. ¶¶ 55, 58, 60, 66, 72, 76, 79, 80, 84, 88, 90, 95, 118, 128, 129, 132, 133, 134, 137, 151, 163, 165, 175. None is alleged to have been in the Business Affairs unit, regularly engaged in discussions with deal counterparties, or played any role in the advertising component of these transactions.

Given the scant overlap in transactions between Mr. Rindner and the other Defendants, and the starkly different roles that Mr. Rindner and the other defendants allegedly played in the deals, severing Mr. Rindner's case would result in little cumulative evidence or testimony. To the contrary, including Mr. Rindner would result in two radically different and disjointed trials compressed into a single marathon proceeding: one trial involving Mr. Rindner, Telefonica, and WorldCom that focuses on the role of Business Affairs, and a second trial involving Sun, Veritas, HP, Wembley/Ticketmaster, BAG and WorldCom that focuses on the role of management. Accordingly, the first two factors – whether the issues related to each defendant significantly differ from one another and whether those separable issues would require different

- 21 -

evidence or testimony – weigh strongly in favor of severance. *See Corporan v. Binghamton*, 2006 U.S. Dist. LEXIS 74963, at *12 (few ties between separate incidences weighs in favor of severance).

**2.    The SEC will experience no prejudice if severance is granted, but Mr. Rindner will be prejudiced if the case against him is not severed**

The remaining two factors also weigh in favor of severance. The SEC will experience no significant prejudice if severance is granted: there is little overlap between the allegations against Mr. Rindner and the other defendants, the evidence against Mr. Rindner would differ substantially from that used against the other defendants, and the SEC and its lawyers are based in or around the Eastern District of Virginia. *See Pignatiello*, 1998 U.S. Dist. 8297, at *11. By the same token, compelling Mr. Rindner to litigate in the Southern District of New York would likely substantially prejudice him. As set forth above, Mr. Rindner's key witnesses cannot be compelled to testify in the Southern District of New York and some would not voluntarily appear there, the Southern District of New York is far from the locus of operative events, and forcing Mr. Rindner to attend a three month trial in the Southern District of New York would create both personal and professional hardship.

In addition, Mr. Rindner would be compelled to attend a lengthy trial involving substantial numbers of transactions in which he was not materially involved, dozens of witnesses who will not mention his name, and hundreds of exhibits that do not pertain to him. That would create a genuine likelihood of juror confusion and the strong possibility of spill-over prejudice based on evidence presented against other Defendants. *See Corporan*, 2006 U.S. Dist. LEXIS 74963, at *13-*14; *see also Zafiro v. United States*, 506 U.S. 534, 539 (1993) ("When many defendants are tried together in a complex case and they have significantly different degrees of culpability, the risk of prejudice is heightened."). The sole means of alleviating that prejudice,

- 22 -

and ensuring that the case presented is one that actually relates to Mr. Rindner, is to sever his case. Because all four relevant factors weigh in favor of severance, Mr. Rindner's case should be transferred to the Eastern District of Virginia.

## CONCLUSION

The majority of the factors – including the most important factors – that courts consider in determining whether to transfer a proceeding overwhelmingly weigh in favor of transfer. Taken as a whole, the SEC's case is connected to the Southern District of New York by only the finest of threads, and to the Eastern District of Virginia by every measurable fact. In addition, the minimal overlap in the allegations against Mr. Rindner and the other defendants demonstrates that severing his case to facilitate transfer is appropriate. Accordingly, Mr. Rindner respectfully requests that this Court transfer Mr. Rindner's case to the United States District Court for the Eastern District of Virginia.

Respectfully submitted,


_/s/ Jonathan C. Drimmer_____
Mark J. Hulkower
Jonathan C. Drimmer
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795
(202) 429-3000

*Counsel for Steven Rindner*

Dated:  August 28, 2008

```
ERROR: undefined
OFFENDING COMMAND:

STACK:
```

**Index of Exhibits to**
**Defendant Steven Rindner's Motion to Transfer Venue**
*SEC v. Kelly*, **No. 08 Civ. 04612 (SWK)**

1.   Cover pages of Section 21(a) Reports filed by American Online, Inc.

2.   AOL Business Affairs/Corp Dev Department Phone List, dated Dec. 4, 2000

3.   E-mail from S. Rindner to J. Patti, dated Jan. 17, 2001

4.   AOL Business Affairs and Development Office Phone Numbers, Locations, dated Jul. 18, 2001

5.   E-mail from J. Tyeryar to E. Prince, S. Rindner, dated Dec. 14, 2001

6.   E-mail from S. Rindner to E. Keller, G. Rigdon, D. Dunbar, dated Feb. 2, 2002

7.   E-mail from S. Rindner to V. Harker, dated Nov. 21, 2001

8.   Instant Message exchange, dated Dec. 7, 2000

9.   SEC's Notice of Designation of Related Civil Cases, filed March 21, 2005 in *SEC v. Time Warner, Inc.*, No. 05-0578

10.  Excerpts from Prince Dep. 145:14-157:9, *In re AOL Time Warner, Inc. Sec. & "ERISA" Shareholder Litig.*, MDL Docket No. 1500, 02 Civ. 5575 (SWK), Aug. 31, 2006

11.  Memorandum to AOL Investigation Files from Eddie Paul, Nov. 6, 2002 ("Telefonica DataCorp., S.A.U. (Telefonica) December 2000 Agreements as to When Fair Value of Advertising Sold Under Umbrella Advertising Agreements Should Be Evaluated")

12.  Excerpts from Wovsaniker Dep. 36:5-37:6, *In re AOL Time Warner, Inc. & "ERISA" Shareholder Litig.*, MDL Docket No. 1500, 02 Civ. 5575 (SWK), Jul. 24, 2006

13.  Excerpts from Kelly Dep. 29:13-32:14, *In re AOL Time Warner, Inc. & "ERISA" Shareholder Litig.*, MDL Docket No. 1500, 02 Civ. 5575 (SWK), Jul. 26, 2006

14.  Excerpts from Beams Dep. 11:16-12:3, 12:22-13:2, *In re AOL Time Warner, Inc. & "ERISA" Shareholder Litig.*, MDL Docket No. 1500, 02 Civ. 5575 (SWK), Jun. 15, 2006

15.  Excerpts from Hurst Dep. 22:19-25, *In re AOL Time Warner, Inc. & "ERISA" Shareholder Litig.*, MDL Docket No. 1500, 02 Civ. 5575 (SWK), Jul. 11, 2006

16.  Excerpts from Colburn Testimony 191:14-23, 193:9-10, *In re AOL Time Warner*, No. HO-9249, Apr. 25, 2007

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

F. WHITTEN PETERS
(202) 434-5440
wpeters@wc.com

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

September 23, 2002

## HAND DELIVERED

Gregory T. Lawrence, Esquire
United States Securities & Exchange Commission
450 5th Street, N.W.
Washington, D.C.  20549

Re:    In the Matter of AOL Time Warner Inc., No. HO-9429

Dear Mr. Lawrence:

Enclosed is an interim report by AOL Time Warner Inc. ("AOLTW") reporting on America Online, Inc.'s ("AOL") transactions with Homestore.com, submitted in response to the Securities and Exchange Commission's (the "Commission") Order under Section 21(a) of the Securities Exchange Act of 1934, dated August 13, 2002, as modified by the August 28, 2002 letter from the Commission's staff (collectively, the "Order"), directing that AOLTW file a statement in writing, under oath, as to the facts and circumstances concerning certain indicated matters ("Requests").

There are several matters to bring to your attention:  First, since AOLTW has already given you the addresses of most of the AOL employees who are identified in the transaction summaries, we have not included those again in the report.  If you need an additional address, just let me know and I will get it for you.  Second, because the SEC's investigation of Homestore.com only covered the time period after January 1, 2001, the detail presently available for transactions between AOL and Homestore during earlier years is somewhat less – although, as you will see, still quite substantial.  Third, AOLTW has made every effort to provide the accompanying information in as comprehensive manner as possible, consistent with

Confidential Treatment Requested Under 17 C.F.R. § 200.83
6AOL001570001
CONFIDENTIAL TREATMENT
REQUESTED

03020001

WILLIAMS & CONNOLLY LLP
Gregory T. Lawrence, Esquire
September 23 , 2002
Page 2

previously discussed time limitations and other constraints, and will continue to work with the Commission to address any concerns about this or any other matter.

AOLTW requests that this letter and the enclosed documents be given confidential treatment pursuant to Commission Rule 83 (17 C.F.R. § 200.83).

Very truly yours,

F. Whitten Peters

6AOL001570002
CONFIDENTIAL TREATMENT
REQUESTED

Confidential Treatment Requested Under 17 C.F.R. § 200.83



DAVID POVICH
STEVEN M. UMIN
JOHN W. VARDAMAN
PAUL MARTIN WOLFF
J. ALAN GALBRAITH
JOHN G. KESTER
WILLIAM E. McDANIELS
BRENDAN V. SULLIVAN, JR.
AUBREY M. DANIEL, III
RICHARD M. COOPER
GERALD A. FEFFER
ROBERT P. WATKINS
JERRY L. SHULMAN
LEWIS H. FERGUSON, III
ROBERT E. BARNETT
DAVID E. KENDALL
GREGORY B. CRAIG
JOHN J. BUCKLEY, JR.
TERRENCE O'DONNELL
DOUGLAS R. MARVIN
JOHN K. VILLA
BARRY S. SIMON

KEVIN T. BAINE
STEPHEN L. URBANCZYK
PHILIP J. WARD
F. WHITTEN PETERS
JAMES A. BRUTON, III
PETER J. KAHN
JUDITH A. MILLER
LON S. BABBY
MICHAEL S. SUNDERMEYER
JAMES T. FULLER, III
BRUCE R. GENDERSON
CAROLYN H. WILLIAMS
F. LANE HEARD III
STEVEN A. KUNEY
GERSON A. ZWEIFACH
PAUL MOGIN
HOWARD W. GUTMAN
STEVEN A. STEINBACH
MARK S. LEVINSTEIN
MARY G. CLARK
VICTORIA RADD ROLLINS
DANIEL F. KATZ

## LAW OFFICES
# WILLIAMS & CONNOLLY LLP
725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

KATHLEEN L. BECCS
WILLIAM R. MURRAY, JR.
EVA PETKO LEREA
STEPHEN D RANER
DAVID C. KIERNAN
LON E. MUSSLEWHITE
ROBIN B. JACOBSOHN
HEIDI K. HUBBARD
GLENN J. PFADENHAUER
GEORGE A. BORDEN
ROBERT J. SHAUGHNESSY
JONATHAN B. GRAHAM
ALLEN P. WAXMAN
DAVID J. BLATT
ARI J. ZYMELMAN
REGINA G. MALONEY
DANE H. BUTSWINKAS
LAURIE S. FULTON
DENNIS M. BLACK
PHILIP A. SECHLER
LYNDA SCHULER
PAUL R. DUEFFERT

R. HACKNEY WIEGMANN
ROBERT M CARY
KEVIN M. HODGES
DAVID M. ZINN
JOSEPH G. PETROSINELLI
STEVEN M. FARINA
KEVIN M. DOWNEY
THOMAS G. HENTOFF
KUMIKI GIBSON
PAUL B. GAFFNEY
EMMET T. FLOOD
ROBERT A. VAN KIRK
MARCIE R. ZIEGLER
KENNETH C. SMURZYNSKI
JOHN E. SCHMIDTLEIN
SUZANNE H. WOODS
CRAIG D. SINGER

OF COUNSEL
VINCENT J. FULLER
RAYMOND W. BERGAN
JEREMIAH C. COLLINS

October 23, 2002

**HAND DELIVERED**

Gregory T. Lawrence, Esquire
United States Securities & Exchange Commission
450 5th Street, N.W.
Washington, D.C. 20549

    Re:   **In the Matter of AOL Time Warner Inc., No. HO-9429**

Dear Mr. Lawrence:

    Enclosed is an interim report by AOL Time Warner Inc. ("AOLTW") reporting on certain of America Online, Inc.'s ("AOL") transactions, submitted in response to the Securities and Exchange Commission's (the "Commission") Order under Section 21(a) of the Securities Exchange Act of 1934, dated August 13, 2002, as modified by the August 28, 2002 letter from the Commission's staff (collectively, the "Order"), directing that AOLTW file a statement in writing, under oath, as to the facts and circumstances concerning certain indicated matters ("Requests"). This report discusses two of the transactions that were initially described in a series of articles in the Washington Post -- Telefonica's December 2000 agreements with AOL and eBay's advertising representative arrangement with AOL. This interim report describes all transactions of which we are aware between AOL and Telefonica, and therefore constitutes AOL's complete response to Section IX of the Order. As to eBay, this interim report focuses only on the transactions specifically identified in my letter to you of September 13, 2002, and does not attempt to provide a comprehensive description of AOL's other agreements with that party.

    AOLTW has made every effort to provide the accompanying information in as comprehensive manner as possible, consistent with previously discussed time

Confidential Treatment Requested Under 17 C.F.R. § 200.83

2AOL05919 1845
Confidential Treatment
Requested

2AOL059191845

WILLIAMS & CONNOLLY LLP
Gregory T. Lawrence, Esquire
October 23, 2002
Page 2

limitations and other constraints, and will continue to work with the Commission to address any concerns about this or any other matter.

AOLTW requests that this letter and the enclosed documents be given confidential treatment pursuant to Commission Rule 83 (17 C.F.R. § 200.83).

Very truly yours,

F. Whitten Peters

Confidential Treatment Requested Under 17 C.F.R. § 200.83

2AOL05919 1846
Confidential Treatment
Requested

2AOL059191846

DAVID POVICH
STEVEN M. UMIN
JOHN W. VARDAMAN
PAUL MARTIN WOLFF
J. ALAN GALBRAITH
JOHN G. KESTER
WILLIAM E. McDANIELS
BRENDAN V. SULLIVAN, JR.
AUBREY M. DANIEL, III
RICHARD M. COOPER
GERALD A. FEFFER
ROBERT P. WATKINS
JERRY L. SHULMAN
LEWIS H. FERGUSON, III
ROBERT B. BARNETT
DAVID E. KENDALL
GREGORY B. CRAIG
JOHN J. BUCKLEY, JR.
TERRENCE O'DONNELL
DOUGLAS R. MARVIN
JOHN K. VILLA
BARRY S. SIMON

KEVIN T. BAINE
STEPHEN L. URBANCZYK
PHILIP J. WARD
F. WHITTEN PETERS
JAMES A. BRUTON, III
PETER J. KAHN
JUDITH A. MILLER
DON S. BABBY
MICHAEL S. SUNDERMEYER
JAMES T. FULLER, III
BRUCE R. GENDERSON
CAROLYN H. WILLIAMS
F. LANE HEARD III
STEVEN R. KUNEY
GERSON A. ZWEIFACH
PAUL MOGIN
HOWARD W. GUTMAN
STEVEN A. STEINBACH
MARK S. LEVINSTEIN
MARY G. CLARK
VICTORIA RADD ROLLINS
DANIEL F. KATZ

KATHLEEN L. BEGGS
WILLIAM R. MURRAY, JR.
EVA PETKO ESBER
STEPHEN D. RABER
DAVID C. KIERMAN
LON E. MUSSLEWHITE
ROBIN B. JACOBSOHN
HEIDI K. HUBBARD
GLENN J. PFADENHAUER
GEORGE A. BORDEN
ROBERT J. SHAUGHNESSY
JONATHAN P. GRAHAM
ALLEN P. WAXMAN
DAVID S. BLATT
ARI S. ZYMELMAN
REGINA G. MALONEY
DANE H. BUTSWINKAS
LAURIE S. FULTON
DENNIS M. BLACK
PHILIP A. SECHLER
LYNDA SCHULER
PAUL K. DUEFFERT

R. HACKNEY WIEGMANN
ROBERT M. CARY
KEVIN M. HODGES
DAVID M. ZINN
JOSEPH G. PETROSINELLI
STEVEN M. FARINA
KEVIN M. DOWNEY
THOMAS G. HENTOFF
KUMIKI GIBSON
PAUL B. GAFFNEY
EMMET T. FLOOD
ROBERT A. VAN KIRK
MARGIE A. ZIEGLER
KENNETH C. SMURZYNSKI
JOHN E. SCHMIDTLEIN
SUZANNE H. WOODS
CRAIG D. SINGER

———

OF COUNSEL
VINCENT J. FULLER
RAYMOND W. BERGAN
JEREMIAH C. COLLINS

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

November 15, 2002

**HAND DELIVERED**

Gregory T. Lawrence, Esquire
United States Securities & Exchange Commission
450 5th Street, N.W.
Washington, D.C.  20549

    Re:   **In the Matter of AOL Time Warner Inc., No. HO-9429**

Dear Mr. Lawrence:

      Enclosed is an interim report by AOL Time Warner Inc. ("AOLTW") reporting on certain of America Online, Inc.'s ("AOL") transactions, submitted in response to the Securities and Exchange Commission's (the "Commission") Order under Section 21(a) of the Securities Exchange Act of 1934, dated August 13, 2002, as modified by the August 28, 2002 letter from the Commission's staff (collectively, the "Order"), directing that AOLTW file a statement in writing, under oath, as to the facts and circumstances concerning certain indicated matters ("Requests"). This report discusses the Ticketmaster (August 2000) and Wembley (September 2000) transactions that were initially described in a series of articles in the Washington Post. This interim report focuses only on the transactions specifically identified in my letter to you of September 13, 2002, and does not attempt to provide a comprehensive description of AOL's other agreements (if any) with Ticketmaster and Wembley. AOLTW has made every effort to provide the accompanying information in as comprehensive manner as possible, consistent with previously discussed time limitations and other constraints, and will continue to work with the Commission to address any concerns about this or any other matter.

Confidential Treatment Requested Under 17 C.F.R. § 200.83

1AOL37102 0530
Confidential Treatment –
Requested

WILLIAMS & CONNOLLY LLP

Gregory T. Lawrence, Esquire
November 15, 2002
Page 2

AOLTW requests, pursuant to 17 C.F.R. § 200.83, that confidential treatment be accorded to this letter and to the enclosed report. AOLTW further requests that confidential treatment be accorded to any notes, memoranda, or other records created by or at the direction of the Commission, its officers or staff members, that reflect, refer or relate to this letter or the enclosed report.

Please promptly inform me, at the address and phone number listed above, of any request under the Freedom of Information Act seeking access to this letter or the enclosed report to enable us to substantiate the grounds for confidential treatment, unless the Commission intends to deny such request for access on other grounds.

Very truly yours,

F. Whitten Peters

Confidential Treatment Requested Under 17 C.F.R. § 200.83

1AOL37102 0531
Confidential Treatment –
Requested

DAVID POVICH
STEVEN M. UMIN
JOHN W. VARDAMAN
PAUL MARTIN WOLFF
J. ALAN GALBRAITH
JOHN G. KESTER
WILLIAM E. McDANIELS
BRENDAN V. SULLIVAN, JR.
AUBREY M. DANIEL, III
RICHARD M. COOPER
GERALD A. FEFFER
ROBERT P. WATKINS
JERRY L. SHULMAN
LEWIS H. FERGUSON, III
ROBERT B. BARNETT
DAVID E. KENDALL
GREGORY E. CRAIG
JOHN J. BUCKLEY, JR.
TERRENCE O'DONNELL
DOUGLAS R. MARVIN
JOHN K. VILLA
BARRY S. SIMON

KEVIN T. BAINE
STEPHEN L. URBANCZYK
PHILIP J. WARD
F. WHITTEN PETERS
JAMES A. BRUTON, III
PETER J. KAHN
JUDITH A. MILLER
LON S. BABBY
MICHAEL S. SUNDERMEYER
JAMES T. FULLER, III
BRUCE R. GENDERSON
CAROLYN H. WILLIAMS
F. LANE HEARD III
STEVEN R. KUNEY
GERSON A. ZWEIFACH
PAUL MOGIN
HOWARD W. GUTMAN
STEVEN A. STEINBACH
MARK S. LEVINSTEIN
MARY G. CLARK
VICTORIA RADD ROLLINS
DANIEL F. KATZ

LAW OFFICES
WILLIAMS & CONNOLLY LLP
725 TWELFTH STREET, N.W.
WASHINGTON, D. C. 20005-5901
(202) 434-5000
FAX (202) 434-5029

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

KATHLEEN L. BEGGS
WILLIAM R. MURRAY, JR.
EVA PETKO ESBER
STEPHEN D. RABER
DAVID C. KIERNAN
LON E. MUSSLEWHITE
ROBIN E. JACOBSOHN
HEIDI K. HUBBARD
GLENN J. PFADENHAUER
GEORGE A. BORDEN
ROBERT J. SHAUGHNESSY
JONATHAN P. GRAHAM
ALLEN P. WAXMAN
DAVID J. BLATT
ARI J. ZYMELMAN
REGINA G. MALONEY
DANE H. BUTSWINKAS
LAURIE S. FULTON
DENNIS M. BLACK
PHILIP A. SECHLER
LYNDA SCHULER
PAUL K. DUEFFERT

R. HACKNEY WIEGMANN
ROBERT M. CARY
KEVIN M. HODGES
DAVID M. ZINN
JOSEPH G. PETROSINELLI
STEVEN M. FARINA
KEVIN M. DOWNEY
THOMAS G. HENTOFF
KUMIKI GIBSON
PAUL B. GAFFNEY
BARRET T. FLOOD
ROBERT A. VAN KIRK
MARCIE R. ZIEGLER
KENNETH C. SMURZYNSKI
JOHN S. SCHMIDTLEIN
SUZANNE H. WOODS
CRAIG D. SINGER

OF COUNSEL
VINCENT J. FULLER
RAYMOND W. BERGAN
JEREMIAH C. COLLINS

November 22, 2002

**HAND DELIVERED**

Gregory T. Lawrence, Esquire
United States Securities & Exchange Commission
450 5th Street, N.W.
Washington, D.C.  20549

    Re:    **In the Matter of AOL Time Warner Inc., No. HO-9429**

Dear Mr. Lawrence:

    Enclosed is an interim report by AOL Time Warner Inc. ("AOLTW") reporting on certain of America Online, Inc.'s ("AOL") transactions, submitted in response to the Securities and Exchange Commission's (the "Commission") Order under Section 21(a) of the Securities Exchange Act of 1934, dated August 13, 2002, as modified by the August 28, 2002 letter from the Commission's staff (collectively, the "Order"), directing that AOLTW file a statement in writing, under oath, as to the facts and circumstances concerning certain indicated matters ("Requests"). This report discusses certain transactions between AOL and Veritas, Hewlett-Packard, and The Golf Channel. The enclosed report focuses on the transactions that were the subject of the restatement announced by AOLTW on October 23, 2002, and does not attempt to provide a comprehensive description of AOL's other agreements (if any) with those entities. AOLTW has made every effort to provide the accompanying information in as comprehensive manner as possible, consistent with previously discussed time limitations and other constraints, and will continue to work with the Commission to address any concerns about this or any other matter.

