Gregory G. Little
glittle@hunton.com
Stephen R. Blacklocks
sblacklocks@hunton.com
HUNTON & WILLIAMS LLP
200 Park Avenue
New York, New York  10166
(212) 309-1000

Bonnie K. Arthur (pro hac vice motion pending)
barthur@hunton.com
HUNTON & WILLIAMS LLP
1900 K Street NW
Washington, D.C.  20006
(202) 419-2063

Attorneys for Defendant Joseph A. Ripp

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— :
                                                         :
**SECURITIES AND EXCHANGE COMMISSION,** :
                                                         :
                           **Plaintiff,**        :
                                                         :
                    **v.**                          :
                                                         :     **08 Civ. 4612 (SWK)**
**JOHN MICHAEL KELLY, STEVEN E.**   :     **ECF Case**
**RINDNER, JOSEPH A. RIPP, and**        :
**MARK WOVSANIKER,**                      :
                                                         :
                           **Defendants.**     :
———————————————————————— :


**DECLARATION OF GREGORY G. LITTLE IN SUPPORT OF**
**JOSEPH A. RIPP'S MOTION TO DISMISS THE COMPLAINT**

Gregory G. Little, pursuant to 28 U.S.C. § 1746, hereby declares:

1.      I am a partner at the law firm Hunton & Williams LLP, attorneys for defendant

Joseph A. Ripp.  I am familiar with this matter and submit this declaration in support of Mr.

Ripp's motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6).

2.      Attached hereto as Exhibit A is a true and correct copy of pages from the trial

transcript in U.S. v. Wiegand, 05-cr-12 (WDK) (E.D.Va. 2005), dated December 7, 2005. As

with certain other exhibits, noted below, we have submitted only the relevant pages of this

document; however, at the court's request, we will provide the full document.

3.      Attached hereto as Exhibit B is a true and correct copy of the transcript of the

AOL Time Warner, Inc., analysts' teleconference on January 7, 2002.

4.      Attached hereto as Exhibit C is a true and correct copy of a PowerPoint

presentation entitled "Network Operations," referred to in paragraph 114 of the complaint.

5.      Attached hereto as Exhibit D is a true and correct copy of a press release issued

by AOL Time Warner on November 24, 1998.

6.      Attached hereto as Exhibit E is a true and correct copy of the article, "Amid

Advertising Slowdown, AOL Parlays Partnerships Into Revenue," published by the Wall Street

Journal on April 16, 2001.

7.      Attached hereto as Exhibit F is a true and correct copy of the article,

"Crunchtime: Bob Pittman is Promising the World. AOL Time Warner Better Deliver,"

published by Advertising Age on May 7, 2001.

8.      Attached hereto as Exhibit G is a true and correct copy of a PowerPoint

presentation entitled "Network & Data Center Operations," dated October 26, 2001.

9.      Attached hereto as Exhibit H is a true and correct copy of pages F-7 and F-28 of

AOL Time Warner Inc.'s 2001 Annual Report (Form 10-K), dated March 25, 2002.

10.     Attached hereto as Exhibit I is a true and correct copy of the agreement entered into by the SEC and Ripp on April 4, 2006.

11.     Attached hereto as Exhibit J is a true and correct copy of the agreement entered into by the SEC and Ripp on September 26, 2006.

12.     Attached hereto as Exhibit K is a true and correct copy of the complaint filed by the Securities and Exchange Commission in <u>S.E.C. v. Time Warner Inc.</u>, 05-cv-578 (GK) (D.D.C. 2005), dated March 21, 2005.

13.     Attached hereto as Exhibit L is a true and correct copy of page F-60 of AOL Time Warner Inc.'s 2002 Annual Report (Form 10-K), dated March 28, 2003.

14.     Attached hereto as Exhibit M is a true and correct copy of an e-mail sent on August 13, 2001 to Ripp referred to in paragraph 176 of the complaint.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 5th day of September, 2008.

 /s/ Gregory G. Little_____
                Gregory G. Little

## **DECLARATION OF SERVICE**

Raymond E. Galbraith hereby declares under penalty of perjury, pursuant to 28 U.S.C.

§ 1746, that:

I am a Litigation Paralegal at the law firm of Hunton & Williams LLP, attorneys for

Defendant Joseph A. Ripp.

That on September 5, 2008, I served a true and correct copy of the foregoing Declaration

of Gregory G. Little in Support of Defendant Joseph A. Ripp's Motion to Dismiss the Complaint,

on counsel of record via the Court's ECF System.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 5, 2008.

<u>/s/ Raymond E. Galbraith</u>
Raymond E. Galbraith

TO:  All Counsel of Record

**EXHIBIT A TO THE MEMORANDUM OF LAW IN SUPPORT OF JOSEPH A. RIPP'S MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM**

120705be.txt

1

1                    IN THE UNITED STATES DISTRICT COURT

                   FOR THE EASTERN DISTRICT OF VIRGINIA

2                          ALEXANDRIA DIVISION


3


4    UNITED STATES OF AMERICA              )

                                           )

5          v.                              )

                                           ) CRIMINAL NO. 1:05cr12

6    SCOTT E. WIEGAND,                      )

                                           )

7                      Defendant.          )


8


9


10


11


12                   TRANSCRIPT OF TRIAL PROCEEDINGS
                              Page 1

120705be.txt

13                          Alexandria, Virginia

14                          December 7, 2005

15                          Volume I

16

17

18

19

20

21   Before:    THE HONORABLE WALTER D. KELLEY, JR.
                United States District Judge
22

23

24

25

PENNY C. WILE, RMR, CRR
Page 2

120705be.txt

25    Directors.  And as you will see, it is a harder thing still


PENNY C. WILE, RMR, CRR

OFFICIAL COURT REPORTER



41


1    to accuse Junior Johnson of fraud and yet dodge the facts

2    strongly suggesting, to the internal investigating team at

3    least, that Scott Wiegand was also involved.

4         After the revenue announcement Scott Wiegand knew a

5    line had been crossed.  It was not the line between right and

6    wrong.  That had been crossed a long time ago.  It was the

7    line that mattered most to Scott Wiegand.  It is the line

120705be.txt

8   that matters most to any wrongdoer.  It is the line between

9   what you could get away with and what you could not get away

10   with.  By having his Kentucky pal, Geoff Layne, forge the

11   signature of Eric Keller at AOL Junior Johnson had made the

12   conspiracy far more dangerous, and Scott Wiegand knew it.

13   First, it was a much more blatant and less detectable form of

14   fraud, but, second, and even more threatening, it meant that

15   Eric Keller and AOL were no longer cooperating with Junior

16   Johnson and PurchasePro.  The fact that Junior Johnson has to

17   forge AOL signatures meant that he had lost control of AOL.

18   It meant that the AuctioNet Statement of Work and the rest of

19   the revenue coming from AOL was a time bomb waiting to

20   explode.  It was only a matter of time until AOL found out

21   what Junior Johnson had done, and then AOL would be forced to

22   expose Junior Johnson.  And, in fact, that is exactly what

23   happened.

Page 83

120705be.txt

24          Two weeks later, on May 14th, 2001, a letter from

25     Joseph Ripp, the CFO at AOL, arrived disavowing the AuctioNet


                    PENNY C. WILE, RMR, CRR

                    OFFICIAL COURT REPORTER




                                                          42



1    Statement of Work and other revenue from AOL.  Joe Ripp was

2    not part of the conspiracy at AOL.  He was one of the white

3    hats in this case that helped reveal the fraud.  The outside

4    auditors, the Board members, the internal investigators, all

5    refer to the so-called Ripp letter as a bombshell.  That's

6    because it was such a total surprise to everyone except Scott

7    Wiegand.

**EXHIBIT B TO THE MEMORANDUM OF LAW IN SUPPORT OF JOSEPH A. RIPP'S MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM**

**AOL Time Warner, Inc.**

**Analysts' Teleconference**
**January 7, 2002**

**Richard Hanlon, Senior Vice President, Investor Relations**

Thank you, and for Jerry Levin, Dick Parsons, Bob Pittman and Wayne Pace, thanks to all of you for joining us.

Before we begin the call, a couple of formalities: First, we'll be providing you later this afternoon with new Pro Forma Trending Schedules, which were recast for your fuller understanding, the four quarters of 2000 and the first three quarters of 2001, to provide for the consolidation of AOL's [inaudible] and the acquisition of IPC Media.

These Schedules will also reflect FAS 142, giving pro forma effect for the new accounting standard, as well as another new standard covering revenue classification.

The new Trending Schedules will also be available on our Web site at AOLtimewarner.com or AOL Keyword IR in another hour or so.

Second, a quick reminder that this afternoon's call will include Forward-Looking Statements within the meaning of the Safe Harbor Provisions of the Private Securities Litigation Reform Act of 1995; particularly statements regarding future financial and operating results of the Company and the integration of the businesses of Time Warner and America Online. These statements are based on Management's current expectations or beliefs, and are subject to uncertainty and changes in circumstances.

Actual results may vary materially from those expressed or implied by the statements herein, due to changes in economic, business, competitive, technological, and/or regulatory factors, and factors affecting the integration of the businesses of Time Warner and America Online.

More detailed information about these factors may be found in Company filings with the SEC, especially its most recent Annual Report on Form 10-K and the section entitled, "Caution Concerning Forward-Looking Statements" in its most recent Quarterly Report on Form 10-Q.

AOL Time Warner is under no obligation to, and expressly disclaims any such obligation, to update or alter its Forward-Looking Statements, whether as a result of new information, future events, or otherwise.

And now, our Chief Executive, Jerry Levin.

2AOL07216 1277
Confidential Treatment
Requested

**AOL Time Warner, Inc.**

**Gerald M. Levin, Chief Executive Officer**

**Analysts' Teleconference**
**January 7, 2002**

Thank you, Richard, and good afternoon and thank all of you for joining us.

With me are Dick Parsons, Bob Pittman and Wayne Pace.

We thought that at the outset of the new year we would provide our outlook for the Company for 2002, which will include the consolidation of 100% of AOL Europe into AOL Time Warner. We will also give you a preliminary look at the full year-end and fourth-quarter results for 2001 which will be released, as scheduled, on January 30th.

I wanted to have this call with Dick, Bob and Wayne so that you could hear directly from the team who, along with the senior management throughout AOL Time Warner, as well as Steve Case, will lead the Company going forward when I retire in four months. So, I'll provide an introduction and then turn the discussion over to Dick. And, after you hear from our team, they will answer your questions.

In 2001, we rode out a very rough economic environment. Despite the serious economic pitfalls, as well as terrible human tragedies, the people of this Company carried on with their responsibility to run our businesses in the interest of our shareholders. Along the way, we accomplished a great deal, beginning with the launch of AOL Time Warner as one company.

On many fronts we made tangible progress toward fulfilling the vision that drove our merger: that is to transform how people throughout the world acquire information, are entertained, purchase a full range of goods and services and communicate with each other.

We stand at the forefront of this worldwide revolution because we possess a unique and powerful array of technologies, content and consumer relationships. As we've said before, this is a one-of-a-kind Company, positioned for sustained growth and industry-leading performance.

Let me cite just some of the Company's achievements in 2001:

We continued to strengthen and expand our single most important asset; that is our direct relationship with the consumer. Subscriptions remain at the heart of AOL Time Warner, and these relationships are tremendously valuable, particularly in difficult times.

The creative side of our business flourished and added significant value to our Company, which will also be realized over many years to come. We developed extraordinary new movie

2AOL07216 1278
Confidential Treatment
Requested

franchises, and our Music business was able to increase its market share. Year-in and year-out, every division of AOL Time Warner -- including CNN, Time Inc., HBO and AOL -- creates the most informative, entertaining and trusted content in the industry.

In addition, and importantly, we extended the penetration of our broadband and digital technologies and set the stage for an increasingly wide array of high-value consumer offerings, such as multiple high-speed Internet services, Video on Demand and Subscription VOD. We are clearly leading the industry with these exciting new technologies.

In what has been the weakest advertising market in memory, our online and other advertising businesses performed quite well, certainly on a relative basis.

AOL Time Warner also expanded in key overseas markets, particularly in Europe, where we will own 100% of AOL's rapidly growing European enterprise. This acquisition of Bertelsmann's stake in AOL Europe increases our ability to expand this growth property. We consider this a strategically important and lucrative acquisition, based not only on its intrinsic, but also its cross-marketing prospects. Further underscoring our commitment to international growth, in 2001 we acquired IPC Media, one of the leading publishers in Europe and another important platform for cross-Company initiatives.

We also undertook a broad spectrum of successful cross-divisional marketing initiatives. AOL has virtually revolutionized how content can be promoted. Our theatrical hits and music releases have benefited greatly from online promotion. AOL and our Publishing division are successfully delivering subscribers to each other. And the digital media properties across the Company are operating more efficiently and cohesively as a result of AOL's expertise in this area.

Our networks not only extended their leadership, but their response to the events of September 11th demonstrated the increasing importance of our corporate mission to inform and connect. Millions of people turned to CNN and our local news channels. Millions more stayed connected through AOL when other systems were out of operation. Additional millions kept informed through our magazines. I am personally quite proud of our Company for all of these accomplishments.

In 2001, we organized the Company to enhance our productivity and maintain financial discipline on a continuing basis. We also devoted considerable time and effort to putting in place across the Company the management who will execute on our strategies to drive growth.

You will see that the Company's financial results for 2001 were strong, given the current environment, particularly versus industry peers and other large-cap companies. But we were clearly not immune to the widespread economic decline. With the depth of the advertising recession, our full-year targets proved too high.

Moving forward, the essential AOL Time Warner story will not be altered by the ups and downs of economic cycles. As you will hear from Dick, we will be taking a conservative approach and will not be assuming economic growth.

2AOL07216 1279
Confidential Treatment
Requested

In 2002, we will focus on execution and investing for the future so that we can continue to grow market share. The strengths of our subscription and content businesses will again be clear this year. When an advertising rebound does come, we expect to be one of the very first beneficiaries of that upturn. And it is our intention to outperform our peers and deliver superior results, regardless of what the economy brings.

The AOL Time Warner story is one of building our unique and powerful assets for sustained growth and leadership. In May, I will be leaving the Company in the hands of the best management team anywhere. I am confident that Dick, Bob, Wayne and all of our senior management will make great strides over the coming years to realize the full potential of this Company as a cohesive whole, while also nurturing the creative entrepreneurial spirit in each of our operating units.

In their new roles, these gifted executives will continue to keep AOL Time Warner at the forefront of the global transformation that is the mission and the story of our Company.

To tell you about our continuing progress, as well as the near-term picture, here is CEO-Elect, Dick Parsons.

# # # # #

2AOL07216 1280
Confidential Treatment
Requested

**AOL Time Warner, Inc.**

**Bob Pittman, Co-Chief Operating Officer**

**Analysts' Teleconference**
**January 7, 2002**

Thanks, Dick, and thanks to all of you for joining us today.

Before I begin, I'd like to make two personal points: First I'd like to add my voice to what Dick said about Jerry. I have known Jerry for over 20 years and have worked with him on and off throughout those years. He has been instrumental to my career, as he has with so many people both here at AOL Time Warner and around the entire media industry. We all owe him a huge debt of gratitude for his guidance, strategic wisdom, leadership and most of all his friendship. I have known Dick, too, for a long time, and over the past few years we have perfected the close partnership that will now continue in our new roles.

With that, let me add just one thought to what Dick laid out about our 2001 accomplishments.

Last year, we began to revolutionize how we market to the consumer. You have seen the press coverage of what we call the "AOL Time Warner Marketing Machine" -- and it is one of the best examples of the power of the combined Company.

To cite just one example, we turned to AOL to generate interest in our content success stories of the last year -- and not just *Harry Potter*. Three months ago, interest in *The Lord of the Rings* was limited largely to fans of the books. But after a massive interactive campaign on AOL involving downloadable trailers and contests, the buzz for *The Lord of the Rings* was as intense as I've seen for any movie. Not surprisingly, it set the single-day record for any film opening in December.

Now I'd like to run down some issues that I know are on your mind, and give you our perspectives on them. Let's start with advertising.

The advertising recession was the drag on our Company's earnings for 2001, and it has affected all of our advertising businesses. To give a dramatic example, if we had just half of the growth rate in advertising that we had in the year 2000, we would have easily hit our original guidance of 30% EBITDA growth for 2001.

That said, in an advertising market like this, the best measure is how we did relative to the rest of the industry. So here are two key metrics from 2001:

AOL Time Warner advertising outperformed its competitors and gained share by slipping just 3% compared to an overall advertising market drop of 6%.

1

2AOL07216 1281
Confidential Treatment
Requested

And AOL's advertising and commerce grew 14% compared to an 11% decline in Internet advertising and commerce.

For AOL, specifically, we expect the advertising recession finally will be fully felt in 2002. Even though our online advertising/commerce revenue was relatively strong for the full year 2001, by the end of the year our advertising revenue growth for AOL had slowed in step with our other advertising businesses, and we expect that to extend into this year.

So, while AOL continues to bring marketing partners the value of interactivity, we are not building advertising revenue growth into our budgets for 2002. And, since AOL felt the slowdown only in the second half of 2001, the comparisons to prior year will be tougher for AOL in the first two quarters of this year.

Nobody wants to be in this kind of advertising market, but there are some silver linings for us in this slowdown:

First, this advertising market promotes consolidation around the major players and we are well-positioned to be a beneficiary of that trend, and that will increase the positive impact on our Company when the market does turn around;

Second, we have been able to use our unique set of marketing properties and assets to take advantage of our clients' desire for more impact from their advertising and their consolidation of their buying around the biggest players.

Indeed, Global Marketing Solutions -- which is the operating arm of our Advertising Council -- has put together agreements worth more than $1 billion this last year. This is certainly one of the contributing factors to our increase in market share of advertising during this downturn.

When you add it all up, we have no doubt that when the advertising market rebounds, we will outperform the market.

For those who have concerns about AOL's subscription growth -- don't. This is actually one of the strong points of our Company's growth story.

For the year, worldwide, we added 6.5 million members -- an all-time record -- for a total ending the year at 33.2 million.

The fourth quarter totaled 1.9 million new members, including 1.1 million in the U.S..

And, on December 26, we posted our second-biggest day ever for total membership growth with nearly 64,000 net new subscribers.

2

2AOL07216 1282
Confidential Treatment
Requested

The U.S. online market is far from mature. We estimate this market will eventually reach 90 to 95 million households, slightly larger than the Paid-for-TV market, since there is no equivalent of free broadcast TV for the Internet.

Today, just over half of this anticipated market is online. We expect that approximately 6 million U.S. households will continue to come online annually and we expect to continue to take about half of those net new adds each year for our AOL service.

We also are seeing record usage for AOL. Member satisfaction is at an all-time high with the tremendous adoption rate of AOL 7.0. And AOL members -- half of the U.S. online market -- account for an even greater share: two-thirds of this year's $50 billion in online sales.

That's one reason that our members are such an attractive audience for our advertisers. And when you look at this unbroken, upward trend in buying online, you understand why we are so confident in the enormous upside of the advertising/commerce side of the business when we exit this ad recession.

Internationally, the Internet market is expanding even faster than in the U.S..

AOL Latin America reached the one-million-member mark this fall -- just 21 months after its original launch.

At AOL Europe, by the time we buy out Bertelsmann's share, we will have invested about $7 billion for 100% of the Company and its 5.5 million AOL members and nearly 1 million CompuServe subscribers.

To put that investment in perspective, it is about half of T-Online's market cap, and about the same as Wanadoo's market cap. And, remember, AOL France alone has 20% of all the Internet usage in France compared to just 5% for Wanadoo.

In fact, we anticipate reaching $1 billion in revenue for AOL Europe, while substantially reducing our losses in this year.

Not only does this acquisition provide great growth for the AOL division, but it's also the foundation for the creation of an AOL Time Warner marketing machine in Europe, which will have a positive impact on all of our businesses beyond AOL.

Now let me address the rollout of broadband services.

Broadband is going well. It is developing just as we predicted, and we like our position today and in the future.

Broadband is being gradually adopted as an add-on connection for experienced narrow band users. It is not a separate market; it does not attract newbies. The target user is someone who is already online.

3

2AOL07216 1283
Confidential Treatment
Requested

As a matter of fact, that was at the heart of the debate four years ago between AOL and @Home and I think that debate is pretty much over.

Because of our particular array of businesses, we will benefit more than anyone else from broadband's development.

Let me explain how: To begin, we get consumers online with the AOL service, which we've done and done well.

The next step is to get them to add broadband. Today, we have hundreds of thousands of AOL members who buy that broadband add-on access directly from us, and millions more who have added broadband access from other providers to use with their AOL, just like they run their narrow band connections over phone lines owned by someone else. The simple truth is that our members really like our service, and they are very loyal to it.

And the vast majority of those who buy add-on broadband access from somebody else continue to pay us $23.90 per month for the full AOL service.

Once our members have broadband, we can then offer them new products and services, like high-quality music, games and home networks, something that will benefit many of our other divisions.

Because we have both cable and online companies, we have been able to succeed in broadband over cable in ways others have not. In fact, this unique capability has enabled us to build Road Runner into the number one broadband-only ISP, in contrast to the failure of other broadband ventures.

Time Warner Cable is the first cable company to offer multiple ISPs, reaching its 20 largest markets last year -- representing 15 million households -- with the rest scheduled for launch this year.

The preliminary results for the initial markets show strong demand for AOL. Indeed, we had to slow down and limit the marketing of AOL so as not to overwhelm the capacity of our Cable Company to deal with the demand.

Importantly, let me lay to rest one of the big concerns about multiple ISPs. We now have enough evidence to say for sure that it is not cannibalizing our Road Runner service. These are almost all incremental ISP subscribers. It looks a lot like multi-pay to the cable operator.

As this trend becomes even clearer, we have total confidence that the other cable companies will respond positively to a new incremental revenue stream. They, like us, have been concerned about cannibalization. Now our experience puts that concern to rest.

4

2AOL07216 1284
Confidential Treatment
Requested

So think about the position that this Company is in. We are the Internet leader with over half of the online market connecting through AOL. We are the number one provider of broadband connectivity to the home. And, lastly, we have the content and services that can both drive and benefit from broadband in the home.

This unparalleled combination of expertise, products and resources gives us the ability to lead the development of broadband for the mass market.

Now, I want to briefly expand on several other growth drivers that will be important in 2002 and beyond.

Time Warner Cable is launching exciting new products and services beyond broadband data services. We expect to roll out Video on Demand and Subscription Video on Demand to the majority of our homes this year.

In addition, voice services over cable are in the final test phases, and we plan to introduce these, too, later in the year. And finally, we will continue the development of interactive television, and you'll see some components of it in our set-top boxes in the coming months.

Another big growth driver across the Company is music.

Using AOL on our cable networks, Warner Music has been able to promote and break artists in entirely new ways. Top-sellers like Linkin Park, Enya and Staind -- whose albums all ranked in the top five for 2001 -- were beneficiaries of these innovative techniques.

AOL Music continues to build its leadership in online music, now reaching four times as many unique users as MTV's site. And, last month, AOL did a beta rollout of the Music.net subscription service. This year, we will refine and integrate it for its official launch.

Not only will we expand our online services to Road Runner, but Time Warner Cable will develop its own digital music service for its subscribers to deliver the music directly to the household's stereo.

Our franchise films are yet another growth driver. Not only do we have the leading library of TV programming and feature films, but we are now in the unique position of having multiple blockbuster franchises, which include *Harry Potter*, which now has topped $800 million in worldwide box office, *The Lord of the Rings*, *Matrix*, *Rush Hour* and *Austin Powers*.

