**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>Plaintiff,<br><br>v.<br><br>**JOHN MICHAEL KELLY, STEVEN E. RINDNER, JOSEPH A. RIPP, and MARK WOVSANIKER,**<br><br>Defendants. | 08 Civ. 4612-SWK<br>(ECF Case) |

**DECLARATION OF ADA FERNANDEZ JOHNSON
IN SUPPORT OF DEFENDANT J. MICHAEL KELLY'S
MOTION TO DISMISS**

I, Ada Fernandez Johnson, declare and say as follows:

1.      I am a member of the bars of the District of Columbia and State of

Virginia and am admitted *pro hac vice* in the above-captioned case.  I am associated with

the law firm of Debevoise & Plimpton LLP, attorneys for defendant John Michael Kelly

in this action.  I submit this declaration to present to the court the following Exhibits in

support of Mr. Kelly's motion to dismiss this action pursuant to Federal Rules of Civil

Procedure 12(b)(6) and 9(b).  This declaration is based on my personal knowledge.

2.      Attached as Exhibit 1 to this declaration is a true and correct copy of a

November 15, 2002 letter from James Coffman to Gregory S. Brunch and F.Whitten

Peters, Counsel to AOLTW, *Re:  In the Matter of AOL Time Warner Inc. File No. HO-

9429.*

3.      Attached as Exhibit 2 to this declaration is a true and correct copy of the "Wells Notice" issued to Mr. Kelly on March 14, 2006.

4.      Attached as Exhibit 3 to this declaration are true and correct copies of the March 2006 and December 2006 tolling agreements, referenced in ¶ 187 of the Complaint, which were drafted by the SEC and signed by Mr. Kelly.

5.      Attached as Exhibit 4 to this declaration are true and correct copies of the Complaint captioned *SEC v. Time Warner, Inc*.  05-cv-578 (GK) (D.D.C. March 21, 2005) and the accompanying SEC Litigation Release No. 19147.

6.      Attached as Exhibit 5 to this declaration is a true and correct copy of the November 1998 Sun Microsystems, Inc. Service Provider Agreement between AOL and Sun, referenced in ¶ 53 of the Complaint.

7.      Attached as Exhibit 6 to this declaration is a true and correct copy of the management representation letter, referenced in ¶ 181 of the Complaint, addressed to Wayne Pace and signed by Mr. Kelly on April 15, 2002.

8.      Attached as Exhibit 7 to this declaration is a true and correct copy of the Order Instituting Public Cease-And-Desist Proceedings against James W. Barge, Pascal Desroches, and Wayne H. Pace dated March 21, 2005.

9.      Attached as Exhibit 8 to this declaration are true and correct copies of the SEC subpoenas issued to AOL in December  2001 and February 2002.

10.     Attached as Exhibit 9 to this declaration are true and correct copies of excerpted pages from the SEC testimony transcripts of Joseph Ripp, dated May 31, 2002 and Steven Rindner, dated May 30, 2002.

11.     Attached as Exhibit 10 to this declaration is a true and correct copy of excerpted pages from AOLTW's 2002 10-K filed on March 28, 2003.

12.     Attached as Exhibit 11 to this declaration is a true and correct copy of a May 3, 2000 email exchange between Mr. Kelly and David Colburn regarding the Yodlee transaction, referenced in ¶ 50 of the Complaint.

13.     Attached as Exhibit 12 to this declaration is a true and correct copy of the AOLTW report regarding the Yodlee transaction responding to the SEC's Order under Section 21(a) of the Securities and Exchange Act of 1934.

14.     Attached as Exhibit 13 to this declaration is a true and correct copy of the June 1, 2000 email referenced in ¶¶ 53-56 of the Complaint.

15.     Attached as Exhibit 14 to this declaration is a true and correct copy  the June 22, 2001 PowerPoint presentation entitled "Midyear Forecast Review Network and Data Operations," referenced in ¶ 116 of the Complaint.

16.     Attached as Exhibit 15 to this declaration is a true and correct copy of the October 26, 2001 PowerPoint presentation, referenced in ¶ 117 of the Complaint.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
        September 5, 2008

                                        /s/ Ada Fernandez-Johnson
                                        Ada Fernandez-Johnson

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

        v.

JOHN MICHAEL KELLY, STEVEN E.
RINDNER, JOSEPH A. RIPP, and
MARK WOVSANIKER,

             Defendants.

_____

08 Civ. 4612-SWK
(ECF Case)

# <u>EXHIBIT 1</u>

**DECLARATION OF ADA FERNANDEZ JOHNSON
IN SUPPORT OF DEFENDANT J. MICHAEL KELLY'S
MOTION TO DISMISS**



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Mail Stop 7-5
450 Fifth Street, N.W.
Washington, D.C. 20549-0705

DIVISION OF ENFORCEMENT

November 15, 2002

<u>VIA FACSIMILE</u>
<u>AND FEDERAL EXPRESS</u>

Gregory S. Bruch, Esq.
Foley & Lardner
3000 K Street, N.W.
Suite 500
Washington, D.C. 20007-5101

F. Whitten Peters, Esq.
Steven A. Steinbach, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901

Re:    *In the Matter of AOL Time Warner Inc.*, File No. HO-9429

Dear Messrs. Bruch, Peters, and Steinbach:

This letter responds to your letter to me dated November 8, 2002, regarding AOL Time
Warner Inc.'s ("AOL") failure to comply with the Commission's Order Requiring the Filing of a
Sworn Statement Pursuant to Section 21(a) of the Securities Exchange Act of 1934, issued on
August 13, 2002 (the "Order"). I do not detail here every one of the many communications
between the staff and AOL regarding this investigation both before and after the Commission
issued the Order, but reserve the right to do so if future circumstances warrant.

<u>Background</u>

In May 2002, we began an informal investigation and invited AOL to meet with the staff
to discuss certain transactions between AOL and Homestore.com, Inc. and PurchasePro.com, Inc.
This began a voluntary dialogue between AOL and the staff that lasted several months.

2AOL05919 1737
**Confidential Treatment**
**Requested**

Messrs. Bruch, Peters, and Steinbach
November 15, 2002
Page 2

At the first meeting, which took here place on May 13, 2002, AOL defended its accounting treatment of the Homestore and PurchasePro transactions and stated it was unaware of any similar transactions that might pose accounting or reporting problems. The staff suggested that AOL conduct a thorough internal investigation to determine the existence and accounting treatment of any other Homestore- or PurchasePro-type transactions and report its findings to the staff. The staff also requested a more in-depth presentation concerning AOL's accounting for its transactions with Homestore and PurchasePro. Shortly after the May 13 meeting, the staff learned information that raised issues concerning transactions AOL entered into with Monster.com and Gateway, and the staff requested AOL to address those transactions as well.

On June 12, 2002, AOL met with the staff to report the results of its investigation. During this meeting, AOL made representations that later proved to be, at best, incomplete and inaccurate. AOL represented to the staff that it concluded that its accounting treatment of transactions with PurchasePro and Homestore was proper. AOL also asserted that AOL had not entered into any other like transactions. At the June 12 meeting, AOL did not address the Monster.com or Gateway transactions. Only after repeated requests from the staff, AOL sent a July 11, 2002 letter reporting that the Monster.com transaction had been approved by top management and was accounted for appropriately. In this letter, AOL further informed the staff that AOL had improperly recognized revenue on the Gateway transaction, but that AOL had identified this issue in 2001 and made an adjustment. Three months later, AOL announced its restatement, and informed the staff that the restatement related to the PurchasePro, Homestore, Monster.com, and Gateway transactions, as well as transactions involving nine other companies.

As the dialogue continued during and after the June 12 meeting, it appeared that, rather than conduct its own investigation and make full and complete disclosure to the staff, AOL adopted a strategy to respond only to issues already uncovered by the staff. In an effort to prompt AOL to conduct a thorough and accurate examination of, and report on, the accounting issues raised by the staff, the Commission issued the Order, which requires AOL to file a statement, under oath, concerning specific transactions, categories of transactions, and corporate governance issues. The Commission issued the Order on August 13, 2002, and the staff served it on AOL that day.

On the following day, AOL publicly disclosed that it might have "improperly recognized" $49 million of revenues in connection with three transactions. These transactions are materially similar to the transactions the staff had been questioning since this investigation began in May.[1] Yet the staff first learned of AOL's analysis and conclusions just hours before the announcement.

---

[1] In fact, AOL's deals with WorldCom, Hewlett-Packard, and Veritas were among the transactions questioned in the Order, which was already issued by the Commission at that point.

2AOL05919 1738
Confidential Treatment
Requested

Messrs. Bruch, Peters, and Steinbach
November 15, 2002
Page 3

On October 23, 2002, AOL announced a restatement of revenues, totaling $190 million for the quarters ended September 30, 2000 through June 30, 2002. AOL, in effect, admitted that it had improperly recognized the revenue in connection with transactions with thirteen companies. Moreover, AOL officials were quoted in the press saying that they believe no other transactions will be restated, suggesting that other transactions included in the Order have been examined and AOL has concluded that revenues were recognized in accordance with GAAP. Nonetheless, in spite of five months of nearly daily communications and frequent meetings with the staff, AOL did not advise the staff of its investigation into these deals and the conclusions it reached until hours before the restatement announcement. More importantly, while AOL has examined many, if not most of the transactions discussed in the Order and has announced its findings and conclusions to the financial press and to investors, it has failed and refused, with limited exceptions, to comply with the Order and pass its evidence and analysis on to the Commission.

### The Order

The August 13 Order requires AOL to file a sworn statement responding to the specific questions relating to the investigation by August 30, 2002.

AOL requested a meeting with the staff to discuss compliance with the Order, and a meeting was held here on August 21, 2002. During the meeting, AOL made requests for limitations on the scope of the Order, and the staff requested that AOL provide the staff with any reports of any internal investigation. AOL refused the staff's request. Nevertheless, by letter dated August 28, 2002, the staff agreed to most, if not all, of AOL's requested limitations. Most importantly, the staff agreed to limit the Order to transactions concerning AOL's online division and transactions over specified dollar amounts, and the staff agreed to extend the deadline to October 24, 2002. The August 28 letter also provides that AOL must file such interim statements according to a schedule acceptable to the staff. AOL proposed an interim schedule in a letter dated August 30, 2002. Without any waiver of rights, the staff agreed that the interim schedule was acceptable.[2]

AOL soon abandoned its commitment to meet the deadlines it proposed and agreed to with the staff – a commitment on which the staff's willingness to limit the scope and extend the deadline rested. Nonetheless, the staff has continued its dialog with you based on AOL's purported willingness to complete its response within a reasonable time frame. During our latest conversation with you last week, we told you that if AOL did not finish its response by mid-December (three and a half months past the Order's deadline and one and three-quarters months past the date originally promised by AOL), we would proceed on the assumption that AOL did

---

[2] In the August 30 letter, subsequent interim reports, and otherwise, AOL has proposed additional modifications to the Order. The staff has not agreed, in writing or otherwise, to any modifications beyond those agreed to in the August 28 letter.

2AOL05919 1739
Confidential Treatmen
Requested

Messrs. Bruch, Peters, and Steinbach
November 15, 2002
Page 4

not intend to fully comply with the Order.  During the call, we gave you a list of priorities for completion and indicated that we were inclined to agree that AOL could put off for now responding to certain parts of the Order.  We told you we would consider a proposed schedule for compliance that includes a date certain for AOL's full response to the Order.

Despite the staff's documented willingness to help AOL commit to a reasonable date to complete its response to the Order (by significantly limiting the scope of the Order, by extending deadlines, by indicating a willingness to excuse AOL, for now, from responding to parts of Order, and by indicating a willingness to agree to AOL's not certifying interim reports), we conclude from your letter to me dated November 8, 2002, that AOL is not willing to commit to *any* date for completing its response to the Order.  As the staff made clear during our telephone conference last week, any proposal that does not contain an end date for completion is unacceptable.

While your letter details AOL's efforts to comply with the Order to date and cooperate with the staff's investigation, we note the following: On October 23, 2002, AOL reported its restatement of revenue with respect to transactions involving thirteen companies.  Before the restatement, AOL presumably completed a thorough investigation into these transactions.  However, to date, AOL has provided the staff with full reports as to only two of the thirteen companies and restatement-specific reports on three others.  Moreover, while your letter states that the few AOL finance employees who are knowledgeable about the transaction are working intensely to provide information in response to the Order, several individuals outside of the finance department, who were directly involved in these transactions and are certainly the most knowledgeable about the transactions, have refused to cooperate in this investigation with AOL or the staff, but remain on AOL's payroll.  These facts color the staff's view of AOL's repeated assertions that it has done everything possible to respond to the Order and cooperate with the staff's investigation.

I do not here set forth in detail the many instances that AOL failed to meet agreed upon deadlines, the deficiencies in the responses so far provided, or the extent to which AOL's response to date falls far short of full compliance with the Order.

AOL is in violation of the Commission Order and has been since October 24, 2002.  While the staff is receptive to AOL's proposal regarding completion of priority items, we cannot accept any proposal that does not include a date for final completion of AOL's response to the Order.  The staff cannot and will not agree to any open-ended extensions.  The staff's willingness to discuss steps by which AOL may attempt to remedy its violation of the Order and complete the tasks prescribed by the Order is not intended, nor shall be construed, in any way as a waiver of

2AOL05919 1740
Confidential Treatment
Requested

Messrs. Bruch, Peters, and Steinbach
November 15, 2002
Page 5

the October 24, 2002 deadline.  The staff and the Commission continue to reserve the right to take appropriate action at any time to enforce the Order.

　　　　We request that you provide a copy of this letter to the Audit Committee of AOL's Board of Directors.

　　　　　　　　　　　　　　　　　Sincerely yours,

　　　　　　　　　　　　　　　　　*James Coffman*

　　　　　　　　　　　　　　　　　James Coffman          by MATR
　　　　　　　　　　　　　　　　　Assistant Director

2AOL05919 1741
Confidential Treatment
Requested

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,

                    v.

JOHN MICHAEL KELLY, STEVEN E.
RINDNER, JOSEPH A. RIPP, and
MARK WOVSANIKER,

                              Defendants.

08 Civ. 4612-SWK
(ECF Case)

# EXHIBIT 2

**DECLARATION OF ADA FERNANDEZ JOHNSON
IN SUPPORT OF DEFENDANT J. MICHAEL KELLY'S
MOTION TO DISMISS**



UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON. D.C. 20549

DIVISION OF
ENFORCEMENT

March 14, 2006

**By Fax to 202/383-8124 and First-Class Mail**

Jonathan R. Tuttle, Esq.
Debevoise & Plimpton, LLP
555 13th Street, N.W.
Washington, DC 20004

    Re:  *In the Matter of AOL Time Warner*, HO-09429

Dear Mr. Tuttle:

    This letter confirms your telephone conversation with the staff today in which we advised you that we intend to recommend that the Securities and Exchange Commission bring a civil injunctive action against your client, Michael Kelly, alleging that he (i) violated Section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, 240.13b2-2]; (ii) aided and abetted AOL Time Warner's violations of Section 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, 13a-13 and 13b2-1 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13 and 240.13b-2]; (iii) aided and abetted AOL Time Warner's violation of the Commission's May 15, 2000 cease and desist order; and (iv) aided and abetted AOL Time Warner's violation of the Commission's August 13, 2002 Section 21(a)(1) Order.  In accordance with Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 C.F.R. § 202.5(c), we are offering your client the opportunity to make a Wells Submission.

    In connection with the contemplated action, the staff may seek an injunction, an officer and director bar, a civil penalty, disgorgement of trading profits, bonuses and severance payments and an administrative order seeking to bar your client from practicing before the Commission as an accountant pursuant to Rule 102(e) of the Commission's Rules of Practice.

Jonathan R. Tuttle, Esq.
March 14, 2006
Page Two


We enclose for your information a copy of Securities Act Release No. 5310 entitled "Procedures Relating to the Commencement of Enforcement Proceedings and Termination of Staff Investigations." If your client wishes to make a written or videotaped submission setting forth any reasons of law, policy or fact why he believes the action should not be brought, or bringing any facts to the Commission's attention in connection with its consideration of this matter, you should forward your submission to us no later than March 28, 2006. Any written submission should be limited to 40 pages, and any video submission should not exceed 12 minutes. Any submission should be sent to:

> James T. Coffman
> Assistant Director, Division of Enforcement
> Securities and Exchange Commission
> 100 F Street, N.E.
> Mail Stop 5010-B
> Washington, DC 20549

In the event the staff makes an enforcement recommendation to the Commission on this matter, we will forward any submission you make to the Commission. Please be advised that the Commission may use the information contained in such a submission as an admission, or in any other manner permitted by the Federal Rules of Evidence, in connection with Commission enforcement proceedings, or otherwise. Please also be advised that any submission you make may be discoverable by third parties in accordance with applicable law.

If you have any questions, please contact me at 202/551-4953.

> Sincerely yours,
>
> James T. Coffman
> Assistant Director

Enclosure: Securities Act Release No. 5310

PROCEDURES RELATING TO THE COMMENCEMENT OF ENFORCEMENT
PROCEEDINGS AND TERMINATION OF STAFF INVESTIGATIONS

SECURITIES ACT OF 1933, Release No. 5310; SECURITIES
EXCHANGE ACT OF 1934, Release No. 9796; INVESTMENT COMPANY
ACT OF 1940, Release No. 7390; INVESTMENT ADVISORS ACT OF
1940, Release No. 336

September 27, 1972

The Report of the Advisory Committee on Enforcement Policies and Practices, submitted to
the Commission on June 1, 1972, contained several recommendations designed to afford persons
under investigation by the Commission an opportunity to present their positions to the Commission
prior to the authorization of an enforcement proceeding.[1]  These procedural measures, if adopted,
would in general require that a prospective defendant or respondent be given notice of the staff's
charges and proposed enforcement recommendation and be accorded an opportunity to submit a
written statement to the Commission which would accompany the staff recommendation.  The
objective of the recommended procedures is to place before the Commission prior to the
authorization of an enforcement proceeding the contentions of both its staff and the adverse party
concerning the facts and circumstances which form the basis for the staff recommendation.[2]

The Commission has given these recommendations careful consideration.  While it agrees
that the objective is sound, it has concluded that it would not be in the public interest to adopt
formal rules for that purpose.  Rather, it believes it necessary and proper that the objective be
attained, where practicable, on a strictly informal basis in accordance with procedures which are
now generally in effect.

The Commission desires not only to be informed of the findings made by its staff but also,
where practicable and appropriate, to have before it the position of persons under investigation at
the time it is asked to consider enforcement action.

---

[1]  See Report of the Advisory Committee on Enforcement Policies and Practices, June 1, 1972, page
31 et seq.

[2]  It should be noted that the obtaining of a written statement from a person under investigation is
expressly authorized by Section 20(a) of the Securities Act of 1933 and Section 21(a) of the
Securities Exchange Act of 1934.  Section 21(a) of the Exchange Act provides as follows:

"The Commission may, in its discretion, make such investigations as it deems
necessary to determine whether any person has violated or is about to violate any
provision of this title or any rule or regulation thereunder, and may require or
permit any person to file with it a statement in writing, under oath or otherwise as
the Commission shall determine, as to all the facts and circumstances concerning
the matter to be investigated. . . ."

2

The Commission, however, is also conscious of its responsibility to protect the public interest. It cannot place itself in a position where, as a result of the establishment of formal procedural requirements, it would lose its ability to respond to violative activities in a timely fashion.

The Commission believes that the adoption of formal requirements could seriously limit the scope and timeliness of its possible action and inappropriately inject into actions it brings issues, irrelevant to the merits of such proceedings, with respect to whether or not the defendant or respondent had been afforded an opportunity to be heard prior to the institution of proceedings against him and the nature and extent of such opportunity.

The Commission is often called upon to act under circumstances which require immediate action if the interests of investors or the public interest are to be protected. For example, in one recent case involving the insolvency of a broker-dealer firm, the Commission was successful in obtaining a temporary injunctive decree within 4 hours after the staff had learned of the violative activities. In cases such as that referred to, where prompt action is necessary for the protection of investors, the establishment of fixed time periods, after a case is otherwise ready to be brought, within which proposed defendants or respondents could present their positions would result in delay contrary to the public interest.

The Commission, however, wishes to give public notice of a practice, which it has heretofore followed on request, of permitting persons involved in an investigation to present a statement to it setting forth their interests and position. But the Commission cannot delay taking action which it believes is required pending the receipt of such a submission, and, accordingly, it will be necessary, if the material is to be considered, that it be timely submitted. In determining what course of action to pursue, interested persons may find it helpful to discuss the matter with the staff members conducting the investigation. The staff, in its discretion, may advise prospective defendants or respondents of the general nature of its investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing a submission. The staff must, however, have discretion in this regard in order to protect the public interest and to avoid not only delay, but possible untoward consequences which would obstruct or delay necessary enforcement action.

Where a disagreement exists between the staff and a prospective respondent or defendant as to factual matters, it is likely that this can be resolved in an orderly manner only through litigation. Moreover, the Commission is not in a position to, in effect, adjudicate issues of fact before the proceeding has been commenced and the evidence placed in the record. In addition, where a proposed administrative proceeding is involved, the Commission wishes to avoid the possible danger of apparent prejudgment involved in considering conflicting contentions, especially as to factual matters, before the case comes to the Commission for decision. Consequently, submissions by prospective defendants or respondents will normally prove most useful in connection with questions of policy, and on occasion, questions of law, bearing upon the question of whether a proceeding should be initiated, together with considerations relevant to a particular prospective defendant or respondent which might not otherwise be brought clearly to the Commission's attention.

Submissions by interested persons should be forwarded to the appropriate Division Director or Regional Administrator with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which it relates. In the event that a recommendation for enforcement action is presented to the Commission by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

It is hoped that this release will be useful in encouraging interested persons to make their views known to the Commission and in setting forth the procedures by which that objective can best be achieved.

The Advisory Committee also recommended that the Commission should adopt in the usual case the practice of notifying a person who is the subject of an investigation, and against whom no further action is contemplated, that the staff has concluded its investigation of the matters referred to in the investigative order and has determined that it will not recommend the commencement of an enforcement proceeding against him.[3]

We believe this is a desirable practice and are taking steps to implement it in certain respects. However, we do not believe that we can adopt a rule or procedure under which the Commission in each instance will inform parties when its investigation has been concluded. This is true because it is often difficult to determine whether an investigation has been concluded or merely suspended, and because an investigation believed to have been concluded may be reactivated as a result of unforeseen developments. Under such circumstances, advice that an investigation has been concluded could be misleading to interested persons.

The Commission is instructing its staff that in cases where such action appears appropriate, it may advise a person under inquiry that its formal investigation has been terminated. Such action on the part of the staff will be purely discretionary on its part for the reasons mentioned above. Even if such advice is given, however, it must in no way be construed as indicating that the party has been exonerated or that no action may ultimately result from the staff's investigation of that particular matter. All that such a communication means is that the staff has completed its investigation and that at that time no enforcement action has been recommended to the Commission. The attempted use of such a communication as a purported defense in any action that might subsequently be brought against the party, either civilly or criminally, would be clearly inappropriate and improper since such a communication, at the most, can mean that, as of its date, the staff of the Commission does not regard enforcement action as called for based upon whatever information it then has. Moreover, this conclusion may be based upon various reasons, some of which, such as workload considerations, are clearly irrelevant to the merits of any subsequent action.

By the Commission.

---

[3] Report, page 20.

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C.  20549
MAIL STOP
OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300

200041163-99 cois

Jonathan R. Tuttle, Esq.
Debevoise & Plimpton, LLP
555 13th Street, N.W.
Washington, DC 20004



UNITED STATES POSTAL
02 1A
00043-2247
MAILED FROM ZIP CODE 20001
$ 00.630
MAR 15 2006

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JOHN MICHAEL KELLY, STEVEN E.
RINDNER, JOSEPH A. RIPP, and
MARK WOVSANIKER,

Defendants.

——————————————————————

:     08 Civ. 4612-SWK
:     (ECF Case)

# EXHIBIT 3

### DECLARATION OF ADA FERNANDEZ JOHNSON
### IN SUPPORT OF DEFENDANT J. MICHAEL KELLY'S
### MOTION TO DISMISS

## TOLLING AGREEMENT

**WHEREAS**, the Division of Enforcement ("Division") of the United States Securities and Exchange Commission ("Commission") has notified John Michael Kelly, through his counsel, that the Division intends to recommend that the Commission authorize the filing of a civil enforcement action (the "proceeding") against John Michael Kelly with respect to the Commission's investigation entitled In the Matter of AOL Time Warner Inc. (the "investigation"); and

**WHEREAS**, the Division has informed John Michael Kelly, through his counsel, that it would seek the imposition of certain sanctions and other relief, including but not limited to permanent injunction, officer and director bar, a civil penalty and disgorgement of trading profits and bonuses, in the proceeding; and

**ACCORDINGLY, AND FOR THEIR MUTUAL BENEFIT, IT IS HEREBY AGREED** by and between the parties that:

1.  any statute of limitations applicable to the proceeding or any other action or proceeding brought by or on behalf of the Commission or to which the Commission is a party arising out of the investigation ("any related proceedings"), including any sanctions or relief that may be imposed therein, is tolled for the period beginning on March 23, 2006 and ending at midnight on December 31, 2006 (the "tolling period");

2.  John Michael Kelly and any of his agents or attorneys will not assert that the Commission's failure to commence the proceeding or any related proceedings during the tolling period gives him any grounds for (a) asserting any statute of limitations as a defense to the proceeding or any related proceedings, or any sanctions or relief to be imposed therein, or (b) raising in any way any statute of limitations or any failure to commence the proceeding or any related proceedings during the tolling period as a defense to the proceeding or any related proceedings or to avoid or reduce any sanctions or relief to be imposed therein; and

3.  nothing in this agreement shall be construed as an admission by the Commission or Division relating to the applicability of any statute of limitations to the proceeding or any related proceedings, including any sanctions or relief that may be imposed therein, or to the length of any limitations period that may apply.

This instrument contains the entire agreement of the parties and may not be changed orally, but only by an agreement in writing.

SECURITIES AND EXCHANGE COMMISSION
DIVISION OF ENFORCEMENT

By: _____        Date: _____9/27/06_____
~~Deputy~~ Assistant Director

John Michael Kelly

_____            Date: _____9/21/06.____

Approved as to Form:

_____            Date: _____9/26/06_____
Jonathan R. Tuttle, Esq.
Debevoise & Plimpton, LLP
555 13th Street, N.W.
Washington, D.C. 20004

Counsel to John Michael Kelly

12/14/2006 17:06 FAX 2027728288                                        ☑ 002/003

## TOLLING AGREEMENT

**WHEREAS**, the Division of Enforcement ("Division") of the United States Securities and Exchange Commission ("Commission") has notified John Michael Kelly, through his counsel, that the Division intends to recommend that the Commission authorize the filing of a civil enforcement action (the "proceeding") against John Michael Kelly with respect to the Commission's investigation entitled In the Matter of AOL Time Warner Inc. (the "Investigation"); and

**WHEREAS**, the Division has informed John Michael Kelly, through his counsel, that it would seek the imposition of certain sanctions and other relief, including but not limited to permanent injunction, officer and director bar, a civil penalty and disgorgement of trading profits and bonuses, in the proceeding; and

**ACCORDINGLY, AND FOR THEIR MUTUAL BENEFIT, IT IS HEREBY AGREED** by and between the parties that:

1.  any statute of limitations applicable to the proceeding or any other action or proceeding brought by or on behalf of the Commission or to which the Commission is a party arising out of the investigation ("any related proceedings"), including any sanctions or relief that may be imposed therein, is tolled for the period beginning on March 23, 2006 and ending at midnight on March 31, 2007 (the "tolling period");

2.  John Michael Kelly and any of his agents or attorneys will not assert that the Commission's failure to commence the proceeding or any related proceedings during the tolling period gives him any grounds for (a) asserting any statute of limitations as a defense to the proceeding or any related proceedings, or any sanctions or relief to be imposed therein, or (b) raising in any way any statute of limitations or any failure to commence the proceeding or any related proceedings during the tolling period as a defense to the proceeding or any related proceedings or to avoid or reduce any sanctions or relief to be imposed therein; and

3.  nothing in this agreement shall be construed as an admission by the Commission or Division relating to the applicability of any statute of limitations to the proceeding or any related proceedings, including any sanctions or relief that may be imposed therein, or to the length of any limitations period that may apply.

This instrument contains the entire agreement of the parties and may not be changed orally, but only by an agreement in writing.

SECURITIES AND EXCHANGE COMMISSION
DIVISION OF ENFORCEMENT

By: _____                    Date: _____
Assistant Director

John Michael Kelly

_____                        Date: 12/20/06

Approved as to Form:

Jonathan R. Tuttle by                    Date: December 22, 2006
Jonathan R. Tuttle, Esq.                 Karen Walterinni
Debevoise & Plimpton, LLP
555 13th Street, N.W.
Washington, D.C. 20004

Counsel to John Michael Kelly

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————

SECURITIES AND EXCHANGE COMMISSION,

                                Plaintiff,

                    v.

JOHN MICHAEL KELLY, STEVEN E.
RINDNER, JOSEPH A. RIPP, and
MARK WOVSANIKER,

                          Defendants.

——————————————————————

:
:
:
:
:
:
:
:
:
:
:
:
:

08 Civ. 4612-SWK
(ECF Case)

# EXHIBIT 4

**DECLARATION OF ADA FERNANDEZ JOHNSON
IN SUPPORT OF DEFENDANT J. MICHAEL KELLY'S
MOTION TO DISMISS**

James T. Coffman
Luis R. Mejia
Melissa A. Robertson
Gregory T. Lawrence
Jeffrey B. Finnell
Christopher K. Agbe-Davies
Thomas D. Manganello
Andrew B. Stevens

Attorneys for Plaintiff
Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, DC 20549
(202) 942-4744 (Mejia)
MejiaL@sec.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| 450 Fifth Street, N.W. | : | |
| Washington, DC 20549 | : | |
| Plaintiff, | : | |
|  | : | |
| v. | : | C.A. No. 1:05CV00578-GK |
|  | : | |
| TIME WARNER INC., | : | |
| One Time Warner Center | : | |
| New York, New York 10019 | : | |
| Defendant. | : | |

---

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges as follows:

## SUMMARY

1.      This is a financial fraud case.  America Online, Inc. ("AOL") and its

successor corporation AOL Time Warner Inc. ("AOLTW" and collectively with AOL,

the "Company") artificially inflated reported online advertising revenues and Internet

subscriber counts—two key measures by which investors and analysts evaluated the Company. The Company reported inflated online advertising revenue in periodic reports filed with the Commission and other public statements from October 2000 through February 2003 based on transactions entered into from June 2000 through December 2001. The Company also inflated its Internet subscriber counts in 2001. Subsequent to the events described below, AOLTW changed its name to Time Warner Inc.

2.     The Company inflated its online advertising revenues by engaging in "round-trip" transactions with a host of companies with which it had commercial relationships. These transactions ranged in complexity and sophistication, but in substance, the Company provided its customers with funds to purchase online advertising from AOL. Simultaneously, the customer would enter into an agreement to "purchase" online advertising from AOL in an amount corresponding to the payment from the Company. AOL and AOLTW improperly recognized as online advertising revenue the amounts received pursuant to these purported advertising agreements and improperly accounted for the funds it provided to the customers.

3.     Several of the customers were public companies with securities registered with the Commission. Some of these customers used the transactions to artificially inflate their own financial results. As a consequence, the Company also aided and abetted the frauds of three public companies that improperly recognized revenue in connection with the round-trip transactions.

4.     The Company also inflated the number of AOL's Internet subscribers by including memberships provided in bulk to corporate customers in its published subscriber counts, even though most employees of those corporate customers never

2

became members.  The Company also inflated AOL's subscriber counts by, among other means, funding its corporate customers' bulk subscription "purchases."

5.      The Company's financial statements were further misstated by its failure to properly consolidate the losses and debt of one of its subsidiaries, AOL Europe, S.A. This resulted in material misstatements of the Company's 2000 and 2001 financial results, including overstatements of operating income, net income, and free cash flow, and understatements of net losses and total debt.

6.      This conduct violated the federal securities laws as well as a cease-and-desist order against AOL issued by the Commission on May 15, 2000.  The Commission issued the cease-and-desist order because of AOL's improper capitalization of certain advertising costs that should have been expensed as they were incurred.  As a result of this improper accounting treatment, AOL reported profits for six of eight quarters in fiscal years 1995 and 1996, rather than the losses it would have reported had it properly expensed the advertising costs.  Within several weeks of consenting to that order, AOL began violating it by engaging in the new acts alleged in this Complaint.

7.      On October 23, 2002, months after the Commission commenced its investigation of this matter, the Company announced that it would restate its financial results for each of the quarters ended September 30, 2000 through June 30, 2002, and for the years ended December 31, 2000 and 2001 (the "2002 Restatement").  The 2002 Restatement reversed some, but not all, of the improper round-trip transactions and resulted in a reduction of $190 million in principally online advertising revenue.  The 2002 Restatement was materially deficient.

3

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action under Section 22(a) of the

Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)], and Sections 21(d), 21(e),

and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)

and (e) and 78aa].  Defendant, directly or indirectly, made use of the means or

instrumentalities of interstate commerce, of the mails, or of the facilities of a national

securities exchange in connection with the transactions, acts, practices, and courses of

business alleged in this Complaint.

9.      Venue is appropriate in this Court under Section 22(a) of the Securities

Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because

the defendant does business in this judicial district and certain acts or transactions

constituting the violations occurred in this district.

## DEFENDANT

10.     Time Warner Inc. is the corporate parent of AOL and is a media and

entertainment company incorporated in Delaware and headquartered in New York, New

York.  Time Warner Inc.'s common stock is registered with the Commission pursuant to

Section 12(b) of the Exchange Act and trades on the New York Stock Exchange.  Time

Warner Inc. files annual, quarterly, and current reports with the Commission on Forms

10-K, 10-Q, and 8-K.  Time Warner Inc. registered securities offerings from January

2001 through January 2003 by filing with the Commission Forms S-3 and S-8.

11.     AOL Time Warner Inc. was formed by the merger of AOL and Time

Warner on January 11, 2001.  It changed its name to Time Warner Inc. on October 16,

2003.

12.     AOL is an Internet service provider located in Dulles, Virginia.  AOL

provides its members with access to the Internet, e-mail accounts, and content.

13.     Certain conduct alleged in this Complaint occurred at AOL before it

merged with Time Warner.  AOL's common stock was registered with the Commission

pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock

Exchange.  It filed annual, quarterly, and current reports with the Commission on Forms

10-K, 10-Q, and 8-K.  AOLTW registered a securities offering on December 28, 2000 by

filing with the Commission a Form S-4.

