**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

**SECURITIES AND EXCHANGE COMMISSION,**

                       **Plaintiff,**

                **v.**

**JOHN MICHAEL KELLY, STEVEN E.**
**RINDNER, JOSEPH A. RIPP, and**
**MARK WOVSANIKER,**

                       **Defendants.**

_____

08 Civ. 4612-SWK
(ECF Case)

**DEFENDANT J. MICHAEL KELLY'S MEMORANDUM OF LAW**
**IN SUPPORT OF HIS MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL STATEMENT ............................................................................................... 3

    A.    The Investigation ................................................................................... 3

    B.    The Parties ............................................................................................ 4

    C.    The SEC's Allegations .......................................................................... 5

ARGUMENT ................................................................................................................. 8

II.    THE COMPLAINT IS TIME BARRED UNDER THE APPLICABLE STATUTE
    OF LIMITATIONS. ................................................................................................ 8

    A.    Under 28 U.S.C. § 2462, Claims Accrue at the Time of the Allegedly
        Fraudulent Transaction, Not on Discovery. ............................................ 8

    B.    All of the Acts Alleged Against Mr. Kelly Occurred Outside the Limitations
        Period, Regardless of How the Tolling Agreements Are Interpreted. ........ 10

    C.    Doctrine of Equitable Tolling Does not Apply to Relieve the SEC From the
        Consequences of Its Delay. ................................................................... 13

        1.    The SEC Fails to Plead Fraudulent Concealment. ........................ 13

        2.    The SEC was on Inquiry Notice Before May 11, 2002. ................ 17

    D.    The Claims for Civil Fines, a Permanent Officer and Director Bar, and a
        Permanent Injunction Are Penalties Subject to Section 2462. ................... 19

III.    THE COMPLAINT FAILS TO PLEAD FRAUD AS TO MR. KELLY. ............................. 21

    A.    The SEC Has Asserted No Valid Claim of Fraud Against Mr. Kelly Based on
        the Veritas, HP, Telefonica, Ticketmaster, Wembley, or WorldCom
        Transactions. ...................................................................................... 22

    B.    The Complaint Fails to Raise a Strong Inference of Scienter as to Mr. Kelly ........... 25

        1.    The SEC's Allegations of Motive Are Deficient. .......................... 26

        2.    The Complaint Fails to Allege Facts Supporting Strong
            Circumstantial Evidence of Conscious Misbehavior or Recklessness. .......... 28

i

**TABLE OF CONTENTS**

<u>Page</u>

IV.     THE AIDING AND ABETTING CLAIMS MUST BE DISMISSED. ...................................37

V.      THE COMPLAINT FAILS TO STATE A CLAIM FOR BOOKS AND RECORDS
        VIOLATIONS. ...................................................................................................................38

CONCLUSION ...................................................................................................................................39

# TABLE OF AUTHORITIES

Page(s)

CASES

*3M Co. v. Browner*, 17 F.3d 1453 (D.C. Cir. 1994) ....................................................8, 9

*Acito v. IMCERA Group, Inc*., 47 F.3d 47 (2d Cir. 1995) ................................27, 28, 29

*Adams v. Woods*, 6 U.S. 336 (1805) ...............................................................................19

*Armstrong v. McAlpin*, 699 F.2d 79 (2d Cir. 1983)........................................................37

*ATSI Commc'ns v. Shaar Fund Ltd.*, 493 F.3d 87 (2d Cir. 2007) ............................22, 33

*Bay Harbour Mgmt. LLC v. Carothers*, No. 07-1124-cv, 2008 U.S. App. LEXIS
      13422 (2d Cir. June 24, 2008) ..............................................................................33

*Bell Atl. Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955 (2007)....................................23

*Boos v. Runyon*, 201 F.3d 178 (2d Cir. 2000)................................................................13

*Butala v. Agashiwala*, 916 F. Supp. 314 (S.D.N.Y. 1996) .............................................14

*Campbell v. Haverhill*, 155 U.S. 610 (1895) ...................................................................9

*Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506
      (2d Cir. 2002)........................................................................................................14

*Chill v. Gen. Elec. Co.,* 101 F.3d 263 (2d Cir. 1996) ....................................................28

*De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65 (2d Cir. 1996) ......................................22

*De la Fuente v. DCI Telecomms., Inc.*, 259 F. Supp. 2d 250 (S.D.N.Y. 2003)............12

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)........................................................22

*FEC v. Williams*, 104 F.3d 237 (9th Cir. 1996)........................................................9, 17

*Ganino v. Citizens Utils. Co*., 228 F.3d 154 (2d Cir. 2000) ..........................................22

*Glickman v. Alexander & Alexander Servs., Inc.*, No. Civ. 7594 (LAP), 1996 WL
      88570 (S.D.N.Y. Feb. 29, 1996)..........................................................................27

*Gould v. Berk & Michaels, P.C.*, No. 89 Civ. 5036 (SWK), 1990 U.S. Dist.
      LEXIS 3655 (S.D.N.Y. Apr. 4, 1990) ..................................................................17

# TABLE OF AUTHORITIES

Page(s)

*Grandon v. Merrill Lynch and Co., Inc.*, No. 95 Civ. 10742 (SWK), 2001 WL
826092 (S.D.N.Y. July 20, 2001) ........................................................22

*Grunewald v. United States*, 353 U.S. 391 (1957) ....................................16

*Halbrecht v. Prudential-Bache Props., Inc.,* No. H-90-799 (JAC), 1992 WL
336757 (D. Conn. July 25, 1991).........................................................15

*In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453 (S.D.N.Y. 2008)...........................25

*In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005).....................................27

*In re Bristol-Meyers*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004)...............................27, 28,29

*In re Carter-Wallace Sec. Litig.*, 220 F.3d 36 (2d Cir. 2000)......................................28

*In re Medrators, Inc.,* 190 B.R. 515 (S.D.N.Y. 1995) ...................................14

*In re Merrill Lynch P'shps. Litig.*, 7 F. Supp. 2d 256 (S.D.N.Y. 1997) ........................14

*In re Merrill Lynch Ltd. P'shps Litig.*, 154 F.3d 56 (2d Cir. 1998)........................14, 17

*In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00 Civ. 1041 (DLC), 2000 WL
1234601 (S.D.N.Y. Aug. 31, 2000) ....................................................29

*In re Take Two Interactive Sec. Litig.,* 551 F. Supp. 2d 247 (S.D.N.Y. 2008)...........................26

*In re Tower Auto. Sec. Litig.,* 483 F. Supp. 2d 327 (S.D.N.Y. 2007) ...............................2

*Johnson v. SEC*, 87 F.3d 484 (D.C. Cir. 1996)...........................................8, 19, 20, 21

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ...........................................25, 26, 27, 28

*Kurtzman v. Compaq Computer Corp.*, No. Civ. A H-99-779, 2002 WL 32442832
(S.D. Tex. Mar. 30, 2002) ........................................................30, 35, 36

*Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161 (2d Cir. 2005) .............................22

*Miller v. International Telephone & Telegraph Corp.*, 755 F.2d 20 (2d Cir.1985) ....................13

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993) .....................................23

*National Group for Commc'ns and Computers, Ltd. v. Lucent Techs. Inc.,* 420 F.
Supp. 2d 253 (S.D.N.Y. 2006).........................................................14, 39

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)...............................15, 16, 23, 26, 29, 35

# TABLE OF AUTHORITIES

Page(s)

*O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674 (2d Cir. 1991) .......................................22

*Proffitt v. FDIC*, 200 F.3d 855 (D.C. Cir. 2000) ...................................................20, 21

*Ressler v. Liz Claiborne, Inc*., 75 F. Supp. 2d 43 (E.D.N.Y 1998) ...............................28

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ........................................21, 22, 27, 28, 38

*Scone Invs., L.P. v. Am. Third Mkt. Corp.*, No. 97 Civ. 3802 (SAS), 1998 WL
 205338 (S.D.N.Y. Apr. 28, 1998) .......................................................................23

*SEC v. Caserta*, 75 F. Supp. 2d. 79 (E.D.N.Y. 1999) .................................................12

*SEC v. Cayman Islands Reinsurance Corp. Ltd.* ...........................................................21

*SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326 (S.D.N.Y. 2006) .................21, 37

*SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90 (2d Cir. 1978) ...................................20, 21

*SEC v. Culpepper*, 270 F.2d 241 (2d Cir. 1959) .........................................................20

*SEC v. Dauplaise*, No. 6:05CV1391, 2006 WL 449175 (M.D. Fla. Feb. 22, 2006) ....................38

*SEC v. DiBella*, 409 F. Supp. 2d 122 (D. Conn 2006) ................................................19

*SEC v. Fisher*, No. 07 C 4483, 2008 WL 2062699 (N.D. Ill. May 13, 2008) ........................17, 18

*SEC v. Harden*, No. 1:05-CV-354, 2006 U.S. Dist. LEXIS 2681
 (W.D. Mich. Jan. 12, 2006) .........................................................................9

*SEC v. Jones*, 476 F. Supp. 2d 374 (S.D.N.Y. 2007) ("Jones II") ................................8, 19, 20, 21

*SEC v. Jones*, No. 05 Civ. 7044 (RCC), 2006 WL 1084276
 (S.D.N.Y. Apr. 25, 2006) ("Jones I") .................................................................9, 12

*SEC v. Kahn*, No. 99 C 6343, 2002 WL 1163723 (N.D. Ill. May 31, 2002) ..............................38

*SEC v. KPMG LLP*, 412 F. Supp. 2d 349 (S.D.N.Y. 2006) .............................................37

*SEC v. Lucent Techs. Inc.*, No. Civ. 04-2315 (WHW), 2005 WL 1206841 (D.N.J.
 May 20, 2005) .........................................................................................26, 38

*SEC v. Lyon*, 529 F. Supp. 2d 444 (S.D.N.Y. 2008) ....................................................23

*SEC v. McCaskey*, No. 98 Civ. 6153SWKAJP, 2002 WL 850001 (S.D.N.Y. Mar.
 26, 2002) .............................................................................................20

v

# TABLE OF AUTHORITIES

Page(s)

*SEC v. Monarch Funding Corp.*, 192 F.3d 295 (2d Cir. 1999) ........................................................22

*SEC v. Northshore Asset Mgmt.*, No. 05 Civ. 2192 (WHP), 2008 U.S. Dist. LEXIS 36160 (S.D.N.Y. May 5, 2008) ...........................................................25, 26

*SEC v. Parnes*, No. 01 Civ. 0763225, 2001 WL 1658275 (LLS) (S.D.N.Y. Dec. 26, 2001) ...........................................................23

*SEC v. Patel*, 61 F.3d 137 (2d Cir. 1995) ...........................................................20, 21

*SEC v. Scrushy*, No. CV-03-J-615-3, 2005 U.S. Dist. LEXIS 30553 (N.D. Ala. Nov. 29, 2005) ...........................................................9

*SEC v. Tambone*, 417 F. Supp. 2d 127 (D. Mass. 2006) ...........................................................35

*SEC v. Todd*, No. 03CV2230 BEN(WMc), 2007 WL 1574756 (S.D. Cal. May 30, 2007) .........39

*SEC v. Todd*, No. 03CV2230 BEN, 2006 WL 1564892 (S.D. Cal. May 30, 2006) ....................30

*Shields v. Citytrust Bankcorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994)....................................21, 23, 33