    AOLTW requests, pursuant to 17 C.F.R. § 200.83, that confidential treatment be accorded to this letter and to the enclosed report. AOLTW further requests that confidential treatment be accorded to any notes, memoranda, or other records

Confidential Treatment Requested Under 17 C.F.R. § 200.83

2AOL05919 1600
Confidential Treatment
Requested

2AOL059191600

WILLIAMS & CONNOLLY LLP

Gregory T. Lawrence, Esquire
November 22, 2002
Page 2

created by or at the direction of the Commission, its officers or staff members, that
reflect, refer or relate to this letter or the enclosed report. Please promptly inform
me, at the address and phone number listed above, of any request under the
Freedom of Information Act seeking access to this letter or the enclosed report to
enable us to substantiate the grounds for confidential treatment, unless the
Commission intends to deny such request for access on other grounds.

Very truly yours,

*F. Whitten Peters/SAS*

F. Whitten Peters

Confidential Treatment Requested Under 17 C.F.R. § 200.83

2AOL05919 1601
Confidential Treatment
Requested

2AOL059191601

DAVID POVICH
STEVEN M. UMIN
JOHN W. VARDAMAN
PAUL MARTIN WOLFF
J. ALAN GALBRAITH
JOHN G. KESTER
WILLIAM E. McDANIEL
BRENDAN V. SULLIVAN, JR.
AUBREY M. DANIEL, III
RICHARD M. COOPER
GERALD A. FEFFER
ROBERT P. WATKINS
JERRY L. SHULMAN
LEWIS H. FERGUSON, III
ROBERT B. BARNETT
DAVID E. KENDALL
GREGORY B. CRAIG
JOHN J. BUCKLEY, JR.
TERRENCE O'DONNELL
DOUGLAS R. MARVIN
JOHN K. VILLA
BARRY S. SIMON

KEVIN T. BAINE
STEPHEN L. URBANCZYK
PHILIP J. WARD
F. WHITTEN PETERS
JAMES A. BRUTON, III
PETER J. KAHN
JUDITH A. MILLER
LON S. BABBY
MICHAEL S. SUNDERMEYER
JAMES T. FULLER, III
BRUCE R. GENDERSON
CAROLYN H. WILLIAMS
F. LANE HEARD III
STEVEN R. KUNEY
GERSON A. ZWEIFACH
PAUL MOGIN
HOWARD W. GUTMAN
STEVEN A. STEINBACH
MARK S. LEVINSTEIN
MARY G. CLARK
VICTORIA RADD ROLLINS
DANIEL F. KATZ

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

KATHLEEN L. BEGGS
WILLIAM R. MURRAY, JR.
EVA PETKO ESBER
STEPHEN D. RABER
DAVID C. KIERNAN
LON E. MUSSLEWHITE
ROBIN E. JACOBSOHN
HEIDI K. HUBBARD
COLLEEN J. PFADENHAUER
GEORGE A. BORDEN
ROBERT J. SHAUGHNESSY
JONATHAN P. GRAHAM
ALLEN P. WAXMAN
DAVID S. BLATT
ARI J. ZYMELMAN
REGINA G. MALONEY
DANE H. BUTSWINKAS
LAURIE S. FULTON
DENNIS M. BLACK
PHILIP A. SECHLER
LYNDA SCHULER
PAUL K. DOEFFERT

R. HACKNEY WIEGMANN
ROBERT M. CARY
KEVIN M. HODGES
DAVID M. ZINN
JOSEPH G. PETROSINELLI
STEVEN M. FARINA
KEVIN M. DOWNEY
THOMAS G. HENTOFF
KUMIKI GIBSON
PAUL B. GAFFNEY
EMMET T. FLOOD
ROBERT A. VAN KIRK
MARCIE R. ZIEGLER
KENNETH C. SMURZYNSKI
JOHN E. SCHMIDTLEIN
SUZANNE H. WOODS
CRAIG D. SINGER

OF COUNSEL
VINCENT J. FULLER
RAYMOND W. BERGAN
JEREMIAH C. COLLINS

November 27, 2002

**HAND DELIVERED**

Gregory T. Lawrence, Esquire
United States Securities & Exchange Commission
450 5th Street, N.W.
Washington, D.C.  20549

Re:   In the Matter of AOL Time Warner Inc., No. HO-9429

Dear Mr. Lawrence:

Enclosed is an interim report by AOL Time Warner Inc. ("AOLTW") reporting on certain of America Online, Inc.'s ("AOL") transactions, submitted in response to the Securities and Exchange Commission's (the "Commission") Order under Section 21(a) of the Securities Exchange Act of 1934, dated August 13, 2002, as modified by the August 28, 2002 letter from the Commission's staff (collectively, the "Order"), directing that AOLTW file a statement in writing, under oath, as to the facts and circumstances concerning certain indicated matters ("Requests"). This report discusses certain transactions between AOL and: Network Solutions Inc.; CareInsite, Inc.; NBA Media Ventures, LLC; WebMD; First USA VISA; Public Broadcasting Service; Circuit City Stores, Inc.; Target Corporation; TV Guide; Sony Pictures; Sesame Workshop; Blockbuster, Inc.; Hachette Filipacchi Magazines, Inc.; BigStep.com, Inc.; MCI Worldcom, Inc.; and Qwest Communications. The enclosed reports on MCI Worldcom, Inc. and Qwest Communications focus only on the transactions that were the subject of the restatement announced by AOLTW on October 23, 2002, and do not attempt to provide a comprehensive description of AOL's other agreements with those entities. AOLTW has made every effort to provide the accompanying information in as comprehensive manner as possible, consistent with previously discussed time limitations and other constraints, and

Confidential Treatment Requested Under 17 C.F.R. § 200.83

1AOL37102 1196
Confidential Treatment –
Requested

WILLIAMS & CONNOLLY LLP

Gregory T. Lawrence, Esquire
November 27, 2002
Page 2

will continue to work with the Commission to address any concerns about this or any other matter.

AOLTW requests, pursuant to 17 C.F.R. § 200.83, that confidential treatment be accorded to this letter and to the enclosed report. AOLTW further requests that confidential treatment be accorded to any notes, memoranda, or other records created by or at the direction of the Commission, its officers or staff members, that reflect, refer or relate to this letter or the enclosed report. Please promptly inform me, at the address and phone number listed above, of any request under the Freedom of Information Act seeking access to this letter or the enclosed report to enable us to substantiate the grounds for confidential treatment, unless the Commission intends to deny such request for access on other grounds.

Very truly yours,

F. Whitten Peters

Confidential Treatment Requested Under 17 C.F.R. § 200.83

1AOL37102 1197
Confidential Treatment –
Requested

1AOL371021197



DAVID POVICH
STEVEN M. UMIN
JOHN W. VARDAMAN
PAUL MARTIN WOLFF
J. ALAN GALBRAITH
JOHN G. KESTER
WILLIAM E. McDANIELS
BRENDAN V. SULLIVAN, JR.
AUBREY M. DANIEL, III
RICHARD M. COOPER
GERALD A. FEFFER
ROBERT P. WATKINS
JERRY L. SHULMAN
LEWIS H. FERGUSON, III
ROBERT B. BARNETT
DAVID E. KENDALL
GREGORY B. CRAIG
JOHN J. BUCKLEY, JR.
TERRENCE O'DONNELL
DOUGLAS R. MARVIN
JOHN K. VILLA
BARRY S. SIMON

KEVIN T. BAINE
STEPHEN L. URBANCZYK
PHILIP J. WARD
F. WHITTEN PETERS
JAMES A. BRUTON, III
PETER J. KAHN
JUDITH A. MILLER
LON S. BABBY
MICHAEL S. SUNDERMEYER
JAMES T. FULLER, III
BRUCE R. GENDERSON
CAROLYN H. WILLIAMS
F. LANE HEARD III
STEVEN R. KUNEY
GERSON A. ZWEIFACH
PAUL MOGIN
HOWARD W. GUTMAN
STEVEN A. STEINBACH
MARK S. LEVINSTEIN
MARY G. CLARK
VICTORIA RADD ROLLINS
DANIEL F. KATZ

LAW OFFICES

WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

KATHLEEN L. BEGGS
WILLIAM R. MURRAY, JR.
EVA PETKO ESBER
STEPHEN D. RABER
DAVID C. KIERNAN
LON B. MUSSLEWHITE
ROBIN E. JACOBSOHN
HEIDI K. HUBBARD
GLENN J. PFADENHAUER
GEORGE A. BORDEN
ROBERT J. SHAUGHNESSY
JONATHAN P. GRAHAM
ALLEN P. WAXMAN
DAVID S. BLATT
ARI S. ZYMELMAN
REGINA G. MALONEY
DANE H. BUTSWINKAS
LAURIE J. FULTON
DENNIS M. BLACK
PHILIP A. SECHLER
LYNDA SCHULER
PAUL K. DUEFFERT

R. HACKNEY WIEGMANN
ROBERT M. CARY
KEVIN M. HODGES
DAVID M. ZINN
JOSEPH G. PETROSINELLI
STEVEN M. FARINA
KEVIN M. DOWNEY
THOMAS G. HENTOFF
KUMIKI GIBSON
PAUL B. GAFFNEY
EMMET T. FLOOD
ROBERT A. VAN KIRK
MARCIE R. ZIEGLER
KENNETH C. SMURZYNSKI
JOHN E. SCHMIDTLEIN
SUZANNE H. WOODS
CRAIG D. SINGER

OF COUNSEL
VINCENT J. FULLER
RAYMOND W. BERGAN
JEREMIAH C. COLLINS

December 13, 2002

**BY FEDERAL EXPRESS**

Gregory T. Lawrence, Esquire
United States Securities & Exchange Commission
450 5th Street, N.W.
Washington, D.C.  20549

Re:    In the Matter of AOL Time Warner Inc., No. HO-9429

Dear Mr. Lawrence:

Enclosed is an interim report by AOL Time Warner Inc. ("AOLTW") reporting on certain of America Online, Inc.'s ("AOL") transactions, submitted in response to the Securities and Exchange Commission's (the "Commission") Order under Section 21(a) of the Securities Exchange Act of 1934, dated August 13, 2002, as modified by the August 28, 2002 letter from the Commission's staff (collectively, the "Order"), directing that AOLTW file a statement in writing, under oath, as to the facts and circumstances concerning certain indicated matters ("Requests"). This report discusses certain transactions between AOL and Oxygen Media, Inc. and Bertelsmann A.G. AOLTW has made every effort to provide the accompanying information in as comprehensive manner as possible, consistent with previously discussed time limitations and other constraints, and will continue to work with the Commission to address any concerns about this or any other matter.

AOLTW requests, pursuant to 17 C.F.R. § 200.83, that confidential treatment be accorded to this letter and to the enclosed report. AOLTW further requests that confidential treatment be accorded to any notes, memoranda, or other records created by or at the direction of the Commission, its officers or staff members, that reflect, refer or relate to this letter or the enclosed report. Please promptly inform me, at the address and phone number listed above, of any request under the

Confidential Treatment Requested Under 17 C.F.R. § 200.83

2AOL08601 0056
Confidential Treatment
Requested

_



**WILLIAMS & CONNOLLY LLP**

Gregory T. Lawrence, Esquire
December 13, 2002
Page 2

Freedom of Information Act seeking access to this letter or the enclosed report to enable us to substantiate the grounds for confidential treatment, unless the Commission intends to deny such request for access on other grounds.

Very truly yours,

F. Whitten Peters

2AOL08601 0057
Confidential Treatment
Requested

**Confidential Treatment Requested Under 17 C.F.R. § 200.83**



DAVID POVICH
STEVEN M. UMIN
JOHN W. VARDAMAN
PAUL MARTIN WOLFF
J. ALAN GALBRAITH
JOHN G. KESTER
WILLIAM E. McDANIELS
BRENDAN V. SULLIVAN, JR.
AUBREY M. DANIEL, III
RICHARD M. COOPER
GERALD A. FEFFER
ROBERT P. WATKINS
JERRY L. SHULMAN
LEWIS H. FERGUSON, III
ROBERT B. BARNETT
DAVID E. KENDALL
GREGORY B. CRAIG
JOHN J. BUCKLEY, JR.
TERRENCE O'DONNELL
DOUGLAS R. MARVIN
JOHN K. VILLA
BARRY S. SIMON

KEVIN T. BAINE
STEPHEN L. URBANCZYK
PHILIP J. WARD
F. WHITTEN PETERS
JAMES A. BRUTON, III
PETER J. KAHN
JUDITH A. MILLER
LON S. BABBY
MICHAEL S. SUNDERMEYER
JAMES T. FULLER, III
BRUCE R. GENDERSON
CAROLYN H. WILLIAMS
F. LANE HEARD III
STEVEN R. KUNEY
GERSON A. ZWEIFACH
PAUL MOGIN
HOWARD W. GUTMAN
STEVEN A. STEINBACH
MARK S. LEVINSTEIN
MARY G. CLARK
VICTORIA RADD ROLLINS
DANIEL F. KATZ

KATHLEEN L. BEGGS
WILLIAM R. MURRAY, JR.
EVA PETKO ESBER
STEPHEN D. RABER
DAVID C. KIERNAN
LON E. MUSSLEWHITE
ROBIN E. JACOBSOHN
HEIDI K. HUBBARD
GLENN J. PFADENHAUER
GEORGE A. BORDEN
ROBERT J. SHAUGHNESSY
JONATHAN P. GRAHAM
ALLEN P. WAXMAN
DAVID S. BLATT
ARI S. ZYMELMAN
REGINA C. MALONEY
DANE H. BUTSWINKAS
LAURIE S. FULTON
DENNIS M. BLACK
PHILIP A. SECHLER
LYNDA SCHULER
PAUL R. DUEFFERT

R. HACKNEY WIEGMANN
ROBERT M. CARY
KEVIN M. HODGES
DAVID M. ZINN
JOSEPH G. PETROSINELLI
STEVEN M. FARINA
KEVIN M. DOWNEY
THOMAS G. HENTOFF
KUMIKI GIBSON
PAUL B. GAFFNEY
EMMET T. FLOOD
ROBERT A. VAN KIRK
MARGEE R. ZIEGLER
KENNETH C. SMURZYNSKI
JOHN E. SCHMIDTLEIN
SUZANNE H. WOODS
CRAIG D. SINGER

— OF COUNSEL —
VINCENT J. FULLER
RAYMOND W. BERGAN
JEREMIAH C. COLLINS

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

February 28, 2003

**HAND DELIVERED**

Gregory T. Lawrence, Esquire
United States Securities & Exchange Commission
450 5th Street, N.W.
Washington, D.C.  20549

        Re:    In the Matter of AOL Time Warner Inc., No. HO-9429

Dear Mr. Lawrence:

        Enclosed is a report by AOL Time Warner Inc. ("AOLTW") reporting on
certain matters relating to America Online, Inc. ("AOL"), submitted in response to
the Securities and Exchange Commission's (the "Commission") Order under Section
21(a) of the Securities Exchange Act of 1934, dated August 13, 2002, as modified by
the August 28, 2002 letter from the Commission's staff (collectively, the "Order"),
directing that AOLTW file a statement in writing, under oath, as to the facts and
circumstances concerning certain indicated matters ("Requests").  This report
responds to Requests X through XV of the Order.  Also enclosed are documents
bearing bates numbers 13AOL002010001 through 13AOL002012873 that are
referenced in this report.  AOLTW has made every effort to provide the
accompanying information in as comprehensive manner as possible, consistent with
previously discussed time limitations and other constraints, and will continue to
work with the Commission to address any concerns about this or any other matter.

        AOLTW requests, pursuant to 17 C.F.R. § 200.83, that confidential treatment
be accorded to this letter, the enclosed report, and the accompanying documents.
AOLTW further requests that confidential treatment be accorded to any notes,
memoranda, or other records created by or at the direction of the Commission, its
officers, or staff members that reflect, refer, or relate to this letter, the enclosed

Confidential Treatment Requested Under 17 C.F.R. § 200.83

2AOL05224 0880
Confidential Treatment
Requested

WILLIAMS & CONNOLLY LLP

Gregory T. Lawrence, Esquire
February 28, 2003
Page 2

report, or the accompanying documents. Please promptly inform me, at the address
and phone number listed above, of any request under the Freedom of Information
Act seeking access to this letter or the enclosed report or documents to enable us to
substantiate the grounds for confidential treatment, unless the Commission intends
to deny such request for access on other grounds.

Very truly yours,

F. Whitten Peters

Confidential Treatment Requested Under 17 C.F.R. § 200.83

2AOL05224 0881
Confidential Treatment
Requested

BUSINESS AFFAIRS/CORP DEV DEPARTMENT LIST

**America Online, Inc**
CC4: 22260 Pacific Blvd
Dulles VA 20166
HQ: 22000 AOL Way
Dulles VA 20166

**Netscape**
US Mail: 501 East Middlefield Road
Mountain View CA 94043
Shipping: 360 West Caribbean Drive
Sunnyvale CA 94089

**CompuServe**
5000 Arlington Centre Blvd
Columbus OH 43220

**New York**
45 W. 18th Street
New York, NY 10011

**AOL Europe**
80 Hammersmith Road
London UK W14 8UD

| Name | Phone | Screen name | Position |
|------|-------|-------------|----------|
| Alan Alford | 614 538 4022 | AAlford11@cs.com | Vice President |
| Ali Asghar | 52489 | Baasghar | Director |
| Mari Aspegren | +44 20 7348 8067 | MaspegrenUK | AA to Tobias |
| June Aubin | 53830 | JuneAubin00 | AA for Edson |
| Mirza Baig | 51130 | MirzaBaig9 | Sr Manager |
| Jennifer Baltimore | 51843 | JEBaltimor | Director |
| Jill Battisti | 614 538 4327 | JillBattisti | AA for Pete & Andy |
| Andrew Berman | 650-937-2744 | AJBerman1 | Exec Director |
| Amy Borck | 56197 | AmyBorck | AA for Ron Grant & J Werther |
| Jennifer Botwright | 51922 | JenniferBot | AA for Joe & Lisa |
| Megan Brown | 51159 | MeganBrwn | Sr Analyst |
| Travis Brown | 51593 | TravisTBrown | Director |
| John Buchbinder | 917 606 4644 | JohnBuchbinder | Manager |
| Clay Buckley | 53513 | ClayBuckly | Director |
| Carolyn Caylor | 52998 | Crcaylor | EA to Miles |
| Sabrina Cellarosi | 52308 | Scellarosi | Manager |
| Amanda Chamberlain | +44 207 348 8331 | UKAmandaC | Temp AA for Lance |
| David Chen | 51168 | DavidChen1 | Manager |
| Perry Chen | 650-937-5623 | PerryChen88 | Content Analyst |
| Lynda Clarizio | 51311 | Clarily | Sr Vice President |
| David Colburn | 52365 | DKRJJ | President |
| | (CC4) 56072 | | |
| Lance Conn | +44 20 7348 8330 (UK) | LanceConn | Sr Vice President |
| Michele Erin Cox | 53758 | MicheleCox00 | Temp AA for Angela & Travis |
| Sean Daniels | 212 206 4499 | DanielsSJ | Sr Manager |
| Tobias Dengel | +44 20 7348 8192 (UK) | TADengel | Vice President |
| Patricia Detweiler | 51970 | TriciaSpeed | Manager |
| Ken Dodelin | 51277 | KenDodelin | Manager |
| Michelle Dunne | 51777 | MichelleDunne | Database Specialist Intake |
| Jim Eadie | 56329 | JimTEadie | Sr Analyst |
| Jonathan Edson | 52453 | JREdson | Vice President |
| Hope Elliott | 650-937-6303 | HopeElliott | Manager |
| Julie Essman | 56040 | JulieEssman00 | Temp AA to J Baltimore, D Liu |
| Mark Feldman | 51888 | MarkSFeldman | Manager |
| Mike Flecker | 56113 | MichaelFlecker | Sr Manager |
| Mike Fogarty | 212-206-4554 | FogartyMP | Director |
| Brandon Fong | 56351 | BrandonFong1 | Sr Analyst |
| Josh Freeman | 52291 | JoshLFreeman | Sr Manager |
| Alfred Garcia | 650 937 4493 | AlfredGarcia | Exec Director |
| Miles Gilburne | 51258 | ZGI | Corp Dev. Board of Directors |
| Erin Gough | 56316 | ErinGough00 | Temp AA for Lynda & Ali |
| Ron Grant | 51031 | RonEGrant | Sr Vice President |
| Evan Grayer | TBD | EvanGrayer | Sr Manager |
| Vicki Green | 51123 | Vgreen01 | AA to J Lindsay and D Prieto |
| Andy Hackett | 614 538 4256 | andyhackett | Manager |
| Navid Haghighi | 51964 | Navid6 | Sr Manager |
| Andrew Haire | 53457 | AndrewHaire | Director |
| Laura Hall | 51380 | Lauraahall | Sr Analyst |
| Paul "Skip" Hanke | 51453 | PaulAHanke | Manager |
| Andie Harrelle | 52594 | AHarrelle | AA for Ron, Jennifer, David |
| Val Hawkins | +44 207 348 8279(UK) | Vphawkins | Manager, BA Wireless |
| Dawn Hilderbrandt | 51051 | DHilderbrandt | AA for Ted Prince |
| Matthew Hong | 650 937 6690 | MattHong650 | Manager |
| Marisa Hughes | 51184 | marisahughes | Analyst |
| Yolande Hughes | 51883 | Yolandehgh | AA for Eric's group |
| Gio Hunt | 650 937 5660 | GioHunt | Vice President |
| Joseph Jacob | 55244 | JosephJacob | Vice President |
| Samara Jaffe | 650 937 6278 | SamaraJ | Sr Analyst |
| | 52136 (CC4) | | |
| Ohad Jehassi | 53442 | OhadJehassi | Manager |
| Linda Johnson | 650-937-2119 | LJohnson720 | Temp AA to Andy Berman |

Last Update: 12/04/2000(AUTODATE)