All of our divisions continue to develop and reinvigorate their core businesses in the U.S. and around the world: From the revitalized CNN; relaunched Headline News; and the increasing market shares for *Fortune*, *Time* and *Time-4-Media* to Warner Music Group's growing U.S. market share; Warner Bros. recapturing its box office leadership position; and the unstoppable creative triumphs from HBO.

5

2AOL07216 1285
Confidential Treatment
Requested

Finally, let me close by saying a few words about how we are managing AOL Time Warner as one company.

A year ago, our ability to operate as one company was our greatest challenge; this year it will be our greatest advantage. We'll continue to make progress on this front, and that will have a very positive benefit for this Company.

That will not only enable us to outperform our peers, but it will will help us continue to increase our penetration of the global consumer marketplace.

And now let me turn the call over the Wayne Pace.

#####

6

2AOL07216 1288
Confidential Treatment
Requested

# AOL Time Warner, Inc.

## Wayne H. Pace, Executive VP and Chief Financial Officer

### Analysts' Teleconference
### January 7, 2002

Thank you, Bob.

Since this is my first call with this audience as CFO, let me start by saying I am excited and happy to be here and I look forward to working with all of you.

Following up on what you've heard, and trying not to repeat, I will elaborate on some financial information for 2001 and our outlook for 2002.

The bottom line on our '01 performance -- in a very weak economic climate -- is that, first, we reaffirmed the tremendous strength of the AOL Time Warner business model, with its multiple revenue streams, and our ability to leverage infrastructure to contain costs. And, second, our Company emerged from 2001 with a broader platform for growth than we had when we launched the merger. By broader platform I mean an expanded subscriber base, superior cable pipeline, unparalleled content, a strategically advantaged publishing group through acquisitions, and an enhanced international presence.

Dick has given you the top-line numbers. I want to expand some on that. I also want to say again to you that the amounts are preliminary and that we'll be releasing complete information on January 30th. Also, the 2001 results that I'll discuss exclude certain one-time non-recurring charges, as has been our past practice.

Let me begin with some revenue trends.

As you've heard, subscriptions continue to be the main driver of revenue growth, increasing at a solid pace, demonstrating resilience even in this environment. Company-wide, Subscription Revenues will increase approximately 12% for the year and a very strong 16% in the fourth quarter, and we will report solid results across all our subscription businesses.

Subscription Revenues at AOL will be up approximately 12% for the year and 17% for the quarter, driven by new members as well as the July price increase. At Cable, Subscription Revenues will grow 14% for the full year and 15% for the fourth quarter as a result of new digital and high-speed data services.

As you heard, our Advertising/Commerce line is expected to show a decline of 3% for the year and will show a 13% decline for the fourth quarter. These decreases include lower commerce revenues as a result of the closing of our studio stores, which particularly affect our fourth-

2AOL07216 1287
Confidential Treatment
Requested

quarter comparisons. Excluding the stores from both years, the fourth-quarter advertising and commerce decline would be approximately 9%, principally because of declines at AOL and the Networks, offset in part by increases at Cable. As you've heard, the Company continues to support and benefit from cross-promotional advertising among our various business units.

Growth in the Content and Other Revenue line will be low single-digit for both the year and the quarter, reflecting a mixture of pluses and minuses.

We show strong performance at AOL and the Filmed Entertainment divisions and have offset by weaknesses at Music. Revenue growth at AOL includes the iPlanet alliance, which ended in the fourth quarter. Our Filmed Entertainment's strength is from box office hits like *Rush Hour 2* in the summer and *Harry Potter, The Lord of the Rings* and *Ocean's 11* in the fourth quarter. Also, DVD revenues have been strong all year long. Music's weakness during the year continued into the fourth quarter, generally reflecting the soft market conditions.

Let me turn to EBITDA, where we expect growth of approximately 18% for the year and 14% for the quarter.

Full-year EBITDA is expected to show gains of 20% or more at AOL, Filmed Entertainment, Networks and Publishing. Cable is expected to deliver growth in the low teens, and Music will be down approximately 20%.

For the fourth quarter, Filmed Entertainment had a blowout quarter and it's expected to post about a 90% EBITDA increase over last year.

Cable and Publishing's EBITDA are expected to grow in the low teens in the quarter. Cable's EBITDA growth continues to come from the rollout of new services and advertising gains, particularly relating to the launch of new channels. Publishing's EBITDA benefited from the earnings of IPC. Excluding IPC, Publishing's growth would be single digits.

AOL's growth in EBITDA for the fourth quarter is expected to be around 10%. Its growth has been negatively affected by declines in high-margin advertising revenues, mitigated by the cross-promotional opportunities Bob talked about. Our growth came from subscriptions, cost containment and iPlanet.

Networks are expected to post low single-digit growth in the fourth quarter with slight revenue gains and aggressive cost management.
Music will likely post mid-teen declines in the fourth quarter, largely from softness in the overall market and write-offs relating to weak retailers.

Our EBITDA margin for both the full year and the fourth quarter will be about 26%, up nearly 300 basis points on the year and over 200 basis points in the fourth quarter. The streamlining and efficiencies we achieved in 2001 leave us well positioned for improved performance once the economy begins to turn around. Cost management is a healthy part of our culture, and we will

2AOL07216 1288
Confidential Treatment
Requested

continue to focus on it in '02 and beyond. Said another way, we will watch our waistline, but we won't cut muscle.

**2002 Outlook**

Let me turn to 2002. Dick's given you the top-line information and our key assumptions and I want to get behind the numbers a little bit.

Subscription revenue, led by AOL and Cable, will once again drive our revenue growth; we anticipate growth in the low- to mid-teens.

On the advertising side, we are assuming that the overall industry will be flat-to-down for the year. We expect also that the first half of the year will show declines against '01 because the full effects of the downturn occurred later in the year. This trend will be true for us as well. However, we believe the strength of our brands and the continuing investments that we're making in our advertising businesses position us to increase our market share, and we expect, therefore, to outperform the market as a whole for the year. We certainly like our position for when the market inevitably turns.

In 2002, we expect Content and Other Revenue will grow in the low single digits as we build on the successes we had in 2001. We expect to continue to benefit from the very successful film franchises we launched in '01, including *Harry Potter* and *The Lord of the Rings*.

At Music, we believe that although the industry will continue to be weak, we will gain market share as a result of our A&R investments and our ability to promote artists on AOL. These anticipated increases will be partly offset by the absence of approximately $400 million in revenue related to the termination of our iPlanet alliance with Sun and, also, we'll have a decrease in television product available in '02 for syndication.

With respect to EBITDA, it's important that we look at this on an "apples to apples" basis. Because of the size of the AOL Europe transaction, the only appropriate way to make comparisons going forward is to put it in '01 as well as '02. And even though it's a smaller transaction, we thought it is only right to put IPC's revenues and IPC's profits in both years as well. Both AOL Europe and IPC will be integrated into our operations and they will contribute to our 2002 pro forma growth.

In 2001, AOL Europe will have revenues of about $800 million and losses of approximately $600 million. We will significantly reduce those losses through revenue increases and cost reductions as our economies of scale begin to kick in.

As far as IPC Media is concerned, we similarly expect pro forma EBITDA growth from cost containment as well as revenue enhancement. In addition, as you've heard, we will benefit from AOLE and IPC as a foundation for expansion throughout the European market. As Bob pointed out, one of the top priorities for AOLE is to take advantage of major cross-promotional opportunities similar to those in the U.S.

3

2AOL07216 1289
Confidential Treatment
Requested

Briefly, with regard to the first quarter, as Dick noted -- and for the reasons I discussed just a moment ago -- we expect EBITDA and revenue growth to be essentially flat. This means it could be up or down a point or so.

Also, as you know, in the first quarter we will be adopting FAS 142. This will not affect our revenues or EBITDA, but will affect our below-the-line costs. We expect that the effect of this new accounting standard will be to reduce our annual amortization expense by over $7 billion. The amortization that will remain relates principally to our film library, music catalogue and customer lists.

On the balance sheet side, FAS 142 requires goodwill to be revalued. Accordingly, we are expecting to record a one-time, non-cash charge in our income statement for the first quarter of 2002 in the $40-$60 billion range to reflect overall market declines since the AOL Time Warner merger was announced in January of 2000. This charge will be reflected as the cumulative effect of adopting the change required by the pronouncement, and it does not affect the Company's operations.

With regard to our financial condition, we are in great shape and we are committed to maintaining a very strong balance sheet. Net debt will increase as a result of the AOLE acquisition, but our credit ratios will be sufficient to maintain our investment-grade rating. Also, our strong balance sheet and our cash flow allow us to pursue a variety of funding sources as and when we might need them to pursue good business opportunities.

**Beyond 2002**

Looking beyond 2002, as Dick mentioned, the critical variable remains the economy. A recovery in '02 that is sustained and built into '03 means that we'll have a good shot at EBITDA growth ranging from the low to high teens. The point to keep remembering is that last year's expense actions were not one-time events; we'll benefit from them significantly with any incremental top-line growth.

It's also important to keep in mind that, in our business model, the leverage doesn't just come when advertising returns; just as important, it also comes from our subscriber base. By 2003, we will have a great many more subscribers, both in the U.S. and internationally and we'll be providing those subscribers with added services, and many of them will be paying us more.

So, to close, we are in a great position to return to high-growth performance. It's going to begin with prudent steps this year. And we're taking them, confident that if we do what we've set out for ourselves, we'll be delivering great value to all of you in the years to come.

Let me now turn you back to Dick.

# # # # #

4

2AOL07216 1290
Confidential Treatment
Requested

**AOL Time Warner, Inc.**

**Richard D. Parsons, Co-Chief Operating Officer**

**Analysts' Teleconference**
**January 7, 2002**

Thanks Jerry, and good afternoon ladies and gentlemen. We appreciate your joining us today.

Before I get on with the review of 2001 and the look ahead at the current year, I want to say a few things of a more general nature.

The first is to remind us all that that it's a little early to say goodbye to Jerry Levin. Although he's turned most of this call over to Bob, Wayne and me, he's still very much around to help see that the new team gets off to a good start. We'll have plenty of time to say a proper goodbye to Jerry and to acknowledge his extraordinary contributions to the creation of this Company in the weeks and months ahead. I'd also like to acknowledge how pleased I am to be continuing my partnership with Bob Pittman. Bob is not only my friend, he is the best operating executive in the business, bar none.

Secondly, since this is the first time I am speaking to you in my new capacity as CEO-Designate, I thought it would be appropriate to say a word or two about my view of the Company and its opportunities. We will, of course, have many occasions to visit this subject in greater detail in the future, but I suspect many of you want to know what to look for going forward.

Let me start by saying I am 100% committed to the strategic vision that drove Steve Case and Jerry Levin to fashion the merger of AOL Time Warner in the first instance. That vision is anchored in two fundamental beliefs:

The first is that new delivery systems -- enabled by the unremitting march of technology -- will alter consumer habits and relationships and, as a result, our businesses dramatically. While one can argue about the precise pace of this change -- or what some are calling "convergence" -- and about how exactly convergence will reconfigure the media landscape, there is no question that the boundaries between products, businesses, and services are already beginning to blur and that consumer habits are already evolving in new directions.

The second belief is that putting all the pieces together that relate to this convergence of products and services will enable us not only to better manage, but to drive our own destiny.

I share these beliefs. The strength of our Company lies in the relationship each of our businesses has to the other. The value of each is greater because they are all part of one family.

1

2AOL07216 1291
Confidential Treatment
Requested

In the year since our merger, the strategic foundations of AOL Time Warner have been firmly established. We have created a one-of-a-kind Company with a unique array of brands, technologies and talents. No competitor has anything close to our range of consumer relationships or our financial strength. And our executive and managerial depth is unmatched.

Going forward, the emphasis will be on execution; on making the investments necessary to position ourselves to drive convergence and making sure all the parts of the Company are working together to create incremental new value.

In sum, I think AOL Time Warner is the most exciting and dynamic Company in the world and has the potential to be the most valuable. Although Jerry will shortly leave us, Steve, Ted, Bob, Wayne and a host of talented executives are still here. We are all mindful of the history of innovation and success we are inheriting, and we are committed to building upon that heritage and taking the Company to heretofore unimagined heights.

Now onto the business of the day, which is to provide you with an overview of the Company's progress in 2001 and to give you an update on 2002, based on our expectations for the operating businesses and the effects of consolidating AOL Europe.

## 2001 Results and Achievements

Let me turn first to the preliminary numbers for 2001:

For the full year, revenue growth will be approximately 5%;

EBITDA growth will be approximately 18%;

With respect to free cash flow, we saw a growth of more than 200% for the year, to about $3.0 billion; and

EBITDA margins increased for the year, to approximately 26%.

With respect to the fourth quarter of 2001, revenue growth will come in at approximately 3%, and EBITDA will increase approximately 14%.

The weak spot for the year clearly was advertising, with the advertising and commerce revenue line showing a decline of about 3% for the full year.

Let me touch briefly on four examples of our 2001 accomplishments that I believe are important to the future growth of the Company. Bob will amplify these in a few minutes:

First, subscribers. We achieved robust subscriber growth, even in the face of a very significant recession. Company-wide, we closed the year with more than 147 million subscribers.

2AOL07216 1292
Confidential Treatment
Requested

Second, broadband. During the year, we added more than 1.5 million new digital subscribers, for a year-end total of nearly 3.3 million. At the same time, the number of high-speed data subscribers more than doubled to 1.9 million.

Third, international. Progress on the international front in 2001 was substantial, as we passed 5.5 million AOL members in Europe and one million members in Latin America. We also acquired IPC Media, the largest magazine publisher in Europe, and began to establish a foothold in the Chinese television market.

Fourth, how we market to consumers. We started using our multiple platforms to cross-sell our products to consumers in a number of new and exciting ways. As I indicated, Bob will get into more detail on this in a moment.

Finally, we took huge strides forward in integrating the Company. This, of course, will be an ongoing area of attention, but I am very pleased with where we are today.

## 2002 Expectations and Priorities

Now, to 2002. Before I look at the year ahead, I'd like to offer a few comments on earnings forecasts. As I have just reviewed, this Company made major progress on many fronts in 2001, and we had a strong financial performance in light of the economy. Still, last year we made certain economic assumptions and then ran right into a major advertising recession. As a result, we got no credit for our achievements because of the high expectations we, ourselves, created. In fact, I think we were penalized.

Of course, it would not be credible to suggest to you that we have no sense of what we anticipate for the coming year. Going forward, however, our assumptions regarding future economic conditions will be more conservative. It simply is not prudent to be aggressive about forecasting the economy in a volatile world. So, we will try not to overpromise, and we will deliver.

Our outlook for 2002 is based on these factors:

First, we are assuming no recovery in the economy.

Second, we are including the consolidation of AOL Europe and our acquisition of IPC Media.

Third, we will make significant investments in our businesses to increase market share and strengthen our competitive positions. We believe that this weak economic climate is the ideal time to make such investments.

As a result of all these factors, we expect revenue growth in 2002 to be in the range of 5%-8% and EBITDA growth in the 8%-12% range. For the first quarter of 2002, we expect EBITDA and revenue growth to be essentially flat.

3

2AOL07216 1293
Confidential Treatment
Requested

I'd like to add a word or two about AOL Europe because this is a very important part of our picture going forward. AOL just completed its best year ever in Europe, growing its membership by more than 40%. AOL Europe has substantial growth potential still in front of it in the U.K., France and Germany.

In 2002, we will focus on building our subscriber base, and we expect significant increases at AOL and in Cable. AOL membership will be driven by increases in the U.S. and in our key international markets. In Cable, digital capabilities and new high-speed subscribers will be key factors in expanding our high-revenue, high-margin part of this business.

Advertising was the most important swing variable in 2001, and we are not counting on any growth in the advertising market in 2002. We will concentrate, however, on further increasing market share and we have no doubt that when advertising rebounds, we will be in a strong position to outperform the market again.

We're expecting a solid performance in our content businesses, building on the valuable film franchises we established in 2001, continued international expansion, and further development of our libraries. Our Music business continues to turn around, gaining market share and producing hits, and we expect good things from Warner Music in 2002.

With respect to our specific investment priorities in 2002, which fulfill the need to drive convergence, these are the top ones:

We will continue to develop and launch new products and services that will drive subscriber and revenue growth; for example, Video on Demand, Subscription Video on Demand, Digital TV, AOL Music, HBO on Demand, and multiple ISPs. With respect to multiple ISPs, we expect to have them up in all of our markets by mid-year. And I can tell you one thing: multiple ISPs are here to stay.

International expansion will also be a major focus, and AOL Europe will be our number one priority.

We will continue to invest in other new businesses, including acquisitions, while integrating recent acquisitions such as IPC Media.

And we will pursue substantial reinvestment in our core businesses.

Now, with respect to the 3–to–5 year outlook, let me offer some remarks.

Obviously, the performance of the economy in 2002 will have a major influence on the outlook for 2003 and beyond. A meaningful upturn, depending on the size and scope of it, could lead to EBITDA growth in the low- to high-teens in 2003 and beyond.

2AOL07216 1294
Confidential Treatment
Requested

For all the reasons I outlined at the top of these remarks, we have every reason to be optimistic about the future, but in the present environment, it would not be wise to travel too far down that path.

But let me make one thing clear. I believe that no other company is better positioned than we are to take advantage of the improvement in the economy when it comes. During 2001, we put in place all the things we need to create a supercharged Company. Looking ahead, there is much more we can do, and will do, and I look forward to the future with great anticipation.

My most important message today is we have made enormous progress in laying a strong foundation for the future. That foundation begins with a uniquely powerful combination of technology, content and an expanding relationship with consumers throughout the world. AOL Time Warner performed well in 2001, given the environment, and comes into 2002 ready to build on that foundation.

And to tell you a little bit more about that, I'm going to turn it over now to Bob for a look at the operating units.

5

2AOL07216 1295
Confidential Treatment
Requested

## DICK PARSONS' CONCLUDING REMARKS:

Thanks, Wayne. Before taking your questions, ladies and gentlemen, I'd like to wrap things up by underscoring a few key points:

First, this is a one-of-a-kind Company.

Both absolutely and relatively to everyone else, we delivered a very strong financial performance in 2001.

In addition, we accomplished a number of other important goals for the year: successfully integrating the Company, putting an extraordinary management team in place, streamlining operations and improving cost efficiencies across the Company. We also made substantial progress in the areas that drive long-term growth: such as subscriptions, international operations, cross-divisional sales of advertising, and expansion of broadband services.

In 2002, our focus will be on taking full advantage of our Company's unique strengths, by building on the progress we made in 2001, by investing in our future and by continuing to outperform our competitors in the U.S. and key markets around the globe.

Lastly, going forward, we don't pretend to know what the economy will look like for this year or next, but our assumptions are conservative and we remain poised to benefit from any recovery.

With that, ladies and gentlemen, we will take your questions.

# # # # #

6

2AOL07216 1296
Confidential Treatment
Requested

**AOL Time Warner, Inc.**

**Analysts' Teleconference**
**January 7, 2002**

**Q&A:**

**Q:** Wayne, and perhaps Dick, as you look forward to your cash requirements, could you tell us how you plan to buy in the Bertelsmann put, and also what your thinking is as to TWE? How would you look at it perhaps for your target leverage at the end of the year?

**Wayne Pace:** We'll pay for the 49% interest in Bertelsmann with cash under our existing and available committed bank and other credit facilities.

**Dick Parsons:** Vis-à-vis TWE, as you know, first of all, Comcast, if they're successful in their acquisition or merger with AT&T Broadband, they will be the new partner in that. We've always said that we're under no compulsion to do anything about TWE unless it makes an awful lot of sense for both us and our partners. So, we'll just have to see, as that situation shapes up, how we deal with it. But we've got the financial capacity; we're confident to move in any direction it makes sense to move in.

**Wayne Pace:** I would also reaffirm what we said in our remarks that we're committed to maintaining our investment-grade rating, and that in our ratios — including the Bertelsmann transaction -- we stay comfortably well within those ranges.

**Q:** Would that suggest that you're moving toward the 3.2 kind of leverage that we talked about in the past?

**Wayne Pace:** Not with the things that we are committed to do. We will stay around the 3-times number.

1

2AOL07215 0156
Confidential Treatment
Requested

**Q:** Could you give a little bit more detail on IPC's financials 2001, and what you expect for 2002? And with iPlanet, you talked about the revenues; you didn't talk about the imminent impact on 2001 so we can get a sense for what's missing from 2002.

And, if I can hog it for a second, a few hundred thousand broadband subscribers directly buying from you, AOL; it sounds to me like most of those probably came on in Q4, which would be basically your Cable systems. Am I right?

**Wayne Pace:** IPC contributed about $25 million in earnings -- or will contribute about $25 million in earnings -- to the Publishing group for the fourth quarter of 2001. I described what impact that had on the growth of Publishing, quarter-to-quarter.

For next year, we will pro forma 2001 to include IPC for the full year, when you make comparisons for the Publishing group's actual 2002 results. There will be a nice growth at IPC in 2002 against its full-year 2001, but we won't be breaking that out separately in 2002.

There was about $400 million in revenue from the iPlanet alliance in 2001 and the earnings complement for that is about $320 million.

**Bob Pittman:** Going to the Broadband question, actually we're just getting started on the Cable side. I think we have been somewhat constrained by capacity; as we launched all the systems I think we found a tremendous demand. There is a certain capacity that the Cable Company can take the order and install. We are actually limiting the marketing of AOL to let them catch up to the AOL business.

And I would say the majority of the hundreds of thousands are actually DSL subs, which we promised you last year that we would begin selling this year, and I think we'll exit the year at a growth rate that's the highest of any of the quarters.

**Q:** Could you discuss a little bit, in terms of your progress in negotiations with the other MSOs for having AOL as a multiple ISP? And, attached to that, how has your view of cable changed with the potential loss of the bidding war for AT&T Broadband?

2

2AOL07215 0157
Confidential Treatment
Requested

**Dick Parsons**: I'm going to start with the so-called loss in the bidding war for AT&T Cable. Clearly, we have been, we are, and we will continue to be, big believers in Cable. This was an opportunity to sort of participate in what we see as the inevitable consolidation of that industry in a way that benefited our Company.

But the fact that Comcast stepped up in a very big way does not, from our perspective, cause any change in our view of Cable. In fact, it only reaffirms I think, for us and for you, the value of the Cable platform and franchise.

And we look forward to working closely with Comcast, assuming that they're going to be successful -- and we think they are, we hope they are — because we think one of the things that will be a part of that consolidation will be sort of a further re-acclamation (because we're already there) of the whole notion of multiple ISPs, which I spoke about earlier. So we think this is a good thing and we look forward to being a continuing active participant in the consolidation of this industry.

**Bob Pittman**:  I think, if you look at the negotiations we've got with the cable industry, they will only put on multiple ISPs if it's in their economic interest. I think the good news is that, through this experience now with Time Warner Cable, we have pretty much proven that it's in their economic interest as it is in Time Warner Cable's. So I feel good about those and, as you can imagine, we've had ongoing discussions and we continue those on almost a daily basis.

**Q**: My questions involve AOL Europe. Could you give us a sense on the progress of moving toward flat-rate pricing outside of the United States throughout Europe, beyond the U.K.; the importance of that to reaching profitability in AOL Europe? And when do you see the Company achieving profitability on a quarterly basis in AOL Europe?