## FACTS

### I.
### AOL and Time Warner Propose a Merger.

14.     In the fall of 1999, AOL entered into merger discussions with Time

Warner, and the two companies announced a proposed merger in January 2000.  The

implied market value of the merged company was approximately $200 billion, making it

the then-largest merger in U.S. history.

### II.
### AOL Settles an Action with the Commission
### Based on AOL's Improper Accounting Practices.

15.     On May 15, 2000, the Commission issued a cease-and-desist order against

AOL in connection with AOL's accounting for advertising costs in 1995 and 1996.  The

Commission found that AOL violated the reporting and the books and records provisions

of the federal securities laws by capitalizing costs of acquiring new subscribers and

reporting the costs as an asset on its balance sheet, instead of expensing them as incurred.

AOL had capitalized aggregate advertising costs of approximately $385 million by

September 30, 1996, when it wrote them off in their entirety.  AOL consented to the

issuance of the cease-and-desist order without admitting or denying the Commission's allegations.

16.    In connection with the cease-and-desist order, the Commission filed a related civil action against AOL in the United States District Court for the District of Columbia seeking a civil penalty.  AOL settled the matter by consenting to a court order requiring it to pay a $3.5 million penalty.

### III.

### AOL and AOLTW Violate the Commission's Cease-and-Desist Order and Engage in Fraud to Artificially Boost Online Advertising Revenue.

17.    Beginning in mid-2000, while the AOL/Time Warner merger was pending, stock prices of Internet-related businesses declined precipitously as, among other things, sales of online advertising declined and the rate of growth of new online subscriptions started to flatten.  During this period, AOL employed round-trip transactions that boosted its online advertising revenue and masked the fact that it also was beginning to experience a business slow-down.

18.    AOL's round-trip transactions took several forms, including: (i) vendor transactions, in which AOL agreed to pay inflated prices for, or forego discounts on, goods and services it purchased in exchange for the vendors' purchases of online advertising in the same amount as the markup or foregone discount; (ii) converting settlements of legal claims into online advertising revenue; (iii) business acquisitions, in which AOL increased the purchase price in exchange for the sellers' purchase of online advertising in the same amount as the increase in the purchase price; and (iv) referral transactions, in which AOL and its counterparties falsely created and reported revenues.

6

19.    By each of these means, AOL effectively funded its own online advertising revenue by giving the counterparties the means to pay for advertising that they would not otherwise have purchased.  To conceal the true nature of the transactions, the Company typically structured and documented round-trip transactions as if they were two or more separate, bona fide transactions, conducted at arm's length and reflecting each party's independent business purpose.

20.    AOL's recognition of online advertising revenue in connection with these transactions departed from generally accepted accounting principles ("GAAP").  GAAP requires accounting to reflect the substance of a transaction over its legal form.  For example, revenue should not be recorded in a round-trip transaction in which the essence of the transaction is merely a circular flow of cash and the customer does not want or need the goods or services provided, would not normally purchase the goods or services at that time, or purchases quantities in excess of its needs.  AOL's recognition of revenue on these round-trip transactions departed from GAAP by elevating form over substance.

21.    In connection with these round-trip transactions, AOL often delivered untargeted, less desirable, remnant advertising.  Often, the round-trip advertisers had little or no ability to control the quantity, quality, and sometimes even the content of the online advertising they received.  Because the round-trip customers effectively were paying for the online advertising with AOL's funds, they seldom, if ever, complained.

A.    **The Vendor Round-Trip Transactions**

22.    As described above, AOL agreed to pay inflated prices for, or forego discounts on, goods and services it purchased in exchange for the vendors' purchases of online advertising in amounts equivalent to the markup paid or discount foregone.  The essence of these transactions was a circular flow of money by which AOL used its own cash to create the false appearance of receipt of advertising revenue, enabling the Company to meet internal revenue targets and analysts' expectations.  Examples of these transactions include the following:

*Computer Hardware Transactions*

23.    In June 2000, AOL transformed a commitment to purchase computer hardware into a transaction that generated $37.5 million in online advertising revenue for AOL in the second half of 2000.

24.    The hardware supplier is a California-based company that manufactures the network equipment AOL uses to support its online service.  In November 1998, AOL entered into an agreement to purchase at least $300 million of network equipment over three years.

25.    AOL's equipment needs outpaced expectations, and by June 2000 AOL had already purchased $300 million of equipment.

26.    In June 2000, the supplier asked AOL to enter into a new purchase commitment.  During the negotiations that followed, AOL secured an additional 15% discount in exchange for committing to purchase $250 million of additional equipment.

27.    To inflate its online advertising revenues, AOL proposed to pay the supplier $37.5 million—by foregoing the 15% discount and paying the full $250 million

for the equipment—in exchange for the supplier's agreement to purchase $37.5 million of

online advertising. The hardware supplier agreed, and AOL structured the transaction to

conceal the fact that it paid an additional $37.5 million for the network equipment in

exchange for the supplier's agreement to purchase $37.5 million of online advertising.

28.    The advertising contract provided AOL with complete discretion over

where and when to run this online advertising, subject only to a $25 million cap on

advertising within a single quarter.

29.    Faced with a shortfall in online advertising revenues in the third quarter of

2000, AOL obtained oral approval to run the full $37.5 million in advertising in that

quarter. AOL also charged a 175% premium to its list price for the $37.5 million ad

purchase.

30.    In its 2002 Restatement, AOLTW reversed the $37.5 million and

accounted for it as a reduction in the purchase price for the network equipment.

31.    Following the model described above, AOL converted a $12 million

discount from another hardware vendor into $12 million of advertising revenue in the

fourth quarter of 2000. In its 2002 Restatement, AOLTW reversed the $12 million of

online advertising revenue recognized in connection with this transaction.

### Software License Transactions

32.    In September 2000, AOL engineered a round-trip transaction with a

California-based software company that creates and licenses data storage software. The

software company's common stock is registered with the Commission pursuant to

Section 12(g) of the Exchange Act and is quoted on the Nasdaq National Market

("Nasdaq").

33.     During the summer of 2000, AOL began negotiating to purchase a software license from the company.  By mid-September 2000, the parties agreed on a $30 million purchase price for the license and associated services.

34.     During the final month of the license negotiations, AOL proposed that the software company purchase online advertising from AOL.  The software company rejected AOL's proposal.

35.     Hours before the parties were set to execute the license agreement, AOL offered to pay an additional $20 million for the license in return for the software company's agreement to purchase $20 million of AOL online advertising.  The parties did not change the terms of the license as a result of the price increase nor did they engage in any substantive negotiations regarding the online advertising contract.  By oral side agreement, the parties further agreed to simultaneously wire payments of the amounts due under the contracts.

36.     AOL and the software company documented the license transaction to conceal the fact that AOL agreed to pay an additional $20 million for the license in exchange for the software company's agreement to purchase $20 million in online advertising.  The Company improperly recognized the $20 million as advertising revenue, and the software company improperly recognized most of the additional $20 million as license and service revenue.  In its 2002 Restatement, AOLTW reversed the $20 million of improperly recognized revenue.

37.     In January 2001, AOL returned to the software company's independent auditors a materially misleading confirmation of the purported terms of the license, further aiding and abetting the software company's fraud.

38.     Another example involves a $4.5 million round-trip.  In July 2000, AOL began negotiations with another software maker and licensor to purchase a license.  By mid-November 2000, AOL and the licensor agreed on a $33 million price for this software.

39.     During the negotiations, AOLTW pressed the licensor to purchase online advertising.  The licensor, which had no need or budget for the advertising, repeatedly rejected AOLTW's proposal.  After agreeing to the $33 million purchase price, but before the deal was signed, AOLTW then proposed to pay the licensor an additional $4.5 million for its license in exchange for an agreement by the licensor to buy $4.5 million of online advertising from AOLTW.  The licensor agreed.

40.     AOLTW documented the transactions as two independent agreements: AOLTW's purchase of a software license from the licensor for $37.5 million and the licensor's purchase of $4.5 million of online advertising from AOLTW.  AOLTW recognized $4.5 million as advertising revenue in the first quarter of 2001.  The Company did not restate its financial results to reverse this $4.5 million of advertising revenue in the 2002 Restatement.

B.     **The Business Acquisition Transactions**

*The Bertelsmann Online Advertising Contracts*

41.     In 2001 and 2002, AOLTW improperly recognized $400 million in online advertising revenue as a result of transactions with Bertelsmann AG ("BAG").  In substance, BAG paid $400 million to AOLTW as consideration for amendments to a multi-billion-dollar contract governing AOLTW's purchase of BAG's interest in AOL Europe.  The contract amendments had substantial value and BAG offered to compensate

11

AOLTW for the amendments.  Rather than accept cash in exchange for the two amendments, however, AOLTW requested BAG to purchase online advertising in the aggregate amount of $400 million.  AOLTW inflated its online advertising revenues by recognizing the $400 million as advertising revenue rather than as consideration received for amending the AOL Europe purchase agreement.

### *Purchase of BAG's Interest in AOL Europe*

42.    AOL and BAG formed a joint venture in 1995 that created AOL Europe, which owns and operates European Internet services (including AOL UK and AOL Germany).  In March 2000, AOL and BAG entered into a contingent purchase agreement concerning AOL's acquisition of BAG's interest in AOL Europe.  The agreement was structured as a put/call option (the "Put/Call").  Under the Put/Call, BAG could exercise an option to "put" its AOL Europe shares to AOL by selling those shares for $6.75 billion; if BAG did not exercise its option, AOL could exercise an option to "call" BAG's AOL Europe shares by purchasing BAG's shares for $8.25 billion.  BAG's Put rights under the Put/Call had two settlement dates: January 2002 for 80% of BAG's AOL Europe shares, and July 2002 for the remaining 20% of BAG's AOL Europe shares.  The Put/Call provided AOL the option to pay in cash or stock.  AOL retained the further option to settle in cash or stock for 12 days after the price of AOL stock was fixed for settlement (the "free-look period").  If AOL's stock price at the end of the free-look period was below the price fixed for settlement under the Put/Call, AOL could deliver stock worth less than the Put/Call price.

43.    At the same time in March 2000, BAG and AOL executed an online advertising agreement committing BAG to purchase $150 million in online ads from

AOL over four years (the "Premier Ad Deal"). The Premier Ad Deal provided BAG "premier status," entitling it to extensive ad placement and exclusivity rights, and "preferred pricing," under which the parties agreed by December 2000 to provide BAG with a 40% discount to AOL's list price. Under the Premier Ad Deal, BAG negotiated the content, placement, and timing of the online advertising. After the January 2001 merger of AOL and Time Warner, AOLTW became AOL's successor in interest under the BAG agreements.

### *$125 Million Put/Call Amendment Deal*

44.    Shortly after entering into the Put/Call agreement, BAG attempted to realize some or all of the $6.75 billion it was due upon exercise of its Put rights, which according to the contract could not be settled until 2002. In the fall of 2000, BAG tried to sell its interest in the Put/Call agreement to an investment banking firm. However, the investment bankers were unwilling to purchase BAG's interest in the Put/Call because of the uncertainty inherent in its terms. Specifically, the free-look period put BAG at risk of receiving AOL stock worth substantially less than $6.75 billion, and AOL's option to pay with stock, rather than cash, created material, and potentially costly, obstacles to realizing value from BAG's rights prior to the settlement of the Put/Call. As a result of this uncertainty, BAG could not monetize, or realize value from, its rights under the Put/Call agreement prior to settlement. The most effective way to reduce the uncertainty, thereby enabling BAG to realize value by borrowing against the Put/Call agreement, was to obtain AOLTW's agreement to pay the Put price in cash rather than stock.

45.    In January 2001, BAG proposed to amend the Put/Call to require AOLTW to pay some or all of the $6.75 billion price in cash to enable BAG to monetize its

interest. BAG offered to compensate AOLTW for the amendment with cash, a reduction in the Put/Call price, or other means. AOLTW proposed that the consideration take the form of an agreement by BAG to purchase online advertising from AOLTW.

46.    From January through March 2001, AOLTW and BAG negotiated the terms of the Put/Call amendment. Almost all of the negotiations focused on the value and structure of various Put/Call amendments. There were few, if any, negotiations concerning terms of the online advertising deal, other than the overall price, which was determined by the negotiated value of the Put/Call amendment. During the negotiations, AOLTW and BAG consulted with finance experts and investment bankers concerning the value of the Put/Call amendment, which included the value of the free-look period and the value of avoiding a block sale discount for large blocks of stock. Values asserted by AOLTW during negotiations with BAG ranged from $200 million to $412 million.

47.    On March 30, 2001, AOLTW and BAG amended the Put/Call to require AOLTW to pay at least $2.5 billion in cash if BAG exercised its $6.75 billion Put (the "First Put/Call Amendment"). As consideration for the First Put/Call Amendment, BAG agreed to pay AOLTW $125 million in the form of an online advertising purchase (the "March '01 Deal").

48.    BAG had no need for additional online advertising. The March '01 Deal provided online advertising that was qualitatively different from the online advertising provided under the Premier Ad Deal. Among other things, the March '01 Deal stripped BAG of the preferred pricing and special rights that it enjoyed under the Premier Ad Deal, and it essentially eliminated BAG's ability to control the content, placement, and frequency of the advertising delivered pursuant to the March '01 Deal.

49. AOLTW decided each quarter how much online advertising to run under the March '01 Deal by determining the amount of online ad revenues it needed during the period to reach its targets. Often, the advertising for BAG ran late in the reporting period, after AOLTW had determined the amounts by which it could not otherwise attain its revenue goals. BAG generally signed the advertising purchase orders after AOLTW had already run the advertising. Negotiations, to the extent they occurred, concerned mostly the allocation of the ads among BAG's various subsidiaries and not the placement or frequency of the ads. An AOLTW internal summary of the March '01 Deal described the online advertising as "pure gravy" and a "freebie," explaining that "these plans are not to be negotiated." A later AOLTW internal memorandum described the March '01 Deal as an "aggressive revenue recognition plan" under which "AOL policy has been focused on maximum revenue recognition without regard to the quality of the carriage or input from the BAG Brands on either participation or carriage." Internal BAG memoranda and e-mails likewise referred to the agreement in pejorative terms, including describing the advertising as valueless and "rubbish."

50. AOLTW ignored the substance of the transaction and improperly recognized online advertising revenue in 2001 as a result of the March '01 Deal as follows: $16.3 million in the first quarter, $65.5 million in the second quarter, and $39.8 million in the third quarter. The Company did not restate this transaction in the 2002 Restatement.

### $275 Million Put/Call Amendment Deal

51. In September 2001, BAG asked AOLTW to commit to pay cash for the remaining $4.25 billion due when BAG exercised its Put right. Again, AOLTW proposed to structure the consideration received for the amendment as a payment for on-

line advertising. Once again, AOLTW improperly accounted for the payment from BAG for a Put/Call amendment as if it were advertising revenue.

52.    From late November through mid-December 2001, AOLTW and BAG negotiated over the second amendment to the Put/Call. As was the case in March, substantially all of the negotiations concerned the value and structure of the proposed Put/Call amendment. There were few, if any, negotiations concerning terms of the online advertising deal, other than the overall price, which was determined by the negotiated value of the Put/Call amendment. During the negotiations, AOLTW and BAG consulted with finance experts and investment bankers concerning the value of a second Put/Call amendment. The values asserted by AOLTW during the negotiations with BAG ranged from $250 million to $420 million.

53.    On December 21, 2001, AOLTW and BAG amended the Put/Call to require AOLTW to pay the remaining $4.25 billion Put amount in cash (the "Second Put/Call Amendment"). As consideration for the Second Put/Call Amendment, BAG agreed to pay AOLTW $275 million in the form of an online advertising purchase (the "December '01 Deal").

54.    BAG had no need for additional online advertising. Like the March '01 Deal, the December '01 Deal stripped BAG of the preferred pricing and special rights that it enjoyed under the Premier Ad Deal, and it essentially eliminated BAG's ability to control the content, placement, and frequency of the advertising delivered. AOLTW booked almost the entire $275 million in online advertising from the December '01 Deal in 2002. AOL administered the December '01 Deal substantially the same as it did the March '01 Deal.

16

55.  AOLTW ignored the substance of the transaction and improperly recognized online advertising revenue on the December '01 Deal in the following amounts in 2002: $80.3 million in the first quarter, $84.4 million in the second quarter, $51.6 million in the third quarter, and $58.0 million in the fourth quarter.  The Company did not restate its financial results to reverse the revenue recognized in connection with this transaction in the 2002 Restatement.

56.  GAAP requires that the accounting for a transaction reflect its economic substance.  The economic substance of the exchanges of March and December 2001 was that BAG paid $400 million for amendments to the Put/Call.  AOLTW concealed that fact and fraudulently recognized the $400 million paid for the amendments as if it were bona fide advertising revenue.

### Other BAG Transactions

57.  In addition to the $400 million in fraudulent revenue from the March and December '01 Deals, AOLTW and BAG entered into a round-trip agreement which resulted in $17.4 million of improperly recognized online advertising revenue in the fourth quarter of 2000.  From the fourth quarter of 2000 through the fourth quarter of 2001, AOL and BAG also entered into a series of undisclosed side agreements resulting in the premature recognition of approximately $33.6 million in online advertising revenue.

### Another Instance of Improper Revenue Recognition
### In Connection With an Acquisition

58.  AOLTW entered into a "stock swap" with one of its joint venture partners in the first quarter of 2001.  In the stock swap, among other things, AOLTW purchased the partner's 55% interest in their joint venture.  Similar to other round-trip transactions in

17

which AOLTW funded its revenue, AOLTW and the partner agreed on a purchase price of $700 million, with the understanding that the purchase price would be increased by $25 million in exchange for the partner's commitment to purchase $25 million of online advertising from AOLTW. AOLTW artificially inflated its online advertising revenue in each quarter of 2001 and the first quarter of 2002 by improperly recording $25 million in online advertising revenue. The Company did not restate its financial results to reverse the $25 million recognized as revenue for this transaction in the 2002 Restatement.

**C.**     **Legal Settlements Converted to Online Advertising Revenue**

59.     Shortly after AOL began trading discounts for online advertising revenue with its vendors, AOL also started converting settlements of disputes into online advertising revenue.

60.     For example, in August and September 2000, two companies agreed to settle longstanding disputes with AOL by paying AOL $12.5 million and approximately $25 million, respectively. Under GAAP, these payments should not have been recorded as advertising revenue.

61.     The two companies offered to pay these amounts to AOL without regard to any advertising purchases. AOL improperly converted these settlements into online advertising revenue and documented the settlement payments as advertising purchases, thereby improperly inflating its online advertising revenue by $12.5 million in the third quarter of 2000 and by $23.8 million in the third and fourth quarters of 2000.

62.     Similarly, in two transactions with a major communications provider, AOLTW improperly converted settlements with the counterparty into purchases of online advertising and documented the settlement payments as advertising purchases, thereby

inflating its online advertising revenues by $34.2 million and $17 million in the second and fourth quarters of 2001.

63.    Likewise, AOLTW converted a $4 million lease termination penalty into a $4 million ad revenue deal with a vendor on which it recognized revenue in the fourth quarter of 2001.

64.    In its 2002 Restatement, AOLTW reversed online advertising revenue recognized in connection with these transactions.

**D.    The Sham Referrals**

***Improper Transactions with PurchasePro***

65.    PurchasePro.com, Inc. was a publicly-owned corporation with its corporate headquarters in Las Vegas, Nevada. PurchasePro's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and quoted on the Nasdaq. PurchasePro provided business-to-business electronic-commerce software licenses and services.

66.    AOL and PurchasePro engaged in round-trip transactions to enable both companies to record and report false revenues.

67.    In the third quarter of 2000, AOL paid PurchasePro $2 million for software licenses that it neither needed nor intended to use. In exchange, and by way of an undisclosed side agreement, PurchasePro amended a warrant agreement so that AOL would receive $3 worth of warrants for PurchasePro stock for every $1 in third-party revenue AOL referred to PurchasePro. In a false confirmation to PurchasePro's auditors, AOL failed to disclose, among other things, that it had received additional rights under the warrant agreement in exchange for making the $2 million purchase. PurchasePro

19

materially overstated its revenues by improperly recognizing the $2 million in revenue in the third quarter of 2000.

68.    In the fourth quarter of 2000, AOL and PurchasePro manipulated their warrant agreement to artificially manufacture revenue for both companies. Under the agreement, AOL could earn warrants only when third parties it referred to PurchasePro entered into commercial arrangements that enabled PurchasePro to recognize revenue. The agreement did not permit AOL to earn warrants based on purchases it made from PurchasePro. Nevertheless, in the fourth quarter of 2000, AOL bought $10 million worth of products and services from PurchasePro, and PurchasePro deemed AOL to have "earned" $30 million worth of warrants. To circumvent PurchasePro's auditors' objections, AOL and PurchasePro falsified documents to create the appearance that AOL had actually referred $10 million of third-party purchases to PurchasePro. AOL thus improperly recognized advertising and electronic commerce revenue on the net $20 million difference between the value of the warrants and the $10 million it paid directly to PurchasePro. PurchasePro, for its part, improperly recognized revenue on AOL's $10 million purchase and thus overstated its fourth quarter and year-end revenues. In the 2002 Restatement, AOLTW did not restate its financial results to reverse the $20 million in improper revenue it recognized on this transaction.

### The Homestore Transactions

69.    Homestore, Inc. is a Delaware corporation headquartered in Westlake Village, California. Homestore provides Internet real estate listings to consumers and sells products and services to real estate brokers. Since June 2000, Homestore has provided content for the "House and Home" channel on AOL's online service.

20

Homestore's stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and is quoted on the Nasdaq.

70.     During the third quarter of 2000 and the first quarter of 2001, the Company and Homestore entered into a series of purportedly unrelated transactions which resulted in both companies misstating their revenues. To conceal the true nature of these arrangements, AOL and Homestore entered into undisclosed side agreements and falsified documents to make it appear that third parties purchased online advertising. During the second and third quarters of 2001, AOLTW assisted in inflating Homestore's revenues through another series of transactions that effectively resulted in Homestore's buying its own revenues. AOL falsified documents to make it appear that third parties purchased Homestore online advertising.

71.     In total, the Company improperly inflated its online advertising revenue based on the Homestore-related transactions by at least $1.5 million in the fourth quarter of 2000 and $7 million in the first quarter of 2001. In its 2002 Restatement, AOLTW restated its financial results to reverse these amounts. For its part, Homestore materially overstated its reported financial results for the third quarter of 2000 and the first through third quarters of 2001 based on improperly recognizing the following amounts of revenue on AOL-related transactions: $1.5 million in the third quarter of 2000, $15 million in the first quarter of 2001, $18.5 million in the second quarter of 2001, and $3.3 million in the third quarter of 2001. Homestore has restated its financial results to reverse the amounts for 2001.

### E.    **Improper Subscriber Counts**

72.    In addition to AOL's online advertising revenue, the market evaluated AOL (both before and after its merger with Time Warner) based on, among other factors, the number of subscribers using AOL's Internet service as well as the growth of that subscriber base.  Senior Company executives set internal subscriber growth targets each quarter and pressured lower level executives and employees to meet the targets.

73.    In 2000, AOL began selling Internet account memberships in bulk at substantial discounts to corporations with which it had commercial relationships.  AOL counted these memberships as subscribers under the assumption that its corporate customers would offer these memberships to their employees and the employees would activate the memberships.

74.    In 2001, AOLTW used the bulk subscription program to inflate its AOL membership numbers by counting members AOLTW knew did not actually exist. Specifically, AOLTW used bulk deals to "close the gap" between its actual AOL subscriber numbers and its targets.  The "attach rates"—the percentage of persons or entities that actually became AOL members—were exceptionally low for bulk deals. Notwithstanding the low attach rates, which AOLTW tracked closely, AOLTW counted most of these bulk AOL subscription memberships in 2001 to meet its subscriber targets.

75.    Some businesses resisted AOLTW's pressure to buy bulk AOL subscriptions because they did not want to incur the cost.  These businesses only agreed to enter into contracts to "purchase" AOL subscriptions as an accommodation to AOLTW and upon AOLTW's agreement to fully fund these purchases.

22

76.   For example, in the second quarter of 2001, internal reports indicated that AOLTW would fall short of its AOL subscriber growth target for the quarter by approximately 250,000 members.  To meet its target, AOLTW pressed a major retail business to purchase 250,000 AOL subscriptions.  The retailer declined.  AOLTW then offered to reimburse the retailer for the cost of the subscriptions by increasing payments made to the retailer pursuant to another contractual arrangement.  The retailer again declined.  AOLTW finally prevailed upon the retailer to "purchase" the subscriptions by agreeing to inflate the payments under the other arrangement in such a way that, based upon historical experience, the retailer would receive more than 100% of the money it paid for the subscriptions.

77.   As the quarter drew to a close, the gap in AOL's subscriber numbers had increased to approximately 350,000 as other marketing efforts had underperformed.  To close the gap, AOLTW increased the number of AOL subscriptions in the bulk deal with the retailer from 250,000 to 350,000.  Because the transaction was economically neutral (or beneficial) to the retailer, AOLTW knew it would not object.  As a result, AOLTW met its AOL subscriber count goal that quarter.

78.   In four instances, AOLTW should not have counted AOL bulk subscribers in certain quarters because it failed to complete the transactions within the quarters.  Specifically, AOLTW failed to deliver by the end of the relevant quarter membership kits that met the specifications set forth in the respective contracts.  AOLTW shipped non-conforming membership kits prior to quarter end with the understanding that it would replace these materials in the following quarter with materials that conformed to the

contracts. AOLTW improperly included in its subscription counts the memberships in each bulk deal at the time of the initial shipment of non-conforming kits.

79.    AOLTW improperly counted these bulk subscription memberships to meet subscriber targets in the second, third, and fourth quarters of 2001 so it could report to the investment community that it had met its targets.

### F.    Failure to Consolidate AOL Europe

80.    In addition to improperly recognizing as online advertising revenue payments it received from BAG for amendments to the Put/Call, AOL and AOLTW failed to properly consolidate the financial results of AOL Europe in their financial statements between March 2000 and January 2002. This resulted in material misstatements of AOL's and AOLTW's financial results, including overstatements of operating income and free cash flow in 2000 and 2001, overstatements of net income in 2000, understatements of net losses in 2001, and understatements of total debt in 2000 and 2001.

81.    Provisions of the Put/Call agreement specified that AOL would continue to hold no more than 50% of AOL Europe's voting securities, but BAG agreed it would have no contractual veto, consent, approval, voting, or similar rights with respect to AOL Europe and agreed to cause its own designated directors, steering committee members, or members of any similar governing body of AOL Europe to act in accordance with AOL's directions. By virtue of these provisions, AOL obtained broad and direct powers enabling it to control the operations and assets of AOL Europe. Also, AOL informed the European Commission (in the context of satisfying EC merger regulations) that BAG

24

relinquished essentially all control regarding the operations or management of AOL Europe.

82.     AOL's failure to properly report AOL Europe as a consolidated subsidiary commencing with the execution of the Put/Call agreement departed from GAAP.  GAAP requires consolidation when one entity has a controlling financial interest in another entity.

## FIRST CLAIM FOR RELIEF

### Violations of Commission Cease-and-Desist Order

83.     Paragraphs 1 through 82 are re-alleged and incorporated by reference.

84.     On May 15, 2000, the Commission ordered that AOL "cease and desist from causing any violations, and any future violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 13a-1 and 13a-13 thereunder." *In the Matter of America Online, Inc.,* Exchange Act Rel. No. 34-42781 (May 15, 2000).

85.     By reason of the foregoing, and as explained further in paragraphs 89 through 94, the Company committed violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Exchange Act Rules 13a-1 and 13a-13.  Accordingly, the Company has violated, and unless ordered to comply will violate, the Commission's May 15, 2000 order.

## SECOND CLAIM FOR RELIEF

### Fraud

Violations of Section 17(a) [15 U.S.C. § 77q(a)] of the Securities Act, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]

86.     Paragraphs 1 through 4 and 6 through 79 are re-alleged and incorporated by

reference.

87.    By reason of the foregoing, defendant directly or indirectly, acting intentionally, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the offer, sale, or purchase of securities: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; (c) obtained money or property by means of any untrue statement of a material fact or any omission of a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (d) engaged in transactions, acts, practices, or courses of business which operated as a fraud or deceit upon other persons.

88.    By reason of the foregoing, defendant violated, and unless restrained will violate, Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5.

### THIRD CLAIM FOR RELIEF

#### Reporting

Violations of Section 13(a) of the Exchange Act [15 U.S.C.
§ 78m(a)] and Exchange Act Rules 12b-20, 13a-1, 13a-11,
and 13a-13 [17 C.F.R. § 240.12b-20, § 240.13a-1, §
240.13a-11, and § 240.13a-13]

89.    Paragraphs 1 through 82 are re-alleged and incorporated by reference.

90.    The Exchange Act and Exchange Act rules require every issuer of registered securities to file reports with the Commission that accurately reflect the issuer's financial performance and provide other true and accurate information to the public.

91.    By reason of the foregoing, defendant violated, and unless restrained will violate, Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13.

## FOURTH CLAIM FOR RELIEF

### Record Keeping

Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1]

92.    Paragraphs 1 through 82 are re-alleged and incorporated by reference.

93.    The Exchange Act and Exchange Act rules promulgated thereunder require each issuer of registered securities to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the business of the issuer and to devise and maintain a system of internal controls sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit preparation of financial statements and to maintain the accountability of accounts.

94.    By reason of the foregoing, defendant violated, and unless restrained will violate, Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Exchange Act Rule 13b2-1.

## FIFTH CLAIM FOR RELIEF

### Aiding and Abetting Fraud

Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]

95.    Paragraphs 1 through 3, 6 through 22, 32 through 37, and 65 through 71 are re-alleged and incorporated by reference.

27

96.    By reason of the foregoing, defendant knowingly and substantially assisted PurchasePro, Homestore, and the company referenced in paragraph 32 in directly or indirectly, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) employing devices, schemes, or artifices to defraud; or (b) making untrue statements of material fact or omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

97.    By reason of the foregoing, defendant aided and abetted violations of, and unless restrained will aid and abet violations of, Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

### REQUEST FOR RELIEF

The Commission respectfully requests that the Court enter an Order:

(i)    Ordering defendant to comply with the Commission's May 15, 2000 order issued in *In the Matter of America Online, Inc.*;

(ii)    Permanently restraining and enjoining defendant from violating Section 17(a) of the Securities Act, Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, and 13b2-1;

(iii)    Permanently restraining and enjoining defendant, its subsidiaries, officers, directors, agents, servants, employees, and attorneys-in-fact, and all persons in active concert or participation with them, from aiding and abetting violations of any of the above-listed securities laws;

28

(iv)    Ordering defendant to disgorge ill-gotten gains, including pre-judgment and

post-judgment interest, resulting from the violations alleged in this Complaint;

(v)    Ordering defendant to retain an independent examiner, not unacceptable to the

Commission's staff, to determine whether defendant's historical accounting

treatment for certain transactions was in conformity with GAAP;

(vi)    Ordering defendant to pay a civil penalty; and

(vii)    Granting such other relief as the Court deems just and appropriate.


Dated:  March 21, 2005

Respectfully submitted,


_____/S/_____
James T. Coffman
Luis R. Mejia (DC Bar No. 417043)
Melissa A. Robertson (DC Bar No. 396384)
Gregory T. Lawrence
Jeffrey B. Finnell (DC Bar No. 441525)
Christopher K. Agbe-Davies (DC Bar No. 473727)
Thomas D. Manganello (DC Bar No. 481335)
Andrew B. Stevens

Attorneys for Plaintiff
Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, DC  20549-0911
(202) 942-4744 (Mejia)
MejiaL@sec.gov



U.S. Securities and Exchange Commission

**U.S. SECURITIES AND EXCHANGE COMMISSION**

**Litigation Release No. 19147 / March 21, 2005**

**Accounting and Auditing Enforcement
Release No. 2216 / March 21, 2005**

**SEC v. Time Warner Inc.,** Civil Action No. 1:05CV00578 (GK)
(D.D.C.)

**In the Matter of James W. Barge, Pascal Desroches, and Wayne H.
Pace,**
**Exchange Act Rel. No. 34-51400 / March 21, 2005**

**Accounting and Auditing Enforcement
Release No. 2215 (March 21, 2005)**

**SEC CHARGES TIME WARNER WITH FRAUD, AIDING AND ABETTING
FRAUDS BY OTHERS, AND VIOLATING A PRIOR CEASE-AND-DESIST
ORDER; CFO, CONTROLLER, AND DEPUTY CONTROLLER CHARGED
WITH CAUSING REPORTING VIOLATIONS**

**Time Warner Agrees to $300 Million Penalty, Antifraud Injunction
and Order to Comply with Prior Cease-and-Desist Order; Will
Restate Its Financial Results and Engage Independent Examiner**

**CFO, Controller and Deputy Controller Consent to Cease-and-Desist
Order**

The Securities and Exchange Commission today charged Time Warner Inc.
(formerly known as AOL Time Warner) with materially overstating online
advertising revenue and the number of its Internet subscribers, and with
aiding and abetting three other securities frauds. The Commission also
charged that the company violated a Commission cease-and-desist order
issued against America Online, Inc. on May 15, 2000. In a separate
administrative proceeding, the Commission charged Time Warner CFO
Wayne H. Pace, Controller James W. Barge, and Deputy Controller Pascal
Desroches with causing violations of the reporting provisions of the federal
securities laws.

Without admitting or denying the allegations in the complaint, Time Warner
consented to the entry of a judgment ordering it to comply with the May
15, 2000 cease-and-desist order against AOL and enjoining Time Warner
from violating Section 17(a) of the Securities Act of 1933, Sections 10(b),
13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Securities Exchange Act of 1934
("Exchange Act"), and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11,
13a-13, and 13b2-1. The judgment also orders Time Warner to pay $300
million in civil penalties, which the Commission will request be distributed
to harmed investors. The penalties cannot be used to offset any judgment
or settlement in any related shareholder suit. In addition, Time Warner
agreed to restate its historical financial results to reduce its reported online

advertising revenues by approximately $500 million (in addition to the $190 million already restated) for the fourth quarter of 2000 through 2002 and to properly reflect the consolidation of AOL Europe in the company's 2000 and 2001 financial statements. The company also agreed to engage an independent examiner to determine whether the company's historical accounting for certain transactions was in conformity with generally accepted accounting principles (GAAP).

In the separate administrative action, Pace, Barge, and Desroches consented, without admitting or denying the allegations, to the entry of an administrative order that finds that they caused reporting violations by the company based on their roles in accounting for $400 million paid to the company by Bertelsmann AG in two sets of transaction. The order directs them to cease-and-desist from causing any violations and any future violations of Section 13(a) of the Exchange Act and Exchange Act Rules 13a-1 and 13a-13.