*Smith v. McGinnis*, 208 F.3d 13 (2d Cir. 2000)....................................13

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190 (2d Cir. 2008)....................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, No. 06-484, __ U.S. __, 127 S. Ct. 2499 (June 21, 2007)....................................25, 26, 32

*Trawinski v. United Techs. Carrier Corp.*, 313 F.3d 1295 (11th Cir. 2002) ..................................9

*United States v. All Funds Distributed to Weiss*, 345 F.3d 49 (2d Cir. 2003) ........................13, 19

*United States v. Ancorp Nat'l Servs., Inc.*, 516 F.2d 198 (2d Cir. 1975)........................................9

*United States v. Core Labs., Inc.*, 759 F.2d 480 ( 5th Cir. 1985) ...................................................9

*United States v. Grenoble*, 413 F.3d 569 (6th Cir. 2005) ...........................................................16

## STATUTES

28 U.S.C. § 2462....................................................................................................................8, 9, 22

15 U.S.C. § 78m(b)(5) ....................................................................................................................38

**TABLE OF AUTHORITIES**

Page(s)

**OTHER AUTHORITIES**

17 C.F.R. 202.5(a) (2008)....................................................................................18

17 C.F.R. § 240.13b2-1......................................................................................38

## PRELIMINARY STATEMENT

The Securities and Exchange Commission ("SEC") filed its Complaint against J. Michael Kelly and the other Defendants on May 19, 2008, trumpeting its filing in a litigation release and statements to the media to the effect that Mr. Kelly and the other Defendants "engineered, oversaw, and executed fraudulent round-trip transactions," that the Defendants "intended to inflate revenue and they succeeded," and that the case was "one of the most egregious accounting frauds in recent memory." Behind the headline and publicity-seeking hype of its media campaign, however, and in a manner ill-befitting a federal law enforcement agency dedicated to full and fair disclosure, the SEC seeks to rely on a legally deficient, selectively pled, and, at times, factually misleading Complaint to evade the fundamental flaws in its case, namely that: (1) the SEC has simply waited too long to bring its case under any interpretation of the applicable statute of limitations or long-standing notions of appropriate equitable remedies; and (2) even after six years of investigation, the SEC cannot plead actual facts to support the fraud or other claims asserted against Mr. Kelly.

The Complaint is most notable for the facts that the SEC cannot, or chooses not to, plead. For example:

- Desperate to avoid the consequences of its inexcusable delay in bringing this action, the SEC conveniently omits from its allegations of fraudulent concealment the fact that it had started its investigation of AOL by early May 2002. The SEC staff, in a November 2002 letter to AOL's outside counsel, asserted that transactions disclosed by AOL in August 2002 – identified by the SEC as the WorldCom, Hewlett-Packard, and Veritas transactions (all of which are now pled in the Complaint) – were "*materially similar* to the transactions the staff had been questioning since [the SEC's] *investigation had begun* in *May [2002]*."[1] The fact

---

[1] Johnson Decl., Ex. 1, Letter from J. Coffman to G. Bruch and F.W. Peters, Counsel to AOLTW, *Re: In the Matter of AOL Time Warner Inc. File No. HO-9429*, at 2 (Nov. 15, 2002) ("Coffman letter") (emphasis added). In deciding a Rule 12(b)(6) motion, the Court may consider (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the

that the SEC knew about and was actively investigating the very types of transactions alleged in the Complaint in early May 2002 squarely contradicts any claim that Mr. Kelly "fraudulently concealed" the transactions.

- The SEC uses the pejorative label "round-trip" to characterize the transactions alleged in the Complaint but fails to provide any facts to substantiate its claims that Mr. Kelly knew or had reason to believe that the transactions at issue were anything other than legitimate, appropriate, substantive transactions and accounted for correctly as such.  As discussed in more detail below, the SEC fails to disclose in its Complaint that the only document it cites that uses the term "round-trip" actually refers to a type of transaction that is not even alleged in the Complaint and one which was not restated.[2]  The SEC's legal conclusions and mischaracterizations, however, cannot substitute for specific facts.

- The Complaint is replete with generalized conclusions about Mr. Kelly's direction, involvement, or approval of the transactions alleged in the Complaint.  When it comes to making actual allegations, however, the SEC only alleges facts concerning Mr. Kelly's purported involvement in two of the seven transactions. And even as to those two transactions, the Complaint falls woefully short of alleging particularized facts raising a *strong inference* that Mr. Kelly acted knowingly or recklessly.

- Finally, conspicuously absent from the Complaint are factual allegations regarding the role played by Ernst & Young LLP ("E&Y"), AOL's outside auditor, in the review and approval of the two transactions in which Mr. Kelly is alleged to have played a role – Sun Microsystems, Inc. and Bertelsmann, A.G.  In a Complaint that seeks to charge Mr. Kelly with "lying to the auditors," the absence of such allegations is deafening.

The Complaint must be dismissed because it:  (1) seeks punitive remedies, including civil

monetary penalties, an officer and director bar, and, even, an injunction that are all barred by the

---

material and relied on it in framing the Complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence."  *In re Tower Auto. Sec. Litig.,* 483 F. Supp. 2d 327, 334 (S.D.N.Y. 2007).  There can be no question that the SEC had both "knowledge" and "possession" of the Coffman letter and that the contents of the letter are directly relevant to the SEC's investigation of AOL and the transactions alleged in the Complaint.  The Court may therefore take judicial notice of the Coffman letter.  The Coffman letter and other documents are submitted to the Court as attachments to the declaration of Ada Fernandez Johnson, dated September 5, 2008 ("Johnson Decl."), filed concurrently herewith.

[2]  As set forth *infra* II.A, the email cited by the SEC refers to the Yodlee transaction, which is not alleged in the Complaint, was an entirely different kind of transaction from the ones alleged in the Complaint, and was not restated.

applicable statute of limitations; (2) fails adequately to plead the fraud claims it asserts against

Mr. Kelly, failing in some cases to plead facts at all, pleading only conclusory or hindsight-based

allegations in other instances, and failing to allege evidence to support a finding of scienter

through either intentional or reckless conduct; and (3) fails adequately to plead that Mr. Kelly

aided and abetted AOL's alleged violations of the federal securities laws, that he knowingly

falsified AOL's books and records or that he misled AOL's outside auditor, E&Y.

This action, we submit, has been so long in coming for a reason: there is no viable claim

against Mr. Kelly, whose professional life has unfairly been put on hold for over half a decade

while the SEC sought in vain to find some basis for a claim. It has not done so and has waited

too long under the law to be permitted to continue beyond this motion to dismiss. As set forth

below, the Complaint fails as a matter of law and should be dismissed with prejudice pursuant to

Federal Rules of Civil Procedure 9(b) and 12(b)(6).

## FACTUAL STATEMENT

The facts, as alleged in the Complaint, and accepted as true solely for the purposes of this

motion, or as the Court is permitted to consider through judicial notice, are as follows:

### A.    The Investigation

The 214-paragraph Complaint is based upon an investigation by the SEC that lasted more

than six years. As detailed below, the transactions at issue in this case took place between 1999

and 2001, and some relevant events occurred as far back as 1998, more than *ten years ago*.

Following investigations of AOL's transactions with other online businesses that started

in December 2001, the SEC initiated this separate investigation of AOL in early May 2002,

specifically targeting transactions and accounting issues at AOL that the staff of the SEC

conceded years ago were "materially similar" to the transactions in the Complaint. After nearly

five years of investigation, and with the statute of limitations already run for some transactions and looming for others, the SEC issued a "Wells Notice" to Mr. Kelly on March 14, 2006. Johnson Decl., Ex. 2. The Wells Notice stated that, "we *intend* to recommend that the Securities and Exchange Commission bring a civil injunctive action against your client . . ." and invited Mr. Kelly to provide a Wells Submission. *Id.* (emphasis added). Mr. Kelly submitted a written response to the SEC on April 14, 2006. In March 2006, the SEC sought Mr. Kelly's agreement to toll the statute of limitations through means of an agreement drafted and provided by the SEC. Compl. ¶ 187; Johnson Decl. Ex. 3. Mr. Kelly subsequently agreed to extensions of the tolling agreement with identical language through midnight on March 31, 2007. Compl. ¶ 187. The SEC ultimately allowed the tolling agreement to expire on March 31, 2007.

On May 19, 2008, the SEC finally filed its Complaint against Mr. Kelly. The filing came more than *six years after* the SEC commenced its investigation, more than *three years after* the SEC brought its claims (based on the same transactions) against AOL and three senior financial executives of Time Warner (*id.* Johnson Decl. Ex. 4), *two years after* its Wells Notice to Mr. Kelly, and more than *one year after* the tolling agreement expired (*id.* Johnson Decl. Ex. 3). Mr. Kelly's alleged conduct at issue in the Complaint ended, at the latest, in April 2002.

### B.    The Parties

Mr. Kelly was the Chief Financial Officer ("CFO") of America Online, Inc. ("AOL") from July 1998 to January 2001. Compl. ¶ 14. When the merger between AOL and Time Warner, Inc. closed on January 2001, Mr. Kelly became the CFO of the combined entity AOLTW, Inc. ("AOLTW"). *Id.* Mr. Kelly remained the CFO of AOLTW until November 2001. *Id.* In November 2001, Mr. Kelly returned to AOL – now a division of AOLTW – to serve as the Chief Operating Officer ("COO") of that division, after which time Mr. Kelly had no

involvement in, or responsibility for, AOL or AOLTW's accounting or financial reporting. *Id.* In 2002, Mr. Kelly became the Chairman and CEO of AOL International and AOL Web Services. *Id.*[3] Mr. Kelly left AOL in March 2005. *Id.*

The Complaint names three other individuals as defendants: Joseph A. Ripp, the former CFO of Time Warner, who, following the merger of AOL and Time Warner, served as the CFO of AOL from January 2001 until September 2002 when he became Vice Chairman and COO of AOLTW (Compl. ¶ 16); Mark Wovsaniker, a former partner at E&Y, who was Senior Vice President for Accounting Policy at AOL during the time period alleged in the Complaint (*id.* ¶ 17); and Steven E. Rindner, a former Senior Vice President in AOL's Business Affairs group (*id.* ¶ 15) (collectively, the "Defendants").

## C.    The SEC's Allegations

The Complaint's central allegations concern three types of "round-trip" transactions that the SEC claims Mr. Kelly "engineered and executed" (*id.* ¶ 48) to inflate AOL's advertising and commerce revenue. *Id.* ¶ 37. According to the SEC, Mr. Kelly wished to "artificially boost" AOL's advertising and commerce revenue in order to achieve revenue targets and ensure that the pending merger with Time Warner was finalized. *Id.* ¶ 47. The Complaint further alleges that AOLTW ultimately restated certain revenue associated with the transactions. *Id.* ¶ 7. The Complaint does not, because the SEC cannot, explain what Mr. Kelly would personally gain from the alleged fraud, or even what his role or involvement was with respect to the bulk of the transactions alleged. In fact, the SEC only attempts to substantiate its conclusory allegations of Mr. Kelly's involvement in two of the seven transactions alleged in the Complaint.

---

[3] The SEC incorrectly alleges that Mr. Kelly was the *CFO* of AOL International & Web Services. Compl. ¶ 14.