003S1AOL0070042700
Confidential Treatment Requested

| Name | Number | Screen Name | Title |
|---|---|---|---|
| Christina Kakol | 52818 | Christinakakol | AA for Andrew Haire |
| Eric Keller | 52024 | ELKeller | Sr Vice President |
| John Kelly | 650 937 2622 | JohnKellyNSCP | Manager |
| Ruth Kirschner | 917 606 4668 (NY) | RSKirschner | Sr Manager |
| | 415 844 9225 (SF) | | |
| Tracey Lakatos | 212-606-4710 | TraceyNY09 | AA to Kent, Mike |
| Sam Lam | 53322 | SamuelCLam | Sr Analyst |
| Lisa Landi | 52374 | LisaLandi1 | AA for Corp Dev |
| Lori LaSpada | 51918 | LoriLaSpada | Analyst |
| Adam Lehman | 51236 | AdamL | Sr Vice President |
| Jeff Lindsay | 53751 | NOVOCAS | Exec Director |
| David Liu | 53296 | DLiu8 | Director |
| Angela Long | 51237 | AngelaMLong | Exec Director |
| Jeff Lord | 53075 | JeffRLord | Sr Manager |
| Patricia Lougee | 650 937 2743 | Plougee | AA for BA West Coast |
| Kim Luong | 51022 | Kimilu2 | AA for Adam |
| Trish Mast | 56185 | MastTrish | AA for Clay & Steve |
| Aileen McConnell | 54429 | mcconnellaileen | Sr Manager |
| Matt McConnell | 51413 | mattmcconnell9 | Director |
| Esther McCullough | 55302 | WriteEsther | Temp AA helping Margo |
| Brian Murphy | 53839 | Murphola | Operations Manager |
| Tom Newman | 56304 | ThomNewman | Director |
| | 917-606-4707 (NY) | | |
| Erin Nguyen | 650 937 3326 | erinn@netscape.com | Manager |
| Larisa Nunley | 53042 | LANunley | Analyst |
| Andrea Orleans | 51966 | AndreaOleans | Sr Manager |
| Pete Pajor | 614 538 4618 | Pajor | Director |
| Jim Patti | 51889 | JamesWPatti | Sr Manager |
| Debbie Pettersson | 51862 | Dpettersson | Office Manager |
| Indrajit Ponnambalam | 56303 | Iponnambalam | Sr Analyst |
| Sandy Pressley | 917 606 4623 | NYCBAAA | Temp AA for NYC |
| Dan Prieto | 50106 | Prietodan | Director |
| Ted Prince | 50060 | EdwardPrince | Exec Director |
| Jay Rappaport | 51989 | JayRapp | Sr Vice President |
| Srikanth Reddy | 56354 | srikanthreddy1 | Sr Analyst |
| Greg Rigdon | 51256 | GregRigdon | Exec Director |
| Steven Rindner | 52038 | Srindner | Exec Director |
| Donna Roberts | 650 937 6445 | DonnaNSCP | Sr Manager |
| Joe Ruffolo | 55370 | JoeRuffolo1 | Manager |
| Sherri Ruppert | 52129 | SherriHig | EA for David |
| Laura Quirk | 50396 | Lauraquirk00 | Temp AA for Eric & Greg |
| Jonathan Salkoff | 51955 | jonathansalkoff | Manager |
| Steve Schroeder | 51017 | SteveSchroeder | Exec Director |
| Sarah Searls | 50113 | SearlsSara | Manager |
| Danny Shapiro | 56110 | DanielAShapiro | Analyst |
| David Shapiro | 52298 | DavidShapiro9 | Sr Analyst |
| Akbar Sharfi | 51498 | AkbarSharfi | Manager |
| Robert Sirmans | 51872 | SirmansBob | Manager |
| Lisa Soltani | 53684 | LisaSolt | Exec Director |
| Veronika Sonsev | 53934 | Vsonsev | Manager |
| Margo Stephen | 53402 | MargoStephen1 | AA for Steve Schroeder |
| William Stoesser | 50286 | StoesserWC | Manager |
| Gabriel Stone | 50118 | GabStone | Manager |
| Greg Sugar | 415-934-2816 | Greg Sugar | Sr Manager |

Spinner, Inc., 375 Alabama St., Suite 350, San Francisco, CA 94110

| Name | Number | Screen Name | Title |
|---|---|---|---|
| Jeff Sunshine | 51415 | JeffSunshine | Manager |
| Kelly Takeuchi | 614 538 4328 | KellyTakeuchi | AA for Alan |
| Tina Taylor | 53567 | Taylore555 | AA for Jay |
| Cyril Thottam | 56380 | CyrilThottam | Sr Analyst |
| Ann Tubbs | 53314 | VAAnn1 | AA for Sherri/David |
| Jeff Tyeryar | 50646 | tyeryar | Sr Manager |
| Jake Vastine | 650 937 2118 | JakeVastine | Manager |
| Kent Wakeford | 212 206 4417 | KDWakeford | Exec Director |
| Jon Werther | 52103 | JonWerther | Director |
| Jason Witt | 415 844 9232 | jsnwtt | Manager |
| Simone Wu | 51820 | SimoneWu | Director |
| Anne Wydler | 53511 | ABWydler | Sr Analyst |
| Tom Ziemba | 206 343 7001 | TFZiemba | Sr. Manager |

Tegic Communications, 1000 Dexter Ave, N, Suite 300, Seattle, WA 98121

*Last Update: 12/04/2000(AUTODATE)*

003S1AOL0070042701
Confidential Treatment Requested

**_FAX #s_**

**CC4**

| | |
|---|---|
| BA Main Fax (45B:K02) | 703 265 1206 |
| 45B C05 (near Angela Long's ofc) | 703 265 4780 |
| 45A.B00 | 703 265 0672 |
| Ron Grant's Group | 703 265 0242 |
| Adam Lehman's Group | 703 265 4780 |
| CC4 5th Floor Fax | 703 265 0670 |
| | 703 265 0671 |

**HQ**

| | |
|---|---|
| David Colburn | 703 265 1202 |
| Corp Dev | 703-265-1103 |
| M & A | 703 265 2996 |
| Pete Pajor Fax | 614-457-9665 |
| Alan Alford Fax | 614-538-3365 |
| West Coast BA Group | 650-937-5444 |
| NY Fax | 212-206-4592 |
| NY Fax (Tom Newman) | 212-206-4595 |
| NY Fax (Wakeford) | TBD |

**UK**

| | |
|---|---|
| Lance Conn & Tobias Dengel | +44.20.7348.8005 |

**_MISC_**

| | | |
|---|---|---|
| Help Central | 51911 | |
| Facilities Help Desk | 53058 | |
| Operations Security | | 54040 |
| Accounting Help Desk | 51827 | |
| Gatehouse (Keys & Guests) | 52320 | |
| Dulles Main # | 703-265-1000 | |
| Reception (HQ) | 52120 | |
| Reception (CC1) | 52130 | |
| Reception (CC2) | 52100 | |
| Reception (CC3) | 52500 | |
| Reception (CC4) | 50660 | |
| Marriott Catering | 52322 | (SN: Cafebrenda) |
| Garber Travel | 51880 | |
| Copy Center | 53160 | |
| Weather Line | 703-265-1606 | |
| Mailroom (HQ) | 52113 | |
| Mail room (CC4) | 50663 | |
| | | |
| Shipping (FedEx etc) | 53255 | |
| Transfer to V/M | 81701 | |
| Retrieve VM Messages | 51701 | |

55229

*Last Update: 12/04/2000(AUTODATE)*

003S1AOL0070042702
Confidential Treatment Requested

Confidential Treatment
Requested by
Steptoe & Johnson LLP

Page 1 of 1

Subj:     **Re: Veritas Information**
Date:     1/17/01
To:       JamesWPatti
BCC:      wovsaniker/a

In a message dated 1/16/01 6:28:55 PM Eastern Standard Time, JamesWPatti writes:

<< Mark - we do not have an agreed-upon, baseline plan prior to signing, which occured on 9/30. We do have an email trail of discussions between account services and Veritas that begin in early October and continue through the month (and to the present - as the relationship progresses).

The deal was struck with the understanding that we'd work on mutually agreeable carriage at pre-set, rate-card spending levels by quarter. The first ads launched on 10/15. Please see below for a list of all the iterations of the carriage plan by date. Revisions occur regularly on most deals as the client monitors the performance of the ads.

Jim Patti >>

Jim – You need to clean this up and take a second to think about the e-mails you send out. We are all aware that there was no carriage plan in place prior to signing the deal – it was a TBD at our discretion. Subsequently, I asked you to go back to Veritas and get them to agree to a carriage plan – plan properly valued and that made sense for them. All of which you confirmed for me had been done and sent to accounting with the "official package." Your e-mail above confuses issues. I want you to talk with AS and find out exactly the process that was used to gain their agreement on the carriage plan that was created and forwarded to them. Thanks. Steven

**SER/AOLTW E0098**

002S1AOL0070044481
Confidential Treatment Requested

Confidential - Subject to Protective Order Requested
003SIAOL007003651

## AOL Business Affairs and Development
### Office Phone Numbers, Locations

**Dulles Campus:**
- HQ: 22000 AOL Way, Dulles VA 20166
- CC4: 22250 Pacific Blvd, Dulles VA 20166

**CompuServe:** 5000 Arlington Centre Blvd, Columbus OH 43220

**Netscape:** (mailing) 466 Ellis Street, Mountain View CA 94043
(shipping) 360 West Caribbean Drive, Sunnyvale CA 94089

**AOL Europe:** 80 Hammersmith Road, Rm. 307, London UK W148TH

**New York:**
- AOL - BA&D: 45 W 18th Street, New York NY 10011
- AOL TW: 75 Rockefeller Plaza, New York NY 10019

**Spinner:** 375 Alabama Street #350, San Francisco CA 94110

**Tegic:** 1000 Dexter Ave North, Suite 300, Seattle WA 98121

**ICQ - Israel:** Kiryat-Atidim, Bldg. #2, Tel Aviv Israel

| Last Name | First | Phone | Screenname | Position | Location | Group |
|---|---|---|---|---|---|---|
| Alford | Alan | 614 538 4022 | AAlford11@cs.com | Vice President | Columbus | Alford |
| Asghar | Ali | 52489 | Basaghar | Director | HQ | Clarizio |
| Asoegien | Mari | 44 20 7348 8067 | MaspoigenUK | AK: T Dengel | London | Lehman |
| Aubin | June | 53530 | June4ubin00 | AK: J Edson | CC4 | Edson |
| Ayers | John | 59578 | JohnayersC | Vice President | HQ | Clarizio |
| Baig | Mirza | 51130 | MirzaBaig9 | Sr Manager | CC4 | Rinchner |
| Baing | Michelle | 212 484 7963 | MichelleBaing51 | Sr Analyst | 75 Rock | Clarizio |
| Battisti | Jill | 614 538 4327 | JillBatisti | AK: A Alford | Columbus | Alford |
| Ben-Yoseph | Ohad | 55722 | OhadBA | Senior Analyst | CC4 | Prince |
| Berman | Andy | 650 937 2744 | AJBerman1 | Exec Director | Mtn View | Edson |
| Boesenberg | Alex | 650 937 3139 | AlexBoesen | Sr. Analyst | Mtn View | Hunt |
| Booboosingh | Michael | 212 484 7970 | MBooboosingh1 | AK: J Jacob, J.Ruffino | 75 Rock | Mandel |
| Rothright | Jennifer | 51977 | JenniferBird | AA [Temp] | CC4 | Lehman |
| Brog | David | 50294 | DavidBrog | Exec Director | CC4 | Rinchner |
| Brown | Claudette | 51167 | ClaudetteBrown00 | AK: M Green [Temp] | CC4 | Prince |
| Brown | Travis | 51593 | TravisTBrown | Exec Director | CC4 | Prince |
| Buckley | Clay | 53513 | ClayBuckly | Exec Director | CC4 | Rinchner |
| Cellorosi | Sabina | 52208 | Scellarosi | Sr Manager | CC4 | Lehman |
| Centers | Shannon | 53758 | ShannonCenters00 | AK: T Brown [Temp] | CC4 | Lehman |
| Chamberlain | Amanda | 44 207 348 8331 | UKAmandaC | AK: L Coom | London | Lohman |
| Chen | Perry | 650 937 5623 | PerryChen88 | Consent Analyst | Mtn View | Hunt |
| Chen | Ted | 650 937 2458 | TedChen'01 | Director | Mtn View | Hunt |
| Clarizio | Lynda | 51311 | Clarify | Sr Vice President | HQ | Clarizio |
| Colburn | David | 52365 / 212 484 6840 (NY) | DKHJ | President | HQ | Colburn |
| Combs | Zandra | 55741 | ZandraCombs | Manager | 75 Rock | Prince |
| Conn | Lance | 44 20 7348 8330 | LanceJConn | Sr Vice President | London | Lehman |
| Daniels | Sean | 212 206 4499 | DanielsSJ | Sr Manager | 45 W 18th | Rinchner |
| David (Brown) | Megan | 51159 | MeganBrvn | Sr Analyst | CC4 | Edson |
| DeAngelo | Ed | 614 538 3217 | EdDeAngelo@cs.com | Sr Manager | Columbus | Alford |
| Dengel | Tobas | 50118 | TADengel | Vice President | CC4 | Lehman |
| Dodelin | Ken | 51277 | KenDodelin | Sr Manager | CC4 | Edson |
| Dunne | Michele | 51777 | MicheleDunne | Database Specialist/Intake | CC4 | Lehman |
| Eadie | Jim | 55329 | JimTEadie | Sr Analyst | CC4 | Grant |
| Edson | Jonathan | 52453 | JREdson | Vice President | CC4 | Edson |

Confidential Treatment Requested
00351AOL007003639652

*Last Update: 7/18/01*

AOL Business Affairs and Development
Office Phone Numbers, Locations

| Last Name | First | Phone | Screenname | Position | Location | Global |
|---|---|---|---|---|---|---|
| Erzoah-Cudjoe | Theresa | 55196 | TheresaECO0 | Intern/Intie | CC4 | Lehman |
| Essman | Julie | 55040 | JulieEssman00 | AK: D.Liu, J.Schei | CC4 | Grant |
| Fedorovitch | Sue Ellen | 57828 | Fedso | AK: S Rincher | CC4 | Rincher |
| Feldman | Mark | 51888 | MarkSFeldman | Sr Manager | CC4 | Prince |
| Flacker | Mike | 59113 | MichaelFlacker | Director | CC4 | Grant |
| Florentino | Sonia | 917 606 4709 | SoniaFiorentino1 | AA [Temp] | 45 W 18th | Grant |
| Fogarty | Mike | 212 206 4554 | FogartyMP | Director | 45 W 18th | Rincher |
| Fong | Brandon | 55351 | BrandonFong1 | Sr Analyst | CC4 | Rincher |
| Freeman | Josh | 55291 | JoshL_Freeman | Director | CC4 | Grant |
| Frid | Itzik | 972 3 766 5540 | itzik@nyq.com | Director | Israel | Lehman |
| Garcia | Alfred | 650 937 4493 | AlfredGarcia | Vice President | CC4 | Hurt |
| Gautier | Rachael | 51184 | RachaelGautier | Analyst | CC4 | Esson |
| Goss-Johns | Maisha | 55787 | MaishaGossJohns | Manager | CC4 | Esson |
| Gratt | Ron | 51031 | RonEGratt | Sr Vice President | CC4 | Esson |
| Grayer | Evan | 212 506 4316 | EvanGrayer | Director | NYC | Prince |
| Green | Micah | 55686 | MicahGreenBA | Exec Director | CC4 | Prince |
| Guinon (Elliott) | Hope | 650 937 6303 | HopeElliott | Manager | Mtn View | Esson |
| Hackett | Andy | 614 538 4256 | AndyHackett1 | Manager | Columbus | Prince |
| Haghighi | Navid | 51984 | Navid5 | Director | CC4 | Prince |
| Haire | Andrew | 53457 | AndrewHaire | Exec Director | CC4 | Prince |
| Hall | Laura | 51080 | Lauahall | Sr Analyst | CC4 | Rincher |
| Hanie | Paul "Skip" | 51453 | PaulAHanie | Sr Analyst | CC4 | Esson |
| Hawkins | Val | 44 2107 348 8273 | Vphawkins | Manager, BA Wireless | London | Lehman |
| Hobbs | Darryl | 57381 | DhobbsBA | Director | CC4 | Prince |
| Hong | Mathew | 650 937 6690 | MatHong650 | Sr Manager | Mtn View | Hurt |
| Hunt | Go | 650 937 6660 | GoHunt | Vice President | Mtn View | Hurt |
| Hurd | Joe | 57765 | JHurdBd | Director | Mtn View | Hurt |
| Jacob | Joseph | 55244 | JosephJacob | Vice President | CC4 | Rincher |
| Jaffe | Samata | 52136 | Samatau | Sr Analyst | CC4 | Rincher |
| Johnson | Linda | 650 937 2119 | LJohnsonEA | AK: A Berman, A Meisels | Mtn View | Hurt |
| Junionez | Lior | 212 494 6223 | Liurionriz | Director | 75 Rock | Lehman |
| Kakol | Ann | 55494 | AnnKakol00 | Assistant to M Group [Temp] | CC4 | Mandel |
| Kakol | Christina | 52818 | Christinakakol | AK: A Haire | CC4 | Rincher |
| Kelly | John | 650 937 2622 | JohnKellyISCP | Sr Manager | Mtn View | Hurt |
| Kieh | Greta | 53765 | GretaKieh1 | Director | CC4 | Esson |
| Kimberly | Dawn | 51051 | DawnKimberly1 | AK: S Schroeder | CC4 | Prince |
| Knol | Duffy | 55696 | DuffyKnolBA | AK: T Prince | CC4 | Prince |
| Lakatos | Tracey | 917 606 4710 | TraceyN709 | Director | CC4 | Rincher |
| Lam | Sam | 53322 | SamuelCLam | AK: K.Wakeford, M.Fogarty | 45 W 18th | Rincher |
| Lan | Ranee | 212 494 7770 | RaneeLan1 | Sr Analyst | 75 Rock | Esson |
| Landi | Lisa | 52574 | LisaLandi1 | Sr Manager | CC4 | Mandel |
| LaSpada | Lori | 51918 | LoriLaSpada | E.A.: C.Calizon, J.Ayers | CC4 | Clarizio |
| Lehman | Adam | 51236 | Adaml | Operations Manager | CC4 | Lehman |
| Levine | Paul | 55688 | PaulLevineBA | Sr Vice President | CC4 | Lehman |
| Liu | David | 53396 | DLiu6 | Director | CC4 | Prince |
| Long | Angela | 51237 | AngelaMLong | Director | CC4 | Grant |
| Lord | Jeff | 44 207 559 3426 | JeffRLord | Exec Director | London | Lehman |
| Lougee | Patricia | 51022 | Plougee | Director | London | Lehman |
| Luong | Kim | 650 937 2743 | Kimliu2 | E.A.: West Coast Group | Mtn View | Hurt |
| Mandel | Sam | 212 484 7874 | Sammancel | AK: A.Lehman | 75 Rock | Lehman |
| Marcus | Joy | 212 484 7778 | JMarcus03 | Vice President | 75 Rock | Mandel |
| Marin | Ken | TBA | KenHeitmann | Director | 45 W 18th | Rincher |

CONFIDENTIAL

63742v4

Confidential, Treatment Requested
00351AOL007003G653

Last Update: 7/18/01

## AOL Business Affairs and Development
### Office Phone Numbers, Locations

| Last Name | First | Phone | Screenname | Position | Location | Group |
|---|---|---|---|---|---|---|
| Marks | Lisa | 57616 | LisaMarks2 | Manager | CC4 | Prince |
| McConnell | Aileen | 54429 | Mcconnellaileen | Director | CC4 | Grant |
| McConnell | Matt | 51413 | Mattmcconnell9 | Director | CC4 | Colburn |
| Mepalis | Adrienne | 650 937 2720 | Amepalis | Director (iPlanet) | Mtn View | Hunt |
| Miller | Neil | 56678 | TerriLynnM1 | AA: C Buckley, D Brog, J Hurd | CC4 | Rincher |
| Moses | Neil | 57749 | NeilMMoses | Sr Manager | CC4 | Rincher |
| Murphy | Brian | 53839 | Murphbria | Director | CC4 | Hunt |
| Newman | Tom | 212 464 6182 | ThomNewman | Manager | 75 Rock | Clarizio |
| Nguyen | Erin | 650 937 3326 | Erinn@netscape.com | AA: S Ruppert/D Colburn | Mtn View | Clarizio |
| Nooteom (Tubbs) | Ann | 53314 | AnnNooteom | Analyst | HQ | Colburn |
| Nunley | Larisa | 53042 | LANunley | Manager | CC4 | Rincher |
| Oliveira | Alison | 51655 | AlisonOliveira1 | Director | CC4 | Prince |
| Pajor | Pete | 614 538 4618 | Pajor@cs.com | Director | Columbus | Alford |
| Pasielski | Janet | 55114 | JanetPasielski | Office Manager | CC4 | Prince |
| Pettersson | Deb | 51662 | Dpettersson | Sr Analyst | CC4 | Lehman |
| Ponnambalam | Indrajit | 55303 | Iponnambalam | Sr Manager | HQ | Clarizio |
| Press | David | 57728 | DLPress9 | Manager | CC4 | Grant |
| Pressley | Sandy | 212 464 6276 | NYCBAAA | AA: T Newman, S Mandel | 75 Rock | Mandel |
| Prince | Ted | 50060 | EdwardPrince | Vice President | CC4 | Prince |
| Roddy | Srikanth | 55554 | Srikanthroddy1 | Sr Analyst | HQ | Clarizio |
| Ricci | Pat | 650 937 2652 | PRicci@netscape.com | EA: West Coast Group (Temp) | Mtn View | Hunt |
| Rigdon | Greg | 51256 | GregRigdon | Vice President | CC4 | Rincher |
| Rindner | Steven | 52038 | Srindner | Vice President | CC4 | Rincher |
| Roberts | Donna | 310 841 4697 | DonnaNSCP | Sr Manager | Culver City | Rincher |
| Ruffolo | Joe | 55370 | JoeRuffolo1 | Manager | CC4 | Lehman |
| Ruppert | Sherri | 52129 | Sherrirg | EA for D Colburn | HQ | Colburn |
| Samnick | Jonathan | 212 464 7850 | Jonathansamnick | Director | 75 Rock | Grant |
| Schansisky | Rachel | 50396 | Rachelschansky | AA: Rigdon, Mann, IM | CC4 | Rincher |
| Schroeder | Steve | 51017 | SteveSchroeder | Exec Director | CC4 | Ecson |
| Searls | Sarah | 50113 | SearlsSara | Sr Manager | CC4 | Ecson |
| Shapiro | Danny | 59110 | DannishShapiro | Sr Analyst | CC4 | Ecson |
| Shapiro | David | 52298 | DavidShapiro9 | Manager | CC4 | Grant |
| Sharfi | Akbar | 51498 | AkbarSharfi | Sr Manager | CC4 | Lehman |
| Shuda | Laura | 55313 | Laurashuda00 | AA (Temp): M&A | CC4 | Lehman |
| Sichel | Jon | 52115 | Jsichel1 | Vice President | HQ | Grant |
| Snyder | Donna | 614 538 3820 | Donnasnyder | AA: P Pajor, A Hackett | Columbus | Alford |
| Sonsev | Veronika | 53634 | Vsonsev | Sr Manager | CC4 | Alford |
| Stephen | Margo | 53402 | MargoStephen1 | AA: Content Group | CC4 | Ecson |
| Stewart | Matthew | 212 464 7961 | MatthewStewart00 | AA: J Samnick, 75 Rock Team | 75 Rock | Grant |
| Stoesser | William | 52286 | StoesserWC | Manager | CC4 | Lehman |
| Stone | Gabriel | 212 464 7984 | GabStone | Sr Manager | 75 Rock | Prince |
| Su | Jing | 52624 | Jingsuba | Sr Analyst | CC4 | Lehman |
| Sugar | Greg | 415 934 2816 | Greg Sugar | Director | San Fran | Grant |
| Sunshine | Jeff | 51415 | JeffSunshine | Sr Manager | CC4 | Clarizio |
| Tyeryar | Jeff | 50646 | Tyeryar | Sr Manager | HQ | Grant |
| Underwood | John | 58997 | JUnderwoodBA | Manager | CC4 | Prince |
| von Shautten | Derek | 917 606 4749 | vanShautten0 | Manager | 45 W 18th | Rincher |
| Vastine | Jake | 650 937 2118 | JakeVastine | Sr Analyst | Mtn View | Hunt |
| Vogt | Jeff | 59185 | JSVogt | Sr Analyst | CC4 | Prince |
| Wakeford | Kent | 212 206 4417 | KCWakeford | Exec Director | 45 W 18th | Rincher |
| Werther | Jon | 52103 | JonWerther | Exec Director | CC4 | Rincher |
| Wilsey | Jeff | 53077 | JeffWilsey | Sr Manager | CC4 | Rincher |