**Bob Pittman**:  In terms of flat-rate pricing in Europe, as you know there is now flat-rate pricing in the U.K., where AOL is number one. We are number two in France and Germany and we're number two to the telcos in those countries. They do have a structural advantage because there is not flat-rate pricing. We think they will be going to flat-rate pricing in both countries, either through regulatory or competitive pressures, because the consumers want it and it's good for the consumers.

3

2AOL07215 0158
Confidential Treatment
Requested

And, yes, you're right, it will be good for the growth of the Internet; we know usage will increase, we think rather substantially, just like it did in the U.S. when we went to flat-right pricing. We do think it levels the playing field for the ISPs with the telcos when there is flat-rate pricing. So we feel very positive about that as a business opportunity for Europe.

In terms of achieving profitability, we've not made projections and I don't think we'll get into that.

**Q:** Would you expect to announce at least one deal with another major MSO during the course of 2002 for AOL as a third-party ISP?

**Dick Parsons:** We aren't in the business of predicting deals, but I'm very hopeful and optimistic that we're going to make real progress on that front in this year.

**Bob Pittman:** Also, do keep in mind that we now have DSL deals that cover about 80%-85% of the AOL footprint and we've gone through, I think, the hard phase of working out how that will operate; and now we're down to the process of beginning to normalize it as a way of selling broadband to our consumers.

**Q:** On the AOL Europe consolidation, is that going to come in for the full year? And can you give us a sense of how you're tracking toward breakeven? Should we expect breakeven, for example, to be a 2003 event for AOL Europe?

Secondly, with the investments you plan to make, can you give us an update on cap-ex guidance? Do you still expect, for example, Cable cap-ex to be down in 2002?

**Wayne Pace:** Just to restate what AOL-E will look like in 2001, it will have revenues of about $800 million and losses of about $600 million. We will reduce those losses significantly in 2002. Revenues, we believe, will cross the billion-dollar mark and we're going to work hard on cost management, because a lot of the infrastructure is principally built and we'll be able to keep the costs at a reasonably low growth level. It will not make money in 2002, but we will cut those losses significantly, and we're not really talking about what will happen to it beyond 2002 at this point.

4

2AOL07215 0159
Confidential Treatment
Requested

**Bob Pittman:** Let me give just the dynamic of the business; primarily, that business is in the growth phase. To a certain degree, the losses - or getting to earnings - are within our control, depending on how aggressive we want to be on either opening up new territories, opening up new services, or continuing to achieve a big subscriber growth, or take advantage of some opportunities. Those are things we'll evaluate, as we do now, on a continuing basis.

**Wayne Pace:** You asked about cap-ex; we have made the point that we will continue to invest significantly in our existing and new businesses in 2002. We'll be discussing our budget for the year with our Board next week, and, as we roll out into the year after the earnings release, we'll give you some specifics on our level of cap-ex. But we will have significant capital expenditures in 2002.

**Q:** So, to clarify, for the $600 million of EBITDA losses in 2001, you are expecting some cost growth in 2002, even though it's only modest?

**Wayne Pace:** It would be very modest.

**Q:** With the Bertelsmann transaction, are they renewing their advertising deal with you, or is there a more comprehensive deal in place there?

**Dick Parsons:** I think there is a more comprehensive deal in place. Bob, do you want to answer that?

**Bob Pittman:** Actually, I don't have all the information on it; we can certainly get the information for you. We continue to have a good relationship with Bertelsmann. This has been a great partnership, they've been a great partner. They continue to believe in the business and they use, I think, the full range of our products, so we're happy with them being a client.

**Q:** I think they were paying AOL about $50 million a year on reserves?

2AOL07215 0160
Confidential Treatment
Requested

**Bob Pittman**: They have been a great advertiser of ours. Unfortunately, I'm not certain of the exact dollars going forward, but I would certainly expect them to continue to be a customer of ours.

**Dick Parsons**: You used the words "more comprehensive". It's more comprehensive.

**Q**: I wonder if you could give us more color on what you expect digital cable subs and high-speed data subs to look like next year at the Cable division? Would you be willing to give us a stab at how many AOL broadband subscribers you think you might have?

And, Wayne, is it safe to assume that if we're not getting cap-ex guidance we probably wouldn't get 2002 free cash flow guidance until after you present your budget to the Board?

**Dick Parsons**: I'm going to answer that last question for Wayne. It's safe to make that assumption.

In terms of the growth of digital...

**Wayne Pace**: That's really something we're planning to talk with you about, specifically, following the earnings release on January 30. So we're going to get there with those discussions with you, but after the earnings release.

**Q**: First, you said in the press release that all the divisions performed in line with expectations in the fourth quarter. Yet, at least, compared to my model, we're way below expectations on the total EBITDA line, and it looks like it's because of the AOL division in advertising. Can you just give us some sort of better understanding of what happened there in the quarter, and how much that was actually down?

Secondly, in advertising for 2002, you're betting on a flat year for the market and an outperformance for you guys. Is it safe to assume that you'll have a low-single- or mid-single-digit advertising growth rate this year? Is that, basically, the guidance you're giving?

**Dick Parsons**: Let me start and then turn to Bob for more specifics about AOL advertising. As I said in my remarks — and we've all sort of touched on the fact and you all know it, because you

6

2AOL07215 0161
Confidential Treatment
Requested

follow this -- that it was the big story, and the advertising market just continued to sort of weaken as we went deeper and deeper into the year.

To the extent that your models may have been off, I think that it was the effect of advertising; and even though we had growth in AOL in advertising, year-over-year, it was still not what we had anticipated at the beginning of the year, prior to the onset of the advertising recession.

In terms of advertising, Company-wide, going forward in 2002, what we said was that we don't expect any rebound or upturn in the economy or in the advertising market; that we had projected a very modest increase year-over-year in our own advertising revenues, because we think we'll grab some share out there, even in a declining market.

**Bob Pittman:** If I know your number correctly, I think we'll be in that neighborhood, in terms of advertising/e-commerce on the AOL service, but, clearly, as we looked at advertising over the year, it was a continuing decline.

And, for those of you who followed it, it first hit our TV Networks group and people didn't think it was going to be that severe. It began to get worse for TV and then it began to hit the Magazine business, and by third quarter we were beginning to feel the effects of it in the Internet business. And, as I mentioned in my comments, we expect to see that continue into next year.

**Q:** Can you just elaborate on the TV syndication comment that Wayne made at the end of the call?

**Wayne Pace:** We had significant television product available for syndication in 2001 and we won't have comparable product in 2002. In 2001 it was *Friends* and *Seinfeld*, and we don't have comparable things available at this point in time for 2002, so we didn't budget for it.

**Q:** Wayne, I think the iPlanet thing caught a lot of us off guard; something delivering in the order of $300 million in EBITDA just evaporating after three years, with no warning, was rather disconcerting. I wonder if there are other contracts that we should sort of be put on notice that could provide difficulties here, going forward?

7

**Wayne Pace:**  Not that we're aware of. The iPlanet was disclosed earlier, and it could be that we should have said something, but we did disclose at the time when we knew that the contract would terminate and it wouldn't be renewed.

**Dick Parsons:**  There isn't anything else out there like that.

**Q:**  Wayne, could you give any specifics on where you expect AOL segment margins to end in Q4?

And, Bob, in the press release you guys mentioned the billion dollars in advertising and marketing agreements; can you give some color on how much of that you believe is truly incremental? Then, what the timing might look like for some of those dollars to flow through?

**Wayne Pace:**  We talked about AOL's EBITDA in the fourth quarter, growth at about 10% against fourth quarter of 2000. I would encourage you to go back...and we'll send out the Trending Schedules for 2000 and the first three quarters of 2001 later on this afternoon. You should be able to make your calculations, on margins and so forth, from that.

**Bob Pittman:**  In terms of incremental money and Global Marketing Solutions, our target going into it was about 20% incremental revenue. We did much better than that, I believe, this year. Of course, we probably did even better because, when you start thinking incremental at the beginning of the year and based on past practices in a declining ad market, we probably had a larger delta than we had expected.

Going forward, we're targeting a minimum threshold of about 20%; otherwise, why are we doing it in Global Marketing Solutions, and we're sort of kidding ourselves to do it overall?

**Q:**  It seems like in your remarks that you felt you had good success with AOL Europe. What will change, in terms of complete ownership of AOL Europe, going forward? In other words, are there things you're going to be able to do now that you didn't do in the past? Could you give us any more color on how you expect to reach what sound like pretty aggressive growth targets for AOL Europe, going forward?

8

2AOL07215 0163
Confidential Treatment
Requested

**Dick Parsons:** I'll start and turn it over to Bob. One of the things we're going to be able to do now that we've bought this back into 100% ownership, is make it work more effectively and supportively with our other assets. We have the new IPC acquisition -- the largest magazine company in the U.K. -- we've got other assets in Europe and, as I outlined in my remarks, the strength of our Company comes from the relationship of all of these assets, each to the other.

And, when you have 100% ownership of AOL-E now, I think we're going to be able to do some of the things we are effective at doing here in the U.S., in terms of cross-promotions and mutual reinforcement of business models, in Europe, as well. Plus the fact that Europe is literally behind the U.S. in terms of development of this market, and a lot of the trajectory of growth that you saw in the U.S. as the market was maturing, you're going to see in Europe, particularly as flat-rate pricing comes into vogue, which I think it surely will.

**Bob Pittman:** For us, we're very excited about the deal, and we're excited because, for those of us who were back at AOL at about 5 million subs, we have a chance to do it all over again. We have flat-rate pricing still ahead of us; if you recall the positive impact that had on the U.S.. We've got advertising/commerce emerging as a new revenue stream, just like it did "way back when" on AOL.

And, in terms of what we can do that we couldn't do in a partnership, we can begin to really package that advertising together with our TV products in Europe, our Magazine products in Europe. We can begin to do multi-national deals, which I think allow us to extend the advertising deals we have in the U.S. into Europe pretty clearly.

As Dick mentioned, we can build that AOL Time Warner marketing machine in Europe, where we can capture value. We don't necessarily -- if we own all of AOL Europe -- have to capture the value on AOL Europe. We can capture it in Movies, we can capture it in TV, we can capture it in a lot of other places. So, for us, we think it is a terrific opportunity, not only for the AOL Europe business, but also for what it can do for all of our other businesses and, therefore, for the bottom line of the Company.

Going back to the line, I think what you heard me, Dick and Jerry all talk about, is, when we begin to operate as one we get some real power, and I think AOL Europe is at the nexus of that.

9

2AOL07215 0164
Confidential Treatment
Requested

**Q:** On AOL Europe, is it possible that in the current year losses could be cut in half? And what is the assumption regarding your tax-exempt status in the U.K.? Do you expect to keep that?

And, as part of that question, if losses are cut in half at AOL Europe, it implies very modest growth rate for the rest of the Company; can you tell me if that's accurate?

Secondly, on the investment side, several members of management have said there will be significant investment in the current year. In 2001, was cap-ex in the $3.6-billion range, just to get a feel for how much it might be this year?

**Wayne Pace:** Again, on AOL-E, we will reduce that $600-million loss substantially, and it is possible that we could cut it in half. We're certainly shooting for at least that.

**Bob Pittman:** And I think we do have a fair amount of control over that, and part of it depends on what kinds of growth opportunities we have that we want to chase, that require investment dollars, or whether we want to keep it on the bottom line.

**Wayne Pace:** I think the next one was on the cap-ex for 2001. It will be just a little bit north of where you are; it will be about $3.7 billion for the year.

**Q:** A couple of little adjustments and clarifications here: Could you please review the fourth quarter AOL unit EBITDA growth percentage?; I missed it.

Second, does the approximately $10 billion in 2001 EBITDA include the pro forma impact for AOL Europe and IPC?

Then, finally, if you're coming in around $10 billion for 2001, your 8%-12% EBITDA growth guidance would get you to about $11 billion in 2002. Don't you get there if you just cut the losses in AOL Europe, as well as factor in the Network cost reductions, per your contracts [inaudible] some of the other providers at AOL? That would make the rest of the Company essentially EBITDA flat, or neutral for 2002.

10

2AOL07215 0165
Confidential Treatment
Requested

**Wayne Pace:** AOL's EBITDA growth rate in the fourth quarter that we disclosed will be about 10%. The $10-billion number for the full-year EBITDA does not include AOL-E in it; it includes IPC for the fourth quarter -- that's about $25 million for the fourth quarter.

We're sending out later the Trending Schedules. When we pro forma 2001, we will pick up IPC for the full year, so we'll go back and pick up in that pro forma calculation the earnings for the period of time before we acquired it. And we'll also include the $600 million in losses for AOL-E in the 2001 numbers. That will be the base that you will use off which to think about our growth in 2002, where we gave the range of 8%-12%.

**Q:** That $9.4 billion, plus the IPC contribution for the full year; then growth of 8%-12% on that number?

**Wayne Pace:** Yes. You'll get the Trending Schedules that show you how to adjust for IPC for 2001 for the period of time before the actual acquisition of it.

**Q:** The final question, which was Network costs alone; doesn't that get you $500 million or $600 million in cost savings? AOL Europe gets you a couple of hundred million dollars, IPC could get you a contribution; doesn't that account for the entire growth for the Company, then?

**Wayne Pace:** No. I think the way to approach it will be to start with the base that I just walked through, then think through the growth ranges that we've described to you. I think you'll be able to get there.

**Bob Pittman:** I think also we're not seeing at this point any continuing reduction in Network costs that are dramatically affecting the AOL numbers.

The second is that you also have to factor in the absence of the iPlanet revenue and earnings for 2002, which I think will offset any improvements that we see in AOL Europe.

**Dick Parsons:** At the end of the day I think you're going to see substantial growth in our businesses, but we are not (and I'll go back to something we started out with) looking for any help from the

11

2AOL07215 0166
Confidential Treatment
Requested

economy; in fact, we continue to see a pretty bleak picture out there. So we've been conservative but, we think, realistic.

**Q:** 8%-12% EBITDA growth for 2002: it's hard to see much pricing power in the subscriber parts of your business. Obviously, we know the demand side for advertising is limited for the next few quarters at least. Can you talk about -- sort of granularize it for us -- how much of that 8%-12% EBITDA growth is a function of incremental cost-cutting in 2002, and how much of it is sort of the expected revenue growth of some of the entire parts of the business? Obviously, you've got two new businesses -- IPC and AOL Europe -- that you'll be able to lower costs on.

But, you've conversely said that you're going to invest a lot of money as well into new businesses. I'm just trying to get a handle on how much of that EBITDA growth is cost-driven, versus top-line-driven.

**Dick Parsons:** Let me start and then I'll ask Wayne to bring it home. First of all, you all know that we did have substantial cost-cutting this year, and I think the fair way to say it is it's now kind of embedded in our culture that you always keep a weather eye on costs and make sure that you're performing in the most cost-effective fashion. But we made quite a bit of progress in terms of right-sizing the organization against the opportunities as we saw them, and positioning the organization in a fashion to work efficiently together.

We are not looking at substantial cost cuts in the way that we did in 2001 and, indeed, we don't currently have any major personnel actions or any of those sorts of things anticipated.

In terms of revenue growth, as I said in my remarks, 5%-8% and EBITDA growth in the target range of 8%-12%. And I think that most of the growth we're going to see going forward on EBITDA will be the flow-through of that increase in revenues coming off the back of substantially driving the subscription machine forward, again, and building on the powerful Content franchises that we've built this year.

**Wayne Pace:** If you think back through on the comments of the individual parts of our revenue, subscription revenue, again, will drive while the advertising economy is where it is. And that growth will be in low- to mid-teens next year.

12

2AOL07215 0167
Confidential Treatment
Requested

Advertising -- we expect to outperform the market and we think the market will be flat-to-down for the full year and will be down in the early part of the year. There's a lot of information that says there will be a modest recovery in the latter part of the year. But we know it's going to be down for the first half of the year; probably flat-to-down full year; and we will beat that.

Then, in Content, we will have healthy increases in our Content from the Filmed Entertainment businesses, but will be offset some by the iPlanet situation, and also by the lack of television product available in 2002.

**Bob Pittman**: I just want to add that in 2001 the real bright spot was the subscription growth and subscription revenue as a Company; that should continue into 2002. It's the one area of the Company -- I think that and Content -- that really has not been affected by this ad recession, and is operating independently of the ad recession. So we continue to expect that to be one of the stars of this Company.

**Q**: Really a couple of questions, one of which was this $1.5-$1.8 billion of non-cash charges from the reevaluation of equity investees. What does that relate to, specifically?

**Wayne Pace**: The largest part of that relates to Time Warner Telecom and it's the investment that we have in it, and it's in dealing with the current stock price for that investment.

**Q**: Now that is strictly below the line?

**Wayne Pace**: All of these will come below the EBITDA line.

**Q**: Are they considered non-recurring? In other words, when you report earnings per share, are these things going to be in it, or not?

**Wayne Pace**: It will be in our net earnings-per-share number, but it will be a charge below the EBITDA line. On Time Warner Telecom we wrote that investment up above our historical cost, in connection with the AOL Time Warner merger. So we wrote it up at the beginning of the year and,

13

2AOL07215 0168
Confidential Treatment
Requested

because of the decline in the market, we're required to write it down at the end of this year. That's the big driver of that number.

**Q:** I've got you -- that's fun and games.

The other quick question is, when you do the pro forma numbers, are you going to pro forma in the interest cost on the $6.75 billion, or is that going to be separate?

**Wayne Pace:** We will absolutely pro forma in for our 2001 numbers as if the acquisition occurred at the beginning of 2001.

**Q:** I was trying to come out with some kind of an earnings-per-share figure, which I guess we can't do yet.

**Wayne Pace:** You'll see it when we give you the Trending Schedules; then, when we roll the fourth quarter of 2001 in, we will show where we include the interest as if that debt were out there for the full year.

**Dick Parsons:** Thank you, ladies and gentlemen; we appreciate your patience late into the evening here. Just by way of conclusion, I would say again that we really believe that there is no other company out there that is positioned in the way that we are to take advantage of the recovery in the economy when it does come.

We've squeezed lots of costs out -- as Bob would say we are "lean and efficient mean" -- and when the economy turns around and the advertising market comes back we're going to be supercharged, in terms of taking advantage of those high-margin dollars.

Lastly, it doesn't necessarily always get reflected in the numbers, but we've made a lot of progress in 2001 in putting the foundations of this uniquely powerful Company together. And, going forward, we are optimistic about our ability to not only just outperform whoever our competitors and peer groups are, but, as I say, to take this thing to heretofore unimagined heights.

Thank you for your patience. We will be communicating with you again in a couple of weeks when we put out the year-end results. And, on an ongoing basis, we will be keeping you apprised of how we see things developing. Thank you and goodnight.

14

2AOL07215 0169
Confidential Treatment
Requested

**EXHIBIT C TO THE MEMORANDUM OF LAW IN SUPPORT OF JOSEPH A. RIPP'S
MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM**



Network Operations

Total Budget - CY01
$2,875M

CompuServe ($176M)
6%

Netcenter ($36M)
1%

AOL by Phone ($46M)
2%

AOL ($2,616M)
91%

1AOL153140001
Confidential Treatment
Requested

Network Operations

COLLECTED

2AOL059880506
*Confidential Treatment Requested*

AOL Confidential

1/23/01



Total Network Operations Budget by Major Brand

2AOL059880507
Confidential Treatment Requested

1AOL15314 0002
Confidential Treatment
Requested

COLLECTED

2AOL059880507



# AOL Brand Operations Budget

**AOL Operations Budget - CY00**
$2,166M

- Host Costs ($419M) 19.3%
- Staffing & G&A ($94M) 4.3%
- Broadband ($9M) 0.4%
- Network ($1,632M) 75.5%

**AOL Operations Budget - CY99**
$1,898M

- Host Costs ($248M) 14.6%
- Staffing & G&A ($71M) 3.8%
- Broadband ($0.7) 0.0%
- Network ($1,536M) 81.7%

**AOL Operations Budget - CY01**
$2,616M

- Host Costs ($868M) 25.5%
- Staffing & G&A ($117M) 4.8%
- Broadband ($179M) 7.0%
- Network ($1,651M) 63.1%

### AOL Brand Operations Cost Per Hour

|  | CY98 | CY99 | CY00 | CY01 |
|---|---|---|---|---|
| Network | $0.364 | $0.324 | $0.218 | $0.163 |
| Host Costs | $0.063 | $0.053 | $0.061 | $0.068 |
| Staffing/G&A | $0.016 | $0.013 | $0.012 | $0.010 |
|  | $0.443 | $0.390 | $0.290 | $0.231 |

### AOL Brand P&L Summary of Operations ($M) - CY01

| | |
|---|---|
| Network & Host | $2,319,267 |
| Broadband | $179,611 |
| Staffing & G&A | $117,650 |
| **Total Ops $** | **$2,616,929** |
| Gain on ANS Sale | ($76,218) |
| Surcharge Rev | ($76,800) |
| **Total Net Ops $** | **$2,462,911** |

1/23/01

AOL Confidential

1AOL15314.0003
Confidential Treatment
Requested

Network Operations

COLLECTED

2AOL059880508
*Confidential Treatment Requested*



Network Operations

1AOL 15314 0004
Confidential Treatment
Requested COLLECTED

2AOL059880509
Confidential Treatment Requested

AOL Confidential

2AOL059880509



AOL Brand

U.S. Membership Forecast

U.S. Usage Forecast

U.S. Usage at Peak

U.S. Simultaneous Users At Peak

COLLECTED

1AOL163140005
Confidential Treatment Requested

Network Operations

2AOL059880510
Confidential Treatment Requested

AOL Confidential

1/23/01



COLLECTED

Network Operations

1AOL15314 0006
Confidential Treatment
Requested

2AOL059880511
*Confidential Treatment Requested*

AOL Confidential

1/23/01



Gateway Brand

1AOL15314.0007
Confidential Treatment
Requested
COLLECTED

2AOL059880512
Confidential Treatment Requested



Network Operations

1AOL153314 0008
Confidential Treatment
Requested
COLLECTED

2AOL059880513
Confidential Treatment Requested

AOL Confidential

1/23/01

2AOL059880513



AOL, CS2000, Gateway Usage

Network Operations

1AOL15314 0009
Confidential Treatment
Requested
COLLECTED

2AOL059880514
Confidential Treatment Requested

AOL Confidential

1/23/01



Modem Utilization

Network Operations

1AOL15314 0010
Confidential Treatment
Requested

COLLECTED

2AOL059880515
Confidential Treatment Requested

AOL Confidential

1/23/01

2AOL059880515



# Network Expenses

Network Cost Per Hour

Host Cost Per Hour

Network Access Cost Per Member

Network Operations Cost Summary

COLLECTED

Network Operations

1AOL15314 0011
Confidential Treatment
Requested

2AOL059880516
Confidential Treatment Requested

AOL Confidential

1/23/01



# Host Expenses

**Host Expenses - CY 99**
$307M

Maintenance
($36M)
12%

Other Non-Capital
($6M)
2%

Lease/
Depreciation
($265M)
86%

**Host Expenses - CY 00**
$446M

Maintenance
($53M)
12%

Other Non-Capital
($3M)
1%

Lease/
Depreciation
($389M)
82%

**Host Expenses - CY 01**
$726M

Maintenance
($60M)
8%

Other Non-Capital
($18M)
3%

Lease
/Depreciation
($648M)
89%

AOL Confidential

1/23/01

## Network Operations Host Costs per Hour

|  | CY98 | CY99 | CY00 | CY01 |
|---|---|---|---|---|
| Lease/Deprec | $0.007 | $0.056 | $0.047 | $0.045 |
| Maintenance | $0.007 | $0.046 | $0.006 | $0.006 |
| Other Non-Cap | $0.003 | $0.002 | $0.000 | $0.002 |
|  | $0.006 | $0.061 | $0.054 | $0.041 |
| Hours (M) | 3,328 | 6,454 | 9,259 | 11,529 |