The Commission's complaint against Time Warner, which was filed in the United States District Court for the District of Columbia, includes the following allegations:

**Fraudulent Round-Trip Transactions to Inflate Online Advertising Revenue**

Beginning in mid-2000, stock prices of Internet-related businesses declined precipitously as, among other things, sales of online advertising declined and the rate of growth of new online subscriptions started to flatten. Beginning at this time, and extending through 2002, the company employed fraudulent round-trip transactions that boosted its online advertising revenue to mask the fact that it also experienced a business slow-down. The round-trip transactions ranged in complexity and sophistication, but in each instance the company effectively funded its own online advertising revenue by giving the counterparties the means to pay for advertising that they would not otherwise have purchased. To conceal the true nature of the transactions, the company typically structured and documented round-trips as if they were two or more separate, bona fide transactions, conducted at arm's length and reflecting each party's independent business purpose. The company delivered mostly untargeted, less desirable, remnant online advertising to the round-trip advertisers, and the round-trip advertisers often had little or no ability to control the quantity, quality, and sometimes even the content of the online advertising they received. Because the round-trip customers effectively were paying for the online advertising with the company's funds, the customers seldom, if ever, complained.

**Aiding and Abetting Frauds**

Several of the counterparties to the round-trip transactions were publicly traded companies. Three of these counterparties-Homestore, Inc., PurchasePro.com, Inc., and a California software company- improperly recognized revenue on the round-trip transactions and reported materially misstated financial results to their own investors.

As a consequence, the company aided and abetted the frauds of three public companies.

**Fraudulent Use of Bulk Sales to Inflate the Number of AOL Subscribers**

The company artificially inflated the number of AOL subscribers in the second, third, and fourth quarters of 2001 so it could report to the investment community that it had met its new subscriber targets, an important metric the market used to evaluate AOL (both before and after its merger with Time Warner). Specifically, the company counted members from "bulk subscription sales" to corporate customers (for distribution to their employees) when the company knew that the memberships had not, and mostly would not, be activated. In at least one instance, the company entered into round-trip arrangements to fund the corporate customers' purchases of bulk subscriptions. Additionally, in last-minute efforts to meet the quarterly targets, the company on at least four occasions shipped non-conforming bulk subscription membership kits to the customers prior to quarter-end with the understanding that it would turn around and replace them at a later date with conforming kits, but it nonetheless counted new subscribers from these sales as of the quarter-end.

### Failure to Consolidate AOL Europe

From March 2000 through January 2002, the company failed to properly consolidate the financial results of AOL Europe in its financial statements. AOL Europe was originally a 50/50 joint venture between AOL and Bertelsmann. In March 2000, AOL entered into a contingent purchase agreement relating to Bertelsmann's interest in AOL Europe. The agreement gave AOL broad and direct powers enabling it to control the operations and assets of AOL Europe. In fact, AOL informed the European Commission (in the context of satisfying EC merger regulations) that Bertelsmann relinquished essentially all control regarding the operations or management of AOL Europe. GAAP requires consolidation when one entity has a controlling financial interest in another entity. The company's failure to properly consolidate AOL Europe resulted in material misstatements of its financial results, including overstatements of operating income and free cash flow in 2000 and 2001, overstatements of net income in 2000, understatements of net losses in 2001, and understatements of total debt in 2000 and 2001.

### Violations of the Commission's Cease-and-Desist Order

The Commission issued a cease-and-desist order against AOL on May 15, 2000 because AOL violated reporting and books-and-records provisions of the federal securities laws. Thereafter, the company violated the cease-and-desist order by artificially inflating its online advertising revenue and the number of AOL subscribers, as well as its failure to consolidate AOL Europe's financial statements.

* * * *

### Commission's Order Against Pace, Barge, and Desroches

The Commission's cease-and-desist order against Pace, Barge, and Desroches addresses their roles in accounting for transactions with Bertelsmann. In 2001 and 2002, the company inflated its online advertising revenue by $400 million in connection with transactions with Bertelsmann. In substance, Bertelsmann paid $400 million as consideration for amendments to the multi-billion-dollar contingent purchase agreement governing the company's purchase of Bertelsmann's interest in AOL Europe. The contract amendments had substantial value, and Bertelsmann offered to compensate the company for the amendments. Rather than accept cash in exchange for the amendments, however, the company requested that

Bertelsmann purchase advertising in the aggregate amount of $400 million. The company then improperly and materially inflated its online advertising revenues by recognizing the $400 million as advertising revenue rather than as consideration received for amending the AOL Europe purchase agreement.

Pace, Barge, and Desroches were corporate-level finance and accounting executives at the company who were responsible for, among other things, reviewing and approving the accounting treatment recommended by the company's business units. In this role, they approved the company's accounting for the $400 million as advertising revenue. In doing so, they based their accounting decisions on the form of the transactions and oral and written representations, some of which were false and omitted material facts, by other company employees. They failed to pursue facts and circumstances that evidenced the true economic substance of the transactions. As a result, although others were responsible for negotiating the $400 million transactions, Pace, Barge, and Desroches each were a cause of the company's improperly accounting for the $400 million in annual and periodic reports filed with the Commission.

* * * *

The Commission's investigation into these matters continues.

➤ SEC Complaint in this matter

*http://www.sec.gov/litigation/litreleases/lr19147.htm*

---

Home | Previous Page                                      Modified: 03/21/2005

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

> Plaintiff,

v.

JOHN MICHAEL KELLY, STEVEN E.
RINDNER, JOSEPH A. RIPP, and
MARK WOVSANIKER,

> Defendants.

---

08 Civ. 4612-SWK
(ECF Case)

# EXHIBIT 5

### DECLARATION OF ADA FERNANDEZ JOHNSON
### IN SUPPORT OF DEFENDANT J. MICHAEL KELLY'S
### MOTION TO DISMISS



SUN MICROSYSTEMS, INC.
SERVICE PROVIDER AGREEMENT

This "AGREEMENT" is effective on November 1, 1998, by and between Sun Microsystems, Inc., ("Sun"), having a place of business at 901 San Antonio Road, Palo Alto, California 94303 and America Online, Inc. ("AOL") having a place of business at 22000 AOL Way, Dulles, Virginia 20166. The General Commercial Terms that govern the relationship between Sun and AOL follow in Section 1. Generally applicable legal terms are contained in Section 2.

## SECTION 1:  GENERAL COMMERCIAL TERMS

### 1.1 DEFINITIONS

(A) "EQUIPMENT" means the hardware components (may also be referred to as "hardware") of Products and includes the media on which Software is loaded.

(B) "Sun Products" or "Product(s)" means the Sun computer hardware products sold to AOL and the software products licensed to AOL under this Agreement.

(C) "SOFTWARE" means the software program components of Products in machine-readable form and related documentation.

(D) "AOL" includes all entities in which AOL directly or indirectly owns more than 50% of the voting securities together with all other entities of which AOL directly or indirectly owns at least 19.9% of the voting securities and which operate an on-line service utilizing an AOL-owned brand; provided that any such entities agree in writing to be bound by the terms of this Agreement.

(E) "AOL Services" includes integrated, end-to-end electronic commerce and extended communities and communication services.

1.2 SCOPE.  This Agreement governs AOL's authorization to purchase certain Sun Products directly from Sun for internal use by AOL. Authorized AOL buying locations are set out in Exhibit A; provided that AOL may add buying locations upon written notice to Sun. AOL may not resell Sun Products pursuant to this Agreement. AOL may apply to become a Sun Authorized Value Added Reseller and Sun will in good faith negotiate terms for an Agreement on a most favored reseller basis. The parties Agreement entitled "Strategic Alliance and End User Discount Agreement" dated September 24, 1997 is hereby immediately terminated; however, this termination shall not affect any Sun Enterprise Services obligations set forth therein, all of which will survive in accordance with the terms set forth therein.

9AOL010003
CONFIDENTIAL TREATMENT
REQUESTED

1.3  PURCHASE COMMITMENTS.

(A)  AOL commits to purchase Sun Products so that "net revenue" to Sun (applicable list price of Sun Products minus the discount provided herein) is as follows:

For November 1, 1998 until June 30, 2000: $100 Million (the "First Period");

July 1, 2000 until June 30, 2001: $100 Million (the "Second Period"); and,

July 1, 2001 until June 30, 2002: $100 Million (the "Third Period").

(B)  If AOL fails to purchase the amount of the commitments for any Period set forth in Section 1.3(A), AOL shall pay Sun "Liquidated Damages," as Sun's sole and exclusive remedy for AOL's failure to meet its commitments under Section 1.3(A) as follows:

1)  For the First Period, the Liquidated Damages shall be forty percent (40%) of the shortfall of the amounts committed in the First Period under Section 1.3(A);

2)  For the Second and Third Periods, the Liquidated Damages shall be ten percent (10%) of the first 20 Million Dollars ($20,000,000) of the shortfall of the amounts committed in the Second and Third Periods under Section 1.3(A) and forty percent (40%) of any remaining portion of the shortfall.

For any Sun Product purchases in any Period in excess of the minimum amount required for such Period, such excess can be carried forward and applied to the minimums required in the next Period. At AOL's request, AOL may apply any Liquidated Damages assessed and paid as a credit against fifty percent (50%) of any amounts purchased in excess of the commitments required under any remaining Period under Section 1.3(A). If this Agreement is extended pursuant to Section 1.15(A), then AOL purchases of Sun Products in excess of the commitments of Period Three may be applied against the Sun Product purchase commitments of all such extensions. Sun Product purchased by AOL from Sun authorized resellers will be applied against the minimum commitments for each or any Period provided AOL submits written notification to Sun of such purchases and Sun confirms the purchases. Purchases made by AOL in November 1998 are governed by the terms of this Agreement.

1.4  ACCOUNT PLAN.  AOL will submit Account Plans to Sun. The initial Account Plan will be submitted in February 1999; Account Plans shall thereafter be submitted annually, commencing July of 1999. The initial Account Plan will cover the remainder of the year ending June 1999. Each further Account Plan will cover the then applicable Commitment Period identified in Section 1.3 or any extension period pursuant to Section 1.15. The Account Plan shall set forth procurements planned for the applicable Period. The Account Plan will state AOL's understandings and intentions, but will have no other binding effect.

1.5  SUN DEVELOPMENT FUND.

Sun agrees to invest Ten Million Dollars ($10,000,000) in the development of Sun's systems and Java platforms on features and enhancements (including client-side) in each of the following periods:

(i)  from November 1, 1998 until December 31, 1999;

9AOL010004
CONFIDENTIAL TREATMENT
REQUESTED

   (ii)   calendar year 2000, and

   (iii)  calendar year 2001

Sun will expend these funds pursuant to the "Joint Development Agreement" being entered by the parties concurrently herewith. In the event the Joint Development Agreement between the parties is terminated, AOL will be entitled to a credit equal to thirty percent (30%) of any of the unused funds specified herein which credit may be applied against purchases of Sun Products.

## 1.6  SALES AND SERVICE SUPPORT.

In consideration of the purchase commitments as identified in Section 1.3, Sun commits to provide service maintenance pricing as follows:

(A)  **For Products Purchased and Installed in the continental United States.**  For the first One Hundred Million Dollars ($100,000,000) of aggregate purchases of Sun Products purchased by AOL under the Agreement for its internal use (the "Initial Installed Base") the maintenance fee will be 3% per annum on Products. The maintenance fee will only increase for additional purchases as follows:

   (i) for AOL purchases that result in an installed base of up to 500 systems beyond the Initial Installed Base (for AOL's internal use), there will be no additional maintenance fee;

   (ii) when AOL has an installed base of more than 500 systems beyond the Initial Installed Base, the maintenance fee will be increased by the rate of $350,000 per annum.

   (iii) the maintenance fee will be thereafter be increased by the additional rate of $350,000 per annum for each additional 500 systems in the Installed Base (i.e., at 1001, 1501, 2001 systems, etc.) beyond the Initial Installed Base. For each and every $350,000 per annum increase in the maintenance fee, Sun will place one additional full-time, dedicated support person on-site at AOL and shall increase the on-site spares to the appropriate levels. For purposes hereof, the "Installed Base" hereunder will mean systems purchased and installed hereunder, less systems taken out of service by AOL.

(B)  **For Products Purchased and Installed outside the continental United States.**  For Sun Products purchased and installed outside of the continental United States, AOL, at its option, may receive maintenance and Service Support for such Products either by:

   1) Entering a maintenance contract with Sun, at the Platinum Level (as defined herein)   where available, and paying Sun five percent (5%) of the applicable list price of the Sun Products; or

   2) Agreeing to pay Sun for a full-time, dedicated support person on-site at AOL at a rate of $350,000 per year plus the local published uplift. AOL will provide Sun with prior notice as to each of the locations where it will require service on Sun Products.

(C)  Sun's obligations to provide sales, services and maintenance support hereunder shall terminate upon the termination or expiration of this Agreement, whichever is sooner. However, if AOL desires to continue service on Sun Product purchased hereunder upon the earlier of the termination or expiration of this Agreement, then Sun will continue to provide support on the terms and conditions hereof, including fees, subject to modifications of fees to reflect cost increases to Sun of applicable labor and parts, for a period of up to four (4) years following termination.

(D)  The maintenance provided hereunder will be Sun's Platinum level of support (as the terms of that offering, which are not inconsistent with the terms of this section, are set forth in the offering attachment hereto). In furtherance of this commitment, Sun shall deploy its Mission Critical

9AOL010005
CONFIDENTIAL TREATMENT
REQUESTED

Readiness Team (MCRT); such support includes Platinum level service plus AOL-dedicated personnel in Sun's Customer Care Center, 24 x 7 x 365 escalations and on-site spares. At least 8 dedicated support personnel will initially be provided, some of which will be on-site at AOL (as mutually determined by AOL and Sun ), with appropriate increases as provided herein and by Sun's highest level policies.

(E)    Upon AOL's reasonable request, Sun agrees to replace Sun system parts with AOL-owned third-party "Sun Certified Parts" and further install such "Sun Certified Parts" in Sun systems purchased hereunder and, within a reasonable proximity of the original system, reinstall the removed Sun parts in other Sun systems purchased by AOL hereunder. In the event that AOL-owned "Sun Certified Parts" do not resolve a specific identified repair issue, then AOL agrees to purchase from Sun the appropriate parts. Installation will be included as part of all sales, as part of the maintenance fee.

(F)    AOL may use SPDF funds (as provided for in section 1.9 below) toward payment on Sun Enterprise Services training classes and training services. If AOL cannot or chooses not to so utilize SPDF, or has exhausted all SPDF, Sun grants AOL a twenty-five percent (25%) discount off the Sun Enterprise Services Price List for published training and educational offerings. The discount set forth above is in addition to free classes (i.e., product release and orientation classes) offered by Sun which will be made available to AOL.

1.7  CORPORATE EXECUTIVE MEETINGS.    So that Sun may provide the systems and products and services required by AOL, the parties agree to meet as often as needed by mutual consent, to discuss and recommend methodologies and processes (including any application re-engineering, timing requirements, life-cycle costs, and target cost-performance goals). In addition, AOL shall maintain and provide to Sun a standing requirements list, in priority order, of features requested by AOL. This list, with status, shall be reviewed at each meeting.

1.8  PRICES AND DISCOUNTS.

(A)    Prices and license fees for Products will be based on the appropriate Sun Computer Systems Division ("CSD") Worldwide Price List consisting of four geographic price lists that will be used for all purchases of Sun Products. The appropriate Price List will be determined by the "Country of Final Destination." Each Country of Final Destination is covered by one of these price lists, as specified in the Country Price List Table incorporated in the Worldwide Price List Book.

(B)    AOL's net price for Products or spare parts purchased and licensed under this Agreement shall be the Sun applicable Worldwide List Price at the time AOL's order is accepted, less a discount of forty percent (40%) on Category A Products, twenty-eight percent (28%) on Category B Products and fifteen percent (15%) on Category H Products.

(C)    AOL is authorized to purchase "Development Equipment" consisting of Sun Products priced pursuant to the applicable Worldwide Price List at the time the order is accepted less a discount of forty five percent (45%) on Category A Products, twenty eight percent (28%) on Category B Products and fifteen (15%) on Category H Products. AOL is required to inform Sun in writing as to the specific development project for which the Development Equipment is to be used pursuant to procedures to be agreed upon by the parties.

(D)    Discounts provided herein will not apply to those Products which are listed as "non-discountable" in the appropriate price list, nor may they be applied to exceed any listed maximum

9AOL010006
CONFIDENTIAL TREATMENT
REQUESTED

discount. Such discounts will apply towards purchases of discountable spare parts, but such discounts will not apply to purchases of training, installation (except where included in the purchase price of the Products), consulting, repairs, maintenance work or similar services and source code license fees. Price lists are subject to change at any time.

(E) If AOL believes that the price for any Sun Product hereunder is higher than that available to AOL for similar products from any Qualified Vendor (as defined below) when performance differentials are taken into account and AOL nevertheless purchases the Sun Product, then Sun, subject to the existence of a price differential, will either reduce the price hereunder to eliminate the difference or provide to AOL, at no cost to AOL, a sufficient amount of new Sun Products (the "Credit Products") to equalize the difference. As a condition of the price reduction or the provision of Credit Products, AOL must provide Sun with specific written description and substantiation of the identified price/performance differentials (including product quotations and performance benchmarks) to enable Sun to assess the identified differential and, a differential exists, then Sun will reduce the applicable price or equalize the difference as provided herein. If, within six (6) months after any such Credit Products are provided, Sun either reduces the price on the applicable products to AOL so as to eliminate the difference or improves performance or supplies upgraded products to AOL to eliminate the difference, then Sun may invoice AOL for the Credit Products at the effective prices hereunder as of the invoice date. "Qualified Vendor" means any vendor who has provided at least ten percent (10%) of AOL's hardware requirements for the applicable product in any year or who is then capable of bidding to provide at least ten (10%) percent of such hardware requirements for the current year. In the event that any information required by Sun for substantiation hereunder is the confidential information of a third party, then the parties will attempt to implement reasonable methods for providing such substantiation without violating the confidentiality obligations of AOL, including, at AOL's expense, engaging a mutually acceptable third party, such as a major accounting firm, to validate the substantiation.

(F) Sun agrees to grant AOL most favored customer status, such that no other commercial customer providing services similar to AOL Services (excluding government, education, non-profit customers and resellers to these customers) shall receive better pricing, terms and conditions on an overall basis taking into account all benefits, terms and conditions on an overall basis accruing to AOL under this Agreement.

(G) In the event that Sun reduces its list price on any Sun Product, such reduced list price will be utilized for calculating prices on all of such Sun Products purchased by AOL within sixty (60) days prior to such price reduction. AOL will receive a credit for the price reduction which may be utilized for purchase of Sun Products including for payments of invoices of any affected product.

## 1.9 SERVICE PROVIDER DEVELOPMENT FUND ("SPDF"). This section governs AOL accrual, use, and reimbursement of SPDF.

(A) AOL will receive SPDF at a rate equal to two percent (2%) of its net direct purchase of Sun Products.

Sun Confidential Information
AOL Agreement
NO. 169        P. 6/29        5        23 November, 1994 / BMGV/wlp
NOV. 23. 1998  10:35PM  059  788-8396

9AOL010007
CONFIDENTIAL TREATMENT
REQUESTED

(B)  SPDF shall be utilized by AOL as follows:

      50%  of SPDF on SMI technology, training, services

      50%  of SPDF on Marketing Initiatives.  SPDF may be utilized for all marketing
          undertaken by AOL under the Strategic Development and Marketing Agreement
          being entered into by the parties concurrently herewith.

(C)  The policies and procedures governing the AOL's reporting, use and reimbursement of
     SPDP are set forth on the web site (URL to be determined).

(D)  AOL agrees to pay all such taxes as required.

(E)  All claims for reimbursement must be received by the designated co-op agency within  6
     months from the accrual date.  Any funds not claimed during this time period will be
     forfeited to Sun.  AOL shall be advised in writing of unused funds at least thirty (30) days
     prior to the  forfeiture date.

(F)  Sun shall not be responsible in any way for the acts, errors, or omissions of the designated
     co-op agency.

1.10  **SALES INFLUENCE PROGRAM.**    AOL shall receive influence credit pursuant to the Sun
Sales Influence Agreement attached hereto when:

      (i) AOL actually influences a sale of Sun Products to customers who have not purchased
      Sun Products in the twelve (12) months preceding the sale, and

      (ii) as provided in Section 12 thereof.

1.11  **PAYMENT TERMS.**    Prices and fees for Sun Products and services are exclusive of all
shipping and insurance charges, and do not include sales tax or any other tax based upon the value
of Products, services and/or Software.  AOL is responsible for payment of all such charges and
taxes.  AOL agrees to pay any fees within 30 days from the date of invoice or shipment, whichever
is later.  Sun reserves the right in its reasonable commercial judgment to place AOL on credit
hold, in which event Sun will promptly inform AOL and may, a) with respect to Product
purchases, delay or reschedule AOL orders, and b) with respect to Services,  discontinue the
delivery of Services upon  30 days' notice to AOL if payment has not been received.  Interest will
accrue from the date on which payment is due at the lesser of 15% per annum or the maximum rate
permitted by applicable law.  AOL will not be required to pay the disputed portion of any invoice,
pending resolution of that dispute, provided that Notice of the dispute has been forwarded to Sun in
writing within 15 days of the date of the invoice.

1.12  **ORDERS AND DELIVERY.**  AOL may submit written Product orders to Sun at any time.
However, acceptance of AOL's Product orders will only be effective upon issuance of  Sun's
order acknowledgment form.  Sun will use reasonable efforts to meet the delivery date(s) identified
on the acknowledgment form.  If AOL places a purchase order with Sun and Sun cannot deliver
Sun Products within the greater of the Sun  published lead time or eight (8) weeks, and AOL
cancels the order, reorders non-Sun computer equipment of comparable functionality to the Sun
Products ordered and provides Sun with documentation evidencing the alternative purchase,  then
Sun will credit against the applicable yearly commitment identified in Section 1.3, the net amount

6

9AOL010008
CONFIDENTIAL TREATMENT
REQUESTED

of the cancelled order. Unless otherwise specified on AOL's order, Sun may not make partial deliveries or invoice each partial delivery. Such deliveries will not relieve AOL of its obligation to accept other parts of its order. Title to Equipment, and risk of loss of or damage to Products, will pass to AOL upon shipment by Sun, Ex Works Sun's product delivery center. For purposes of AOL's payment obligations hereunder, products will be deemed accepted upon receipt by AOL. Sun's product offerings are continually evolving. Accordingly, Sun reserves the right to make product substitutions and modifications that do not cause a material adverse effect in product performance.

**1.13 RESCHEDULING, RECONFIGURATION, AND CANCELLATION CHARGES.** AOL may reschedule, reconfigure, refuse or cancel the whole or part of any Product order once, at no charge, provided the written request to do so is received by Sun at least sixty (60) days prior to the scheduled delivery date and, in the case of rescheduling or reconfiguration, the requested delivery date is within sixty (60) days of the original delivery date. If an order for a Product is rescheduled, reconfigured, refused, or cancelled at AOL's request on any other basis, or if Sun reschedules the Product order because AOL fails to meet an obligation under this Agreement, then Sun may, upon written notice to AOL and reasonable opportunity for AOL to cure, charge AOL a restocking fee equal to ten percent (10%) of the applicable list price of the rescheduled, refused, reconfigured or cancelled portion of the order.

**1.14 PRODUCT UPGRADES.** The list price of Product upgrades is based upon the return to Sun of specified parts from system(s) being upgraded, as identified in the applicable End User Price List. If Sun does not receive the specified parts within forty-five (45) days of upgrade delivery to AOL, Sun will invoice AOL for the non-returned parts. AOL agrees to pay Sun for such non-returned parts the difference between the list price of the purchased upgrade(s) and the list price of the upgraded system(s) if purchased new.

**1.15 TERM AND TERMINATION**

(A) Term.

This Agreement shall commence on November 1, 1998 and shall remain in force until and through June 30, 2002. Upon written request from AOL, this Agreement will be extended for up to three (3) years, in separate one year increments, if AOL commits to purchase 100 Million in Sun Products during each year this Agreement is extended.

(B) Termination.

(1) This Agreement may be terminated by either party, by notice, if the other party fails to cure any material remediable breach of this Agreement within ninety (90) days of receipt of Notice of such breach.

(2) If Sun terminates the "Strategic Development and Marketing Agreement" as a result of the change of control of AOL as provided in the Strategic Development and Marketing Agreement, then Sun may immediately terminate this Agreement upon Notice.

9AOL010009
CONFIDENTIAL TREATMENT
REQUESTED

(3)    If AOL terminates the "Strategic Development and Marketing Agreement" as a result of the change of control of Sun as provided in the Strategic Development and Marketing Agreement, then AOL may immediately terminate this Agreement upon Notice.

(C)  Effect of Termination.

(1)  Upon any termination or expiration of this Agreement, AOL shall no longer be authorized to purchase Sun Products. In the event of termination for cause, Sun will not be obligated to accept any AOL orders that have not been previously accepted.

(2)  Rights and obligations under this Agreement which by their nature should survive, will remain in effect after termination or expiration hereof. Neither party shall be liable to the other for damages of any kind, on account of the termination or expiration of this Agreement in accordance with its terms and conditions.

(D)  Netscape Closing.

In the event the currently contemplated merger between AOL and Netscape does not close, then:

(1)  Section 1.3(B) shall be amended such that AOL's commitments for the First, Second and Third Periods shall be 30 Million Dollars ($30,000,000) for each Period so that the total commitments over the three Periods shall be 90 Million Dollars ($90,000,000). In such event, Liquidated Damages for each Period shall in all instances be based upon forty percent (40%) of any shortfall below the revised commitment provided in this Section 1.15(D) (1). Section 12 of the Sales Referral Agreement attached hereto will be nullified.

(2)  In the event that both the contemplated merger between AOL and Netscape does not close and the Joint Development Agreement is terminated, then AOL will have the option to eliminate any further Liquidated Damages for failure to meet the revised commitments under Section 1.15(D)(1) and AOL will be entitled to the credit for the unused finds specified in Section 1.5.

(3)  In the event that AOL exercises the option set forth in Section 1.15 (D)(2), the provisions of Section 1.8 (F) will be  nullified and the provisions of Section 1.8 will be renegotiated.

## 1.16  BINARY CODE LICENSE

(A)  **Grant and Restrictions:** As set forth in Exhibit B (Binary Code License), AOL is granted a non-exclusive and non-transferable license ("License") for the use of Software provided with Product in machine-readable form and accompanying documentation, by the number of users for which the applicable fee has been paid. Transfer of the License shall be pursuant to Exhibit C. Software is copyrighted and title to all copies is retained by Sun, its licensors or both. AOL will not make copies of Software or accompanying documentation, other than a  reasonable number of copies of Software for archival purposes and, if applicable, AOL may, for its internal use only, print the number of copies of on-line documentation for which the applicable fee has been paid, in which event all proprietary rights notices on Software will be reproduced

62/9˙d    691˙ON                                                    9688-982 059    WdSS:01  8661 ˙EZ˙ΛON

9AOL010010
CONFIDENTIAL TREATMENT
REQUESTED

and applied. AOL will not modify, decompile, disassemble, decrypt, extract or otherwise reverse engineer Software.

(B) **License to Develop:** In the event that AOL desires to develop software programs which incorporate portions of Software ("Developed Programs"), the following provisions apply, to the extent applicable: Developed Programs are to have an application programming interface that is the same as that of Software; fonts within such Software will remain associated with their toolkit or server; Developed Programs may be used and distributed, but only on computer equipment licensed to utilize Solaris operating system software, unless an additional Developer's License Agreement has been executed by Sun and AOL; AOL is not licensed to develop printing applications or print, unless AOL has secured a valid printing license; incorporation of portions of Motif® in Developed Programs may require reporting of copies of Developed Programs to Sun; and AOL agrees to indemnify, hold harmless and defend Sun from and against any losses, expenses, claims or suits, including attorney's fees, which arise or result from distribution or use of Developed Programs, to the extent that such claims or suits arise from the development performed by AOL.

(C) **Confidential Information:** Software is confidential and proprietary information of Sun, its licensors, or both. AOL agrees to take reasonable steps to protect Software from unauthorized disclosure or use.

(D) **U.S. Government Restrictions:** If AOL is acquiring Software or accompanying documentation on behalf of the U.S. Government, it will be subject to "Restricted Rights", as that term is defined in the Federal Acquisition Regulations ("FARs") in paragraph 52.227-19(c)(2), or its equivalent paragraph in the DOD Supplement to the FARs or its successor provisions.

(E) **Termination:** The License is effective until terminated. AOL may terminate the License at any time by destroying Software and accompanying documentation and all copies thereof. The License will terminate immediately upon Notice from Sun if AOL fails to comply with the terms of this License Section or the Confidential Information obligations set forth above. Upon termination, AOL will destroy all copies of Software and accompanying documentation.

## 1.17  YEAR 2000 WARRANTY

(A) Sun warrants that specified versions of Products identified on Sun's external Web site (url: www.sun.com/y2000/cpl.html) as being Year 2000 compliant ("Listed Products") will not produce errors in the processing of date data related to the year change from December 31, 1999 to January 1, 2000. Date representation, including leap years, will be accurate when Listed Products are used in accordance with their accompanying documentation, provided that all hardware and software products used in combination with Listed Products properly exchange date data with them.

(B) Specified versions of Products identified on Sun's external Web site as not yet compliant, but which have a compliance date scheduled, will become Listed Products when a remedial patch, update or subsequent release is issued, but in no event later than June 30, 1999. Other Products are not covered by these warranties.

(C) AOL's sole and exclusive remedy for Sun's breach of these warranties will be for Sun: (i) to use commercially reasonable efforts to provide AOL promptly with equivalent Year 2000

9AOL010011
CONFIDENTIAL TREATMENT
REQUESTED

compliant products; or (ii) if (i) is commercially unreasonable, to refund to AOL its net book value for non-compliant Products.

(D) **UNLESS SPECIFIED IN THIS SECTION, ALL EXPRESS OR IMPLIED CONDITIONS, REPRESENTA-TIONS AND WARRANTIES, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, ARE DISCLAIMED, EXCEPT TO THE EXTENT THAT SUCH DISCLAIMERS ARE HELD TO BE LEGALLY INVALID.**

## SECTION 2:  GENERAL TERMS

### 2.1  AOL's OBLIGATIONS

(A) Indemnity and Insurance. Each Party will defend, indemnify, save and hold harmless the other Party and the officers, directors, agents, Affiliates, distributors, franchisees and employees of such other Party from any and all third party claims, demands, liabilities, costs or expenses, including reasonable attorney's fees ("Liabilities resulting from the indemnifying Party's breach of any duty, representation, warranty of this Agreement, except where such Liabilities result from the gross negligence or knowing and willful misconduct of such other Party.  Each Party agrees to (i) promptly notify the other Party in writing of any indemnifiable claim and give the other Party the opportunity to defend or negotiate a settlement of any such claim at such other Party's expense, and (ii) cooperate fully with the other party, at that other Party's expense, in defending or settling such claim.

(B) Fair Representation. AOL shall display, demonstrate and represent Sun Products fairly and shall make no representations concerning Sun or its Sun Products which are false, misleading, or inconsistent with those representations set forth in promotional materials, literature and manuals published and supplied by Sun. AOL shall comply with all applicable laws and regulations in performing under this Agreement.

### 2.2  LIMITATION OF LIABILITY.   Except for obligations under the Section entitled "Aircraft Product and Nuclear Applications," any applicable software license, and any damages caused by gross negligence, and to the extent not prohibited by applicable law:

(A) Each party's aggregate liability to the other for claims relating to this Agreement, whether for breach or in tort, shall be limited to the amount paid by AOL for Product which is the subject matter of the claims.

(B) Neither party be liable for any indirect, punitive, special, incidental or consequential damages in connection with or arising out of this Agreement (including loss of business, revenue, profits, use, data, or other economic advantage), however it arises, whether for breach or in tort, even if that party has been previously advised of the possibility of such damage.

(C) If a court concludes or the parties agree that an exclusive remedy provided for in this Agreement fails of its essential purpose, then Sun will have no liability for damages for the breach or nonperformance of the Section(s) covered by the exclusive remedy.

### 2.3  PRODUCT WARRANTY.   Product warranties may vary depending on the type of Sun Products purchased.  Applicable terms and conditions are as set out in the then current Sun applicable End

9AOL010012
CONFIDENTIAL TREATMENT
REQUESTED

Price List. Software provided with Product is warranted to conform to published specifications for a period of ninety (90) days from the date of delivery. Sun does not warrant that; (i) operation of any such Software will be uninterrupted or error free; or (ii) functions contained in such Software will operate in combinations which may be selected for use by the licensee or meet the licensee's requirements. These warranties extend only to AOL as an original purchaser. Sun reserves the right to change these warranties at any time upon notice and without liability to AOL or third parties.

(A) **Limitation of Liability under Warranty:** AOL's exclusive remedy and Sun's entire liability under these warranties will be: (i) with respect to Equipment, repair or at Sun's option, replacement; and (ii) with respect to Software, using reasonable efforts to correct such Software as soon as practicable after AOL has notified Sun of such Software's nonconformance. If such repair, replacement or correction is not reasonably achievable, Sun will refund the purchase price/license fee.

(B) **No Warranty:** No warranty will apply to: (i) any and all Software customization, such Software is provided "AS IS", and "WITH ALL FAULTS"; or (ii) any Product that is modified without Sun's written consent or which has been misused, altered, repaired or used with Equipment or software not supplied or expressly approved by Sun.

2.4   **NO OTHER WARRANTIES.**   UNLESS SPECIFIED IN THIS AGREEMENT, ALL EXPRESS OR IMPLIED CONDITIONS, REPRESENTATIONS AND WARRANTIES, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, ARE DISCLAIMED, EXCEPT TO THE EXTENT THAT SUCH DISCLAIMERS ARE HELD TO BE LEGALLY INVALID.

2.5   **CONFIDENTIAL INFORMATION.**   If Sun desires that information provided to AOL under this Agreement be held in confidence, Sun will identify the information as confidential or proprietary. AOL may not disclose Sun's confidential or proprietary information and may use it only for purposes specifically contemplated in this Agreement. Sun will treat tangible business and financial information, including but not limited to, any technical operational, membership or capacity information, of AOL that has been previously identified as confidential, with the same degree of care as it does its own similar information. If either party is regarded by law to disclose or produce confidential information to a third party, then the producing/disclosing party shall (i) notify the other party in a manner to allow the other party to seek appropriate protections from or conditions upon the required disclosure, and (ii) take other reasonable steps to secure confidential status of the confidential information. The foregoing obligations do not apply to information which: (i) is or becomes known by recipient without an obligation to maintain its confidentiality; (ii) is or becomes generally known to the public through no act or omission of recipient, or (iii) is independently developed by recipient without use of confidential or proprietary information. This Section will not affect any other confidential disclosure agreement between the parties.