Vendor Transactions:  The first set of transactions, which are referred to as "vendor transactions," purportedly involved AOL paying more for, or forgoing an agreed-upon discount on, certain goods and services it purchased from vendors in order to sell advertising in amounts equivalent to the allegedly inflated price or the foregone discounts.  *Id*. ¶ 48.  The Complaint alleges that AOL entered into these purported "round-trip" transactions with four vendors – Sun Microsystems, Inc. ("Sun"), Veritas Software Corporation ("Veritas"), Hewlett-Packard Co. ("HP"), and Telefonica DataCorp, S.A. ("Telefonica").  *Id*. ¶¶ 53, 68, 87, 98.  The *only* vendor transaction in which Mr. Kelly is even mentioned is the transaction involving Sun.  *Id.* ¶ 55.  As to the remaining vendor transactions – Veritas, HP and Telefonica – there is not a single specific allegation regarding Mr. Kelly's contemporaneous involvement with or knowledge of these transactions.

The Complaint alleges that in November 1998, AOL and Sun entered into a business agreement wherein AOL would purchase at least $300 million worth of equipment from Sun over three years, and AOL would sell advertising to Sun.  *Id.* ¶ 53; Johnson Decl. Ex. 5.  In *June 2000*, an extension of this agreement was negotiated with Sun providing that AOL would purchase $250 million in network equipment and Sun would purchase $37.5 million in advertising.  Compl. ¶ 60.  The SEC generally alleges that this $37.5 million was improperly recognized as advertising revenue by AOL when it should have been accounted for as a discount from Sun to AOL.  *Id*. ¶ 60.  The revenue was first reported by AOL in its September 30, 2000 Form 10-Q, filed with the SEC on November 9, 2000.  *Id.* ¶ 32.

Business Acquisition Transactions:  The second type of transaction, referred to in the Complaint as "business acquisition" transactions, involved AOL's relationship with the German media company Bertelsmann, A.G. ("BAG").  *Id.* ¶¶ 32, 119.  AOL and BAG had a long-

existing partnership dating back to 1995 when the two companies entered into a joint venture to create AOL Europe.  *Id.* ¶ 123.  In March 2000, AOL entered into an agreement by which AOL could, in the future, acquire BAG's interest in AOL Europe via a put/call agreement under which BAG had the option of selling its shares to AOL for $6.75 billion, but which gave AOL the option of paying for BAG's interest in cash *or* AOL stock.  *Id.* ¶¶ 123, 124.  The Complaint alleges that in March 2001 (when Mr. Kelly was CFO of AOLTW), BAG "proposed" to amend the put/call agreement in order to obtain a guarantee that $2.5 billion of AOLTW's payment would be made in cash.  *Id.* ¶¶ 126, 130.  The parties reached an agreement in March 2001 whereby AOLTW ultimately agreed to commit to purchase a portion of BAG's interest in AOL Europe for $2.5 billion in cash and BAG agreed to purchase $125 million in online advertising from AOL.  *Id.* ¶ 130.  The Complaint further alleges that several months later, in December 2001, BAG and AOLTW negotiated a second amendment to the put/call agreement pursuant to which AOLTW agreed to pay cash for the remaining amount due under the put/call.  *Id.* ¶ 131.  BAG also agreed to purchase $275 million in online advertising.  *Id.*

Business Dispute Settlements:  The third set of transactions alleged in the Complaint, referred to as "business dispute settlements," involve transactions with Ticketmaster Corporation ("Ticketmaster"), Wembley, PLC ("Wembley"), and WorldCom, Inc. ("WorldCom").  *Id.* ¶¶ 148-180.  The SEC alleges that in these transactions AOL converted settlements of business disputes into "additional" online advertising revenue.  *Id.* ¶ 145.  Mr. Kelly is not mentioned in any of the allegations relating to Ticketmaster, Wembley, or WorldCom.

**ARGUMENT**

## II.   THE COMPLAINT IS TIME BARRED UNDER THE APPLICABLE STATUTE OF LIMITATIONS.

### A.   Under 28 U.S.C. § 2462, Claims Accrue at the Time of the Allegedly Fraudulent Transaction, Not on Discovery.

Claims for civil penalties brought by the SEC are governed by the five-year statute of limitations in 28 U.S.C. § 2462:

> Except as otherwise provided by an Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued. …

*See 3M Co. v. Browner*, 17 F.3d 1453, 1457 (D.C. Cir. 1994) (holding that Section 2462 applies to administrative proceedings); *see also Johnson v. SEC*, 87 F.3d 484, 486 n.2 (D.C. Cir. 1996) (applies to SEC enforcement actions); *SEC v. Jones* , 476 F. Supp. 2d 374, 380 (S.D.N.Y. 2007) ("Jones II") (same).

The statute of limitations begins to run at the time of the conduct by Mr. Kelly – the execution of the transactions he purportedly negotiated, the statements he purportedly made, and the financial statements he purportedly signed – alleged by the SEC to be fraudulent.  The SEC appears to hope that its inexcusable delay in bringing this case can be remedied by seeking application of the discovery rule – the legal rule holding that claims accrue on the victim's discovery of the basis for the claim, not at the time of the violation.  The overwhelming majority of courts, however, disagree and have held that the discovery rule does not apply to enforcement actions seeking civil penalties:

> This discovery rule, which might be applicable to statutes of limitations in state tort actions, has no place in a proceeding to enforce a civil penalty under a federal statute.  The statute of limitations begins with the violation itself – it is upon violation, and not upon discovery of harm, that the claim is complete and the clock is ticking.

*Trawinski v. United Techs. Carrier Corp*., 313 F.3d 1295, 1298 (11th Cir. 2002) (applying § 2462).[4]

In the context of SEC enforcement actions, courts have interpreted this authority to mean that claims accrue at the time of an allegedly fraudulent transaction that is the basis of the claim. *See SEC v. Jones*, No. 05 Civ. 7044 (RCC), 2006 WL 1084276, at *3-6 (S.D.N.Y. Apr. 25, 2006) ("*Jones I*"); *SEC v. Scrushy*, No. CV-03-J-615-3, 2005 U.S. Dist. LEXIS 30553, at *9 (N.D. Ala. Nov. 29, 2005) ("[T]he appropriate start of the statute of limitations is the date of the violations for which the civil penalties are sought, not the discovery of such violations."); *SEC v. Harden*, No. 1:05-CV-354, 2006 U.S. Dist. LEXIS 2681, at *4 (W.D. Mich. Jan. 12, 2006). While the SEC's Complaint muddles the timing of events in an attempt to avoid the problems posed by the statute of limitations, the pleadings simply do not alter the fact that it was filed nearly seven years after all the transactions referenced in the Complaint.  Further exacerbating the problem of faded memories that the statute was, in part, intended to avoid, the SEC has proposed a trial date that would be nearly a decade later.  *See Campbell v. Haverhill*, 155 U.S. 610, 617 (1895) ("[I]t is a cardinal principle of modern law and of this court [that statutes of limitations] . . . are not to be construed so as to defeat their obvious intent to secure the prompt

_____

[4]  Every appellate court to consider an argument proposing the application of the discovery rule to § 2462 has held that it does not apply – the limitations period runs from the time of the violation.  *See Browner*, 17 F.3d at 1462-63 ("We reject the discovery of violation rule [the government] advocates as unworkable; outside the language of the statute; inconsistent with judicial interpretations of § 2462; unsupported by the discovery of injury rule adopted in non-enforcement, remedial cases; and incompatible with the functions served by a statute of limitations in penalty cases."); *United States v. Core Labs., Inc.*, 759 F.2d 480, 482 (5th Cir. 1985) (relevant case law interpreting § 2462 "clearly demonstrates that the date of the underlying violation has been accepted without question as the date when the claim first accrued, and, therefore, as the date on which the statute began to run"); *FEC v. Williams*, 104 F.3d 237, 240 (9th Cir. 1996) (rejecting discovery rule for FEC violations governed by § 2462); *United States v. Ancorp Nat'l Servs., Inc.*, 516 F.2d 198, 201 n.5 (2d Cir. 1975) (limitations period for payments made in violation of an FTC cease and desist order accrued when payments allegedly received).

enforcement of claims . . .when [witnesses'] recollection may be presumed to be still unimpaired.").

### B.  All of the Acts Alleged Against Mr. Kelly Occurred Outside the Limitations Period, Regardless of How the Tolling Agreements Are Interpreted.

Mr. Kelly entered into a series of agreements with the SEC tolling the applicable statute of limitations from March 23, 2006 through March 31, 2007.  Compl. ¶ 187.  In the tolling agreements, which were drafted by the SEC, the tolling specifically applies only to Mr. Kelly's ability to assert the statute as a defense based on the SEC's "failure to *commence the proceeding or any related proceedings during the tolling period*."  Johnson Decl. Ex. 3.  Mr. Kelly hereby adopts the arguments made by defendants Ripp and Rindner that the tolling agreements, by their plain language, do not operate to extend the statute of limitations, merely to toll its application while the agreements are in effect.[5]  In Mr. Kelly's case, however, interpretation of the tolling agreements is not essential to dismissal based on the statute of limitations because, even assuming that the tolling agreements described above extend the statute of limitations, the relevant limitations period would be extended only from five years to six years and eight days, thus moving the relevant accrual "cut-off" date only from May 19, 2003 to May 11, 2002.  Every allegation against Mr. Kelly predates this "cut-off."

First, all of the transactions in which Mr. Kelly is alleged to have participated were concluded well before May 11, 2002.

- The Complaint alleges that Mr. Kelly negotiated the BAG transactions; the final agreement was executed in December 2001.  Compl. ¶¶ 130, 131, 134.  While the Complaint asserts that BAG revenue "materially inflated" the advertising revenue in the company's financial statements, *id.* ¶ 144, the only allegations against Mr. Kelly are that he "signed the Company's Forms 10-Q for the first and second quarters of 2001," which were filed with the SEC on May 15, 2001 and August 14,

---

[5]  Under this interpretation, the court may only entertain the SEC's request for penalties based on claims that accrued after May 19, 2003.

2001, respectively. *Id.* ¶¶ 32, 137. As the Complaint makes clear, Mr. Kelly left the AOLTW CFO position in the Fall of 2001 for a non-finance position in AOL and, accordingly, did not sign or prepare any financial statements or SEC filings after August 2001. *Id.* ¶¶ 14, 32.

- The allegations against Mr. Kelly relating to the Sun transaction are from an even earlier time period; Mr. Kelly allegedly approved the accounting for the transaction "in or about June 2000." *Id.* ¶ 60. The only other mention of Mr. Kelly relates to discussions about running additional advertising in September 2000. *Id.* ¶ 63. The revenue for the Sun transaction was recognized in AOL's quarter ending September 30, 2000 and reflected in the Form 10-Q for that quarter, filed November 9, 2000. *Id.* ¶¶ 32, 60. Thus, the statute of limitations on any claim based on the Sun transaction expired long before any tolling agreement was proposed by the SEC.

- Finally, the Complaint suggests that Mr. Kelly was told about "the impact advertising revenue gross-ups were having" in a meeting in June 2001, and that he reviewed a "PowerPoint outline" that raised similar concerns in "November or December 2001." *Id.* ¶¶ 116, 117.

Second, each allegation of misleading statements by Mr. Kelly also pre-dates May 11, 2002.

- Mr. Kelly allegedly "signed public filings that included the Company's materially false and misleading financial results," the last being AOLTW's Form 10-Q for the quarter ending June 30, 2001 (filed August 14, 2001). *Id.* ¶¶ 32, 137.