CONFIDENTIAL

Page 3

63142v4

00351AOL007003965 4
Confidential - Attorneys' Eyes Only Pursuant to Protective Order Requested

Last Update: 7/18/01

## AOL Business Affairs and Development
### Office Phone Numbers, Locations

| Last Name | First | Screename | Phone | Position | Location | Group |
|---|---|---|---|---|---|---|
| Wilson | Rusty | RwilsonBA | 59855 | Exec Director | CC4 | Prince |
| Witt | Jason | Jonwitt | 44 20 7599 3458 | Sr Manager | CC4 | Rirchner |
| Wystler | Anne | ABWystler | London | Manager | London | Grant |
| Yang | Vivian | VWYang | 212 484 7870 | Director | 75 Rock | Mandel |
| Zaretsky | Jeff | ZaretskyJeff | 650 937 2602 | Manager (Planet) | Mtn View | Hunt |
| Ziemba | Tom | TFZiemba | 54595 | Director | CC4 | Prince |
| Zinda | Christine | ChristineZinda | 55748 | EA, R Grant, J Wether | CC4 | Grant |

**SUMMER INTERNS**

| Last Name | First | Screename | Phone | Position | Location | Group |
|---|---|---|---|---|---|---|
| Kinari | Kate | KateWari1 | 212 484 7872 | Intern/Analyst | NYC | Clanzio/Giant |
| Liebsohn | Adam | AdamLiebsohn | 57358 | Intern/Analyst | CC4 | Lehman |
| Rigdon | Mark | RigdonMark | 650 937 2613 | Intern/Analyst | Mtn View | Hunt |
| Steffio | Peter | PeterSteffio1 | 614 538 4661 | Intern/Analyst | Columbus | Alford |

**FAX NUMBERS**

| | |
|---|---|
| BA&D Main Fax (45B K02) | 703 265 1206 |
| 45A B00 | 703 265 0672 |
| 45B O05 | 703 265 4780 |
| CC4 5th Floor Fax | 703 265 0670 |
| CC4 5th Floor Fax | 703 265 0671 |
| Adam Lehman | 703 265 4949 |
| Ron Grant's Group | 703 265 0242 |
| David Coburn - Dulles HQ | 703 265 1202 |
| David Coburn - 75 Rock | 212 253 3068 |
| Investments & Acquisitions | 703 265 2998 |
| Investments & Acquisitions | 703 265 5638 |
| Alan Alford - CompuServe | 614 538 3365 |
| Pete Pajor - CompuServe | 614 457 9665 |
| Gio Hunt - Netscape | 650 937 5444 |
| NY - 45 W 18th St | 212 206 4592 |
| NY - 45 W 18th St | 212 206 4595 |
| NY - 75 Rockefeller | 212 405 5212 |
| London | 44 20 7340 8005 |

**MISCELLANEOUS NUMBERS**

| | | |
|---|---|---|
| Accounting Help Desk | | 51827 |
| AOL New Business Hotline (Intake) | | 51200 |
| AOL Convenience Store (CC1) | | 53211 |
| Badging Office | | 51452 |
| Catering - Marriott (SN_CafeBrenda) | | 50322 |
| Corporate Express | 800 238 6329 | |
| Courier Service (via Corp Express - Acct# 8360) | 800 336 4753 | |
| Facilities Help Desk (SN_Facility) | | 53058 |
| Garber Travel | | 51850 |
| Gatehouse | | 52320 |
| H-R Direct | | 51988 |
| IC Help Desk | | 51911 |
| IKON Office | | 53154 |
| Les Concierges | Matt Kledowski (Mgr) | 53636 |
| | Warren Mahan (Mgr) | 51356 |
| | Mary Goff (Mgr) | 50398 |
| | (SN_LesCon222) | 52113 |
| Mailroom - HQ | | 53195 |
| Mailroom - CC1 | | 50663 |
| Mailroom - CC4 | | 51000 |
| Main # - Dulles | | 52120 |
| Reception (HQ) | | 52130 |
| Reception (CC1) | | 52100 |
| Reception (CC2) | | 52500 |
| Reception (CC3) | | 50690 |
| Reception (CC4) | | 56000 |
| Reception (CC5) | | |
| Security (SN_AOL_Security) | 54357 (5-HELP) | |
| Security/Operations (SN_OpsSec) | | 54040 |
| Shipping/Receiving - Fed Ex, etc | | 53254 |
| Taxi - Dulles | | 703 481 8181 |
| Taxi - DC | | 703 651 8230 |
| Voice Mail - retrieve messages | | 51701 |
| Voice Mail - transfer to | | 81701 |
| Weather Line | | 51606 |

**Meeting Place Call-in Numbers**

| Call-In Number | Internal | Toll Free |
|---|---|---|
| 703-265-5000 | 55000 | 877 708 6777 |
| 703-265-5001 | 55001 | 877 708 6770 |
| 703-265-5002 | 55002 | 877 708 6771 |
| 703-265-4963 | 54963 | 877 319 3725 |

CONFIDENTIAL

63142v4

Subj:       **Fwd: Potential New HP Ad Revenue $$$$**
Date:       12/14/01 9:25:38 AM Eastern Standard Time
From:       Tyeryar
To:         EdwardPrince, Srindner
File:       **IDCUNIXReport.htm** (45815 bytes) DL Time (TCP/IP): < 1 minute
Sent on:    AOL 6.0 for Windows US sub 10553


Key Points:

1. Ops wants to do an HP deal  but would like to wait for outcome of HP/Compaq merger before committing. If a
deal is done before the merger outcome is known, it will be small - less than $50M (down from last deal of
$200M), because Ops is dangerously overcommitted on their spend. HP would obviously like to force a deal pre-
merger, so that they can claim both the HP and Compaq commitments post merger.

2. If we can do a deal after the HP/Compaq merger (assuming it closes), we have an opportunity to wipe out the
Compaq commitment and do one larger deal for the unified company.

3. We have an existing partner marketing deal with HP that Paul Ewert has told me they're generally happy with .
. . so incorporating it into a new GA is simply moving paper unless we achieve a significantly better PM deal.

4. In the past deal, we traded discounts back to fund ads - i.e., HP has never in an Ops deal has never done an
ad deal based on real value. I'd like to change that, through Share Shift, and get Ops their negotiated discounts
back.
---------------
Forward Verified: Fri Dec 14 11:04:14 2001
Subj:       **Fwd: Potential New HP Ad Revenue $$$$**
Date:       12/14/01 8:45:12 AM Eastern Standard Time
From:       EdwardPrince
To:         Srindner, Tyeryar
Sent on:    AOL 7.0 for Windows US sub 118

fyi


---------------
Forward Verified: Fri Dec 14 11:04:14 2001
Subj:       **Fwd: Potential New HP Ad Revenue $$$$**
Date:       12/14/01 8:18:40 AM Eastern Standard Time
From:       RayllN
To:         EdwardPrince
Sent on:    AOL 7.0 for Windows US sub 118

FYI,
Ray


---------------
Forward Verified: Fri Dec 14 11:04:14 2001
Subj:       **Potential New HP Ad Revenue $$$$**
Date:       12/14/01 12:13:33 AM Eastern Standard Time
From:       rich_place@hp.com
To:         korn@aol.com
CC:         rayiln@aol.com, labertj@aol.com, barrettjg@aol.com, dlcoleops@aol.com, ann_livermore@hp.com,
            sebastiano_tevarotto@hp.com, scott_mcninch@hp.com
*Sent from the Internet (Details)*

Matt,

018S1AOL0070057112

As this fiscal year comes to a close HP will be one of many potential General Agreements that come up for review.  We expect our proposal to AOL TW to be made by mid-January and I hope that HP will have the opportunity to present what I believe is a very strong value proposition for AOL TW.

As you know the HP General Agreement (GA) with AOL expires this December. We are currently working to restructure the GA and have broad HP executive support for this new GA with AOL.  The new GA will cover:

1. Significant Advertising Revenue
2. AOL Subscriber Revenue
3. Software Licensing Fees
4. Alliance and Partnership Opportunities

HP continues to be the #1 Home PC and Printer company in the marketplace as measured by IDC.  In the latest financial report HP stated  "Home PC revenues increased 23% sequentially" and "HP retained its leading position in home PCs".  This has enabled HP over the last 3 years to generate year-over-year new subscriber revenue of over $300M for AOL.  HP's focus and new products for home appliances and networking would allow AOL and HP to collaborate in new ways and generate new revenue streams for AOL TW for their existing music and video content.

AOL continues to be a valued customer of HP's and we thank you for your business. HP continues to have broad acceptance and success with our Unix and storage products in the marketplace.  I have attached the press release that shows the IDC data that HP is the leader in high-end and midrange Unix systems and is the only computer company to grow Unix revenue quarter to quarter.  D.H. Brown has ranked HP #1 among total storage providers and Gartner Group says "Hewlett-Packard's (HP's) XP-512 is architecturally the most advanced storage subsystem available. The breakthrough design promises large capacity, excellent availability and leadership in throughput".

I will call your assistance to schedule some time so that we can review the outline of the General Agreement.


Best regards,
Richard Place
Account General Manager - AOL Time Warner
703-204-2529 office
703-244-7093 cell

016S1AOL0070057113

| Subj: | **Fwd: AOL and Wembley** |
|---|---|
| Date: | 2/2/01 9:48:14 AM Eastern Standard Time |
| From: | Srindner |
| To: | ELKeller |
| CC: | GregRigdon, DianaDun |
| *Sent on:* | *AOL 5.0 for Windows sub 116* |

In a message dated 1/30/01 9:30:28 PM Eastern Standard Time, ELKeller writes:

<< This has to be a cruel joke --- just confirm that this has been fixed. >>

Eric,  Greg is working on this and will call the folks at Wembly to see exactly what they are asking for/issue here.
Steven
---------------
Forward Verified: Fri Feb 2 18:19:46 2001

| Subj: | **Fwd: AOL and Wembley** |
|---|---|
| Date: | 1/30/01 9:30:28 PM Eastern Standard Time |
| From: | ELKeller |
| To: | Srindner, GregRigdon |
| CC: | DianaDun |

Sent on:   AOL 5.0 for Windows sub 103

This has to be a cruel joke --- just confirm that this has been fixed.
---------------
Forward Verified: Fri Feb 2 18:19:46 2001

| Subj: | **Fwd: AOL and Wembley** |
|---|---|
| Date: | 1/30/01 5:56:11 PM Eastern Standard Time |
| From: | DougNeilLA |
| To: | ELKeller |
| CC: | DianaDun |

Sent on:   6.0 sub 10501

Eric-

I had been working with Jim Patti on the implementation of the settlement with Wembley.com.  As you may know, the deal was that we would run 1 billion impressions and then recognize revenue ($20+MM) - which was done before the end of the year.  We were instructed to run the campaign without any input from Wembley as they were not ready to begin anything yet and we needed to have the impressions run by year end - i.e., we created the art and linked to dummy pages.

**Wembley is now contacting us to begin their campaign.  All of their impressions have run.  How should we respond?**

Thanks,
Doug

Doug Neil
Director, Account Services
310/841-4731
DougNeilLA@aol.com
---------------
Forward Verified: Fri Feb 2 18:19:46 2001

| Subj: | **AOL and Wembley** |
|---|---|

002S1AOL1700183479
Confidential Treatment Requested

| Date: | 1/30/01 11:17:38 AM Eastern Standard Time |

From:   George.Georgiou@wembley.co.uk (George Georgiou)
To:     DougNeilLA@aol.com (Doug Neil (E-mail)), DCKuchem@aol.com (Dana Kuchem (E-mail))

Hi Doug, Dana,

Hope you are keeping well.

Following on from our initial conversation late last year, we are in a
position to move forward with the planning and fulfilment of the impressions
campaign. We can arrange another conference call if you so wish  - please
feel free to suggest a day and time.

Look forward to hearing from you soon.

Regards
George
George Georgiou
Sales & Marketing Manager
24dogs
Wembley plc
Elvin House,
Stadium Way,
Wembley,
Middlesex
HA9 0DW
T: +44 (020) 8585 3909
F: +44 (020) 8903 8285
www.24dogs.com

Map Reference:
http://www.streetmap.co.uk/streetmap.dll?P2M?P=HA90DW&Z=1


---------------------- Headers ------------------------------
Return-Path: <George.Georgiou@wembley.co.uk>
Received: from  rly-yd01.mx.aol.com (rly-yd01.mail.aol.com [172.18.150.1]) by air-yd03.mail.aol.com (v77.31)
with ESMTP; Tue, 30 Jan 2001 11:17:38 -0500
Received: from  stalker1.atlas.net.uk (stalker1.atlas.net.uk [195.54.226.7]) by rly-yd01.mx.aol.com (v77.27) with
ESMTP; Tue, 30 Jan 2001 11:17:22 -0500
Received: from email.wembley (email.wembley.co.uk [195.54.238.18])
    by stalker1.atlas.net.uk (8.11.2/8.11.2) with ESMTP id f0UGFfk17167;
    Tue, 30 Jan 2001 16:15:41 GMT
Received: by email.wembley with Internet Mail Service (5.5.2650.21)
    id <D7QV0DCP>; Tue, 30 Jan 2001 16:16:46 -0000
Message-ID: <6CCAADF5D660D411A83E00508B5532F8757F6B@email.wembley>
From: George Georgiou <George.Georgiou@wembley.co.uk>
To: "Doug Neil (E-mail)" <DougNeilLA@aol.com>,
    "Dana Kuchem (E-mail)"
    <DCKuchem@aol.com>
Subject: AOL and Wembley
Date: Tue, 30 Jan 2001 16:14:51 -0000
MIME-Version: 1.0
X-Mailer: Internet Mail Service (5.5.2650.21)
Content-Type: text/plain;
    charset="iso-8859-1"

002S1AOL1700183480
Confidential Treatment Requested

| Subj: | **Fwd: AOL Issues** |
|---|---|
| Date: | 11/21/01 |
| To: | victoria.harker@wcom.com |
| CC: | edwardprince/a, andrewhaire/a |
| BCC: | dkrjj1/a, junderwoodba/a |

Victoria,

I am glad we had the chance to talk this afternoon. Here is the note we discussed just confirming our conversation. I look forward to exchanging signatures on Monday. Thanks again and hope you have a happy Thanksgiving weekend. Steven

We will run $8.5mm of AOL carriage this Q according to a plan that provides WCom/MCI placements that are comparable to placements that we have run for WCom/MCI on AOL previously. Of course, we will continue to work with your marketing group to run a plan that reflects their latest input.
In Q1 (with respect to the remaining $8.5mm of the $17mm), we will allocate $6mm on AOL and $2.5mm on Turner and Time Warner Cable. With respect to the online component for Q1 and going forward, we will work with your team to finalize a carriage plan. If we do not get final online carriage plans from WCom/MCI within 30-days before the end of a quarter, then again we will only run a carriage plan, limited to the online component, that is comparable to the placements agreed upon in previous quarters by WCom/MCI. For the offline component, we will always only run media placements that are agreed upon by you.
As to payments, the media will be paid for following the $17mm payment that we are making to you on the network agreement. (Media due on 1/31/01 and Network due on 1/15/01.)

With respect your second point in your note to me, I agree that David and Scott need to discuss this, and I will arrange for them to talk.

002S1AOL0070037901
Confidential Treatment Requested

| Subj: | **Re: Telefónica** |
|---|---|
| Date: | 12/7/00 |
| To: | Briheller, KLitsinger |
| CC: | Joshwresnik |

In a message dated 12/7/00 10:01:14 AM Eastern Standard Time, Briheller writes:

<< Congrats to Josh for a great job under the gun.

**Briheller [9:52 AM]:**  i see a telefonica banner on e-mail. it links to a web page that says nothing but "telephonica" in the middle of the page. no graphics, no links, no nuthin!
**Briheller [9:53 AM]:**  Telefónica
**Briheller [9:53 AM]:**  LOL
**Briheller [9:53 AM]:**  you da MAN
**Joshwresnik [9:54 AM]:**   welcome to the new world of e-commerce
**Briheller [9:55 AM]:**  yesssss
**Briheller [9:55 AM]:**  I'm doing a little revenue dance at my desk now
**Joshwresnik [9:55 AM]:**  lol

Brian A. Heller >>
Josh deserves an award for this one. I'm not kidding.

Monday, January 20, 2003 America Online: daticon07

002S1AOL0070046343
Confidential Treatment Requested

CLERK'S OFFICE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CO-932
Rev. 4/96

NOTICE OF DESIGNATION OF RELATED CIVIL CASES PENDING
IN THIS OR ANY OTHER UNITED STATES COURT

**FILED**

**MAR 21 2005**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Civil Action No. __05  0578__
(To be supplied by the Clerk)

**NOTICE TO PARTIES:**

Pursuant to Rule 405(b)(2), you are required to prepare and submit this form at the time of filing any civil action which is related to any pending cases or which involves the same parties and relates to the same subject matter of any dismissed related cases. This form must be prepared in sufficient quantity to provide one copy for the Clerk's records, one copy for the Judge to whom the cases is assigned and one copy  for each defendant, so that you must prepare 3 copies for a one defendant case, 4 copies for a two defendant case, etc.

**NOTICE TO DEFENDANT:**

Rule 405(b)(2) of this Court requires that you serve upon the plaintiff and file with your first responsive pleading or motion any objection you have to the related case designation.

**NOTICE TO ALL COUNSEL**

Rule 405(b)(3) of this Court requires that as soon as an attorney for a party becomes aware of the existence of a related case or cases, such attorney shall immediately notify, in writing, the Judges on whose calendars the cases appear and shall serve such notice on counsel for all other parties.

The plaintiff, defendant or counsel must complete the following:

I.    RELATIONSHIP OF NEW CASE TO PENDING RELATED CASE(S).

A new case is deemed related to a case pending in this or another U.S. Court if the new case:  [Check appropriate box(e's) below.]

|   |   |   |
|---|---|---|
| [ ] | (a) | relates to common property |
| [x] | (b) | involves common issues of fact |
| [x] | (c) | grows out of the same event or transaction |
| [ ] | (d) | involves the validity or infringement of the same patent |
| [ ] | (e) | is filed by the same pro se litigant |

2.    RELATIONSHIP OF NEW CASE TO DISMISSED RELATED CASE(ES)

A new case is deemed related to a case dismissed, with or without prejudice, in this or any other U.S. Court, if the new case involves the same parties and same subject matter.

Check box if new case is related to a dismissed case: [ ]

3.    NAME THE UNITED STATES COURT IN WHICH THE RELATED CASE IS FILED (IF OTHER THAN THIS COURT):

_____

4.    CAPTION AND CASE NUMBER OF RELATED CASE(E'S).  IF MORE ROOM IS NEED PLEASE USE OTHER SIDE.

SEC _____ v. Charles Johnson, Jr., et al. _____ C.A. No. __05cv0036__ GK

__March 21, 2005__
DATE

Signature of Plaintiff /Defendant (or counsel)

2

Prince, Edward Minor (Ted) (corrected version)  8/31/2006  9:10:00 AM

1

```
1
2        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
3        IN AND FOR THE COUNTY OF LOS ANGELES
4    Coordination Proceeding Special Title
5    (Rule) 1550(b)
6    AOL TIME WARNER CASES I & II
7    Coordinated Actions:
8
9    California State Teachers' Retirement )
10   System v. AOL Time Warner, Inc., et al)
11   (S.F. Super. Ct. No. CGC-03-422609)  )
12                                        )
13   The Regents of the University of     )
14   California, et al v. Parsons, et al  )
15   (L.A. Super. Ct. No. BC293848)       )
16                                        )
17   California Public Employees'         )
18   Retirement System v. AOL Time        )
19   Warner, Inc., et al                  )
20   (Sacramento Super. Ct. No. 03AS04015) )
21
22   FTIF Franklin Aggressive Growth      )
23   Fund, et al v. Time Warner           )
24   (San Mateo Super. Ct.                )
25    No. CIV45222)                       )
```

2

```
1
2
3    Water and Power Employees'   ) Judicial Council
4    Retirement Plan, et al v.    ) Coordination Proceeding
5    AOL Time Warner, et al       ) Nos. 4322 and 4325
6    (L.A. Super. Ct. BC346081)   )
7    -----------------------------
8     Videotaped Deposition of EDWARD MINOR PRINCE, JR.
9              Washington, Maryland
10            Thursday, August 31, 2006
11              9:10 a.m.
12   Job No.: 22-85300
13   Pages: 1 - 208
14   Reported By:  Dawn M. Hart, Notary Public, RPR/RMR
15   Videographer:  Will Freburger
16
17
18
19
20
21
22
23
24
25
```

3

```
1
2
3        Videotaped deposition of Edward Minor Prince,
4    Jr., held at the law offices of:
5            Williams & Connolly
6            725 Twelfth Street, Northwest
7            Washington, D.C.  20005
8            (202) 434-5000
9
10
11        Pursuant to Notice, before Dawn M. Hart,
12   RPR/RMR and Notary Public in and for the State of
13   Maryland.
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
1
2              A P P E A R A N C E S
3    ON BEHALF OF CERTAIN CALIFORNIA AND OHIO
4    PLAINTIFFS:
5        SUSAN GOSS TAYLOR, ESQUIRE
6        LAUREN KERKOFF, ESQUIRE
7        LERACH, COUGHLIN, STOIA, GELLER
8        RUDMAN & ROBBINS, LLP
9        655 West Broadway, Suite 1900
10       San Diego, California  92101
11       (619) 231-1058
12   ON BEHALF OF THE PLAINTIFFS CALPERS AND
13   LA FUNDS:
14       AVIAH COHEN PIERSON, ESQUIRE
15       KAPLAN FOX & KILSHEIMER, LLP
16       805 Third Avenue
17       New York, New York  10022
18       (212) 687-1980
19
20   ON BEHALF OF THE DEFENDANT COLBURN:
21       MARY I. PETERS, ESQUIRE
22       ZUCKERMAN SPAEDER, LLP
23       1800 M Street, Northwest
24       Washington, D.C.  20036
25       (202) 778-1800
```

Prince, Edward Minor (Ted) (corrected version)  8/31/2006  9:10:00 AM

5

```
1
2    A P P E A R A N C E S   C O N T I N U E D
3    ON BEHALF OF THE TIME WARNER DEFENDANTS:
4        THOMAS M. CRAIG, ESQUIRE
5        WILLIAMS & CONNOLLY
6        725 Twelfth Street, Northwest
7        Washington, D.C.  20005
8        (202) 434-5000
9
10       GARY A. BORNSTEIN, ESQUIRE
11       STACY LOZNER, ESQUIRE
12       CRAVATH, SWAINE & MOORE, LLP
13       Worldwide Plaza
14       825 Eighth Avenue
15       New York, New York  10019-7475
16       (212) 474-1934
17
18
19
20
21
22
23
24
25
```

6

```
1
2    A P P E A R A N C E S   C O N T I N U E D
3    ON BEHALF OF THE WITNESS:
4        DEBRA D. BERNSTEIN, ESQUIRE
5        JOE D. WHITLEY, ESQUIRE
6        ALSTON & BIRD, LLP
7        One Atlantic Center
8        1201 West Peachtree Street
9        Atlanta, Georgia  30309-3424
10       (404) 881-7000
11
12
13
14
15   ALSO PRESENT:  Mary Britton, Esquire, AOL
16
17
18
19
20
21
22
23
24
25
```