Network Operations

1AOL15314.0012
Confidential Treatment
Requested

**COLLECTED**

2AOL059880517
Confidential Treatment Requested

# Genuity
## (formerly, GTE, formerly BBN)

- Fixed Network
- Contract term – 7 year contract expires 12/31/06
- Minimum purchase commitment – 1 million modems by June 2002
- Total estimated contract value – $3.0B
- One of two network providers in Japan

01/23/01                    AOL Confidential                    Geraldine MacDonald

2AOL059880518
Confidential Treatment Requested

1AOL15314 0013
Confidential Treatment
Requested

COLLECTED

# Level 3

- Fixed Network
- Contract term – 5 year contract expires 10/12/05
- Minimum purchase commitment – 300K modems by June 2001
- Total estimated contract value – $700M
- Currently setting market price at $27.35 per modem

01/23/01

AOL Confidential

Geraldine MacDonald

2AOL059880519
*Confidential Treatment Requested*

1AOL15314 0014
Confidential Treatment
Requested

COLLECTED

# Worldcom (UUNet)

- Fixed and hourly components

- Contract term - 5 years expires 12/31/04

- Minimum purchase commitment - 513,472 base modems plus 112 million hours per month plus 37% of incremental growth (base modems expire 12/02)

- Total estimated contract value - $3.0B

01/23/01         AOL Confidential

Geraldine MacDonald

1AOL15314.0015
Confidential Treatment
Requested

2AOL059880520
Confidential Treatment Requested

COLLECTED

# SPRINT

- Fixed network
- Contract term - 8 year contract expires 12/31/02
- Minimum purchase commitment - 25% of incremental fixed modem growth
- Total estimated contract value - $1.5B

01/23/01

AOL Confidential

Geraldine MacDonald

2AOL059880521
Confidential Treatment Requested

1AOL15314 0016
Confidential Treatment
Requested

COLLECTED

# Broadband Providers

- DSL

  – SBC - $30.00 per member, 4 year contract, value $600M

  – Ameritech - $39.95 per member, 5 year contract, value $500M

  – Verizon - $29.95 per member, 5 year contract, value $600M

  – GTE - $25.00 per member, 5 year contract, value $500m

01/24/01    AOL Confidential    Geraldine MacDonald

2AOL059880522
*Confidential Treatment Requested*

1AOL15314 0017
**Confidential Treatment Requested**

**COLLECTED**

# Broadband Providers

- Genuity
  - Provides backhaul and ATM circuits
    - Backhaul - $5.05/member in Ameritech and SBC territories, $4.30/member in GTE and Verizon territories, decreases after 100K members
    - ATM circuits - $2K - $5K depending upon LATA
- Satellite
  - Hughes - $20.50 per member, no minimum commitment

01/24/01                AOL Confidential                Geraldine MacDonald

2AOL059880523
Confidential Treatment Requested

1AOL15314.0018
Confidential Treatment
Requested

COLLECTED



2AOL059880524
Confidential Treatment Requested

1AOL 15314 0019
Confidential Treatment
Requested

COLLECTED

# International Networks

- Carrier 1 - UK and Germany
- British Telecom - UK
- Siris, Cegetal, Transpac - France
- Cable & Wireless - UK
- AAPT - Australia
- Netstream, Embratel, Telemar - Brazil

01/23/01                  AOL Confidential

Geraldine MacDonald

2AOL059880525
Confidential Treatment Requested

1AOL.15314.0020
Confidential Treatment
Requested

COLLECTED

# International Networks

- Viatel - UK
- Alestra, Avental, Telmex - Mexico
- Impsat - Argentina
- Worldcom (Uunet)
  - Japan, Hong Kong, Germany, Netherlands, UK, Switzerland, Sweden, Ireland, Canada, Belguim, France, Luxembourg, and other smaller POP's

01/23/01          AOL Confidential          Geraldine MacDonald

2AOL059880526
Confidential Treatment Requested

1AOL.15314.0021
Confidential Treatment
Requested

COLLECTED

2AOL059880526

# International Networks

- Telefonica
  - Covers Brazil, Argentina, Mexico, UK, France, Germany, Spain, Italy
  - Two year contract term expires 6/30/02
  - Minimum purchase commitment - $250M

01/23/01                    AOL Confidential                    Geraldine MacDonald

2AOL059880527
Confidential Treatment Requested

1AOL153140022
Confidential Treatment
Requested

COLLECTED

Providers SQ CHT

**AOLnet Modem Commitment**
'Status Quo' 9.2 Hours per Modem



Page 1

2AOL059880528
Confidential Treatment Requested

1AOL.15314.0023
Confidential Treatment
Requested

COLLECTED

# Plan Challenge

- P&B has asked operations to achieve $46 million dollars of savings above submitted plan.

- Network operations has accepted the challenge.

- <u>Opportunities include:</u>

  – Cable subscriber pricing  ($4.6 Million)

  – Cable subscriber installations delayed one quarter($15.7 Million).

  – Genuity's acceptance of modem market price ($19.7 million)

  – Converting Sprint installed base to modem market pricing ($79 million)

  – Considering write down of Sprint usage based modems ($58 million)

  – Reduction of Genuity modems due to non delivery ($2.3 million)

- <u>Risks include:</u>

  – WCOM successfully contests market modem pricing:  $60.2 million

02/06/01                    AOL Confidential                    Bill McGrath

2AOL059880529
*Confidential Treatment Requested*

1AOL1S314 0024
Confidential Treatment
Requested

COLLECTED

2AOL059880529

# Plan Issues

- Loading of other business unit costs into the Cost of Revenue.

  – Advertising Revenue gross ups:

    • Veritas license negotiated to a $30 million 3 year unlimited license. Final contract price of $50 million dollars includes $20 million dollar ad and revenue gross up.

    • Other deals similarly structured include Telfonica and Sun.

- Loading Time Warner costs into AOL Cost of Revenues.

  – 15 people now dedicated to Time Warner projects with no cost relief.

  – Major capital commitments including Software licenses and network gear supporting TWX.

02/06/01                          AOL Confidential                          Bill McGrath

2AOL059880530
*Confidential Treatment Requested*

1AOL15314.0025
Confidential Treatment
Requested

COLLECTED

2AOL059880530

# Plan Issues

- Operating an open staffing plan.
  - Growth plan of 108 people inadequate.
    - International growth and Time Warner support stressing infrastructure.

- Improving expense allocations to different brands.
  - Provide ability to better gauge each product's profitability.

02/06/01

AOL Confidential

Bill McGrath

2AOL059880531
*Confidential Treatment Requested*

1AOL15314 0026
**Confidential Treatment Requested**

COLLECTED



**Network Operations**

Total Budget - CY01
$2,875M

CompuServe ($176M)
6%

Netcenter ($36M)
1%

AOL by Phone ($46M)
2%

AOL ($2,616M)
91%

2AOL059880532
*Confidential Treatment Requested*

Network Operations
1AOL15314.0027
**Confidential Treatment Requested**

**COLLECTED**

AOL Confidential

1/23/01

**EXHIBIT D TO THE MEMORANDUM OF LAW IN SUPPORT OF JOSEPH A. RIPP'S MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM**



corporate information

corporate citizenship

companies

international

investors

news

Executive Speeches
Press Kit

features

careers

## News

> Current news about AOL Time Warner and our companies.

---

**IPlanet-Sun/Netscape Alliance**                          **Nov. 24, 1998**

**America Online, Inc. and Sun Microsystems, Inc. Form Strategic Alliance**

Will Accelerate Growth of E-Commerce and Develop Next-Generation Internet Devices

Three-Year Development and Marketing Agreements

Sun to Become a Lead Systems and Services Provider to AOL

DULLES, VA and PALO ALTO, CA, November 24, 1998 - America Online, Inc. (NYSE: AOL), the world's leading provider of branded interactive services, and Sun Microsystems, Inc. (NASDAQ: SUNW), a leader in network computing products and services, today announced that they have entered into a strategic alliance to accelerate the growth of enterprise-class e-commerce, and to use Sun's Java technology to develop selected next-generation Internet devices that will help Internet users access America Online brands from anywhere, anytime.

The alliance follows America Online's separate announcement today that it will acquire Netscape Communications Corporation.

Under their definitive three-year development and marketing agreements, America Online and Sun will work together to develop the most comprehensive suite of easy-to-deploy, end-to-end solutions to help companies and Internet service providers rapidly enter the e-commerce market and scale their e-commerce operations. Sun will become a lead systems and service provider to America Online, with America Online committed to purchase systems and services worth $500 million at list price from Sun through 2002 for its e-commerce partners and its own use.

America Online will receive more than $350 million in licensing, marketing and advertising fees from Sun, plus significant minimum revenue commitments, over the next three years.

Steve Case, Chairman and Chief Executive Officer of America Online, said: "The development of e-commerce is entering an exciting new stage. Increasingly, companies are seeing the power of the Internet as central to their business strategies and consumers are seeing the convenience of online commerce as central to their lives. We are confident that working with Sun will make it much easier and faster for us to help companies set up shop online, as well as to rapidly build their e-commerce businesses."

Mr. Case added: "By acquiring Netscape and working with Sun to provide winning e-commerce solutions, we will be able to both broaden and deepen our relationships with business partners who need this additional level of infrastructure support, and to provide more value and convenience for Internet consumers. We share with Sun a vision for the

future in which consumers will be able to access America Online brands anywhere, at any time, and from any device, and we believe that with this alliance, we can make this happen more quickly."

Scott McNealy, President, CEO and Chairman of Sun Microsystems, said: "As we rapidly move toward the networked age, major corporations are turning to Sun to provide the equivalent of 'dial tone' in their computing networks. Internet commerce requires continuous operation, infinite scalability yet consumer-friendly ease-of-use. By combining the strengths of Sun with AOL and its brands, we can lead our customers into the electronic commerce marketplace of the future - into the networked age."

Complementary E-Commerce Strengths

The companies said that their strategic alliance will take advantage of the complementary strengths of America Online, Sun and Netscape. These include America Online's success as an Internet service provider and its industry-leading consumer reach, Sun's expertise and global reach as an enterprise software and network computing leader, and Netscape's suite of e-commerce software and services. Together, the companies will be able to offer complete turnkey solutions along with modular software flexibility and consulting services to enable e-commerce partners to put their businesses online quickly and scale rapidly to meet consumer demand.

The new offerings will allow customers to completely outsource their electronic commerce operations, with America Online providing everything from Internet traffic and application connectivity to online marketing, orders, billing and payments. Sun and America Online will also market their e-commerce solutions to customers, including other Internet service providers, who want to create part of the solution themselves. The products will be available on Sun's Solaris operating environment as well as on other operating systems.

Sun will initially be able to sell AOL's Netscape-branded suite of middleware software, with both companies using each other's sales channels and customer relationships to market their existing products and services. As new products are developed, both companies will sell the next-generation e-commerce solutions. Sun's large sales and service organization will provide technical support for these products and services.

Ed Zander, Sun's Chief Operating Officer, said: "Sun's focus on developing scalable, carrier-grade network services is now greatly enhanced. Today's announcements with America Online further establishes Sun as the partner of choice to meet the needs of both service providers and major organizations worldwide. We are demonstrating the value of Sun's Java and Jini technologies and how they will enhance new world commerce."

Included in the alliance is a commitment by Sun and America Online to develop the next generation Netscape Navigator and Communicator software clients. In addition, America Online will support the Java technology from Sun in its e-commerce solutions, including the soon-to-ship version 1.2 as well as PersonalJava.

A major focus of the alliance will be to utilize PersonalJava to offer America Online services across a range of next generation Internet devices, consistent with its "AOL Anywhere" strategy to extend its brand to all emerging mass-market platforms. PersonalJava is specifically designed for small, nomadic devices such as a personal digital assistant, cell phone or pager. This will further establish the Java platform as a leading software environment for these emerging Internet-based personal and business tools.

America Online plans to support multiple technologies in its e-commerce solutions and to support multiple platforms in the development of next-

generation Internet devices.

About America Online, Inc. America Online, Inc., based in Dulles, Virginia, is the world's leader in branded interactive services and content. America Online, Inc. operates two worldwide Internet online services: America Online, with more than 14 million members; and CompuServe, with approximately 2 million members. America Online, Inc. also operates AOL Studios, a leading builder of Internet brands for new market segments. Other branded Internet services operated by America Online, Inc. include AOL.COM, the world's most accessed Web site from home; Digital City, Inc., the No. 1 branded local content network and community guide on AOL and the Internet; AOL NetFind, AOL's comprehensive guide to the Internet; AOL Instant Messenger, an instant messaging tool available on both AOL and the Internet; and ICQ, an instant communication and chat technology on the Internet. About Sun Microsystems, Inc. Since its inception in 1982, a singular vision, "The Network Is The Computer(tm) " has propelled Sun Microsystems, Inc. (NASDAQ: SUNW), to its position as a leading provider of high quality hardware, software and services for establishing enterprise-wide intranets and expanding the power of the Internet. With more than $10 billion in annual revenues, Sun can be found in more than 150 countries and on the World Wide Web at http://www.sun.com. This release contains forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. The forward-looking statements are based on the current expectations or beliefs of the respective managements of America Online, Inc. and Sun Microsystems, Inc., as well as on a number of assumptions about future events, and are subject to factors and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements. The reader is cautioned not to put undue reliance on forward-looking statements, which are not a guarantee of future performance and are subject to a number of uncertainties and other factors, many outside America Online's and Sun's control. The forward-looking statements in this release address subjects including future financial and operating results, growth of the online commerce industry, availability of online commerce solutions on various operating systems, and the development and success of new online commerce devices, technology and platforms. The following factors, among others, could cause either America Online's or Sun's actual results to differ materially from those described in the forward-looking statements: the inability to identify, develop and achieve commercial success for new products and services and access and distribution technologies pursuant to the development and marketing agreements; the risk that the Netscape business will not be integrated successfully into America Online's business; costs related to the merger; increased competition and its effects on pricing, spending, third-party relationships, the subscriber base and revenues; reliance on network service providers; risks of new and changing regulation in the U.S. and internationally. For a detailed discussion of these and other cautionary statements, please refer to America Online's filings with the Securities and Exchange Commission, especially in the Forward-Looking Statements section of the Management's Discussion and Analysis section of America Online's Form 10-K for the fiscal year ended June 30, 1998 and in the 10-Q for the quarter ended September 30, 1998, and in the Risk Factors section of America Online's most recently filed registration statement on Form S-3 filed in June 1998. In addition, for a detailed discussion by Sun of the above risks and other risks and uncertainties, as well as related cautionary statements, please refer to Sun's filings with the Securities and Exchange Commission, including, without limitation, Sun's Report on Form 10-K for its fiscal year ended June 30, 1998 and its Report on Form 10-Q for its fiscal quarter ended September 27, 1998.

*back to press release search*

**EXHIBIT E TO THE MEMORANDUM OF LAW IN SUPPORT OF JOSEPH A. RIPP'S
MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM**

# THE WALL STREET JOURNAL.

4/16/01 WSJ B1
4/16/01 Wall St. J. B1
2001 WL-WSJ 2860385

Page    1

The Wall Street Journal
Copyright (c) 2001, Dow Jones & Company,
Inc.

Monday, April 16, 2001

**Amid Advertising Slowdown, AOL Parlays
Partnerships Into Revenue
By Julia Angwin
Staff Reporter of The Wall Street Journal**

Advertising isn't just in a slump, it's in the dumps. Many media firms are reporting notable downturns in ad spending this quarter.

Yet, during the past three months, media giant AOL Time Warner Inc. has landed eight advertising contracts that people familiar with the situation say are worth an extra $100 million in revenue this year.

How did AOL do it? Primarily, with a little help from its friends. Many of the recent deals, the result of an initiative by AOL Co-Chief Operating Officer Robert Pittman, are packages of Internet, magazine and TV advertising that piggy-back off relationships AOL already has with suppliers and companies in which it owns a stake.

AOL's advertising deal with Foundry Networks Inc., a company that makes Internet hardware, is one example. AOL is one of Foundry's biggest longtime customers. In March, Foundry announced it would launch its first-ever mainstream advertising campaign, a "multiyear, multimillion dollar" effort that would run on AOL's Internet, magazine and possibly TV properties. Prior to this announcement, Foundry had only advertised in industry trade magazines. "We want to really build our brand," says Ken Cheng, vice president of marketing for Foundry.

Some observers see AOL's strategy of reaching out to business partners such as Foundry as smart business, particularly in

these difficult times. But others question just how valuable such arrangements are for the newly merged company over the long term and whether they can be replicated in years to come.

"If you want to trumpet something, please don't make it from someone from whom you buy hundreds of millions of dollars of equipment," says John Corcoran, an analyst at CIBC World Markets. He calls the Foundry deal basically "a rebate."

Myer Berlow, president of interactive marketing at AOL's America Online unit, disagrees, saying the Foundry arrangement doesn't constitute a rebate. He says it makes perfect sense for AOL to leverage its relationships. "We have always been firm believers in doing business as much as we can with our partners," Mr. Berlow says. "If you can't do business with your partners, then what's wrong with you?"

Indeed, rivals may eventually follow AOL's lead. "To date, we haven't made [suppliers] part of the equation. But it's absolutely a possibility in the future," says Lisa McCarthy, senior vice president of Viacom Plus, Viacom Inc.'s integrated sales and marketing unit. Already, Viacom Inc. has turned some of its Internet investments into advertisers.

AOL's marketing deals are conceived at biweekly meetings of the AOL Ad Council where executives brainstorm ways to combine their Internet, magazine, cable and TV properties into custom advertising packages for big advertisers. Mr. Pittman has touted the effort as one important way that AOL is learning to cooperate among divisions and to leverage existing relationships to bring in additional revenue.

So far, eight deals have been announced from the Ad Council's deliberations. Three of them involve technology suppliers to AOL and three others involve companies with equity

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Copyright © 2000 Dow Jones & Company, Inc. All Rights Reserved.



4/16/01 WSJ B1                                                                 Page  2

relationships with AOL or its executives. The two other advertisers are Continental Airlines, which renewed its existing deal with America Online and agreed to buy two 12-page advertising spreads in AOL's ON magazine, and Princess Cruises.

Princess Cruises said it was lured, in part, by the prospect of a discount deal. "They are getting increased revenues from us and we're getting better rates from them," says Todd Putman, vice president of marketing at Princess Cruises, a subsidiary of P&O Princess Cruises PLC. The company said in March that it would expand its advertising with America Online into a "multimillion dollar" deal across several AOL properties. As part of the deal, Princess will also promote AOL's service; details will be announced later this month. "There is money going both ways, yes," Mr. Putman says.

Money is also apparently flowing both ways between AOL and Compaq Computer Corp. AOL is the largest purchaser of Compaq's top-of-the-line Himalaya servers and AOL also pays to make its service available on the Compaq Presario line of computers.

Compaq declines to comment on the details of its "multiyear, multifaceted" marketing agreement with AOL that was announced on Jan. 31, saying details will be announced later this month. "The announcement is pretty significant, in terms of them purchasing our technology and us putting more and more of our marketing and advertising dollars into the AOL Time Warner franchise," Compaq spokesman Arch Currid says.

Another supplier that AOL has tapped is Nortel Networks Corp., which makes telephones and other voice technology. "AOL sat down with Nortel and said, 'Yes, we want to do some things with you in the voice technology area, but let's look at the total picture across all our properties,'" AOL's Mr. Berlow says.

The advertising package that emerged in January: Nortel said it would "expand" its advertising on CNN and Time and Fortune magazines while AOL would collaborate with

Nortel to expand its AOLbyPhone service. With Nortel, as with its other partners, AOL declines to specify exactly how much incremental revenue the company will make off each deal.

Some of AOL's new advertisers are also found among AOL's portfolio of investments, such as Internet startup PurchasePro.com Inc., in which AOL has warrants to purchase two million shares. In January, PurchasePro said it would begin advertising on AOL's magazine and cable TV properties.

Another investor on AOL's roster of advertisers is Kinko's Inc. Although it hasn't been disclosed previously, AOL also purchased a stake in closely held Kinko's last year. Kinko's confirmed the stake but declined to elaborate upon its size; according to shareholder documents, America Online owned 11.5% of Kinko's as of Sept. 30. In March, Kinko's said it would expand its advertising on AOL properties.

Tom Wolzien, an analyst with Sanford C. Bernstein & Co., says that kind of arrangement raises questions about whether Kinko's is using the money it raised from AOL to increase its ad spending. "Is it just circular?" he says. "The reality is, we won't know for a couple of quarters."

AOL says its investments have no bearing on the advertising relationship. "I don't keep track of that," Mr. Berlow says. "This is strictly for me a business, advertising, e-commerce relationship."

But Mr. Berlow says it makes sense to take advantage of other connections. For example, Mr. Pittman, before joining AOL, was the chief executive of Century 21 Real Estate Corp., a unit of Cendant Corp. He is also still a director and shareholder. In January, Cendant announced it would "expand advertising" for its brands on AOL Time Warner properties.

"Nothing would make me happier than if [Mr. Pittman] were on 10 boards," AOL's Mr. Berlow says. "It's smart business to use personal relationships like that to drive

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Copyright © 2000 Dow Jones & Company, Inc. All Rights Reserved.



business."

---

Synergy Scorecard

AOL Time Warner recently landed eight expanded advertising contracts. Many of the advertisers had pre-existing relationships with America Online before it merged with Time Warner.

2001 Ad

| Deal Date | Advertiser | Relationship with AOL |
|---|---|---|
| Jan. 31 | Cendant | AOL co-COO Bob Pittman is director, shareholder of Cendant |
| Jan. 31 | Compaq Computer | AOL is top purchaser of Compaq's Tandem line of mainframes |
| Jan. 31 | Nortel Networks | AOL will collaborate with Nortel on technology projects |
| Jan. 31 | PurchasePro | AOL owns stock warrants in PurchasePro |
| March 8 | Continental Airlines | Purchased an expanded ad package |
| March 8 | Kinko's | AOL owns an 11.5% equity stake in Kinko's |
| March 8 | Princess Cruises | Purchased an expanded ad package |
| March 22 | Foundry Networks | AOL is one of Foundry's largest customers |

Sources: The companies, SEC filings

---- INDEX REFERENCES ----

COMPANY (TICKER):  America Online Inc.; Bce Inc.; Compaq Computer Corp.; Foundry Networks Inc.; Nortel Networks Corp.; POC; Bce Inc.; Nortel Networks Corp.; U.POS; Kinko's Inc. (AOL BCE CPQ FDRY NT POC T.BCE T.NT U.POS X.KNK)

NEWS SUBJECT:       American Depository Receipts;    Contracts,    Non-Government; Contracts,   Non-government;   Newspapers' Section Fronts; Page- One Story; High-Yield Issuers; Marketing; Markets and Marketing; Dow Jones Total Market Index; Wall Street Journal; English language content; Corporate and Industrial News; Contracts and Orders; Content Types (ADR CTC C333 FRT NPAG

HIY MRK C31 WEI WSJ ENGL CCAT C33 NCAT)

MARKET SECTOR:       Consumer Cyclical; Industrial; Technology; Utilities (CYC IDU TEC UTI)

INDUSTRY:                      Advertising; Communications Technology; Computers; All Entertainment & Leisure; General Industrial & Commercial Services; Film, Television & Music;   Printing   Services;   Recreational Services   and   Attractions;   Recreational Products & Services; Leisure Services & Products; Regional Telephone Systems; All Industrial    &    Commercial    Services; Telecommunications, All; Telephone Systems; Dow    Jones    Sector    Titans    Index    -

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Copyright © 2000 Dow Jones & Company, Inc. All Rights Reserved.