2.6   **IMPORT AND EXPORT LAWS.**   All Products and technical data delivered under this Agreement are subject to U.S. export control laws and may be subject to export or import regulations in other countries. AOL agrees to comply strictly with all such laws and regulations and acknowledges that it has the responsibility to obtain such licenses to export, re-export or import as may be required after delivery to AOL. AOL agrees that it will not export Products outside the United States for purposes of resale unless AOL has been accepted into Sun's

9AOL010013
CONFIDENTIAL TREATMENT
REQUESTED

Passport Program and has executed a Passport Exhibit to this Agreement. AOL recognizes that under the Passport Program, the prices it pays may be different from those stated in this Agreement, and that purchases made outside the U.S. will be subject to local terms and condition.

2.7 **AIRCRAFT PRODUCT AND NUCLEAR APPLICATIONS.**    Products are not designed or intended for use in on-line control of aircraft, air traffic, aircraft navigation or aircraft communications; or in the design, construction, operation or maintenance of any nuclear facility. Sun disclaims any express or implied warranty of fitness for such uses. AOL represents and warrants that it will not use or resell the Sun Products for such purposes, and that it will use its best efforts to ensure that its customers and end-users of the Sun Products are provided with a copy of the foregoing notice.

2.8 **TRADEMARKS LOGOS AND PRODUCT DESIGNS.**

"Sun Trademarks" means all names, marks, logos, designs, trade dress and other brand designations used by Sun in connection with Products. AOL may refer to Products by the associated Sun Trademarks, provided that such reference is not misleading and complies with the then current *Sun Trademark and Logo Policies*. AOL shall not remove, alter or add to any Sun Trademarks, nor shall it co-logo Product. AOL is granted no right, title or license to, or interest in, any Sun Trademarks. AOL acknowledges Sun's rights in Sun Trademarks and agrees that any use of Sun Trademarks by AOL shall inure to the sole benefit of Sun. AOL agrees not to (i) challenge Sun's ownership or use of, (ii) register, or (iii) infringe any Sun Trademarks, nor shall AOL incorporate any Sun Trademarks into AOL'S trademarks, service marks, company names, internet addresses, domain names, or any other similar designations. If AOL acquires any rights in any Sun Trademarks by operation of law or otherwise, it will immediately at no expense to Sun assign such rights to Sun along with any associated goodwill, applications, and/or registrations.

2.9 **ADDITIONAL GENERAL TERMS**

(A) **Dispute Resolution.** Any action related to this Agreement will be governed by California law, excluding choice of law rules.

(B) **Relationship of the Parties.** This Agreement is not intended to create a relationship such as a partnership, franchise, joint venture, agency or employment relationship. Neither party may act in a manner which expresses or implies a relationship other than that of independent contractor, nor bind the other party.

(C) **Assignment.** Neither party may assign or otherwise transfer any of its rights or obligations under this Agreement, without the prior written consent of the other party, except that Sun may assign its right to payment and may assign this Agreement to an affiliated company.

(D) **Waiver or Delay.** Any express waiver or failure to exercise promptly any right under this Agreement will not create a continuing waiver or any expectation of non-enforcement.

(E) **Force Majeure.** A party is not liable under this Agreement for non-performance caused by Force Majeure events or conditions beyond that party's control if the party makes reasonable efforts to perform. This provision does not relieve AOL of its obligation to make payments then owing.

9AOL010014
CONFIDENTIAL TREATMENT
REQUESTED

(F) **Notices.** All written Notices required by this Agreement must be delivered in person or by means evidenced by a delivery receipt and will be effective upon receipt.

(G) **Execution.** This Agreement shall become binding only after it has been signed by an authorized officer of AOL and an authorized officer of Sun.

(H) **Entire Agreement.**

    (i) This Agreement is the parties' entire agreement relating to subject matter. It supersedes all prior or contemporaneous oral or written communications, proposals, conditions, representations and warranties and prevails over any conflicting or additional terms of any quote, order, acknowledgment, or other communication between the parties relating to its subject matter during the term of this Agreement

    (ii) No modification to this Agreement will be binding unless in writing and signed by an authorized representative of each party.

(I) **Point of Contact.** Both parties agree to appoint and maintain a single person to serve as the point of contact for all day to day communications regarding the performance and implementation of this Agreement (the "Contact Person"). Sun's initial Contact Person is Mike Abramowitz. AOL's initial Contact Person is Terry Laber. A party's Contact Person may be changed upon written notice to the other party.

(J) **Injunctive Relief.** It is understood and agreed upon that, notwithstanding any other provisions of this Agreement, breach of this Agreement by a party may cause irreparable damage for which recovery of money would be inadequate and that either party shall be entitled to timely injunctive relief to protect such party's rights under this Agreement in addition to any and all remedies at law.

(K) **Return Of Information.** Upon the expiration or termination of this Agreement, each party will, upon the written request of the other party, return or destroy (at the option of the party receiving the request) all Confidential Information, documents, manuals and other material specified by the other party.

(L) **Headings.** The paragraph headings appearing in this Agreement are inserted only as a matter of convenience and in no way define, limit, construe, or describe the scope or extent of such paragraph or in any way affect this Agreement.

(M) **Acknowledgment.** The parties hereto each acknowledges that the provisions of this Agreement were negotiated to reflect an informed, voluntary allocation between them of all risks (both known and unknown) associated with the transactions contemplated hereunder. The limitations and disclaimers related to warranties and liabilities contained in this Agreement are intended to limit the circumstances and extent of liability. The provisions of such sections (and this Section) will be enforceable independent and severable from any other enforceable or unenforceable provision of this Agreement.

(N) **Reference Customer.** Sun will be entitled to use AOL as a reference customer and to refer to AOL in any materials in which Sun's clients and customers are mentioned, subject in each case

9AOL010015
CONFIDENTIAL TREATMENT
REQUESTED

to AOL's approval. AOL grants Sun the right to use AOL's name and logos and related other trade marks, trade names and service marks in connection with any such materials.

(O)    **Exhibits.**   The attached Exhibits may be modified only upon the mutual written consent of the parties. The  current version of each Exhibit is hereby incorporated by reference.


Sun and AOL acknowledge that each has read and understood this Agreement and consents to be bound by its terms.  Agreed to this 23rd day of November, 1998.

**SUN MICROSYSTEMS, INC.:**                    **AMERICA ONLINE, INC.:**

By: _W J Radychel_                             By: _Manfred RK_

Name: _W J RADYCHEL_                           Name: _MATT KORN_

Title: _Chief Strategy Officer_                Title: _Senior Vice President, Network Operations_

Date: _11/23/98 PST_                           Date: _11-24-98_

9AOL010016
CONFIDENTIAL TREATMENT
REQUESTED

EXHIBIT A

AOL AUTHORIZED BUYING LOCATIONS

[ TO BE PROVIDED BY AOL ]

9AOL010017
CONFIDENTIAL TREATMENT
REQUESTED

## EXHIBIT B

## END USER BINARY CODE LICENSE

SUN IS WILLING TO LICENSE THE OPERATING SYSTEM SOFTWARE TO YOU ONLY UPON THE CONDITION THAT YOU ACCEPT ALL OF THE TERMS CONTAINED IN THIS LICENSE AGREEMENT. READ THE TERMS AND CONDITIONS OF THIS LICENSE CAREFULLY BEFORE USING THE SOFTWARE. BY USING THE SOFTWARE, YOU AGREE TO THE TERMS AND CONDITIONS OF THIS AGREEMENT. IF YOU ARE NOT WILLING TO BE BOUND BY THIS AGREEMENT, YOU ARE NOT AUTHORIZED TO USE THE OPERATING SYSTEM SOFTWARE.

1.  **License to Use.** Customer is granted a non-exclusive and non-transferable license ("License") for the use of the applicable Solaris®* operating system software in machine-readable form, together with accompanying documentation ("Software"), by the number of users and with the class of computer hardware for which the corresponding fee has been paid.

2.  **License to Develop.** In the event that Customer desires to develop software programs which incorporate portions of Software ("Developed Programs"), the following provisions apply, to the extent applicable: Developed Programs are to have an application programming interface that is the same as that of Software; fonts within Software are to remain associated with their toolkit or server; Developed Programs may be used and distributed, but only on computer equipment licensed to utilize Solaris operating system software, unless an additional Developer's License Agreement has been executed by Sun and Customer; Customer is not licensed to develop printing applications or print, unless Customer has secured a valid printing license; and Customer agrees to indemnify, hold harmless and defend Sun from and against any claims or suits, including attorneys' fees, which arise or result from distribution or use of Developed Programs to the extent such claims or suits arise from the development performed by Customer.

3.  **Restrictions.** Software is copyrighted and title to all copies is retained by Sun and/or its licensors. Customer shall not make copies of Software, other than a single copy of Software for archival purposes and, if applicable, Customer may, for its internal use only, print the number of copies of on-line documentation for which the applicable fee has been paid, in which event all proprietary rights notices on Software shall be reproduced and applied. Except as specifically authorized in Paragraph 2 above, Customer shall not modify, decompile, disassemble, decrypt, extract, or otherwise reverse engineer Software, except to the extent any of the foregoing limitations are unenforceable under applicable law. Software is not designed or licensed for use in on-line control equipment in hazardous environments such as operation of nuclear facilities, aircraft navigation or control, or direct life support machines.

4.  **Confidentiality.** Software is confidential and proprietary information of Sun and/or its licensors. Customer agrees to take adequate steps to protect Software from unauthorized disclosure or use.

5.  **Warranty.** Sun warrants that the media on which Software is furnished will be free of defects in materials and workmanship under normal use for a period of ninety (90) days from the date of purchase, as evidenced by a copy of the receipt. Otherwise, Software is provided "AS IS," without a warranty of any kind. This warranty extends only to Customer as the original licensee. Customer's exclusive remedy and Sun's entire liability under this warranty will be the correction of defects in media or replacement of the media, or, if correction or replacement is not reasonably achievable by Sun, the refund to Customer of the license fee paid, upon return of Software.

6.  **Disclaimer of Warranty.** EXCEPT AS SPECIFIED IN THIS LICENSE AGREEMENT, ALL EXPRESS OR IMPLIED CONDITIONS, REPRESENTATIONS AND WARRANTIES, INCLUDING

23 November, 1998/BMM/wlp

9AOL010018
CONFIDENTIAL TREATMENT
REQUESTED

## EXHIBIT C

## LICENSED SOFTWARE TRANSFER NOTIFICATION/AGREEMENT

TO:     Sun Microsystems, Inc.
        Attn:  Contracts Department, M/S UPAL01-495
        901 San Antonio Road
        Palo Alto, CA 95134

TRANSFER NOTIFICATION:

In connection with the sale of used Sun workstations ("Equipment") Licensee undertakes to notify Sun Microsystems, Inc., of the transfer of certain Licensed Software in conjunction with such sale, to the party herein named below under "Transfer Agreement" ("Transferee"). Licensee warrants that Licensee has not retained any copies of the Licensed Software transferred in conjunction with the sale of used Equipment to Transferee and hereby relinquishes all rights in the Licensed Software previously granted by Sun.

Licensed Software Transferred:          Used Equipment Sold

    Licensed Software:

    Equipment Serial Number:

    a. _____          a. _____

    b. _____          b. _____

    c. _____          c. _____

    d. _____          d. _____


        Signed: _____

        Name: _____

        Title: _____

        Company: _____

        Address: _____

        _____

        _____

        Date: _____

9AOL010020
CONFIDENTIAL TREATMENT
REQUESTED

**TRANSFER AGREEMENT:**

**EXHIBIT C**
**(CONTINUED)**

Transferee herein acknowledges receipt of the Licensed Software in conjunction with the purchase of the Equipment as herein set forth above.

Transferee further agrees to the terms and conditions governing the transfer and use of the Licensed Software as contained in Sun's Binary Code License, attached hereto. The term "LICENSEE" as contained in the Binary Code License shall be deemed to apply to Transferee.

Signed: _____

Name: _____

Title: _____

Company: _____

Address: _____

_____

_____

Date: _____

**9AOL010021**
**CONFIDENTIAL TREATMENT**
**REQUESTED**

ATTACHMENT

SUN PLATINUM SERVICES OFFERING

SunSpectrum℠ Support Program Module describes the specific terms by which Customer purchases SunSpectrum support services from Sun and by which Sun, through its Enterprise Services Division, delivers SunSpectrum support services to Customer. To the extent not inconsistent with the following terms, the provisions of the Service Provider Agreement between Sun and AOL are incorporated by reference. The terms of this Program Module apply to systems listed on a Schedule or Quote ("Schedule") which references this Program Module, and are identified on Sun's then current Enterprise Services Price List for SunSpectrum support ("system(s)"). This Program Module is effective as of the date indicated on the applicable Schedules and continues in effect until the expiration or termination of all Schedules to this Program Module.

1) CUSTOMER REQUIREMENTS:

(A) SUPPORT REQUESTS: Customer may designate certain of its employees as "Contacts" for each eight (8) hour shift during the period in which Telephone Assistance is provided by Sun. Only Contacts may initiate support requests. Each Contact must possess or, at Customer's expense, acquire the necessary expertise and training (as from time to time defined by Sun) to diagnose and resolve system software malfunctions with direction by Sun.

(B) CUSTOMER'S DUTIES: Customer will perform routine system preventative maintenance and cleaning. Prior to requesting support from Sun, Customer must comply with all published operating and troubleshooting procedures for the systems. If such efforts are unsuccessful in eliminating the malfunction, Customer will then promptly notify Sun of the malfunction. Customer must establish and maintain a procedure external to systems for reconstruction of lost or altered files, data, or programs. Customer must provide Sun support personnel with: (a) reasonable and safe access to systems; (b) adequate working space and facilities at the installation site necessary to service systems; and (c) cooperation in maintaining a site activity log. Customer acknowledges that the examination, replacement, and handling of hardware components can be hazardous. Support tasks should only be performed by qualified service personnel with the appropriate technical training and experience to recognize these hazards (e.g., electrostatic discharge) and who observe all protection procedures and precautions. Customer agrees to use qualified service personnel and to employ adequate safety precautions in the performance of its obligations hereunder.

(C) MOVEMENT OF COVERED SYSTEMS: All services will be delivered at the installation site(s) indicated on the Schedule(s) referencing this Program Module. Support of systems moved by Customer to a new installation site is subject to local availability and will be subject to additional fees. If requested by Customer, Sun may supervise any movement of systems in accordance with the terms and conditions of the SunMOVES℠ Program Module. If Sun does not supervise the movement of systems, Sun may require that it inspect and recertify the systems as a condition of continued support of those systems.

(D) REMOTE SUPPORT REQUIREMENTS: To obtain remote services, including without limitation Remote Systems Monitoring and Remote Dial-In Analysis, Customer must procure and maintain a Sun-specified gateway, and Customer is responsible for any costs associated with procuring and maintaining that gateway. Customer will be responsible for all outbound telecommunications charges related to the remote services. If remote services are not permitted or facilitated by Customer, Sun reserves the right to decline to deliver remote services and/or to assess additional charges on Customer for the delivery of services which would otherwise be provided remotely.

2) ADDITIONAL SYSTEMS: Customer may add systems to a Schedule at Sun's then current per system fee, at any time upon notice to Sun, subject to the rights of Sun set forth below in INSPECTIONS. Sun will provide services for systems added to a Schedule for a period coterminous with the term of the Schedule, and Sun shall pro rate the fee for such systems. Customer will receive an add-on Schedule reflecting the additional covered systems and associated additional fee.

9AOL010022
CONFIDENTIAL TREATMENT REQUESTED

3) **PRICES:** Prices for Services hereunder are set forth in the SP Agreement.

4) **INSPECTIONS:** Systems are subject to inspection by Sun prior to the commencement of support, and any for required repairs or updates will be charged to Customer at Sun's current published time and material

5) **LICENSE:** Software updates, version releases and product releases (collectively "enhancement releases"), maintenance releases, patches, and SunSolve.TM knowledge database provided hereunder may only be used, or accessed by, systems listed on a Schedule. Use of software enhancement releases, maintenance releases, and patches is governed by the applicable software license obtained with the original product. On line versions of support databases may only be accessed by Contacts for the sole purpose of diagnosing and resolving problems on systems listed on a Schedule. Use of educational software and videotape products is governed by, and the Customer agrees to be bound by, the license agreement accompanying each individual product.

6) **EXCLUSIONS:** Sun's obligation to provide support services under this Program Module is contingent upon proper use and care of systems. Sun has no obligation to provide support under this Program Module, should such support be required because of: (a) improper use, abuse, accident, or neglect; (b) causes external to the system, such as failure to maintain environmental conditions within the operating range specified by the manufacturer of the systems; or (c) failure to maintain software and systems at Sun-specified minimum configuration or release level. Any support delivered by Sun as a result of such events will be invoiced separately and paid at Sun's then current published time and materials rates. Operating supplies and accessories, such as magnetic tapes and anti-glare coatings on video display monitors, and unsupported options are not covered by this Program Module. Sun will have no obligation to provide support under this Program Module if Customer fails to meet its obligations under Section 10 (Payment Terms) of the Master Terms of Service.

7) **LEVELS OF SUPPORT:**

(A) 7 X 24 **TELEPHONE ASSISTANCE:** Unlimited, toll-free assistance for Sun supported software, hardware, and network problems 24 hours per day, 7 days per week, including Sun holidays.

(B) 7 x 24 **ON-SITE ASSISTANCE:** On-site hardware support assistance 24 hours per day, 7 days per week, including Sun holidays.

(C) **CUSTOMER-DEFINED PRIORITY AND RESPONSE TIME:** When Contact calls for support assistance, Contact will assign a priority rating to the call: URGENT, SERIOUS, or NOT CRITICAL:

  · **URGENT** (system unusable) - Live transfer of service request. Personnel arrive at the installation site within an average of two (2) hours of service request for on-site hardware support assistance.

  · **SERIOUS** (system seriously impaired) - Live transfer of service request. Personnel arrive at the installation site within an average of four (4) hours for on-site hardware support assistance.

  · **NOT CRITICAL** - Live transfer of service request. Personnel arrive at the installation site after an average of one (1) business day or at a later mutually convenient time for on-site hardware support assistance.

(D) **SITE ACTIVITY LOG:** On-site service performed will be recorded in a site activity log.

(E) **REMOTE DIAL-IN ANALYSIS:** Remote examination and diagnosis of systems through the Customer provided gateway.

(F) **REMOTE SYSTEMS MONITORING:** Sun's remote systems monitoring tools will periodically collect data from designated systems of Customer. Customer gives Sun ongoing permission to access the supported system, strictly for the purpose of fulfilling Sun's support responsibilities. Customer agrees to obtain an appropriate gateway per the remote services requirements of Section 1(d) above, and

9AOL010023
CONFIDENTIAL TREATMENT
REQUESTED

this gateway will include a Sun-specified telecommunications line dedicated to remote systems monitoring. Sun reserves the right to limit the use and availability of this feature at any time. The remote systems monitoring tools may be configured for the Customer's requirements.

**(G) SOLARIS ENHANCEMENT RELEASES:** Unless otherwise specified by Sun, Customer will receive periodic delivery of one (1) copy of Solaris enhancement releases.

**(H) PATCHES AND MAINTENANCE RELEASE ACCESS:** Unless otherwise specified by Sun, Customer will receive patches and maintenance releases for Solaris software.

**(I) SUNSOLVE LICENSE:** Customer is granted a license to use SunSolve, subject to the license terms above under LICENSE.

**(J) SUNSOLVE EARLYNOTIFIER SERVICE:** Periodic notice from Sun containing information on newly discovered problems and bugs.

**(K) PERSONAL TECHNICAL ACCOUNT SUPPORT; SERVICE ACCOUNT MANAGEMENT:** Customer account will be assigned to a Sun Account Advocate who will assist Customer in assessing critical support issues and help coordinate Sun's response. The assigned Sun Account Advocate may also provide available information on known bugs, potential system problems, and currently available patches, as well as maintain pertinent account information in Sun's Customer Account Management Database. These services are provided to Customer during Sun's local business hours, excluding Sun holidays.

**(L) ACCOUNT SUPPORT PLAN:** Sun's local customer support management will provide the process for the design of an Account Support Plan for Customer.

**(M) ACCOUNT SUPPORT REVIEW:** Monthly account review of Customer's service activity and requirements if requested by Customer.

**(N) SUN VENDOR INTEGRATION PROGRAM (SunVIP):** Provision of multivendor software problem management; includes coverage for approved ISVs (as may be designated by Sun from time to time) with whom Customer maintains a valid service contract with equivalent hours of coverage and response times.

**(O) SKILLS ASSESSMENT:** Sun will assist Customer annually in evaluating the skills of up to ten (10) of Customer's technical personnel with responsibility for systems administration.

**(P) MISSION CRITICAL SUPPORT TEAMS:** For Customer defined URGENT problems, telephone assistance will be provided by a separate team of experienced Sun personnel. Availability of such personnel may be limited during peak call periods and non-business hours, during which times backup Sun Solution Center engineers will be available to handle service requests.

**(Q) SYSTEM AVAILABILITY GUARANTEE:** For properly configured, maintained and administered systems, Sun will commit to maintain certain levels of System Availability, as defined in Exhibit A, SunSpectrum System Availability Guarantee.

**(R) SOFTWARE RELEASE PLANNING:** Provision of assistance to Customer in evaluating new Solaris releases and Customer's need for migration from any of the following versions of Solaris: Solaris 2.X through the most current version of Solaris. This service is subject to Customer complying with Sun's requests for information and data relevant to providing this service.

**(S) SOFTWARE PATCH MANAGEMENT ASSISTANCE:** Provision of assistance to Customer in evaluating whether patches for selected Sun software products should be applied to Customer's systems. This service is subject to Customer complying with Sun's requests for information and data relevant to providing this service.

9AOL010024
CONFIDENTIAL TREATMENT
REQUESTED

(T) **FIELD CHANGE ORDER ("FCO") MANAGEMENT ASSISTANCE:** Provision of assistance to Customer in evaluating the service impact of Field Change Orders for selected Sun hardware products. This service is subject to Customer complying with Sun's requests for information and data relevant to providing this service.

(U) **INSTALLATION SERVICES:** For systems installed outside the continental United States, Customer's choice of one installation service from among: SunBasic Start$^{SM}$, DeskStart$^{SM}$, Server-Start$^{SM}$, and SPARCstorage$^{TM}$ ArrayStart$^{SM}$. The particular installation service selected by Customer will be listed on a Schedule.

(V) **ADDITIONAL FEE SERVICES:** Subject to an additional per service fee, Customer may purchase the additional services:

· **SUN UNBUNDLED SOFTWARE ENHANCEMENTS:** Periodic delivery of one (1) copy of enhancement releases. Enhancements may not be available for all software products.

· **ADDITIONAL MEDIA AND DOCUMENTATION:** One additional copy of media and documentation for Solaris enhancement releases and/or Sun unbundled software enhancements obtained under this Program Module.

· **ADDITIONAL CONTACTS:** Customer may designate additional Contacts meeting the requirements set forth above under CUSTOMER REQUIREMENTS, SUPPORT REQUESTS.

· **ACCOUNT SUPPORT REVIEW:** Semi-annual account review of Customer's service activity and requirements if requested by Customer.

· **ADDITIONAL MEDIA AND DOCUMENTATION:** One additional copy of media and documentation for Solaris enhancement releases and/or Sun unbundled software enhancements obtained under this Program Module.

**THE PARTIES ARE NOT REQUIRED TO EXECUTE THIS DOCUMENT UNLESS CUSTOMER WISHES TO HAVE A SIGNED PROGRAM MODULE.**

THE PARTIES HAVE READ THIS PROGRAM MODULE AND AGREE TO BE BOUND HEREBY.
THIS PROGRAM MODULE IS EFFECTIVE AS OF _____/_____/_____

SUN MICROSYSTEMS, INC.:

By: _W. Raducher_

Print: _W J RADUCHER_

Title: _Chief Strategy Officer_

CUSTOMER: _America Online Inc_

By: _[signature]_

Print: _Matt Korn_

Title: _SR Vice President, Network Operations_

Sun Confidential Information
AOL Agreement

23

23 November, 1998 / BMM/wlp

NOV. 23. 1998   11:00PM   658 786-8356   NO. 169   P. 24/29

9AOL010025
CONFIDENTIAL TREATMENT
REQUESTED

**ATTACHMENT**
SALES REFERRAL AGREEMENT BETWEEN AMERICA ONLINE, INC.
AND SUN MICROSYSTEMS, INC.

This Agreement is entered into and effective November 1, 1998 by and between America OnLine, Inc. ("AOL") and Sun Microsystems, Inc., (hereinafter referred to as "Sun"). The Service Provider Agreement between Sun and AOL effective November 1, 1998 is incorporated by reference.

1. **TERM**

   The AOL/Sun Sales Referral Program (hereinafter referred to as "SRP") will have the same term as the Service Provider Agreement and will terminate upon termination or expiration of the Service Provider Agreement.

2. **ELIGIBLE PRODUCTS, SERVICES AND SOFTWARE**

   Sun Products listed on the then current United States Computer Systems Division Price List are eligible for the Program fees as specified in this Agreement. (Such Sun Products are hereinafter referenced as "Eligible Products".) This Program is for Sun sales influenced by AOL in the United States. If AOL desires to participate in SRP-type programs outside of the United States, Sun agrees to negotiate those agreements with AOL.

3. **ELIGIBLE SALES/APPLICATION SOLUTIONS**

   Eligible Products sold directly to an end user in the United States by Sun that are a direct result of the sale of Application Solutions (as defined below) shall be considered an "Eligible Sale" under this Agreement. A "sale" under this Agreement shall be considered "Eligible" only if AOL initiates the sales opportunity, recommends Eligible Products to the end user, and drives the sale of the Eligible Products to an end user who has not purchased Sun Products in the past twelve (12) months. Sun will determine, its sole opinion, whether a sale is an Eligible Sale within the meaning of this Agreement.

   "Applications Solutions" means AOL Services deployed in the employment and utilization of technology to solve a specific business problem or develop a business solution. AOL's "Application Solutions" within the meaning of this Agreement are set forth on Exhibit A. Other AOL Services can apply for program eligibility, via written request to Sun. At the written consent of Sun, the additional applications will become eligible for SRP credit through the term of the existing agreement.

   Eligible Sales, as determined by the Sun end user sales representative, shall not include any follow-on sales of Eligible Products to a Sun customer.

4. **FEE SCHEDULE FOR DIRECT SALES**

   AOL's fee for Eligible Sales by Sun shall be three and six tenths percent (3.6%) of the Sun U.S. Computer System's list price for all Eligible Products. The then current list price is defined as of the time of order placement.

5. **PROCESS AND PAYMENT**

   The following sets forth the SRP process, which both parties shall adhere to under this Agreement:

   A. In order to qualify as an "Eligible Sale," AOL will submit to Sun, under an appropriate Non-Disclosure Agreement, a list of "Target Accounts." The Target Account list will identify AOL's customers or potential customers to which AOL will be recommending Eligible Product and potentially making a Request for Eligible Sale (as defined below). AOL will not be eligible for payment under this program for sale of Sun product into accounts that are not on the Target

9AOL010026
CONFIDENTIAL TREATMENT
REQUESTED

Account list. The Target Account list may be amended by AOL upon the consent of Sun; however, for AOL to be eligible for payment hereunder, the new account must be on the eligible list for at least 120 days. Request for amendment to the Target Account list must be in writing to the Sun Contacts identified below and an account will be deemed on the Target Account as of the date of Sun's written confirmation of the amendment of the Target Account List. The Target Account list is Exhibit B to the Agreement.

B. In order to qualify as an "Eligible Sale" AOL will submit to the Sun designee a "Request for Eligible Sale" which will include:

1. the name and location of end user;

2. the sales opportunity identified by AOL;

3. the AOL Application Solution sold to the end user;

4. the Sun Sales Team engaged in the opportunity;

5. a copy of the Agreement between AOL and the end user;

6. a description of how AOL initiated and drove the sale of Sun hardware to the end user.

C. Sun's sales representatives will determine whether the Sun hardware sale qualifies as an "Eligible Sale" and will notify AOL.

D. Sun will make Quarterly payments of SRP Program fees (if any) to AOL within thirty (30) days after the close of each of Sun's fiscal year quarters. Initial start-up of payment process may extend payment by an additional fifteen (15) days for the first one hundred and twenty (120) days after execution of Agreement.

E. In the event that the end user returns Eligible Product for credit for which AOL has previously received a corresponding SRP Program fee, Sun will be reimbursed for such fee unless the cause was a failure of Eligible product to perform according to Sun's specifications. In addition, if the end user fails to make payment for Sun Eligible Products for which AOL has received a corresponding SRP Program fee predominantly caused by a failure of AOL's Applications Solutions, Sun will be reimbursed for such fee.

6. GEOGRAPHIC COVERAGE

The SRP Program will be valid for all Eligible Sales in North America.

7.     Each party is an independent contractor and is free to set its own prices for all products that each party licenses or sells to end user customers for its own accounts.

8. AMERICA ONLINE CONTACTS

Program Administrator: _____
Contract Manager: _____
Product Manager: _____

9. SUN CONTACTS

Sales Manager: _____
Program Administrator: _____

Contract Manager: _____
Product Manager: _____

10.    This Agreement is not exclusive and either party may enter into similar arrangements with one or more third parties.

9AOL010027
CONFIDENTIAL TREATMENT
REQUESTED

11.    A)    The parties may provide one another certain proprietary information under this Agreement, including but not limited to the following: pricing, end user lists and marketing information. The parties shall adhere to the terms and conditions of the GA between the parties herein, as it pertains to such proprietary information hereunder.

B)    Sun shall make the following efforts to ensure that its personnel mark as "Sun Confidential Proprietary" any pricing information and proposal specific configuration specifications provided to AOL hereunder (the "Sensitive Information").

Sun shall prepare a Description/Announcement of this Agreement that generally describes the terms and conditions of the Agreement, including specifically Sun's policy that it mark or label Sensitive Information as "Confidential and Proprietary". This SRP Description/Announcement will be provided in writing: (i) to the Sun U.S. Sales Force within thirty (30) calendar days of the date of execution of this Agreement; (ii) when Sun's Sales Force makes any inquiry regarding the Agreement; and (iii) on a semi-annual basis, to the Sun Sales Force generally.

If Sun complies with the special efforts set forth above and, in spite of such efforts, Sun in good faith and in the normal course of business delivers to AOL Sensitive Information without marking or labeling such information as "Sun Confidential and Proprietary", then AOL will be liable for the unauthorized disclosure of such information if such disclosure is made to a competitor of Sun and is made consciously, deliberately and in bad faith, with the intent of identifying clearly to the competitor that the Sensitive Information belongs to Sun.

12.    Notwithstanding any of the provisions of Sections 2, 3, 4, 5 and 6, Sun will pay AOL a commission of three and six tenths percent (3.6%) of the applicable list price of all Sun Products and Services (excluding any "Software and Associated Services" as defined in the Strategic Development and Marketing Agreement) sold by Sun in connection with any "AOL EC Service Opportunity" as defined in the Strategic Development and Marketing Agreement. Payments will be made pursuant to the first sentence of Section 5(D) of the SRP Agreement. If Payment is made pursuant to this paragraph, then no other payments will be made under this Agreement with respect to such sales.

In the event that the currently contemplated merger between AOL and Netscape closes but subsequently the Strategic Development and Marketing Agreement is terminated due to a breach thereof by AOL, then this Section 12 will be nullified.

In the event that AOL is deemed an agent under applicable law or this program creates by operation of law any further Sun obligations, payments or other responsibilities in addition to those set forth in this Agreement, then AOL waives any such additional claims, responsibilities, payments, penalties or obligations. To the extent these additional payment obligations cannot be waived, Sun is entitled to apply any such payments as a credit against any amounts AOL is entitled to under any agreements or other obligation between Sun and AOL.

Agreed to and accepted, this 23rd day of November, 1998.

SUN MICROSYSTEMS, INC.

By _W. Pedulla_

Name: _W. S RADUCHEL_

Title: _Chief Stutgy Officer_

_11/27/98 PST_

AMERICA ONLINE, INC.

By _Matt Korn_

Name: _MATT KORN_

Title: _SR Vice President, Network Operations_

Date: _11-24-98_

Sun Confidential Information
AOL Agreement

26

*23 November, 1998 / BAOL/wlp*

NOV.23.1998  11:02PM  AOL20:11  650 786-8396  659 786-8396  NO.169  P.27/29

9AOL010028
CONFIDENTIAL TREATMENT
REQUESTED

SALES REFERRAL PROGRAM ("SRP) AGREEMENT

EXHIBIT A

This is Exhibit A as referenced in the foregoing Agreement and sets forth AOL's Applications Solutions. AOL may add or delete from this list in a timely manner. SRP payment shall not be made on the sales of Sun Price listed Products against applications not reviewed and accepted by Sun.

[ TO BE PROVIDED BY AOL ]

9AOL010029
CONFIDENTIAL TREATMENT
REQUESTED

SALES REFERRAL PROGRAM ("SRP) AGREEMENT

EXHIBIT B
TARGET ACCOUNTS

[ TO BE PROVIDED BY AOL ]

9AOL010030
CONFIDENTIAL TREATMENT
REQUESTED

**Company Name:**      SUN
**Type of Agreement:**  Software and License Maintenance Agreement
**Date:**              June 26, 2001

## Vendor Negotiating Team Contacts and Phone Numbers

Mike Kersten, Business Development Manager, Strategic Accounts: office: 770-360-6476; cell: 678-485-9856
Jessica Morello, Enterprise Service Rep: office: 703-208-5845; 703-926-9129

## Deal Overview and Rationale

AOL signed an enterprise agreement with Micromuse in June 2000 that expires June 30, 2001. Micromuse at a bare minimum would charge approximately $443,094 for maintenance renewal alone. Furthermore, Micromuse alleges that AOL must pay a premium for the upcoming version 4 for the Omnibus product. Micromuse estimates that for the quantity of version 4 that AOL would like to purchase, Micromuse would charge AOL in excess of $4 million just for the licenses. Under the SUN deal, SUN will sell a package of version 4 licenses at a pre set price, with discounts in place for additional purchases.

## Key Takeaways

A. **Key Benefits to AOL Time Warner**

- Savings of at least $2.9 million by going with the SUN deal versus entering into an agreement with Micromuse directly based on projected AOL spends for Micromuse products
- Unlike Micromuse, the SUN deal including discounts and licenses apply to all AOL Time Warner
- By doing business with SUN, SUN may apply the purchase towards its commitment level. The purchase is valued at a cost of $316,000, verified per email dated June 28, 2001 sent by Regina Kunkle. SUN will assume responsibility for maintenance issues, and has agreed to broker any concerns with Micromuse

B. **AOL Obligations and Related Risks**

- AOL to issue PO for total amount by June 29, 2001
- SUN could terminate the OEM it has with Micromuse. This risk is minimal. SUN's history of OEMs with other companies such as Veritas and BMC spans over five years. These agreements continue through this year.