- Mr. Kelly allegedly "made or substantially contributed to various public statements to investors that touted the fraudulent financial results," the last being an earnings call on January 7, 2002. *Id.* ¶ 33.

- The last public statement specifically attributed to Mr. Kelly about AOL's advertising and commerce revenue was on October 17, 2001. *Id.* ¶ 45.

- As COO of AOL, Mr. Kelly allegedly signed a "materially false and misleading management representation letter" on April 15, 2002, for the period ended March 31, 2002. *Id.* ¶ 181. The letter, which by its terms applies only to transactions in the quarter ending March 31, 2002, is addressed only to Mr. Pace, the AOLTW CFO, who the SEC has already sued for his role in the BAG transaction (the only transaction even potentially relevant in that time period), and is simply not evidence of any conduct that could possibly be actionable by the SEC. Johnson Decl. Ex. 6 and Ex. 7. Yet even this strained attempt to extend the timing of Mr. Kelly's conduct fails to reach the applicable May 11, 2002 cut-off point.

- Finally, the Complaint seeks to conceal the age of the SEC's actual evidence against Mr. Kelly behind broad, conclusory allegations that AOLTW's financial

statements incorporated the allegedly inflated numbers until the restatement in "late 2003." Compl. ¶¶ 37, 144. The Complaint offers no factual allegation at all in support of this conclusion, nor could it given the fact that Mr. Kelly was no longer CFO of AOLTW and, therefore, no longer signed or was involved in the preparation of the company's financial statements and SEC filings.[6]

Significantly, the Complaint omits important events that were also occurring in early 2002, most notably those in connection with the SEC's investigation of these matters.[7] In late 2001, the SEC commenced its investigations of PurchasePro and Homestore. These investigations included inquiries into allegedly fraudulent "round-trip" transactions with AOL. The SEC issued subpoenas to AOL in December 2001 and February 2002 and had access to AOL's accounting records during this time period. Johnson Decl. Ex. 8. In addition, the SEC took testimony from several AOL executives in the spring of 2002, including defendants Joseph Ripp and Steven Ridner. *Id.* Ex. 9. The SEC then commenced an informal investigation into AOL's accounting practices in early May 2002, as evidenced by the Coffman letter. Based on the letter's reference to the initial meeting the SEC held with AOL's counsel on May 13, 2002, a Monday, it is certain that the investigation must have commenced prior to May 11, 2002.

Despite these failed efforts to extend the timeline through conclusory allegations and strategic omissions, it is clear that all of the SEC's claims against Mr. Kelly derive from events that occurred more than six years and eight days ago (and well more than five years ago). Given that *(i)* all the transactions occurred outside the limitations period, *(ii)* every alleged misleading

---

[6] Surely the SEC is not suggesting that the alleged violations "continued" through 2003. The case law in the Second Circuit and this district indicates that the continuing violation doctrine is disfavored in securities fraud cases. *See SEC v. Caserta*, 75 F. Supp. 2d. 79, 80 (E.D.N.Y. 1999) (refusing to apply continuing violation doctrine); *Jones I*, 2006 WL 1084276, at *5 (same); *see also De la Fuente v. DCI Telecomms., Inc.*, 259 F. Supp. 2d 250, 267 n.12 (S.D.N.Y. 2003).

[7] This omission is even more glaring in light of the fact that SEC referenced the early 2002 investigation in its complaint against the Company, when it thought doing so would advance its claims. In that complaint, the SEC clarified that the October 23, 2002 statement (*see* Compl. ¶ 186) occurred "months after the Commission commenced its investigation of this matter." Johnson Decl. Ex. 4, *SEC v. Time Warner, Inc.*, 05-cv-578 (GK), Complaint (D.D.C. March 21, 2005).

statement by Mr. Kelly falls outside the limitations period, and *(iii)* the SEC commenced this investigation before the "cut-off" date, all claims for penalties must be dismissed.

### C.    Doctrine of Equitable Tolling Does not Apply to Relieve the SEC From the Consequences of Its Delay.

Recognizing that its claims against Mr. Kelly are barred by the statute of limitations, the SEC attempts to avoid the consequences of its delay, by adding a section in the Complaint entitled "Fraudulent Concealment." Compl. ¶¶ 184-186. With these three paragraphs, the SEC seems to be invoking the doctrine of equitable tolling. However, this doctrine is reserved for "rare and exceptional circumstance[s]," *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000), where a plaintiff has been "prevented in some *extraordinary way* from exercising [its] rights" and where a plaintiff can "show that it would have been *impossible* for a reasonably prudent person to learn" about its cause of action. *Miller v. International Telephone & Telegraph Corp.*, 755 F.2d 20, 24 (2d Cir.1985) (emphasis added); *see also United States v. All Funds Distributed to Weiss*, 345 F.3d 49, 54 (2d Cir. 2003). The Complaint and the circumstances here fall far short of that standard. The SEC does not, and cannot, plead facts demonstrating that Mr. Kelly wrongfully concealed the allegedly fraudulent transactions and, given that its investigation had, in fact, already started, does not even attempt to claim that anything Mr. Kelly did prevented the SEC from discovering its claims within the limitations period. Notwithstanding any of this, the fact that the SEC was investigating by early May 2002 also demonstrates conclusively that it was on inquiry notice at least by that date.

### 1.    The SEC Fails to Plead Fraudulent Concealment.

The SEC has the burden of satisfying rigorous pleading standards in order to invoke the doctrine of fraudulent concealment. *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000) ("The burden of demonstrating the appropriateness of equitable tolling . . . lies with the plaintiff."); *see*

*also Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 512 (2d Cir.

2002).  To meet that burden, the SEC must establish:  "(1) wrongful concealment by

[defendants], (2) which prevented [plaintiff's] discovery of the nature of the claim within the

limitations period, and (3) due diligence in pursuing the discovery of the claim."  *In re Merrill

Lynch Ltd. P'shps Litig.*, 154 F.3d 56, 60 (2d Cir. 1998); *see also National Group for Commc'ns

and Computers, Ltd. v. Lucent Techs. Inc.,* 420 F. Supp. 2d 253, 266-67 (S.D.N.Y. 2006).

Plaintiff must plead all three elements of concealment with particularity under Rule 9(b).  *Butala

v. Agashiwala*, 916 F. Supp. 314, 319 (S.D.N.Y. 1996) (citing cases); *see also In re Merrill

Lynch Ltd. P'shps. Litig.*, 7 F. Supp. 2d 256, 274 (S.D.N.Y. 1997), *aff'd* 154 F.3d 56 (2d Cir.

1998).  Group pleading is not sufficient.  *In re Medrators, Inc.,* 190 B.R. 515, 525 (S.D.N.Y.

1995) (to apply concealment claims to "any and all defendants" without individualized

allegations would "expand a limited exception to federal statutes of limitation beyond its

intended scope").

The SEC's allegations of fraudulent concealment are limited to three paragraphs.  The

first, paragraph 184, does not mention Mr. Kelly by name and only makes a generalized

reference to all defendants' alleged involvement in transactions that is belied by the facts pled

elsewhere in the Complaint, including the fact that Mr. Kelly is only alleged to have been

involved in two transactions.  The second, paragraph 185, refers to five "additional affirmative

steps" of alleged concealment:

> (1) in discussions with E&Y, Kelly, Ripp and Wovsaniker,
> misrepresented or omitted material information about the transactions
> described above, including details about their contingent nature and
> the fact that, in substance, they were round-trips dependent on AOL
> funding its own revenue;
>
> (2) Kelly and Ripp signed and submitted false confirmations to
> auditors;

(3) the Company publicly denied allegations contained in *Washington Post* articles published in July 2002;

(4) in response to the *Washington Post* articles, on July 18, 2002, Kelly and Ripp sent an e-mail to all AOL employees, stating, "We are writing to reassure you that AOL has no 'accounting issues' . . . and we are confident that our accounting, as well as our business practices generally, are fair and appropriate"; and

(5) at the behest of Kelly and Ripp, on June 21, 2002, an E&Y partner sent a letter to the Company, intended for public dissemination, stating, "We stand by our original view that the accounting and related financial statements disclosures for those transactions were appropriate and in accordance with Generally Accepted Accounting Principle[s]."

In the third paragraph (Compl. ¶186), the Complaint asserts that the Company was actively concealing the fraud until October 23, 2002 when it made a "public acknowledgment that its financial statements for 2000 and 2001 could no longer be relied upon." This paragraph also fails to specify any acts by Mr. Kelly. *Id.*

In order to establish the first prong of "wrongful concealment," a plaintiff must plead that each defendant took affirmative steps *with the intent of delaying* a victim's discovery of the fraud. *See Halbrecht v. Prudential-Bache Props., Inc.,* No. H-90-799 (JAC), 1992 WL 336757, at *6 (D. Conn. July 25, 1991). None of the allegations above demonstrate the requisite intent to delay the SEC's discovery of the alleged misconduct, and all fail to meet the standards of Rule 9(b). The first two allegations are merely conclusory summaries of the underlying claims. Nowhere in the Complaint is there a specific allegation that Mr. Kelly actively misled the auditors, and that deficiency cannot be remedied by the summary statement in paragraph 185.

The remaining three allegations in paragraph 185 are all based upon the Company's responses to the *Washington Post* articles. The generic "Company" statement and the vague allegation that E&Y issued a statement "at the behest of" Mr. Kelly and Mr. Ripp fail the fundamental "who, what, when and where" test of Rule 9(b). *See Novak v. Kasaks*, 216 F.3d 300,

306 (2d Cir. 2000).  Only the July 18, 2002 email is directly attributed to Mr. Kelly (albeit

simultaneously attributed to Mr. Ripp).  However, there is no allegation that this email,

addressed to AOL employees, was sent by Mr. Kelly to the SEC, was, in any sense, intended to

mislead the SEC or that it did, in fact, mislead the SEC.  Indeed, the very fact that a national

publication had already published articles identifying transactions that form the basis for the

SEC's Complaint undermines any notion that any alleged violation was fraudulently concealed

or that Mr. Kelly impeded, in any way, the SEC's ability to investigate and bring this case in a

timely manner.  To sanction a theory that broadly reassuring public statements from a company,

its auditors, or its executives toll the statute of limitations would eviscerate the very purpose of

statute.

In fact, this illogical and untenable theory is exactly what the SEC seeks to advance in

paragraph 186 when it asserts that the Company was actively concealing the fraud until October

23, 2002.  This allegation is devoid of any facts that might help the SEC meet its burden, yet the

suggestion that the statute of limitations might be tolled until this date belies credulity.  Even

private plaintiffs, bearing no investigatory authority or power, filed 30 complaints in 2002, many

within days of the *Washington Post* articles.[8]  Several of these complaints were consolidated

before Your Honor, and the SEC now asserts that those complaints were "related" to this

enforcement action.  Surely, the SEC cannot be arguing that it was "duped" by AOLTW's

responses when multitudes of private plaintiffs apparently were not.

Remarkably, the SEC does not even attempt to meet the last two prongs of its burden.

The SEC does not (and cannot) explain how these statements prevented its discovery of the

nature of its claims and also fails to allege any facts to establish its due diligence.  These failures,

---

[8]  *See* Johnson Decl. Ex. 10 at F-123.

standing alone, are sufficient to bar the application of the equitable tolling doctrine here.  *See In re Merrill Lynch*, 154 F.3d 56 at 60 (refusing to toll the statute when plaintiff "did not allege . . . that they exercised due diligence; they make no allegation of any specific inquiries of [defendant], let alone detail when such inquiries were made, to whom, regarding what, and with what response").