7

```
1
2              C O N T E N T S
3    EXAMINATION OF EDWARD MINOR PRINCE, JR.    PAGE
4        By Ms. Taylor                  9
5            E X H I B I T S
6        (Attached to the transcript.)
7    PRINCE DEPOSITION EXHIBITS          PAGE
8    3104  9AOL230012-14                  55
9    3105  1AOL371040005-06               65
10   4601  4/30/01 E-mail, Tyeryar to Quinn    77
11   4602  E-mail String              83
12   4603  E-mail String              96
13   4604  E-mail String              123
14   4605  10/3/01 E-mail to Mr. Prince
15        re Worldcom Update              133
16   4606  11/2/01 E-mail, Haire to Prince    141
17   4607  E-mail String              150
18   4608  1/15/01 E-mail, Prince to Colburn    159
19   4609  E-mail String              164
20   4610  E-mail String              178
21   4611  E-mail String              184
22   4612  7/18/02 Instant Messenger E-mail    200
23
24
25
```

8

```
1            EDWARD MINOR PRINCE, JR.
2            P R O C E E D I N G S
3        VIDEOGRAPHER:  Here begins Videotape No. 1
4    in the deposition of Ted Prince in the matter AOL Time
5    Warner Securities Litigation.
6        Today's date is August 31st, 2006.  The
7    time on the video monitor is 9:10 a.m.  The video
8    operator today is Will Freburger.  This video
9    deposition is taking place at Williams & Connolly, 725
10   12th Street, Northwest, Washington, D.C.
11       Counsel, please voice identify yourselves
12   and state whom you represent.
13       MS. TAYLOR:  Susan Taylor from Lerach
14   Coughlin Stoia Geller Rudman & Robbins on behalf of
15   various individual action Plaintiffs.
16       MS. KERKOFF:  Laura Kerkoff also with
17   Lerach Coughlin.
18       MS. PIERSON:  Aviah Cohen Pierson with
19   Kaplan Fox & Kilsheimer representing CalPERS and LA
20   Funds.
21       MS. PETERS:  Mary Peters from Zuckerman
22   Spaeder on behalf of Defendant David Colburn.
23       MR. BORNSTEIN:  Gary Bornstein with my
24   colleague Stacy Lozner from Cravath, and Tom Craig
25   from Williams & Connolly.  We represent Time Warner.
```

145

```
 1        EDWARD MINOR PRINCE, JR.
 2     A   That that was a proposed component of a
 3  multi, you know, component deal.
 4     Q   Okay.  And do you recall when that
 5  discussion occurred?
 6     A   I do not.
 7     Q   Do you recall who you were talking to?
 8     A   Andrew was updating me on that, and that was
 9  one of the issues of this, of this component -- of
10  this multi-component deal.
11     Q   Okay.  Was Andrew responsible for
12  negotiating with Worldcom?
13     A   Yes, he was.
14     Q   Okay.  The second point under Our
15  Understanding states, we subsequently agreed with you
16  that AOL Europe would actually pay the full shortfall
17  liability amount under the 10/98 CS Europe agreement
18  and that you would buy ads on AOL Time Warner
19  Properties.  Do you see that?
20     A   Yes, I do.
21     Q   And do you recall discussions regarding that
22  component of the, of the deal?
23     A   I do not recall discussions related to that.
24     Q   Okay.  It states further in that paragraph,
25  as I explained in my E-mail on 10/18, we had accrued
```

146

```
 1        EDWARD MINOR PRINCE, JR.
 2  17 million for the shortfall liability part-way
 3  through Q3, but subsequently we accrued an additional
 4  amount, in parens, at that time 8 million, now
 5  9 million, so we would pay you the shortfall liability
 6  of 26 million and you would buy 25 million of ads.  Do
 7  you see that?
 8     A   Yes, I do.
 9     Q   And what's your understanding of that
10  component of the deal?
11     A   I was not involved on the ad piece, but
12  we're saying the actual liability from this contract
13  we're willing -- we owe and we will pay the shortfall
14  of that liability.
15     Q   And you understood that you would get
16  $25 million in advertising in return, correct?
17     MR. BORNSTEIN:  Object to the form of that
18  question.
19     A   Yeah, I'm -- can you repeat that?
20     Q   And part of deal was to get $25 million of
21  advertising in return, correct?
22     MR. BORNSTEIN:  Object to the form.
23     A   These deals were negotiated
24  contemporaneously, so there was an ad component that
25  had -- there was an ad component as part of us paying
```

147

```
 1        EDWARD MINOR PRINCE, JR.
 2  off this liability that we owed.
 3     Q   And the ad component had similar, if not the
 4  same, value as the liability that was being paid off,
 5  correct?
 6     MS. BERNSTEIN:  You mean discussed as of
 7  this time?
 8     MS. TAYLOR:  Right.
 9     MS. BERNSTEIN:  Just to narrow down the time
10  frame.
11     A   In this E-mail, the ad component is --
12  that's being discussed is similar to the liability
13  that we, that we owed CompuServe.
14     Q   Okay.  And did you have an understanding
15  that that was to be a component of the deal, that AOL
16  would receive advertising in an amount equal to what
17  was paid for the shortfall liability?
18     A   No, I did not have an understanding of that.
19     Q   If you look at the next section entitled
20  Your Understanding.
21     A   Yes.
22     Q   Do you see that?
23     A   Yes.
24     Q   Under No. 1, the second sentence in that
25  paragraph states, we also understand from your note
```

148

```
 1        EDWARD MINOR PRINCE, JR.
 2  that you are willing to buy 25 million for ads,
 3  although it is -- although it's unclear to us how you
 4  would pay 25 million in ads unless we agreed to settle
 5  the shortfall liability for a $25 million payment.  Do
 6  you see that?
 7     A   Yes.
 8     MS. BERNSTEIN:  With that $25 million
 9  payment.
10     MS. TAYLOR:  Excuse me?
11     MS. BERNSTEIN:  I was just -- you said for a
12  $25 million payment.  It just says with.
13     Q   With a $25 million payment.  Do you see that
14  language?
15     A   Yes.
16     Q   Does that refresh your recollection
17  regarding that AOL expected to get an ad deal in the
18  amount that it paid for the shortfall liability?
19     A   I think it was -- there was a
20  contemporaneous piece to this -- to paying off this
21  liability which was an ad component.
22     Q   What do you mean by a contemporaneous piece?
23     A   Sorry.  Contemporaneous negotiation.
24     Q   Okay.  So it's your understanding that the
25  advertising negotiation was completely independent of
```

Prince, Edward Minor (Ted) (corrected version) 8/31/2006 9:10:00 AM

149

1          EDWARD MINOR PRINCE, JR.
2    the shortfall liability payment?
3        A   It was a separate agreement being negotiated
4    by separate people both on the AOL side and on the
5    Worldcom side, was my understanding, albeit
6    contemporaneously.  There was a contemporaneous
7    negotiation.
8        Q   Do you recall working with Mr. Haire to
9    draft the language that's in Exhibit 4606 to be given
10   to Mr. Colburn to use?
11       A   I think I said earlier I don't recall doing
12   those edits.
13       Q   Okay.  Do you recall the situation in
14   general where you and Mr. Haire were asked to prepare
15   a message of -- with information of the nature in 4606
16   for Mr. Colburn?
17       A   I'm sorry, can you rephrase that?
18       Q   Do you recall the situation in general --
19   irrespective of whether you recall drafting and
20   editing this specific language, do you recall a
21   situation being asked to put together the information
22   for Mr. Colburn?
23       MR. BORNSTEIN:  Put together what
24   information for Mr. Colburn?
25       Q   Information that's included in this exhibit,

150

1          EDWARD MINOR PRINCE, JR.
2    but I'm not talking about necessarily editing, you
3    know, this particular --
4        A   So different information than what's in --
5        Q   Do you recall being asked to put together
6    information regarding the shortfall liability and the
7    advertising component with respect to Worldcom's
8    understanding and AOL's understanding?
9        A   Other -- different than this?
10       Q   In general, do you remember being asked to
11   do that?
12       A   In general.  I don't recall the specifics
13   around that.
14       Q   Do you recall general?
15       A   No, I don't.
16       Q   So you don't recall anything about this
17   particular -- being asked to put together the
18   different viewpoints regarding this agreement for
19   Mr. Colburn?
20       A   No, I don't remember that request from him.
21       MS. TAYLOR:  Ask the Court Reporter to mark
22   this as Exhibit 4607.
23       (Exhibit No. 4607 was marked for identification
24   and was attached to the transcript.)
25

151

1          EDWARD MINOR PRINCE, JR.
2        MS. TAYLOR:  For the record, this is a
3    multiple-page document bearing Bates stamp
4    2AOL059840245 through 50.
5        A   (Reviewing.)
6        Okay.
7    BY MS. TAYLOR:
8        Q   And do you recognize this document?
9        A   I don't recall getting it.
10       Q   Okay.  Have you ever seen it before?
11       A   Yes, I have seen it.
12       Q   Okay.  Have you seen it outside the -- do
13   you recall seeing it outside the review -- outside of
14   any review with your counsel?
15       A   No, I do not.
16       Q   If you look at the top of the first page --
17   well, this document contains a series of E-mails,
18   correct?
19       A   Correct.
20       Q   And on the top of the first page, the
21   subject Forward, Forward AOL Worldcom, 11/5/01, from
22   you to Andrew Haire, correct?
23       A   That is correct.
24       Q   Okay.  Do you recall forwarding these
25   E-mails to Mr. Haire?

152

1          EDWARD MINOR PRINCE, JR.
2        A   I do not.
3        Q   Okay.  Any reason to believe you wouldn't
4    have done so during the time you were employed at AOL?
5        A   No, there's none.
6        Q   Okay.  And the next E-mail, same subject,
7    date also 11/5/01, from Mr. Colburn to you and an
8    Srindner, correct?
9        A   Correct.
10       Q   And do you know who Srindner is?
11       A   Yes.
12       Q   Who's that?
13       A   Steven Rindner.
14       Q   Okay.  And what was his role at AOL?
15       A   He was in charge of the advertising piece --
16   or he was Vice-President of Advertising within
17   Business Affairs.
18       Q   Okay.  And I'm actually going to have you
19   flip to the back of this document, on Page 5.  It ends
20   in Bates 249 at the bottom.
21       A   Yes.
22       Q   Okay.  Do you see that?
23       A   Yes.
24       Q   There's an E-mail at the bottom of the page
25   from David Colburn sent Sunday, November 4th to

Prince, Edward Minor (Ted) (corrected version)  8/31/2006  9:10:00 AM

153

EDWARD MINOR PRINCE, JR.

1   EDWARD MINOR PRINCE, JR.
2   Scott Sullivan, subject AOL/Worldcom.  Do you see
3   that?
4       A   Yes, I do.
5       Q   Okay.  And if you look at the text of this
6   E-mail, it contains the AOL View and Worldcom View in
7   bullet points that is a further draft of the E-mail we
8   looked at in Exhibit 4606; is that correct?
9       A   Without going back and comparing, I think
10  that is correct.
11      Q   Okay.  And do you recall working any further
12  with Mr. Colburn in preparing this information to send
13  to Mr. Sullivan?
14      A   No, I do not.
15      Q   Okay.  If you then -- if you then move back
16  to the first page of the document, the E-mail at the
17  bottom of the page is from Mr. Sullivan to David
18  Colburn on 11/5/01, correct?
19      A   Yes, that is correct.
20      Q   Okay.  And does it appear that Mr. Sullivan
21  has forwarded all the sort of intervening E-mails in
22  his E-mail chain; is that your understanding of, of
23  these various E-mails?
24      A   It's a little hard to follow, but -- whether
25  he's copied or forwarded them.  There are, there are

154

1   EDWARD MINOR PRINCE, JR.
2   multiple E-mails attached to this.
3       Q   Okay.  Contained in the E-mail that
4   Mr. Sullivan eventually sent to Mr. Colburn?
5       A   Yes.
6       Q   Okay.
7           MS. BERNSTEIN:  It looks like a lot of
8   E-mails within the E-mail.
9           MS. TAYLOR:  I believe that's how it appears
10  in their system when they forward them.
11          THE WITNESS:  Yeah, it's hard to --
12      Q   Okay.  So looking at this E-mail on the
13  bottom of the first page from Mr. Sullivan, it states,
14  David, we are issuing 17 million in credits on the CSI
15  deal.  If you want 17 million in advertising, then pay
16  17 million instead of the credit and we will place ads
17  even though we don't need them.  If you want
18  $20 million in advertising, then pay 17 million
19  instead of the credit, pay another 3 million and we
20  will place ads even though we don't need them.  If you
21  want $25 million in advertising, then pay 17 million
22  instead of the credit, pay another 8 million and we
23  will place the ads even though we don't need them, et
24  cetera, et cetera.  Do you see that?
25      A   Yes, I do.

155

1   EDWARD MINOR PRINCE, JR.
2       Q   Do you have an understanding of what
3   Mr. Sullivan is talking about here?
4       A   No, I do not.
5       Q   Did you at any time come to learn that the
6   advertising deal with Worldcom was in exchange for the
7   amount that AOL would pay to satisfy the shortfall on
8   the CompuServe portion of the arrangement?
9           MS. BERNSTEIN:  I'm sorry, can you say that
10  again?
11      A   Yeah, can you say that again?
12          MS. TAYLOR:  Can you say the question.  Read
13  back the question.
14          (Record read.)
15      A   No.  As I said before, they were
16  contemporaneously negotiated, but not in exchange for.
17      Q   If you look at the next paragraph of
18  Mr. Sullivan's E-mail it says, David, this has turned
19  into a money-changing scheme and it can't continue.
20  Do you see that?
21      A   Yes, I do.
22      Q   Do you know what he's referring to there?
23      A   No, I do not.
24      Q   Do you recall discussing that with
25  Mr. Colburn in November of 2001?

156

1   EDWARD MINOR PRINCE, JR.
2       A   No, I do not.
3       Q   Do you recall discussing Mr. Sullivan's
4   comments with anyone else at AOL in that time frame?
5       A   I believe I forwarded this to Andrew and
6   asked him if -- what he thought of this.
7       Q   Okay.  And do you recall what he said?
8       A   I say -- yes.  He thought that Mr. Sullivan
9   was very confused and frustrated with the process and
10  that this did not reflect where Andrew, who was
11  negotiating the transaction, was on the transaction.
12      Q   Okay.  What did he feel Mr. Sullivan was
13  confused about with respect to the transaction?
14      A   My recollection is that the amount of the --
15  there were two things at issue; the payment versus the
16  waiver of the liability and the amount of the
17  liability, and there was a lot of confusion about
18  those two variables.
19      Q   Okay.  Do you recall anything more
20  specifically regarding what the confusion was?
21      A   No, I do not.
22      Q   I believe you said you forwarded this E-mail
23  to Mr. Haire, and I'm assuming you're referring to the
24  E-mail at the top of the page?
25      A   Correct.

157

```
1            EDWARD MINOR PRINCE, JR.
2      Q   And he -- did he respond to you in E-mail,
3   do you recall, or --
4      A   I don't recall.
5      Q   Did you have any further discussions or
6   follow-up with him regarding this deal after the
7   discussion you were just telling me about?
8      A   In the time -- in the November time frame,
9   no, I did not.
10     Q   Okay.  Was there a later point in time where
11  you had further follow-up with him and discussions with him
12  regarding this deal?
13     A   Regarding this deal.  We may have discussed
14  it subsequent to this transaction.
15     Q   Okay.  But you don't have a specific
16  recollection of that?
17     A   No, I do not.
18     Q   Above the E-mail we were just looking at for
19  Mr. Sullivan is one from Mr. Colburn to yourself and
20  Steven Rindner?
21     A   Correct.
22     Q   And it says, does this work?  Not sure what
23  he is saying, David.  Do you see that?
24     A   Yes, I do.
25     Q   Do you recall him sending this to you and
```

158

```
1            EDWARD MINOR PRINCE, JR.
2   asking you about this arrangement?
3      A   No, I don't recall that.
4      Q   Do you have an understanding of why he would
5   be asking you in particular for, for assistance?
6      MR. BORNSTEIN:  You mean why he's asking him
7   and Mr. Rindner?
8      MS. TAYLOR:  I'm asking him why he's
9   asking him, if he has an understanding of why he's
10  being asked that.
11     MR. BORNSTEIN:  Oh, I understand.
12     MS. TAYLOR:  Yes.
13     A   I don't know why David is saying this to me,
14  to -- that's it.
15     Q   Do you recall asking him what -- what is
16  this about, what do you want me to do with it, or
17  anything like that?
18     A   No, I don't recall.
19     Q   You just forwarded it to Mr. Haire and asked
20  him to look into it?
21     A   Mr. Haire was leading this negotiation, so I
22  wanted to send it to the person who had the most facts
23  on the negotiation.
24     Q   And do you recall going back to Mr. Colburn
25  with a response?
```

159

```
1            EDWARD MINOR PRINCE, JR.
2      A   I don't recall at the time.
3      MS. TAYLOR:  Ask the Court Reporter to mark
4   this as 4608.
5      (Exhibit No. 4608 was marked for identification
6   and was attached to the transcript.)
7      MS. TAYLOR:  For the record, this is a
8   one-page document bearing Bates stamp
9   018S1AOL0070123307.
10     A   (Reviewing.)
11     Okay.
12  BY MS. TAYLOR:
13     Q   Have you had a chance to review this?
14     A   Yes, I have.
15     Q   Okay.  And do you recognize this document?
16     A   Yes, I've seen -- seen it.
17     Q   Okay.  Have you -- do you recall seeing it
18  outside of reviewing documents with your counsel?
19     A   No, I do not.
20     Q   Okay.  This is an E-mail, subject Re Forward
21  AOL Worldcom, date 1/15/01, from you to Mr. Colburn
22  and Steven Rindner with a cc to Andrew Haire, correct?
23     A   That is correct.
24     Q   Do you recall sending this E-mail?
25     A   I don't recall.
```

160

```
1            EDWARD MINOR PRINCE, JR.
2      Q   Any reason to believe you didn't during the
3   course of your responsibilities while you were
4   employed at AOL?
5      A   No.
6      Q   The message begins with -- excuse me.  The
7   E-mail begins with Mr. Colburn's message which states,
8   does this work?  Not sure what he is saying.  Correct?
9      A   That is correct.
10     Q   And the text below is your response to that;
11  is that correct?
12     A   Yes, this -- I may have drafted this or
13  Andrew Haire may have drafted this, I'm not sure, but
14  this is my response to it.
15     Q   Okay.  And it states, think he is still
16  missing that the liability will be 25 to 26 million by
17  year-end.  He is saying pay 17 million for liability,
18  pay another 8 million for I do not know what, and he
19  will pay us 25 million.
20     Do you see that?
21     A   Yes, I do.
22     Q   Okay.  Do you have an understanding of what
23  you were referring to there?
24     A   I think this goes back to the confusion over
25  what the liability amount was at the time.
```

≡ıı **ERNST & YOUNG** LLP     ■ Internal Correspondence     ■ McLean, VA Office

~~Draft - Subject to Further Review and Input~~
FINAL

Date:       November 6, 2002

To:         AOL Investigation Files

From:       Eddie Paul

Subject:    Telefonica DataCorp, S.A.U. (Telefonica) December 2000 Agreements

## Original EY Procedures Performed

We reviewed America Online, Inc.'s (AOL or the Company) advertising agreement with Telefonica as part of our revenue testing procedures for the quarter ended December 31, 2000. We tested the fair value of the advertising using the carriage plans and rates at which the advertising was provided.

## Company's Historical Accounting

The advertising contracts were accounted for as standard insertion orders for $25 million with revenues to be recognized as the impressions were provided. Refer to the attached Company summary for further detail of the historical accounting.

## Primary Areas of Concern in the Investigation

The Company's review focused on the fair value of the advertising that was provided by AOL and the fair value of the network services that the Company committed to purchase.

## Information Gathered Through the Company's Investigation

The Company obtained emails and desk files accumulated by Cravath related to the Telefonica agreements and reviewed that information for discrepancies from the Company's historical accounting. The information obtained in conjunction with the Company's investigation indicated that there was a verbal agreement between AOL and Telefonica such that AOL would provide "bonus" impressions that were in addition to the impressions guarantee in the insertion orders, and such bonus impressions were to be provided in periods beyond the period in which the impressions provided for in the insertion orders would be delivered by AOL. AOL's Finance Department and Accounting Policy Department became aware of this issue and appropriately deferred revenue recognition related to the bonus impressions to the period in which the bonus impressions were delivered. Refer to the attached Company summary for a description of the adjustment to revenue recognition that was recorded in the quarter ended December 31, 2000 as a result of the bonus impressions guarantee.

EYR 008912
Confidential Treatment
Request by Ernst & Young LLP

With the exception of the aforementioned bonus impressions, the information gathered by the Company did not indicate that AOL agreed to items other than what was in the contracts or that the Company's historical accounting for the agreements was inappropriate. We note that Telefonica was mentioned in the following Company interview questionnaires we reviewed:

Linda Clarizio – Ms. Clarizio indicated that it seemed unusual that Telefonica, a non-US corporate network provider, wanted to advertise to consumers on domestic AOL properties.

Matt Korn – Mr. Korn indicated that it seemed unusual that Telefonica, a non-US corporate network provider, wanted to advertise to consumers on domestic AOL properties.

Lori Locke – When inquired as to whether there were any unusual transactions, Ms. Locke indicated that Telefonica was one such transaction.

Jim MacGuidwin - When inquired as to whether there was anything unusual about the items included in the list of transactions that was provided to Mr. MacGuidwin that the Company should follow up, he indicated that the agreement with Telefonica was one such transaction based on news articles and discussions with Randy [Boe].

Kent Wakefield – Mr. Wakefield indicated that agreement with Telefonica did not make sense.

Mark Wovsaniker – Mr. Wovsaniker indicated that the agreement with Telefonica had side deals or quid pro quo arrangements not documented in the overall deal agreement.

See attached Company interview questionnaires for further detail. All of the above comments were considered by the Company in the execution of their investigation.

## Company's Interpretation of the Additional Information

We discussed the agreements with Cheryl Ingram who indicated that the emails and documents obtained during the investigation including the information obtained during the interviews with AOL personnel or through discussions with PriceWaterhouseCoopers or Cravath, did not indicate that the Company's historical accounting was not appropriate.

Included in the information gathered by the Company was a document obtained from Lori Locke with handwritten notes indicating that AOL's Business Affairs (BA) Group had secretly entered into agreements to manipulate revenue recognition. We inquired of Ms. Ingram about whether the Company addressed this document during its internal investigation. Ms. Ingram indicated that this document was discussed with Ms. Locke and Ms. Locke indicated that the notes were making reference to the bonus impressions (discussed in the above section) that certain BA personnel verbally guaranteed to provide Telefonica. She made the notes at the time she was notified that BA had made impression guarantees beyond the term of the advertising agreement.