Telecommunications; Dow Jones Sector Titans
Index - Technology; Advertising: Television;
Advertising: Agencies; Advertising: Revenue
(ADV CMT CPR ENT ICS MOV PNT RCS R

PRODUCT:        Canadian News; Computer
Hardware;      European      News/Features;
Industrial Goods & Services; Leisure; Media;
Telecommunications (DCA DCO DEE DIG
DLE DME DTE)

REGION:        California; Canada; Canada;
European Union; Europe; North America;
Ontario; Canada - Ontario; Pacific Rim;
Quebec; Canada - Quebec; Texas; United
Kingdom; United States; United States;
Southern U.S.; Western U.S.; Virginia;
Western Europe; North American Countries;
Western European Countries; European
Countries (CA CN CANA EC EU NME ONT
CAON PRM QBC CAQC TX UK US USA
USS USW VA WEU NAMZ WEURZ EURZ)

LAYOUT CODES:       Large Majors; Second
Front Umbrella (LMJ SFR)

Word Count: 1265

4/16/01 WSJ B1

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Copyright© 2000 Dow Jones & Company, Inc. All Rights Reserved.

**EXHIBIT F TO THE MEMORANDUM OF LAW IN SUPPORT OF JOSEPH A. RIPP'S
MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM**



Citation                    Found Document              Rank(R) 1 of 1           Database
5/7/01 ADVTGAGE 1                                                                ADVTGAGE
5/7/01 Advert. Age 1
2001 WL 5299154

Advertising Age
Copyright (C) 2001 Crain Communications, Inc. All rights reserved.

Monday, May 7, 2001

Vol: 72 Num: 19

News

CRUNCHTIME :  Bob Pittman is promising the world. AOL Time Warner better
deliver
Jon Fine

THE CHILLED DIET COKES ON HIS conference table are not his because Bob
Pittman says he's quit caffeine: "I'd be too hopped-up otherwise."

The energy level of the fast-talking co-chief operating officer of AOL
Time Warner--the go-to-guy for many of the new company's integration
challenges--is formidable enough without it, thank you. Today, he's
executive-casual--cream-colored shirt, no tie, top button undone, jacket
tossed over the chair to the left of his desk--but his cadences still
sometimes slip into evangelist's stream-of-consciousness speed-drawl.

Mr. Pittman, 47, is a Mississippi-born preacher's son, but his is a
different pulpit. It will require all of his considerable selling
skills. In addition to overseeing the biggest merger of all time, he's
attempting to graft an America Online advertising-cum-partnership
strategy across the entire portfolio of the world's largest media
company.

He needs to deliver on the promises of large-scale cross-media ad
packages that have long bedeviled the industry while not unduly
alienating agencies, some of which seem less than thrilled about a
structure that, despite Mr. Pittman's avowals to the contrary, at times
appears to end-run their role. There are also operational nuts and bolts
to tend to. As one business-side staffer puts it, the net effect of
being inside the newly merged company is akin to flying a plane while
it's still being built.

Mr. Pittman, a creator of MTV, paints a picture of AOL Time Warner as
a gleaming new machine. He views it as naturalists see a redwood
forest-an ecosystem big enough to change the surrounding climate to one
that best suits it. When one sits across from him in his Manhattan
office 29 floors above midtown Manhattan, his words whip-cracking off
his conference table's black granite top, it's hard not to be swayed by

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Copyright © 2000 Dow Jones & Company, Inc. All Rights Reserved.

5/7/01 ADVTGAGE 1

his conviction.
  Upon leaving such rarified air, though, one hears the groaning gears
down below as much of the company readjusts to a new operating
philosophy and units scramble, sometimes desperately, to make aggressive
growth numbers in a slumping economy.

  WOWING WALL STREET

  AOL Time Warner last month gave Wall Street a welcome shot of relief
by making its first-quarter estimates when many other blue-chip media
companies substantially reduced expectations. It's not an overstatement
that AOL Time Warner has Wall Street analysts dewy-eyed with joy; as of
late April, 33 of 36 analysts had the company pegged as a strong buy.
This despite the formidable challenge AOL Time Warner faces to grow
revenue 12% to 15% by the end of the year, to around $40 billion, and
earnings before interest, taxes, depreciation and amortization 25%
annually. (The stock, at $50.65 on May 3, hit a post-merger high of
$55.75 in January 2001.)

  One of Mr. Pittman's points clearly resonates with analysts: Robust
subscription-based services within AOL and cable systems can
substantially offset ad markets' cyclicity. The $2.1 billion the entire
company took in from advertising made up just 23% of AOL Time Warner's
first-quarter revenue stream. Subscription revenues, which make up 42%
of the total were up 9.3%-a leap greater than any ad spending increase
in 10 years, said analyst Lanny Baker of Salomon Smith Barney, San
Francisco.

  So far, the company's first eight cross-media ad deals announced by
mid-April are pegged by analysts to be worth about $100 million over
their duration (many are multi-year agreements). Its ninth deal
announced April 26, is an extended technology and advertising
partnership with watchmaker Swatch, valued by one senior AOL Time Warner
executive between $25 and $50 million. (See chart below.)

  These deals result from brainstorming by AOL Time Warner's Advertising
Council-composed of each division's top sales executive. But Mr.
Pittman's approach reflects AOL's beginnings. Outsiders to agency
culture (even today, with well under 10% of its ad revenue coming
through agencies), AOL is sold by going straight to the top.

  "We generally do these issues at the COO or CEO level within the
company," Mr. Pittman said of the cross-media approach. "It's a matter
of coming in, talking to customers, and saying 'What big strategic
issues are you wrestling with?"'

  Like AOL, the new company seeks to "partner" in this arena with
companies it has existing supplier relationships with-such as its deals
with Compaq Computer Corp. and Net infrastructure providers Foundry
Networks. Mr. Pittman rightly points out the company's massive
purchasing base-it spends $30 billion a year on salaries and

  Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.  Copyright © 2000 Dow Jones & Company, Inc. All Rights Reserved.  DOW JONES Westlaw.

5/7/01 ADVTGAGE 1

supplies-gives the company the potential for a broader definition of
partnerships, which some analysts say seem suspiciously similar to
barter. "Maybe we don't have a vendor who gives us the lowest price,"
Mr. Pittman said, "but maybe we have a vendor who's giving us the lowest
price when you add to it how much they are spending on advertising ...
We have to think holistically."

   Some of which is fodder for agency-side criticism. Mike McHale, a
group media director at Publicis Groupe's Optimedia, New York, who buys
for BMW and British Airways, said the CEO-to-CEO approach "is why none
of us little media directors have gotten to see this integrated thing
yet." The Advertising Council began brainstorming potential packages
well in advance of the $124 billion merger's completion this January.

   Even in the company, there's some skepticism. One executive within AOL
Time Warner argued the CEO-to-CEO approach may not be built for the long
haul. "I'm not sure that [approach] is going to produce that much" long
term.

   Moving to a true multiplatform framework also would take some
cross-selling weight off top execs' shoulders-to say nothing of Mr.
Pittman's, who said he's the "account executive" on the biggest accounts
and fields such client calls at home after hours.

   Already, there are internal discussions to form an Advertising Council
offshoot to dream up potential cross-media packages. The reasoning is
that the Council has plenty else to focus on without taking on more
selling responsibilities. Council members include Brad Ball,
president-theatrical marketing; Myer Berlow, president-worldwide
interactive marketing, AOL; Larry Goodman, president-sales and
marketing, CNN; Dave Long, president-media sales and marketing, Time
Inc.; Paul McNicol, senior VP-interactive marketing, AOL; Jed Petrick,
exec VP-media sales, The WB; Dan Romanelli, president, Warner Bros.
Consumer Products; Bob Schneider, senior VP-worldwide corporate
promotions, Warner Bros.; Mayo Stuntz, chief operating officer, AOL's
interactive-services group.

   Some of the headaches of coordinating advertiser relationships when
deals can potentially be struck at every level-up to the CEO-have been
alleviated, Mr. Berlow said, by the every-other-weekly Council meetings.
"It keeps us from tripping over each other," he said.

   And advertisers seem as hungry to make those deals as AOL Time Warner
is. "There has not been one advertiser that we've either pursued or that
has called us and not said, 'What about [the new company]? How do we
take advantage of it?"' said Joe Uva, president of Turner Entertainment
Sales.

   As many as six more cross-platform deals could be announced by the end
of the second quarter, said one executive familiar with them. The Ad
Council recently made the troubled automotive category a target, though

      Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.    Copyright © 2000 Dow Jones & Company, Inc. All Rights Reserved.    DOW JONES Westlaw.

5/7/01 ADVTGAGE 1

Mr. Pittman conceded it could take up to a year for much larger packages to be finalized.

BIG NUMBERS

Big numbers routinely get thrown around at AOL Time Warner: $100-plus million in cross-media ad deals; the 28.8 million worldwide subscribers to AOL-and, Salomon Smith Barney's Mr. Baker said-the potential to end up with 40 million subscribers in the U.S. alone. In a figure seized on by the magazine industry, desperate for new sources of magazine subscriptions, America Online generates 100,000 subscriptions for Time Inc.'s titles each month-which, said Mr. Pittman, are all industry-grail "evergreens," or automatically renewing subscriptions charged to consumers' credit cards.

But 1.2 million subscriptions annually is a drop in the bucket for a publishing division that claims more than 42 million subscribers. Back in the mid-'90s, when stampsheet purveyors Publishers Clearing House and American Family Enterprises thrived, they generated as many as 5 million subscriptions for Time Inc., said a former company executive. And that 5 million figure doesn't include the 18 newly acquired titles in its Time4 Media unit (formerly Times Mirror Magazines), which were heavily dependent on stampsheet subscription sources.

Similarly, $125 million to $150 million in total commitments from nine companies in today's market is nothing to sneeze at-"I would say most people would lust after that," declared Mr. Pittman. But those are long-term figures and only equate to between 5% and 7% of AOL Time Warner's first-quarter ad revenue. Other megamedia giants like Viacom, via its Viacom Plus unit, and NewsCorp's NewsCorp One have teed up several deals in the $5 million to $15 million range, though they've been at it longer.

Mr. Pittman won't quantify the importance of cross-platform ad deals. "It's important," he said, "but there's a million other things in the company that are important to us." It seems clear, however, that AOL Time Warner's hopes in this arena are greater than those of, say Walt Disney Co.'s ABC, where President Alex Wallau has said such deals might one day make up 1% to 2% of his company's ad revenues.

Asked how long before the cross-platform sell was embedded within the company's DNA, Mr. Pittman said that at AOL it already was, but that it would take "a couple of media cycles-a couple of years" for the rest of AOL Time Warner to catch up.

Despite such claims, the importance of the cross-sell to AOL Time Warner's success "probably is" overstated, said Salomon Smith Barney's Mr. Baker. "There's no advertiser buying Time who hasn't thought at some point about buying AOL." One danger: Many of the cross-sell deals merely become in-house discounting.

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.     Copyright © 2000 Dow Jones & Company, Inc. All Rights Reserved.     DOW JONES Westlaw.

5/7/01 ADVTGAGE 1

THE BOTTOM LINE
"The bottom line is this: They are on target to make their revenue and cash flow targets for 2001," said John Corcoran, a Boston-based analyst with CIBC Oppenheimer. "If it slows very much from where we are now, it will become increasingly difficult to achieve revenue and cash-flow targets."

Voices inside the company already testify to some strain. "Let me put it to you this way," said one company executive. "The company did everything it could to make its numbers [in the first quarter]. The question is how long it can do that."

Part of it is cost-cutting, with the company promising $1 billion in cost savings in '01. It's not hard to find executives throughout the company who expect layoffs and buyouts beyond those that have taken place-2,400 in January company wide-and the around 800 buyout offers expected at Time Inc. later this month. "I don't think you've seen anything yet," warned one.

Mr. Pittman said all such decisions are up to divisional CEOs.

The aggressive profit numbers for 2001 were set last fall, before the depth of the current ad slowdown was apparent. Two Time Inc. executives said Time Inc. CEO Don Logan, when the extent of that downturn became clear, asked Mr. Pittman for more breathing room on the numbers-a request they say was denied. Mr. Logan said that's an "inaccurate portrayal."

"The question was raised," to a group of top company executives, "because the deal closed later: Should we revisit targets? Will we get all the synergies we talked about?" Mr. Logan said. The group, which included Mr. Pittman, CEO Gerald Levin, and Co-Chief Operating Officer Dick Parsons, decided no revision was needed.

Mr. Pittman said the process of arriving at target numbers is collaborative with divisional CEOs. "These numbers are not magical numbers handed out by the Ouija board at the finance department," he said. "Every quarter I've done in this business has been a hard quarter-I've never had an easy quarter in my life," he added. The advantage of AOL Time Warner's structure is getting CEOs to focus on the big picture-another hedge, in effect. "If we think about the business holistically, when a guy's got a little extra [beyond quarterly goals], he says: 'Ah, [another CEO] is down, I'll cover some of it.'"

This is precisely what rankles some company executives. "In some areas, they feel businesses are being compromised," said one, because "too much is being tapped to support other areas." This change from Time Warner's modus operandi, in which executives got bonuses for departmental, not company-wide performances, has been a post-merger chafing point.

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.  Copyright © 2000 Dow Jones & Company, Inc. All Rights Reserved.    DOW  Westlaw.

/

5/7/01 ADVTGAGE 1

Mr. Pittman downplayed tensions among company units. "Oh, the DNA is different everywhere," he dismissed. "What we do here is worship consumers."

Referring to readers or viewers as consumers, though, is exactly the kind of talk that makes some Time Warner executives instinctively cringe. Yet another obstacle for Mr. Pittman to overcome. Observers don't expect him to fail. But few deny this transition still has far to go, in an environment that leaves little room for error.

Contributing: Mercedes M. Cardona, David Goetzl, Wayne Friedman, Catharine P. Taylor

TABULAR OR GRAPHIC MATERIAL SET FORTH IN THIS DOCUMENT IS NOT DISPLAYABLE

Art Caption: The whole * Sum of the parts * Big deals Art Credit: Source: AOL Time Warner

---- INDEX REFERENCES ----

COMPANY (TICKER):  America Online Inc. (AOL)

KEY WORDS:         ECONOMY, BUSINESS AND FINANCE MEDIA

NEWS SUBJECT:      English language content; Dow Jones Total Market Index; High-Yield Issuers; Table; Content Types (ENGL WEI HIY NTAB NCAT)

NEWS CATEGORY:     CURRENT

INDUSTRY:          Film, Television & Music (MOV)

Word Count: 2107
5/7/01 ADVTGAGE 1
END OF DOCUMENT

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.  Copyright © 2000 Dow Jones & Company, Inc. All Rights Reserved.   Westlaw.

**EXHIBIT G TO THE MEMORANDUM OF LAW IN SUPPORT OF JOSEPH A. RIPP'S MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM**

# Network & Data Center Operations

## 2002 Capital Plan

### October 26, 2001

1AOL27809 1195
Confidential Treatment
Requested

AOL Confidential

# Capital Summary

| ($ in Millions) | 1Q 01 | 2Q 01 | 3Q 01 | 4Q 01 | CY01 | 1Q 02 | 2Q 02 | 3Q 02 | 4Q 02 | CY02 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Access Networks** | | | | | | | | | | |
| Voice Mail - AOL by Phone | $0 | $0 | $0 | $0 | $0 | $5 | $1 | $1 | $1 | $7 |
| Subtotal Access Networks | $0 | $0 | $0 | $0 | $0 | $5 | $1 | $1 | $1 | $7 |
| **Host Operations** | | | | | | | | | | |
| Lease Replacements | $0 | $20 | $20 | $15 | $55 | $29 | $45 | $41 | $92 | $206 |
| Growth | $57 | $79 | $52 | $49 | $237 | $64 | $65 | $74 | $78 | $283 |
| Subtotal Systems Operations | $57 | $99 | $72 | $64 | $292 | $93 | $110 | $115 | $171 | $489 |
| **Network Operations** | | | | | | | | | | |
| IRUs | $3 | $0 | $20 | $35 | $58 | $43 | $2 | $23 | $23 | $91 |
| Network Routers and Other Gear | $59 | $25 | $37 | $29 | $150 | $74 | $47 | $34 | $26 | $181 |
| Subtotal Network Operations | $62 | $25 | $57 | $64 | $208 | $117 | $49 | $57 | $49 | $273 |
| **Operations Security** | | | | | | | | | | |
| IDS | $0 | $0 | $0 | $0 | $0 | $5 | $0 | $0 | $1 | $7 |
| Subtotal Operations Security | $0 | $0 | $0 | $0 | $0 | $5 | $0 | $0 | $1 | $7 |
| Capital Budget Submission | $119 | $124 | $129 | $128 | $500 | $220 | $160 | $173 | $222 | $775 |

AOL Confidential

1AOL27809 1196
Confidential Treatment
Requested

2

# Key Drivers

- Overall capital spend up $225 million or 45 percent increase 2002 Vs 2001.
  - Capital spend less MISP and lease return increase flat to 2001. — *what do we do w/ b)*
    - MISP increase $83M
    - Lease Returns increase $151M.
  - Spend burdened by expanded business storage requirements and inefficient streaming design(Real Networks).
- Continued leverage of network spend by Business Affairs weakening ability to reduce cost.
  - Sun commitment unrealistic
  - Advertising surcharge adding .2 cents per hour to the host rate.

1AOL27809 1197
Confidential Treatment
Requested

AOL Confidential

3

# Opportunities

- Host capital
  - $30M Enterprise hosting. No customers.
  - $10M Member storage. Reduced Intervals.

- Network Capital
  - $10M Redesign of streaming complex. Requires ending Real partnership.

1AOL27809 1198
Confidential Treatment
Requested

AOL Confidential

# Lease Vs Buy

- Network & Data Center Operations impartial to either financing method.

- Policy shift to purchase must be accompanied by

  - Analysis of technology to avoid purchasing technology with limited useful life(less than 2 years).

  - System upgrade to accommodate technology refresh activity.

  - Upgrade to end of life asset management capability.

    - Disposal and sale of obsolete inventory burden currently bore by lessor.

1AOL27809 1199
Confidential Treatment
Requested

AOL Confidential

5

# Host Operations-Current Submission

- Total Capital Plan of $489 Million
  - Lease Replacements        $206 M
  - Hardware for Growth        $283 M
  - Total                                 $489 M

*Assume by on growth*

1AOL27809 1201
Confidential Treatment
Requested

AOL Confidential

7

# 2002 Quarterly Sys Ops Plan
## ($Millions)



| | Q1 2002 | Q2 2002 | Q3 2002 | Q4 2002 |
|---|---|---|---|---|
| New Gear | 64.3 | 64.9 | 74.4 | 79.4 |
| Replacements | 28.7 | 44.5 | 41.2 | 91.6 |

■ New Gear □ Replacements

AOL Confidential

1AOL27809 1202
Confidential Treatment
Requested

# 2002 Lease Replacements

- Original Cost of Leased Gear
  - 2001 Returns = $123 M
  - 2002 Returns = $245 M
  - 2003 Returns = $526 M

- Replacement Assumptions
  - Gear ordered 2-4 months in advance
  - Gear replaced at 57.5% of original cost

9

1AOL27809 1203
Confidential Treatment
Requested

AOL Confidential

# 2002 Lease Replacements

- Lease Replacements Reconciliation

  - Calendar 2002 Returns     $245 M
  - Less Q1 2002 Returns     ($ 46 M)
  - Add Q1 2003 Returns     $160 M
  - Gross Replacements     $359 M

- Replacements at 57.5%     $206 M

1AOL27809 1204
Confidential Treatment
Requested

AOL Confidential

# Capital Planning Drivers

- AOL Simultaneous Users - 12% growth

- Monthly Hours - 20% growth

- Page Views (Variable by Property)

- Other
  - Mail message volume
  - Mail attachments
  - TW support and migration
  - Projects (i.e. Billing, Datawarehouse)

1AOL27809 1205
Confidential Treatment
Requested

AOL Confidential

11

# New Capital
## ($Millions)

| | |
|---|---:|
| Service Infrastructure | $ 64 |
| Other Infrastructure | 31 |
| Web Hosting | 36 |
| Data Warehouse | 30 |
| Enterprise Hosting Service | 30 |
| Mail Messages | 70 |
| Mail Attachments | 22 |
| | $ 283 |

1AOL27809 1206
Confidential Treatment
Requested

AOL Confidential

# Service Infrastructure
## ($Millions)

| | |
|---|---:|
| Pod Growth (Q3-Q4; Broadband) | $ 4.0 |
| AIM Scaling | 6.0 |
| AdServer Scaling | 4.0 |
| Remote Cache Builds | 6.0 |
| Personal Finance (Redesign, Storage, Portfolios) | 4.0 |
| Message Boards/Newsgroups Growth | 4.0 |
| SAPI Configuration | 2.0 |
| AOL Search (AOL, AOL.com, CS, NSCP) | 3.5 |
| AOL Properties Search | 15.1 |
| Application Engineering | 13.8 |
| Login Systems | 1.6 |
| Total | $ 64.0 |



13

1AOL27809 1207
Confidential Treatment
Requested

AOL Confidential

# AOL Properties Search
## ($Millions)

| | |
|---|---|
| News Feeds | $ 1.3 |
| Hometown | 0.8 |
| International Search | 2.3 |
| Member Directory | 5.0 |
| Universal Member Profile | 3.0 |
| Government Guide | 0.8 |
| Other (Retrieval Infrastructure) | 1.9 |
| | $ 15.1 |

1AOL27809 1208
Confidential Treatment
Requested

AOL Confidential

14

# Application Engineering
## ($Millions)

| | | |
|---|---|---|
| Ad Demographics | $ | 2.4 |
| Keyword | | 1.7 |
| Phone Home | | 1.5 |
| AIM Registration Database | | 1.5 |
| Buddylist/Feedbag | | 1.5 |
| Popups | | 1.2 |
| Multiple Portfolios | | 0.6 |
| Other (Dev, QA, Monitoring Infrastructure) | | 3.4 |
| | $ | 13.8 |

1AOL27809 1209
Confidential Treatment
Requested

AOL Confidential

# Web Hosting
### ($Millions)

| | |
|---|---:|
| AOL US | $ 3.3 |
| Netscape | 12.5 |
| ICQ | 7.5 |
| CompuServe | 4.6 |
| Proteus (Calendar) | 1.6 |
| International | 1.6 |
| Mapquest, Moviephone, DCI | 1.7 |
| Other (Shop@aol, Love@aol, AIM web) | 3.2 |
| Total | $ 36.0 |

AOL Confidential

1AOL27809 1211
Confidential Treatment
Requested

17

# Data Warehouse Driven

## ($Millions)

| | |
|---|---|
| Newton Billing Project | $ 5.0 |
| On-Line Reporting Backup | 6.3 |
| Call Centers Reporting | 1.6 |
| DW Reporting - Member Tracking | 4.5 |
| DW Reporting - OnRamp | 5.0 |
| DW Support | 7.6 |
| Total | $ 30.0 |