C. **External Risks**

- One risk is that Micromuse might fall prey to the bad economy. This risk is mitigated by Micromuse's strong showing on Wall Street.

D. **Other**

1. **Termination Rights:** The termination rights would mirror those granted to AOL under the master SUN agreement.

2. **Renewal and Post Termination Rights:** SUN assured AOL that it will continue to provide Micromuse through 2003 for purchasing discounts and maintenance.

3. **Implementation responsibility and contacts within SUN:**

Mike Kersten, Business Development Manager, Strategic Accounts: office: 770-360-6476; cell: 678-485-9856
Jessica Morello, Enterprise Service Rep: office: 703-208-5845; 703-926-9129

4. **Miscellaneous:**

9AOL010031
CONFIDENTIAL TREATMENT
REQUESTED

AOL Confidential

## Summary of Key Deal Terms

- Licensed Products Include:

| Licensed Software | Designated Computers / Operating Systems |
|---|---|
| • Omnibus Suite (including version 4)<br>• Probe License<br>• Object Server<br>• Compatibility Server<br>• Impact Server<br>• Impact Data Sources<br>• ISMs/ASMs (total 50 of either) | UNIX |

- Agreement includes maintenance and product purchases
- Discount of 37.5% for any additional licenses and/or products not listed for $50k product purchases
- 2 months of SUN consulting services valued at $75,000 list price
- PO to be issued June 29, 2001 for $760,000
- AOL entitled to 24 x 7, 365 support.
- AOL must ensure it receives software binaries by FTP rather than hard media so that it receives intangible property. Receipt as intangible saves AOL 4.5% sales tax.

AOL has spent $1.5 million to date with Micromuse, covering from 1997 through 2000.

## Key Contract Dates

| | |
|---|---|
| Effective date: | 06/29/01 |
| Purchase Order: | 6/29/01 |
| Payment due date: | Pay within 120 days of invoice date |
| Termination date: | Licenses are perpetual, maintenance terminates June 30, 2003 |

2

9AOL010032<br>CONFIDENTIAL TREATMENT<br>REQUESTED



**Sun Professional Services**
**Consulting Services Agreement**

| | | | |
|---|---|---|---|
| Customer: | America Online | Date: | June 28, 2001 |
| Business Address: | 12100 Sunrise Valley Drive Reston, VA 20191-3408 | SIS Number: | SPS 2574 |
| Attention: | Tatiana Roodkowsky | Submitted By: | Michael Kersten |
| Phone Number: | 703.265.2134 | Phone Number: | 770.360.6476 |
| Fax Number: | 703.265.4720 | Fax Number: | 770.360.6745 |
| E-Mail Address: | troodkowky@aol.com | | |

| Description of Services | Units | Fixed | Extension |
|---|---|---|---|
| Sun Microsystems, Inc. ("SunPS") will provide America Online, Inc. with Micromuse products and maintenance. The products include: a site license of Omnibus suite, and maintenance coverage on Omnibus, Impact including: | 1 | $760,000 | $760,000 |
| **Licensed Software:** | | | |
| ✓ Omnibus Suite (Including version 4.0 and subsequent versions and upgrades) | | | |
| ✓ Probe License | | | |
| ✓ Object Server | | | |
| ✓ Compatibility Server | | | |
| ✓ Impact Server | | | |
| ✓ Impact Data Sources | | | |
| ✓ ISM/ASMs (total 50 of either) | | | |
| The purchase price for the products included is $316,000 Service maintenance, 24 x 7, 365 cost is $444,000 | | | |
| The term of this coverage is from July 1, 2001 through June 30, 2002. | | | |

| | | | |
|---|---|---|---|
| | | **Sub-Total:** | $760,000 |
| **Place of Delivery:** Reston, VA | | **Total Cost** | $760,000 |

9AOL010033
CONFIDENTIAL TREATMENT
REQUESTED

ᒷ4ᔓ ᑊ

# AMENDMENT NUMBER THREE

To Sun Microsystems, Inc. Service Provider Agreement, as amended, (hereinafter "Agreement"), dated as of the 1st day of November, 1998, by and between SUN MICROSYSTEMS, INC. ("Sun"), and AMERICA ONLINE, INC. ("AOL"), made and effective this *17th* day of ____*July*____, 2001.

WHEREAS, Sun and AOL desire to modify the Agreement to revise the definition of "AOL;" and

WHEREAS, Sun and AOL desire to provide for certain support terms to apply to Sun Products of AOL's Affiliate, Time Warner; and

WHEREAS, Sun and Customer agree to such additional terms;

NOW, THEREFORE, the parties hereby agree as follows:

1.    Notwithstanding anything to the contrary set forth in the Agreement, the terms and conditions hereinafter set forth shall control, and any term or condition in the Agreement that is inconsistent with any term or condition hereinafter set forth shall be of no force or effect whatsoever.

2.    To correct duplicate numbering of amendments to this Agreement, "Amendment Number One" whose Section 2 modifies Section 1.3 of the Agreement shall continue to be designated as Amendment Number One. "Amendment No. 1" whose Section 1 modifies Section 1.6(A)(iii) shall hereinafter be designated as Amendment Number Two.

3.    Delete Section 1.1(D) in its entirety and insert the following in lieu thereof:

"AOL" includes Affiliated Companies of AOL. "Affiliated Companies" or "Affiliate" means any entity: (a) which is owned 50% or more by AOL; or (b) over which AOL exercises management control; or (c) which is under common control with AOL; or (d) which owns 50% or more of AOL; or (e) of which AOL directly or indirectly owns at least 19.9% of the voting securities and which operate an online service utilizing an AOL-owned brand; and which provide written notice of their acceptance of the terms herein; provided, however, Time Warner Telecommunications Holdings shall be considered an Affiliate so long as AOL owns at least 40% thereof.

4. Add to Section 1.1, subsection (F), as follows:

(F) "Data Centers" are defined as those in Dulles, Virginia; Manassas, Virginia; Reston, Virginia; Mountain View, CA; and Gainesville, Virginia. Additional Data Centers may be added by mutual written agreement of the parties.

9AOL010034
CONFIDENTIAL TREATMENT
REQUESTED

5. To Section 1.6(A)(iii), as amended, add to the beginning of the first line, "For Data Centers only, ..."

6. To Section 1.6(A), as amended, add subsection (iv), as follows:

(a) Maintenance for Equipment Located Outside the Data Centers: For the former Time Warner affiliates and other acquisitions added as a result of the AOL Time Warner merger after Jan. 11, 2001, all post–merger equipment acquired for use at Time Warner locations shall be entitled to purchase SunSpectrum Platinum level maintenance service only at 71% off list price. The term of any purchase order shall be a minimum of 12 months and the order must be a direct order to Sun from AOL or Affiliate, which shall exclude orders from resellers. If such post–merger equipment is brought into one of the four (4) Data Centers, Sun will transition the post–merger equipment to fall under 1.6(A)(iii), above, i.e., 500 systems for $350,000 per annum, upon 30 days written notice from AOL to a Sun representative, as specified by Sun.

(b) 90 Day Grace Period to Receive Credit: Upon receipt of written notification from each Affiliate requesting maintenance services in accordance with this Agreement, as amended, where such request is received by the effective date of this Amendment, the effective cancellation date shall be February 1, 2001, and such Affiliate will receive credit, if due. The Affiliate shall issue a new purchase order for Platinum Level Service, referencing this Agreement, for a minimum period of 12 months, beginning February 1, 2001.

(c) "Affiliate Opt–out:" Within 90 days of the effective date of this Amendment Number Three, any Affiliate can notify Sun in writing to opt out of this Agreement and continue to acquire Equipment and services under any applicable agreement in effect at the time. If Sun does not receive written notification of such "opt–out," the applicable Sun agreement will be terminated as to that Affiliate and the terms and conditions of this Agreement will apply immediately. Otherwise, any and all other requests to change such service terms after June 30, 2001, will require 60 days prior written notice. Further, all new E10K or E10K–like systems (defined as systems capable of housing greater than 32 CPUs in a single system) shall receive a 71% discount from SunSpectrum Platinum level only list price (excluding all other discounts or promotions) for all locations, including Data Centers, as set forth in 1.6(A)(iii).

7. To the end of Section 1.8(B), add the following:

"...provided, however, Sun memory modules for Sun systems will be competitively priced by Sun based on Sun's analysis of current market prices. AOL's net price for Category M Products shall be Sun's applicable Worldwide Price List price at the time AOL's order is accepted, less 25%."

8.    All other terms and conditions shall remain in full force and effect.

9AOL010035
CONFIDENTIAL TREATMENT
REQUESTED

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives.

SUN MICROSYSTEMS, INC.                    AMERICA ONLINE, INC.

_Marie C O'Brien_                          _[signature]_
Signature                                  Signature

_Marie C. O'Brien_                         _TERRANCE T. LAGER_
Typed or Printed Name                      Typed or Printed Name

_VP Mid Atlantic Area_                     _VICE PRESIDENT_
Title                                      Title

_August 13, 2001_                          _7/17/2001_
Date                                       Date

```
┌─────────────────────────────────────┐
│       Approved As To Form           │
│     Sun Microsystems, Inc.          │
│       Legal / Contracts             │
│  Approver: _SEm_   Date: _8/29/01_  │
└─────────────────────────────────────┘
```

9AOL010036
CONFIDENTIAL TREATMENT
REQUESTED

# AMENDMENT NUMBER THREE

To Sun Microsystems, Inc. Service Provider Agreement, as amended, (hereinafter "Agreement"), dated as of the 1st day of November, 1998, by and between SUN MICROSYSTEMS, INC. ("Sun"), and AMERICA ONLINE, INC. ("AOL"), made and effective this 17th day of _____ July _____, 2001.

WHEREAS, Sun and AOL desire to modify the Agreement to revise the definition of "AOL;" and

WHEREAS, Sun and AOL desire to provide for certain support terms to apply to Sun Products of AOL's Affiliate, Time Warner; and

WHEREAS, Sun and Customer agree to such additional terms;

NOW, THEREFORE, the parties hereby agree as follows:

1.      Notwithstanding anything to the contrary set forth in the Agreement, the terms and conditions hereinafter set forth shall control, and any term or condition in the Agreement that is inconsistent with any term or condition hereinafter set forth shall be of no force or effect whatsoever.

2.      To correct duplicate numbering of amendments to this Agreement, "Amendment Number One" whose Section 2 modifies Section 1.3 of the Agreement shall continue to be designated as Amendment Number One. "Amendment No. 1" whose Section 1 modifies Section 1.6(A)(iii) shall hereinafter be designated as Amendment Number Two.

3.      Delete Section 1.1(D) in its entirety and insert the following in lieu thereof:

"AOL" includes Affiliated Companies of AOL. "Affiliated Companies" or "Affiliate" means any entity: (a) which is owned 50% or more by AOL; or (b) over which AOL exercises management control; or (c) which is under common control with AOL; or (d) which owns 50% or more of AOL; or (e) of which AOL directly or indirectly owns at least 19.9% of the voting securities and which operate an online service utilizing an AOL-owned brand; and which provide written notice of their acceptance of the terms herein; provided, however, Time Warner Telecommunications Holdings shall be considered an Affiliates so long as AOL owns at least 40% thereof.

4. Add to Section 1.1, subsection (F), as follows:

(F) "Data Centers" are defined as those in Dulles, Virginia; Manassas, Virginia; Reston, Virginia; Mountain View, CA: and Gainesville, Virginia.   Additional Data Centers may be added by mutual written agreement of the parties.

9AOL010037
CONFIDENTIAL TREATMENT
REQUESTED

5. To Section 1.6(A)(iii), as amended, add to the beginning of the first line, "For Data Centers only, ..."

6. To Section  1.6(A), as amended, add subsection (iv), as follows:

(a) Maintenance for Equipment Located Outside the Data Centers: For the former Time Warner affiliates  and other acquisitions added as a result of the AOL Time Warner merger after Jan. 11, 2001, all post–merger equipment acquired for use at Time Warner locations shall be entitled to purchase SunSpectrum Platinum level maintenance service only at 71% off list price. The term of any purchase order shall be a minimum of 12 months and the order must be a direct order to Sun from AOL or Affiliate, which shall exclude orders from resellers. If such post–merger equipment is brought into one of the four (4) Data Centers, Sun will transition  the post–merger equipment to fall under 1.6(A)(iii), above, i.e., 500 systems for $350,000 per annum, upon 30 days written notice from AOL to a Sun representative, as specified by Sun.

(b) 90 Day Grace Period to Receive Credit:  Upon receipt of written notification from each  Affiliate requesting maintenance services in accordance with this Agreement, as amended, where such request is received by the effective date of this Amendment , the effective cancellation date shall be February 1, 2001, and such Affiliate will receive credit, if due. The Affiliate shall issue a new purchase order for Platinum Level Service, referencing this  Agreement, for a minimum period of 12 months , beginning February 1, 2001.

(c)  "Affiliate Opt–out:"  Within 90 days of the effective date of this Amendment Number Three, any  Affiliate can notify Sun in writing to opt out of this Agreement  and continue to acquire Equipment and services under  any applicable agreement in effect at the time.  If Sun does not receive written notification of such "opt–out," the applicable Sun agreement will be terminated as to that Affiliate and the terms and conditions of this Agreement will apply immediately.  Otherwise, any and all other requests to change such service terms after June 30, 2001, will require 60 days prior written notice.  Further, all new E10K or E10K–like systems (defined as systems capable of housing greater than 32 CPUs in a single system) shall receive a 71% discount from SunSpectrum Platinum level only list price (excluding all other discounts or promotions) for all locations, including Data Centers, as setforth in 1.6(A)(iii).

7. To the end of Section 1.8(B), add the following:

"...provided, however, Sun memory modules for Sun systems will  be competitively priced by Sun based on Sun's analysis of current market prices. AOL's net price for Category M Products shall be Sun's applicable Worldwide Price List price at the time AOL's order is accepted, less 25%.

8.      All other terms and conditions shall remain in full force and effect.

9AOL010038
CONFIDENTIAL TREATMENT
REQUESTED

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives.

SUN MICROSYSTEMS, INC.

_Marie C O'Brien_
Signature

_Marie C O'Brien_
Typed or Printed Name

_VP Mid Atlantic Area_
Title

_August 13, 2001_
Date

AMERICA ONLINE, INC.

_Se J. Jahn_
Signature

_TERRANCE J. LABER_
Typed or Printed Name

_VICE PRESIDENT_
Title

_7/17/2001_
Date

Approved As To Form
Sun Microsystems, Inc.
Legal / Contracts
Approver: _SEM_  Date: _7/25/01_

Sun/AOL Proprietary/Confidential    3 of 3                    07/11/01 SEM

**9AOL010039**
CONFIDENTIAL TREATMENT
REQUESTED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JOHN MICHAEL KELLY, STEVEN E.
RINDNER, JOSEPH A. RIPP, and
MARK WOVSANIKER,

Defendants.

08 Civ. 4612-SWK
(ECF Case)

---

# EXHIBIT 6

### DECLARATION OF ADA FERNANDEZ JOHNSON
### IN SUPPORT OF DEFENDANT J. MICHAEL KELLY'S
### MOTION TO DISMISS



**AMERICA ONLINE**
I N C O R P O R A T E D

April 15, 2002

Mr. Wayne H. Pace
Executive Vice President and Chief Financial Officer
Mr. James W. Barge
Vice President and Controller
AOL Time Warner Inc.
75 Rockefeller Plaza
New York, New York 10019

I have read the letter of representations dated April 15, 2002, addressed to you from Joseph A. Ripp and Thomas R. Colan in connection with the financial information of America Online (the "Company") at March 31, 2002 and for the quarterly period then ended. I recognize that obtaining representations from us concerning the information contained in this letter is a significant procedure in enabling you to determine, and to make certain representations to Ernst & Young LLP as to, whether the consolidated financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of AOL Time Warner Inc. ("AOL Time Warner") in conformity with generally accepted accounting principles. I recognize that the members of Company management are responsible for the fair presentation, in the financial information, of financial position, results of operations and cash flows in conformity generally accepted accounting principles applied on a consistent basis. In connection therewith, I make the following representations, which are true to the best of my knowledge and belief.

I have no reason to believe that the information contained in the letter referred to above is not correct.

There are no events or transactions that have occurred since March 31, 2002 or are pending that would have a material effect on the financial information (including disclosures) we submitted to you at that date or for the period then ended, or that are of such significance in relation to the Company's affairs to require mention in the information we report to you or in a note to AOL Time Warner's consolidated financial statements in order to make them not misleading regarding the financial position, results of operations, or cash flows of the Company or AOL Time Warner.

Very truly yours,

J. Michael Kelly
Chief Operating Officer

EYATW02 003560
CONFIDENTIAL TREATMENT
REQUESTED BY ERNST & YOUNG LLP

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

          v.

JOHN MICHAEL KELLY, STEVEN E.
RINDNER, JOSEPH A. RIPP, and
MARK WOVSANIKER,

                    Defendants.

08 Civ. 4612-SWK
(ECF Case)

---

# EXHIBIT 7

### DECLARATION OF ADA FERNANDEZ JOHNSON
### IN SUPPORT OF DEFENDANT J. MICHAEL KELLY'S
### MOTION TO DISMISS

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

Securities Exchange Act of 1934
Release No. 51400 / March 21, 2005

Accounting And Auditing Enforcement
Release No. 2215 / March 21, 2005

Administrative Proceeding
File No. 3-11862

| | |
|---|---|
| In the Matter of<br><br>     James W. Barge,<br>     Pascal Desroches, and<br>     Wayne H. Pace,<br><br>Respondents. | ORDER INSTITUTING PUBLIC CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934 |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against James W. Barge, Pascal Desroches, and Wayne H. Pace (collectively, "Respondents").

**II.**

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, Respondents consent to the entry of this Order Instituting Public Cease-and-Desist Proceedings, Making Findings, and Imposing a Cease-and-Desist Order Pursuant to Section 21C of the Securities Exchange Act of 1934 ("Order"), as set forth below.

III.

On the basis of this Order and Respondents' Offers, the Commission finds the following[1]:

### A.    Summary

This matter involves Respondents' roles in the accounting treatment accorded to improperly recognized revenue by Time Warner Inc. (formerly AOL Time Warner Inc., and hereinafter referred to as "AOLTW" or the "Company"), a publicly traded media and entertainment company.  In 2001 and 2002, the AOL Division ("AOLD") of AOLTW improperly inflated its online advertising revenue by $400 million in connection with transactions with Bertelsmann AG ("BAG").  In substance, BAG paid $400 million as consideration for amendments to a multi-billion-dollar contract governing AOLTW's purchase of BAG's interest in AOL Europe, S.A.  The contract amendments had substantial value, and BAG offered to compensate AOLTW for the amendments.  AOLTW proposed that, in exchange for the two amendments, BAG purchase advertising in the aggregate amount of $400 million.  AOLD then improperly and materially inflated its online advertising revenues by recognizing the $400 million as advertising revenue rather than as consideration received for amending the AOL Europe purchase agreement.  AOLD's financial results were consolidated in AOLTW's financial statements, and the $400 million payment was improperly reflected as online advertising revenue in AOLTW's financial statements that were filed with the Commission.

Respondents were corporate-level finance and accounting executives at AOLTW who were responsible for, among other things, reviewing and approving the accounting treatment recommended by the Company's business units, including AOLD.  Respondents approved AOLTW's accounting for the $400 million as advertising revenue.  In doing so, they based their accounting decisions on the form of the transactions and oral and written representations, some of which were false and omitted material facts, by other AOLTW and AOLD employees.  They failed to pursue facts and circumstances that evidenced the true economic substance of the transactions.  As a result, although others were responsible for negotiating the $400 million transactions, Respondents each were a cause of AOLTW's improperly accounting for the $400 million in annual and periodic reports filed with the Commission.

### B.    Respondents

James W. Barge, age 49, served as Vice President and Controller of AOLTW from January 2001 to September 2001, and he served as Vice President in charge of AOLTW's Financial Planning and Analysis from September 2001 through December 2001.  Since January 2002, Barge assumed both the Controller and Financial Planning and Analysis

---

[1] These findings are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

2

responsibilities, and Barge was promoted to Senior Vice President and Controller. Prior to the merger of America Online, Inc. ("AOL") and Time Warner Inc. in January 2001, Barge was Vice President and Controller of Time Warner. Barge formerly was an audit partner with Ernst & Young LLP and a Professional Accounting Fellow with the Commission's Office of the Chief Accountant. Barge is a certified public accountant ("CPA").

Pascal Desroches, age 40, joined AOLTW in 2001 as Assistant Controller and has served as Vice President and Deputy Controller of AOLTW since May 2002. Desroches formerly was a partner with KPMG LLP and a Professional Accounting Fellow with the Commission's Office of the Chief Accountant. Desroches is a CPA.

Wayne H. Pace, age 58, has served as Chief Financial Officer ("CFO") of AOLTW since November 2001. Prior to assuming that position, Pace had served as CFO of Turner Broadcasting Systems, Inc., an AOLTW subsidiary, since 1993. Pace formerly was an audit partner with Price Waterhouse LLP. Pace was a CPA, but he allowed his license to lapse in 1995.

### C.    Relevant Entities

Time Warner Inc., the corporate parent of AOLD, is a media and entertainment company. Time Warner is incorporated in Delaware and headquartered in New York, New York. Time Warner's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the New York Stock Exchange. Time Warner files annual and quarterly reports with the Commission on Forms 10-K and 10-Q. Time Warner was formed by the merger of AOL and Time Warner on January 11, 2001. The merged company was named AOL Time Warner Inc. It changed its name to Time Warner Inc. on October 16, 2003.

AOLD is an Internet service provider. AOLD provides its subscribers with access to the Internet, e-mail accounts, and content. AOLD's headquarters are located in Dulles, Virginia.

Bertelsmann AG is a media and entertainment company. BAG is incorporated in Germany and headquartered in Guetersloh, Germany.

### D.    The Bertelsmann Advertising Contracts

*AOL's Purchase of BAG's Interest in AOL Europe*

AOL and BAG formed a joint venture in 1995 that created AOL Europe, which owns and operates European Internet services (including AOL UK and AOL Germany). In March 2000, AOL and BAG entered into a contingent purchase agreement concerning AOL's acquisition of BAG's interest in AOL Europe. The contingent agreement was structured as a put/call option (the "Put/Call Agreement"). Under the Put/Call Agreement, BAG could exercise an option to "put" its AOL Europe shares to AOL by selling them to AOL for $6.75 billion; if BAG did not exercise its option, AOL could "call" BAG's AOL

3

Europe shares by purchasing BAG's shares for $8.25 billion. BAG's Put rights under the Put/Call Agreement had two settlement dates: January 2002 for 80% of BAG's AOL Europe shares, and July 2002 for the remaining 20% of BAG's AOL Europe shares. Following the merger of AOL and Time Warner, AOLTW became AOL's successor in interest under the contract. The Put/Call Agreement provided AOLTW the option to pay in cash or stock. AOLTW retained the further option to settle in cash or stock for 12 days after the price of AOLTW stock was fixed for settlement (the "free-look period"). If AOLTW's stock price at the end of the free-look period was below the price fixed for settlement under the Put/Call, AOLTW could deliver stock worth less than the Put/Call Agreement price.

At the same time in March 2000, BAG and AOL executed an online advertising agreement committing BAG to purchase $150 million in online ads from AOL over four years (the "Premier Ad Deal"). The Premier Ad Deal provided BAG "premier status," entitling it to valuable advertising placement and exclusivity rights and "preferred" pricing, defined as rates and terms no worse, when taken as a whole, than those generally offered by AOL to third parties for similar programs. By December 2000, the parties agreed that BAG was entitled to an across-the-board 40% discount to AOL's list price under the preferred pricing provision. Under the Premier Ad Deal, BAG negotiated the content, placement, and timing of the advertising.

### $125 Million Put/Call Amendment Deal

Shortly after entering into the Put/Call Agreement, BAG attempted to realize some or all of the $6.75 billion it would be due when it exercised its Put rights, which according to the contract could not be settled until 2002. In the fall of 2000, BAG tried to sell its interest in the Put/Call Agreement to an investment banking firm. However, the investment bankers were unwilling to purchase BAG's interest because of the uncertainty inherent in its terms. Specifically, the free-look period put BAG at risk of receiving AOL stock worth substantially less than $6.75 billion, and AOL's option to pay with stock, rather than cash, created material, and potentially costly, obstacles to the ability of a purchaser of BAG's interest to realize the value of the stock. As a result of the uncertainty arising from these circumstances, BAG could not monetize, or realize value from, its rights under the Put/Call prior to settlement. The most effective way to reduce the uncertainty was to obtain AOLTW's agreement to pay the Put price in cash rather than stock.

In January 2001, BAG proposed to amend the Put/Call Agreement to require AOLTW to pay some or all of the $6.75 billion in cash to enable BAG to monetize its interest. BAG offered to compensate AOLTW with cash, a reduction in the Put/Call Agreement price, or other means. AOLTW proposed that the consideration take the form of BAG's purchasing online advertising. Respondents did not participate in these discussions and relied on others to describe them accurately. While Barge and Desroches were not directly involved in the process, they learned of the proposed amendment shortly before it was executed, and they were involved, to varying degrees, in approving the manner in which AOLTW accounted for the transaction.

4

From January through March 2001, AOLTW and BAG negotiated the terms of the Put/Call amendment. Almost all of the negotiations focused on the value and structure of the Put/Call amendment. There were few, if any, negotiations concerning terms of the advertising deal, other than the overall price, which was determined by the negotiated value of the Put/Call amendment. During negotiations, AOLTW and BAG consulted with finance experts and investment bankers concerning the value of various Put/Call Amendments, which included the value of the free-look period and the value of avoiding a block sale discount for large blocks of stock. Values asserted by AOLTW during negotiations with BAG ranged from $200 million to $412 million.

On March 30, 2001, AOLTW and BAG amended the Put/Call Agreement to require AOLTW to pay at least $2.5 billion in cash if BAG exercised its $6.75 billion Put (the "First Put/Call Amendment"). As consideration for the First Put/Call Amendment, BAG agreed to pay AOLTW $125 million in the form of an advertising purchase (the "March '01 Deal"). Internal AOLTW documents stated that BAG agreed to enter into the advertising transaction "as compensation for" or "in exchange for" the amendment to the Put/Call.

The March '01 Deal provided online advertising that was qualitatively different from the online advertising provided under the Premier Ad Deal. Among other things, the March '01 Deal stripped BAG of the preferred pricing and special rights that it enjoyed under the Premier Ad Deal, and it essentially eliminated BAG's ability to control the content, placement, and frequency of the advertising delivered pursuant to the March '01 Deal. Unknown to the Respondents at the time they initially approved the accounting treatment, BAG had no need to enter into the $125 million advertising agreement.

AOLTW decided each quarter how much online advertising to run under the March '01 Deal by determining the amount of online ad revenues it needed during the period to reach its targets. Often, the advertising for BAG ran late in the reporting period, after AOL had determined the amounts by which it could not otherwise attain its revenue goals. BAG generally signed the advertising purchase orders after AOLTW had already run the advertising. Negotiations, to the extent they occurred, concerned mostly the allocation of the ads among BAG's various subsidiaries and not the placement or frequency of the ads.[2] AOLTW ran the advertising and recorded almost the entire $125 million in online advertising revenue from the March '01 Deal in the first three quarters of 2001.

---

[2] Unknown to Respondents at the time they initially approved the accounting treatment, AOLD knew that BAG did not need or value the online advertising. An AOLD internal summary of the March '01 Deal described the online advertising as "pure gravy" and a "freebie," explaining "these plans are not to be negotiated." A later AOLD internal memorandum described the March '01 Deal as an "aggressive revenue recognition plan" under which "AOL policy has been focused on maximum revenue recognition without regard to the quality of the carriage or input from the BAG Brands on either participation or carriage."

*$275 Million Put/Call Amendment Deal*

In September 2001, BAG asked AOLTW to commit to pay in cash the remaining $4.25 billion under the Put/Call, although doing so reduced AOLTW's financial flexibility and represented a significant opportunity cost to the Company. AOLTW again accounted for a payment from BAG for a Put/Call amendment as if it were a purchase of advertising.

From late November through mid-December 2001, AOLTW and BAG negotiated the second amendment to the Put/Call. Virtually all of the negotiations concerned the value and structure of the proposed Put/Call amendment. There were few, if any, negotiations concerning terms of the advertising deal, other than the overall price, which was determined by the negotiated value of the Put/Call amendment. Throughout negotiations, AOLTW and BAG consulted with finance experts and investment bankers concerning the value of a second Put/Call amendment. During negotiations, AOLTW asserted that the value of the amendment ranged from $250 million to $420 million. Respondents did not participate in these discussions and relied on others to describe them accurately. While Respondents were not directly involved in the process, they knew of the proposed transaction, and they were involved, to varying degrees, in approving the manner in which AOLTW accounted for the transaction.

On December 21, 2001, AOLTW and BAG amended the Put/Call Agreement to require AOLTW to pay the remaining $4.25 billion Put amount in cash (the "Second Put/Call Amendment"). As consideration for the Second Put/Call Amendment, BAG agreed to pay AOLTW $275 million in the form of an advertising purchase (the "December '01 Deal"). Internal AOLTW e-mails stated that BAG agreed to enter into the advertising transaction in "exchange for" the amendments to the Put/Call.

Like the March '01 Deal, the December '01 Deal stripped BAG of the preferred pricing and special rights that it enjoyed under the Premier Ad Deal, and it essentially eliminated BAG's ability to control the content, placement, and frequency of the advertising delivered. Unknown to Respondents at the time, BAG had no need for additional online advertising. AOLTW administered the December '01 Deal substantially the same as it did the March '01 Deal. AOLTW ran the advertising and booked almost the entire $275 million in online advertising from the December '01 Deal in 2002.

**E.      Respondents were Each a Cause of AOLTW's Improperly Recognizing Revenue on the Bertelsmann Transactions and Filing Inaccurate Reports with the Commission**

A fundamental tenet of generally accepted accounting principles ("GAAP") is that the accounting for a transaction should reflect its economic substance, and the form of a transaction is not necessarily controlling. For example, revenue should not be recorded in a round-trip transaction in which the essence of the transaction is merely a circular flow of cash and the customer does not need the goods or services provided, would not normally purchase the goods or services at that time, or purchases quantities in excess of its needs. For those charged with preparing financial statements, an important and

6

fundamental responsibility is to ensure that companies account for transactions based on their economic substance. In some cases, this requires looking beyond the terms of the agreements and even beyond assurances from company employees, whose compensation may be affected by the accounting decisions.

The economic substance of the exchanges between AOLD and BAG was that BAG paid $400 million for amendments to the Put/Call. AOLD ignored the substance of these transactions and improperly recognized $400 million of online advertising revenue on these transactions in 2001 and 2002. This caused material overstatements of AOLTW's reported online advertising and commerce revenues, consolidated operating income, and consolidated net income for each reporting period from the quarter ended June 30, 2001 through the year ended December 31, 2002. Specifically, AOLTW improperly recognized the following amounts: $16.3 million in the first quarter of 2001, $65.5 million in the second quarter of 2001, $39.8 million in the third quarter of 2001, $80.3 million in the first quarter of 2002, $84.4 million in the second quarter of 2002, $51.6 million in the third quarter of 2002, and $58.0 million in the fourth quarter of 2002.

Respondents were charged with ensuring that AOLTW filed accurate financial statements presented in conformity with GAAP. They recognized the possibility that BAG's payments to AOLD were not advertising revenues, but rather compensation for amendments to the Put/Call. They consulted with executives of AOLD and AOLTW, including those who negotiated the deals, concerning the nature and terms of the transactions and were provided false and incomplete information. They were not told that BAG had offered cash or to reduce the purchase price for AOL Europe in exchange for the amendments, and they did not know how the advertising programs were administered. They requested, and were assured, that the advertising to be provided to BAG would be priced at fair value.[3] However, they were aware of facts and circumstances that called those representations into question. They knew the following:

- BAG purchased advertising under the March and December '01 Deals in exchange for the First and Second Put/Call Amendments.

- The Put/Call Amendments had significant value to BAG because they provided cash certainty that would be costly to acquire in the marketplace, and cash certainty was important to BAG's effort to monetize or otherwise borrow against the underlying value of their Put.

- AOLTW's agreement to pay in cash rather than stock reduced the Company's flexibility and represented a significant opportunity cost.

---

[3] Desroches, with the concurrence of the other Respondents, also consulted with the Company's auditors concerning their proposed accounting treatment for the December '01 deal and received the auditors' approval. However, at the time of the consultation, the Respondents had not performed an inquiry sufficient to determine the nature of the transaction.

- The proposed accounting treatment assigned no value to the Put/Call Amendments and recognized $400 million of advertising revenue.

- Advertising revenue was important to AOLD because of its high profit margin and because analysts and investors considered advertising revenue a key measure of AOLD's current and future financial performance.

- The March and December '01 Deals represented two of the largest purchases of online ads in AOL's history.

In addition, at least Desroches received documents indicating that the $400 million March and December '01 Deals granted substantially less favorable terms to BAG than the $150 million Premier Ad Deal, and the March and December '01 Deals deprived BAG of any contractual means to manage or control the advertising it received.

Nevertheless, Barge and Desroches did not review the terms of the final agreements for the March and December '01 Deals before approving the accounting for the transactions. Likewise, Pace did not review the terms of the agreement for the December '01 Deal before approving the accounting treatment. Further, neither Barge nor Desroches reviewed the negotiating history of the Put/Call Amendments or the March and December '01 Deals before approving the accounting treatment. Similarly, Pace did not review the negotiating history of the Second Put/Call Amendment or the December '01 Deal before approving the accounting treatment for the $275 million.

Barge signed AOLTW's Forms 10-K filed for 2001 and 2002, and he reviewed AOLTW's Forms 10-Q for the second quarter of 2001 and the first through third quarters of 2002. Desroches prepared and reviewed AOLTW's Forms 10-Q and 10-K from the second quarter of 2001 through year end 2002. Pace signed AOLTW's Form 10-K for 2001. Pace also signed AOLTW's Forms 10-Q and 10-K for each period in 2002.

In light of matters discussed above and the magnitude of these transactions and their impact on AOLD's and AOLTW's financial results, the Respondents should have obtained more information concerning the transactions and should have looked beyond the assurances of employees whose compensation may have been affected by the accounting decisions. Because they failed to obtain more information before they approved the accounting, Respondents lacked a reasonable basis for their accounting conclusion. Thus, each of them was a cause of AOLTW's improper accounting for, and reporting of, the BAG revenue.