> 2.    The SEC was on Inquiry Notice Before May 11, 2002.

The SEC knows quite well that there was no fraudulent concealment here; it also knows that it had notice about the nature of its claims during the spring of 2002, as evidenced by the Coffman letter.  In the unlikely event that, for purposes of a motion to dismiss, the court determines the SEC has adequately pled facts justifying equitable tolling, the limitations period may only be tolled until the SEC could have discovered the violations through diligent inquiry. *Gould v. Berk & Michaels, P.C.*, No. 89 Civ. 5036 (SWK), 1990 U.S. Dist. LEXIS 3655, at *15 (S.D.N.Y. Apr. 4, 1990) ("The doctrine of fraudulent concealment is available only when plaintiffs have no notice of the facts underlying their claims.") (citation omitted).  For an agency with broad investigatory power such as the SEC, inquiry notice arises at the time it has sufficient information to discover improprieties through further investigation.  *See, e.g., FEC v. Williams,* 104 F.3d 237, 241 (9th Cir. 1996) (refusing to toll the statute of limitations when agency "through a duly diligent exercise of its investigatory power,  . . . could have discovered the operative facts giving rise to this suit").  The logical counterpart to this principle is that once an inquiry has actually begun, a plaintiff, especially an agency with the powers and resources of the SEC, must complete its inquiry and file its Complaint within the limitations period; there is no legal doctrine that extends the statute of limitations to enable a plaintiffs to "complete his investigation, draft his Complaint, and put the Complaint in a drawer to be taken out in a year." *SEC v. Fisher*, No. 07 C 4483, 2008 WL 2062699 at *16 (N.D. Ill. May 13, 2008).

Not surprisingly, the Complaint does not specify the exact date the informal investigation started, but as explained above, it could not have been any later than May 10, 2002. The SEC rules make it clear that informal investigations are commenced with at least some belief that there may have been violations. *See* 17 C.F.R. 202.5(a) (2008) ("Where, from Complaints received from members of the public, communications from Federal or State agencies, examination of filings made with the Commission, or *otherwise*, it appears that there may be violation of the acts administered by the Commission or the rules or regulations thereunder, a preliminary investigation is generally made."). For the SEC to propose any "accrual" or "inquiry notice" date later than May 10 2002 would be "greedy," if not ludicrous. *See Fisher*, 2008 WL 2062699 at *5 (discussing the absurdity of the SEC's position on the statute of limitations issues in that case).[9]

But in fact, this appears to be exactly what the SEC seeks to do here. The SEC was able to bring claims against AOLTW and three AOLTW finance executives on the same facts and transactions in 2005 (Johnson Decl. Ex. 4), and in March 2006, nearly two years and two months before the Complaint was filed, the SEC told Mr. Kelly that it had sufficient evidence and intended to file a Complaint against him (*id*. Ex. 2). Allowing the SEC to simply circumvent § 2462 through generic and vague allegations of fraudulent concealment would "run counter to the Supreme Court's basic position on the subject: . . . '[i]n a country where not even treason can be prosecuted after a lapse of three years, it would scarcely be supposed, that an individual

---

[9]  Specifically, the court wrote: "Reflecting on the SEC's position, one is reminded of the story of the mouse and the cookie: if you give a mouse a cookie, he will ask for a glass of milk, and how can he drink his milk without a straw, etc. The SEC receives the benefit of the five-year statute of limitations. It also seeks the application of the "discovery rule," which would start the clock ticking at the time the alleged injury was discovered instead of when the alleged act was committed. And now, the Commission seeks the most generous possible accrual date; not the date when it *first* learned of facts indicating there might be a problem, but the date it had learned *all* the facts necessary to file a suit." *Id*. (citing Laura Joffe Numeroff and Felicia Bond, *If You Give A Mouse A Cookie* (1985)).

would remain forever liable to a pecuniary forfeiture.'" *Johnson*, 87 F.3d at 492 (quoting *Adams v. Woods*, 6 U.S. 336, 342 (1805)). Thus, even under a favorable interpretation of the tolling agreements, a generous application of potentially relevant legal doctrines, and the most lenient accrual or "inquiry notice" date, the SEC's requests for penalties must be dismissed as time-barred.

### D.    The Claims for Civil Fines, a Permanent Officer and Director Bar, and a Permanent Injunction Are Penalties Subject to Section 2462.

The Complaint makes the following requests for relief against Mr. Kelly:  a permanent injunction, disgorgement, civil penalties, and a permanent bar against acting as an officer or director of a publicly-traded company.  Compl. pp. 54-55.  The civil monetary penalty is "unquestionably a penalty" and, as such, time-barred by the five-year limitations period of § 2462. *Jones II,* 476 F. Supp. 2d at 381.  Section 2462 also applies to other remedies that are punitive in nature.  *See SEC v. DiBella*, 409 F. Supp. 2d 122, (D. Conn 2006) 128 n.3 (§ 2462 applies to SEC claims for civil penalties, a permanent injunction, and an officer and director bar). The "test for whether a sanction is sufficiently punitive to constitute a 'penalty' within the meaning of § 2462 is an objective one; . . . the degree and extent of the consequences to the subject of the sanction must be considered as a relevant factor in determining whether the sanction is a penalty." *Johnson,* 87 F.3d at 488 (also defining penalty as "a form of punishment imposed by the government for unlawful or proscribed conduct").  To determine whether such remedies are punitive in a particular case, "the Court looks to the likelihood of recurrence of violations and the possible collateral consequences of issuing" the requested relief.  *Jones II,* 476 F. Supp. 2d at 383.  Here, it is clear from the SEC's own conduct, the paucity of allegations in the Complaint, and the nature of the relief sought that at least two of the other remedies sought

by the SEC – a permanent injunction and a permanent bar from serving as an officer or director of a public company – are punitive, and therefore barred.[10]

First, the allegations in the Complaint about the likelihood of recurrence are sparse and deficient. The SEC's repeated yet bare allegation that "unless enjoined from [violating securities laws], Kelly . . . [is] likely to commit the foregoing violations in the future" is simply insufficient to establish an objective likelihood of recurrence.[11] Compl. ¶¶ 8-10. Where, as here, the SEC fails to "offer[] facts that suggest the requested [relief] is aimed at protecting the public from future harm," such relief "can only be characterized as a penalty." *Jones II,* 476 F. Supp. 2d at 385; *see also Proffitt v. FDIC,* 200 F.3d 855, 862 (D.C. Cir. 2000) (injunction was punitive because it was "based . . . solely on Proffitt's long past conduct and made no attempt to evaluate his present fitness or competence"). Moreover, the SEC cannot escape the fact that the Complaint asserts claims for alleged violations that occurred, most recently, almost *seven years ago*, and some more than *eight years ago*. In light of the extensive delays by the SEC detailed herein, any claim that an injunction or a bar is now necessary to protect the public is disingenuous at best. *See Jones II*, 476 F. Supp. 2d at 384 (noting that "several years have passed since Defendants' alleged misconduct, apparently without incident. This fact further

---

[10]  The SEC has not articulated in its Complaint sufficient facts or theories of the purported disgorgement it seeks from Mr. Kelly to enable any evaluation of whether such disgorgement is, in fact, punitive or remedial. Because disgorgement that seeks anything beyond unjust enrichment specifically and causally connected to the alleged violation would be a penalty, *see, e.g., SEC v. McCaskey*, No. 98 Civ. 6153SWKAJP, 2002 WL 850001, at *8 (S.D.N.Y. Mar. 26, 2002) ("a disgorgement order that ignored  . . . losses would work a punishment, contrary to well-settled law"), Mr. Kelly reserves his right to seek to have such relief barred under the statute of limitations.

[11]  To establish the need for an injunction in the Second Circuit, the SEC must "go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence." *SEC v. Commonwealth* Chem. Sec., Inc., 574 F.2d 90, 100 (2d Cir. 1978); *see also SEC v. Culpepper*, 270 F.2d 241, 250 (2d Cir. 1959) (SEC "must satisfy the court that relief is needed [and] that there exists some cognizable danger of recurrent violation. . ."). The Second Circuit has similar requirements for an officer and director bar. *See, e.g., SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995).

undercuts [the suggestion] that Defendants pose a continuing risk to the public."); *see also Proffitt*, 200 F.3d at 862 (six-year delay in seeking injunction weakened the FDIC's claim that the relief sought was remedial).

Second, the collateral consequences of either a bar or an injunction are objectively severe. Both remedies would have extraordinary repercussions in the world of public company management: "The practical effect of such [remedies] here would be to stigmatize Defendants . . . and significantly impair their ability to pursue a career." *Jones II,* 476 F. Supp. 2d at 385.[12]  Similarly, the Second Circuit recognizes that "an injunction, while not always a 'drastic remedy' . . . , often is much more than [a] 'mild prophylactic'. . . .  In some cases the collateral consequences of an injunction can be very grave." *Commonwealth Chem.*, 574 F.2d at 99.  Accordingly, the SEC's requests for an officer and director bar and an injunction are punitive and, therefore, time-barred under Section 2462.

## III.    THE COMPLAINT FAILS TO PLEAD FRAUD AS TO MR. KELLY.

Because "fraud" is a very serious accusation, the pleading rules protect defendants from vague and conclusory assertions of fraud.  Federal Rule of Civil Procedure 9(b) demands that "the circumstances constituting fraud . . . [be] state[d] with particularity."[13]  Rule 9(b) serves to "provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation

---

[12] *See also Patel,* 61 F.3d at 142 (in overturning a lifetime bar, emphasizing "[t]he loss of livelihood and the stigma attached to permanent exclusion from the corporate suite"); *Johnson*, 87 F.3d at 489 & n.6 (noting the "longer-lasting repercussions" of censure and that "Congress and the courts have long considered the suspension or revocation of a professional license as a penalty.").

[13] This heightened pleading standard applies to claims brought under § 10(b) and Rule 10b-5 (First Claim), *Shields v. Citytrust Bankcorp, Inc.*, 25 F.3d 1124, 1127 (2d Cir. 1994), and § 17(a) (Second Claim), SEC *v. Cayman Islands Reinsurance Corp. Ltd.*, No. 82 Civ. 1166, 1982 WL 1312, at *5-6 (S.D.N.Y. June 17, 1982), as well as aiding and abetting claims (Third and Seventh Claims), *SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 334 (S.D.N.Y. 2006).  In addition, the SEC's complaint "sounds in fraud," therefore, to plead its § 17(a)(2) and (3) claims, the SEC must plead facts giving rise to a strong inference of unreasonableness.  *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).

from improvident charges of wrongdoing, and to protect a defendant against the institution of a

strike suit." *Rombach*, 355 F.3d at 171 (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936

F.2d 674, 676 (2d Cir. 1991)). The pleading requirements under Rule 9(b) are "stringent,"

*Grandon v. Merrill Lynch and Co., Inc.*, No. 95 Civ. 10742 (SWR), 2001 WL 826092, at *2

(S.D.N.Y. July 20, 2001), and must be "applied assiduously" to securities fraud claims. *Lentell v.