We noted that in conjunction with the investigation the Company obtained various email messages in which the sender indicated that the addressee should be careful when documenting the agreements since the contracts are unusual. In addition, there was an email message where the sender indicated that the addressee should not talk to

EYR 008913
Confidential Treatment
Request by Ernst & Young LLP

AOL's Accounting Group about the Telefonica contracts. Although the email messages did not include specific items that indicate the Company's historical accounting was not appropriate, our concern was that the sender was trying to hide items that may impact revenue recognition. We inquired of Ms. Ingram as to whether such email messages were considered as part of the Company's internal investigation. Ms. Ingram informed us that such email messages were considered and that the sender was making reference to the bonus impressions discussed above. Ms. Ingram informed us that she believes the sender was making reference to the bonus impressions based on her discussions with Company personnel, based on the dates of the email messages, and there was no information gathered that would suggest otherwise.

The network services agreement required Telefonica to provide services to the purchasing AOL affiliate (e.g., AOL Europe, AOL Latin America, etc.) on a most favored customer (MFC) basis, wherever it offered such services. Certain countries in which Telefonica provides network services provide statutory rates that require network service providers to charge customers the same rates based on the volume of services purchased. However, the MFC provision in the network services agreement guaranteed that AOL would receive network services at the lowest rates charged by Telefonica for such services without regard to the statutory rates or volume of services purchased. The information obtained by AOL during its investigation included an email message and an advertising deal summary indicating that in situations where the statutory rate charged to AOL was higher than the lowest rate charged to another customer for similar services, Telefonica would issue AOL a credit for the difference. The email message and advertising deal summary indicate that the credit issued by Telefonica may be facilitated through a cash refund to AOL or that Telefonica would purchase advertising from AOL for an amount equal to the credit. The Company informed us that Telefonica never issued AOL credits, in any form, for network services.

Company gathered information included emails with correspondence indicating that AOL advertising linked to Telefonica's website, which was displayed in Spanish, and/or a web page with only the name "Telefonica" in the middle of the page. We inquired of Ms. Ingram as to whether they considered this correspondence in their investigation. Ms. Ingram informed us that she discussed this correspondence with Company personnel. The Company's position is that this does not have any impact on the Company's historical accounting as Telefonica, not AOL, bore sole responsibility for and maintained sole control over the content of the Telefonica website and its ability to handle traffic generated by the AOL advertisements.

**EY Procedures**

Our procedures included reviewing our historical work-papers related to Telefonica, reviewing the emails and desk files that were obtained in conjunction with the investigation, reviewing the summary of the historical accounting prepared by the Company, reviewing the questionnaires the Company used to document their interviews with Company personnel, and holding discussions with Ms. Ingram to discuss certain of the documents we reviewed and whether there were any items in addition to the aforementioned information she had knowledge of that may indicate the Company's historical accounting was not appropriate.

EYR 008914
Confidential Treatment
Request by Ernst & Young LLP

**EY Conclusions**

Based on the information gathered by the Company as a result of their investigation we consider their interpretation of the information, as described above, to be reasonable.

EYR 008915
Confidential Treatment
Request by Ernst & Young LLP

Wovsaniker, Mark (corrected version) 7/24/2006 9:18:00 AM

0001

```
2           V O L U M E  1
3      IN THE SUPERIOR COURT OF THE STATE OF CALIFORN
4        IN AND FOR THE COUNTY OF LOS ANGELES
5    Coordination Proceeding Special Title
6    (Rule) 1550(b)
7    AOL TIME WARNER CASES I & II
8    Coordinated Actions:
9
10   California State Teachers' Retirement )
11   System v. AOL Time Warner, Inc., et al)
12   (S.F. Super. Ct. No. CGC-03-422609)  )
13                                         )
14   The Regents of the University of     )
15   California, et al v. Parsons, et al   )
16   (L.A. Super. Ct. No. BC293848)        )
17                                         )
18   California Public Employees'          )
19   Retirement System v. AOL Time         )
20   Warner, Inc., et al                   )
21   (Sacramento Super. Ct. No. 03AS04015) )
22
23   FTIF Franklin Aggressive Growth       )
24   Fund, et al v. Time Warner            )
25   (San Mateo Super. Ct.                 )
```

0002

```
2    No. CIV45222)        )
3    Water and Power Employees'  ) Judicial Council
4    Retirement Plan, et al v.   ) Coordination Proceeding
5    AOL Time Warner, et al      ) Nos. 4322 and 4325
6    (L.A. Super. Ct. BC346081)  )
7    -----------------------------
8      Videotaped Deposition of MARK WOVSANIKER
9            Washington, D.C.
10           Monday, July 24, 2006
11              9:18 a.m.
12   Job No.:  22-83215
13   Pages:  1 - 336
14   Reported By:  Dawn M. Hart, Notary Public, RPR/RMR
15   Videographer:  Cali Day
```

0003

```
2
3       Videotaped deposition of Mark Wovsaniker, held at
4    the law offices of:
5         Williams & Connolly
6         725 Twelfth Street, Northwest
7         Washington, D.C.  20005
8         (202) 434-5000
9
10
11       Pursuant to Notice, before Dawn M. Hart,
12   RPR/RMR and Notary Public in and for the State of
13   Maryland.
```

0004

```
2           A P P E A R A N C E S
3    ON BEHALF OF THE PLAINTIFFS CALIFORNIA AND OH
4    PLAINTIFFS:
5        MICHAEL J. DOWD, ESQUIRE
6        MATTHEW I. ALPERT, ESQUIRE
7        LERACH, COUGHLIN, STOIA, GELLER
8        RUDMAN & ROBBINS, LLP
9        655 West Broadway, Suite 1900
10       San Diego, California  92101
11       (619) 231-1058
12
13   ON BEHALF OF THE DEFENDANT COLBURN:
14       MARY I. PETERS, ESQUIRE
15       ZUCKERMAN SPAEDER, LLP
16       1800 M Street, Northwest
17       Washington, D.C.  20036
18       (202) 778-1800
19
20   ON BEHALF OF THE TIME WARNER DEFENDANTS:
21       EDWARD BENNETT, ESQUIRE
22       WILLIAMS & CONNOLLY
23       725 Twelfth Street, Northwest
24       Washington, D.C.  20005
25       (202) 434-5000
```

Wovsaniker, Mark (corrected version)  7/24/2006  9:18:00 AM

```
      0005                                              0006
2     A P P E A R A N C E S   C O N T I N U E D        2     A P P E A R A N C E S   C O N T I N U E D
3                                                      3
4         GARY A. BORNSTEIN, ESQUIRE                   4     ON BEHALF OF THE DEFENDANTS TULI AND RINDNE
5         RADU A. LELUTIU, ESQUIRE                     5         SUZANNE DALLAS REIDER, ESQUIRE
6         CRAVATH, SWAINE & MOORE, LLP                 6         STEPTOE & JOHNSON, LLP
7         Worldwide Plaza                              7         1330 Connecticut Avenue, Northwest
8         825 Eighth Avenue                            8         Washington, D.C.  20036-1795
9         New York, New York  10019-7475               9         (202) 429-3000
10        (212) 474-1000                               10
11                                                     11    ON BEHALF OF THE PLAINTIFFS CALPERS, WATER &
12    ON BEHALF OF THE DEFENDANT ERNST & YOUNG, LI     12    POWER, LACERS, LA FIRE AND POLICE:
13        MICHAEL L. RUGEN, ESQUIRE                    13        HAE SUNG NAM, ESQUIRE
14        HELLER EHRMAN, LLP                           14        KAPLAN, FOX & KILSHEIMER, LLP
15        333 Bush Street                              15        805 Third Avenue
16        San Francisco, California  94104-2878        16        New York, New York  10022
17        (415) 772-6000                               17        (212) 687-1980
18    ON BEHALF OF THE WITNESS:                        18
19        STEPHEN G. TOPETZES, ESQUIRE                 19    ALSO PRESENT:  Mary Britton, Esquire
20        ANDREW R. McFALL, ESQUIRE                    20        Andrew Rudolph, CPA
21        KIRKPATRICK & LOCKHART                       21
22        NICHOLSON GRAHAM, LLP                        22
23        1601 K Street, Northwest                     23
24        Washington, D.C.  20006-1600                 24
25        (202) 778-9100                               25
```

```
      0007                                              0008
2         C O N T E N T S                              2     E X H I B I T S   C O N T I N U E D
3     EXAMINATION OF MARK WOVSANIKER        PAGE       3     2960  EY6/00007191-7192 Memo 2000
4     By Mr. Dowd                    12                4           Audit Files from Klein 6/21/00      144
5         E X H I B I T S                              5     2961  1AOL105060079-081 re Business
6         (Attached to the transcript.)                6           Affairs Staff Meeting 10/16/00      149
7     WOVSANIKER DEPOSITION EXHIBITS        PAGE       7     2962  E0EAOL0030136072-077 E-mail
8     2951  002S1AOL2780008146-8147                    8           4/30/01                  160
9           E-mail 5/6/99 Wovsaniker to Kelly    54    9     2963  1AOL103770144-0145 E-mail
10    2952  13AOL002012696-2705 re Compensation        10          Wovsaniker to Desroches 10/19/01    168
11          History Wovsaniker          61             11    2964  EY6/99004933-941 Audit Strategies
12    2953  1AOL115270001-0002 E-mail 9/6/99           12          Memo 6/30/98              184
13          Wovsaniker to Kelly, et al      69         13    1266  002S1AOL2780011975-976 E-mail
14    2954  002S1AOL2780004851 E-mail 9/23/99    88    14          Kelly to Len C            --
15    2955  E0E6AOL0030733277-278 E-mail               15    2965  1AOL173560173 E-mail 2/24/00
16          9/23/99 Keller to Wovsaniker      98       16          Wovsaniker to Kelly, et al      202
17    2956  040S1AOL2280088895 E-mail Wovsaniker       17    440   1AOL115070260 E-mail BAG Update
18          to MacGuldwin 1/31/00       113            18          2/27/00
19    2957  E0E6AOL0020022273-274 E-mail Miesel        19    2966  002S1AOL2780027272-79 E-mail
20          to Wovsaniker 3/17/00       126            20          String 3/15-3/16/00       219
21    2958  002S1AOL2780044917 E-mail                  21    2967  002S1SOL2780018910 E-mail
22          MacGuldwin to Wovsaniker 3/21/00    135    22          Wovsaniker to Kelly 4/17/00     224
23    2959  002S1AOL2780018358 E-mail                  23    2968  018S1AOL2780028326 E-mail
24          MacGuldwin to Colburn 5/8/00      140      24          Sokol to Wovsaniker 6/6/00      227
25                                                     25
```

32

1      MARK WOVSANIKER
2  became a partner.
3     Q  Were there any particular types of audits or
4  industries that you were involved in auditing during
5  the time that you were with Ernst & Young but before
6  you began working on AOL matters?
7     A  I -- a large -- as a partner, a large amount
8  of my time was spent in merger and acquisition work.
9  I also worked on software companies and entertainment
10 companies.
11    Q  When you say merger and acquisition work,
12 exactly what do you mean by that?
13    A  We assisted companies and venture capital
14 firms in due diligence and making acquisitions.
15    Q  And what do you mean when you say due
16 diligence?
17    A  Review of financial information from target
18 companies.
19    Q  So in other words, for a company that was
20 interested in making an acquisition, you performed
21 this dual diligence as you described it for the
22 acquiring company?
23    A  That's correct.
24    Q  Okay.  And what's the purpose of doing due
25 diligence?

33

1      MARK WOVSANIKER
2     A  To gain an understanding of the company's
3  financial information to try and make appropriate
4  decisions about purchase and about value.
5     Q  When did you first work on matters related
6  to either AOL or Time Warner at Ernst & Young?
7     A  I was a staff accountant in 1977 on Time,
8  Inc.
9     Q  And that's where you worked with Mr. Ripp?
10    A  Yes.
11    Q  And how long did you remain on the Time,
12 Inc. audit team?
13    A  For one year.
14    Q  And when was the next time that you worked
15 on either AOL or Time Warner matters?
16    A  As a partner I consulted on various issues
17 affecting both companies.
18    Q  Okay.  So in other words, between '77 and
19 '89 as best you recall you didn't do any work with
20 regard to AOL or Time Warner?
21    A  Not that I recall.
22    Q  Okay.  And when you say you consulted as a
23 partner, what do you mean by that?  Do you have
24 specific things that you remember consulting about?
25    A  Nothing that I can remember specifically.  I

34

1      MARK WOVSANIKER
2  remember there were various issues with respect to
3  potential acquisitions that AOL was making.  I was
4  consulted on potential accounting for those.  There
5  were -- there may have been one or two issues with
6  Time Warner that I was consulted on.
7     Q  Do you recall any particular acquisitions
8  made by AOL that you consulted on?
9     A  I don't.
10    Q  And do you recall any particular
11 acquisitions that you were consulted on with regard to
12 Time Warner?
13    A  I don't.
14    Q  Did there become -- did there come a time
15 that you became involved in audits of AOL or Time
16 Warner?
17    A  Yes.
18    Q  Okay, tell me about that.
19    A  In -- I believe it was in, March 1998, I
20 was asked to become the audit partner for AOL.
21    Q  And who asked you to do that?
22    A  I can't recall specifically.
23    Q  How does that work at Ernst & Young in that
24 time frame, say in March of '98, how would you get a
25 new audit client or become an audit partner for a new

35

1      MARK WOVSANIKER
2  client?
3     A  Someone at a senior level in the firm
4  approached me and asked me if I would take that on.
5     Q  And what had you been doing prior to that
6  time?
7     A  I was primarily involved in merger and
8  acquisition due diligence work.
9     Q  And what was the first quarterly review or
10 year-end audit that you became involved in as an
11 Ernst & Young partner in connection with AOL?
12    A  June 1998.
13    Q  And that would have been the year-end audit
14 for AOL at that time?
15    A  Yes.
16    Q  And who worked with you at Ernst & Young in
17 connection with the year-end '98 audit of AOL?
18    A  John Shames was the second partner.  There
19 were various staff members.
20    Q  Do you recall any of the staff members at
21 that time?
22    A  I just recall Stephen Kenny.
23    Q  And had you worked with Mr. Kenny prior to
24 that time?
25    A  Yes.

Wovsaniker, Mark (corrected version) 7/24/2006 9:18:00 AM

36

MARK WOVSANIKER

1
2    Q   And in connection with what issues or deals?
3    A   He had worked with me on various deals and
4    transactions in New York.
5    Q   And you encouraged him to move to Virginia
6    and work on the AOL audits; is that correct?
7    A   Yes.
8    Q   Did you consider yourself a mentor for Mr.
9    Kenny?
10   A   I probably was one of many.
11   Q   I take it you remained the engagement
12   partner for AOL until the merger with AOL Time Warner?
13   A   No.
14   Q   Okay.  How did you your role change?
15   A   In I believe May of 1999, Mike Kelly asked
16   me to join the company.
17   Q   And that's when you went to work for AOL?
18   A   Yes.
19   Q   Tell me about your discussions with Mr.
20   Kelly when you first came on board AOL, I mean about
21   your employment.
22   A   I'm not sure what --
23   Q   Sure.
24   A   -- what you mean.
25   Q   Did you approach Mr. Kelly, did he approach

37

MARK WOVSANIKER

1
2    you?  Just tell me about your conversations.
3    A   No, he approached me.  He said that, that he
4    thought it was appropriate for the company to have
5    some of the skills that I had in-house and he asked me
6    to join the company.
7    Q   Okay.  So that would have been in May of
8    1998 -- 99?
9    A   May of 1999, correct.
10   Q   Did you know Mr. Kelly prior to the time
11   that you became an Ernst & Young engagement partner
12   for AOL in June of '98?
13   A   No.
14   Q   How many times had you met with Mr. Kelly
15   prior to the time he asked you if you would be
16   interested in a position with AOL?
17   A   Fairly frequently.  I can't recall
18   specifically.
19   Q   In connection with your audit work?
20   A   Yes.
21   Q   Okay.  Were there other people at the AOL
22   who you had worked with in the past, former Ernst &
23   Young people for example, other than Mr. Ripp?
24   MR. BORNSTEIN:  Object to the form of that
25   question.  Mr. Ripp was not at AOL at the time.

38

MARK WOVSANIKER

1
2    MR. DOWD:  Sure.  I understand.
3    A   Yes.
4    Q   Okay.  And tell me about that.
5    A   Tom Pierno.
6    Q   Anyone else besides Mr. Pierno?
7    A   Nothing -- no one that I can think of.
8    Q   And how had you worked with Mr. Pierno?
9    A   He had formerly been in the Ernst & Young
10   office in New York.
11   Q   Had you worked with him on particular audits
12   or issues?
13   A   He was -- he and I were at one time both
14   assigned to the Gulf and Western engagement.
15   MR. RUGEN:  Mr. Wovsaniker, as Ernst &
16   Young's counsel, I just want to caution you if you --
17   you're free to testify about public engagements for
18   publicly-traded companies, but I would prefer that you
19   not testify about private engagements or consulting
20   engagements for public companies that might not be
21   publicly-available information.
22   THE WITNESS:  Okay.
23   MR. RUGEN:  You can describe the latter, but
24   not use the names.  How's that?
25   BY MR. DOWD:

39

MARK WOVSANIKER

1
2    Q   During the time that you were at AOL and
3    then AOL Time Warner, I take it you had a fair amount
4    of contact with Ernst & Young audit team?
5    A   Yes.
6    Q   Were you the primary contact for the Ernst &
7    Young audit team in connection with the AOL division?
8    A   I don't, I don't believe so, no.
9    Q   Okay.  Who would you say was their primary
10   contact?
11   A   I would say primary contact would be the
12   Controller.
13   Q   And that would have been Mr. MacGuidwin at
14   some point in time?
15   A   Yes.
16   Q   Okay.  Anyone else?
17   A   Later on, Tom Colan.
18   Q   During the time that you were at the AOL
19   division, was there ever a time that in your mind you
20   failed to disclose relevant information to Ernst &
21   Young auditors?
22   A   Not that I'm aware of.
23   Q   I take it that in your role as special
24   advisor you've had time to go back and look at
25   documents relating to particular transactions that

1

0001
1        SUPERIOR COURT OF THE STATE OF CALIFORNIA
2              COUNTY OF LOS ANGELES
3       COORDINATION PROCEEDING SPECIAL TITLE
4       (RULE 1550(b)):
5            AOL TIME WARNER CASES I & II
6            COORDINATED ACTIONS
7       ------------------------------x
8       REGENTS OF THE UNIVERSITY OF  |
9       CALIFORNIA, et al,            |
10            Plaintiffs,   |  L.A. Super. Ct.
11                          |  No. BC293848
12            vs.           |
13      RICHARD D. PARSONS, et al,  |
14            Defendants.   |
15      ------------------------------x
16      CALIFORNIA PUBLIC EMPLOYEES  |
17      RETIREMENT SYSTEM,           |
18            Plaintiff,   |  Sacramento
19            vs.          |  Super. Ct. No.
20      AOL TIME WARNER, INC., et al, |  03AS04015
21            Defendants.  |
22      ------------------------------x
23      ------------------------------
24         -- CAPTION CONTINUED NEXT PAGE --
25      ------------------------------

2

1       ------------------------------x
2       CALIFORNIA STATE TEACHERS   |
3       RETIREMENT SYSTEM,          |
4            Plaintiff,   |  S.F. Super. Ct.
5            vs.          |  No.
6       AOL TIME WARNER, INC., et al, |  CGC-03-422609
7            Defendants.  |
8       ------------------------------x
9       ------------------------------x
10      LOS ANGELES COUNTY EMPLOYEES  |
11      RETIREMENT ASSOCIATION,       |
12            Plaintiff,   |
13      vs.                |  L.A. Super. Ct.
14      RICHARD D. PARSONS, et al,  |  No. BC303050
15            Defendants.  |
16      ------------------------------x
17
18
19
20
21
22
23      ------------------------------
24         -- CAPTION CONTINUED NEXT PAGE --
25      ------------------------------

3

1       IN THE COMMON PLEAS COURT OF FRANKLIN COUNTY,
2       ------------------------------x
3       OHIO PUBLIC EMPLOYEES      |
4       RETIREMENT SYSTEM, et al,  |
5            Plaintiffs,  |  Case No.
6       vs.                |  03CVH07-7932
7       RICHARD D. PARSONS, et al,  |
8            Defendants.  |
9       ------------------------------x
10      SUPERIOR COURT OF THE STATE OF ALASKA
11            FIRST JUDICIAL DISTRICT
12      ------------------------------x
13      ALASKA STATE DEPARTMENT OF  |
14      REVENUE, et al,             |
15            Plaintiffs,  |  Case No.
16      vs.                |  1JU-04-503-CI
17      AMERICA ONLINE, INC., et al, |
18            Defendants.  |
19      ------------------------------X
20         Confidential Videotaped Deposition of
            J. MICHAEL KELLY
21         Wednesday, July 26th, 2006
            Washington, D.C.
22         9:00 a.m.
23      Job No.: 22-80932
24      Pages 1 - 321, Volume I
25      Reported by:  Laurie Bangart-Smith

4

1
2         Confidential Videotaped Deposition of
3              J. MICHAEL KELLY
4
5       HELD AT THE OFFICES OF:
6            WILLIAMS & CONNOLLY, LLP
7            725 Twelfth Street, Northwest
8            Washington, D.C. 20005
9            (202)434-5145
10
11
12
13
14
15
16
17
18
19         Pursuant to notice, before Laurie
20      Bangart-Smith, Registered Professional Reporter,
21      Certified Realtime Reporter, and Notary public of
22      the District of Columbia.
23
24
25

5

| | |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | |
| 3 | ON BEHALF OF PLAINTIFFS THE REGENTS OF THE |
| 4 | UNIVERSITY OF CALIFORNIA, AMALGAMATED BANK AND |
| 5 | ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIA |
| 6 | MICHAEL J. DOWD, ESQUIRE |
| 7 | LERACH, COUGHLIN, STOIA, GELLER, |
| 8 | RUDMAN & ROBBINS, LLP |
| 9 | 655 West Broadway, Suite 1900 |
| 10 | San Diego, California 92101 |
| 11 | Telephone: (619)231-1058 |
| 12 | ON BEHALF OF PLAINTIFF CALPERS AND THE LOS ANGE |
| 13 | COUNTY EMPLOYEES RETIREMENT ASSOCIATION: |
| 14 | DONALD R. HALL, ESQUIRE |
| 15 | KAPLAN, FOX & KILSHEIMER, LLP |
| 16 | 805 Third Avenue |
| 17 | New York, New York 10022 |
| 18 | Telephone: (212)687-1980 |
| 19 | ON BEHALF OF DEFENDANT ERNST & YOUNG: |
| 20 | MICHAEL L. RUGEN, ESQUIRE |
| 21 | HELLER EHRMAN |
| 22 | 333 Bush Street |
| 23 | San Francisco, California 94104 |
| 24 | Telephone: (415)772-6000 |
| 25 | |

6

| | |
|---|---|
| 1 | (Appearances continued) |
| 2 | ON BEHALF OF DEFENDANT DAVID COLBURN: |
| 3 | MARYLL TOUFANIAN, ESQUIRE |
| 4 | ZUCKERMAN SPAEDER, LLP |
| 5 | 1800 M Street, Northwest |
| 6 | Washington, D.C. 20036 |
| 7 | Telephone: (202)778-1800 |
| 8 | ON BEHALF OF DEFENDANT TIME WARNER AND THE |
| 9 | WITNESS, J. MICHAEL KELLY: |
| 10 | EVAN R. CHESLER, ESQUIRE |
| 11 | MICHAEL BEAM, ESQUIRE |
| 12 | CRAVATH, SWAINE & MOORE, LLP |
| 13 | Worldwide Plaza |
| 14 | 825 Eighth Avenue |
| 15 | New York, New York 10019 |
| 16 | Telephone: (212)474-1243 |
| 17 | -- and -- |
| 18 | JONATHAN R. TUTTLE, ESQUIRE |
| 19 | ADA FERNANDEZ JOHNSON, ESQUIRE |
| 20 | DEBEVOISE & PLIMPTON, LLP |
| 21 | 555 13th Street, Northwest |
| 22 | Washington, D.C. 20004 |
| 23 | Telephone: (202)383-8124 |
| 24 | |
| 25 | |