1AOL27809 1212
Confidential Treatment
Requested

AOL Confidential

18

# Mail Capital

- Volume Driven
  - Message volume up by 200 MM per day
  - Mailboxes $48 MM
    - Capacity is 5 MM messages per day per box
    - 40 new boxes for 2002 at $1 MM per box
    - $8 MM peripheral gear (SETI, TMBRS)
  - Mail Contents $22 MM
    - Database can process 900k messages per day
    - 10 databases per storage unit; $900k per SU
    - Database runs at 90%

- Attachment Driven
  - Mail Attachments $22 MM
    - Increased storage needs
    - Significant investment in Q4 2002

AOL Confidential

1AOL27809 1213
Confidential Treatment
Requested

19



# Message Volume Projections

Millions of messages per day

Week Number

AOL Confidential

1AOL27809 1214
Confidential Treatment
Requested



## Mail Attachments 2001-2002

1AOL27809 1215
Confidential Treatment
Requested

AOL Confidential

# Network Operations
## 2002 Capital Plan

Joe Barrett

October 26, 2001

1AOL27809 1216
Confidential Treatment
Requested

AOL Confidential

22

# Capital Summary

| $ in Millions | 1Q 01 | 2Q 01 | 3Q 01 | 4Q 01 | CY01 | 1Q 02 | 2Q 02 | 3Q 02 | 4Q 02 | CY02 |
|---|---|---|---|---|---|---|---|---|---|---|
| **MISP** | | | | | | | | | | |
| IRUs | 0 | | | $35 | $35 | $43 | $2 | $23 | $23 | $91 |
| Network Routers and Gear | | $5 | $25 | $20 | $50 | $31 | $23 | $17 | $11 | $82 |
| Subtotal MISP | $ - | $ 5 | $ 25 | $ 55 | $ 85 | $ 74 | $ 25 | $ 40 | $ 34 | $ 173 |
| | | | | | | | | | | |
| **AOL Traditional** | | | | | | | | | | |
| IRUs | $3 | $0 | $20 | $0 | $23 | $0 | $0 | $0 | $0 | $0 |
| Network Routers other Gear | $59 | $20 | $12 | $9 | $100 | $43 | $24 | $17 | $15 | $99 |
| AOL | $62 | $20 | $32 | $9 | $123 | $43 | $24 | $17 | $15 | $99 |
| | | | | | | | | | | |
| Total Network Operations | $62 | $25 | $57 | $64 | $208 | $117 | $49 | $57 | $49 | $273 |

AOL Confidential

1AOL27809 1217
Confidential Treatment
Requested

# CY02 Capital Spend



| | | |
|---|---|---|
| ACME | $ 59.3 M | 32.7% |
| AOL Wave (ACME) | $ 15.8 M | 8.7% |
| ANVIL (ACME) | $ 7.9 M | 4.4% |
| ANVIL (DSL) | $ 8.7 M | 4.8% |
| AOL Traditional Network | $ 36.1 M | 19.9% |
| GTC (New Datacenter) | $ 5.8 M | 3.2% |
| ATDN International | $ 9.2 M | 5.1% |
| Web Cache servers | $ 7.7 M | 4.2% |
| Streaming | $ 30.8 M | 17.0% |
| Total | $ 181.2 M | 100.0% |
| Less MISP Charge Back | -$ 83.0 M | |
| Net AOL Network Capital | $ 98.2 M | |

## AOL CY01 CapEx spend of $100 M

AOL Confidential

1AOL27809 1218
Confidential Treatment
Requested

24

# Capital Expense Breakdowns

| ACME | | |
|------|------|------|
| Backbone Interfaces | $20.5 M | 34.5% |
| Backbone Upgrade (OC-192) | $16.0 M | 27.0% |
| POP Builds (7) | $14.0 M | 23.6% |
| Peering Interfaces | $4.7 M | 8.0% |
| Transit Interfaces | $4.1 M | 6.9% |
| Total | $59.3 M | 100.0% |

| AOL Wave (ACME) | | |
|------|------|------|
| NY State | $3.5 M | 22.2% |
| Ohio | $3.5 M | 22.2% |
| Florida | $1.8 M | 11.1% |
| LA | $3.5 M | 22.2% |
| Carolinas | $3.5 M | 22.2% |
| Total | $15.8 M | 100.0% |

| Traditional AOL | | |
|------|------|------|
| Web Net Upgrade (OC-192) | $6.3 M | 18.5% |
| Flat Cache | $6.0 M | 17.5% |
| Partner Nets | $4.6 M | 13.5% |
| Access Net Upgrade (OC-192) | $4.2 M | 12.3% |
| Measurment & Monitoring | $3.1 M | 9.2% |
| Replacement of Cisco 7500's | $3.0 M | 8.8% |
| Misc. Network builds | $2.7 M | 7.9% |
| International Web Cache | $1.5 M | 4.4% |
| Other | $2.6 M | 7.7% |
| Total | $34.0 M | 100.0% |

| ATDN International | | |
|------|------|------|
| Tokyo POP | $2.0 M | 21.9% |
| Australia POP | $2.0 M | 21.9% |
| Sao Paulo POP | $2.0 M | 21.9% |
| TBD POP | $2.0 M | 21.9% |
| POP Interface upgrades | $0.6 M | 6.0% |
| DSL build out | $0.6 M | 6.6% |
| Total | $9.2 M | 100.0% |

| Web Cache Servers | | |
|------|------|------|
| VA Cache Growth | $4.1 M | 53.4% |
| CA Cache Growth | $2.7 M | 35.5% |
| Japan Cache Growth | $0.3 M | 4.5% |
| Brazil Cache Growth | $0.3 M | 4.5% |
| Australia Cache Growth | $0.2 M | 2.2% |
| Total | $7.7 M | 100.0% |

| Streaming | | |
|------|------|------|
| Content Growth | $8.1 M | 26.4% |
| Radio Properties | $4.8 M | 15.5% |
| Streaming Network Infrastructure | $4.6 M | 15.0% |
| Content Distribution (International) | $4.4 M | 14.4% |
| Content Distribution (Domestic) | $3.5 M | 11.3% |
| Web Properties & Search | $2.4 M | 7.6% |
| Monitoring Infrastructure | $1.1 M | 3.6% |
| Music Net | $1.0 M | 3.3% |
| Next Generation Streaming | $0.9 M | 2.9% |
| Total | $30.8 M | 100.0% |

1AOL27809 1219
Confidential Treatment
Requested

AOL Confidential

**EXHIBIT H TO THE MEMORANDUM OF LAW IN SUPPORT OF JOSEPH A. RIPP'S MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM**

10-K405 1 d10k405.htm FORM 10-K405

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# FORM 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 31, 2001**

**Commission file number 001-15062**

# AOL TIME WARNER INC.
#### (Exact name of Registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | | **13-4099534** |
| **(State or other jurisdiction of incorporation or organization)** | | **(I.R.S. Employer Identification No.)** |

**75 Rockefeller Plaza**
**New York, NY 10019**
**(Address of Principal Executive Offices)**

**(212) 484-8000**
**(Registrant's Telephone Number, Including Area Code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒        No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☒

As of the close of business on February 28, 2002, there were 4,270,919,209 shares of registrant's Common Stock and 171,185,826 shares of registrant's Series LMCN-V Common Stock outstanding. The aggregate market value of the registrant's voting securities held by non-affiliates of the registrant (based upon the closing price of such shares on the New York Stock Exchange Composite Tape on February 28, 2002) was approximately $101.71 billion.

**Documents Incorporated by Reference:**

| **Description of document** | **Part of the Form 10-K** |
|---|---|



Portions of the Definitive Proxy Statement to be used in
connection with the registrant's 2002 Annual Meeting of
Stockholders.

Part III (Item 10 through Item 13)



**AOL TIME WARNER INC. AND TIME WARNER ENTERTAINMENT COMPANY, L.P.**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**
**AND OTHER FINANCIAL INFORMATION**

|  | Page | |
| --- | --- | --- |
|  | **AOL Time Warner** | **TWE** |
| Management's Discussion and Analysis of Results of Operations and Financial Condition | F-2 | F-92 |
| Consolidated Financial Statements: |  |  |
|     Balance Sheet | F-27 | F-110 |
|     Statement of Operations | F-28 | F-111 |
|     Statement of Cash Flows | F-29 | F-112 |
|     Statement of Shareholders' Equity and Partnership Capital | F-30 | F-113 |
|     Notes to Consolidated Financial Statements | F-31 | F-114 |
| Report of Independent Auditors | F-77 | F-146 |
| Selected Financial Information | F-78 | F-147 |
| Quarterly Financial Information | F-81 | F-148 |
| Supplementary Information | F-83 |  |
| Financial Statement Schedule II—Valuation and Qualifying Accounts | F-91 | F-149 |

F-1



### AOL TIME WARNER INC.
### MANAGEMENT'S DISCUSSION AND ANALYSIS
### OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION — (Continued)

**2001 vs. 2000**

Revenue and EBITDA by business segment are as follows (in millions):

| | Years Ended December 31 | | | |
| | Revenues | | EBITDA | |
| | 2001 Historical | 2000(a)(b) Pro Forma | 2001 Historical | 2000(b) Pro Forma |
| --- | --- | --- | --- | --- |
| AOL | $ 8,718 | $ 7,703 | $ 2,945 | $ 2,350 |
| Cable(c) | 6,992 | 6,054 | 3,199 | 2,859 |
| Filmed Entertainment | 8,759 | 8,119 | 1,017 | 796 |
| Networks | 7,050 | 6,802 | 1,797 | 1,502 |
| Music | 3,929 | 4,148 | 419 | 518 |
| Publishing | 4,810 | 4,645 | 909 | 747 |
| Corporate | — | — | (294) | (304) |
| Merger-related costs | — | — | (250) | (155) |
| Intersegment elimination | (2,024) | (1,258) | (86) | (46) |
| Total revenues and EBITDA | $38,234 | $ 36,213 | $ 9,656 | $ 8,267 |
| Depreciation and amortization | — | — | (9,203) | (8,650) |
| Total revenues and operating income (loss) | $38,234 | $ 36,213 | $ 453 | $ (383) |

(a) Revenues reflect the provisions of Securities and Exchange Commission ("SEC") Staff Accounting Bulletin No. 101 ("SAB 101"), which was retroactively adopted by the Company in the fourth quarter of 2000. The impact of SAB 101 was to reduce revenues and costs by equal amounts of $359 million on a pro forma basis for 2000.

(b) In order to enhance comparability, unaudited pro forma financial information for 2000 is provided as if the America Online-Time Warner merger had occurred at the beginning of 2000.

(c) EBITDA includes pretax gains of approximately $28 million in 2000 relating to the sale or exchange of certain consolidated cable television systems.

**Consolidated Results**

AOL Time Warner had revenues of $38.234 billion and a net loss of $4.921 billion for 2001, compared to revenues of $36.213 billion on a pro forma basis ($7.703 billion on a historical basis) and a net loss of $4.370 billion on a pro forma basis (net income of $1.152 billion on a historical basis) for 2000. AOL Time Warner had basic and diluted net loss per common share of $1.11 for 2001, compared to basic and diluted net loss before cumulative effect of an accounting change of $0.92 per common share on a pro forma basis in 2000 (basic earnings per share of $0.50 and diluted earnings per share of $0.45 on a historical basis).

As previously described, in addition to the consummation of the Merger, the comparability of AOL Time Warner's operating results for 2001 and 2000 has been affected by the recognition of certain significant and nonrecurring items in both periods. These items totaled $2.782 billion of net pretax losses in 2001, compared to $1.396 billion of net pretax losses on a pro forma basis in 2000, including $738 million relating to an accounting change ($270 million of net pretax losses on a historical basis) for 2000. If these items were excluded from earnings, the aggregate net effect would be to reduce basic and diluted net loss per common share by $0.38 in 2001 and $0.20 on a pro forma basis in 2000 (an increase in basic earnings per share of $0.07 and diluted earnings per share of $0.06 on a historical basis).

*Revenues.*  AOL Time Warner's revenues increased to $38.234 billion in 2001, compared to $36.213 billion on a pro forma basis in 2000 ($7.703 billion on a historical basis). This overall increase in revenues was driven by an increase in subscription revenues of 12% to $16.543 billion and an increase in content and other revenues of 4% to $13.204 billion,

offset in part by a decrease in advertising and commerce revenues of 3% to $8.487 billion.

F-7

**AOL TIME WARNER INC.**
**CONSOLIDATED STATEMENT OF OPERATIONS**
**Years Ended December 31,**
**(millions, except per share amounts)**

| | 2001 Historical | 2000 Pro Forma[a] | 2000 Historical[a] | 1999 Historical |
|---|---|---|---|---|
| **Revenues:** | | | | |
| Subscriptions | $ 16,543 | $ 14,733 | $ 4,777 | $ 3,874 |
| Advertising and commerce | 8,487 | 8,744 | 2,369 | 1,240 |
| Content and other | 13,204 | 12,736 | 557 | 610 |
| Total revenues[b] | 38,234 | 36,213 | 7,703 | 5,724 |
| Cost of revenues[b] | (20,704) | (19,887) | (3,874) | (3,324) |
| Selling, general and administrative[b] | (9,596) | (9,550) | (1,902) | (1,390) |
| Amortization of goodwill and other intangible assets | (7,231) | (7,032) | (100) | (68) |
| Gain on sale or exchange of cable television systems | — | 28 | — | — |
| Merger-related costs | (250) | (155) | (10) | (123) |
| Operating income (loss) | 453 | (383) | 1,817 | 819 |
| Interest income (expense), net | (1,379) | (1,373) | 275 | 138 |
| Other income (expense), net[b] | (3,539) | (1,356) | (208) | 677 |
| Minority interest expense | (310) | (264) | — | — |
| Income (loss) before income taxes and cumulative effect of accounting change | (4,775) | (3,376) | 1,884 | 1,634 |
| Income tax provision | (146) | (551) | (732) | (607) |
| Income (loss) before cumulative effect of accounting change | (4,921) | (3,927) | 1,152 | 1,027 |
| Cumulative effect of accounting change, net of $295 million income tax benefit | — | (443) | — | — |
| Net income (loss) | (4,921) | (4,370) | 1,152 | 1,027 |
| Preferred dividend requirements | — | (14) | — | — |
| Net income (loss) applicable to common shares | $ (4,921) | $ (4,384) | $ 1,152 | $ 1,027 |
| Basic income (loss) per common share before cumulative effect of accounting change | $ (1.11) | $ (0.92) | $ 0.50 | $ 0.47 |
| Cumulative effect of accounting change | — | (0.10) | — | — |
| Basic net income (loss) per common share | $ (1.11) | $ (1.02) | $ 0.50 | $ 0.47 |
| Average basic common shares | 4,429.1 | 4,300.8 | 2,323.0 | 2,199.0 |
| Diluted income (loss) per common share before cumulative effect of accounting change | $ (1.11) | $ (0.92) | $ 0.45 | $ 0.40 |
| Cumulative effect of accounting change | — | (0.10) | — | — |
| Diluted net income (loss) per common share | $ (1.11) | $ (1.02) | $ 0.45 | $ 0.40 |
| Average diluted common shares | 4,429.1 | 4,300.8 | 2,595.0 | 2,599.0 |

(a) AOL Time Warner's historical financial statements for the prior periods represent the financial results of America Online, as predecessor to AOL Time Warner. In order to enhance comparability, unaudited pro forma financial statements for 2000 are presented supplementally as if the merger of America Online and Time Warner had occurred at the beginning of 2000 (Note 1).

(b) Includes the following income (expenses) resulting from transactions with related companies:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Revenues | $ | 721 | $ | 762 | $ | 99 | $ | 68 |
| Cost of revenues | | (327) | | (212) | | — | | — |
| Selling, general and administrative | | 10 | | (32) | | 10 | | 6 |
| Other income (expense), net | | 11 | | (19) | | — | | — |

See accompanying notes.

F-28

**EXHIBIT I TO THE MEMORANDUM OF LAW IN SUPPORT OF JOSEPH A. RIPP'S MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM**

## TOLLING AGREEMENT

**WHEREAS**, the Division of Enforcement ("Division") of the United States Securities and Exchange Commission ("Commission") has notified Joseph A. Ripp, through his counsel, that the Division intends to recommend that the Commission authorize the filing of a civil enforcement action (the "proceeding") against Joseph A. Ripp with respect to the Commission's investigation entitled In the Matter of AOL Time Warner Inc. (the "investigation"); and

**WHEREAS**, the Division has informed Joseph A. Ripp, through his counsel, that it would seek the imposition of certain sanctions and other relief, including but not limited to permanent injunction, officer and director bar, a civil penalty and disgorgement of trading profits and bonuses, in the proceeding; and

**ACCORDINGLY, AND FOR THEIR MUTUAL BENEFIT, IT IS HEREBY AGREED** by and between the parties that:

1. any statute of limitations applicable to the proceeding or any other action or proceeding brought by or on behalf of the Commission or to which the Commission is a party arising out of the investigation ("any related proceedings"), including any sanctions or relief that may be imposed therein, is tolled for the period beginning on March 22, 2006 and ending at midnight on September 30, 2006 (the "tolling period");

2. Joseph A. Ripp and any of his agents or attorneys will not assert that the Commission's failure to commence the proceeding or any related proceedings during the tolling period gives him any grounds for (a) asserting any statute of limitations as a defense to the proceeding or any related proceedings, or any sanctions or relief to be imposed therein, or (b) raising in any way any statute of limitations or any failure to commence the proceeding or any related proceedings during the tolling period as a defense to the proceeding or any related proceedings or to avoid or reduce any sanctions or relief to be imposed therein; and

3. nothing in this agreement shall be construed as an admission by the Commission or Division relating to the applicability of any statute of limitations to the proceeding or any related proceedings, including any sanctions or relief that may be imposed therein, or to the length of any limitations period that may apply.

This instrument contains the entire agreement of the parties and may not be changed orally, but only by an agreement in writing.

SECURITIES AND EXCHANGE COMMISSION
DIVISION OF ENFORCEMENT

By: _____          Date: _3/23/05_
    Deputy Assistant Director

Joseph A. Ripp

_____              Date: _4/4/06_

Approved as to Form:

_____              Date: _4/4/06_
David F. Geneson, Esq.
Hunton & Williams
1900 K Street, N.W.
Washington, D.C. 20006

Counsel to Joseph A. Ripp

**EXHIBIT J TO THE MEMORANDUM OF LAW IN SUPPORT OF JOSEPH A. RIPP'S
MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM**



## TOLLING AGREEMENT

**WHEREAS**, the Division of Enforcement ("Division") of the United States Securities and Exchange Commission ("Commission") has notified Joseph A. Ripp, through his counsel, that the Division intends to recommend that the Commission authorize the filing of a civil enforcement action (the "proceeding") against Joseph A. Ripp with respect to the Commission's investigation entitled In the Matter of AOL Time Warner Inc (the "investigation"); and

**WHEREAS**, the Division has informed Joseph A. Ripp, through his counsel, that it would seek the imposition of certain sanctions and other relief, including but not limited to permanent injunction, officer and director bar, a civil penalty and disgorgement of trading profits and bonuses, in the proceeding; and

**ACCORDINGLY, AND FOR THEIR MUTUAL BENEFIT, IT IS HEREBY AGREED** by and between the parties that:

1.  any statute of limitations applicable to the proceeding or any other action or proceeding brought by or on behalf of the Commission or to which the Commission is a party arising out of the investigation ("any related proceedings"), including any sanctions or relief that may be imposed therein, is tolled for the period beginning on March 22, 2006 and ending at midnight on March 31, 2007 (the "tolling period");

2.  Joseph A. Ripp and any of his agents or attorneys will not assert that the Commission's failure to commence the proceeding or any related proceedings during the tolling period gives him any grounds for (a) asserting any statute of limitations as a defense to the proceeding or any related proceedings, or any sanctions or relief to be imposed therein, or (b) raising in any way any statute of limitations or any failure to commence the proceeding or any related proceedings during the tolling period as a defense to the proceeding or any related proceedings or to avoid or reduce any sanctions or relief to be imposed therein; and

3.  nothing in this agreement shall be construed as an admission by the Commission or Division relating to the applicability of any statute of limitations to the proceeding or any related proceedings, including any sanctions or relief that may be imposed therein, or to the length of any limitations period that may apply.




This instrument contains the entire agreement of the parties and may not be changed orally, but only by an agreement in writing.

SECURITIES AND EXCHANGE COMMISSION
DIVISION OF ENFORCEMENT

By: _____          Date: _____
    Deputy Assistant Director

Joseph A. Ripp

_____          Date:  9- 26 - 06

Approved as to Form:

_____          Date:  9/28/06

David F. Geneson, Esq.
Sheppard Mullin Richter & Hampton LLP
1300 I Street, N.W., 11th Floor East
Washington, D.C.  20005-3314

Counsel to Joseph A. Ripp

**EXHIBIT K TO THE MEMORANDUM OF LAW IN SUPPORT OF JOSEPH A. RIPP'S MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM**



James T. Coffman
Luis R. Mejia
Melissa A. Robertson
Gregory T. Lawrence
Jeffrey B. Finnell
Christopher K. Agbe-Davies
Thomas D. Manganello
Andrew B. Stevens

Attorneys for Plaintiff
Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, DC 20549
(202) 942-4744 (Mejia)
MejiaL@sec.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>450 Fifth Street, N.W.<br>Washington, DC 20549<br><br>                                    Plaintiff,<br><br>                    v.<br><br>TIME WARNER INC.,<br>One Time Warner Center<br>New York, New York 10019<br><br>                                    Defendant. | CASE NUMBER 1:05CV00578<br><br>JUDGE: Gladys Kessler<br><br>DECK TYPE: General Civil<br><br>DATE STAMP: 03/21/2005 |

**COMPLAINT**

Plaintiff Securities and Exchange Commission alleges as follows:

**SUMMARY**

1.      This is a financial fraud case. America Online, Inc. ("AOL") and its

successor corporation AOL Time Warner Inc. ("AOLTW" and collectively with AOL,

the "Company") artificially inflated reported online advertising revenues and Internet

29TWCIV001016216

subscriber counts—two key measures by which investors and analysts evaluated the Company. The Company reported inflated online advertising revenue in periodic reports filed with the Commission and other public statements from October 2000 through February 2003 based on transactions entered into from June 2000 through December 2001. The Company also inflated its Internet subscriber counts in 2001. Subsequent to the events described below, AOLTW changed its name to Time Warner Inc.

2.      The Company inflated its online advertising revenues by engaging in "round-trip" transactions with a host of companies with which it had commercial relationships. These transactions ranged in complexity and sophistication, but in substance, the Company provided its customers with funds to purchase online advertising from AOL. Simultaneously, the customer would enter into an agreement to "purchase" online advertising from AOL in an amount corresponding to the payment from the Company. AOL and AOLTW improperly recognized as online advertising revenue the amounts received pursuant to these purported advertising agreements and improperly accounted for the funds it provided to the customers.

3.      Several of the customers were public companies with securities registered with the Commission. Some of these customers used the transactions to artificially inflate their own financial results. As a consequence, the Company also aided and abetted the frauds of three public companies that improperly recognized revenue in connection with the round-trip transactions.

4.      The Company also inflated the number of AOL's Internet subscribers by including memberships provided in bulk to corporate customers in its published subscriber counts, even though most employees of those corporate customers never

2

29TWCIV001016217

became members. The Company also inflated AOL's subscriber counts by, among other means, funding its corporate customers' bulk subscription "purchases."