**F.      Legal Conclusions**

The Exchange Act and Exchange Act rules require every issuer of registered securities to file reports with the Commission that accurately reflect the issuer's financial performance and provide other true and accurate information to the public.

As a result of the conduct described above, AOLTW violated Section 13(a) of the Exchange Act and Exchange Act Rules 13a-1 and 13a-13 by filing materially misleading annual and quarterly reports with the Commission.

Based on the foregoing, Barge, Desroches, and Pace caused AOLTW's violations of Section 13(a) of the Exchange Act and Exchange Act Rules 13a-1 and 13a-13.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondents' Offers.

Accordingly, it is hereby ORDERED that:

Respondents James W. Barge, Pascal Desroches, and Wayne H. Pace cease and desist from causing any violations and any future violations of Section 13(a) of the Exchange Act and Exchange Act Rules 13a-1 and 13a-13.

By the Commission.

Jonathan G. Katz
Secretary

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JOHN MICHAEL KELLY, STEVEN E.
RINDNER, JOSEPH A. RIPP, and
MARK WOVSANIKER,

Defendants.

---

08 Civ. 4612-SWK
(ECF Case)

# EXHIBIT 8

DECLARATION OF ADA FERNANDEZ JOHNSON
IN SUPPORT OF DEFENDANT J. MICHAEL KELLY'S
MOTION TO DISMISS



## SUBPOENA

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

### In the Matter of PurchasePro.com, Inc. (HO-9253)

To:        Custodian of Records
           America Online, Inc.
           c/o Laura Jehl, Esq.
           AOL Way
           Sterling, VA 20166

☒   **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the Securities and Exchange Commission, at the place, date and time specified below. 450 Fifth Street, N.W., Washington, D.C. 20549-0806, December 12, 2001 by 5:00 p.m.

☐   **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the place, date and time specified below.

**FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.** Failure to comply may subject you to a fine and/or imprisonment.

By:   _[signature]_                         Date: 11/28/01
      Andrew Stevens
      Senior Counsel
      Division of Enforcement
      Securities and Exchange Commission
      450 5th Street, N.W.
      Washington, D.C. 20549-0806
      (202) 942-4844

I am an officer of the Securities and Exchange Commission authorized to issue subpoenas in this matter. The Securities and Exchange Commission has issued a formal order authorizing this investigation under Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.

NOTICE TO WITNESS:     If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

# ATTACHMENT TO SUBPOENA TO CUSTODIAN OF RECORDS OF AMERICA ONLINE, INC.

## I.    Definitions and Rules of Construction

A.    As used in this attachment, the term "AOL" means and includes America Online, Inc. and all present and former subsidiaries, affiliates, predecessors, successors, officers, directors, agents, employees, partnerships, general and limited partners thereof, and any aliases, code names, or trade or business names used by any of the foregoing.

B.    As used in this attachment, the term "PurchasePro" means and includes PurchasePro.com, Inc. and all present and former subsidiaries, affiliates, predecessors, successors, officers, directors, agents, employees, partnerships, general and limited partners thereof, and any aliases, code names, or trade or business names used by any of the foregoing.

C.    For purposes of this attachment, the term "documents" means and includes all tangible forms of information, whether on paper, in e-mail or other electronic format, on computer disk, or on film, video, or audio recording, and includes drafts as well as final versions.

D.    Except where otherwise specified, this attachment seeks documents created, reviewed, or in effect during the period from January 1, 1999 through the present.

## II.    Documents to Produce

1.    The following documents concerning all relationships, partnerships, or other business dealings that AOL discussed, negotiated, accepted, consummated, entered into, or disputed with PurchasePro: all contracts, agreements, client or issue memoranda, correspondence, payment or billing records, and all other documents reflecting oral or written communications.

2.    Documents sufficient to identify the name, department, title, current address, and telephone number of all current and former AOL employees who participated in the relationships, partnerships, or dealings embraced by item II(1) above. In lieu of producing such documents, AOL may provide a list of all such individuals, including their names, positions, and dates of employment.

3.    All documents concerning any internal investigation authorized or conducted by AOL concerning the relationships, partnerships, or dealings embraced by item II(1) above.

4.    All documents pertaining to the employment of Eric Keller.

@007/010

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

## Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena

### False Statements and Documents

Section 1001 of Title 18 of the United States Code provides as follows:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined under this title or imprisoned not more than five years, or both.

### Testimony

If your testimony is taken, you should be aware of the following:

1. *Record.* Your testimony will be transcribed by a reporter. If you desire to go off the record, please indicate this to the Commission employee taking your testimony, who will determine whether to grant your request. The reporter will not go off the record at your or your counsel's, direction.

2. *Counsel.* You have the right to be accompanied, represented and advised by counsel of your choice. Your counsel may advise you before, during and after your testimony; question you briefly at the conclusion of your testimony to clarify any of the answers you give during testimony; and make summary notes during your testimony solely for your use. If you are accompanied by counsel, you may consult privately.

If you are not accompanied by counsel, please advise the Commission employee taking your testimony whenever during your testimony you desire to be accompanied, represented and advised by counsel. Your testimony will be adjourned to afford you the opportunity to arrange to do so.

You may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's. If you are represented by counsel who also represents other persons involved in the investigation, the Commission will assume that you and counsel have discussed and resolved all issues concerning possible conflicts of interest. The choice of counsel, and the responsibility for that choice, is yours.

3. *Transcript Availability.* Rule 6 of the Commission's Rules Relating to Investigations, 17 CFR 203.6, states:

> A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees: *Provided, however,* That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request. In any event, any witness, upon proper identification, shall have the right to inspect the official transcript of the witness' own testimony.

If you wish to purchase a copy of the transcript of your testimony, the reporter will provide you with a copy of the appropriate form. Persons requested to supply information voluntarily will be allowed the rights provided by this rule.

4. *Perjury.* Section 1621 of Title 18 of the United States Code provides as follows:

> Whoever . . . having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly .... willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true... is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years or both . . . ,

5. *Fifth Amendment and Voluntary Testimony.* Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

SEC 1662 (7-98)

You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you or subject you to fine, penalty or forfeiture.

If your testimony is not pursuant to subpoena, your appearance to testify is voluntary, you need not answer any question, and you may leave whenever you wish. Your cooperation is, however, appreciated.

6. *Formal Order Availability.* If the Commission has issued a formal order of investigation, it will be shown to you during your testimony, at your request. If you desire a copy of the formal order, please make your request in writing.

## Submissions and Settlements

Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(c), states:

Persons who become involved in . . . investigations may, on their own initiative, submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation. Upon request, the staff, in its discretion, may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing and submitting a statement prior to the presentation of a staff recommendation to the Commission for the commencement of an administrative or injunction proceeding. Submissions by interested persons should be forwarded to the appropriate Division Director, Regional Director, or District Administrator with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which they relate. In the event a recommendation for the commencement of an enforcement proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

The staff of the Commission routinely seeks to introduce submissions made pursuant to Rule 5(c) as evidence in Commission enforcement proceedings, when the staff deems appropriate.

Rule 5(f) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(f), states:

In the course of the Commission's investigations, civil lawsuits, and administrative proceedings, the staff, with appropriate authorization, may discuss with persons involved the disposition of such matters by consent, by settlement, or in some other manner. It is the policy of the Commission, however, that the disposition of any such matter may not, expressly or impliedly, extend to any criminal charges that have been, or may be, brought against any such person or any recommendation with respect thereto. Accordingly, any person involved in an enforcement matter before the Commission who consents, or agrees to consent, to any judgment or order does so solely for the purpose of resolving the claims against him in that investigative, civil, or administrative matter and not for the purpose of resolving any criminal charges that have been, or might be, brought against him. This policy reflects the fact that neither the Commission nor its staff has the authority or responsibility for instituting, conducting, settling, or otherwise disposing of criminal proceedings. That authority and responsibility are vested in the Attorney General and representatives of the Department of Justice.

## Freedom of Information Act

The Freedom of Information Act, 5 U.S.C. 552 (the "FOIA"), generally provides for disclosure of information to the public. Rule 83 of the Commission's Rules on Information and Requests, 17 CFR 200.83, provides a procedure by which a person can make a written request that information submitted to the Commission not be disclosed under the FOIA. That rule states that no determination as to the validity of such a request will be made until a request for disclosure of the information under the FOIA is received. Accordingly, no response to a request that information not be disclosed under the FOIA is necessary or will be given until a request for disclosure under the FOIA is received. If you desire an acknowledgment of receipt of your written request that information not be disclosed under the FOIA, please provide a duplicate request, together with a stamped, self-addressed envelope.

## Authority for Solicitation of Information

*Persons Directed to Supply Information Pursuant to Subpoena.* The authority for requiring production of information is set forth in the subpoena. Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have.

*Persons Requested to Supply Information Voluntarily.* One or more of the following provisions authorizes the Commission to solicit the information requested: Sections 19 and/or 20 of the Securities Act of 1933; Section 21 of the Securities Exchange Act of 1934; Section 321 of the Trust Indenture Act of 1939; Section 42 of the Investment Company Act of 1940; Section 209 of the Investment Advisers Act of 1940; and 17 CFR 202.5. Disclosure of the requested information to the Commission is voluntary on your part.

ENDORSEMENT

## Effect of Not Supplying Information

*Persons Directed to Supply Information Pursuant to Subpoena.* If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so. If such an order is obtained and you thereafter fail to supply the information, you may be subject to civil and/or criminal sanctions for contempt of court. In addition, if the subpoena was issued pursuant to the Securities Exchange Act of 1934, the Investment Company Act of 1940, and/or the Investment Advisers Act of 1940, and if you, without just cause, fail or refuse to attend and testify, or to answer any lawful inquiry, or to produce books, papers, correspondence, memoranda, and other records in compliance with the subpoena, you may be found guilty of a misdemeanor and fined not more than $1,000 or imprisoned for a term of not more than one year, or both.

*Persons Requested to Supply Information Voluntarily.* There are no direct sanctions and thus no direct effects for failing to provide all or any part of the requested information.

## Principal Uses of Information

The Commission's principal purpose in soliciting the information is to gather facts in order to determine whether any person has violated, is violating, or is about to violate any provision of the federal securities laws or rules for which the Commission has enforcement authority, such as rules of securities exchanges and the rules of the Municipal Securities Rulemaking Board. Facts developed may, however, constitute violations of other laws or rules. Information provided may be used in Commission and other agency enforcement proceedings. Unless the Commission or its staff explicitly agrees to the contrary in writing, you should not assume that the Commission or its staff acquiesces in, accedes to, or concurs or agrees with, any position, condition, request, reservation of right, understanding, or any other statement that purports, or may be deemed, to be or to reflect a limitation upon the Commission's receipt, use, disposition, transfer, or retention, in accordance with applicable law, of information provided.

## Routine Uses of Information

The Commission often makes its files available to other governmental agencies, particularly United States Attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate. Whether or not the Commission makes its files available to other governmental agencies is, in general, a confidential matter between the Commission and such other governmental agencies.

Set forth below is a list of the routine uses which may be made of the information furnished.

1. To coordinate law enforcement activities between the SEC and other federal, state, local or foreign law enforcement agencies, securities self-regulatory organizations, and foreign securities authorities.

2. By SEC personnel for purposes of investigating possible violations of, or to conduct investigations authorized by, the federal securities laws.

3. Where there is an indication of a violation or potential violation of law, whether civil, criminal or regulatory in nature, and whether arising by general statute or particular program statute, or by regulation, rule or order issued pursuant thereto, the relevant records in the system of records may be referred to the appropriate agency, whether federal, state, or local, a foreign governmental authority or foreign securities authority, or a securities self-regulatory organization charged with the responsibility of investigating or prosecuting such violation or charged with enforcing or implementing the statute or rule, regulation or order issued pursuant thereto.

4. In any proceeding where the federal securities laws are in issue or in which the Commission, or past or present members of its staff, is a party or otherwise involved in an official capacity.

5. To a federal, state, local or foreign governmental authority or foreign securities authority maintaining civil, criminal or other relevant enforcement information or other pertinent information, such as current licenses, if necessary to obtain information relevant to an agency decision concerning the hiring or retention of an employee, the issuance of a security clearance, the letting of a contract, or the issuance of a license, grant or other benefit.

6. To a federal, state, local or foreign governmental authority or foreign securities authority, in response to its request, in connection with the hiring or retention of an employee, the issuance of a security clearance, the reporting of an investigation of an employee, the letting of a contract, or the issuance of a license, grant or other benefit by the requesting agency, to the extent that the information is relevant and necessary to the requesting agency's decision on the matter.

7. In connection with proceedings by the Commission pursuant to Rule 2(e) of its Rules of Practice, 17 CFR 201.2(e).

8. When considered appropriate, records in this system may be disclosed to a bar association, the American Institute of Certified Public Accountants, a state accountancy board or other federal, state, local or foreign licensing or oversight authority, foreign securities authority, or professional association or self-regulatory authority performing similar functions, for possible disciplinary or other action.

9. In connection with investigations or disciplinary proceedings by a state securities regulatory authority, a foreign securities authority, or by a self-regulatory organization involving one or more of its members.

10. As a data source for management information for production of summary descriptive statistics and analytical studies in support of the function for which the records are collected and maintained or for related personnel management functions or manpower studies, and to respond to general requests for statistical information (without personal identification of individuals) under the Freedom of Information Act or to locate specific individuals for personnel research or other personnel management functions.

11. In connection with their regulatory and enforcement responsibilities mandated by the federal securities laws (as defined in Section 21(g) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(g)), or state or foreign laws regulating securities or other related matters, records may be disclosed to national securities associations that are registered with the Commission, the Municipal Securities Rulemaking Board, the Securities Investor Protection Corporation, the federal banking authorities, including but not limited to, the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, and the Federal Deposit Insurance Corporation, state securities regulatory or law enforcement agencies or organizations, or regulatory law enforcement agencies of a foreign government, or foreign securities authority.

12. To any trustee, receiver, master, special counsel, or other individual or entity that is appointed by a court of competent jurisdiction or as a result of an agreement between the parties in connection with litigation or administrative proceedings involving allegations of violations of the federal securities laws (as defined in Section 21(g) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(g)) or the Commission's Rules of Practice, 17 CFR 202.1 et seq., or otherwise, where such trustee, receiver, master, special counsel or other individual or entity is specifically designated to perform particular functions with respect to, or as a result of, the pending action or proceeding or in connection with the administration and enforcement by the Commission of the federal securities laws or the Commission's Rules of Practice.

13. To any persons during the course of any inquiry or investigation conducted by the Commission's staff, or in connection with civil litigation, if the staff has reason to believe that the person to whom the record is disclosed may have further information about the matters related therein, and those matters appeared to be relevant at the time to the subject matter of the inquiry.

14. To any person with whom the Commission contracts to reproduce, by typing, photocopy or other means, any record within this system for use by the Commission and its staff in connection with their official duties or to any person who is utilized by the Commission to perform clerical or stenographic functions relating to the official business of the Commission.

15. Inclusion in reports published by the Commission pursuant to authority granted in the federal securities laws (as defined in Section 21(g) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(g)).

16. To members of advisory committees that are created by the Commission or by the Congress to render advice and recommendations to the Commission or to the Congress, to be used solely in connection with their official designated functions.

17. To any person who is or has agreed to be subject to the Commission's Rules of Conduct, 17 CFR 200.735-1 et seq., and who assists in the investigation by the Commission of possible violations of federal securities laws (as defined in Section 21(g) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(g)), in the preparation or conduct of enforcement actions brought by the Commission for such violations, or otherwise in connection with the Commission's enforcement or regulatory functions under the federal securities laws.

18. Disclosure may be made to a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the request of that individual.

19. To respond to inquiries from Members of Congress, the press and the public which relate to specific matters that the Commission has investigated and to matters under the Commission's jurisdiction.

20. To prepare and publish information relating to violations of the federal securities laws as provided in 15 U.S.C. 78u(a), as amended.

21. To respond to subpoenas in any litigation or other proceeding.

22. To a trustee in bankruptcy.

*Small Business Owners:* The SEC always welcomes comments on how it can better assist small businesses. If you have comments about the SEC's enforcement of the securities laws, please contact the Office of Chief Counsel in the SEC's Division of Enforcement at 202-942-4530 or the SEC's Small Business Ombudsman at 202-942-2950. If you would prefer to comment to someone outside of the SEC, you can contact the Small Business Regulatory Enforcement Ombudsman toll free at 888-REG-FAIR. The Ombudsman's office receives comments from small businesses and annually evaluates federal agency enforcement activities for their responsiveness to the special needs of small business.

4



293



# SUBPOENA

# UNITED STATES OF AMERICA
# SECURITIES AND EXCHANGE COMMISSION

**To:**    Custodian of Records
Privacy Guard
Trilogiant
Net Markets

### In the Matter of Homestore.com, Inc. (LA-2554)

**YOU MUST PRODUCE** all of the documents described in the Attachment to this subpoena to officers of the Securities and Exchange Commission at 5670 Wilshire Blvd., 11th Floor, Los Angeles, California 90036, by or before February 22, 2002.

---

**FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.** Failure to comply may subject you to a fine and/or imprisonment.

By: _____        Date:  February 7, 2002
Michael R. Wilner

I am an officer of the Securities and Exchange Commission authorized to issue subpoenas in this matter.  The Securities and Exchange Commission has issued a formal order authorizing this investigation under Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.

---

NOTICE TO WITNESS:      If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

**Attachment to Subpoena to**
**PRIVACY GUARD**
**TRILOGIANT**
**NET MARKETS**
**In the Matter of Homestore.com, Inc. (LA-2554)**
**February 7, 2002**

I.   <u>Definitions</u>

This subpoena requires the production of those documents described in Part II below that are in your possession, custody, or control.  You must obtain and submit items that are in your custody or under your control but not in your possession.  The required documents are to be produced in accordance with the following general requirements:

A.   The term "documents" refers to all written or graphic matter, however produced or reproduced onto any other tangible record, including, but not limited to, all writings or recordings, whether set down in handwriting, typewriting, printing, Photostatting, photographing, magnetic impulse, mechanical or electronic recording or other form of data compilation, and any drafts of all documents, whether or not used or circulated, and all versions of a document, both with and without notations.

B.   Documents or communications "relating to," "regarding," or "concerning" a given subject matter mean any document or communication that constitutes, contains, embodies, comprises, reflects, identifies, states, refers to, deals with, comments on, responds to, describes, analyzes, or is in any way pertinent to that subject, including, but not limited to, documents concerning the presentation of other documents.

C.   "Communications" means and includes, without limitation, any correspondence, memoranda, notes, telephone conversations, and other conversations, conferences or meetings.

D.   "You" and "your" mean and include, without limitation, Privacy Guard, Trilogiant, or Net Markets, and all entities in which Privacy Guard, Trilogiant, or Net Markets, have or has a controlling interest, all subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing.

E.   "Homestore" means and includes, without limitation, Homestore.com, Inc. and all entities in which Homestore.com, Inc. has a controlling interest, all subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names or trade or business names used by any of the foregoing.

F.    "AOL" means and includes, without limitation, AOL Time Warner, Inc. and all entities in which AOL Time Warner, Inc. has a controlling interest, all subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names or trade or business names used by any of the foregoing. This term specifically includes America Online and any websites or other businesses affiliated with America Online.

G.    All documents produced <u>must</u> be legible, including microfiche.

H.    The terms "all" and "each" shall be construed as all and each. The term "any" shall be construed as any and all. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the attachment all responses that might otherwise be construed to be outside of its scope. The use of the singular form of any word includes the plural and vice versa.

I.    Unless otherwise noted, all requests require production of materials from January 1, 2000, through the present.

II.    <u>Documents Requested</u>

You must produce the following material:

A.    Documents concerning the sales of any goods or services by you to Homestore or AOL. This request includes, but is not limited to, contracts, agreements, licenses, letters of intent, purchase orders, insertion orders, order acknowledgements, bills of lading, and order confirmations.

B.    Documents reflecting payments made by Homestore or AOL to you for any goods and services. This request includes, but is not limited to invoices, check ledgers, canceled checks, wire transfers, and credit agreements.

C.    Documents concerning your <u>purchase</u> of any services and/or <u>advertising</u> from Homestore or AOL. This request includes, but is not limited to, contracts, agreements, licenses, letters of intent, purchase orders, insertion orders, order acknowledgements, bills of lading, and order confirmations.

D.    <u>Documents</u> concerning the <u>payment by you to</u> Homestore or <u>AOL</u> for services and/or advertising. This request includes, but is not limited to, invoices, check ledgers, canceled checks, wire transfers, and credit agreements.

E.    Documents concerning all communications, discussions, agreements, or
      memoranda of understanding between you and Homestore or AOL. This request
      includes, but is not limited to, electronic mail, letters, fax transmissions, notes of
      conversations, phone logs, and all correspondence.

F.    Documents concerning all communications, discussions, agreements, or
      memoranda of understanding between you and PricewaterhouseCoopers
      concerning Homestore or AOL. This request includes, but is not limited to,
      electronic mail, letters, fax transmissions, notes of conversations, phone logs, and
      all correspondence.

G.    Documents reflecting the payment of any monies from you, directly or indirectly,
      to any employee, officer, director, or representative of Homestore or AOL.

H.    A list of (or documents sufficient to identify) all your personnel who
      communicated or had any dealings with Homestore or AOL.

I.    A list of (or documents sufficient to identify) all Homestore or AOL personnel
      who communicated or had any dealings with you.

# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549



### CONFIDENTIALITY NOTE

THIS FACSIMILE MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, OR OTHERWISE PROTECTED FROM DISCLOSURE. IT IS INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU SHOULD BE AWARE THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS BY MAIL. THANK YOU.

From:  **Andrew Stevens**
**Senior Counsel**
**Division of Enforcement**

Telephone Number:  (202) 942-4844
Telecopier Number:  (202) 628-9630

Date:  November 28, 2001
Case:  In the Matter of PurchasePro.com, Inc., HO-9253

## PLEASE DELIVER THE FOLLOWING PAGES TO:

Name:  Laura Jehl, Esq.

Company:  America Online, Inc. — Legal Dept.

Telephone Number:     ( )
Telecopier Number:     (703) 265-1054

Total Number of Pages, Including Cover Sheet:  10

If you do not receive all the pages, please call (202) 942-4844 as soon as possible.

  


**DIVISION OF
ENFORCEMENT**

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

November 28, 2001

<u>**VIA FACSIMILE (703-265-1054)**</u>
Custodian of Records
America Online, Inc.
c/o Laura Jehl, Esq.
Legal Department
AOL Way
Sterling, VA 20166

Re:     <u>**In the Matter of PurchasePro.com, Inc. (HO-9253)**</u>

Dear Sir or Madam:

The staff of the Securities and Exchange Commission is conducting a formal investigation in the matter identified above. The enclosed subpoena has been issued to you as part of this investigation. The subpoena requires you to give us documents and provide sworn testimony.

Please read the subpoena and this letter carefully. This letter answers some questions you may have about the subpoena. You should also read the enclosed SEC Form 1662. You must comply with the subpoena. You may be subject to a fine and/or imprisonment if you do not.

**Producing Documents**

*What materials do I have to produce?*

The subpoena requires you to give us the documents described in the attachment to the subpoena. You must provide these documents by December 12, 2001. The attachment to the subpoena defines some terms (such as "document") before listing what you must provide.

Please note that if copies of a document differ in any way, they are considered separate documents and you must send each one. For example, if you have two copies of the same letter, but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

If you prefer, you may send us photocopies of the originals. The Commission cannot reimburse you for the copying costs. The copies must be identical to the originals, including even faint marks or print. If you choose to send copies, you <u>must</u> keep the originals in a safe place. The staff will accept the copies for now, but may require you to produce the originals later.

If you <u>do</u> send us photocopies, please put an identifying notation on each page of each document to indicate that it was produced by you, and number the pages of all the documents

Custodian of Records
11/28/2001
Page 2

submitted. (For example, if Jane Doe sends documents to the staff, she may number the pages JD-1, JD-2, JD-3, etc., in a blank corner of the documents.) Please make sure the notation and number do not conceal any writing or marking on the document. If you send us originals, please do not add any identifying notations.

*Do I need to send anything else?*

You should enclose a list briefly describing each item you send. The list should state which paragraph(s) in the subpoena attachment each item responds to.

Please include a cover letter stating whether you believe you have met your obligations under the subpoena by searching carefully and thoroughly for everything called for by the subpoena, and sending it all to us.

*What if I do not send everything described in the attachment to the subpoena?*

The subpoena requires you to send all the materials described in it. If, for any reason — including a claim of attorney-client privilege — you do not produce something called for by the subpoena, you should submit a list of what you are not producing. The list should describe each item separately, noting:

- its author(s);
- its date;
- its subject matter;
- the name of the person who has the item now, or the last person known to have it;
- the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents; and
- the reason you did not produce the item.

If you withhold anything on the basis of a claim of attorney-client privilege or attorney work product protection, you should also identify the attorney and client involved.

*Where should I send the materials?*

Please send the materials to the attention of the undersigned at the following address:

U.S. Securities and Exchange Commission
Division of Enforcement
450 5th Street, N.W.
Washington, D.C. 20549-0806

Custodian of Records
11/28/2001
Page 3

### Testifying

*Where and when do I testify?*

The subpoena does not require you to testify under oath. We may, however, require your testimony at a later time.

### Other Important Information

*May I have a lawyer help me respond to the subpoena?*

Yes. You have the right to consult with and be represented by your own lawyer in this matter. We cannot give you legal advice.

*What will the Commission do with the materials I send?*

The enclosed SEC Form 1662 includes a List of Routine Uses of information provided to the Commission. This form has other important information for you. Please read it carefully.

*Has the Commission determined that anyone has done anything wrong?*

This investigation is a non-public, fact-finding inquiry. We are trying to determine whether there have been any violations of the federal securities laws. The investigation and the subpoena do not mean that we have concluded that you or anyone else has broken the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security.

*I have read this letter, the subpoena, and the SEC Form 1662, but I still have questions. What should I do?*

If you have any other questions, please call me at (202) 942-4844. If I am unavailable, please call Hunter Wiggins, Branch Chief, at (202) 942-4850.

Very truly yours,

Andrew B. Stevens
Senior Counsel

Enclosures:    Subpoena
               SEC Form 1662

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                            Plaintiff,

               v.

JOHN MICHAEL KELLY, STEVEN E.
RINDNER, JOSEPH A. RIPP, and
MARK WOVSANIKER,

                        Defendants.

08 Civ. 4612-SWK
(ECF Case)

---

# EXHIBIT 9

## DECLARATION OF ADA FERNANDEZ JOHNSON
## IN SUPPORT OF DEFENDANT J. MICHAEL KELLY'S
## MOTION TO DISMISS

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:                )
                                 )  File No. LA-2554
HOMESTORE.COM, INC.              )

WITNESS:   Joseph A. Ripp

PAGES:     1 through 60

PLACE:     America Online Headquarters
           22000 AOL Way
           Dulles, Virginia   20166-9393

DATE:      Friday, May 31, 2002


        The above-entitled matter came on for hearing, pursuant
to notice, at 1:40 p.m.


APPEARANCES:

On behalf of the Securities and Exchange Commission:

        MICHAEL R. WILNER, ESQ.
        SENIOR COUNSEL
        Division of Enforcement
        DIANA K. TANI
        ASSISTANT REGIONAL DIRECTOR
        Office of Enforcement
        Securities and Exchange Commission
        450 Fifth Street, N.W.
        Washington, D.C. 20549
        (202)  942-4665

On behalf of the Witness:

        F. WHITTEN PETERS, ESQ.
        HEIDI E. MURDY, ESQ.
        Williams & Connolly LLP
        725 Twelfth Street, N.W.
        Washington, D.C. 20005

        LAURA E. JEHL
        Vice President and Associate Counsel
        America Online, Inc.
        22000 AOL Way
        Dulles, Virginia   20166-9323
        (703)  265-1054


                Diversified Reporting Services, Inc.
                      (202) 467-9200

2

C O N T E N T S

| WITNESS: | | EXAMINATION |
|---|---|---|
| Joseph A. Ripp | | 4 |

| EXHIBITS: | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 108 | 7/3/01 J. Desimone e-mail | 41 |
| 109 | 7/6/01 S. Wolfe e-mail | 43 |

3

```
1                    P R O C E E D I N G S
2              MR. WILNER:  It is 1:40 on the afternoon of Friday,
3       May 31, 2002.  We are located at the corporate headquarters
4       of America Online in Dulles, Virginia, for the testimony of
5       Joe Ripp.
6              My name is Michael Wilner.  With me is Diana Tani.
7       We are both attorneys with the Division of Enforcement of the
8       United States Securities and Exchange Commission.  We are
9       both assigned to the Los Angeles office.  We've also both
10      been appointed officers of the Commission for the purposes of
11      today's proceeding.
12             The staff of the Commission asked you to come in
13      today and meet with us in connection with an investigation
14      entitled "in the matter of Homestore.com, Inc.".  That's
15      Commission number LA-2554.  The Commission is investigating
16      whether there have been any violations of certain provisions
17      of the federal securities laws.
18             However the facts developed through this
19      investigation may constitute violations of other state or
20      federal, civil or criminal laws.
21             The purpose of today's proceeding is so that I can
22      ask you questions and learn information that may assist the
23      Commission in its investigation.  I have to read some
24      prepared remarks to you.  I think we've agreed to waive some
25      of the background questions, and we will get that information
```

4

1    directly from counsel, and then I want to talk to you in some

2    amount of detail about transactions with Homestore.com.

3            First of all, I am required to swear you in.  Can I

4    ask you to raise your right hand, please.

5    Whereupon,

6                        JOSEPH A. RIPP

7    was called as a witness and, having been duly sworn, was

8    examined and testified as follows:

9            MR. WILNER:  Thank you, can I ask you to state and

10   spell your entire name, please.

11           THE WITNESS:  Joseph Allen Ripp, R-i-p-p.

12           MR. WILNER:  Your date and place of birth, please?

13           THE WITNESS:  November 29, 1951.  I was born in

14   Brooklyn, New York.

15           MR. WILNER:  And your social security number?

16           THE WITNESS:  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

17           MR. WILNER:  Thank you.  Before we began today, I

18   provided you with a couple of documents.  The first was the

19   formal order of investigation, which is the typewritten

20   document on the table in front of you.  It will be available

21   for your examination during the course of this proceeding.

22           Have you had an opportunity to review the formal

23   order?

24           THE WITNESS:  Yes.

25           MR. WILNER:   I also provided you with Commission

58

1      AOL acquiring Homestore in 2001?

2          A    Not involved, no.

3              MR. WILNER:  In that case, the SEC staff has no

4      further questions of you, sir.

5              THE WITNESS:  Thank you.

6              MR. WILNER:  You or your lawyer has the opportunity

7      to add to the testimony that you have given today, or to

8      clarify anything, if necessary.

9              MR. PETERS:  We have nothing today.  We owe you a

10     resume, a bio, and we will get that to you.

11             MR. WILNER:  Very good.  In that case, let me thank

12     you very much for coming in and talking with me today.

13             We may need additional testimony or information

14     from you in the future.  If it's necessary, I will contact

15     Mr. Peters and the Williams & Connolly law firm.

16             Thanks again, and we are finished at 3:00.

17             (Whereupon, at 3:00 p.m., the examination was

18     concluded.)

19                          *  *  *  *  *

Diversified Reporting Services, Inc.
(202) 467-9200

**HOMESTORE.COM, INC.**   Multi-Page™   **Steven E. Rindner**

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:              )
                              )  File No. LA-2554
HOMESTORE.COM, INC.            )

WITNESS:  Steven E. Rindner

PAGES:    1 through 222

PLACE:    AOL Headquarters, 22000 AOL Way
          Dulles, Virginia 20166-9323

DATE:     Thursday, May 30, 2002

     The above-entitled matter came on for hearing, pursuant
to notice, at 10:10 a.m.

APPEARANCES:

On behalf of the Securities and Exchange Commission:

     MICHAEL R. WILNER, ESQ.
     SENIOR COUNSEL
     Division of Enforcement
     DIANA K. TANI, ESQ.
     ASSISTANT REGIONAL DIRECTOR
     Office of Enforcement
     Securities and Exchange Commission
     5670 Wilshire Boulevard
     11th Floor
     Los Angeles, California 90036
     (323) 965-3928
     (323) 965-3991

On behalf of the Witness:

     F. WHITTEN PETERS, ESQ.
     HEIDI E. MURDY, ESQ.
     Williams & Connolly LLP
     725 Twelfth Street, N.W.
     Washington, D.C. 20005
     (202) 434-5440
     (202) 434-5314

---

Page 2

                    (202) 467-9200

APPEARANCES:

(Continued)


     LAURA E. JEHL, ESQ.

     America Online

     22000 AOL Way

     Dulles, Virginia 20166-9323

     (703) 625-1054

---

Page 3

                              C O N T E N T S

WITNESS:                                              EXAMINATION

Steven E. Rindner                                          10

| EXHIBITS: | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 82 | E-mail from S. Jaffe to E. Keller dtd 3/19/01 | 127 |
| 83 | E-mail from E. Keller to S. Jaffe dtd 3/20/01 | 127 |
| 84 | E-mail from S. Rindner to D. Colburn dtd 6/6/01 | 131 |
| 85 | E-mail chain dtd 6/18 & 6/19/01 | 135 |
| 86 | E-mail chain dtd 8/26/01 | 137 |
| 87 | S. Rindner fax to D. Colburn forwarding a memo dtd 6/26/01 | 141 |
| 88 | Handwritten notes and memo | 164 |
| 89 | Series of e-mails, S. Rindner to D. Colburn dtd 7/3 & 7/4/01 | 180 |
| 90 | Ltr dtd 7/4/01 from S. Rindner to P. Tafeen | 181 |
| 91 | Series of e-mails. J. Shew to J. Ripp dtd 8/23/01 "AOL rep ltr" | 189 |
| 92 | "Homestore Overview" updated 6/19/01 | 192 |
| 93 | A series of e-mails between S. Losh and S. Rindner dtd 9/12/01 | 196 |
| 94 | E-mail from S. Jaffe to S. Rindner dtd 9/6/01 | 200 |

---

Page 4

| EXHIBITS (Continued) | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 95 | E-mail from S. Jaffe to S. Rindner dtd 8/25/01 | 200 |
| 96 | E-mail from S. Rindner to D. Colburn dtd 9/13/01 | 204 |
| 97 | E-mail from M. Wovsaniker to S. Rindner dtd 3/16/01 | 211 |
| 98 | E-mail from J. Ripp to M. Wovsaniker dtd 3/16/01 | 212 |

1AOL28001 0465
Confidential Treatment
Requested

Steven E. Rindner                    Multi-Page™                    HOMESTORE.COM, INC.