Merrill Lynch & Co., Inc.*, 396 F.3d 161, 168 (2d Cir. 2005).

Under this rigorous standard, in order to survive a motion to dismiss, the Complaint must

offer particularized facts as to each element of the § 10(b) claim asserted against Mr. Kelly,

namely that he: "(1) made a material misrepresentation or a material omission as to which he had

a duty to speak, or used a fraudulent device; (2) with scienter;[14] (3) in connection with the

purchase or sale of securities." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir.

1999). Allegations that are conclusory or unsupported by factual assertions will not suffice. *See

De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996); *see ATSI Commc'ns v. Shaar

Fund Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007).

### A. The SEC Has Asserted No Valid Claim of Fraud Against Mr. Kelly Based on the Veritas, HP, Telefonica, Ticketmaster, Wembley, or WorldCom Transactions.

As a threshold matter, the SEC fails to allege *any* specific factual allegations about Mr.

Kelly's role in the Veritas, HP, Telefonica, Ticketmaster, Wembley and WorldCom transactions;

therefore, at least as to those transactions, the Complaint must be dismissed as to Mr. Kelly. *See

Compl. ¶¶ 68-110, 148-180. Even under the liberal pleading standards of Federal Rule of Civil

Procedure 12(b)(6), the SEC must provide the grounds upon which its claim rests through factual

---

[14] Scienter is defined as "intent to deceive, manipulate or defraud." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).

allegations sufficient "to raise a right to relief about the speculative level." *Bell Atl. Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955, 1965 (2007); *see SEC v. Lyon*, 529 F. Supp. 2d 444, 449 (S.D.N.Y. 2008). Because the SEC has failed to offer *any* factual allegations in support of its claims against Mr. Kelly related to the Veritas, HP, Telefonica, Ticketmaster, Wembley, and WorldCom transactions, the SEC has failed to state any cognizable claim against Mr. Kelly based on them.

Moreover, because the Complaint alleges securities fraud, the claims are subject to the heightened pleading requirements of Rule 9(b), which requires that the precise role of *each* actor with respect to *each* transaction be pled with specificity. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'"). "Courts are especially vigilant in applying Rule 9(b) where a Complaint is made against multiple defendants." *Scone Invs., L.P. v. Am. Third Mkt. Corp.*, No. 97 Civ. 3802 (SAS), 1998 WL 205338, at *4 (S.D.N.Y. Apr. 28, 1998). In this respect, the Complaint falls woefully short. The SEC fails to recount any factual details as to the "who, what, when, where and why" of Mr. Kelly's purported involvement in the Veritas, HP, Telefonica, Ticketmaster, Wembley, and Worldcom transactions and as such it fails to satisfy the pleadings requirements of Rule 9(b). *See Novak*, 216 F.3d at 306. Conclusory assertions that Mr. Kelly "engineered and executed" a "scheme" to artificially inflate AOL's on-line advertising revenue (Compl. ¶¶ 1, 26, 48, 66, 68, 73, 88, 184) are "so broad and conclusory as to be meaningless." *Shields*, 25 F.3d at 1129 (citation omitted); *SEC v. Parnes*, No. 01 Civ. 0763225, 2001 WL 1658275, at *4 (LLS) (S.D.N.Y. Dec. 26, 2001) (dismissing fraud claims against certain defendants where complaint made "undifferentiated references" to those defendants).

Unable, even after years of investigation with the full resources of the federal government, to discover – and therefore allege in the Complaint – any facts suggesting that Mr. Kelly was involved in or aware of the allegedly improper vendor transactions, the SEC asserts that Mr. Kelly "had knowledge of, and concern with, round-trips and aggressive revenue recognition" based on a single May 3, 2000 email exchange between Mr. Kelly and David Colburn, a Business Affairs executive. Compl. ¶ 50. In the email, Mr. Kelly raises concerns about a transaction involving a company called Yodlee and asks if there are any other "round-trips" expected. Johnson Decl. Ex. 11. The SEC blatantly mischaracterizes the email and then seeks to rely upon it in support of a theory of fraud against Mr. Kelly.[15] First, the Yodlee transaction is not even alleged in the Complaint and therefore provides no insight into what Mr. Kelly allegedly knew about the other vendor transactions actually pled in the Complaint. In addition, the Yodlee transaction (which was not restated), involved questions concerning AOL's advertising sales arising from fact that AOL was an investor in Yodlee and from AOL's receipt of warrants for the purchase of Yodlee stock as compensation for the advertising. Johnson Decl. Ex. 12. It therefore did not resemble in any way the vendor transactions alleged in the Complaint. Finally, the SEC's strained focus on Mr. Kelly's use of the phrase "round-trip transaction" in an effort to establish "knowledge" of the vendor transactions' impropriety is both illogical and unreasonable. It requires the court to accept – without any factual support – the SEC's nefarious definition of "round-trip" even though the term "round-trip," as used by Mr. Kelly in the May 3 email, can refer to a variety of multi-element transactions, which are commonplace and, if accounted for correctly, perfectly appropriate. Use of that term alone,

---

[15] The very fact that Mr. Kelly expressed his concerns over a transaction, even one that turned out to be perfectly appropriate, is plainly inconsistent with the SEC's theory that he knowingly or recklessly permitted AOL to recognize revenue improperly.

particularly in an email entirely unrelated to the transactions at issue in the Complaint, cannot support a fraud claim.

The only reasonable inference that can be drawn from the SEC's failure to muster any particularized factual allegations regarding Mr. Kelly is that, in spite of an extensive investigative record developed over several years, there are no facts to support an allegation that Mr. Kelly played a role in these transactions or the alleged fraud related to them. Therefore, any claims – much less fraud claims – against Mr. Kelly based on the Veritas, HP, Telefonica, Ticketmaster, Wembley, and Worldcom transactions must be dismissed as a matter of law.

### B. The Complaint Fails to Raise a *Strong Inference* of Scienter as to Mr. Kelly.

With respect to the remaining two transactions involving Sun and BAG, and collectively all transactions, the SEC has failed to allege sufficient facts to raise a *strong inference* that Mr. Kelly acted with the requisite scienter. For purposes of pleading claims that require scienter, plaintiffs, including the SEC, must plead facts with the requisite particularity that "give rise to a *strong inference* of fraudulent intent." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (emphasis added) (citation omitted); *SEC v. Northshore Asset Mgmt.*, No. 05 Civ. 2192 (WHP), 2008 U.S. Dist. LEXIS 36160, at *21-22 (S.D.N.Y. May 5, 2008) (SEC required to plead strong inference of scienter).

Facts that support a strong inference of fraudulent intent must: (a) demonstrate that the defendant "had both motive and opportunity to commit fraud" or (b) "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit*, 264 F.3d at 138-39 (citation omitted). The inference must be "more than merely 'plausible' or permissible," it must be both "cogent and at least as compelling as any opposing inference" one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, No. 06-484, __ U.S. __, 127 S. Ct. 2499, 2505 (June 21, 2007); *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 462 (S.D.N.Y.

2008).  This Court has found the *Tellabs* standard applicable to § 10(b) actions brought by the SEC.  *See Northshore*, 2008 U.S. Dist. LEXIS 36160, at *21-22 (applying *Tellabs* cogent and compelling standard to § 10(b) action brought by the SEC).  Here, the SEC has alleged no facts to show that Mr. Kelly possessed a *motive* to commit fraud, nor has the SEC alleged sufficient facts establishing that Mr. Kelly acted with *conscious* misbehavior or *recklessness*.  Moreover, the alleged inference of scienter as to Mr. Kelly is neither cogent nor compelling and therefore fails the *Tellabs* standard.  125 S. Ct. at 2505.

### 1.    The SEC's Allegations of Motive Are Deficient.

The Complaint fails to allege how Mr. Kelly stood to benefit in any "concrete and personal way" from the purported fraud at AOL and, as such, the allegations of motive raise *no* inference – much less a strong inference – of fraudulent intent.  *See Kalnit,* 264 F.3d at 139 (quoting *Novak*, 216 F.3d at 307) (in order to plead scienter based on motive to commit fraud, the complaint must "entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged")*; SEC v. Lucent Techs. Inc.*, No. Civ. 04-2315 (WHW), 2005 WL 1206841, at *6 (D.N.J. May 20, 2005).  Courts refuse to infer scienter on the basis of alleged motivations that are possessed by most corporate executives, such as a desire to meet budget targets or to maintain one's corporate position, because permitting cases to proceed based on such generalized motives would expose virtually every corporate executive to securities fraud allegations.  *See In re Take Two Interactive Sec. Litig.,* 551 F. Supp. 2d 247, 269 (S.D.N.Y. 2008); *Kalnit,* 264 F.3d at 139.

The Complaint alleges that Mr. Kelly was motivated to enter into purported "round-trip" transactions in order "artificially inflate" AOL's advertising revenue and thereby meet or exceed revenue targets and/or minimize any revenue shortfalls.  Compl. ¶¶ 4, 23, 25, 63, 138, 142.  Such allegations are patently insufficient to constitute *strong* evidence of scienter, as the general goal

of meeting revenue targets is a motive common to virtually every corporate executive in America. *See Kalnit*, 264 F.3d at 139 (motives "generally possessed by most corporate directors and officers do not suffice" to sustain a claim of fraud); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995); *In re Bristol-Meyers*, 312 F. Supp. 2d 549, (S.D.N.Y. 2004) 560.

The Complaint also alleges that Mr. Kelly was motivated to inflate advertising revenue to maintain the appearance that AOL was profitable because the merger with Time Warner was pending. Compl. ¶ 23. This, too, fails to establish a strong inference of scienter. An alleged interest in completing a deal is not a basis for inferring fraudulent intent, absent an allegation that Mr. Kelly stood to secure a personal gain directly from the transaction. *See also Rombach*, 355 F.3d at 177 (refusing to draw inference of scienter based on allegations that corporate executives inflated stock price in order to complete an acquisition and retire corporate stock); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 445-46 (S.D.N.Y. 2005) (refusing to draw inference of scienter in the absence of an allegation that defendant officers secured a personal gain by reason of a corporate acquisition). There are no allegations whatsoever that Mr. Kelly stood to secure some personal gain from the merger with Time Warner and, even if there were, such allegations also fail to raise any inference of fraudulent intent. *See, e.g., Glickman v. Alexander & Alexander Servs., Inc.*, No. Civ. 7594 (LAP), 1996 WL 88570, at *6 (S.D.N.Y. Feb. 29, 1996) (finding preservation of an executive's financial interest does not establish motive because "an executive's self-interest is often closely tied to improving the company's prospects").

Finally, the SEC makes, at best, a feeble attempt to allege Mr. Kelly's motive to commit fraud based on his alleged stock sales. Compl. ¶ 191 (alleging that Mr. Kelly "profited by selling AOL stock at prices inflated by the fraud"). In general, "executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent." *In re Bristol-Meyers*, 312 F.

Supp. 2d at 561.  Allegations of insider sales may permit an inference of scienter only when accompanied by allegations that the trading was "unusual," in timing and amount, *Acito,* 47 F.3d at 54, and by allegations that the defendant engaged in fraudulent actions that "entail[ed] concrete benefits," *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 268 (2d Cir. 1996) (citations omitted).  Here, although the SEC received all of Mr. Kelly's filed, publicly reported transactions in AOL and AOLTW stock for the relevant time period, the Complaint is entirely devoid of *any* specific facts regarding Mr. Kelly's alleged stock sales, much less specific facts detailing how the sales were unusual in timing and amount.  *See Ressler v. Liz Claiborne, Inc*., 75 F. Supp. 2d 43, 58 (E.D.N.Y 1998); *see also Acito*, 47 F.3d at 54.  Accordingly, the allegations regarding Mr. Kelly's stock sales permit no inference of fraudulent intent.