7

| | |
|---|---|
| 1 | (Appearances continued) |
| 2 | ALSO ON BEHALF OF DEFENDANT TIME WARNER: |
| 3 | EDWARD J. BENNETT, ESQUIRE |
| 4 | WILLIAMS & CONNOLLY, LLP |
| 5 | 725 Twelfth Street, Northwest |
| 6 | Washington, D.C. 20005 |
| 7 | Telephone: (202)434-5000 |
| 8 | IN-HOUSE AOL COUNSEL: |
| 9 | MARY BRITTON, ESQUIRE |
| 10 | ASSISTANT GENERAL COUNSEL |
| 11 | AOL, LLC |
| 12 | 22000 AOL Way |
| 13 | Dulles, Virginia 20166 |
| 14 | Telephone: (703)265-3020 |
| 15 | ON BEHALF OF DEFENDANT CITY GROUP GLOBAL MARI |
| 16 | INC.: |
| 17 | DAMALI A. TAYLOR, ESQUIRE |
| 18 | DAVIS, POLK & WARDWELL |
| 19 | 450 Lexington Avenue |
| 20 | New York, New York 10017 |
| 21 | Telephone: (212)450-2000 |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

8

| | |
|---|---|
| 1 | (Appearances continued) |
| 2 | ON BEHALF OF DEFENDANT ERIC KELLER: |
| 3 | KYLE FIET, ESQUIRE |
| 4 | LATHAM & WATKINS |
| 5 | 555 Eleventh Street, Northwest |
| 6 | Washington, D.C. 20004 |
| 7 | Telephone: (202)637-2200 |
| 8 | ON BEHALF OF DEFENDANT MORGAN STANLEY: |
| 9 | LAURA E. KABLER, ESQUIRE |
| 10 | SULLIVAN & CROMWELL, LLP |
| 11 | 1888 Century Park East |
| 12 | Los Angeles, California 90067 |
| 13 | Telephone: (310)712-6648 |
| 14 | |
| 15 | Also present: |
| 16 | John Hagin, Videographer |
| 17 | Andrew Rudolph, CPA |
| 18 | Terry Koelbl |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

29

1  the online businesses and how to use their assets
2  and push them into the online -- take advantage of
3  the online opportunities that were coming down the
4  line.
5      Q   You said that you formally became the
6  CFO of AOL Time Warner in January 2001; is that
7  right?
8      A   I said when the merger closed, it was
9  January 2001, yes.
10     Q   And did you physically move from
11 Virginia up to New York at that point?
12     A   No, sir.
13     Q   Okay.  Tell me about that.  How did
14 your -- physically how did you switch jobs?
15     A   Physically I was in the office Monday
16 through Friday and through the weekends up in New
17 York.  I had an apartment in New York.  Most of
18 time I would go up Monday morning very early and
19 come back late Friday evenings.
20     Q   So you would be in the New York office
21 during the week?
22     A   Absolutely.
23     Q   Okay.  And --
24     A   Unless I was traveling -- excuse me --
25 unless I was traveling for visiting the operations

30

1  out in the field or other activities, but my
2  permanent office was in New York.
3      Q   Sure.  I just wanted to understand where
4  you were based.
5          And who replaced you as the CFO of AOL?
6      A   Mr. Ripp.
7      Q   Had you worked with Mr. Ripp before?
8      A   I worked with Mr. Ripp during the
9  process of the merger.  Going back a bit just to
10 expand, hopefully have some context here, during
11 the merger we spent -- we started to spend a fair
12 amount of time in New York during the spring and
13 fall of 2000, it was during the spring of 2000,
14 preparing for some meetings.  We also spent a
15 great deal of time in the early fall, late summer
16 early fall all the way until close, in New York,
17 working on merger integration, budgets, processes.
18 During that time frame I had an opportunity to
19 meet Mr. Ripp on a number of occasions and worked
20 with him on a variety of projects at that point in
21 time.
22     Q   How long did you remain the CFO of the
23 combined company?
24     A   The time the merger was consummated
25 until such time as in the late, late fall, early

31

1  winter of that year, of 2001.
2      Q   Okay.  Can you give me a month, say?
3      A   I think officially it was -- my
4  responsibilities carried over.  That's why I'm
5  being -- I think officially in the October time
6  frame we named the new CFO.  I retained some
7  responsibility for some transactions that were
8  under way that didn't -- but didn't really finish
9  up until December time frame.
10     Q   What were the transactions that you
11 remained responsible for between October and
12 December?
13     A   The largest transaction, the majority of
14 the work was related to contemplating and
15 participating in the auction for the AT&T
16 broadband assets.
17     Q   So you remained in charge of that
18 process?
19     A   That's correct.
20     Q   And what new role did you take after you
21 left the CFO position?
22     A   Came back down to AOL's Chief Operating
23 Officer of the AOL Division.
24     Q   And what prompted that switch from being
25 the CFO of AOL Time Warner to be the COO of AOL?

32

1      A   There was two issues or two related
2  issues.  The first was that AOL Division was
3  starting to struggle.  We had taken a lot of
4  struggle from a management perspective, from our
5  perspective.  Mr. Pittman first approached me
6  about going back down to assist Mr. Schuler.
7  Mr. Levin also approached me.  We had discussions
8  about the opportunity.  I thought it might be a
9  good career move in terms of going down and
10 helping to do that.  The second, frankly, is that
11 the back-and-forth on a repeated basis now for
12 almost a year and a half, the commute, was not
13 having as much time with my family as I would have
14 liked.
15     Q   When you were the CFO of the AOL
16 Division between '98 and the time the merger
17 closed, who did you report to?
18     A   Reported to Mr. Case.
19     Q   And after the merger, how did your
20 reporting structure change, if at all?
21     A   Sorry?
22     Q   How did your reporting structure change,
23 if at all?
24     A   I reported to Mr. Levin for the
25 combined -- at the combined company level.

1

```
0001
 1        SUPERIOR COURT OF THE STATE OF CALIFORNIA
              COUNTY OF LOS ANGELES
 2    ----------------------------------------X
      Coordination Proceeding Special Title
 3        (Rule 1550(b)):
          AOL TIME WARNER CASES I & II
 4           Coordinated Actions:
 5    Regents of the University of California,
      et al. vs. Parsons, et al.
 6       (L.A. Super. Ct. No. BC293848)
 7    California Public Employees' Retirement System
      vs. AOL Time Warner, Incorporated
 8       (Sacramento Super. Ct. No. 03AS04015)
 9    California State Teachers' Retirement System
      vs. AOL Time Warner, Incorporated
10       (S.F. Super. Ct. No. CGC-03-422609)
11    Los Angeles County Employees Retirement
      Association vs. Parsons, et al.
12       (L.A. Super. Ct. No. BC303050)
13    ----------------------------------------X
14        FRANKLIN COUNTY COMMON PLEAS COURT
                  COLUMBUS, OHIO
15
      Ohio Public Employees' Retirement System, et al.
16       vs.
      Richard D. Parsons, R.E. "Ted Turner," et al.
17    Case No. 03CVH07-7932
      ----------------------------------------X
18           VOLUME I
19    Videotaped, Video Streamed, and Text Streamed
                Deposition of
20             Ernst & Young
             by and through
21          GREGORY M. BEAMS
      Held on: Thursday, June 15, 2006, 9:19 a.m.
22       Held at:  Heller Ehrman
                7 Times Square
23             New York, New York
              before Frank Bas, RPR
24    Notary Public in and for the State of New York
25
```

2

```
 1
 2    A P P E A R A N C E S:
 3
      LERACH, COUGHLIN, STOIA, GELLER,
 4    RUDMAN & ROBBINS LLP
      Attorneys for State Teachers' Retirement
 5    System of Ohio
         655 West Broadway, Suite 1900
 6       San Diego, California  92101-3301
 7    BY:  MIKE DOWD, ESQ.
 8
      KAPLAN FOX & KILSHEIMER LLP
 9    Attorneys for CALPERS and the California
      Public Employees' Retirement System
10       805 Third Avenue
         New York, New York 10022
11
12    BY:  MELINDA D. RODON, ESQ.
13
14
15    HELLER EHRMAN LLP
      Attorneys for Ernst & Young and
16    The Witness
         333 South Hope Street
17       Los Angeles, California  90071
18    BY:  ROBERT HUBBELL, ESQ.
19
20
21    MICHAEL J. CRANE, ESQ.
      Associate General Counsel
22       Ernst & Young LLP
         5 Times Square
23       New York, New York 10017
24
25
```

3

```
 1
 2    A P P E A R A N C E S (continued):
 3
      CRAVATH, SWAINE & MOORE LLP
 4    Attorneys for Time Warner
         825 Eighth Avenue
 5       New York, New York  10019-7475
 6    BY:  OWEN CYRULNIK, ESQ.
 7
 8
 9    ZUCKERMAN SPAEDER LLP
      Attorneys for David Colburn
10       1800 M Street, NW
         Washington, D.C. 20036-5802
11
      BY:  MARYLL WEATHERSTON TOUFANIAN, ESQ.
12
13
14
      ALSO PRESENT:
15
16    ANDREW RUDOLPH, Lerach Coughlin
17    TERRY KOELBL, Lerach Coughlin
18    MATTHEW CHAVEZ, Videographer
19    LegaLink Action Video
20
21
22
23
24
25
```

4

```
 1
 2        VIDEOGRAPHER:  This is video
 3    operator speaking, Matthew Chavez, of
 4    Legalink Action Video, 420 Lexington
 5    Avenue, New York, New York.  Today is
 6    June 15, 2006 and the time is 9:19 a.m.
 7        We are at the offices of Heller
 8    Ehrman, 7 Times Square Plaza, New York,
 9    New York to take the videotaped deposition
10    of Gregory Beams in the matter of AOL Time
11    Warner, Cases I and II, in the Superior
12    Court of the State of California, County of
13    Los Angeles.
14        Will counsel please voice identify
15    themselves for the record.
16        MR. HUBBELL:  Good morning.  Robert
17    Hubbell of Heller Ehrman for Ernst & Young
18    LLP and the witness.
19        MS. TOUFANIAN:  Maryll Toufanian,
20    Zuckerman Spaeder, for David Colburn.
21        MR. CYRULNIK:  Owen Cyrulnik,
22    Cravath Swaine & Moore, for Time Warner.
23        MR. DOWD:  Mike Dowd from Lerach
24    Coughlin.  Also with me today are Andy
25    Rudolph and Terry Koelbl, on behalf of
```

Beams, Gregory M. Vol. I  6/15/2006  9:19:00 AM

5

```
1              GREGORY BEAMS
2    certain plaintiffs in California and Ohio.
3              MS. RODON:  Melinda Rodon of Kaplan
4    Fox & Kilsheimer on behalf of plaintiffs
5    California Public Employees' Retirement
6    System.
7              VIDEOGRAPHER:  Will the court
8    reporter, Frank Bas, of Legalink please
9    swear in the witness.
10   G R E G O R Y   M.   B E A M S,
11   called as a witness, having been duly
12   sworn by a Notary Public (Frank J. Bas),
13   was examined and testified as follows:
14   EXAMINATION
15   BY MR. DOWD:
16       Q.  Good morning, Mr. Beams.
17       A.  Good morning.
18       Q.  Could you state your name for the
19   record, please, and spell your last name?
20       A.  Sure.  Gregory Michael Beams,
21   spelled B-e-a-m-s.
22       Q.  And could you tell us your home
23   address?
24       A.  Yes.  It's 27706 Southeast 24th Way,
25   Fall City, Washington 98024.
```

6

```
1              GREGORY BEAMS
2        Q.  And what is your current work
3    address?
4        A.  It's 999 Third Avenue, Suite 3500,
5    Seattle, Washington 98104.
6        Q.  Okay.  And who is your current
7    employer?
8        A.  Ernst & Young.
9        Q.  And you are represented by counsel
10   here today?
11       A.  I am.
12       Q.  And that's Mr. Hubbell?
13       A.  Yes.
14       Q.  Okay.  And have you had your
15   deposition taken before, sir?
16       A.  Yes, I have.
17       Q.  And how many times?
18       A.  On three different dates.
19       Q.  And is that by the SEC in connection
20   with the AOL investigation?
21       A.  Yes.
22       Q.  Other than the depositions by the
23   SEC, have you been deposed with regard to any
24   other matters?
25       A.  No.  I have not.
```

7

```
1              GREGORY BEAMS
2        Q.  Okay.  And I take it, then, you
3    understand a little bit about the deposition
4    process, but I just want to go over it with you
5    so that, you know, we understand each other
6    today.
7        A.  Okay.
8        Q.  I get to ask you a series of
9    questions and then other counsel will have a
10   chance to ask you questions as well.  And it's
11   just a couple of important sort of admonitions.
12           The first is that it's important
13   that you and I not speak at the same time.  All
14   right?
15       A.  Okay.
16       Q.  The second is if at any time I ask
17   you a question that you don't understand or it
18   doesn't make sense, I would ask that you ask me
19   to rephrase it or repeat it for you.  Will you
20   do that for me?
21       A.  Yes.
22       Q.  And are you under the influence of
23   medication or anything like that, or are you
24   prepared to give your best testimony today?
25       A.  No medication.  Prepared to give my
```

8

```
1              GREGORY BEAMS
2    best testimony.
3        Q.  Fair enough, sir.
4           Have you met with Mr. Hubbell or
5    anyone else from Heller Ehrman in preparation
6    for your deposition today?
7        A.  Yes.
8        Q.  Okay.  And how many times did you
9    meet with your counsel to prepare for the
10   deposition?
11       A.  I met with him for one day
12   previously, and then three days or two and a
13   half days this week.
14       Q.  And that was with Mr. Hubbell?
15       A.  Yes.
16       Q.  And anyone else?
17       A.  Yes.  The first meeting was just
18   with Mr. Hubbell.  The two and a half days were
19   with Michael Crane as well and Joyce Grego, and
20   Michael Rugan joined us for one of the days.
21       Q.  Did you see any documents during
22   your preparation for the deposition that
23   refreshed your recollection about events that
24   occurred at AOL or AOL Time Warner between 1999
25   and 2004?
```

9

GREGORY BEAMS

2    A.   Yes, I did.

3    Q.   Okay.  Were there any particular
4    documents that you recall that refreshed your
5    recollection?

6    A.   Not in particular.  No.

7    Q.   Sir, it's my understanding that you
8    graduated from Central Washington University.
9    Is that correct?

10   A.   Yes.

11   Q.   And you graduated in 1987?

12   A.   Yes.

13   Q.   And can you tell me what type of
14   degree you received?

15   A.   Yes.  I received a degree in
16   business administration, with a concentration in
17   accounting, and a degree in finance.

18   Q.   And have you had any postgraduate
19   work?

20   A.   No.

21   Q.   And you are a licensed CPA, sir, is
22   that correct?

23   A.   Yes.

24   Q.   In what state?

25   A.   In Washington, Virginia, Oregon,

10

GREGORY BEAMS

2    Nevada, California, and Kentucky.

3    Q.   Okay.  Did you go to work for Ernst
4    & Young when you first graduated from college?

5    A.   Yes, I did.

6    Q.   What was your entry-level position
7    with Ernst & Young?

8    A.   Staff accountant.

9    Q.   What office were you assigned to
10   with Ernst & Young?

11   A.   I started in the Seattle office.

12   Q.   And were there any particular
13   accounts that you worked on at that time?

14   A.   I worked on a number of different
15   accounts.  One of my larger accounts at that
16   point was the SAVCO Insurance Companies.  But I
17   worked on a pretty wide dispersion over my
18   career.

19   Q.   Okay.  And was it primarily audit
20   work during the time you were with E&Y in
21   Washington?

22   A.   Yes.  Pretty much exclusively.

23   Q.   And did there come a time that you
24   received a promotion from staff accountant to
25   some other position?

11

GREGORY BEAMS

2    A.   Yes.  The next position within Ernst
3    & Young is a senior accountant.  I believe I was
4    promoted in 1989.

5    Q.   And did you receive any promotions
6    thereafter?

7    A.   Yes.  The next promotion was to
8    manager, I don't recall the exact time frame of
9    that.  It was somewhere in the mid '90s, I
10   believe.

11   Q.   And after that time did you receive
12   any other promotions?

13   A.   Yes.  I was promoted to senior
14   manager after that, and then was promoted to
15   partner on July 1st of 2001.

16   Q.   And at some point in time you
17   transferred from the Washington office of Ernst
18   & Young to Virginia.  Is that correct?

19   A.   Yes, it is.

20   Q.   Can you tell me when that took
21   place?

22   A.   That was in the February/March time
23   frame of 2000.

24   Q.   Was there any particular reason that
25   you moved from Washington to Virginia?

12

GREGORY BEAMS

2    A.   The primary reason was because my
3    wife's company had relocated.

4    Q.   And who did she work for?

5    A.   She worked at that time for a
6    company called NextLink.

7    Q.   When you first transferred to
8    Virginia, were you assigned to the AOL account?

9    A.   I don't think I was assigned
10   initially, but shortly thereafter I joined the
11   AOL account team.

12   Q.   Were you involved then in the
13   year-end 2000 AOL audit?

14   A.   At that time the year-end was
15   June 30, 2000.  I did have some responsibilities
16   for the audit that year.

17   Q.   Was that sort of the first
18   substantive work that you did with regard to
19   that client, as best you recall?

20   A.   Yes.  I believe it was.

21   Q.   And who was your boss at that time?

22   A.   The partner on the account at that
23   time was Stephen Hurst.

24   Q.   And had you worked with Mr. Hurst
25   prior to that 2000 time frame?

13

GREGORY BEAMS

1
2  A.  No, I had not.
3  Q.  And if you could tell me just a
4  little bit about that year-end 2000 audit, the
5  one that ended for the financial period that
6  closed 6/30/2000.
7  A.  Mm-hmm.
8  Q.  Who else from Ernst & Young was
9  involved with that audit?
10  A.  At that time, to the best of my
11  recollection, Steve Hurst was the partner on the
12  account.  Eric Klein was another senior manager
13  that was on the account.  Steve Kenny at that
14  time, I believe, was a manager on the account.
15  Todd Boyle, I believe he was a manager at that
16  time.  I think Ryan Coopersmith may have been a
17  staff person on the account at that time.  I
18  think also Krissy Castle may have been a senior
19  auditor at that time.
20      I'm not certain of the titles of the
21  staff and seniors, but I think that was about
22  it.  There may have been a few other folks as
23  well on the account.
24  Q.  Okay.  And in the hierarchy, were
25  you senior to Mr. Kenny, Mr. Boyle,

14

GREGORY BEAMS

1
2  Mr. Coopersmith and Ms. Castle?
3  A.  I was.  Yes.
4  Q.  Okay.  And what was the relationship
5  in terms of, you know, hierarchy I guess is the
6  best way to put it, between yourself and
7  Mr. Klein?
8  A.  At that time Mr. Klein had
9  responsibility for the day-to-day execution of
10  the audit at the senior manager level.  My role
11  was more directed towards specific tasks.  So I
12  was more of a support role.
13  Q.  Okay.  Do you recall what specific
14  tasks you were involved in in connection with
15  the June 30, 2000 audit?
16  A.  The one that I do recall
17  specifically was Mr. Hurst had asked me to look
18  at the put/call agreement that the company had
19  executed with Bertelsmann, because I had some
20  prior expertise in analyzing derivative
21  securities.  There was a new standard that had
22  recently been published regarding derivatives,
23  and he had asked me to look at that to discern
24  whether or not there were any derivative
25  implications from the put/call agreement.

15

GREGORY BEAMS

1
2  Q.  Okay.  And when you use that phrase,
3  derivative securities, what do you mean by that?
4  A.  If there were any embedded
5  derivatives that would have been included in the
6  contract, so derivatives as defined under a
7  FAS 133, typically you think of put, and
8  forwards and future, things of that nature, but
9  the standard also tended to scope in other
10  things that you wouldn't necessarily consider to
11  be a derivative, and so he had asked me to read
12  through that and see if I found anything in
13  there that might cause concern or might need to
14  be followed up on.
15  Q.  Did you find anything that caused
16  concern or that needed follow-up?
17  A.  No.  I did not.
18  Q.  Now, you said that you were promoted
19  to partner on July 1, 2001.  Is that right?
20  A.  Yes.
21  Q.  How did your -- well let me begin
22  again.
23      Did your duties change in any way
24  with regard to AOL at the time that AOL and Time
25  Warner merged in January 2001?

16

GREGORY BEAMS

1
2  A.  When AOL changed its year-end to
3  December 31, I took over primary day-to-day
4  responsibilities as the senior manager for the
5  audit.
6  Q.  And what happened to Mr. Klein at
7  that time?
8  A.  Mr. Klein rotated onto -- actually
9  he had other accounts at December 31.  He stayed
10  with those accounts.
11  Q.  Can you explain to me, when you
12  became a partner in July of 2001, did your role
13  with regard to the audit of AOL Time Warner
14  change in any way?
15  A.  At that time I became the engagement
16  partner for AOL, the AOL division, along with
17  Ken Marceron, who was more of the coordinating
18  partner, if you will, I reported to Ken.  But I
19  had day-to-day responsibilities at the partner
20  level for execution of the audit.
21  Q.  Of the AOL division?
22  A.  Of the AOL division.  Yes.
23  Q.  And is it correct that Mr. Hurst
24  moved to the audit of AOL Time Warner, the
25  corporate entity?