5.      The Company's financial statements were further misstated by its failure to properly consolidate the losses and debt of one of its subsidiaries, AOL Europe, S.A. This resulted in material misstatements of the Company's 2000 and 2001 financial results, including overstatements of operating income, net income, and free cash flow, and understatements of net losses and total debt.

6.      This conduct violated the federal securities laws as well as a cease-and-desist order against AOL issued by the Commission on May 15, 2000. The Commission issued the cease-and-desist order because of AOL's improper capitalization of certain advertising costs that should have been expensed as they were incurred. As a result of this improper accounting treatment, AOL reported profits for six of eight quarters in fiscal years 1995 and 1996, rather than the losses it would have reported had it properly expensed the advertising costs. Within several weeks of consenting to that order, AOL began violating it by engaging in the new acts alleged in this Complaint.

7.      On October 23, 2002, months after the Commission commenced its investigation of this matter, the Company announced that it would restate its financial results for each of the quarters ended September 30, 2000 through June 30, 2002, and for the years ended December 31, 2000 and 2001 (the "2002 Restatement"). The 2002 Restatement reversed some, but not all, of the improper round-trip transactions and resulted in a reduction of $190 million in principally online advertising revenue. The 2002 Restatement was materially deficient.

3

29TWCIV001016218

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this action under Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)], and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and (e) and 78aa]. Defendant, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

9.    Venue is appropriate in this Court under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because the defendant does business in this judicial district and certain acts or transactions constituting the violations occurred in this district.

## DEFENDANT

10.    Time Warner Inc. is the corporate parent of AOL and is a media and entertainment company incorporated in Delaware and headquartered in New York, New York. Time Warner Inc.'s common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the New York Stock Exchange. Time Warner Inc. files annual, quarterly, and current reports with the Commission on Forms 10-K, 10-Q, and 8-K. Time Warner Inc. registered securities offerings from January 2001 through January 2003 by filing with the Commission Forms S-3 and S-8.

11.    AOL Time Warner Inc. was formed by the merger of AOL and Time Warner on January 11, 2001. It changed its name to Time Warner Inc. on October 16, 2003.

4

29TWCIV001016219

12.   AOL is an Internet service provider located in Dulles, Virginia. AOL provides its members with access to the Internet, e-mail accounts, and content.

13.   Certain conduct alleged in this Complaint occurred at AOL before it merged with Time Warner. AOL's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange. It filed annual, quarterly, and current reports with the Commission on Forms 10-K, 10-Q, and 8-K. AOLTW registered a securities offering on December 28, 2000 by filing with the Commission a Form S-4.

## FACTS

### I.
### AOL and Time Warner Propose a Merger.

14.   In the fall of 1999, AOL entered into merger discussions with Time Warner, and the two companies announced a proposed merger in January 2000. The implied market value of the merged company was approximately $200 billion, making it the then-largest merger in U.S. history.

### II.
### AOL Settles an Action with the Commission
### Based on AOL's Improper Accounting Practices.

15.   On May 15, 2000, the Commission issued a cease-and-desist order against AOL in connection with AOL's accounting for advertising costs in 1995 and 1996. The Commission found that AOL violated the reporting and the books and records provisions of the federal securities laws by capitalizing costs of acquiring new subscribers and reporting the costs as an asset on its balance sheet, instead of expensing them as incurred. AOL had capitalized aggregate advertising costs of approximately $385 million by September 30, 1996, when it wrote them off in their entirety. AOL consented to the

5

29TWCIV001016220

issuance of the cease-and-desist order without admitting or denying the Commission's allegations.

16.    In connection with the cease-and-desist order, the Commission filed a related civil action against AOL in the United States District Court for the District of Columbia seeking a civil penalty. AOL settled the matter by consenting to a court order requiring it to pay a $3.5 million penalty.

### III.

### AOL and AOLTW Violate the Commission's Cease-and-Desist Order and Engage in Fraud to Artificially Boost Online Advertising Revenue.

17.    Beginning in mid-2000, while the AOL/Time Warner merger was pending, stock prices of Internet-related businesses declined precipitously as, among other things, sales of online advertising declined and the rate of growth of new online subscriptions started to flatten. During this period, AOL employed round-trip transactions that boosted its online advertising revenue and masked the fact that it also was beginning to experience a business slow-down.

18.    AOL's round-trip transactions took several forms, including: (i) vendor transactions, in which AOL agreed to pay inflated prices for, or forego discounts on, goods and services it purchased in exchange for the vendors' purchases of online advertising in the same amount as the markup or foregone discount; (ii) converting settlements of legal claims into online advertising revenue; (iii) business acquisitions, in which AOL increased the purchase price in exchange for the sellers' purchase of online advertising in the same amount as the increase in the purchase price; and (iv) referral transactions, in which AOL and its counterparties falsely created and reported revenues.

6

29TWCIV001016221

19.     By each of these means, AOL effectively funded its own online advertising revenue by giving the counterparties the means to pay for advertising that they would not otherwise have purchased. To conceal the true nature of the transactions, the Company typically structured and documented round-trip transactions as if they were two or more separate, bona fide transactions, conducted at arm's length and reflecting each party's independent business purpose.

20.     AOL's recognition of online advertising revenue in connection with these transactions departed from generally accepted accounting principles ("GAAP"). GAAP requires accounting to reflect the substance of a transaction over its legal form. For example, revenue should not be recorded in a round-trip transaction in which the essence of the transaction is merely a circular flow of cash and the customer does not want or need the goods or services provided, would not normally purchase the goods or services at that time, or purchases quantities in excess of its needs. AOL's recognition of revenue on these round-trip transactions departed from GAAP by elevating form over substance.

21.     In connection with these round-trip transactions, AOL often delivered untargeted, less desirable, remnant advertising. Often, the round-trip advertisers had little or no ability to control the quantity, quality, and sometimes even the content of the online advertising they received. Because the round-trip customers effectively were paying for the online advertising with AOL's funds, they seldom, if ever, complained.

7

29TWCIV001016222

## A.   The Vendor Round-Trip Transactions

22.     As described above, AOL agreed to pay inflated prices for, or forego discounts on, goods and services it purchased in exchange for the vendors' purchases of online advertising in amounts equivalent to the markup paid or discount foregone. The essence of these transactions was a circular flow of money by which AOL used its own cash to create the false appearance of receipt of advertising revenue, enabling the Company to meet internal revenue targets and analysts' expectations. Examples of these transactions include the following:

### Computer Hardware Transactions

23.     In June 2000, AOL transformed a commitment to purchase computer hardware into a transaction that generated $37.5 million in online advertising revenue for AOL in the second half of 2000.

24.     The hardware supplier is a California-based company that manufactures the network equipment AOL uses to support its online service. In November 1998, AOL entered into an agreement to purchase at least $300 million of network equipment over three years.

25.     AOL's equipment needs outpaced expectations, and by June 2000 AOL had already purchased $300 million of equipment.

26.     In June 2000, the supplier asked AOL to enter into a new purchase commitment. During the negotiations that followed, AOL secured an additional 15% discount in exchange for committing to purchase $250 million of additional equipment.

27.     To inflate its online advertising revenues, AOL proposed to pay the supplier $37.5 million—by foregoing the 15% discount and paying the full $250 million

8

29TWCIV001016223

for the equipment—in exchange for the supplier's agreement to purchase $37.5 million of online advertising. The hardware supplier agreed, and AOL structured the transaction to conceal the fact that it paid an additional $37.5 million for the network equipment in exchange for the supplier's agreement to purchase $37.5 million of online advertising.

28.     The advertising contract provided AOL with complete discretion over where and when to run this online advertising, subject only to a $25 million cap on advertising within a single quarter.

29.     Faced with a shortfall in online advertising revenues in the third quarter of 2000, AOL obtained oral approval to run the full $37.5 million in advertising in that quarter. AOL also charged a 175% premium to its list price for the $37.5 million ad purchase.

30.     In its 2002 Restatement, AOLTW reversed the $37.5 million and accounted for it as a reduction in the purchase price for the network equipment.

31.     Following the model described above, AOL converted a $12 million discount from another hardware vendor into $12 million of advertising revenue in the fourth quarter of 2000. In its 2002 Restatement, AOLTW reversed the $12 million of online advertising revenue recognized in connection with this transaction.

### Software License Transactions

32.     In September 2000, AOL engineered a round-trip transaction with a California-based software company that creates and licenses data storage software. The software company's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and is quoted on the Nasdaq National Market ("Nasdaq").

9

29TWCIV001016224

33.    During the summer of 2000, AOL began negotiating to purchase a software license from the company. By mid-September 2000, the parties agreed on a $30 million purchase price for the license and associated services.

34.    During the final month of the license negotiations, AOL proposed that the software company purchase online advertising from AOL. The software company rejected AOL's proposal.

35.    Hours before the parties were set to execute the license agreement, AOL offered to pay an additional $20 million for the license in return for the software company's agreement to purchase $20 million of AOL online advertising. The parties did not change the terms of the license as a result of the price increase nor did they engage in any substantive negotiations regarding the online advertising contract. By oral side agreement, the parties further agreed to simultaneously wire payments of the amounts due under the contracts.

36.    AOL and the software company documented the license transaction to conceal the fact that AOL agreed to pay an additional $20 million for the license in exchange for the software company's agreement to purchase $20 million in online advertising. The Company improperly recognized the $20 million as advertising revenue, and the software company improperly recognized most of the additional $20 million as license and service revenue. In its 2002 Restatement, AOLTW reversed the $20 million of improperly recognized revenue.

37.    In January 2001, AOL returned to the software company's independent auditors a materially misleading confirmation of the purported terms of the license, further aiding and abetting the software company's fraud.

10

29TWCIV001016225

38.     Another example involves a $4.5 million round-trip.  In July 2000, AOL began negotiations with another software maker and licensor to purchase a license.  By mid-November 2000, AOL and the licensor agreed on a $33 million price for this software.

39.     During the negotiations, AOLTW pressed the licensor to purchase online advertising.  The licensor, which had no need or budget for the advertising, repeatedly rejected AOLTW's proposal.  After agreeing to the $33 million purchase price, but before the deal was signed, AOLTW then proposed to pay the licensor an additional $4.5 million for its license in exchange for an agreement by the licensor to buy $4.5 million of online advertising from AOLTW.  The licensor agreed.

40.     AOLTW documented the transactions as two independent agreements: AOLTW's purchase of a software license from the licensor for $37.5 million and the licensor's purchase of $4.5 million of online advertising from AOLTW.  AOLTW recognized $4.5 million as advertising revenue in the first quarter of 2001.  The Company did not restate its financial results to reverse this $4.5 million of advertising revenue in the 2002 Restatement.

**B.     The Business Acquisition Transactions**

*The Bertelsmann Online Advertising Contracts*

41.     In 2001 and 2002, AOLTW improperly recognized $400 million in online advertising revenue as a result of transactions with Bertelsmann AG ("BAG").  In substance, BAG paid $400 million to AOLTW as consideration for amendments to a multi-billion-dollar contract governing AOLTW's purchase of BAG's interest in AOL Europe.  The contract amendments had substantial value and BAG offered to compensate

11

29TWCIV001016226

AOLTW for the amendments. Rather than accept cash in exchange for the two amendments, however, AOLTW requested BAG to purchase online advertising in the aggregate amount of $400 million. AOLTW inflated its online advertising revenues by recognizing the $400 million as advertising revenue rather than as consideration received for amending the AOL Europe purchase agreement.

### *Purchase of BAG's Interest in AOL Europe*

42.    AOL and BAG formed a joint venture in 1995 that created AOL Europe, which owns and operates European Internet services (including AOL UK and AOL Germany). In March 2000, AOL and BAG entered into a contingent purchase agreement concerning AOL's acquisition of BAG's interest in AOL Europe. The agreement was structured as a put/call option (the "Put/Call"). Under the Put/Call, BAG could exercise an option to "put" its AOL Europe shares to AOL by selling those shares for $6.75 billion; if BAG did not exercise its option, AOL could exercise an option to "call" BAG's AOL Europe shares by purchasing BAG's shares for $8.25 billion. BAG's Put rights under the Put/Call had two settlement dates: January 2002 for 80% of BAG's AOL Europe shares, and July 2002 for the remaining 20% of BAG's AOL Europe shares. The Put/Call provided AOL the option to pay in cash or stock. AOL retained the further option to settle in cash or stock for 12 days after the price of AOL stock was fixed for settlement (the "free-look period"). If AOL's stock price at the end of the free-look period was below the price fixed for settlement under the Put/Call, AOL could deliver stock worth less than the Put/Call price.

43.    At the same time in March 2000, BAG and AOL executed an online advertising agreement committing BAG to purchase $150 million in online ads from

12

29TWCIV001016227

AOL over four years (the "Premier Ad Deal"). The Premier Ad Deal provided BAG "premier status," entitling it to extensive ad placement and exclusivity rights, and "preferred pricing," under which the parties agreed by December 2000 to provide BAG with a 40% discount to AOL's list price. Under the Premier Ad Deal, BAG negotiated the content, placement, and timing of the online advertising. After the January 2001 merger of AOL and Time Warner, AOLTW became AOL's successor in interest under the BAG agreements.

### $125 Million Put/Call Amendment Deal

44.    Shortly after entering into the Put/Call agreement, BAG attempted to realize some or all of the $6.75 billion it was due upon exercise of its Put rights, which according to the contract could not be settled until 2002. In the fall of 2000, BAG tried to sell its interest in the Put/Call agreement to an investment banking firm. However, the investment bankers were unwilling to purchase BAG's interest in the Put/Call because of the uncertainty inherent in its terms. Specifically, the free-look period put BAG at risk of receiving AOL stock worth substantially less than $6.75 billion, and AOL's option to pay with stock, rather than cash, created material, and potentially costly, obstacles to realizing value from BAG's rights prior to the settlement of the Put/Call. As a result of this uncertainty, BAG could not monetize, or realize value from, its rights under the Put/Call agreement prior to settlement. The most effective way to reduce the uncertainty, thereby enabling BAG to realize value by borrowing against the Put/Call agreement, was to obtain AOLTW's agreement to pay the Put price in cash rather than stock.

45.    In January 2001, BAG proposed to amend the Put/Call to require AOLTW to pay some or all of the $6.75 billion price in cash to enable BAG to monetize its

13

29TWCIV001016228

interest. BAG offered to compensate AOLTW for the amendment with cash, a reduction in the Put/Call price, or other means. AOLTW proposed that the consideration take the form of an agreement by BAG to purchase online advertising from AOLTW.

46.    From January through March 2001, AOLTW and BAG negotiated the terms of the Put/Call amendment. Almost all of the negotiations focused on the value and structure of various Put/Call amendments. There were few, if any, negotiations concerning terms of the online advertising deal, other than the overall price, which was determined by the negotiated value of the Put/Call amendment. During the negotiations, AOLTW and BAG consulted with finance experts and investment bankers concerning the value of the Put/Call amendment, which included the value of the free-look period and the value of avoiding a block sale discount for large blocks of stock. Values asserted by AOLTW during negotiations with BAG ranged from $200 million to $412 million.

47.    On March 30, 2001, AOLTW and BAG amended the Put/Call to require AOLTW to pay at least $2.5 billion in cash if BAG exercised its $6.75 billion Put (the "First Put/Call Amendment"). As consideration for the First Put/Call Amendment, BAG agreed to pay AOLTW $125 million in the form of an online advertising purchase (the "March '01 Deal").

48.    BAG had no need for additional online advertising. The March '01 Deal provided online advertising that was qualitatively different from the online advertising provided under the Premier Ad Deal. Among other things, the March '01 Deal stripped BAG of the preferred pricing and special rights that it enjoyed under the Premier Ad Deal, and it essentially eliminated BAG's ability to control the content, placement, and frequency of the advertising delivered pursuant to the March '01 Deal.

14

29TWCIV001016229

49.   AOLTW decided each quarter how much online advertising to run under the March '01 Deal by determining the amount of online ad revenues it needed during the period to reach its targets.  Often, the advertising for BAG ran late in the reporting period, after AOLTW had determined the amounts by which it could not otherwise attain its revenue goals.  BAG generally signed the advertising purchase orders after AOLTW had already run the advertising.  Negotiations, to the extent they occurred, concerned mostly the allocation of the ads among BAG's various subsidiaries and not the placement or frequency of the ads.  An AOLTW internal summary of the March '01 Deal described the online advertising as "pure gravy" and a "freebie," explaining that "these plans are not to be negotiated."  A later AOLTW internal memorandum described the March '01 Deal as an "aggressive revenue recognition plan" under which "AOL policy has been focused on maximum revenue recognition without regard to the quality of the carriage or input from the BAG Brands on either participation or carriage."  Internal BAG memoranda and e-mails likewise referred to the agreement in pejorative terms, including describing the advertising as valueless and "rubbish."

50.   AOLTW ignored the substance of the transaction and improperly recognized online advertising revenue in 2001 as a result of the March '01 Deal as follows: $16.3 million in the first quarter, $65.5 million in the second quarter, and $39.8 million in the third quarter.  The Company did not restate this transaction in the 2002 Restatement.

### $275 Million Put/Call Amendment Deal

51.   In September 2001, BAG asked AOLTW to commit to pay cash for the remaining $4.25 billion due when BAG exercised its Put right.  Again, AOLTW proposed to structure the consideration received for the amendment as a payment for on-

15

29TWCIV001016230

line advertising. Once again, AOLTW improperly accounted for the payment from BAG for a Put/Call amendment as if it were advertising revenue.

52.     From late November through mid-December 2001, AOLTW and BAG negotiated over the second amendment to the Put/Call. As was the case in March, substantially all of the negotiations concerned the value and structure of the proposed Put/Call amendment. There were few, if any, negotiations concerning terms of the online advertising deal, other than the overall price, which was determined by the negotiated value of the Put/Call amendment. During the negotiations, AOLTW and BAG consulted with finance experts and investment bankers concerning the value of a second Put/Call amendment. The values asserted by AOLTW during the negotiations with BAG ranged from $250 million to $420 million.

53.     On December 21, 2001, AOLTW and BAG amended the Put/Call to require AOLTW to pay the remaining $4.25 billion Put amount in cash (the "Second Put/Call Amendment"). As consideration for the Second Put/Call Amendment, BAG agreed to pay AOLTW $275 million in the form of an online advertising purchase (the "December '01 Deal").

54.     BAG had no need for additional online advertising. Like the March '01 Deal, the December '01 Deal stripped BAG of the preferred pricing and special rights that it enjoyed under the Premier Ad Deal, and it essentially eliminated BAG's ability to control the content, placement, and frequency of the advertising delivered. AOLTW booked almost the entire $275 million in online advertising from the December '01 Deal in 2002. AOL administered the December '01 Deal substantially the same as it did the March '01 Deal.

16

29TWCIV001016231

55.   AOLTW ignored the substance of the transaction and improperly recognized online advertising revenue on the December '01 Deal in the following amounts in 2002: $80.3 million in the first quarter, $84.4 million in the second quarter, $51.6 million in the third quarter, and $58.0 million in the fourth quarter.  The Company did not restate its financial results to reverse the revenue recognized in connection with this transaction in the 2002 Restatement.

56.   GAAP requires that the accounting for a transaction reflect its economic substance.  The economic substance of the exchanges of March and December 2001 was that BAG paid $400 million for amendments to the Put/Call.  AOLTW concealed that fact and fraudulently recognized the $400 million paid for the amendments as if it were bona fide advertising revenue.

### Other BAG Transactions

57.   In addition to the $400 million in fraudulent revenue from the March and December '01 Deals, AOLTW and BAG entered into a round-trip agreement which resulted in $17.4 million of improperly recognized online advertising revenue in the fourth quarter of 2000.  From the fourth quarter of 2000 through the fourth quarter of 2001, AOL and BAG also entered into a series of undisclosed side agreements resulting in the premature recognition of approximately $33.6 million in online advertising revenue.

### Another Instance of Improper Revenue Recognition
### In Connection With an Acquisition

58.   AOLTW entered into a "stock swap" with one of its joint venture partners in the first quarter of 2001.  In the stock swap, among other things, AOLTW purchased the partner's 55% interest in their joint venture.  Similar to other round-trip transactions in

17

29TWCIV001016232

which AOLTW funded its revenue, AOLTW and the partner agreed on a purchase price of $700 million, with the understanding that the purchase price would be increased by $25 million in exchange for the partner's commitment to purchase $25 million of online advertising from AOLTW. AOLTW artificially inflated its online advertising revenue in each quarter of 2001 and the first quarter of 2002 by improperly recording $25 million in online advertising revenue. The Company did not restate its financial results to reverse the $25 million recognized as revenue for this transaction in the 2002 Restatement.

### C.    Legal Settlements Converted to Online Advertising Revenue

59.    Shortly after AOL began trading discounts for online advertising revenue with its vendors, AOL also started converting settlements of disputes into online advertising revenue.

60.    For example, in August and September 2000, two companies agreed to settle longstanding disputes with AOL by paying AOL $12.5 million and approximately $25 million, respectively. Under GAAP, these payments should not have been recorded as advertising revenue.

61.    The two companies offered to pay these amounts to AOL without regard to any advertising purchases. AOL improperly converted these settlements into online advertising revenue and documented the settlement payments as advertising purchases, thereby improperly inflating its online advertising revenue by $12.5 million in the third quarter of 2000 and by $23.8 million in the third and fourth quarters of 2000.

62.    Similarly, in two transactions with a major communications provider, AOLTW improperly converted settlements with the counterparty into purchases of online advertising and documented the settlement payments as advertising purchases, thereby

18

29TWCIV001016233

inflating its online advertising revenues by $34.2 million and $17 million in the second and fourth quarters of 2001.

63.     Likewise, AOLTW converted a $4 million lease termination penalty into a $4 million ad revenue deal with a vendor on which it recognized revenue in the fourth quarter of 2001.

64.     In its 2002 Restatement, AOLTW reversed online advertising revenue recognized in connection with these transactions.

**D.    The Sham Referrals**

*Improper Transactions with PurchasePro*

65.     PurchasePro.com, Inc. was a publicly-owned corporation with its corporate headquarters in Las Vegas, Nevada. PurchasePro's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and quoted on the Nasdaq. PurchasePro provided business-to-business electronic-commerce software licenses and services.

66.     AOL and PurchasePro engaged in round-trip transactions to enable both companies to record and report false revenues.

67.     In the third quarter of 2000, AOL paid PurchasePro $2 million for software licenses that it neither needed nor intended to use. In exchange, and by way of an undisclosed side agreement, PurchasePro amended a warrant agreement so that AOL would receive $3 worth of warrants for PurchasePro stock for every $1 in third-party revenue AOL referred to PurchasePro. In a false confirmation to PurchasePro's auditors, AOL failed to disclose, among other things, that it had received additional rights under the warrant agreement in exchange for making the $2 million purchase. PurchasePro

19

29TWCIV001016234

materially overstated its revenues by improperly recognizing the $2 million in revenue in the third quarter of 2000.

68.     In the fourth quarter of 2000, AOL and PurchasePro manipulated their warrant agreement to artificially manufacture revenue for both companies. Under the agreement, AOL could earn warrants only when third parties it referred to PurchasePro entered into commercial arrangements that enabled PurchasePro to recognize revenue. The agreement did not permit AOL to earn warrants based on purchases it made from PurchasePro. Nevertheless, in the fourth quarter of 2000, AOL bought $10 million worth of products and services from PurchasePro, and PurchasePro deemed AOL to have "earned" $30 million worth of warrants. To circumvent PurchasePro's auditors' objections, AOL and PurchasePro falsified documents to create the appearance that AOL had actually referred $10 million of third-party purchases to PurchasePro. AOL thus improperly recognized advertising and electronic commerce revenue on the net $20 million difference between the value of the warrants and the $10 million it paid directly to PurchasePro. PurchasePro, for its part, improperly recognized revenue on AOL's $10 million purchase and thus overstated its fourth quarter and year-end revenues. In the 2002 Restatement, AOLTW did not restate its financial results to reverse the $20 million in improper revenue it recognized on this transaction.