**Page 5**

1          P R O C E E D I N G S
2          MR. WILNER:  It is a little after 10:00 on the
3  morning of Thursday, May 30, 2002.
4          We're located at the corporate headquarters of AOL,
5  Incorporated, in the testimony of Steven Rindner.
6          My name is Michael Wilner.  With me is Diana Tani.
7  We are both attorneys with the Division of Enforcement of the
8  United States Securities and Exchange Commission.  We're both
9  based in Los Angeles, California.  We've also both been
10 appointed officers of the Commission for the purposes of
11 today's proceeding.
12         The staff of the Commission asked you to come in
13 today in connection with an investigation entitled "In the
14 Matter of Homestore.com, Incorporated."  That's Commission
15 No. LA-2554.
16         The Commission is investigating whether there have
17 been violations of the federal securities laws.  However, the
18 facts developed in this investigation may constitute
19 violations of other federal or state, civil or criminal laws.
20         The purpose of today's proceeding is so that I can
21 ask you questions and learn information that may assist the
22 Commission in its investigation.
23         What I plan to do is go through some brief prepared
24 remarks and talk to you in some detail about some
25 transactions involving Homestore and get some basic personal

**Page 6**

1  information from you probably at the end of the day in the
2  interest of convenience and efficiency.
3          But before we do that, I'm required to swear you
4  in.
5          Please raise your right hand.
6  Whereupon,
7          STEVEN E. RINDNER
8  was called as a witness and, having been first duly sworn,
9  was examined and testified as follows:
10         MR. WILNER:  Thank you.
11         Can I ask you to state and spell your entire name.
12         THE WITNESS:  Steven Eric Rindner.  Steven with a
13 "v" -- S-t-e-v-e-n.  Eric, E-r-i-c.  Rindner R-i-n-d-n-e-r.
14         MR. WILNER:  Thanks.
15         Your date and place of birth please.
16         THE WITNESS:  June 13, 1968.  And I was born in
17 Brooklyn, New York.
18         MR. WILNER:  Before we began today, I provided you
19 with a couple of documents.  The first was the Formal Order
20 of Investigation, which is the typewritten document on the
21 table in front of us.  It will be available for your
22 examination during our hearing today.
23         Did you have an opportunity to review the Formal
24 Order?
25         THE WITNESS:  I did.

**Page 7**

1          MR. WILNER:  Also I provided you with a copy of
2  what we call Commission Form 1662.  It's the printed form on
3  the table that has the orange sticker indicating that it's
4  Commission Exhibit 1.
5          Did you have an opportunity to review that form?
6          THE WITNESS:  I did.
7          MR. WILNER:  Did you have any questions about that?
8          THE WITNESS:  I don't have any questions about it.
9          MR. WILNER:  Okay.  Are you represented by an
10 attorney today?
11         THE WITNESS:  I am.
12         MR. WILNER:  Can I ask you to make your appearance
13 please.
14         MR. PETERS:  It's Whitten Peters, Williams &
15 Connolly, Washington, D.C.  And with Heidi Murdy, M-u-r-d-y,
16 also Williams & Connolly, Washington, D.C.  And Laura Jahl,
17 J-a-h-l, internal counsel for AOL, Inc.
18         MR. WILNER:  Thank you.
19         Can I confirm that you're representing Mr. Rindner
20 in his individual capacity?
21         MR. PETERS:  Yes.
22         MR. WILNER:  Thank you.
23         Let me just make a couple of points before we get
24 going.
25         Everything that we say is being tape recorded by

**Page 8**

1  our Court Reporter and will be turned into a written
2  transcript.
3          To make sure we get an accurate transcript, I need
4  you to answer all of my questions out loud and with words.
5  It's difficult if you hold your hands up or nod your head in
6  response to a question.  It's also very difficult to
7  transcript "uh-huh" and "uh-uh."
8          THE WITNESS:  I understand.  So just let me know if
9  I fall into that habit.
10         MR. WILNER:  I will try and if I don't, I'm sure
11 our Reporter will.
12         THE WITNESS:  Okay.
13         MR. WILNER:  Please let me finish my questions
14 before you begin a response.  It's difficult for the Reporter
15 to take down both of us talking at the same time.
16         If you don't understand any of my questions, let me
17 know and I'll either repeat it or rephrase it so that you do
18 understand it and you can answer it fairly.
19         As we had discussed a moment ago, if you need to
20 take a break for any reason, let me know and we'll stop
21 recording at the appropriate time.
22         We're going to be passing some papers across the
23 table at some point today.  Please be careful handling things
24 near the microphone because our Reporter is wearing
25 headphones and the sound is amplified in her ears.

1AOL28001 0466
Confidential Treatment
Requested

HOMESTORE.COM, INC.                  Multi-Page™                  Steven E. Rindner

Page 217

1 representing Homestore.com?
2    A  No.
3    Q  Have you been approached or contacted by attorneys
4 representing anybody who is related this SEC investigation in
5 any way? Has anybody contacted you, besides the SEC of
6 course?
7    A  No.
8    Q  Okay.
9        MR. WILNER: At this point, the Commission staff
10 does not have additional questions of you.
11       If you or Laura want to ask additional questions or
12 follow-up in any way, please feel free --
13       MR. PETERS: We'll talk about it --
14       MR. WILNER: Of course.
15       Let's go off the record.
16       (A brief recess was taken.)
17       MR. WILNER: Continuing with Mr. Rindner's
18 testimony.
19       Mr. Peters, did you want to ask some questions?
20       MR. PETERS: Thank you, Mr. Wilner.
21       Mr. Rindner, do you recall approximately when the
22 ad referral and ad representative agreements were signed?
23       THE WITNESS: I saw the documents, and I remember
24 they were signed in mid-June. And I remember that AOL signed
25 them on June 19th.

Page 218

1        MR. PETERS: At the time they were signed by AOL,
2 had Mr. Tafeen or someone from Homestore already signed?
3        THE WITNESS: Yes.
4        MR. PETERS: At that time, was there actually an
5 agreement between the parties as to what the net amount to
6 AOL would be?
7        THE WITNESS: No. There was -- as I had said
8 before, there was a dispute as to what that amount would be.
9        MR. PETERS: And that dispute continued on after
10 June 19th?
11       THE WITNESS: Yes.
12       MR. PETERS: Now, why did the parties go ahead and
13 sign the papers in mid-June if there was still a dispute?
14       THE WITNESS: It was a matter of Homestore getting
15 anxious and wanting to be able to move this along, and at
16 least be able to document the transaction, even though there
17 was this dispute. Because they felt that it would take some
18 time to negotiate the documents and get them to a place where
19 they could be signed. And so at least they wanted to get the
20 documents finalized.
21       MR. PETERS: At the time that the documents were
22 signed by AOL, did AOL believe that an agreement would be
23 reached?
24       THE WITNESS: Yes.
25       MR. PETERS: Now, let me turn to the third quarter

Page 219

1 for a moment.
2        Now, you had testified that you didn't know who
3 made the decision to run the specific advertisement that was
4 run on Homestore in the third quarter.
5        Let me ask you if you can explain how the decision-
6 making process works at AOL with respect to what
7 organizations would have made that decision.
8        THE WITNESS: At least as I said, account services
9 makes the decision as to what shows up in carriage plans and
10 account services works with IM operations. IM operations is
11 the part that actually is responsible for operating the ad
12 serving and running the Creative.
13       So ultimately it was kicking it over to them to
14 say, "Here, you have this inventory. What do you want to do
15 with it?" And they would be responsible for picking a
16 partner, deciding to run AOL Creative, which is not something
17 unheard of, which they do in open spaces. But ultimately
18 it's not business affairs but it's account services and IM
19 operations that decides what Creative runs.
20       MR. PETERS: Do you know whether either you
21 yourself or anybody in business affairs told IM operations
22 and account services that the choice was theirs, or gave any
23 other kind of direction to account services or IM operations?
24       THE WITNESS: I think the direction to them was
25 that there was this inventory and that they could make the

Page 220

1 decision as to what would run in the space. It was directed
2 to them as to what they should run on the space.
3        MR. PETERS: So as you sit here today, do you know
4 who in those organizations actually made the decision which
5 ads to run?
6        THE WITNESS: No.
7        MR. PETERS: That's all I have.
8        MR. WILNER: Then let me say that the Commission
9 staff has no further questions. We may need additional
10 testimony or information from you in the future. If this is
11 necessary, we'll contact you through the Williams & Connolly
12 firm.
13       I think if we get that rsum or rsum-type
14 information in writing, that will be sufficient.
15       Let me thank you very much for coming in today. I
16 think we went a little bit longer than we'd anticipated, but
17 we covered a lot of ground. I appreciate you taking the time
18 to talk with us.
19       THE WITNESS: Sure. My pleasure.
20       MR. WILNER: Okay. We've concluded at 5:50.
21       (Whereupon, at 5:50 p.m., the examination was
22 concluded.)
23
                      * * * * *
                 1AOL28001 0519
                 Confidential Treatment
                 Requested

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JOHN MICHAEL KELLY, STEVEN E.
RINDNER, JOSEPH A. RIPP, and
MARK WOVSANIKER,

Defendants.

—————————————————————

08 Civ. 4612-SWK
(ECF Case)

# EXHIBIT 10

### DECLARATION OF ADA FERNANDEZ JOHNSON
### IN SUPPORT OF DEFENDANT J. MICHAEL KELLY'S
### MOTION TO DISMISS

## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# Form 10-K

---

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

#### For the fiscal year ended December 31, 2002

#### Commission file number 001-15062

---

# AOL TIME WARNER INC.
*(Exact name of Registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **13-4099534** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

**75 Rockefeller Plaza**
**New York, NY 10019**
*(Address of Principal Executive Offices)*

**(212) 484-8000**
*(Registrant's Telephone Number, Including Area Code)*

---

#### Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |

#### Securities registered pursuant to Section 12(g) of the Act:
#### None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

**AOL TIME WARNER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**CONTINGENCIES**

**Securities Matters**

As of March 25, 2003, 30 shareholder class action lawsuits have been filed naming as defendants the Company, certain current and former executives of the Company and, in several instances, America Online, Inc. ("America Online"). These lawsuits were filed in U.S. District Courts for the Southern District of New York, the Eastern District of Virginia and the Eastern District of Texas. The complaints purport to be made on behalf of certain shareholders of the Company and allege that the Company made material misrepresentations and/or omissions of material fact in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act. Plaintiffs claim that the Company failed to disclose America Online's declining advertising revenues and that the Company and America Online inappropriately inflated advertising revenues in a series of transactions. Certain of the lawsuits also allege that certain of the individual defendants and other insiders at the Company improperly sold their personal holdings of AOL Time Warner stock, that the Company failed to disclose that the Merger was not generating the synergies anticipated at the time of the announcement of the Merger and, further, that the Company inappropriately delayed writing down more than $50 billion of goodwill. The lawsuits seek an unspecified amount in compensatory damages. All of these lawsuits have been centralized in the U.S. District Court for the Southern District of New York for coordinated or consolidated pretrial proceedings (along with the federal derivative lawsuits and certain lawsuits brought under the Employee Retirement Income Security Act ("ERISA") described below) under the caption *In re AOL Time Warner Inc. Securities and "ERISA" Litigation*. The Minnesota State Board of Investment has been designated lead plaintiff for the consolidated securities actions. The Company intends to defend against these lawsuits vigorously. The Company is unable to predict the outcome of these suits or reasonably estimate a range of possible loss.

As of March 25, 2003, eight shareholder derivative lawsuits are pending. Three were filed in New York State Supreme Court for the County of New York, one in the U. S. District Court for the Southern District of New York and four in the Court of Chancery of the State of Delaware for New Castle County. These suits name current and former directors and officers of the Company as defendants, as well as the Company as a nominal defendant. The complaints allege that defendants breached their fiduciary duties by causing the Company to issue corporate statements that did not accurately represent that America Online had declining advertising revenues, that the Merger was not generating the synergies anticipated at the time of the announcement of the Merger, and that the Company inappropriately delayed writing down more than $50 billion of goodwill, thereby exposing the Company to potential liability for alleged violations of federal securities laws. The lawsuits further allege that certain of the defendants improperly sold their personal holdings of AOL Time Warner securities. The lawsuits request that (i) all proceeds from defendants' sales of AOL Time Warner common stock, (ii) all expenses incurred by the Company as a result of the defense of the shareholder class actions discussed above and (iii) any improper salaries or payments, be returned to the Company. The four lawsuits filed in the Court of Chancery for the State of Delaware for New Castle County have been consolidated under the caption, *In re AOL Time Warner Inc. Derivative Litigation*. A consolidated complaint was filed on March 7, 2003. On December 9, 2002, the Company moved to dismiss the three lawsuits filed in New York State Supreme Court for the County of New York on *forum non conveniens* grounds. Those motions to dismiss were heard on February 11, 2003 and the decision is pending. In addition these three lawsuits have been consolidated under the caption, *In re AOL Time Warner Inc. Derivative Actions*. The lawsuit filed in the U.S. District Court for the Southern District of New York has been centralized for coordinated or consolidated pre-trial proceedings with the securities actions described above and the ERISA lawsuits described below under the caption *In re AOL Time Warner Inc. Securities and "ERISA" Litigation*. The parties to the federal action have agreed that all proceedings in that matter should be stayed pending resolution of any motion to dismiss in the consolidated securities action described above.

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

AOL TIME WARNER INC.

By:          /s/ WAYNE H. PACE

Name: Wayne H. Pace
Title: Executive Vice President and
     Chief Financial Officer

Date: March 28, 2003

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ STEPHEN M. CASE<br><br>(Stephen M. Case) | Chairman of the Board | March 28, 2003 |
| /s/ RICHARD D. PARSONS<br><br>(Richard D. Parsons) | Director and Chief Executive Officer<br>(principal executive officer) | March 28, 2003 |
| /s/ WAYNE H. PACE<br><br>(Wayne H. Pace) | Executive Vice President and<br>Chief Financial Officer<br>(principal financial officer) | March 28, 2003 |
| /s/ JAMES W. BARGE<br><br>(James W. Barge) | Sr. Vice President and Controller<br>(principal accounting officer) | March 28, 2003 |
| /s/ DANIEL F. AKERSON<br><br>(Daniel F. Akerson) | Director | March 28, 2003 |
| /s/ JAMES L. BARKSDALE<br><br>(James L. Barksdale) | Director | March 28, 2003 |
| /s/ STEPHEN F. BOLLENBACH<br><br>(Stephen F. Bollenbach) | Director | March 28, 2003 |

51

| Signature | Title | Date |
|---|---|---|
| /s/ FRANK J. CAUFIELD | Director | March 28, 2003 |
| (Frank J. Caufield) | | |
| /s/ MILES R. GILBURNE | Director | March 28, 2003 |
| (Miles R. Gilburne) | | |
| /s/ CARLA A. HILLS | Director | March 28, 2003 |
| (Carla A. Hills) | | |
| /s/ REUBEN MARK | Director | March 28, 2003 |
| (Reuben Mark) | | |
| /s/ MICHAEL A. MILES | Director | March 28, 2003 |
| (Michael A. Miles) | | |
| /s/ KENNETH J. NOVACK | Director | March 28, 2003 |
| (Kenneth J. Novack) | | |
| | Director | March , 2003 |
| (Franklin D. Raines) | | |
| | Director | March , 2003 |
| (R.E. Turner) | | |
| /s/ FRANCIS T. VINCENT, JR. | Director | March 28, 2003 |
| (Francis T. Vincent, Jr.) | | |

52

Table of Contents

## CERTIFICATIONS

I, Richard D. Parsons, certify that:

1. I have reviewed this annual report on Form 10-K of AOL Time Warner Inc.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

  a. designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

  b. evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

  c. presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

  a. all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

  b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

By:              /s/ RICHARD D. PARSONS

Name: Richard D. Parsons
Title: Chief Executive Officer

Date: March 28, 2003

Table of Contents

I, Wayne H. Pace, certify that:

    1. I have reviewed this annual report on Form 10-K of AOL Time Warner Inc.;

    2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

    3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

    4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

    a. designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    b. evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

    c. presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

    5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

    a. all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

    b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

    6. The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

    By /s/ WAYNE H. PACE

    Name: Wayne H. Pace
    Title: Chief Financial Officer

Date: March 28, 2003

```
<DOCUMENT>
<TYPE>EX-99.4
<SEQUENCE>17
<FILENAME>g81332exv99w4.txt
<DESCRIPTION>EX-99.4 CERTIFICATION OF THE CEO AND CFO
<TEXT>
<PAGE>
```

EXHIBIT 99.4

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350
AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report on Form 10-K (the "Form 10-K") of AOL Time Warner Inc., a Delaware corporation (the "Company"), for the year ended December 31, 2002, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of the undersigned officers of the Company certifies pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to his respective knowledge:

1.      the Report fully complies, in all material respects, with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.      the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Dated:  March 28, 2003                          /s/ Richard D. Parsons
                                                ------------------------------------
                                                Richard D. Parsons
                                                Chief Executive Officer


Dated:  March 28, 2003                          /s/ Wayne H. Pace
                                                ------------------------------------
                                                Wayne H. Pace
                                                Chief Financial Officer