2. <u>The Complaint Fails to Allege Facts Supporting Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness.</u>

The SEC not only fails to plead facts demonstrating that Mr. Kelly was motivated to engage in fraud, it also fails to plead any facts that, if proven, would constitute strong circumstantial evidence of Mr. Kelly's conscious misbehavior or recklessness.  Conscious misbehavior has been defined as "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *In re Carter-Wallace Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000).  Where motive is not adequately pled, "the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit*, 264 F.3d at 142.

The Complaint relies on conclusory assertions with no supporting facts in an attempt to plead Mr. Kelly's alleged knowledge or recklessness.  Perhaps the most glaring example of this is the Complaint's effort to allege Mr. Kelly's knowledge or recklessness based on his "position"

and "status" as the CFO of AOL and then AOLTW.  Compl. ¶ 22.  It is well established that generalized or boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their positions with the Company are insufficient as a matter of law.  *In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00 Civ. 1041 (DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000); *see Novak*, 216 F.3d at 309.  Similarly, the SEC cannot plead a strong inference of scienter as to Mr. Kelly simply by pointing to the fact that the transactions alleged in the Complaint were restated.  *See In re Bristol-Myers*, 312 F. Supp. 2d 549, 565 (S.D.N.Y. 2004) (allegations of GAAP violations or accounting irregularities are insufficient to state a securities fraud claim).

The remaining allegations of scienter as to Mr. Kelly are limited to the Sun and BAG transactions – the only two transactions in which Mr. Kelly is even mentioned by name. However, even as to these two transactions, the Complaint fails to plead facts that give rise to a *strong* inference that Mr. Kelly acted with the required scienter.

(a)    Sun Microsystems, Inc.

The fraud alleged with respect to the Sun transaction is that AOL improperly recorded the revenue from advertising sales to Sun because AOL purportedly knew that Sun agreed to purchase advertising in lieu of a discount Sun had offered to AOL on the purchases of equipment. Compl. ¶¶ 56, 60.  Based on the SEC's allegations, if Sun had not offered such a discount, and AOL had not substituted the advertising for the offered discount, but the parties had simply negotiated AOL's equipment purchases and Sun's advertising purchases at the same time, the accounting would have been correct.  It is therefore Mr. Kelly's knowledge or reckless disregard of the specific facts of Sun's alleged offer of a discount and AOL's substitution of advertising for the amount of that discount that the SEC must allege in order to plead its fraud claim against Mr. Kelly.  As set forth below, the Complaint fails to plead any such facts.

The entirety of the SEC's claim of knowledge by Mr. Kelly with respect to the alleged offer of a discount by Sun, and AOL's purported substitution of an advertising deal instead, rests on a June 1, 2000 email exchange between two Business Affairs executives (copying Mr. Kelly and others), which sets out a *proposal* to present to Sun during the negotiation process. Johnson Decl. Ex. 13. On the basis of this one email, the SEC alleges that Mr. Kelly purportedly "discussed" the Sun transaction with "others," (Compl. ¶ 55), "helped execute" the transaction, (*id.* ¶ 56), and ultimately "approved an accounting" for the transaction (*id.* ¶ 60).

The plain text of the June 1, 2000 email provides no support for the SEC's unreasonable and speculative inference of scienter as to Mr. Kelly. *First*, the email reflects internal AOL discussions about a "*recommended* approach" in reaching out to Sun in negotiating the agreement and sets forth "*alternative* structures" to propose to Sun. Johnson Decl. Ex. 13 (emphasis added). The language used in the email is entirely inconsistent with the view that Sun had agreed to anything by the date of the email exchange, much less that Sun had agreed to an additional discount on hardware – "we *think* there is a *chance*"; "we will *likely* need to come down"; "they are not likely to agree"; "we are *shooting* for." *Id.* (emphasis added). The only reasonable inference to draw from the use of such equivocal language is that individuals within AOL were discussing how to obtain the greatest value from AOL's relationship with Sun. There is nothing illicit about business executives discussing proposals on how to achieve the most out of a business relationship (even if they believe they have *insight* into the other side's margins). *See SEC v. Todd*, No. 03CV2230 BEN, 2006 WL 1564892, at *7 (S.D. Cal. May 30, 2006) (management's desire to close the gap between revenue and analyst consensus expectations was a "common and sound business practice" and did not raise inference of scienter); *Kurtzman v. Compaq Computer Corp.*, No. Civ. A H-99-779, 2002 WL 32442832, at *8 (S.D. Tex. Mar. 30,

2002) (allegations of arm's-length negotiations where each party seeking to get greatest benefit is normal business practice, not fraud). Similarly, the SEC's focus on the suggestion in the email by one of the business executives that AOL was seeking "accounting help" (Compl. ¶ 55) does not – on its own – suggest anything improper. Although the Complaint goes on to allege that *internal Sun* emails "confirm" that "AOL told Sun that AOL needed revenue back from Sun," there is no allegation that Mr. Kelly was privy to any of those internal Sun documents or that they refer, in any way, to Mr. Kelly. Compl. ¶¶ 57-59. The SEC simply does not allege facts demonstrating that Mr. Kelly knew or had reason to believe that the transaction was inappropriate.[16]

A far more "cogent and compelling" inference from the factual allegations in the Complaint (as opposed to the SEC's unsupported conclusions) is that Mr. Kelly reasonably interpreted the June 2000 email exchange as an internal analysis of AOL's negotiating position on a potential second quarter transaction with Sun unrelated to advertising and not as any discussion of an improper advertising transaction. The text of the June 2000 email plainly supports this inference. There is nothing in the email that would have or should have led Mr. Kelly to question the legitimacy of the Sun advertising transaction that was actually recognized in the third quarter of 2000: (1) there is no mention that AOL would forego any discount, as the SEC concludes without factual support (*see* Compl. ¶ 56); to the contrary, the e-

---

[16] The allegation that Mr. Kelly was involved in obtaining Sun's permission to run additional online advertisement in the September quarter of 2000 "to close the revenue gap" (Compl. ¶ 63) also does not provide any insight into Mr. Kelly's knowledge of the terms of the Sun transaction when it was originally negotiated. As the Complaint itself alleges, E&Y was clearly aware of the terms of the Sun advertising transaction or it would not have been involved in the review of the September request to run additional ads. *Id*. ¶ 64. The fact that AOLTW and its auditors disagreed on whether revenue should have been recognized in the September 2000 quarter is evidence only that the transaction was not concealed from the auditors and that the difference of views on the transaction was not material to the financial statements of AOL. There are no allegations, nor could there be, that Mr. Kelly made any misrepresentation to E&Y or that the auditors were not aware of the equipment purchases from Sun.

mail states that AOL was "taking their offered hardware discount" (*see* Johnson Decl. Ex. 13); (2) there is no reference to "free hardware," which the SEC asserts – without explanation of how it would or could be improper – was a central element in the allegedly fraudulent transaction (Compl. ¶¶ 58-61); and, significantly, (3) the e-mail specifically rejects negotiation of "a major ad deal" with Sun as one of two "Alternative Structures" to the actual (non-advertising) deal being proposed.  Johnson Decl. Ex. 13, ¶3.  It is difficult enough, if not impossible, from the text of this single e-mail to draw any inference – much less a *strong* inference – that Mr. Kelly knew that Sun had offered a discount and that AOL had foregone that discount in exchange for an advertising transaction to be recognized in the next quarter.  To claim that such an inference is as "cogent and compelling" as the simple, exculpatory inference that Mr. Kelly viewed the exchange as an internal analysis of possible negotiating positions, requires a leap of logic and an unreasonable interpretation of documents that violates the very dictates of the Supreme Court's holding in *Tellabs*. 125 S. Ct. at 2505.

Finally, the SEC cannot cure its pleading deficiencies by pointing to alleged "facts" that were purportedly brought to Mr. Kelly's attention almost a year after the Sun transaction was finalized.  The Complaint alleges that Mr. Kelly and other senior executives at AOLTW received copies of two multipage PowerPoint presentations that purportedly alerted Mr. Kelly and others to the alleged fraud.  The purported "red flags" cited by the SEC were:

- A single bullet-point that read "Host Cost vs. Ad Revenue Tradeoffs" in a June 22, 2001 11-page presentation entitled "Midyear Forecast Review Network and Data Center Operations."  Compl. ¶ 116; Johnson Decl. Ex. 14.

- One bullet point on the third page of a 25-page presentation from October 26, 2001 that read, "Continued leverage of network spend by Business Affairs weakening ability to reduce costs.  Sun commitment unrealistic; advertising surcharge adding .2 cents per hour to host rate."  Compl. ¶ 117; Johnson Decl. Ex. 15.

The SEC contends that these two excerpts from the multipage presentations raise a *strong* inference that Mr. Kelly knew that "AOL arranged to pay inflated prices for goods and services in exchange for online advertising revenue in the amount AOL overpaid." *Id.* ¶ 112.  The inference the SEC asks the Court to draw is speculative at best, and certainly not cogent or compelling.

As an initial matter, these allegations amount to nothing more than an impermissible attempt to plead fraud-by-hindsight and, therefore, reveal nothing about Mr. Kelly's purported knowledge *at the time* the Sun Transaction was being negotiated in June 2000 or when he signed the SEC filings containing the revenue from the transaction.  *See Shields,* 25 F.3d at 1129 (whether a defendant acted with the requisite state of mind is determined by what the defendant knew at the time of the statements in question, not after the fact); *Bay Harbour Mgmt. LLC v. Carothers*, No. 07-1124-cv, 2008 U.S. App. LEXIS 13422, at *8 (2d Cir. June 24, 2008) (noting that fraud by hindsight is not actionable).  Moreover, the SEC fails to explain how or why the excerpts highlighted from these presentations should have put Mr. Kelly on notice of any alleged fraud.  The reference to "advertising surcharge" (Compl. ¶ 117) does not reveal anything fraudulent or nefarious.  Rather, when read in the context of the whole document (as it should be), a far more cogent and compelling inference to be drawn from the excerpts of the two presentations is that AOL made a business decision to "leverage" its relationships with business partners, seeking to induce these parties to make advertising purchases from AOL – a perfectly legitimate business decision – rather than seeking to further reduce its internal spending on network operations.  *See ATSI Commc'ns,* 493 F.3d at 104 (strong inference of scienter not raised by alleging legitimate investment vehicle created opportunity for fraud).  These facts certainly do not support an inference that, *one year and more after* the transaction in question,

Mr. Kelly must have concluded that Sun had offered a discount, which AOL rejected in favor of an advertising sale.