Hurst, H. Stephen Vol. I  7/11/2006  9:05:00 AM

1

0001
1   SUPERIOR COURT OF THE STATE OF CALIFORNIA
2          COUNTY OF LOS ANGELES
    ------------------------------------------x
3      Coordination Proceeding Special Title,
            (Rule 1550(b):
4      AOL TIME WARNER CASES I & II
       Coordinated Actions:
5
    Regents of the University of California,
6   et al. vs. Parsons, et al.
    (L.A. Super. Ct. No. BC293848)
7
    California Public Employees' Retirement System
8   vs. AOL Time Warner, Incorporated
    (Sacramento Super. Ct. No. 03AS04015)
9
    California State Teachers' Retirement System
10  vs. AOL Time Warner, Incorporated
    (S.F. Super. Ct. No. CGC-03-422609)
11
    ------------------------------------------x
12       FRANKLIN COUNTY COMMON PLEAS COURT
                COLUMBUS, OHIO
13
    Ohio Public Employees' Retirement System,
14  et al. vs. Richard d. Parsons, R.E.
    "Ted Turner," et al.
15  (Case no. 03CVH07-7932)
    ------------------------------------------x
16      Videotaped Deposition of
17      H. STEPHEN HURST
18  Held on:  Tuesday, July 11, 2006
            9:05 a.m.
19
    Held at:  Heller Ehrman LLP
20           7 Times Square
             New York, New York
21
22
    Before Nancy Mahoney, CSR/RPR
23  Notary Public in and for the State of New York
24
25

2

1   A P P E A R A N C E S:
2   LERACH COUGLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
3   Attorneys for State Teachers' Retirement
    System of Ohio
4       655 West Broadway, Suite 1900
        San Diego, California 92101-3301
5
6   BY:   MICHAEL DOWD, ESQ.
7   KAPLAN FOX & KILSHEIMER LLP
    Attorneys for California Public Employees'
8   Retirement System
        805 Third Avenue
9       New York, New York 10022
10  BY:   MELINDA  D. RODON, ESQ.
11
    CRAVATH, SWAINE & MOORE LLP
12  Attorneys for Time Warner
        825 Eighth Avenue
13      New York, New York 10019-7475
14  BY:   RACHEL SKAISTIS, ESQ.
15
    HELLER EHRMAN
16  Attorneys for Ernst & Young
    and the Witness
17      333 South Hope Street
        Los Angeles, California 90071-3043
18
19  BY:   ROBERT B. HUBBELL, ESQ.
20
21
22
23
24
25

3

1   A P P E A R A N C E S:(Cont'd)
2   ZUCKERMAN SPAEDER LLP
    Attorneys for David Colburn
3       1800 M Street, NW
        Washington, D.C. 20036
4
    BY:   CARL S. KRAVITZ, ESQ.
5
6
7
8
9
10
11  ALSO PRESENT:
12  ANDREW RUDOLPH, CPA, CFE
    Director of Forensic Accounting
13  Lerach Coughlin Stoia Geller
    Rudman & Robbins LLP
14
    MICHAEL CRANE
15  JOYCE GREGO
    Ernst & Young
16
17  Richard Bly, Videographer
    LegaLink Action Video
18
19
20
21
22
23
24
25

4

1        THE VIDEOGRAPHER:  This is the video
2   operator speaking, Richard Bly of LegaLink
3   Action Video, located at 420 Lexington Avenue,
4   New York, New York.  The court reporter is Nancy
5   Mahoney of LegaLink Manhattan, located at 420
6   Lexington Avenue, New York, New York.
7        Today's date is July 11th, 2006.
8   The time on the record is 9:07 a.m.
9        We are at the offices of Heller
10  Ehrman, located at 7 Times Square, New York, New
11  York to take the videotaped deposition of H.
12  Stephen Hurst in the matter of AOL/Time Warner
13  Cases I and II Coordinated Actions before the
14  Superior Court of the State of California for
15  the County of Los Angeles, and also the Ohio
16  Public Employees' Retirement System, et al.
17  versus Richard D. Parsons Re Ted Turner, et al.,
18  before the Franklin County Common Pleas Court
19  Columbus, Ohio, case number 03CVH07-7932
20        Will counsel please introduce
21  themselves.
22        MR. DOWD:  Michael Dowd, Lerach
23  Coughlin, representing certain plaintiffs in
24  Ohio and the California actions and also with me
25  is Andy Rudolph.

5

```
1        MS. RODON:  Melinda Rodon, Kaplan
2   Fox & Kilsheimer, representing certain
3   California plaintiffs.
4        MR. HUBBELL:  Good morning, Robert
5   Hubbell of Heller Ehrman for defendant Ernst &
6   Young LLP and the witness.  With me today is
7   Michael Crane -- are Michael Carne and Joyce
8   Grego from the Ernst & Young general counsel's
9   office.
10       MS. SKAISTIS:  Rachel Skaistis,
11  Cravath, Swaine & Moore LLP for the company.
12       MR. KRAVITZ:  Carl Kravitz from
13  Zuckerman Spaeder LLP for David Colburn.
14       THE VIDEOGRAPHER:  Would please
15  swear the witness.
16       H. STEPHEN HURST,
17  having been first duly sworn by the Notary
18  Public (Nancy Mahoney), was examined and
19  testified as follows:
20       EXAMINATION BY MR. DOWD:
21  Q.   Good morning, sir.
22  A.   Good morning.
23  Q.   My name is Mike Dowd.  I'm an
24  attorney with Lerach Coughlin in San Diego.  We
25  represent certain plaintiffs in litigation
```

6

```
1        H. STEPHEN HURST
2   against AOL/Time Warner, certain individual
3   defendants and Ernst & Young.
4        We've never met before this
5   morning.  Is that correct?
6   A.   That's correct.
7   Q.   Could you state your name for the
8   record, please, and spell your last name?
9   A.   It's H. Stephen Hurst, H-u-r-s-t.
10  Q.   And what is your current work
11  address?
12  A.   5 Times Square, New York, New York.
13  Q.   And who is your current employer?
14  A.   Ernst & Young.
15  Q.   And what is your home address?
16  A.   My home address is 150 West 75th,
17  New York, New York.
18  Q.   Have you had your deposition taken
19  before today?
20  A.   Yes.
21  Q.   And I believe you had your
22  deposition taken four times by the SEC in
23  connection with audits of AOL/Time Warner.  Is
24  that correct?
25  A.   Yes.
```

7

```
1        H. STEPHEN HURST
2   Q.   In addition to those depositions,
3   have you had your deposition taken before?
4   A.   Yes.
5   Q.   And how many times?
6   A.   I'm not sure how many times.
7   Various matters, probably six, seven.
8   Q.   Tell me as best you recall about
9   those six or seven times that you were deposed,
10  what the cases were about.
11  A.   There was a case against Ernst &
12  Young brought by Sunshine Mining a number of
13  years ago, several depositions in connection
14  with that, and I don't recall the others.
15  Q.   How recent were the Sunshine Mining
16  depositions?
17  A.   I believe those were in 1999, 2000.
18  Q.   And what were the allegations in
19  that case, as best you understood it, against
20  Ernst & Young?
21  A.   Ernst & Young had resigned from
22  serving Sunshine Mining and Sunshine Mining had
23  sued us over that resignation.
24  Q.   And why had Ernst & Young resigned?
25  A.   I'm sorry, I didn't hear you.
```

8

```
1        H. STEPHEN HURST
2   Q.   Why had Ernst & Young resigned?
3   A.   We had resigned because we chose
4   not to serve them any longer.
5   Q.   And why was that?
6   A.   Because they were not a client we
7   wanted to serve any longer.
8   Q.   For any particular reason?
9   A.   Various reasons.
10  Q.   Tell me about that.
11  A.   The firm has a policy that it
12  reviews periodically whether they want to serve
13  any particular client, and it runs to risk,
14  integrity of management, various factors.
15  Q.   And do you recall any of the other
16  companies that you were involved in depositions
17  with?
18  A.   I don't.
19  Q.   Were they before or after the
20  Sunshine Mining depositions?
21  A.   Must have been before them.
22  Q.   You understand then, I take it,
23  that during the course of the next couple of
24  days I'm going to ask you a series of questions
25  and answers -- or you're going to hopefully give
```

21

```
 1          H. STEPHEN HURST
 2     Q.   When you first came on board with
 3  AOL, did you -- what was your title, was it
 4  coordinating partner, engagement partner?
 5     A.   I was the coordinating partner.
 6     Q.   And who reported to you on that
 7  first audit, say, June 30th, 1999?
 8     A.   It was another partner, John
 9  Shames, who was an engagement partner and the
10  rest of our team.
11     Q.   What's the difference between an
12  engagement partner and the coordinating partner?
13     A.   The coordinating partner has
14  overall responsibility for the conduct of the
15  audit and -- in other words, signing for the
16  firm. The engagement partner has duties
17  reporting to the coordinating partner as a
18  coordinating partner assigns those duties to the
19  engagement partner involved in various aspects
20  of the audit.
21     Q.   So you were in charge?
22     A.   I was in charge.
23     Q.   And how long did Mr. Shames stay in
24  that role with the AOL audits?
25     A.   He was in the role before that
```

22

```
 1  audit and through the better part of the
 2  following year.
 3     Q.   Was he the engagement partner on
 4  the year end 2000 audit, the June 30th, 2000
 5  audit?
 6     A.   I'm not sure if he was the
 7  engagement partner as we closed out the June
 8  30th, 2000 or not. I can't recall whether he
 9  went through that year end or whether he only
10  went through the nine months ended March 31. I
11  don't recall.
12     Q.   Somewhere in that time frame --
13     A.   Yes.
14     Q.   -- he left the audit?
15          Can you tell me in addition to
16  Mr. Shames who else was working on the AOL audit
17  when you came on board in June of '99?
18     A.   I may not remember all of the
19  people. It's been a while. Eric Klein was a
20  senior manager, Steve Kenny was a manager, Eddie
21  Paul was on our staff, Ryan Coopersmith was on
22  the staff, I believe a Craig Romero was on the
23  staff, and there would have been other staff in
24  addition.
25
```

23

```
 1          H. STEPHEN HURST
 2     Q.   Had you worked with Mr. Shames
 3  prior to your reassignment to AOL?
 4     A.   No.
 5     Q.   Had you worked with any of the
 6  managers or staff auditors, to the best of your
 7  knowledge --
 8     A.   No.
 9     Q.   -- when you came on board? You got
10  to be careful again to just -- let's not both
11  talk at the same time.
12          After Mr. Shames left the audit in
13  calendar year 2000, who replaced him as the
14  engagement partner?
15     A.   We had another person come in to
16  the area, joined the office. He was a senior
17  manager, Greg Beams.
18     Q.   And was there an engagement partner
19  at that point in time?
20     A.   No.
21     Q.   So it went from you to Mr. Beams as
22  the next highest person?
23     A.   That's correct.
24     Q.   When did Mr. Marceron come on
25  board?
```

24

```
 1          H. STEPHEN HURST
 2     A.   Mr. Marceron joined the team for
 3  the calendar 2001 audit, so that would have been
 4  January, February of 2001.
 5     Q.   And was there any particular reason
 6  why Mr. Marceron was selected to become involved
 7  in the audit?
 8     A.   Mr. Marceron had consulted with me
 9  on a number of revenue recognition questions.
10  He was in our national SEC practice at the time,
11  and so he had a fair amount of knowledge of AOL,
12  and we needed to add experience to the team when
13  I moved to New York.
14     Q.   So he came on board just as you
15  were moving up to the AOL/Time Warner
16  engagement?
17     A.   Yes.
18     Q.   You said he had consulted with you
19  on a number of occasions with regard to revenue
20  recognition issues.
21     A.   Yes.
22     Q.   Can you tell me which issues you
23  recall talking to him about before he came on
24  board the AOL team?
25     A.   I don't recall.
```

AOL Time Warner, Inc.                 Multi-Page™                     David Colburn, 4/25/07

---

**Page 1**

1  UNITED STATES SECURITIES AND EXCHANGE COMMISSION
2
3  In the Matter of:                    )
4                                        ) File No. HO-09429-A
5  AOL-TIME WARNER, INC.    )
6  WITNESS:  David Martin Colburn
7  PAGES:    1 through 219
8  PLACE:    Securities and Exchange Commission
9              100 F Street, N.E., Testimony Room 6
10            Washington, D.C.
11 DATE:     Wednesday, April 25, 2007
12
13      The above entitled matter came on for hearing, pursuant
14 to notice, at 9:19 a.m.
15
16
17
18
19
20
21
22
23
24            Diversified Reporting Services, Inc.
25                 (202) 467-9200

---

**Page 2**

1  APPEARANCES:
2
3  On behalf of the Securities and Exchange Commission:
4      JEFF FINNELL, ESQ.
5      THOMAS D. MANGANELLO, ESQ.
6      CHRISTOPHER AGBE-DAVIES, ESQ.
7      Division of Enforcement
8      Securities and Exchange Commission,
9      100 F Street, N.E.
10     Washington, D.C.  20549
11     (202) 551-4528
12
13 On behalf of the Witness:
14     ROGER C. SPAEDER, ESQ.
15     CARLOS T. ANGULO, ESQ.
16     CARL S. KRAVITZ, ESQ.
17     Zuckerman Spaeder, LLP
18     1800 M Street, N.W.
19     Washington, D.C.  20036-5802
20     (202) 778-1800
21
22
23
24
25

---

**Page 3**

1                     C O N T E N T S
2  WITNESS:                                   EXAMINATION
3  David M. Colburn                                5
4
5  EXHIBITS      DESCRIPTION                 IDENTIFIED
6  867    Order, 2/8/07                           7
7  868    E-mail, Colburn to Wovsaniker,
8         et al., 5/25/00 (9AOL010474-5)          52
9  869    E-mail, Rappaport to Laber
10 870    Handwritten notes by Colburn,
11        01/01 (DMC 00110)                       122
12 871    E-mail, Colburn to Gang,
13        et al. (9AOL010302)                     129
14 872    Agenda for Business Affairs
15        Corporate Development All-Hands
16        Staff Meeting (13AOL001090211-12)
17        and (9AOL070125-26)                     132
18 873    Embedded e-mail, Tyeryar to Jeff,
19        et al., 11/2/00 (9AOL0800433-44)        141
20 874    E-mail, Prince to Haire, 11/1/01
21        (9AOL502031779)                         179
22 875    E-mail, Colburn to Sullivan,
23        et al., 10/18/01 (9AOL030558-9)         184
24 876    E-mail, Harker to Peth and
25        Haire, 11/2/01 (9AOL030610-12)          184

---

**Page 4**

1                  C O N T E N T S (Continued)
2
3  EXHIBITS     DESCRIPTION              IDENTIFIED
4  877    E-mail, Colburn to Sullivan
5         11/5/01 (1AOL029200057-62 and
6         (E00057-62)                             190
7  878    E-mail, Prince to Colburn,
8         et al., 11/5/01 (9AOL030653)            196
9  879    E-mail, Colburn to Sullivan,
10        et al., 11/21/01 (9AOL020679    )       198
11 880    Draft e-mail of #879 to Colburn re
12        WorldCom MCI/AOL (9AOL020684)           201
13 881    MCI WorldCom Promotional Agreement
14        Amendment Executive Summary
15        (9AOL020715)                            204
16 882    E-mail, Colburn to Prince, et al.,
17        11/28/01 (101881AOL2780105705)          205
18
19
20
21
22
23
24
25

AOL Time Warner, Inc.                Multi-Page™                David Colburn, 4/25/07

Page 193

1    A  I do.
2    Q  Okay.  And did you talk to him or ask him what he
3  meant by that?
4    A  I don't think I ever talked to him about.
5    Q  Okay.  Did you ask -- did you understand what he
6  meant by that?
7    A  Well, as I recall -- and there may be e-mails in-
8  between -- I was oftentimes confused by his responses which,
9  as I think people see, are beyond the colorful and over-the-
10  top.  I just couldn't tell if the two teams were talking
11  about different things which, at the end of the day, it
12  appears to me -- I don't think we ever found out the answer
13  because, remember, there's discussions going down both at the
14  next level and at this level.
15        But the question comes down to -- which I have said
16  now I think five or six times is we are looking to get
17  additional value and take care of the third quarter of this
18  liability.  Whether he understanding that's what our ask is
19  and he's just saying this, that no, that's too much value --
20  because you see in the next thing he's still I think a little
21  bit -- I don't know -- spiteful is the wrong word, but he's
22  not happy that we already tried to ask for additional value
23  for giving him the -- giving WorldCom the voice data deal.
24        But it comes down to the question: did he
25  understand what we were trying to do was get additional value

Page 194

1  for that third quarter or is that just something he doesn't
2  even realize that that money is still out there accruing.
3    Q  And you don't have a recollection of ever trying
4  to -- I'm sorry.  Okay.
5        Did you -- were you concerned by his use of that
6  language, that this was a money changing scheme?
7    A  Not even for a second, as I recall, other than just
8  trying to understand what is he talking about.  Are we just
9  on different planets as far as the structure of this or is he
10  just saying he doesn't want to do it.  And I think ultimately
11  we decided we're never going to get to the bottom of this so
12  we just did the two quarter, the three years, the ads and
13  moved on.
14    Q  Well, wasn't there an agreement in principle as to
15  what would happen with the 7- or $8 million?
16    A  I don't recall.
17    Q  Did you discuss whether or not AOL should pro --
18  I'm sorry.
19        Did you have any discussions or communications
20  about this e-mail exchange with anybody within the company?
21    A  Which e-mail exchange are we talking about?
22    Q  I'm sorry.  The money changing e-mail in
23  Exhibit 877.
24    A  Clearly Andrew Haire is copied on this.  I think
25  Ted Prince got a copy --

Page 195

1    Q  Okay.
2    A  -- of the e-mail.
3    Q  Did you seek any accounting or legal advice in
4  connection with your receipt of this e-mail?
5    A  We sought advice on the entire transaction.
6    Q  But specifically with regard to this e-mail and the
7  characterization --
8    A  Again, I -- again, to me, I didn't take any
9  characterization away from what he wrote.  Again, I sent it
10  to the deal team to understand are there any issues here, are
11  we talking about the same thing.
12    Q  Okay.
13        BY MR. AGBE-DAVIES:
14    Q  Other than Mr. Haire and Mr. Prince, did you have
15  any discussions or conversations with anybody at AOL about
16  this, you know, money changing scheme e-mail, I think it's
17  Exhibit 877, that Mr. Sullivan had used that term or the
18  contents of the e-mail?
19    A  The contents of the e-mail being that he doesn't
20  understand the transaction we were proposing or the contents
21  of the e-mail that he's saying no to the transaction we're
22  proposing?
23    Q  In the context -- I mean the content of the e-mail
24  where he's saying this has turned into a money changing
25  scheme.

Page 196

1    A  But again, that's just a characterization.  The
2  deal is what the deal is.
3    Q  I understand.
4    A  And a transaction is a transaction.  So there's
5  only two things -- beyond sending it to the people who are
6  doing the deal, I -- right, I take from it two things.
7  Either he doesn't understand the transaction we're doing, A,
8  or that we proposed, or B, he's saying no.
9    Q  Let me ask you my question another way because I
10  don't think you've answered my question.
11        Did you talk to anyone at the company, at AOL, that
12  Mr. Sullivan is characterizing, you know, whatever
13  arrangement you thought you had with his company -- was
14  characterizing that arrangement as a money changing scheme?
15    A  But again, I took this response -- so beyond
16  forwarding the e-mail to the guys on the transaction team, I
17  took this as an e-mail either he doesn't understand what
18  we're doing or he's saying no.  So did I communicate to
19  anybody either he doesn't understand what we're doing or that
20  he was saying no?  Possibly I did.  Whether I mentioned the
21  money changing scheme, I would highly doubt it because to me
22  it's just his way of saying either I don't want to do it or I
23  don't understand.
24        (SEC Exhibit No. 878 was marked for
25        identification.)

David Colburn, 4/25/07      Multi-Page™      AOL Time Warner, Inc.

## Page 189

1  So essentially we're thinking, okay, let's solve
2  that as well. And if we're able to solve that the way we
3  propose it, that's $25 million of value to us, not 17,
4  because in theory that's a $25 million liability, not a 17.
5  It's only 17 for the first two quarters.
6  Now, whether they understood that we were trying to
7  take the 17 value to 25 and therefore they're saying no here
8  really or they don't even understand what we're saying is
9  never clear to me because I think we end up dropping the
10  request to deal with the third quarter.
11  Q  Okay.
12  A  Or the last quarter. I don't want to keep calling
13  it the third. The third quarter being one of three.
14  Q  Didn't Mr. Sullivan agree that they would be
15  willing to enter into a $25 million advertising contract as
16  long as AOL was willing to pay $25 million?
17  A  But it appears that one of the things that's
18  missing from this communication is we are looking for the
19  forgiveness of all the liability.
20  Q  Uh-huh.
21  A  And that's the one thing that, again, do they
22  understand we're asking for it and saying, hey, they're
23  asking for too much liability or they just don't even
24  understand what we're asking for.
25  Q  I see.

## Page 190

1  A  And that's the one thing that's never really
2  clarified and at the end we just think, okay, it's too
3  complicated. Mr. Sullivan is a very difficult person to deal
4  with and very busy and doing a million different things, so
5  we just decided, as I recall, to leave that liability out
6  there, terminate, take care of the two quarters, take care of
7  the voice data and move on.
8  Q  And – okay.
9  MR. AGBE-DAVIES: Let me just make one
10  clarification for the record. Jeff, I think earlier you said
11  Exhibit 610 but I think you were referring to Exhibit 876.
12  MR. FINNELL: Oh, thank you.
13  THE COURT REPORTER: Bates 610.
14  MR. AGBE-DAVIES: Right. The Bates number ends
15  with 610.
16  MR. KRAVITZ: We agree that you were referring to
17  that page within Exhibit 876.
18  MR. FINNELL: Thanks.
19  (SEC Exhibit No. 877 was marked for
20  identification.)
21  BY MR. FINNELL:
22  Q  Let me show you what has been just marked as
23  Exhibit 877. Exhibit 877 is an e-mail dated November 5, 2001
24  from DKRJJ1 to Scott Sullivan, bcc Andrew Haire. It's
25  Bates-numbered 1AOL029200057 through 62. It also has a Bates

## Page 191

1  number of E00057 through 62.
2  BY MR. FINNELL:
3  Q  Do you recognize Exhibit 877?
4  A  Generally.
5  Q  Okay. And this is an e-mail you sent on November 5
6  to Mr. Sullivan?
7  A  Apparently, yes.
8  Q  Okay. And you've reviewed this document in
9  preparation for your testimony today?
10  A  Yes.
11  Q  Okay. And does your review of Exhibit 877 refresh
12  your recollection in any way about the AOL transaction beyond
13  what you've testified to?
14  A  No. It just confirms what I've been saying, which
15  is either Mr. Sullivan is terribly confused over what our
16  offer is dealing with the last quarter of the accrued
17  liability or he understands exactly what we're asking for and
18  he sees that we really want 25 million of value for the
19  entire voice data transaction, one or the other. He is doing
20  what I think Mr. Sullivan typically did, is being a little
21  prickly, a little over the top, a little whatever so he can
22  just move on with whatever he wants to do next. So I think
23  that's consistent with what I testified to earlier.
24  Q  Okay. Well, did you understand that Mr. Sullivan
25  was agreeing to purchase $17 million in advertising instead

## Page 192

1  of forgiving -- instead of giving a credit on the AOL Europe
2  liability as an accommodation to AOL?
3  A  That's what he writes.
4  Q  Was that your understanding?
5  A  Mr. Sullivan is not one to do a lot of
6  accommodating. I don't think I focused, you know, on that
7  language one way or the other.
8  Q  Did Mr. Sullivan ever say anything to you that led
9  you to believe that he actually was pursuing the advertising
10  because that's something he wanted?
11  A  I don't think he ever indicated that to me, no.
12  Q  And had Mr. Sullivan not consistently indicated to
13  you that he was willing to do the advertising as something to
14  help you out?
15  A  Had he consistently said That --
16  Q  Yes, in the course of your e-mails and discussions,
17  wasn't that the nature of the discussion, that it was not
18  something that WorldCom wanted to do but that if you needed
19  the help, he would be willing to do the advertising?
20  A  Again, that was, I think, consistent with how
21  Mr. Sullivan negotiated.
22  Q  Okay. And Mr. Sullivan in this e-mail to you
23  indicates that he believes the transaction or the proposed
24  transaction has turned into a money changing scheme and it
25  can't continue. Do you see that?

Page 189 - Page 192