### The Homestore Transactions

69.     Homestore, Inc. is a Delaware corporation headquartered in Westlake Village, California. Homestore provides Internet real estate listings to consumers and sells products and services to real estate brokers. Since June 2000, Homestore has provided content for the "House and Home" channel on AOL's online service.

20

29TWCIV001016235

Homestore's stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and is quoted on the Nasdaq.

70.    During the third quarter of 2000 and the first quarter of 2001, the Company and Homestore entered into a series of purportedly unrelated transactions which resulted in both companies misstating their revenues.  To conceal the true nature of these arrangements, AOL and Homestore entered into undisclosed side agreements and falsified documents to make it appear that third parties purchased online advertising. During the second and third quarters of 2001, AOLTW assisted in inflating Homestore's revenues through another series of transactions that effectively resulted in Homestore's buying its own revenues.  AOL falsified documents to make it appear that third parties purchased Homestore online advertising.

71.    In total, the Company improperly inflated its online advertising revenue based on the Homestore-related transactions by at least $1.5 million in the fourth quarter of 2000 and $7 million in the first quarter of 2001.  In its 2002 Restatement, AOLTW restated its financial results to reverse these amounts.  For its part, Homestore materially overstated its reported financial results for the third quarter of 2000 and the first through third quarters of 2001 based on improperly recognizing the following amounts of revenue on AOL-related transactions: $1.5 million in the third quarter of 2000, $15 million in the first quarter of 2001, $18.5 million in the second quarter of 2001, and $3.3 million in the third quarter of 2001.  Homestore has restated its financial results to reverse the amounts for 2001.

21

29TWCIV001016236

E.    **Improper Subscriber Counts**

72.    In addition to AOL's online advertising revenue, the market evaluated AOL (both before and after its merger with Time Warner) based on, among other factors, the number of subscribers using AOL's Internet service as well as the growth of that subscriber base. Senior Company executives set internal subscriber growth targets each quarter and pressured lower level executives and employees to meet the targets.

73.    In 2000, AOL began selling Internet account memberships in bulk at substantial discounts to corporations with which it had commercial relationships. AOL counted these memberships as subscribers under the assumption that its corporate customers would offer these memberships to their employees and the employees would activate the memberships.

74.    In 2001, AOLTW used the bulk subscription program to inflate its AOL membership numbers by counting members AOLTW knew did not actually exist. Specifically, AOLTW used bulk deals to "close the gap" between its actual AOL subscriber numbers and its targets. The "attach rates"—the percentage of persons or entities that actually became AOL members—were exceptionally low for bulk deals. Notwithstanding the low attach rates, which AOLTW tracked closely, AOLTW counted most of these bulk AOL subscription memberships in 2001 to meet its subscriber targets.

75.    Some businesses resisted AOLTW's pressure to buy bulk AOL subscriptions because they did not want to incur the cost. These businesses only agreed to enter into contracts to "purchase" AOL subscriptions as an accommodation to AOLTW and upon AOLTW's agreement to fully fund these purchases.

22

76.    For example, in the second quarter of 2001, internal reports indicated that AOLTW would fall short of its AOL subscriber growth target for the quarter by approximately 250,000 members.  To meet its target, AOLTW pressed a major retail business to purchase 250,000 AOL subscriptions.  The retailer declined.  AOLTW then offered to reimburse the retailer for the cost of the subscriptions by increasing payments made to the retailer pursuant to another contractual arrangement.  The retailer again declined.  AOLTW finally prevailed upon the retailer to "purchase" the subscriptions by agreeing to inflate the payments under the other arrangement in such a way that, based upon historical experience, the retailer would receive more than 100% of the money it paid for the subscriptions.

77.    As the quarter drew to a close, the gap in AOL's subscriber numbers had increased to approximately 350,000 as other marketing efforts had underperformed.  To close the gap, AOLTW increased the number of AOL subscriptions in the bulk deal with the retailer from 250,000 to 350,000.  Because the transaction was economically neutral (or beneficial) to the retailer, AOLTW knew it would not object.  As a result, AOLTW met its AOL subscriber count goal that quarter.

78.    In four instances, AOLTW should not have counted AOL bulk subscribers in certain quarters because it failed to complete the transactions within the quarters.  Specifically, AOLTW failed to deliver by the end of the relevant quarter membership kits that met the specifications set forth in the respective contracts.  AOLTW shipped non-conforming membership kits prior to quarter end with the understanding that it would replace these materials in the following quarter with materials that conformed to the

23

29TWCIV001016238

contracts. AOLTW improperly included in its subscription counts the memberships in each bulk deal at the time of the initial shipment of non-conforming kits.

79.    AOLTW improperly counted these bulk subscription memberships to meet subscriber targets in the second, third, and fourth quarters of 2001 so it could report to the investment community that it had met its targets.

F.    **Failure to Consolidate AOL Europe**

80.    In addition to improperly recognizing as online advertising revenue payments it received from BAG for amendments to the Put/Call, AOL and AOLTW failed to properly consolidate the financial results of AOL Europe in their financial statements between March 2000 and January 2002. This resulted in material misstatements of AOL's and AOLTW's financial results, including overstatements of operating income and free cash flow in 2000 and 2001, overstatements of net income in 2000, understatements of net losses in 2001, and understatements of total debt in 2000 and 2001.

81.    Provisions of the Put/Call agreement specified that AOL would continue to hold no more than 50% of AOL Europe's voting securities, but BAG agreed it would have no contractual veto, consent, approval, voting, or similar rights with respect to AOL Europe and agreed to cause its own designated directors, steering committee members, or members of any similar governing body of AOL Europe to act in accordance with AOL's directions. By virtue of these provisions, AOL obtained broad and direct powers enabling it to control the operations and assets of AOL Europe. Also, AOL informed the European Commission (in the context of satisfying EC merger regulations) that BAG

24

29TWCIV001016239

relinquished essentially all control regarding the operations or management of AOL Europe.

82.    AOL's failure to properly report AOL Europe as a consolidated subsidiary commencing with the execution of the Put/Call agreement departed from GAAP. GAAP requires consolidation when one entity has a controlling financial interest in another entity.

### FIRST CLAIM FOR RELIEF

#### Violations of Commission Cease-and-Desist Order

83.    Paragraphs 1 through 82 are re-alleged and incorporated by reference.

84.    On May 15, 2000, the Commission ordered that AOL "cease and desist from causing any violations, and any future violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 13a-1 and 13a-13 thereunder." *In the Matter of America Online, Inc.*, Exchange Act Rel. No. 34-42781 (May 15, 2000).

85.    By reason of the foregoing, and as explained further in paragraphs 89 through 94, the Company committed violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Exchange Act Rules 13a-1 and 13a-13. Accordingly, the Company has violated, and unless ordered to comply will violate, the Commission's May 15, 2000 order.

### SECOND CLAIM FOR RELIEF

#### Fraud

Violations of Section 17(a) [15 U.S.C. § 77q(a)] of the Securities Act, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]

86.    Paragraphs 1 through 4 and 6 through 79 are re-alleged and incorporated by

29TWCIV001016240

reference.

87.    By reason of the foregoing, defendant directly or indirectly, acting intentionally, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the offer, sale, or purchase of securities: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; (c) obtained money or property by means of any untrue statement of a material fact or any omission of a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (d) engaged in transactions, acts, practices, or courses of business which operated as a fraud or deceit upon other persons.

88.    By reason of the foregoing, defendant violated, and unless restrained will violate, Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5.

## THIRD CLAIM FOR RELIEF

### Reporting

Violations of Section 13(a) of the Exchange Act [15 U.S.C.
§ 78m(a)] and Exchange Act Rules 12b-20, 13a-1, 13a-11,
and 13a-13 [17 C.F.R. § 240.12b-20, § 240.13a-1, §
240.13a-11, and § 240.13a-13]

89.    Paragraphs 1 through 82 are re-alleged and incorporated by reference.

90.    The Exchange Act and Exchange Act rules require every issuer of registered securities to file reports with the Commission that accurately reflect the issuer's financial performance and provide other true and accurate information to the public.

26

29TWCIV001016241

91.   By reason of the foregoing, defendant violated, and unless restrained will violate, Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13.

## FOURTH CLAIM FOR RELIEF

### Record Keeping

Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1]

92.   Paragraphs 1 through 82 are re-alleged and incorporated by reference.

93.   The Exchange Act and Exchange Act rules promulgated thereunder require each issuer of registered securities to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the business of the issuer and to devise and maintain a system of internal controls sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit preparation of financial statements and to maintain the accountability of accounts.

94.   By reason of the foregoing, defendant violated, and unless restrained will violate, Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Exchange Act Rule 13b2-1.

## FIFTH CLAIM FOR RELIEF

### Aiding and Abetting Fraud

Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]

95.   Paragraphs 1 through 3, 6 through 22, 32 through 37, and 65 through 71 are re-alleged and incorporated by reference.

27

29TWCIV001016242

96.    By reason of the foregoing, defendant knowingly and substantially assisted PurchasePro, Homestore, and the company referenced in paragraph 32 in directly or indirectly, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) employing devices, schemes, or artifices to defraud; or (b) making untrue statements of material fact or omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

97.    By reason of the foregoing, defendant aided and abetted violations of, and unless restrained will aid and abet violations of, Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

## REQUEST FOR RELIEF

The Commission respectfully requests that the Court enter an Order:

(i)    Ordering defendant to comply with the Commission's May 15, 2000 order issued in *In the Matter of America Online, Inc.*;

(ii)   Permanently restraining and enjoining defendant from violating Section 17(a) of the Securities Act, Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, and 13b2-1;

(iii)  Permanently restraining and enjoining defendant, its subsidiaries, officers, directors, agents, servants, employees, and attorneys-in-fact, and all persons in active concert or participation with them, from aiding and abetting violations of any of the above-listed securities laws;

28

29TWCIV001016243

(iv)    Ordering defendant to disgorge ill-gotten gains, including pre-judgment and

post-judgment interest, resulting from the violations alleged in this Complaint;

(v)    Ordering defendant to retain an independent examiner, not unacceptable to the

Commission's staff, to determine whether defendant's historical accounting

treatment for certain transactions was in conformity with GAAP;

(vi)    Ordering defendant to pay a civil penalty; and

(vii)    Granting such other relief as the Court deems just and appropriate.

Dated: March 21, 2005

Respectfully submitted,

James T. Coffman
Luis R. Mejia (DC Bar No. 417043)
Melissa A. Robertson (DC Bar No. 396384)
Gregory T. Lawrence
Jeffrey B. Finnell (DC Bar No. 441525)
Christopher K. Agbe-Davies (DC Bar No. 473727)
Thomas D. Manganello (DC Bar No. 481335)
Andrew B. Stevens

Attorneys for Plaintiff
Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, DC 20549-0911
(202) 942-4744 (Mejia)
MejiaL@sec.gov

29

**EXHIBIT L TO THE MEMORANDUM OF LAW IN SUPPORT OF JOSEPH A. RIPP'S
MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM**

Table of Contents

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# Form 10-K

## ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

### For the fiscal year ended December 31, 2002

### Commission file number 001-15062

# AOL TIME WARNER INC.
*(Exact name of Registrant as specified in its charter)*

| **Delaware** | **13-4099534** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

**75 Rockefeller Plaza**
**New York, NY 10019**
*(Address of Principal Executive Offices)*

**(212) 484-8000**
*(Registrant's Telephone Number, Including Area Code)*

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark if the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2).    Yes ☒

As of the close of business on February 28, 2003, there were 4,312,505,667 shares of registrant's Common Stock and 171,185,826 shares of registrant's Series LMCN-V Common Stock outstanding. The aggregate market value of the registrant's voting securities held by non-affiliates of the registrant (based upon the closing price of such shares on the New York Stock Exchange on June 28, 2002) was approximately $61.24 billion.

## Documents Incorporated by Reference:

| Description of document | Part of the Form 10-K |
|---|---|
| Portions of the Definitive Proxy Statement to be used in connection with the registrant's 2003 Annual Meeting of Stockholders | Part III (Item 10 through Item 13) |

Table of Contents

# AOL TIME WARNER INC.
## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS
## AND OTHER FINANCIAL INFORMATION

|  | Page |
|---|---|
| Management's Discussion and Analysis of Results of Operations and Financial Condition | F-2 |
| Consolidated Financial Statements: | |
|    Balance Sheet | F-59 |
|    Statement of Operations | F-60 |
|    Statement of Cash Flows | F-61 |
|    Statement of Shareholders' Equity | F-62 |
|    Notes to Consolidated Financial Statements | F-63 |
| Report of Management | F-130 |
| Report of Independent Auditors | F-131 |
| Selected Financial Information | F-132 |
| Quarterly Financial Information | F-134 |
| Supplementary Information | F-136 |
| Financial Statement Schedule II — Valuation and Qualifying Accounts | F-144 |

F-1

Table of Contents

# AOL TIME WARNER INC.
## CONSOLIDATED STATEMENT OF OPERATIONS
### Years Ended December 31,
### (millions, except per share amounts)

|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| Revenues: |  |  |  |
| Subscriptions | $ 18,959 | $ 15,657 | $ 4,777 |
| Advertising and commerce | 7,680 | 8,260 | 2,273 |
| Content and other | 14,322 | 13,249 | 555 |
| Total revenues[a] | 40,961 | 37,166 | 7,605 |
| Costs of revenues[a] | (24,315) | (20,533) | (3,866) |
| Selling, general and administrative[a] | (9,916) | (9,079) | (1,864) |
| Amortization of goodwill and other intangible assets | (732) | (7,186) | (99) |
| Impairment of goodwill and other intangible assets | (45,538) | — | — |
| Merger and restructuring costs | (335) | (250) | (10) |
| Operating income (loss) | (39,875) | 118 | 1,766 |
| Interest expense, net | (1,783) | (1,353) | 275 |
| Other expense, net[a] | (2,498) | (3,567) | (208) |
| Minority interest income (expense) | (278) | 46 | — |
| Income (loss) before income taxes, discontinued operations and cumulative effect of accounting change | (44,434) | (4,756) | 1,833 |
| Income tax provision | (140) | (139) | (712) |
| Income (loss) before discontinued operations and cumulative effect of accounting change | (44,574) | (4,895) | 1,121 |
| Discontinued operations, net of tax | 113 | (39) | — |
| Income (loss) before cumulative effect of accounting change | (44,461) | (4,934) | 1,121 |
| Cumulative effect of accounting change | (54,235) | — | — |
| Net income (loss) | $(98,696) | $ (4,934) | $ 1,121 |
| Basic income (loss) per common share before discontinued operations and cumulative effect of accounting change | $ (10.01) | $ (1.11) | $ 0.48 |
| Discontinued operations | 0.03 | — | — |
| Cumulative effect of accounting change | (12.17) | — | — |
| Basic net income (loss) per common share | $ (22.15) | $ (1.11) | $ 0.48 |
| Average basic common shares | 4,454.9 | 4,429.1 | 2,323.0 |
| Diluted income (loss) per common share before discontinued operations and cumulative effect of accounting change | $ (10.01) | $ (1.11) | $ 0.43 |
| Discontinued operations | 0.03 | — | — |
| Cumulative effect of accounting change | (12.17) | — | — |
| Diluted net income (loss) per common share | $ (22.15) | $ (1.11) | $ 0.43 |
| Average diluted common shares | 4,521.8 | 4,584.4 | 2,595.0 |

(a) Includes the following income (expenses) resulting from transactions with related companies:

| | | | |
|---|---|---|---|
| Revenue | $ 678 | $ 721 | $ 99 |
| Cost of revenues | (130) | (296) | — |
| Selling, general and administrative | (83) | 10 | 10 |
| Interest income (expense), net | 14 | 30 | — |
| Other income (expense), net | (9) | (19) | — |

See accompanying notes.

F-60

**EXHIBIT M TO THE MEMORANDUM OF LAW IN SUPPORT OF JOSEPH A. RIPP'S
MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM**

| Subj: | HOT: AOLTW Voice/Data Deals (esp. WCom) |
|---|---|
| Date: | 13/08/01 |
| To: | Rippi/a |
| CC: | mhdarden1/a, RWilsonBA |

*[Mary Helen -- grateful if you could give Joe a hard copy of this email asap -- many thanks]*

Joe

Set out below is a summary of the existing AOLTW voice and data deals which are heading towards closure, for which I'd appreciate your views, in particular for the WCom proposal, which is to renew existing TW voice/data deals at better rates and hopefully with some additional value coming back from WCom -- Mark Wovs confirmed today that the WCom options for additional value will work for an accounting perspective, so I'd be grateful if we could discuss:

-- your preferred option for additional value back from WCom;
-- your views on priority for solving the CS Euro issue (David thinks that Mike Kelly may want a particular kind of solution for the CS Europe discussions, or want particular ways to create value using a CS Euro solution - are you familiar with that at all?);
-- which Finance signoffs we will need (the WCom deal will be signed by TW Inc (existing contracting entity), as an amendment to the existing TW Inc deal, but the rest of AOLTW will also be able to access the deal as well now);
-- any other thoughts you may have.

If its OK with you, I'll work with Mary Helen to squeeze into your schedule on Tuesday morning.

Many thanks
Andrew

### Status

Carrier task force -- IT Council appointed carrier rate task force renegotiation task force in May 2001 to leverage AOLTW 800 voice and data spend -- taskforce goal was to realise maximize cost savings (goal at least 20%) compared with current deals -- BA on the task force (Haghighi).

RFP -- BA ran RFP process -- RFP identified key drivers as cost savings and creative value back to AOLTW -- AT&T and WCom selected as "finalists" -- Qwest & Global Crossing (not enough coverage), Sprint (too expensive) were eliminated.

Timing -- Tentative structure for deals reached last wk (deals below), with savings of 25%-30% over current combined AOL/TW spend of ~$110MM per yr - BUT altho their responses to RFP indicated they would create value back to AOLTW, both AT&T and WCom have not yet agreed to commit to additional value coming back to AOLTW -- AT&T execs are coming back with proposal today/tomorrow, and we are talking to WCom on options (set out below) -- meanwhile task force members (IT Council) are asking for deals to be signed asap (WCom this wk if possible) so that cost savings can start with effect from 8/1.

### Key Takeaways

1AOL029030206
CONFIDENTIAL TREATMENT
REQUESTED

WCom Voice/Data Deal -- *[deal summary to follow 8/14]* -- WCom currently provides voice and data services to TW entities, for sepnd of approx $60MM per yr -- the existing contract expires this month -- as part of RFP process, provisionally re-selected to provide voice and data for TW entities (tho AOL has right to use services too) -- *great pricing* (~2.0-2.2c per min after applying discounts, compared with

current Sprint rate of 3.6c per min [*precise savings over existing deal to follow*]), but want *big commit* (*$50mm per yr*, after application of discounts, for 2 yrs - total $100MM) – WCom has agreed to significantly water down commit (if annualised spend by 1/2002 is not $50MM then no shortfall penalty will be applied at end of term; term can be extended by 6mths beyond 2yrs to meet commit; commit will be restructured if business downturn or AOLTW reorg'd; shortfall penalty wld be 50% of shortfall) – *WCom says is loath to put more ad spend on AOLTW.*

AT&T – provisionally selected to provide 800 voice for AOL call centers, to replace Sprint – *very good pricing* (~2.2c per min after applying discounts), want *commit of $22.5mm per yr* for 2yrs (total $45MM) which AOL call centers will easily meet – has offered $1MM credit for migration costs, $1MM credit if AOLTW spends >$50MM, will forgive projected shortfall under existing Quack/AOL by Phone deal (will be short by $10MM over next 2yrs) – *BUT has not yet agreed to mkting deal (Barbara Peda, SVP Sales to respond today).*

Sprint – currently provides 800 voice svcs to AOL call centers at 3.6c per min - will not accept mkt price notice served by AOL -- will reduce price to 2.7c per min but requires 2yr extenson to agt (to 6/2004) as well – *so AOL proposes to terminate agt and replace with AT&T* -- will save >$1MM per month – full litigation analysis to be circulated today/tomorrow.

### Next steps

Sprint termination – circulation of litigation analysis for senior exec approval of migration plan to AT&T – BA (Haghighi 8/14);
AT&T -- circulate AT&T proposal once received;
WCom – Haire to drill down with WCom deal team on their reactions to proposals -- 8/14.

### WCom - Options for Additional Value

Option 1 -- Ask WCom to accelerate its existing ad spend – at the same online/offline ratio that is currently in effect – proposal would be:

Q3 2001: incremental $1MM
Q4 2001 through Q2 2003: incremental $2.5MM
Q3 2003: incremental $1.5MM
Q4 2003 through Q3 2004: no incremental spend
Q4 2004: W's existing spend of $20.25MM is eliminated

These numbers are based on our assumptions that W will receive an incremental $20MM over 2 years (we assume 20% margin) on the renewed voice/data contract.

Option 2 -- If WCom resistant to accelerated ad spend -- agreement in principle to elimination of the shortfall penalty for CS Europe and a reduction in rates (with precise numbers to be agreed country by country in due course).

The biggest problem with resolving Europe here is that we lack the detailed analytics to give you to make a strong argument - Europe is re-running numbers and AOLE CFO has been out of pocket. But we know enough to propose an agreement in principle. Here's what we know:

The anticipated shortfall penalty will range from $19MM to $27MM - depending on how much volume CS Europe has by the end of the year. AOLE (per its new CFO) is still renunning its budget numbers and projected CS usage, which will not be ready until after the AOLE CFO returns from vacation on 8/21 – however, in the meantime we could propose to Scott that the shortfall penalty is eliminated and that W should also give us an additional $7MM reduction in hourly CS rates -- we can propose these numbers because we will argue that the shortfall penalty is unenforceable under UK law, or at the most W would only be able to enforce 50% of it (ie $13MM max).

1AOL029030207
CONFIDENTIAL TREATMENT
REQUESTED

Reasoning on options 1 and 2 and order of preference:

*-- Penalty Issue May be Solved Independently but We Need Additional Info from AOLE --* AOLE has some leverage points to solve the penalty issue on its own -- for example, under the Agreement, AOLE can opt to extend the term (in which case the commit would be increased by 25%, but we would not owe any shortfall penalty until the end of the extension and we would have total control of the length of the extension) -- but we don't know precisely how we would use this leverage until we have new full analytics from AOLE.

*-- The CS Euro Contractual Penalty may be Unenforceable Anyway --* UK outside legal counsel advises that the penalty structure in the CS Europe agreement may be partially or entirely unenforceable, because it goes much further than merely compensating W -- this gives additional leverage to an argument that the penalty should be reduced or eliminated.

<u>Initial WCom Reaction to Proposal</u>

Informal indications from WCom to date are that (i) WCom will have difficulties accelerating ad spend, in particular online, (ii) preferred WCom option will therefore probably be related to solving CS issues; (iii) WCom sees voice/data deal as continuation of existing TW deal which expires this month, and therefore WCom will only want to create additional value back for "incremental spend", ie spend over the $50MM commit.

1AOL029030208
CONFIDENTIAL TREATMENT
REQUESTED