A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

```
</TEXT>
</DOCUMENT>
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| v. | : |
| JOHN MICHAEL KELLY, STEVEN E. RINDNER, JOSEPH A. RIPP, and MARK WOVSANIKER, | : |
| Defendants. | : |

08 Civ. 4612-SWK
(ECF Case)

---

# EXHIBIT 11

### DECLARATION OF ADA FERNANDEZ JOHNSON
### IN SUPPORT OF DEFENDANT J. MICHAEL KELLY'S
### MOTION TO DISMISS

Page 1 of 1

| | |
|---|---|
| Subj: | Re: Yodlee Overview |
| Date: | 5/3/00 |
| To: | DKRJJ |
| CC: | LisaSolt, Wovsaniker/a, DRN2/a |

In a message dated 5/3/00 1:44:44 PM Eastern Daylight Time, DKRJJ writes:

<< Will be signing this today --- wanted to make sure you are okay — have all the sign-offs etc.

Thx

David >>

I am a little uncomfortable with the rev recg.....$20m over 9 months........then $20m +/- over the next 27 months.........seems very aggressive. Also what valuation are we looking at. To get $10m of value out of the warrants , the entity needs to have a market cap approaching $1b.......is this realistic? What is the value of the inventory we are providing here........I did not see it in the write up........is it at rate card or not. Any thing this precludes us from doing. What other round trips do you have coming down the line? Mike

**24AOL001710437**
*Confidential Treatment Requested*

Redacted                                    KELLY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

          v.

JOHN MICHAEL KELLY, STEVEN E.
RINDNER, JOSEPH A. RIPP, and
MARK WOVSANIKER,

                    Defendants.

—————————————————————————

08 Civ. 4612-SWK
(ECF Case)

# EXHIBIT 12

## DECLARATION OF ADA FERNANDEZ JOHNSON
## IN SUPPORT OF DEFENDANT J. MICHAEL KELLY'S
## MOTION TO DISMISS

**EXHIBIT E**

**Yodlee.com, Inc. ("Yodlee")**

Yodlee has developed technology to enable Internet users to access, on one centralized site, all their personal information from other websites of financial institutions, utilities companies, frequent flyer programs, etc. ("Account Aggregation Services"). Users provide their user IDs and passcodes for the various third-party sites that originate and supply the summary-level data. Yodlee uses the IDs and passcodes to periodically "scrape" the various sites and maintains a data store of personalized information.

America Online, Inc. ("AOL") and Yodlee entered into a relationship where AOL would engage Yodlee as a provider of Account Aggregation Services and AOL would provide advertising and promotion to Yodlee. Initially, AOL would integrate Yodlee's services into AOL's My Account Manager, an area within the AOL Personal Finance channel that would support easy access to financial accounts, an integrated view of financial data, personalized analysis and advice, and access to a wide range of financial products and services. AOL would also incorporate Yodlee service on Netcenter personal finance and small business and on Compuserve personal finance.

To effect this relationship for AOL to carry the Yodlee service and provide advertising and promotion, AOL and Yodlee entered into a master agreement dated April 1, 2000, which provided for an initial service arrangement for AOL and allowed for other AOL properties to obtain Yodlee's services in the future.

The contemporaneous transactions, as defined in AOL Time Warner Inc.'s November 15, 2002 response to the Securities and Exchange Commission, that occurred between AOL and Yodlee were a $25 million investment by AOL in Yodlee and Yodlee warrants issued to AOL.

A more detailed description of the arrangements between AOL and Yodlee is set forth in the following transaction summaries.

| Parties | AOL and Yodlee |
|---|---|
| **Transaction Name** | Master Agreement |
| **Effective Date** | April 1, 2000 |
| **Contract Number** | 9001226 |
| **Term** | Initial Term: April 1, 2000 through earlier of (i) December 31, 2000 (9 months) and (ii) Yodlee's initial public offering ("IPO"). AOL has the right to extend the Initial Term for up to 6 months (the "Initial Term Extension Period") to allow Yodlee more time to successfully close a financing. This Master Agreement will expire at the end of the Initial Term, or the Initial Term Extension Period, if applicable, if it is not renewed.

Initial Renewal Term: The Initial Renewal Term will extend for 3 years minus the Initial Term so that the total term is 36 months. Either party can activate the Initial Renewal Term upon Yodlee's IPO. If Yodlee's IPO has not occurred, only AOL can activate the Initial Renewal Term (AOL's unilateral option to renew).

Additional Renewal Terms: Upon the expiration of the Initial Renewal Term, AOL can extend the Master Agreement for 2 additional renewal periods. The first period for 2 years (years 4 and 5), and the second for 1 year (year 6). At the end of year 6, AOL will have the right to renew on a perpetual basis for successive two-year terms. |
| **Total Contract Amount** | $30 million (non-refundable guaranteed cash payment) |
| **Deal Components** | Cash and Revenue Sharing |
| **Material Terms** | Master Agreement and Participant Addenda: The overall terms of the arrangement for AOL to provide Yodlee's personal account aggregation services are included in this Master Agreement. AOL, and any of AOL's affiliates, can offer Yodlee's services on the terms set forth in the Master Agreement. Any AOL property that offers Yodlee's services (each a "Participant") will sign a separate Participant Addendum (as defined) that will set out the specifications and schedule for each launch. AOL is committed to launch the Yodlee Service (as described below) on four AOL properties.

Yodlee Services: Each AOL Participant can elect to receive Yodlee's Hosted Service or Wire Service. In the Hosted Service, users will be directed to pages hosted on Yodlee's servers that are customized to AOL's specifications. In the Wire Service, Yodlee will provide customer account data to AOL and AOL will be responsible for hosting and presenting the data. Participants may switch their election between the Hosted Service and the Wire Service up to one time every two years.

Service Election, Implementation Fees, and Hosted/Wired Service Fees: AOL will initially offer, market and receive the Hosted Service on the |

Personal Finance Area of the AOL Service during the Term. AOL will pay Yodlee an implementation fee of $400,000 for the Service at the execution of this Master Agreement. AOL will pay $100,000 for launching the Service on each additional AOL property or channel. For the Hosted Service, AOL will also pay to Yodlee a Per User Basis fee (as defined), which has certain caps; or elect to a Revenue Share Basis payment (50% of AOL Advertising Revenue), which has certain monthly minimums, and pay 50% of all Yodlee Bounty Fees (as defined). For the Wire Service, AOL will pay to Yodlee a Per User Basis fee, which is subject to certain caps.

Carriage Plan (Placement/Promotion): AOL will provide promotion as described in the Carriage Plan (Exhibit J).

Impression Commitment: AOL will deliver 720.6 million impressions during the Initial Term. In the event the Master Agreement is renewed, AOL will deliver 1.365 billion impressions during the Initial Renewal Term. If there is a shortfall in impressions delivered at the end of the Initial Term or Initial Renewal Term (as the case may be), AOL will provide to Yodlee advertising placements, which are valued at an amount equal to the value of the shortfall.

Cash Payments: Yodlee will pay to AOL a non-refundable guaranteed payment of $30 million as follows:

    (a)    $20 million within 5 business days of the Closing Date of the Series C financing; and

    (b)    $10 million upon a subsequent Yodlee financing as follows: (i) $10 million cash within 5 days after Yodlee receives proceeds of its IPO; (ii) $10 million in cash within 5 days after Yodlee receives proceeds of at least $30 million from a subsequent private financing; (iii) $5 million in cash within 5 days after Yodlee receives proceeds of at least $20 million from a subsequent private financing; (iv) if a Yodlee IPO or subsequent financing has not occurred before the expiration of the Initial Term, Yodlee will deliver a non-interest bearing note for any unpaid amount to AOL that is due upon the earlier of (x) an IPO or subsequent financing or (y) 12 months from the expiration of the Initial Term.

AOL Obligation for Non-Election of Initial Renewal Term: If AOL elects not to activate the Initial Renewal Term, AOL must pay Yodlee 50% of the revenue AOL receives from any replacement account aggregation services up to $17.5 million (only if AOL enters into future account aggregation contracts).

| | |
|---|---|
| **Deal Employees** | AOL: David Colburn (signatory)<br><br>Yodlee: Swekhinder Singh (signatory) |
| **Accounting Employees** | Mark Wovsaniker |
| **Contingent Agreements** | In connection with entering into this Master Agreement, AOL purchased |

| | |
|---|---|
| | $25 million in Yodlee's Series C Preferred Stock in two rounds of financing (see Series C Preferred Agreement transaction summary). Additionally, concurrent with the execution of this agreement, AOL and Yodlee entered into Series C Preferred Stock Purchase Warrant agreements dated April 1, 2000 (four warrant agreements). AOL Finance recognized at the time that these agreements were negotiated concurrently and evaluated them accordingly. |
| **Accounting Treatment** | Of the $30 million guaranteed payment, AOL allocated to the Initial Term the first guaranteed payment of $20 million, which was received in accordance with the Master Agreement. Since the remaining $10 million payment from Yodlee was contingent upon a successful and sufficient Yodlee financing (whether IPO or private) and payment could not be assured until such time, the $10 million was not ascribed to the Initial Term, and would only be factored into the total revenue recognizable amount on a prospective basis upon Yodlee receiving financing (which has not happened). AOL's allocation of the entire guaranteed $20 million to the Initial Term is considered reasonable and proper because AOL was not obligated to extend the contract term when the Initial Term expired and would only be responsible for paying Yodlee revenue share fees, if any, on a going-forward basis, if AOL took on another account aggregation service in place of Yodlee.<br><br>During the Initial Term, in accordance with AOL's Advertising Revenue Policy for non-standard advertising agreements, advertising revenue of $19.7 million ($20 million net of prorated amount of implementation fees) was recognized on a straight-line basis over the 9-month term of the agreement. The $19.7 million represented the $20 million allocated to the Initial Term net of a proportionate amount ($267,000) of the implementation fee AOL was required to make. Accordingly, AOL recognized monthly and quarterly advertising revenue of $2.2 million and $6.57 million, respectively, beginning in April 2000 and ending December 31, 2000.<br><br>Subsequent to December 31, 2000, the proportionate share of implementation fees was reversed and $267,000 was reflected as revenue in 2001 ($365,000 revenue in Q1 2000 and $98,000 revenue reduction in Q4 2001). In the 1st quarter of 2002, AOL netted the implementation fees (total fee ended up being $500,000) against a $1 million payment received from Yodlee and recognized as advertising revenue in Q1 2002 (see last paragraph below for amendment discussion of $1 million payment from Yodlee), effectively negating the 2001 Yodlee revenue recognition and fully accounting for the implementation fees as reductions to revenue. AOL should have recorded the entire implementation fee payment as revenue reductions evenly during the Initial Term. Management has concluded that this adjustment was not material and thus did not call for an adjustment of previously reported results.<br><br>AOL elected the Per User Basis fee payment method. During the Initial Term, no payments were made. In March 2002, payments totaling $35,000 |

were made and expensed, which included a catch-up for unrecognized amounts during the Initial Term. Management has concluded that this adjustment was not material and thus did not call for an adjustment of previously reported results.

Yodlee's IPO did not occur by December 31, 2001. An amendment was made to the Master Agreement on December 31, 2001 (the Addendum No. 1 to Master Agreement) by the parties for AOL to continue to provide Yodlee's account aggregation service, but to eliminate the carriage plan, and restructure the guaranteed payment terms. See the subsequent transaction summary for discussion of this amendment, for which advertising revenue totaling $1.75 million was recognized in 2002 ($1 million in Q1 2002 and $0.75 million in Q4 2002).

| Parties | AOL and Yodlee |
|---|---|
| Transaction Name | Addendum No.1 to Master Agreement ("Amendment") |
| Effective Date | December 31, 2001 |
| Contract Number | Not Applicable |
| Term | The Master Agreement (see previous transaction summary) was renewed and will now terminate on March 31, 2003. AOL retains the renewal rights from the Master Agreement to extend the agreement through December 31, 2006. |
| Total Contract Amount | $3 million (Amendment cash amount) |
| Deal Components | Cash |
| Material Terms | Reduction in Committed Launch Properties and Future Implementation Fees: Under the original Master Agreement, AOL was obligated to launch the Yodlee service on four AOL properties. This Amendment reduces that commitment to the two properties for which the service has already been launched (AOL Service and CompuServe). This Amendment also reduces the future implementation fee to be paid by AOL for each additional launch, if any, from $100,000 to $50,000.<br><br>Termination of Carriage Plan: Yodlee and AOL agreed to treat the carriage plan as effectively terminated as of December 31, 2000. (AOL will continue to provide the Yodlee account aggregation service.)<br><br>Warrants and Payments: The Amendment restructured Yodlee's original $10 million cash obligation as provided for in the Master Agreement (see previous transaction summary). Instead of a $10 million payment, Yodlee is to pay AOL the equivalent to $10 million through the combination of non-refundable cash payments of $3 million and Additional Warrants (as defined). The $3 million in cash is to be paid as follows:<br><br>    First Payment: $1 million on February 5, 2000<br>    Second Payment: $1 million on December 1, 2002<br>    Third Payment: $1 million on December 1, 2003<br><br>To receive the Third Payment on December 1, 2003, AOL would need to renew the Master Agreement beyond March 31, 2003. If Yodlee misses the Second Payment, Third Payment, or is subject to a change of control and has not paid AOL a total of $3 million, Yodlee will be obligated to pay AOL the full balance of the original $10 million obligation (less any payments already made under this Amendment).<br><br>Effect of Nonrenewal: The Amendment eliminated the requirement under the Master Agreement, for AOL to pay Yodlee 50% of the revenue AOL received from any replacement account aggregation services up to $17.5 million (see previous transaction summary). |
| Deal Employees | AOL: Gio Hunt (signatory), Mark Feldman |

|  | Yodlee: Anil Arora (signatory) |
| **Accounting Employees** | Mark Wovsaniker |
| **Contingent Agreements** | This Amendment relates to the Master Agreement dated April 1, 2000 (see previous transaction summary). |
| **Accounting Treatment** | This Amendment essentially activated the Master Agreement's Initial Renewal Term (see previous transaction summary), with AOL continuing to provide the Yodlee service, but with no advertising carriage to Yodlee. Instead of the original $10 million being attributed to the renewal term (effectively January 1, 2001 through March 31, 2003, or 27 months), the total value of the First and Second Payments, or $2 million, which are to be paid during this renewal term, would be ascribed to this period. When and if it occurred, AOL would ascribe the Third Payment of $1 million on a prospective basis to the end of any subsequent renewal period.

In accordance with AOL's Advertising Revenue Policy for non-standard advertising agreements, advertising revenue of $2 million would be recognized on a straight-line basis over the 27-month renewal term, as described above. Accordingly, AOL would have recognized monthly and quarterly advertising revenue of $0.074 million and $0.222 million, respectively, beginning in January 2001. However, considering the collectibility risk of receiving payments from Yodlee, a company in financial difficulty, AOL elected to not recognize any revenue until such payments were received.

In Q1 2002, the First Payment of $1 million was received. AOL recognized the entire amount to advertising revenue in that quarter, attributing it to services provided and revenues earned in 2001 and Q1 2002. (The $1 million recognized as revenue in Q1 2002 was netted with the $500,000 implementation fees paid by AOL, as described in the previous transaction summary, for net advertising revenue in Q1 2002 of $500,000.)

In Q4 2002, the Second Payment of $1 million was received. AOL recognized $0.75 million to advertising revenue in that quarter, attributing it to services provided and revenues earned from Q2 2002 to Q4 2002. The remaining balance of $0.25 million is to be recognized in the 1st quarter of 2003, ending on March 31, 2003 (expiration of renewal term).

The total amounts recognized to revenue in 2002, based on cash collection recognition, are reasonable and fairly stated given that they materially reflect what cumulative amounts would have been recognized as of December 31, 2002 under AOL's non-standard advertising policy, as described above. Considering revenue recognition was contingent upon cash collection, management has concluded that any revenue recognition adjustments to 2001 and quarterly periods were not material and thus do not call for an adjustment to previously report results.

The Additional Warrants replaced the two original Renewal Warrants, which are described in subsequent transaction summaries. All the major |

|  | terms of the original warrants remained the same, except the vesting performance hurdle to activate the Initial Renewal Term was eliminated. See subsequent warrant transaction summaries for discussion of the accounting impact of these warrants. |
|--|--|

| | |
|---|---|
| **Parties** | AOL, Yodlee and Other Parties (as described below) |
| **Transaction Name** | Series C Preferred Stock Purchase Agreement ("Series C Preferred Agreement") |
| **Effective Date** | May 5, 2000 |
| **Contract Number** | Not Applicable |
| **Term** | Not Applicable |
| **Total Contract Amount** | First Closing: $15 million (AOL's equity purchase) (It is believed that Yodlee received total proceeds of $31 million as part of this First Closing of the Series C Preferred Agreement.)<br><br>Fourth Closing: $10 million (AOL's equity purchase), which occurred in June 2000. |
| **Deal Components** | Equity |
| **Material Terms** | First Closing: AOL purchased 3,325,942 shares of Series C Preferred Stock of Yodlee at a price of $4.51 per share.  (Total Series C Preferred Stock to be issued by Yodlee as part of this First Closing of the Series C Preferred Agreements was 6,873,613 shares.)<br><br>Fourth Closing: AOL purchased 2,278,185 shares of Series C Preferred Stock of Yodlee at a price of $4.51 per share.   (AOL was the only participant in this closing.) |
| **Deal Employees** | Other Parties to Series C Preferred Agreement believed to include: Accel VII L.P.; Accel Internet Fund III L.P.; Accel Investors '99 L.P.; Sequoia Capital IX; Sequoia Capital Entrepreneurs; Sequoia Capital IX Principals Fund; GE Capital Equity Investments, Inc.; Inktomi Corporation; Intel Corporation<br><br>AOL:  David Colburn (signatory)<br><br>Yodlee: Anil Arora (signatory) |
| **Accounting Employees** | Don Neff, Mark Wovsaniker |
| **Contingent Agreements** | In connection with the execution of this Series C Preferred Agreement, AOL and Yodlee entered into the Master Agreement dated April 1, 2000 and Series C Preferred Stock Purchase Warrant agreements dated April 1, 2000 (four warrant agreements). |
| **Accounting Treatment** | In total, AOL purchased 5,604,127 shares or $25 million of Series C Preferred Stock of Yodlee, 3,325,942 shares ($15 million) from the First Closing of the Series C Preferred Agreement and 2,278,185 shares ($10 million) from the Fourth Closing.  On a fully diluted basis, AOL held an approximate ownership interest of 11%.<br><br>Pursuant to APB 18, "The Equity Method of Accounting for Investments in Common Stock", AOL accounted for this total investment in Yodlee at cost ($25 million) and determined it to be fairly stated given that to the best of its knowledge there were several other significant third-party investors |

supporting Yodlee's valuation. For subsequent declines in value determined to be other than temporary, AOL recognized such impairments as realized loss in Other Income and Expense as follows:

Q4 2000    $12.5 million
Q1 2001    $3.8 million
Q2 2002    $4.5 million

In the Q3 2002, AOL sold the Yodlee shares for a loss of $1.7 million.

| Parties | AOL and Yodlee |
|---|---|
| **Transaction Name** | Series C Preferred Stock Purchase Warrant ($13.53 Launch Warrants) |
| **Effective Date** | April 1, 2000 |
| **Contract Number** | Not Applicable |
| **Term** | Exercise Period: The warrants will expire upon the first of the following: (i) April 1, 2003 (3 year term); (ii) closing of a merger or consolidation of Yodlee where voting security holders retain less than 50% of the surviving entity's voting stock; and (iii) closing of the sale of all or substantially all of Yodlee's assets. |
| **Total Contract Amount** | Not Applicable |
| **Deal Components** | Equity |
| **Material Terms** | AOL received warrants to purchase 251,218 shares of Series C Preferred Stock, $0.001 par value, of Yodlee at a price per share of $13.53. The warrants vest and become exercisable upon the occurrence of the launch of the Yodlee service, provided the launch occurs before September 1, 2000. |
| **Deal Employees** | AOL: Lynda Clarizio (signatory)<br><br>Yodlee: Anil Arora (signatory) |
| **Accounting Employees** | Don Neff, Mark Wovsaniker |
| **Contingent Agreements** | This warrant agreement was entered into by AOL and Yodlee concurrent to the Master Agreement dated April 1, 2000 and Series C Preferred Agreement dated May 5, 2000. |
| **Accounting Treatment** | In connection with AOL's investment in Yodlee and the Master Agreement, AOL received warrants totaling 2,009,740 for shares of Yodlee's Series C Preferred Stock. One-quarter of these warrants (502,436 warrants) vested upon the launch of the Yodlee service (the "Launch Warrants"). The remaining three-quarters (1,507,304 warrants) vested upon the renewal of the Master Agreement for the Initial Renewal Term (the "Renewal Warrants"). The following summarizes the four warrants received by AOL, which are each described in separate transaction summaries:<br><br>1. Launch Warrants for 251,218 shares at $13.53 exercise price (those discussed herein)<br>2. Launch Warrants for 251,218 shares at $4.51 exercise price<br>3. Renewal Warrants for 753,652 shares at $13.53 exercise price<br>4. Renewal Warrants for 753,652 shares at $4.51 exercise price<br><br>In accordance with AOL's policy, no value was ascribed to the warrants received due to the difficulty in determining fair value and the inherent illiquidity of private equity warrants. Accordingly, the receipt of the warrants had no accounting impact. |

| Parties | AOL and Yodlee |
|---|---|
| **Transaction Name** | Series C Preferred Stock Purchase Warrant ($4.51 Launch Warrants) |
| **Effective Date** | April 1, 2000 |
| **Contract Number** | Not Applicable |
| **Term** | Exercise Period: The warrants will expire upon the first of the following: (i) April 1, 2003 (3 year term); (ii) closing of a merger or consolidation of Yodlee where voting security holders retain less than 50% of the surviving entity's voting stock; and (iii) closing of the sale of all or substantially all of Yodlee's assets. |
| **Total Contract Amount** | Not Applicable |
| **Deal Components** | Equity |
| **Material Terms** | AOL received warrants to purchase 251,218 shares of Series C Preferred Stock, $0.001 par value, of Yodlee at a price per share of $4.51. The warrants vest and become exercisable upon the occurrence of the launch of the Yodlee service, provided the launch occurs before September 1, 2000. |
| **Deal Employees** | AOL: Lynda Clarizio (signatory)<br><br>Yodlee: Anil Arora (signatory) |
| **Accounting Employees** | Don Neff, Mark Wovsaniker |
| **Contingent Agreements** | This warrant agreement was entered into by AOL and Yodlee concurrent to the Master Agreement dated April 1, 2000 and Series C Preferred Agreement dated May 5, 2000. |
| **Accounting Treatment** | In connection with AOL's investment in Yodlee and the Master Agreement, AOL received warrants totaling 2,009,740 for shares of Yodlee's Series C Preferred Stock. One-quarter of these warrants (502,436 warrants) vest upon the launch of the Yodlee service (the Launch Warrants). The remaining three-quarters (1,507,304 warrants) vest upon the renewal of the Master Agreement for the Initial Renewal Term (the Renewal Warrants). The following summarizes the four warrants received by AOL, which are each described in separate transaction summaries:<br><br>1. Launch Warrants for 251,218 shares at $13.53 exercise price<br>2. Launch Warrants for 251,218 shares at $4.51 exercise price (those discussed herein)<br>3. Renewal Warrants for 753,652 shares at $13.53 exercise price<br>4. Renewal Warrants for 753,652 shares at $4.51 exercise price<br><br>In accordance with AOL's policy, no value was ascribed to the warrants received due to the difficulty in determining fair value and the inherent illiquidity of private equity warrants. Accordingly, the receipt of the warrants had no accounting impact. |

| Parties | AOL and Yodlee |
|---|---|
| Transaction Name | Series C Preferred Stock Purchase Warrant ($13.53 Renewal Warrants) |
| Effective Date | April 1, 2000 |
| Contract Number | Not Applicable |
| Term | Exercise Period: The warrants will expire upon the first of the following: (i) April 1, 2003 (3 year term); (ii) closing of a merger or consolidation of Yodlee where voting security holders retain less than 50% of the surviving entity's voting stock; and (iii) closing of the sale of all or substantially all of Yodlee's assets. |
| Total Contract Amount | Not Applicable |
| Deal Components | Equity |
| Material Terms | AOL received warrants to purchase 753,652 shares of Series C Preferred Stock, $0.001 par value, of Yodlee at a price per share of $13.53. The warrants vest and become exercisable upon the renewal of the Master Agreement for the Initial Renewal Term.<br><br>In connection with the Amendment dated December 31, 2001 to the Master Agreement (see Amendment transaction summary), this warrant was revised to eliminate the above-mentioned Initial Renewal Term vesting performance hurdle. |
| Deal Employees | AOL: Lynda Clarizio (signatory)<br><br>Yodlee: Anil Arora (signatory) |
| Accounting Employees | Don Neff, Mark Wovsaniker |
| Contingent Agreements | This warrant agreement was entered into by AOL and Yodlee concurrent to the Master Agreement dated April 1, 2000 and Series C Preferred Agreement dated May 5, 2000. |
| Accounting Treatment | In connection with AOL's investment in Yodlee and the Master Agreement, AOL received warrants totaling 2,009,740 for shares of Yodlee's Series C Preferred Stock. One-quarter of these warrants (502,436 warrants) vest upon the launch of the Yodlee service (the Launch Warrants). The remaining three-quarters (1,507,304 warrants) vest upon the renewal of the Master Agreement for the Initial Renewal Term (the Renewal Warrants). The following summarizes the four warrants received by AOL, which are each described in separate transaction summaries:<br><br>1. Launch Warrants for 251,218 shares at $13.53 exercise price<br>2. Launch Warrants for 251,218 shares at $4.51 exercise price<br>3. Renewal Warrants for 753,652 shares at $13.53 exercise price (those discussed herein)<br>4. Renewal Warrants for 753,652 shares at $4.51 exercise price<br><br>In accordance with AOL's policy, no value was ascribed to the warrants received due to the difficulty in determining fair value and the inherent illiquidity of private equity warrants. Accordingly, the receipt of the |

| | warrants had no accounting impact. |
|---|---|

**Confidential Treatment Requested Under 17 C.F.R.§ 200.83**

| Parties | AOL and Yodlee |
|---|---|
| Transaction Name | Series C Preferred Stock Purchase Warrant ($4.51 Renewal Warrants) |
| Effective Date | April 1, 2000 |
| Contract Number | Not Applicable |
| Term | Exercise Period: The warrants will expire upon the first of the following: (i) April 1, 2003 (3 year term); (ii) closing of a merger or consolidation of Yodlee where voting security holders retain less than 50% of the surviving entity's voting stock; and (iii) closing of the sale of all or substantially all of Yodlee's assets. |
| Total Contract Amount | Not Applicable |
| Deal Components | Equity |
| Material Terms | AOL received warrants to purchase 753,652 shares of Series C Preferred Stock, $0.001 par value, of Yodlee at a price per share of $4.51. The warrants vest and become exercisable upon the renewal of the Master Agreement for the Initial Renewal Term.<br><br>In connection with the Amendment dated December 31, 2001 to the Master Agreement (see Amendment transaction summary), this warrant was revised to eliminate the above-mentioned Initial Renewal Term vesting performance hurdle. |
| Deal Employees | AOL: Lynda Clarizio (signatory)<br><br>Yodlee: Anil Arora (signatory) |
| Accounting Employees | Don Neff, Mark Wovsaniker |
| Contingent Agreements | This warrant agreement was entered into by AOL and Yodlee concurrent to the Master Agreement dated April 1, 2000 and Series C Preferred Agreement dated May 5, 2000. |
| Accounting Treatment | In connection with AOL's investment in Yodlee and the Master Agreement, AOL received warrants totaling 2,009,740 for shares of Yodlee's Series C Preferred Stock. One-quarter of these warrants (502,436 warrants) vest upon the launch of the Yodlee service (the Launch Warrants). The remaining three-quarters (1,507,304 warrants) vest upon the renewal of the Master Agreement for the Initial Renewal Term (the Renewal Warrants). The following summarizes the four warrants received by AOL, which are each described in separate transaction summaries:<br><br>1. Launch Warrants for 251,218 shares at $13.53 exercise price<br>2. Launch Warrants for 251,218 shares at $4.51 exercise price<br>3. Renewal Warrants for 753,652 shares at $13.53 exercise price<br>4. Renewal Warrants for 753,652 shares at $4.51 exercise price (those discussed herein)<br><br>In accordance with AOL's policy, no value was ascribed to the warrants received due to the difficulty in determining fair value and the inherent illiquidity of private equity warrants. Accordingly, the receipt of the |

| | warrants had no accounting impact. |
|---|---|

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

          v.

JOHN MICHAEL KELLY, STEVEN E.
RINDNER, JOSEPH A. RIPP, and
MARK WOVSANIKER,

                Defendants.

08 Civ. 4612-SWK
(ECF Case)

---

# EXHIBIT 13

## DECLARATION OF ADA FERNANDEZ JOHNSON
## IN SUPPORT OF DEFENDANT J. MICHAEL KELLY'S
## MOTION TO DISMISS

| | |
|---|---|
| Subj: | Re: Sun |
| Date: | 6/1/00 10:36:48 PM Eastern Daylight Time |
| From: | DKRJJ |
| To: | Jayrapp |
| CC: | GioHunt, Lanceconn, Wovsaniker, LaberTJ, Korn, WJRCTO, JMikeKelly, DGang, MayoSJr |

*Sent on: AOL 5.0 for Windows sub 105*

In a message dated 6/1/00 5:51:10 PM Eastern Daylight Time, Jayrapp writes:

<< After talking/emailing with Terry, Mark, Bill and Gio, here is our recommended approach -- fyi, basics of this email are essentially the same as what Mark has already sent to Mike. Please confirm that we should start this process with this structure and I will have Terry make the first call.

1. <u>Deal Structure</u> – AOL will agree to extend its hardware commitment (on the same current terms) by an additional $200M over the next 2 years. Also, AOL will agree to not license any of the Netscape software to third party OEMs for the next 6 months (giving up a right we have in the SDMA) in exchange for Sun agreeing to increasing the MRC for the nexxt two quarters by $15M each (settling at $10M each quarter).

2. <u>Accounting</u> -- While not a slam dunk, Mark feels reasonably confident that the MRC increase will all be allocable to the two quarters in which they are paid and not spread over the 6 months.

3. <u>Alternative Structures</u>-- After talking with Mark W., the only other two structures we could craft to achieve either the dollars this quarter or the subscriber goals we are looking for in exchange for the hardware commitment are: (i) have Sun buy a major ad deal, but the problem was it would be very hard to negotiate that deal and get $15M of ads run this quarter, plus we would likely be using inventory we could sell to others so it would not be a full $15M incremental or (ii) have Sun purchase $15M worth of AOL accounts, but since we already have a dial-up deal with them and it seems the dollars are more important, we opted for the above structure.

4. <u>Rationale for the $30M and $200M</u> -- We think there is a chance we can get Sun to go for the above proposal (albeit we will likely need to come down from $30M to $20M and possibly increase the $200M a little bit, maybe $250M) because in our last Alliance discussions they proposed to split their margins on the hardware above our 40% discount 50/50 if we committed to $750M of hardware. We know they have about 30%-40% margin above our 40% discount, so using the 30% figure on a $200M commit yields a $30M payment to AOL (50% x 30% x $200M). However, since our hardware commitment is less than the $750M they proposed they are not likely to agree to the full 50/50 split so we are likely going to have to reduce it -- we are shooting for at least $20M which would be equivalent to 33/67 split.

5. <u>Issues</u> -- The major issue with using this structure though is that we will need to amend the SDMA to increase the MRC and modify our rights to license OEMs under the SDMA, and once we open up the SDMA, we may be opening up a can of worms that will prevent this deal from ever getting done. Also, since we were asking for a lot more value than just $30M in the Alliance discussions, we may be giving up a lot here; although since nothing is going on in the Alliance discussions and we will have to buy some Sun hardware in any event over the next year or so, we might as well get something for it.

6. <u>Next Steps</u> -- Terry Laber will call his senior level contacts and put this proposal on the table. Terry and I will talk before he calls them to script how we want to pitch this so they know we need to get it done this quarter, but they don't think we are desperate.

Thanks

Jay >>

**COLLECTED**

2AOL098321602
*Confidential Treatment Requested*

Points:

1. Tieing anything to the Alliance means it gets more complex and they will get it in front of Popov, Lehman, etc --- but guess this is only construct to get revs in Q (rebates I assume did not do it?) -- question is whether there is a way to keep it with Terry's contacts or smooth the way --- Gang/Mayo any ideas? In this regard, any way to position as momentum builder in putting relationship back together w?

Monday, September 09, 2002 America Online: Existing Member

LABER

Sun — first we put in Gang and now we commit to more hardware — all we want is some accounting help?

2. This is as true as we can get to old deal we put on the table — we are taking their offered hardware discount — but not giving them any of the other things — and lowering commit substantially.

Lets go for it!

David

**COLLECTED**

**2AOL098321603**
*Confidential Treatment Requested*

Monday, September 09, 2002 America Online: Existing Member

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JOHN MICHAEL KELLY, STEVEN E.
RINDNER, JOSEPH A. RIPP, and
MARK WOVSANIKER,

Defendants.

---

08 Civ. 4612-SWK
(ECF Case)

# EXHIBIT 14

## DECLARATION OF ADA FERNANDEZ JOHNSON
## IN SUPPORT OF DEFENDANT J. MICHAEL KELLY'S
## MOTION TO DISMISS



Network &
Data Center
Operations

America Online,    confidential

# Midyear Forecast Review

## Network and Data Center Operations



Matt Korn

June 22, 2001

043S1AOL1530000050
Confidential Treatment Requested

Confidential Treatment Requested
043SIAOL153000051

# Key Messages

- Planned Network Savings have materialized, but not improved:
  - Worldcom was planned at market; may settle higher but impact will be in FY02
  - Genuity planned above market, dispute continues
  - Sprint negotiation underway for FY02 savings
  - Dial Network capable of delivering more hours than demand

- Aggressive management of data center costs leading to equipment savings:
  - Hardware (off-lease returns, inventory management)

Bill McGrath

2




Network &
Data Center
Operations

America Online, Inc. C___dential



America Online.
Confidential

Network &
Data Center
Operations

# Key Messages

- Current forecast running $130 Million favorable to original plan, driven by:
  - AOL by Phone                    $37 million
  - Broadband Plan                  $34 million
  - Equipment Savings               $35 million
  - Dial Network Savings            $17 million

- Integration of Time Warner operations going well:
  - Web Hosting:    WMG, HBO, WB, Time Inc.
  - ATDN:           Expanded to each Division
  - 800/LD:         Negotiating using AOL Volumes
  - AOL over TWC:   In progress
  - Road Runner:    Leveraging ATDN to Lower Cost

3

Bill McGrath

043S1AOL1530000052
Confidential Treatment Requested

04351AOL1530000053
Confidential Treatment Requested

# Mid Year Forecast vs. Plan

| By Quarter (In Millions) | Q1 | Q2 | Q3 | Q4 | CY01 |
|---|---|---|---|---|---|
| Plan | $ 638.6 | $ 667.5 | $ 690.0 | $ 745.9 | $ 2,742.0 |
| Mid Year Forecast | $ 598.8 | $ 620.0 | $ 670.0 | $ 743.8 | $ 2,632.6 |
| Opportunities | | $ 5.0 | $ 7.1 | $ 8.5 | $ 20.6 |
| Variance | $ 39.8 | $ 52.5 | $ 27.1 | $ 10.6 | $ 130.0 |

Bill McGrath

4

Network & Data Center Operations



America Online, Inc.    dential



Cost per Dial-Up Port

043S1AOL1530000054
Confidential Treatment Requested

04JSIAOLIS30000055
Confidential Treatment Requested



# Dial-Up Network Cost Per Hour

Bill McGrath

Network &
Data Center
Operations

America Online, Inc.,    ...dential





Dial-Up Modem Capacity vs. Demand

Millions of Hours per Month

043S1AOL1530000056
Confidential Treatment Requested



# Broadband Network Cost per Member

04351AOL153000057
Confidential Treatment Requested

Bill McGrath

8



Network &
Data Center
Operations

America Online, Inc.



America Online
Network &
Data Center
Operations
Confidential

# Host Cost Per Hour



- Host costs stabilizing around 6 cents an hour
- Host Cost vs. Ad Revenue Tradeoffs
- Allocating expense for other brands (NetCenter, ICQ, MapQuest, AIM, etc) to properly reflect in brand P&L's
- Opportunities to use more cost efficient technologies (e.g. LINUX on Intel servers)

9

Bill McGrath

043S1AOL1530000058
Confidential Treatment Requested



# AOL Can Reduce Road Runner Costs!

Cost per Subscriber per Month

FY01 FY02 FY03 FY04 FY05

Bill McGrath

10

04351AOL1530000059
Confidential Treatment Requested




Network & Data Center Operations

America Online, Inc.





# Summary

- Rate of decline in narrowband network costs is flattening and at risk.

- Broadband costs are stabilizing. We are looking for opportunities to reduce cost as we achieve scale though largest component is RBOC controlled.

- Aggressively managing host costs to drop AOL below 6 cents/hour.

- Full court press on Time Warner integration opportunities, AOL over TWC, and Road Runner expense management.

11

Bill McGrath

043S1AOL1530000060
Confidential Treatment Requested

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JOHN MICHAEL KELLY, STEVEN E.
RINDNER, JOSEPH A. RIPP, and
MARK WOVSANIKER,

Defendants.

————————————————————————

08 Civ. 4612-SWK
(ECF Case)

# EXHIBIT 15

### DECLARATION OF ADA FERNANDEZ JOHNSON
### IN SUPPORT OF DEFENDANT J. MICHAEL KELLY'S
### MOTION TO DISMISS

# Network & Data Center Operations

## 2002 Capital Plan

October 26, 2001

AOL Confidential

1

•1

005S1AOL2330021183
Confidential Treatment Requested

# Capital Summary

| ($ in Millions) | 1Q 01 | 2Q 01 | 3Q 01 | 4Q 01 | CY01 | 1Q 02 | 2Q 02 | 3Q 02 | 4Q 02 | CY02 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Access Networks** | | | | | | | | | | |
| Voice Mail - AOL by Phone | $0 | $0 | $0 | $0 | $0 | $5 | $1 | $1 | $1 | $7 |
| Subtotal Access Networks | $0 | $0 | $0 | $0 | $0 | $5 | $1 | $1 | $1 | $7 |
| **Host Operations** | | | | | | | | | | |
| Lease Replacements | $0 | $20 | $20 | $15 | $55 | $29 | $45 | $41 | $92 | $206 |
| Growth | $57 | $79 | $52 | $49 | $237 | $64 | $65 | $74 | $78 | $283 |
| Subtotal Systems Operations | $57 | $99 | $72 | $64 | $292 | $93 | $110 | $115 | $171 | $409 |
| **Network Operations** | | | | | | | | | | |
| IRUs | $3 | $0 | $20 | $35 | $58 | $43 | $2 | $23 | $23 | $91 |
| Network Routers and Other Gear | $59 | $25 | $37 | $29 | $150 | $74 | $47 | $34 | $26 | $181 |
| Subtotal Network Operations | $62 | $25 | $57 | $64 | $208 | $117 | $49 | $57 | $49 | $273 |
| **Operations Security** | | | | | | | | | | |
| IDS | $0 | $0 | $0 | $0 | $0 | $5 | $0 | $0 | $1 | $7 |
| Subtotal Operations Security | $0 | $0 | $0 | $0 | $0 | $5 | $0 | $0 | $1 | $7 |
| **Capital Budget Submission** | $119 | $124 | $129 | $128 | $500 | $220 | $160 | $173 | $222 | $775 |

AOL Confidential

2

•2

005S1AOL2330021184
Confidential Treatment Requested

# Key Drivers

- Overall capital spend up $225 million or 45 percent increase 2002 Vs 2001.
  - Capital spend less MISP and lease return increase flat to 2001.
    - MISP increase $83M
    - Lease Returns increase $151M.
  - Spend burdened by obsolete business practices(storage) and inefficient streaming design(Real Networks).
- Continued leverage of network spend by Business Affairs weakening ability to reduce cost.
  - Sun commitment unrealistic
  - Advertising surcharge adding .002 cents per hour to the host rate.

AOL Confidential

3

•3

005S1AOL2330021185
Confidential Treatment Requested

# Opportunities

- Host capital
  - $30M Enterprise hosting. No customers.
  - $10M Member storage. Reduced Intervals.
  - $10M Service Infrastructure. Less Development.
- Network Capital
  - $10M Redesign of streaming complex. Requires ending Real partnership.

AOL Confidential

4

•4

005S1AOL2330021186
Confidential Treatment Requested

# Lease Vs Buy

- Network Operations impartial to either financing method.

- Policy shift to purchase must be accompanied by
  - Analysis of technology to avoid purchasing technology with limited useful life(less than 2 years).
  - System upgrade to accommodate technology refresh activity.
  - Upgrade to end of life asset management capability.
    - Disposal and sale of obsolete inventory burden currently bore by lessor.

5

AOL Confidential

•5

005S1AOL2330021187
Confidential Treatment Requested

# Systems Operations
## 2002 Capital Plan

Terry Laber
October 26, 2001

AOL Confidential

6

•6

005S1AOL2330021188
Confidential Treatment Requested

# Host Operations-Current Submission

- Total Capital Plan of $489 Million
  - Lease Replacements    $206 M
  - Hardware for Growth    $283 M
  - Total    $489 M

AOL Confidential

7

•7

005S1AOL2330021189
Confidential Treatment Requested



005S1AOL2330021190
Confidential Treatment Requested

# 2002 Lease Replacements

- Original Cost of Leased Gear
  - 2001 Returns = $123 M
  - 2002 Returns = $245 M .
  - 2003 Returns = $526 M
- Replacement Assumptions
  - Gear ordered 4 months in advance
  - Gear replaced at 57.5% of original cost

AOL Confidential

9

•9

005S1AOL2330021191
Confidential Treatment Requested

# 2002 Lease Replacements

- Lease Replacements Reconciliation
  - Calendar 2002 Returns      $245 M
  - Less Q1 2002 Returns       ($ 46 M)
  - Add Q1 2003 Returns        $160 M
  - Gross Replacements         $359 M

- Replacements at 57.5%       $206 M

AOL Confidential

10

•10

005S1AOL2330021192
Confidential Treatment Requested

## Capital Planning Drivers

- Simultaneous Users - 12% growth
- Monthly Hours - 20% growth
- Page Views (variable by property)
- Other
  - Mail message volume
  - Mail attachments
  - TW support and migration
  - Projects (i.e. billing, data warehouse)

AOL Confidential

11

•11

005S1AOL2330021193
Confidential Treatment Requested

# New Capital
**($Millions)**

| | | |
|---|---|---|
| Service Infrastructure | $ | 64 |
| Other Infrastructure | | 31 |
| Web Hosting | | 36 |
| Data Warehouse | | 30 |
| Enterprise Hosting Service | | 30 |
| Mail Messages | | 70 |
| Mail Attachments | | 22 |
| | $ | 283 |

AOL Confidential

•12

005S1AOL2330021194
Confidential Treatment Requested

# Service Infrastructure
**($Millions)**

| | |
|---|---:|
| Pod Growth (Q3-Q4) | $ 4.0 |
| AIM Scaling | 6.0 |
| AdServer Scaling | 4.0 |
| Remote Cache Builds | 6.0 |
| Personal Finance (redesign, storage, portfolios) | 4.0 |
| Message Boards/Newsgroups Growth | 4.0 |
| SAPI Configuration | 2.0 |
| AOL Search | 3.5 |
| AOL Properties Search | 15.1 |
| Application Engineering | 13.8 |
| Login Systems | 1.6 |
| Total | $ 64.0 |

AOL Confidential

13

•13

005S1AOL2330021195
Confidential Treatment Requested

# Other Infrastructure Driven

**($Millions)**

| | | |
|---|---|---|
| Memory & Backup Systems | $ | 15.0 |
| Enterprise Management & Metrics | | 1.0 |
| Cycle Activity Scaling | | 5.6 |
| Newton (billing) | | 4.8 |
| Other (Registration, AIM) | | 4.6 |
| Total | $ | 31.0 |

AOL Confidential

14

•14

005S1AOL2330021196
Confidential Treatment Requested

# Application Engineering
### ($Millions)

| | | |
|---|---|---|
| Ad Demographics | $ | 2.4 |
| Keyword | | 1.7 |
| Phone Home | | 1.5 |
| AIM Registration Database | | 1.5 |
| Buddylist/Feedbag | | 1.5 |
| Popups | | 1.2 |
| Multiple Portfolios | | 0.6 |
| Infrastructure | | 3.4 |
| | $ | 13.8 |

AOL Confidential

15

•15

005S1AOL2330021197
Confidential Treatment Requested

## AOL Properties Search
### ($Millions)

| | | |
|---|---|---|
| News Feeds | $ | 1.3 |
| Hometown | | 0.8 |
| International Search | | 2.3 |
| Member Directory | | 5.0 |
| Universal Member Profile | | 3.0 |
| Government Guide | | 0.8 |
| Search Infrastructure | | 1.9 |
| | $ | 15.1 |

AOL Confidential

16

•16

005S1AOL2330021198
Confidential Treatment Requested

# Web Hosting
**($Millions)**

| | | |
|---|---:|---:|
| AOL US | $ | 3.3 |
| Netscape | | 12.5 |
| ICQ | | 7.5 |
| CompuServe | | 4.6 |
| Proteus (Calendar) | | 1.6 |
| International | | 1.6 |
| Mapquest, Moviephone, DCI | | 1.7 |
| Other (Shop@aol, Love@aol, AIM web) | | 3.2 |
| Total | $ | 36.0 |

AOL Confidential

17

•17

005S1AOL2330021199
Confidential Treatment Requested

# Data Warehouse Driven
### ($Millions)

| | |
|---|---:|
| Newton Billing Project | $    5.0 |
| On-Line Reporting Backup | 6.3 |
| Call Centers Reporting | 1.6 |
| DW Reporting - Member Tracking | 4.5 |
| DW Reporting - OnRamp | 5.0 |
| DW Support | 7.6 |
| Total | $   30.0 |

AOL Confidential

18

•18

005S1AOL2330021200
Confidential Treatment Requested

# Mail Capital

- Volume Driven
  - Message volume up by 200 MM per day
  - Mailboxes $48 MM
    - Capacity is 5 MM messages per day per box
    - 40 new boxes for 2002 at $1 MM per box
    - $8 MM peripheral gear (SETI, TMBRS)
  - Mail Contents $22 MM
    - Database can process 900k messages per day
    - 10 databases per storage unit; $900k per SU
    - Database runs at 90%

- Attachment Driven
  - Mail Attachments $22 MM
    - Increased storage needs
    - Significant investment in Q4 2002

AOL Confidential

19

•19

005S1AOL2330021201
Confidential Treatment Requested





•20

005S1AOL2330021202
Confidential Treatment Requested





•21

005S1AOL2330021203
Confidential Treatment Requested

# Network Operations
## 2002 Capital Plan

Joe Barrett
October 26, 2001

AOL Confidential

22

•22

005S1AOL2330021204
Confidential Treatment Requested

# Capital Summary

| $ in Millions | 1Q 01 | 2Q 01 | 3Q 01 | 4Q 01 | CY01 | 1Q 02 | 2Q 02 | 3Q 02 | 4Q 02 | CY02 |
|---|---|---|---|---|---|---|---|---|---|---|
| **MISP** | | | | | | | | | | |
| IRUs | | | | $35 | $35 | $43 | $2 | $23 | $23 | $91 |
| Network Routers and Gear | 0 | $5 | $25 | $20 | $50 | $31 | $23 | $17 | $11 | $82 |
| Subtotal MISP | $ - | $ 5 | $ 25 | $ 55 | $ 85 | $ 74 | $ 25 | $ 40 | $ 34 | $ 173 |
| | | | | | | | | | | |
| **AOL Traditional** | | | | | | | | | | |
| IRUs | $3 | $0 | $20 | $0 | $23 | $0 | $0 | $0 | $0 | $0 |
| Network Routers other Gear | $59 | $20 | $12 | $9 | $100 | $43 | $24 | $17 | $15 | $99 |
| AOL | $62 | $20 | $32 | $9 | $123 | $43 | $24 | $17 | $15 | $99 |
| | | | | | | | | | | |
| Total Network Operations | $62 | $25 | $57 | $64 | $208 | $117 | $49 | $57 | $49 | $273 |

AOL Confidential

23

005S1AOL2330021205
Confidential Treatment Requested



# CY02 Capital Spend

| | | |
|---|---|---|
| ACME | $ 59.3 M | 32.7% |
| AOL Wave (ACME) | $ 15.8 M | 8.7% |
| ANVIL (ACME) | $ 7.9 M | 4.4% |
| ANVIL (DSL) | $ 8.7 M | 4.8% |
| AOL Traditional Network | $ 36.1 M | 19.9% |
| GTC (New Datacenter) | $ 5.8 M | 3.2% |
| ATDN International | $ 9.2 M | 5.1% |
| Web Cache servers | $ 7.7 M | 4.2% |
| Streaming | $ 30.8 M | 17.0% |
| Total | $ 181.2 M | 100.0% |
| Less MISP Charge Back | -$ 83.0 M | |
| Net AOL Network Capital | $ 98.2 M | |

AOL CY01 CapEx spend of $100 M

AOL Confidential

24

•24

005S1AOL2330021206
Confidential Treatment Requested

# Capital Expense Breakdowns

| ACME | | |
|---|---|---|
| Backbone Interfaces | $ 20.5 M | 34.5% |
| Backbone Upgrade (OC-192) | $ 16.0 M | 27.0% |
| POP Builds (7) | $ 14.0 M | 23.6% |
| Peering Interfaces | $ 4.7 M | 8.0% |
| Transit Interfaces | $ 4.1 M | 6.9% |
| Total | $ 59.3 M | 100.0% |

| AOL Wave (ACME) | | |
|---|---|---|
| NY State | $ 3.5 M | 22.2% |
| Ohio | $ 3.5 M | 22.2% |
| Florida | $ 1.8 M | 11.1% |
| LA | $ 3.5 M | 22.2% |
| Carolinas | $ 3.5 M | 22.2% |
| Total | $ 15.8 M | 100.0% |

| Traditional AOL | | |
|---|---|---|
| Web Net Upgrade (OC-192) | $ 6.3 M | 18.5% |
| Flat Cache | $ 6.0 M | 17.5% |
| Partner Nets | $ 4.6 M | 13.5% |
| Access Net Upgrade (OC-192) | $ 4.2 M | 12.3% |
| Measurment & Monitoring | $ 3.1 M | 9.2% |
| Replacement of Cisco 7500's | $ 3.0 M | 8.8% |
| Misc. Network builds | $ 2.7 M | 7.9% |
| International Web Cache | $ 1.5 M | 4.4% |
| Other | $ 2.6 M | 7.7% |
| Total | $ 34.0 M | 100.0% |

| ATDN International | | |
|---|---|---|
| Tokyo POP | $ 2.0 M | 21.9% |
| Australia POP | $ 2.0 M | 21.9% |
| Sao Paulo POP | $ 2.0 M | 21.9% |
| TBD POP | $ 2.0 M | 21.9% |
| POP Interface upgrades | $ 0.6 M | 6.0% |
| DSL build out | $ 0.6 M | 6.6% |
| Total | $ 9.2 M | 100.0% |

| Web Cache Servers | | |
|---|---|---|
| VA Cache Growth | $ 4.1 M | 53.4% |
| CA Cache Growth | $ 2.7 M | 35.6% |
| Japan Cache Growth | $ 0.3 M | 4.5% |
| Brazil Cache Growth | $ 0.3 M | 4.5% |
| Australia Cache Growth | $ 0.2 M | 2.2% |
| Total | $ 7.7 M | 100.0% |

| Streaming | | |
|---|---|---|
| Content Growth | $ 8.1 M | 26.4% |
| Radio Properties | $ 4.8 M | 15.5% |
| Streaming Network Infrastructure | $ 4.6 M | 15.0% |
| Content Distribution (International) | $ 4.4 M | 14.4% |
| Content Distribution (Domestic) | $ 3.5 M | 11.3% |
| Web Properties & Search | $ 2.4 M | 7.0% |
| Monitoring Infrastructure | $ 1.1 M | 3.6% |
| Music Net | $ 1.0 M | 3.3% |
| Next Generation Streaming | $ 0.9 M | 2.9% |
| Total | $ 30.8 M | 100.0% |

AOL Confidential

•25

005S1AOL2330021207
Confidential Treatment Requested