(b)     <u>Bertelsmann, A.G.</u>

The Complaint also falls far short of alleging particularized facts supporting a strong inference of Mr. Kelly's scienter with respect to the amendments to the BAG put/call agreement. The March 2000 put/call agreement between BAG and AOL permitted AOL – at its option – to pay in cash or AOL stock to buy out BAG's interest in AOL Europe. Compl. ¶¶ 123-124. The uncertainty surrounding the form of payment left BAG with the inability to "monetize" its interest in AOL Europe, such as by selling, in advance, the expected payment from AOL or obtaining a loan against it. *Id.* ¶ 125. For that reason, BAG approached AOLTW in early 2001 seeking to amend the put/call agreement in order to secure a firm commitment from AOLTW to guarantee that $2.5 billion of AOLTW's payment would be made in cash. *Id.* ¶ 126, 130. After an intense arm's-length negotiation process, AOLTW ultimately agreed to commit $2.5 billion of AOLTW's payment in cash. *Id.* ¶ 130. BAG also agreed to purchase $125 million in online advertising from AOL. *Id.* Several months later, in December 2001, BAG and AOLTW entered into a second amendment to the put/call agreement. *Id.* ¶ 131. The Complaint is virtually silent as to Mr. Kelly's role with respect to the negotiations over the December amendment, but clearly sets forth that, by the time the transaction documents were executed (not by Mr. Kelly), Mr. Kelly had moved to his new position as the COO of AOL and no longer played role in AOL or AOLTW's accounting or finance functions. *Id.* ¶¶ 14, 131. In connection with the December amendment, AOL agreed to pay cash for the remaining amount due under the put/call and BAG agreed to purchase $275 million in online advertising. *Id.*

The linchpin of the SEC's theory of fraud as to the BAG transactions is the general and factually unsupported allegation that "BAG told Kelly that BAG would compensate AOL for the

34

amendment with cash or a reduction in the put/call price," (Compl. ¶ 127), an allegation that is made only in connection with the first amendment to the put/call agreement in March 2001. The SEC claims that because BAG offered to pay cash, AOL improperly recognized revenue for the advertising agreements rather than treating the advertising as a discount to the "put" price paid to BAG. *Id.* ¶ 135. The SEC, however, offers no particularized facts to support its assertion that BAG purportedly offered to pay cash for AOL's commitment to satisfy the BAG put option with a cash payment. The Complaint does not identify *who* purportedly told Mr. Kelly that BAG would pay cash, *what* was said, *when* such an offer was purportedly made, or *how* it was made. There is no justification for this type of "bare-boned" pleading in a fraud case – especially where, as here, the SEC spent years investigating the transactions, including more than two full days of testimony by Mr. Kelly on the BAG transactions alone. *See SEC v. Tambone*, 417 F. Supp. 2d 127, 131 (D. Mass. 2006) (rejecting SEC's argument that Rule 9(b) should be relaxed in light of fact that SEC conducted extensive investigation and the information necessary to adequately plead fraud was therefore not solely in hands of defendants). Without any specific facts to substantiate a claim that BAG *actually offered* to pay cash, the SEC has no basis on which to assert that the BAG transactions were a "sham." *See Novak*, 216 F.3d at 306. At the very least, without even an allegation of a cash offer for the December amendment, there is absolutely nothing on which to base a claim regarding that transaction.

Again seeking to draw inferences of fraudulent intent from typical business motives, the Complaint also fails to explain why or how it was improper for AOL to leverage its position with BAG to obtain an advertising deal. The fact that Mr. Kelly "used BAG's need for cash certainty" (Compl. ¶ 128) to obtain a benefit for AOL in the form of advertising deals is not fraud. There is nothing improper – let alone fraudulent – with leveraging a negotiating position

to extract something of value from the other party to the negotiation. *See Kurtzman*, 2002 WL 32442832, at *8. As the Complaint itself alleges, AOL had the option to pay in cash or stock Compl. ¶ 124), BAG had tried unsuccessfully to sell its interest in the agreement to third parties (*id*. ¶ 125), and BAG therefore sought AOL's commitment to pay the put price in cash (*id*.). In view of these facts, the most cogent and compelling inference is that AOL, understanding that it was being asked to give up a benefit under the agreement (*i.e.*, the option to pay in cash or stock), used its leverage in the negotiation process to extract something of value for AOL, in this case agreements with BAG to purchase advertising, something that AOL was certainly in the business of selling.[17] Like the Sun Transaction, it is therefore difficult to see how any inference of fraud can be made these facts, much less a *strong* inference that is as cogent and compelling as the non-fraudulent one that appears on the surface of the facts.

Finally, a strong inference of scienter is not established by the conclusory assertion that Mr. Kelly knew that the advertising had "little value to BAG" (Compl. ¶ 140) or that the advertising contracts purportedly "stripped BAG" of certain preferred pricing (*id*. ¶ 141). Although the Complaint alleges that Mr. Kelly "knew" these alleged facts based on "contemporaneous internal communications or negotiations with BAG" (*id*. ¶ 140), it does not specifically identify any such internal communications or conversations that support this contention. Additionally, the Complaint fails to specify how or why these purported facts were relevant to the accounting for the transaction. AOL's ability to secure favorable changes to a pre-existing advertising relationship seems only to further the bona fides of the advertising

---

[17] This logical, non-culpable inference is supported by the fact that, as the SEC is aware, E&Y approved the original accounting treatment for the BAG transactions and the two amendments to the put/call agreement. As with the Complaint's other omissions, the SEC's failure to include in the Complaint facts it surely knows related to E&Y's role in the transaction is further evidence of how the SEC has attempted to plead its "fraud" case with selective – and often misleading – allegations of "facts."

transactions the SEC now alleges are "shams."  Similarly, the fact that BAG purchased and

received advertising from AOL is what is relevant here; how much, intrinsically, they "value[d]"

AOL advertising is subjective, speculative and, ultimately, irrelevant to the question of how

AOL should account for it.  These allegations simply do not amount to fraud.

## IV.    THE AIDING AND ABETTING CLAIMS MUST BE DISMISSED.

The Third and Seventh Counts against Mr. Kelly allege that he is liable for "knowingly

and recklessly" aiding and abetting certain securities law violations.  "Aiding and abetting

liability under § 10(b) must be based on a showing of three elements:  '(1) the existence of a

securities law violation by the primary wrongdoer; (2) knowledge of the violation by the aider

and abettor; and (3) proof that the aider and abettor substantially assisted in the primary

violation.'"  *Cedric Kushner*, 417 F. Supp. 2d at 334 (quoting *Armstrong v. McAlpin*, 699 F.2d

79, 91 (2d Cir. 1983)).  The same standards and pleading requirements apply to the SEC's claims

of aiding and abetting alleged reporting violations of the Exchange Act and Exchange Act Rules.

*Id.* at 336-337.

In addition to the defects described above – *i.e.*, the failure to allege a primary violation

of the securities laws, including the failure to allege specific facts raising a strong inference of

scienter – the aiding and abetting claims suffer from an additional flaw:  The SEC must, but does

not, allege specific facts that, if proven, would establish that Mr. Kelly had *actual knowledge* that

the putative violator was engaging in unlawful conduct.  Decisions in this District have made

clear that reckless conduct does not suffice to state a claim for aiding and abetting liability.  *See*

*SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 372 (S.D.N.Y. 2006) ("The standard for aiding and

abetting liability . . . includes the requirement that the SEC prove that the defendant engaged

knowingly, not just recklessly."); *Cedric Kushner*, 417 F.Supp. 2d at 334-35 (holding that

recklessness is no longer sufficient and that knowing conduct must be shown to establish aiding

and abetting liability).  As set forth *supra* Section II, Mr. Kelly is mentioned in only two transactions, and even as to those two transactions, there are no specific allegations regarding his *actual knowledge* of the alleged fraud.  Accordingly, the aiding and abetting claims against Mr. Kelly must fail as a matter of law.

## V.  THE COMPLAINT FAILS TO STATE A CLAIM FOR BOOKS AND RECORDS VIOLATIONS.

The SEC also asserts several claims against Mr. Kelly concerning the accuracy of AOL's accounting records (the "Books and Records" claims).  The SEC's effort to hold Mr. Kelly responsible for the alleged errors in AOL's recordkeeping is unwarranted.[18]

**Section 13b2-1 (Fourth Claim) and Section 13(b)(5) (Fifth Claim):**  Section 13(b)(5) of the Exchange Act provides that "[n]o person shall . . . knowingly falsify any book, record, or account" which issuers must create under the Exchange Act.  15 U.S.C. § 78m(b)(5).  Similarly, Rule 13b2-1 provides that "no person shall directly or indirectly . . . cause to be falsified, any book, record or account" subject to the reporting provisions of the Securities Exchange Act.  17 C.F.R. § 240.13b2-1.  In order to establish its claims, the SEC must allege with *particularity* which internal accounting controls were purportedly circumvented, how Mr. Kelly failed to create and maintain them, and how Mr. Kelly's conduct caused AOL's books and records to be false.  *See SEC v. Kahn*, No. 99 C 6343, 2002 WL 1163723, at *14 (N.D. Ill. May 31, 2002) (denying summary judgment for the SEC on Section 13(b)(5) claim where SEC failed to identify which internal controls were purportedly circumvented); *SEC v. Dauplaise*, No. 6:05CV1391,

---

[18]  Claims of books and records rules violations as well as claims for misleading auditors that are based on allegations of fraud are subject to Rule 9(b)'s heightened pleading standard.  *See, e.g., Rombach*, 355 F.3d at 171 (holding that Rule 9(b) applies to "all averments of fraud" and "is not limited to allegations styled or denominated as fraud"); *Lucent Techs.*, 363 F. Supp. 2d at 727 (holding that § 13 and related rules are subject to the Rule 9(b) particularity requirement when the allegations "sound in fraud").

2006 WL 449175, at *8 (M.D. Fla. Feb. 22, 2006).  The Complaint fails to provide any such details and, as such, the Fourth and Fifth Claim should be dismissed.

**Rule 13b2-2 (Sixth Claim):**  In order to state a violation of Rule 13b2-2, the SEC must allege that Mr. Kelly knew that the information he allegedly provided to AOL's independent auditors, E&Y, was false.  *See SEC v. Todd*, No. 03CV2230 BEN(WMc), 2007 WL 1574756, at *15 (S.D. Cal., May 30, 2004) ("The Court has yet to find a case where a claim of Rule 13b2-2 violations was sustained without knowledge of the falsity of the statements at issue.").  Here, the SEC alleges in conclusory fashion that Mr. Kelly "did not disclose" the alleged improper transactions to E&Y.  Compl. ¶¶ 32, 185.  But the Complaint does not allege with sufficient particularity what false information was provided to the auditors, or how, when, and where it was provided.  *See*, *supra*, Section II.  Without any specific information about how Mr. Kelly allegedly misled the auditors, the Rule 13b2-2 claim must fail.

## CONCLUSION

For all the foregoing reasons, Mr. Kelly respectfully submits that the claims asserted against him should be dismissed with prejudice.  Leave to replead in this case is unjustified.  The SEC has spent the last six years investigating the transactions at issue in the Complaint and still cannot plead adequately its claims against Mr. Kelly.  Accordingly, the Complaint should be dismissed with prejudice.

Dated:  New York, New York
        September 5, 2008

DEBEVOISE & PLIMPTON LLP

   /s/ Andrew J. Ceresney
Bruce E. Yannett, Esq.
Andrew J. Ceresney, Esq.
919 Third Avenue
New York, New York  10022
(212) 909-6000

Jonathan R. Tuttle, Esq.
Ada Fernandez Johnson, Esq.
Emily S. Pierce, Esq.
555 13th Street, N.W. Ste. 1100E
Washington, D.C. 20004
(202) 383-8000

*Attorneys for J. Michael Kelly*