Stephen G. Topetzes (ST-4145) (admitted pro hac vice)
Erin Ardale Koeppel (EK-3460) (admitted pro hac vice)
K&L GATES LLP
1601 K Street, N.W.
Washington, D.C.  20006
(202) 778-9000
stephen.topetzes@klgates.com
erin.koeppel@klgates.com


Attorneys for Defendant Mark Wovsaniker



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
| **Plaintiff,** | : |
| **v.** | : 08 Civ. 4612-SWK |
| | : ECF Case |
| **JOHN MICHAEL KELLY, STEVEN E. RINDNER, JOSEPH A. RIPP, and MARK WOVSANIKER,** | : |
| **Defendants.** | : |

**DECLARATION OF STEPHEN G. TOPETZES, ESQ. IN SUPPORT OF DEFENDANT MARK WOVSANIKER'S MOTION TO DISMISS THE COMPLAINT**

I, STEPHEN G. TOPETZES, ESQ., of full age, hereby certify that:


1.      I am an attorney-at-law admitted to practice in the U.S. Courts of Appeals for the Second, Fourth, Eighth, District of Columbia and Federal Circuits; the U.S. District Courts for the District of Colorado, the District of Columbia, and the District of Maryland; the State of Wisconsin; and the District of Columbia.  I am admitted pro hac vice to the United

States District Court for the Southern District of New York. I am a partner of the law firm K&L Gates LLP, attorneys for Defendant Mark Wovsaniker.

2.    I make this Declaration in support of Defendant Mark Wovsaniker's Motion to Dismiss the Complaint, pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), and for an order dismissing the Complaint with prejudice.

3.    Attached hereto as Exhibit 1 is a true and correct copy of the Verdict Form in United States v. Benyo, et al., Crim. No. 1:05cr12 (E.D.Va., filed on February 6, 2007).

4.    Attached hereto as Exhibit 2 is a true and correct copy of the Judgment in SEC v. Johnson, No. 05-36 (D.D.C. filed on April 29, 2008).

5.    Attached hereto as Exhibit 3 is a true and correct copy of the Order in SEC v. Johnson, No. 05-36 (filed on December 18, 2007).

6.    Attached hereto as Exhibit 4 is a true and correct copy of excerpts from the trial testimony of Mark Wovsaniker and Kent Wakeford in United States v. Benyo, et al., Crim. No. 1:05cr12 (E.D.Va.).

7.    Attached hereto as Exhibit 5 is a true and correct copy of excerpts from the trial testimony of Mark Wovsaniker in United States v. Wolff, et al., No. 2:05-cr-00398-PA (C.D. Cal.).

8.    Attached hereto as Exhibit 6 is a true and correct copy of the SEC's Complaint filed in SEC v. Time Warner Inc., Civil Action No. 1:05CV00578 (GK) (D.D.C.).

9.    Attached hereto as Exhibit 7 is a true and correct copy the SEC's Complaint filed in <u>SEC v. Johnson</u>, No. 05-36 (D.D.C.).

10.    Attached hereto as Exhibit 8 is a true and correct copy of a letter dated March 2, 2006 from J. Finnell to S. Topetzes ("Wells Notice").

11.    Attached hereto as Exhibit 9 is a true and correct copy of the tolling agreement signed by Mr. Wovsaniker on or about December 29, 2006.

12.    Attached hereto as Exhibit 10 is a true and correct copy of pages 40 to 44, F-3 to F-5, F-54, and F-123 to F-126 of AOL's 2002 Form 10-K, dated March 29, 2003.

13.    Attached hereto as Exhibit 11 is a true and correct copy of a letter dated November 15, 2002 from J. Coffman to G. Bruch and F.W. Peters, Counsel for AOL Time Warner Inc. ("Coffman letter").

14.    Attached hereto as Exhibit 12 is a true and correct copy of the article, "Unconventional Transactions Boosted Sales; Amid Big Merger, Company Resisted Dot-Com Collapse," published by The Washington Post on July 18, 2002.

15.    Attached hereto as Exhibit 13 is a true and correct copy of the article, "Creative Transactions Earned Team Rewards," published by The Washington Post on July 19, 2002.

16.    Attached hereto as Exhibit 14 is a true and correct copy of the article, "Unorthodox Partnership Produced Financial Gains; Deals Allowed AOL, PurchasePro.com to Boost Revenue," published by The Washington Post on July 19, 2002.

17.    Attached hereto as Exhibit 15 is a true and correct copy of pages 50 to 54 and 94 of AOL's June 30, 2002 Form 10-Q, dated August 14, 2002.

18.    Attached hereto as Exhibit 16 is a true and correct copy of AOL's Form 8-K, dated October 23, 2002.

I certify, under penalty of perjury, that the foregoing statements made by me are true.  I am aware that any of the foregoing statements made by me be willfully false, I am subject to punishment.

Executed on September 5, 2008

_____s/ Stephen G. Topetzes_____
STEPHEN G. TOPETZES, ESQ.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | :    08 Civ. 4612-SWK |
| | :    ECF Case |
| **JOHN MICHAEL KELLY, STEVEN E.** | : |
| **RINDNER, JOSEPH A. RIPP, and MARK** | : |
| **WOVSANIKER,** | : |
| | : |
| **Defendants.** | : |
| | : |

### CERTIFICATE OF SERVICE

I, Stephen G. Topetzes, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that:

I am a partner at the law firm K&L Gates LLP, attorneys for Defendant Mark Wovsaniker.

On September 5, 2008, I served a true and correct copy of the foregoing Declaration of Stephen G. Topetzes, Esq. in Support of Defendant Mark Wovsaniker's Motion to Dismiss the Complaint in the above-captioned matter on counsel of record via the Court's ECF System.

Executed on September 5, 2008.

              /s/ Stephen G. Topetzes
Stephen G. Topetzes, Esq. (ST-4145) (admitted pro hac vice)
Erin Ardale Koeppel, Esq. (EK-3460) (admitted pro hac vice)
K&L GATES LLP
1601 K Street, N.W.
Washington, D.C. 20006
Phone:  202-778-9000
Fax:  202-778-9100
stephen.topetzes@klgates.com
erin.koeppel@klgates.com

# EXHIBIT 1
# TO TOPETZES DECLARATION



FILED IN OPEN COURT

FEB - 6 2007

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VA.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA          :
                                  :
                                  :
v.                                :          Criminal Action No.  1:05cr12
                                  :          Judge Walter D. Kelley Jr.
                                  :
CHRISTOPHER J. BENYO,             :
JOHN P. TULI, and                 :
KENT D. WAKEFORD,                 :
                                  :
          Defendants.             :

---

## VERDICT FORM

WE, THE JURY, MAKE THE FOLLOWING FINDINGS WITH RESPECT TO THE

CHARGES AGAINST THE DEFENDANT, **CHRISTOPHER J. BENYO**:

**Count 1:**   Count 1 of the Indictment charges that Defendant Christopher J. Benyo

knowingly and willfully conspired with others to commit at least one of the

following crimes:  (a) securities fraud, by knowingly and willfully causing to

be made materially false and misleading statements regarding

PurchasePro's revenue, on the April 26, 2001 earnings call or the April 26,

2001 press release; (b) securities fraud, by knowingly and willfully making

and causing to be made materially false statements in PurchasePro's First

1.89

Quarter 2001 quarterly report filed with the SEC; (c) securities fraud, by knowingly and willfully maintaining and causing to be maintained false books and records of PurchasePro; and (d) securities fraud, by knowingly and willfully making and intending to make false statements to accountants and auditors of PurchasePro, and concealing material facts from accountants and auditors of PurchasePro. Count 1 of the Indictment further alleges that these crimes occurred in the Eastern District of Virginia and in other places.



_____
NOT GUILTY

_____
GUILTY

**Count 2**:    Count 2 of the Indictment charges that Defendant Christopher J. Benyo aided and abetted securities fraud by knowingly and willfully, directly and indirectly, causing PurchasePro to issue a false and misleading press release on April 26, 2001 announcing the financial results for its fiscal quarter ending March 31, 2001.



_____
NOT GUILTY

_____
GUILTY

**Count 2**:      Pinkerton Liability

IF, AND ONLY IF, you have found Defendant Christopher J. Benyo guilty of the conspiracy charged in Count 1 of the Indictment, you may also find him guilty of the securities fraud charged within Count 2 of the Indictment if you find each of the following beyond a reasonable doubt: (1) the securities fraud charged within Count 2 was committed by some person; (2) the person who committed that securities fraud was a member of the conspiracy you found to have existed; (3) the securities fraud charged within Count 2 was committed pursuant to the common plan and understanding you found to exist among the conspirators; (4) Defendant Christopher J. Benyo was a member of that conspiracy at the time the securities fraud charged within Count 2 was committed; and (5) it was reasonably foreseeable to Defendant Benyo that the securities fraud alleged in Count 2 might occur as a result of that conspiracy.

<u>NOT GUILTY</u>                              <u>GUILTY</u>

FILED IN OPEN COURT

■ - 6 2007.

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VA.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

UNITED STATES OF AMERICA      :
      :
      :
v.      :     **Criminal Action No.  1:05cr12**
      :     **Judge Walter D. Kelley Jr.**
      :
CHRISTOPHER J. BENYO,      :
JOHN P. TULI, and      :
KENT D. WAKEFORD,      :
      :
      Defendants.      :

## VERDICT FORM

WE, THE JURY, MAKE THE FOLLOWING FINDINGS WITH RESPECT TO THE

CHARGES AGAINST THE DEFENDANT, **JOHN P. TULI**:

**Count 1**:    Count 1 of the Indictment charges that Defendant John P. Tuli knowingly

and willfully conspired with others to commit at least one of the following

crimes:  (a) securities fraud, by knowingly and willfully causing to be made

materially false and misleading statements regarding PurchasePro's

revenue, on the April 26, 2001 earnings call or the April 26, 2001 press

release; (b) securities fraud, by knowingly and willfully making and

causing to be made materially false statements in PurchasePro's First

690

Quarter 2001 quarterly report filed with the SEC; (c) securities fraud, by

knowingly and willfully maintaining and causing to be maintained false

books and records of PurchasePro; and (d) securities fraud, by knowingly

and willfully making and intending to make false statements to

accountants and auditors of PurchasePro, and concealing material facts

from accountants and auditors of PurchasePro. Count 1 of the Indictment

further alleges that these crimes occurred in the Eastern District of

Virginia and in other places.

<u>✕</u>                        <u>      </u>
NOT GUILTY                                GUILTY

**Count 2**:    Count 2 of the Indictment charges that Defendant John P. Tuli aided and

abetted securities fraud by knowingly and willfully, directly and indirectly,

causing PurchasePro to issue a false and misleading press release on

April 26, 2001 announcing the financial results for its fiscal quarter ending

March 31, 2001.



<u>✕</u>                        <u>      </u>
NOT GUILTY                                GUILTY

**Count 2**:    <u>Pinkerton</u> Liability

IF, AND ONLY IF, you have found Defendant John P. Tuli guilty of the conspiracy charged in Count 1 of the Indictment, you may also find him guilty of the securities fraud charged within Count 2 of the Indictment if you find each of the following beyond a reasonable doubt: (1) the securities fraud charged within Count 2 was committed by some person; (2) the person who committed that securities fraud was a member of the conspiracy you found to have existed; (3) the securities fraud charged within Count 2 was committed pursuant to the common plan and understanding you found to exist among the conspirators; (4) Defendant John P. Tuli was a member of that conspiracy at the time the securities fraud charged within Count 2 was committed; and (5) it was reasonably foreseeable to Defendant Tuli that the securities fraud alleged in Count 2 might occur as a result of that conspiracy.

<u>               </u>                      <u>               </u>

NOT GUILTY                               GUILTY



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA  :
  :
  :
v.  :  Criminal Action No. 1:05cr12
  :  Judge Walter D. Kelley Jr.
  :
CHRISTOPHER J. BENYO,  :
JOHN P. TULI, and  :
KENT D. WAKEFORD,  :
  :
  Defendants.  :

---

## VERDICT FORM

WE, THE JURY, MAKE THE FOLLOWING FINDINGS WITH RESPECT TO THE

CHARGES AGAINST THE DEFENDANT, **KENT D. WAKEFORD**:

**Count 1**:  Count 1 of the Indictment charges that Defendant Kent D. Wakeford

knowingly and willfully conspired with others to commit at least one of the

following crimes: (a) securities fraud, by knowingly and willfully causing to

be made materially false and misleading statements regarding

PurchasePro's revenue, on the April 26, 2001 earnings call or the April 26,

2001 press release; (b) securities fraud, by knowingly and willfully making

and causing to be made materially false statements in PurchasePro's First

Quarter 2001 quarterly report filed with the SEC; (c) securities fraud, by knowingly and willfully maintaining and causing to be maintained false books and records of PurchasePro; and (d) securities fraud, by knowingly and willfully making and intending to make false statements to accountants and auditors of PurchasePro, and concealing material facts from accountants and auditors of PurchasePro. Count 1 of the Indictment further alleges that these crimes occurred in the Eastern District of Virginia and in other places.



NOT GUILTY                                        GUILTY


**Count 2**:   Count 2 of the Indictment charges that Defendant Kent D. Wakeford aided and abetted securities fraud by knowingly and willfully, directly and indirectly, causing PurchasePro to issue a false and misleading press release on April 26, 2001 announcing the financial results for its fiscal quarter ending March 31, 2001.



NOT GUILTY                                        GUILTY

**Count 2**:    Pinkerton Liability

IF, AND ONLY IF, you have found Defendant Kent D. Wakeford guilty of

the conspiracy charged in Count 1 of the Indictment, you may also find

him guilty of the securities fraud charged within Count 2 of the Indictment

if you find each of the following beyond a reasonable doubt: (1) the

securities fraud charged within Count 2 was committed by some person;

(2) the person who committed that securities fraud was a member of the

conspiracy you found to have existed; (3) the securities fraud charged

within Count 2 was committed pursuant to the common plan and

understanding you found to exist among the conspirators; (4) Defendant

Kent D. Wakeford was a member of that conspiracy at the time the

securities fraud charged within Count 2 was committed; and (5) it was

reasonably foreseeable to Defendant Wakeford that the securities fraud

alleged in Count 2 might occur as a result of that conspiracy.


‾‾‾‾‾‾‾‾‾‾‾
NOT GUILTY                              ‾‾‾‾‾‾‾
                                        GUILTY

# EXHIBIT 2
# TO TOPETZES DECLARATION

A0450 (Rev. - DC 04/00) Judgment in a Civil Case

# UNITED STATES DISTRICT COURT

### DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE COMMISSION

JUDGMENT IN A CIVIL CASE

v.

CHARLES JOHNSON, JR., ET AL

Case Number:    05-36

☑ **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

☐ **Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard a decision has been rendered.

IT IS ORDERED AND ADJUDGED

that the Jury finds that plaintiff has proven liability on claim 3 against defendant Chris Benyo and has not proven liability as to defendant Chris Benyo or any violation with regards to claims 4, 6, and 9; and finding no violation as to defendants Michael Kennedy and Kent Wakeford on claims 3, 5, 7, and 9.

Dated:  *April 29, 2008*

NANCY MAYER-WHITTINGTON, Clerk

By:  *Tonya J. Hightower*

Deputy Clerk

# EXHIBIT 3
# TO TOPETZES DECLARATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SECURITIES & EXCHANGE          :
COMMISSION,                    :
                               :
              Plaintiff,       :
                               :
       v.                      :     Civil Action No. 05-36 (GK)
                               :
CHARLES JOHNSON, JR., *et al.*, :
                               :
              Defendants.      :

<u>ORDER</u>

A Status Conference in this case was conducted by telephone on December 17, 2007.  Upon consideration of the representations of the parties, and the entire record herein, it is hereby

**ORDERED,** that Defendant Tuli's Motion to Continue is hereby granted.


December 18, 2007                    /s/
                                    _____
                                    Gladys Kessler
                                    United States District Judge


**Copies via ECF to all counsel of record**

# EXHIBIT 4
# TO TOPETZES DECLARATION

102406.txt

1

```
 1              THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    ALEXANDRIA DIVISION

 3

 4   UNITED STATES OF AMERICA          )
                                       )
 5        v.                           )
                                       )
 6   CHRISTOPHER J. BENYO,             )   CRIMINAL NO. 1:05cr12
     CHARLES E. JOHNSON, JR.,          )
 7   JOHN P. TULI,                     )
     KENT D. WAKEFORD,                 )
 8                                     )
                      Defendants.      )
 9

10

11

12

13              TRANSCRIPT OF TRIAL PROCEEDINGS

14                   Alexandria, Virginia

15                    October 24, 2006

16                       VOLUME I

17

18

19

20

21   Before:    THE HONORABLE WALTER D. KELLEY, JR.
                United States District Judge, and a Jury
22

23

24

25
```

102406.txt

9  public and to investors, it only reports about 30 million

10  dollars.  It was a huge surprise.

11       Just five weeks earlier defendant Johnson had

12  confirmed PurchasePro's 42 million dollar revenue projection

13  in a press release.  Two weeks earlier he had lied to the

14  Board of Directors and said the company had made its number.

15  And just over one week earlier defendant Johnson had caused

16  management to lie to Arthur Andersen and say again the

17  company had made its quarter.  But the worst was still yet to

18  come.

19       After PurchasePro missed its quarter, after it

20  missed the 42 million dollar number, AOL began conducting an

21  internal investigation into the actions of its employees.

22  There was dissension among PurchasePro management.

23  Ultimately, Junior Johnson is asked to leave the company,

24  which he does on May 21st.

25       And at that time Jim Sholeff and Geoff Layne leave,

PENNY C. WILE, RMR, CRR
OFFICIAL COURT REPORTER

64

1  as well.  Now, worried about what might happen, this is when

2  Johnson directed Jim Sholeff to destroy his AOL documents.

3  And as I told you at the beginning, Sholeff followed his

4  directions.

5       He will describe for you in detail his efforts to

6  make -- the efforts he went through to make sure all of his

7  documents were destroyed.  He shredded them.  He burned them.

Page 66

102406.txt

8   He scattered the ashes into the dirt of his yard.  And when

9   he explained this to Junior Johnson, Johnson complimented him

10  on his work and brought over his own documents to be

11  shredded, burned, and scattered.

12          But defendant Johnson didn't stop at documents.  He

13  also directed Sholeff to destroy his PurchasePro laptop.

14  Once again, Jim Sholeff, Junior Johnson's assistant,

15  listened.  Sholeff took his laptop, he smashed it with a

16  hammer, he took the pieces, and he raked them into the dirt

17  of his yard.

18          Unfortunately for the investors and for the public,

19  Arthur Andersen was not able to uncover all the lies that

20  defendants Johnson, Wakeford, Tuli, and Benyo had set in

21  motion.  And as a result bogus revenue remained in

22  PurchasePro's numbers.  So despite the best efforts of Arthur

23  Andersen and some AOL financial personnel, when PurchasePro

24  filed its Form 10-Q for the first quarter, that quarterly

25  report card, it still contained bogus revenue.


                    PENNY C. WILE, RMR, CRR
                    OFFICIAL COURT REPORTER



                                                        65

1           It was a written lie to the SEC and to investors.

2   For example, you will hear that Junior Johnson admitted that

3   a marketplace deal with a local Virginia company, called

4   YellowBrix, should not have been in the Form 10-Q, it should

                    Page 67

103006B.txt

819

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    ALEXANDRIA DIVISION

 3

 4   UNITED STATES OF AMERICA           )
                                        )
 5        v.                            )
                                        )
 6   CHRISTOPHER J. BENYO,              )   CRIMINAL NO. 1:05cr12
     CHARLES E. JOHNSON, JR.,           )
 7   JOHN P. TULI,                      )
     KENT D. WAKEFORD,                  )
 8                                      )
                         Defendants.    )
 9

10

11

12

13              TRANSCRIPT OF TRIAL PROCEEDINGS

14                    Alexandria, Virginia

15                    October 30, 2006

16                       Volume 4B

17

18

19

20

21   Before:   THE HONORABLE WALTER D. KELLEY, JR.
               United States District Judge, and a Jury
22

23

24

25
```

PENNY C. WILE, RMR, CRR
Page 1

103006B.txt

9   Q.  Approximately how long did your meeting with Kent

10  Wakeford and Eric Keller last?

11  A.  I believe it lasted approximately an hour to an hour

12  and-a-half.

13  Q.  What was the purpose of the meeting, as you understood

14  it?

15  A.  Eric and Kent had requested to meet with me to discuss

16  the sales of PurchasePro marketplaces, and in particular

17  sales to existing AOL customers and how that could be

18  accomplished, and to -- how that could be accomplished with

19  our recording revenue with respect to those sales.

20  Q.  Will you please describe what you recall being said in

21  the course of this meeting with you and Mr. Keller and

22  Mr. Wakeford?

23          MR. ASBILL:  Objection to Mr. Keller.

24          THE COURT:  You're objecting to any testimony about

25  what Mr. Keller might have said?


            PENNY C. WILE, RMR, CRR
            OFFICIAL COURT REPORTER


                                                    898

1           MR. ASBILL:  Yes, sir.

2           THE COURT:  All right.  Mr. Reeves.

3           MR. REEVES:  Your Honor, it's not my intention to

4   elicit anything Mr. Keller says.  I'd like to elicit what

5   Mr. Wovsaniker said in the presence of the defendant and

6   Mr. Keller.
            Page 82

103006B.txt

7          THE COURT:  Okay.

8          MR. REEVES:  If I may --

9          THE COURT:  Why don't you rephrase the question to

10    elicit that?

11    BY MR. REEVES:

12    Q.  In the course of this meeting, did you discuss certain

13    proposed deals with Mr. Keller and Mr. Wakeford?

14    A.  Yes, I did.

15    Q.  What did you say at that time to Mr. Wakeford,

16    Mr. Wovsaniker?

17    A.  I told him that it would be very difficult to sell

18    marketplaces to existing customers or customers that we had

19    existing deals with other than in a very straightforward

20    manner of here is a marketplace, you pay for it.  I told him

21    that we could not do a transaction where anyone was either

22    relieved of any obligation to pay AOL under its existing

23    agreement, that we could not give them marketplaces and

24    additional advertising, that we could not make any guarantees

25    with respect to the marketplaces because they weren't our

PENNY C. WILE, RMR, CRR
OFFICIAL COURT REPORTER

899

1    product, and that we could not have any type of side deal or

2    side promise related to sales of marketplaces.

3    Q.  What do you mean by the term side deal?

4    A.  Any type of agreement or promise that either isn't

Page 83

103006B.txt

5    documented or isn't part of a straight deal of selling the

6    marketplace.

7    Q.  And what is a side promise, as you use that term?

8    A.  Side promise, again, would be something that wouldn't be

9    documented, but some type of promise or commitment by AOL.

10   Q.  Did you use examples and talk through examples in front

11   of Mr. Wakeford?

12   A.  Yes, I did.

13   Q.  When you said that you emphasized that there needed to be

14   a straightforward sale, as you use that term, what did you

15   mean?

16   A.  I meant that we could sell a marketplace and not sell

17   anything else.  Sell a marketplace, collect the money, and

18   that would be it.  There wouldn't be any other change in any

19   other existing AOL deal with the customer or any other

20   commitment on AOL's part for any other future services to the

21   customer.

22   Q.  That would be okay?

23   A.  If there wasn't anything other -- like that, that would

24   be okay, yes.

25   Q.  But the other things raised issues?


PENNY C. WILE, RMR, CRR
OFFICIAL COURT REPORTER


900

1    A.  Yes.

2    Q.  Were you clear on that subject to Mr. Wakeford in your

3    hour and-a-half long meeting with him?

4    A.  I believe I was, yes.

Page 84

010907B

7595

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
2                  ALEXANDRIA DIVISION

3

4   UNITED STATES OF AMERICA        )
                                    )
5        v.                         )
                                    )
6   CHRISTOPHER J. BENYO,           )    CRIMINAL NO. 1:05cr12
    JOHN P. TULI,                   )
7   KENT D. WAKEFORD,               )
                                    )
8              Defendants.          )

9

10

11

12          TRANSCRIPT OF TRIAL PROCEEDINGS

13              Alexandria, Virginia

14               January 9, 2007

15                 Volume 34B

16

17

18

19

20   Before:   THE HONORABLE WALTER D. KELLEY, JR.
               United States District Judge, and a Jury
21

22

23

24

25

Page 1

010907B

7596

```
 1   Appearances:

 2            UNITED STATES ATTORNEY'S OFFICE
             By:  CHARLES F. CONNOLLY, ESQUIRE
 3                TIMOTHY D. BELEVETZ, ESQUIRE
                  MATTHEW J. DONNELLY, ESQUIRE
 4                Assistant United States Attorneys
                      and
 5            UNITED STATES DEPARTMENT OF JUSTICE
             By:  ADAM A. REEVES, ESQUIRE
 6                SENIOR TRIAL ATTORNEY, CRIMINAL DIVISION,
                  FRAUD SECTION
 7                Counsel for the Government

 8            LANKFORD, COFFIELD & REED, PLLC
             By:  TERRANCE G. REED, ESQUIRE
 9                WILLIAM F. COFFIELD, ESQUIRE
                  Counsel for the Defendant Benyo
10
             STEPTOE & JOHNSON, LLP
11           By:  MARK J. HULKOWER, ESQUIRE
                  MARC LEVIN, ESQUIRE
12                SUZANNE D. REIDER, ESQUIRE
                  Counsel for the Defendant Tuli
13
             LEBOEUF, LAMB, GREENE & MACRAE, LLP
14           By:  HENRY W. ASBILL, ESQUIRE
                  KERRI L. RUTTENBERG, ESQUIRE
15                    and
             CLAYMAN & ROSENBURG
16           By:  PAUL S. HUGEL, ESQUIRE
                  Counsel for the Defendant Wakeford
17

18

19

20

21

22

23

24

25
```

7597

```
 1                     I N D E X
                        Page 2
```

010907B

2    WITNESSES                                            PAGE

3    ON BEHALF OF THE DEFENDANT WAKEFORD:

4    Kent D. Wakeford
                Direct by Mr. Asbill                     7599
5

6

7

8

9                        E X H I B I T S

10   NO.                                             ADMITTED

11   KW-141                                             7658
     KW-401                                             7670
12   KW-402                                             7670
     KW-1435                                            7718
13   KW-1440                                            7719

14

15

16

17

18

19

20

21

22

23

24

25

7598

1         (Proceedings began at 2:09 p.m.)

2            THE COURT:  All right.  Chuck, did you have

3    something?

Page 3

010907B

8   provide, you know, a time period.  It's very -- kind of
9   general in a sense, and kind of gives AOL some flexibility
10  here that we'll give you some other promotional programs.
11  With the companies that Neil pitched it was a very specific,
12  you know, we're going to get our money back, we're going to
13  make all our money back in 90 days, it's like a 90-day loan,
14  that kind of stuff.
15  Q.  Back where we started with this, you had a conversation
16  about this particular issue with Mr. Wovsaniker?
17  A.  Yes, I did.
18  Q.  And this is about the customers or the clients calling
19  you and asking you to change the contract as per Neil's
20  promise or representation to them?
21  A.  Yeah.  As I said, there was a bunch of companies that
22  came back with that, and I kept saying we can't do this.  One
23  company in particular, right now I can't remember the name,
24  but came back and asked for it, and so after that call I
25  called Mark to figure out how we could, you know -- what

7676

1   language would be best to use.
2   Q.  All right.  And when you were calling Mr. Wovsaniker,
3   were you calling to ask for advice, to complain, for some
4   other reason?  What were you doing or what was the purpose --
5   were you reporting a problem or what?
6   A.  No.  It was just -- I was going -- this is what the
7   partner -- what the salespeople were pitching, so I just
8   wanted to see how we would draft whatever language, you know.
9   I didn't think we were -- kind of exactly the way Neil

Page 75

010907B

10  pitched it, but what we could provide to these partners.

11  Q.  This was on an issue you had never encountered before in

12  terms of your work at AOL?

13  A.  Never one like this, no.

14  Q.  What was Mr. Wovsaniker -- did you explain to

15  Mr. Wovsaniker essentially what you explained to us right now

16  in terms of your interaction with the partners?

17  A.  Yeah.  I told him that this is what I was hearing based,

18  you know -- this is what potential partners were telling me

19  that Mark -- that Neil Davis was pitching to them.

20  Q.  All right.  And what was Mr. Wovsaniker's response?

21  A.  Mark kind of blew up.

22  Q.  Kind of or did?

23  A.  He did.  He got really upset, which was unusual for him.

24  He got -- started yelling, you know, how could these

25  salespeople be doing this?  We can't agree to it.  You've got

7677

1  to go back and call the company, tell them that we won't do

2  this.  And, you know, in all my interactions with Mark, it

3  was kind of very surprising.

4  Q.  And in view of Mr. Wovsaniker's reaction or response,

5  what, if anything, did you do?

6  A.  Well, I immediately called the partner back, and I said,

7  you know, we can't do this.  We're not going to agree to it.

8  And they said, well, you know, we're going to have problems

9  entering into this contract then.  And we reduced -- the

10  value of the contract came down.  It was either like a 3.7

11  million dollar marketplace or a 2 million dollar marketplace.

12  They said, all right, without this guarantee from Neil we'll

Page 76

010907B

18  A.  I did.

19  Q.  And when did it occur?

20  A.  It was either later in that day or the next day.

21  Q.  So this is roughly the 14th of March?

22  A.  No.  I think it was more kind of middle to kind of the

23  third -- maybe like around the third week of March.

24  Q.  And what was the upshot or nature of that conversation

25  with Mr. Keller when you talked to him again about this

7680

1  subject?

2  A.  At this point Eric was very firm with me.  He said, I

3  don't want you to be speaking with Mark Wovsaniker anymore

4  about these marketplace licenses.  I had created an

5  incredible -- at AOL they use the term swirl, which means a

6  lot of people start kind of talking and discussing something.

7  And I created kind of an uproar with a lot of people, and

8  confused people, and, you know, generally that, you know,

9  kind of my actions, you know, and kind of the process I had

10  taken and the steps I took was inappropriate.

11  Q.  Did he tell you whether or tell you what to do if you had

12  any specific concerns about any issues or possible accounting

13  issues with respect to marketplace license sales if you

14  weren't supposed to be going to Wovsaniker?

15  A.  Yeah.  He specifically said for -- you know, if you have

16  any question, don't go to Mark, but bring it to me or bring

17  it to Steven Rindner.  Steven was -- we've talked about him a

18  little here.  He was Eric's chief operating officer for the

19  group.  He was a vice-president.  So I either were to go to

Page 79

010907B

20   Steven or to Eric.

21   Q.  Okay.  Did you think at this particular time that you had

22   done anything inappropriate at all in talking to

23   Mr. Wovsaniker in either of the circumstances you've

24   described in the last 20 or 30 minutes in this trial?

25   A.  No.

7681

1   Q.  After this discussion with Mr. Keller where he says don't

2   talk to Wovsaniker anymore about marketplace license

3   accounting issues, did you talk to Mr. Wovsaniker again about

4   PurchasePro?

5   A.  I'm pretty sure I had a couple conversations with him.

6   Eric would specifically say, can you call Mark and ask him

7   specifically about this issue or that one, more discrete

8   issues.  So I'm pretty sure I did.  In fact, I know I did,

9   but --

10   Q.  Were those with the express direction of Mr. Keller on

11   whatever issue it was that he asked you to inquire of

12   Mr. Wovsaniker?

13   A.  Yes.

14   Q.  Other than on marketplace license sales and on these

15   couple of occasions or specific incidents -- instances where

16   Mr. Keller asked you -- directed you specifically to talk to

17   Mark, did you continue to talk to Mark about other

18   non-PurchasePro deals that you were working on?

19   A.  Yes.

20   Q.  Was that on a regular basis or infrequently or what?

21   A.  Generally whenever they would come up.  I guess

22   frequently because things came up.  No set time or anything.

Page 80

# EXHIBIT 5
# TO TOPETZES DECLARATION

1

1      UNITED STATES OF AMERICA
       UNITED STATES DISTRICT COURT
2      CENTRAL DISTRICT OF CALIFORNIA
       WESTERN DIVISION
3
                    - - -
4          HONORABLE PERCY ANDERSON
       UNITED STATES DISTRICT JUDGE PRESIDING
5                   - - -

6
   UNITED STATES OF AMERICA,          )
7                                     )
              PLAINTIFF,              )
8                                     )
   VS.                                )   CR 05-0398 PA
9                                     )
   STUART WOLFF,                      )
10                                    )
              DEFENDANT.              )
11  _____ )

12

13

14

         TESTIMONY OF MARK WOVSANIKER
15

16      REPORTER'S TRANSCRIPT OF PROCEEDINGS
           MONDAY, JUNE 12, 2006

17         LOS ANGELES, CALIFORNIA

18

19

20

21
        JENNIFER L. CHESHIRE-SMITH, CSR 10358, RMR, CRR
22         FEDERAL OFFICIAL COURT REPORTER
           312 NORTH SPRING STREET, ROOM 440
23         LOS ANGELES, CALIFORNIA 90012
                PH:  (213)625-5857
24         j_cheshire@hotmail.com

25

1    Q.    And, in fact, to use the -- well, one of the -- one of

2    the conditions for AOL to pay money to Homestore was that

3    money had to come in from the companies that were being sent

4    by Homestore to AOL.

5    A.    Yes.  That's correct.

6    Q.    Okay.  The dollar figures between the two transactions

7    were linked, as far as you knew?

8    A.    Yes.  That's correct.

9    Q.    And you indicated you talked to Mr. Rindner about the

10   mechanics of this transaction?

11   A.    Yes.

12   Q.    And you also talked to Mr. Ripp, who was the chief

13   financial officer of the AOL division, where you worked.

14   A.    Yes.  That's correct.

15   Q.    Okay.  And you were uncomfortable with this transaction

16   when you learned about it.

17   A.    Yes, I was.

18   Q.    This was, first of all, a large transaction, from AOL's

19   perspective.

20   A.    Yes.

21   Q.    It involved 25- or 30-, $35 million in advertising.

22   A.    Yes.

23   Q.    And it appeared to be a large transaction from the

24   perspective of Homestore.

25   A.    Yes.  That's correct.

58

1   Q.   You were uncomfortable because you knew this was an

2   unusual deal?

3   A.   Yes.

4   Q.   And you weren't sure what the real substance of this

5   transaction was when it was initially presented to you.

6   A.   Yes.  That's correct.

7   Q.   Okay.  You were concerned about a quid pro quo?

8   A.   Yes.

9   Q.   And a quid pro quo means essentially "this for that."

10   It's a Latin phrase.

11   A.   Yes.

12   Q.   And putting aside the fact that it's Latin, you were

13   concerned as to why AOL and Keller had agreed to do a deal in

14   which money would come in and money would go out?

15   A.   Yes, I was very concerned.

16   Q.   It didn't make a lot of sense to you?

17   A.   I -- I wouldn't say -- it's not that it didn't make a

18   lot of sense.  It's just an unusual transaction, and it was

19   the type of transaction that we tried to steer away from.

20   Q.   And you also came to learn pretty quickly that Homestore

21   was not interested in fully documenting this transaction.

22   A.   Yes.  That's correct.

23   Q.   The aspect of the transaction in which the companies

24   were buying ads from AOL and a payment was going to go to

25   Homestore, Homestore did not want that side of the

UNITED STATES DISTRICT COURT

59

```
 1   transaction documented.
 2   A.   Yes.  That's correct.
 3   Q.   And that was also of concern to you?
 4   A.   That was extremely troubling to me.
 5   Q.   Because as a business executive at AOL and a former
 6   partner in a major accounting firm, it's kind of suspicious
 7   when a company doesn't want to document its business
 8   transactions.
 9   A.   Yes.
10   Q.   And that was being conveyed to you as coming from senior
11   management at Homestore.
12   A.   Yes.  That's correct.
13   Q.   Okay.  And you eventually came to learn about shouting
14   matches between Mr. Rindner and Mr. Tafeen on this issue?
15   A.   I've heard that, yes.
16   Q.   And you personally had to engage in phone calls with Joe
17   Shew, who you understood to be the CFO of Homestore?
18   A.   Yes.
19   Q.   And you were concerned whether this was, in fact, a
20   legitimate deal that AOL was entering into.
21   A.   Yes, I was.
22   Q.   Okay.  And one of the ways -- or one of the things that
23   was decided at AOL was that this document -- this deal would
24   be fully documented; correct?
25   A.   Yes.  That's correct.
```

60

Q.   Okay.  There would be written agreements for all aspects
of the transaction that you knew about?
A.   Yes.
Q.   One of which is the payment of money from the
advertisers who bought ads at AOL and then this ad
representative side of the transaction.
A.   Yes.  That's correct.
Q.   And you wanted that fully documented?
A.   Yes.
Q.   And to the extent that there were two agreements, they
would be stapled together and exhibits of each other, and
maybe even a reference in the text to each other; correct?
A.   Yes.  That's correct.
Q.   However, it's also true that in connection with this
deal, you didn't know anything in the second quarter about
any financial relationship between Homestore and the
companies which were buying ads at AOL.
A.   No, I didn't.
Q.   Okay.  No one from Homestore told you whether Homestore
was paying companies to buy the ads at AOL?
A.   No.
Q.   And that was not something that found its way into any
of the documents for this transaction.
A.   No.
Q.   Because you didn't have any information about that.

61

1    A.    That's correct.

2    Q.    Nobody told you that.

3    A.    That's correct.

4    Q.    Now, when you were dealing with this issue about how to

5    document the transactions and when you and your colleagues

6    were having discussions with the Homestore staff on this, you

7    were concerned that Homestore might be doing something that

8    wasn't quite right here; correct?

9    A.    Yes, I was.

10   Q.    You were concerned that Homestore might not be dealing

11   fairly with its outside accountants; correct?

12   A.    Yes.

13   Q.    Okay.  And you were aware that PricewaterhouseCoopers

14   was Homestore's accounting firm.

15   A.    Yes.

16   Q.    Okay.  And you knew that Pricewaterhouse was a major,

17   national firm?

18   A.    Yes.

19   Q.    And I won't ask you to compare between your former firm

20   and this firm, but you knew they were both nationally known

21   auditing and accounting firms; correct?

22   A.    That's correct.

23   Q.    Now, you didn't owe any type of obligation or duty to

24   Homestore's accountants; correct?

25   A.    Not that I'm aware of, no.

UNITED STATES DISTRICT COURT

# EXHIBIT 6
# TO TOPETZES DECLARATION

James T. Coffman
Luis R. Mejia
Melissa A. Robertson
Gregory T. Lawrence
Jeffrey B. Finnell
Christopher K. Agbe-Davies
Thomas D. Manganello
Andrew B. Stevens

Attorneys for Plaintiff
Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, DC  20549
(202) 942-4744 (Mejia)
MejiaL@sec.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : <br> 450 Fifth Street, N.W. <br> Washington, DC  20549 <br><br> Plaintiff, <br><br> v. <br><br> TIME WARNER INC., <br> One Time Warner Center <br> New York, New York  10019 <br><br> Defendant. | C.A. No. 1:05CV00578-GK |

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges as follows:

## SUMMARY

1.     This is a financial fraud case.  America Online, Inc. ("AOL") and its

successor corporation AOL Time Warner Inc. ("AOLTW" and collectively with AOL,

the "Company") artificially inflated reported online advertising revenues and Internet

subscriber counts—two key measures by which investors and analysts evaluated the Company. The Company reported inflated online advertising revenue in periodic reports filed with the Commission and other public statements from October 2000 through February 2003 based on transactions entered into from June 2000 through December 2001. The Company also inflated its Internet subscriber counts in 2001. Subsequent to the events described below, AOLTW changed its name to Time Warner Inc.

2.    The Company inflated its online advertising revenues by engaging in "round-trip" transactions with a host of companies with which it had commercial relationships. These transactions ranged in complexity and sophistication, but in substance, the Company provided its customers with funds to purchase online advertising from AOL. Simultaneously, the customer would enter into an agreement to "purchase" online advertising from AOL in an amount corresponding to the payment from the Company. AOL and AOLTW improperly recognized as online advertising revenue the amounts received pursuant to these purported advertising agreements and improperly accounted for the funds it provided to the customers.

3.    Several of the customers were public companies with securities registered with the Commission. Some of these customers used the transactions to artificially inflate their own financial results. As a consequence, the Company also aided and abetted the frauds of three public companies that improperly recognized revenue in connection with the round-trip transactions.

4.    The Company also inflated the number of AOL's Internet subscribers by including memberships provided in bulk to corporate customers in its published subscriber counts, even though most employees of those corporate customers never

2

became members. The Company also inflated AOL's subscriber counts by, among other means, funding its corporate customers' bulk subscription "purchases."

5.      The Company's financial statements were further misstated by its failure to properly consolidate the losses and debt of one of its subsidiaries, AOL Europe, S.A. This resulted in material misstatements of the Company's 2000 and 2001 financial results, including overstatements of operating income, net income, and free cash flow, and understatements of net losses and total debt.

6.      This conduct violated the federal securities laws as well as a cease-and-desist order against AOL issued by the Commission on May 15, 2000. The Commission issued the cease-and-desist order because of AOL's improper capitalization of certain advertising costs that should have been expensed as they were incurred. As a result of this improper accounting treatment, AOL reported profits for six of eight quarters in fiscal years 1995 and 1996, rather than the losses it would have reported had it properly expensed the advertising costs. Within several weeks of consenting to that order, AOL began violating it by engaging in the new acts alleged in this Complaint.

7.      On October 23, 2002, months after the Commission commenced its investigation of this matter, the Company announced that it would restate its financial results for each of the quarters ended September 30, 2000 through June 30, 2002, and for the years ended December 31, 2000 and 2001 (the "2002 Restatement"). The 2002 Restatement reversed some, but not all, of the improper round-trip transactions and resulted in a reduction of $190 million in principally online advertising revenue. The 2002 Restatement was materially deficient.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action under Section 22(a) of the

Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)], and Sections 21(d), 21(e),

and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)

and (e) and 78aa]. Defendant, directly or indirectly, made use of the means or

instrumentalities of interstate commerce, of the mails, or of the facilities of a national

securities exchange in connection with the transactions, acts, practices, and courses of

business alleged in this Complaint.

9.      Venue is appropriate in this Court under Section 22(a) of the Securities

Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because

the defendant does business in this judicial district and certain acts or transactions

constituting the violations occurred in this district.

## DEFENDANT

10.     Time Warner Inc. is the corporate parent of AOL and is a media and

entertainment company incorporated in Delaware and headquartered in New York, New

York. Time Warner Inc.'s common stock is registered with the Commission pursuant to

Section 12(b) of the Exchange Act and trades on the New York Stock Exchange. Time

Warner Inc. files annual, quarterly, and current reports with the Commission on Forms

10-K, 10-Q, and 8-K. Time Warner Inc. registered securities offerings from January

2001 through January 2003 by filing with the Commission Forms S-3 and S-8.

11.     AOL Time Warner Inc. was formed by the merger of AOL and Time

Warner on January 11, 2001. It changed its name to Time Warner Inc. on October 16,

2003.

4

12.     AOL is an Internet service provider located in Dulles, Virginia. AOL provides its members with access to the Internet, e-mail accounts, and content.

13.     Certain conduct alleged in this Complaint occurred at AOL before it merged with Time Warner. AOL's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exhange. It filed annual, quarterly, and current reports with the Commission on Forms 10-K, 10-Q, and 8-K. AOLTW registered a securities offering on December 28, 2000 by filing with the Commission a Form S-4.

## FACTS

### I.
### AOL and Time Warner Propose a Merger.

14.     In the fall of 1999, AOL entered into merger discussions with Time Warner, and the two companies announced a proposed merger in January 2000. The implied market value of the merged company was approximately $200 billion, making it the then-largest merger in U.S. history.

### II.
### AOL Settles an Action with the Commission
### Based on AOL's Improper Accounting Practices.

15.     On May 15, 2000, the Commission issued a cease-and-desist order against AOL in connection with AOL's accounting for advertising costs in 1995 and 1996. The Commission found that AOL violated the reporting and the books and records provisions of the federal securities laws by capitalizing costs of acquiring new subscribers and reporting the costs as an asset on its balance sheet, instead of expensing them as incurred. AOL had capitalized aggregate advertising costs of approximately $385 million by September 30, 1996, when it wrote them off in their entirety. AOL consented to the

issuance of the cease-and-desist order without admitting or denying the Commission's allegations.

16.    In connection with the cease-and-desist order, the Commission filed a related civil action against AOL in the United States District Court for the District of Columbia seeking a civil penalty. AOL settled the matter by consenting to a court order requiring it to pay a $3.5 million penalty.

**III.**

### AOL and AOLTW Violate the Commission's Cease-and-Desist Order and Engage in Fraud to Artificially Boost Online Advertising Revenue.

17.    Beginning in mid-2000, while the AOL/Time Warner merger was pending, stock prices of Internet-related businesses declined precipitously as, among other things, sales of online advertising declined and the rate of growth of new online subscriptions started to flatten. During this period, AOL employed round-trip transactions that boosted its online advertising revenue and masked the fact that it also was beginning to experience a business slow-down.

18.    AOL's round-trip transactions took several forms, including: (i) vendor transactions, in which AOL agreed to pay inflated prices for, or forego discounts on, goods and services it purchased in exchange for the vendors' purchases of online advertising in the same amount as the markup or foregone discount; (ii) converting settlements of legal claims into online advertising revenue; (iii) business acquisitions, in which AOL increased the purchase price in exchange for the sellers' purchase of online advertising in the same amount as the increase in the purchase price; and (iv) referral transactions, in which AOL and its counterparties falsely created and reported revenues.

19.    By each of these means, AOL effectively funded its own online advertising revenue by giving the counterparties the means to pay for advertising that they would not otherwise have purchased. To conceal the true nature of the transactions, the Company typically structured and documented round-trip transactions as if they were two or more separate, bona fide transactions, conducted at arm's length and reflecting each party's independent business purpose.

20.    AOL's recognition of online advertising revenue in connection with these transactions departed from generally accepted accounting principles ("GAAP"). GAAP requires accounting to reflect the substance of a transaction over its legal form. For example, revenue should not be recorded in a round-trip transaction in which the essence of the transaction is merely a circular flow of cash and the customer does not want or need the goods or services provided, would not normally purchase the goods or services at that time, or purchases quantities in excess of its needs. AOL's recognition of revenue on these round-trip transactions departed from GAAP by elevating form over substance.

21.    In connection with these round-trip transactions, AOL often delivered untargeted, less desirable, remnant advertising. Often, the round-trip advertisers had little or no ability to control the quantity, quality, and sometimes even the content of the online advertising they received. Because the round-trip customers effectively were paying for the online advertising with AOL's funds, they seldom, if ever, complained.

A.    **The Vendor Round-Trip Transactions**

22.    As described above, AOL agreed to pay inflated prices for, or forego discounts on, goods and services it purchased in exchange for the vendors' purchases of online advertising in amounts equivalent to the markup paid or discount foregone.  The essence of these transactions was a circular flow of money by which AOL used its own cash to create the false appearance of receipt of advertising revenue, enabling the Company to meet internal revenue targets and analysts' expectations.  Examples of these transactions include the following:

*Computer Hardware Transactions*

23.    In June 2000, AOL transformed a commitment to purchase computer hardware into a transaction that generated $37.5 million in online advertising revenue for AOL in the second half of 2000.

24.    The hardware supplier is a California-based company that manufactures the network equipment AOL uses to support its online service.  In November 1998, AOL entered into an agreement to purchase at least $300 million of network equipment over three years.

25.    AOL's equipment needs outpaced expectations, and by June 2000 AOL had already purchased $300 million of equipment.

26.    In June 2000, the supplier asked AOL to enter into a new purchase commitment.  During the negotiations that followed, AOL secured an additional 15% discount in exchange for committing to purchase $250 million of additional equipment.

27.    To inflate its online advertising revenues, AOL proposed to pay the supplier $37.5 million—by foregoing the 15% discount and paying the full $250 million

for the equipment—in exchange for the supplier's agreement to purchase $37.5 million of online advertising. The hardware supplier agreed, and AOL structured the transaction to conceal the fact that it paid an additional $37.5 million for the network equipment in exchange for the supplier's agreement to purchase $37.5 million of online advertising.

28.    The advertising contract provided AOL with complete discretion over where and when to run this online advertising, subject only to a $25 million cap on advertising within a single quarter.

29.    Faced with a shortfall in online advertising revenues in the third quarter of 2000, AOL obtained oral approval to run the full $37.5 million in advertising in that quarter. AOL also charged a 175% premium to its list price for the $37.5 million ad purchase.

30.    In its 2002 Restatement, AOLTW reversed the $37.5 million and accounted for it as a reduction in the purchase price for the network equipment.

31.    Following the model described above, AOL converted a $12 million discount from another hardware vendor into $12 million of advertising revenue in the fourth quarter of 2000. In its 2002 Restatement, AOLTW reversed the $12 million of online advertising revenue recognized in connection with this transaction.

### Software License Transactions

32.    In September 2000, AOL engineered a round-trip transaction with a California-based software company that creates and licenses data storage software. The software company's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and is quoted on the Nasdaq National Market ("Nasdaq").

9

33.    During the summer of 2000, AOL began negotiating to purchase a software license from the company.  By mid-September 2000, the parties agreed on a $30 million purchase price for the license and associated services.

34.    During the final month of the license negotiations, AOL proposed that the software company purchase online advertising from AOL.  The software company rejected AOL's proposal.

35.    Hours before the parties were set to execute the license agreement, AOL offered to pay an additional $20 million for the license in return for the software company's agreement to purchase $20 million of AOL online advertising.  The parties did not change the terms of the license as a result of the price increase nor did they engage in any substantive negotiations regarding the online advertising contract.  By oral side agreement, the parties further agreed to simultaneously wire payments of the amounts due under the contracts.

36.    AOL and the software company documented the license transaction to conceal the fact that AOL agreed to pay an additional $20 million for the license in exchange for the software company's agreement to purchase $20 million in online advertising.  The Company improperly recognized the $20 million as advertising revenue, and the software company improperly recognized most of the additional $20 million as license and service revenue.  In its 2002 Restatement, AOLTW reversed the $20 million of improperly recognized revenue.

37.    In January 2001, AOL returned to the software company's independent auditors a materially misleading confirmation of the purported terms of the license, further aiding and abetting the software company's fraud.

38.     Another example involves a $4.5 million round-trip.  In July 2000, AOL began negotiations with another software maker and licensor to purchase a license.  By mid-November 2000, AOL and the licensor agreed on a $33 million price for this software.

39.     During the negotiations, AOLTW pressed the licensor to purchase online advertising.  The licensor, which had no need or budget for the advertising, repeatedly rejected AOLTW's proposal.  After agreeing to the $33 million purchase price, but before the deal was signed, AOLTW then proposed to pay the licensor an additional $4.5 million for its license in exchange for an agreement by the licensor to buy $4.5 million of online advertising from AOLTW.  The licensor agreed.

40.     AOLTW documented the transactions as two independent agreements: AOLTW's purchase of a software license from the licensor for $37.5 million and the licensor's purchase of $4.5 million of online advertising from AOLTW.  AOLTW recognized $4.5 million as advertising revenue in the first quarter of 2001.  The Company did not restate its financial results to reverse this $4.5 million of advertising revenue in the 2002 Restatement.

**B.     The Business Acquisition Transactions**

*The Bertelsmann Online Advertising Contracts*

41.     In 2001 and 2002, AOLTW improperly recognized $400 million in online advertising revenue as a result of transactions with Bertelsmann AG ("BAG").  In substance, BAG paid $400 million to AOLTW as consideration for amendments to a multi-billion-dollar contract governing AOLTW's purchase of BAG's interest in AOL Europe.  The contract amendments had substantial value and BAG offered to compensate

AOLTW for the amendments. Rather than accept cash in exchange for the two amendments, however, AOLTW requested BAG to purchase online advertising in the aggregate amount of $400 million. AOLTW inflated its online advertising revenues by recognizing the $400 million as advertising revenue rather than as consideration received for amending the AOL Europe purchase agreement.

### Purchase of BAG's Interest in AOL Europe

42. AOL and BAG formed a joint venture in 1995 that created AOL Europe, which owns and operates European Internet services (including AOL UK and AOL Germany). In March 2000, AOL and BAG entered into a contingent purchase agreement concerning AOL's acquisition of BAG's interest in AOL Europe. The agreement was structured as a put/call option (the "Put/Call"). Under the Put/Call, BAG could exercise an option to "put" its AOL Europe shares to AOL by selling those shares for $6.75 billion; if BAG did not exercise its option, AOL could exercise an option to "call" BAG's AOL Europe shares by purchasing BAG's shares for $8.25 billion. BAG's Put rights under the Put/Call had two settlement dates: January 2002 for 80% of BAG's AOL Europe shares, and July 2002 for the remaining 20% of BAG's AOL Europe shares. The Put/Call provided AOL the option to pay in cash or stock. AOL retained the further option to settle in cash or stock for 12 days after the price of AOL stock was fixed for settlement (the "free-look period"). If AOL's stock price at the end of the free-look period was below the price fixed for settlement under the Put/Call, AOL could deliver stock worth less than the Put/Call price.

43. At the same time in March 2000, BAG and AOL executed an online advertising agreement committing BAG to purchase $150 million in online ads from

AOL over four years (the "Premier Ad Deal"). The Premier Ad Deal provided BAG "premier status," entitling it to extensive ad placement and exclusivity rights, and "preferred pricing," under which the parties agreed by December 2000 to provide BAG with a 40% discount to AOL's list price. Under the Premier Ad Deal, BAG negotiated the content, placement, and timing of the online advertising. After the January 2001 merger of AOL and Time Warner, AOLTW became AOL's successor in interest under the BAG agreements.

### *$125 Million Put/Call Amendment Deal*

44.     Shortly after entering into the Put/Call agreement, BAG attempted to realize some or all of the $6.75 billion it was due upon exercise of its Put rights, which according to the contract could not be settled until 2002. In the fall of 2000, BAG tried to sell its interest in the Put/Call agreement to an investment banking firm. However, the investment bankers were unwilling to purchase BAG's interest in the Put/Call because of the uncertainty inherent in its terms. Specifically, the free-look period put BAG at risk of receiving AOL stock worth substantially less than $6.75 billion, and AOL's option to pay with stock, rather than cash, created material, and potentially costly, obstacles to realizing value from BAG's rights prior to the settlement of the Put/Call. As a result of this uncertainty, BAG could not monetize, or realize value from, its rights under the Put/Call agreement prior to settlement. The most effective way to reduce the uncertainty, thereby enabling BAG to realize value by borrowing against the Put/Call agreement, was to obtain AOLTW's agreement to pay the Put price in cash rather than stock.

45.     In January 2001, BAG proposed to amend the Put/Call to require AOLTW to pay some or all of the $6.75 billion price in cash to enable BAG to monetize its

interest. BAG offered to compensate AOLTW for the amendment with cash, a reduction in the Put/Call price, or other means. AOLTW proposed that the consideration take the form of an agreement by BAG to purchase online advertising from AOLTW.

46. From January through March 2001, AOLTW and BAG negotiated the terms of the Put/Call amendment. Almost all of the negotiations focused on the value and structure of various Put/Call amendments. There were few, if any, negotiations concerning terms of the online advertising deal, other than the overall price, which was determined by the negotiated value of the Put/Call amendment. During the negotiations, AOLTW and BAG consulted with finance experts and investment bankers concerning the value of the Put/Call amendment, which included the value of the free-look period and the value of avoiding a block sale discount for large blocks of stock. Values asserted by AOLTW during negotiations with BAG ranged from $200 million to $412 million.

47. On March 30, 2001, AOLTW and BAG amended the Put/Call to require AOLTW to pay at least $2.5 billion in cash if BAG exercised its $6.75 billion Put (the "First Put/Call Amendment"). As consideration for the First Put/Call Amendment, BAG agreed to pay AOLTW $125 million in the form of an online advertising purchase (the "March '01 Deal").

48. BAG had no need for additional online advertising. The March '01 Deal provided online advertising that was qualitatively different from the online advertising provided under the Premier Ad Deal. Among other things, the March '01 Deal stripped BAG of the preferred pricing and special rights that it enjoyed under the Premier Ad Deal, and it essentially eliminated BAG's ability to control the content, placement, and frequency of the advertising delivered pursuant to the March '01 Deal.

14

49.    AOLTW decided each quarter how much online advertising to run under the March '01 Deal by determining the amount of online ad revenues it needed during the period to reach its targets.  Often, the advertising for BAG ran late in the reporting period, after AOLTW had determined the amounts by which it could not otherwise attain its revenue goals.  BAG generally signed the advertising purchase orders after AOLTW had already run the advertising.  Negotiations, to the extent they occurred, concerned mostly the allocation of the ads among BAG's various subsidiaries and not the placement or frequency of the ads.  An AOLTW internal summary of the March '01 Deal described the online advertising as "pure gravy" and a "freebie," explaining that "these plans are not to be negotiated."  A later AOLTW internal memorandum described the March '01 Deal as an "aggressive revenue recognition plan" under which "AOL policy has been focused on maximum revenue recognition without regard to the quality of the carriage or input from the BAG Brands on either participation or carriage."  Internal BAG memoranda and e-mails likewise referred to the agreement in pejorative terms, including describing the advertising as valueless and "rubbish."

50.    AOLTW ignored the substance of the transaction and improperly recognized online advertising revenue in 2001 as a result of the March '01 Deal as follows: $16.3 million in the first quarter, $65.5 million in the second quarter, and $39.8 million in the third quarter.  The Company did not restate this transaction in the 2002 Restatement.

### *$275 Million Put/Call Amendment Deal*

51.    In September 2001, BAG asked AOLTW to commit to pay cash for the remaining $4.25 billion due when BAG exercised its Put right.  Again, AOLTW proposed to structure the consideration received for the amendment as a payment for on-

15

line advertising. Once again, AOLTW improperly accounted for the payment from BAG for a Put/Call amendment as if it were advertising revenue.

52.    From late November through mid-December 2001, AOLTW and BAG negotiated over the second amendment to the Put/Call. As was the case in March, substantially all of the negotiations concerned the value and structure of the proposed Put/Call amendment. There were few, if any, negotiations concerning terms of the online advertising deal, other than the overall price, which was determined by the negotiated value of the Put/Call amendment. During the negotiations, AOLTW and BAG consulted with finance experts and investment bankers concerning the value of a second Put/Call amendment. The values asserted by AOLTW during the negotiations with BAG ranged from $250 million to $420 million.

53.    On December 21, 2001, AOLTW and BAG amended the Put/Call to require AOLTW to pay the remaining $4.25 billion Put amount in cash (the "Second Put/Call Amendment"). As consideration for the Second Put/Call Amendment, BAG agreed to pay AOLTW $275 million in the form of an online advertising purchase (the "December '01 Deal").

54.    BAG had no need for additional online advertising. Like the March '01 Deal, the December '01 Deal stripped BAG of the preferred pricing and special rights that it enjoyed under the Premier Ad Deal, and it essentially eliminated BAG's ability to control the content, placement, and frequency of the advertising delivered. AOLTW booked almost the entire $275 million in online advertising from the December '01 Deal in 2002. AOL administered the December '01 Deal substantially the same as it did the March '01 Deal.

55.   AOLTW ignored the substance of the transaction and improperly recognized online advertising revenue on the December '01 Deal in the following amounts in 2002: $80.3 million in the first quarter, $84.4 million in the second quarter, $51.6 million in the third quarter, and $58.0 million in the fourth quarter.   The Company did not restate its financial results to reverse the revenue recognized in connection with this transaction in the 2002 Restatement.

56.   GAAP requires that the accounting for a transaction reflect its economic substance.  The economic substance of the exchanges of March and December 2001 was that BAG paid $400 million for amendments to the Put/Call.  AOLTW concealed that fact and fraudulently recognized the $400 million paid for the amendments as if it were bona fide advertising revenue.

### Other BAG Transactions

57.   In addition to the $400 million in fraudulent revenue from the March and December '01 Deals, AOLTW and BAG entered into a round-trip agreement which resulted in $17.4 million of improperly recognized online advertising revenue in the fourth quarter of 2000.  From the fourth quarter of 2000 through the fourth quarter of 2001, AOL and BAG also entered into a series of undisclosed side agreements resulting in the premature recognition of approximately $33.6 million in online advertising revenue.

### Another Instance of Improper Revenue Recognition In Connection With an Acquisition

58.   AOLTW entered into a "stock swap" with one of its joint venture partners in the first quarter of 2001.  In the stock swap, among other things, AOLTW purchased the partner's 55% interest in their joint venture.  Similar to other round-trip transactions in

17

which AOLTW funded its revenue, AOLTW and the partner agreed on a purchase price of $700 million, with the understanding that the purchase price would be increased by $25 million in exchange for the partner's commitment to purchase $25 million of online advertising from AOLTW. AOLTW artificially inflated its online advertising revenue in each quarter of 2001 and the first quarter of 2002 by improperly recording $25 million in online advertising revenue. The Company did not restate its financial results to reverse the $25 million recognized as revenue for this transaction in the 2002 Restatement.

### C.     Legal Settlements Converted to Online Advertising Revenue

59.     Shortly after AOL began trading discounts for online advertising revenue with its vendors, AOL also started converting settlements of disputes into online advertising revenue.

60.     For example, in August and September 2000, two companies agreed to settle longstanding disputes with AOL by paying AOL $12.5 million and approximately $25 million, respectively. Under GAAP, these payments should not have been recorded as advertising revenue.

61.     The two companies offered to pay these amounts to AOL without regard to any advertising purchases. AOL improperly converted these settlements into online advertising revenue and documented the settlement payments as advertising purchases, thereby improperly inflating its online advertising revenue by $12.5 million in the third quarter of 2000 and by $23.8 million in the third and fourth quarters of 2000.

62.     Similarly, in two transactions with a major communications provider, AOLTW improperly converted settlements with the counterparty into purchases of online advertising and documented the settlement payments as advertising purchases, thereby

18

inflating its online advertising revenues by $34.2 million and $17 million in the second and fourth quarters of 2001.

63.     Likewise, AOLTW converted a $4 million lease termination penalty into a $4 million ad revenue deal with a vendor on which it recognized revenue in the fourth quarter of 2001.

64.     In its 2002 Restatement, AOLTW reversed online advertising revenue recognized in connection with these transactions.

**D.     The Sham Referrals**

*Improper Transactions with PurchasePro*

65.     PurchasePro.com, Inc. was a publicly-owned corporation with its corporate headquarters in Las Vegas, Nevada. PurchasePro's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and quoted on the Nasdaq. PurchasePro provided business-to-business electronic-commerce software licenses and services.

66.     AOL and PurchasePro engaged in round-trip transactions to enable both companies to record and report false revenues.

67.     In the third quarter of 2000, AOL paid PurchasePro $2 million for software licenses that it neither needed nor intended to use. In exchange, and by way of an undisclosed side agreement, PurchasePro amended a warrant agreement so that AOL would receive $3 worth of warrants for PurchasePro stock for every $1 in third-party revenue AOL referred to PurchasePro. In a false confirmation to PurchasePro's auditors, AOL failed to disclose, among other things, that it had received additional rights under the warrant agreement in exchange for making the $2 million purchase. PurchasePro

19

materially overstated its revenues by improperly recognizing the $2 million in revenue in the third quarter of 2000.

68.     In the fourth quarter of 2000, AOL and PurchasePro manipulated their warrant agreement to artificially manufacture revenue for both companies. Under the agreement, AOL could earn warrants only when third parties it referred to PurchasePro entered into commercial arrangements that enabled PurchasePro to recognize revenue. The agreement did not permit AOL to earn warrants based on purchases it made from PurchasePro. Nevertheless, in the fourth quarter of 2000, AOL bought $10 million worth of products and services from PurchasePro, and PurchasePro deemed AOL to have "earned" $30 million worth of warrants. To circumvent PurchasePro's auditors' objections, AOL and PurchasePro falsified documents to create the appearance that AOL had actually referred $10 million of third-party purchases to PurchasePro. AOL thus improperly recognized advertising and electronic commerce revenue on the net $20 million difference between the value of the warrants and the $10 million it paid directly to PurchasePro. PurchasePro, for its part, improperly recognized revenue on AOL's $10 million purchase and thus overstated its fourth quarter and year-end revenues. In the 2002 Restatement, AOLTW did not restate its financial results to reverse the $20 million in improper revenue it recognized on this transaction.

### *The Homestore Transactions*

69.     Homestore, Inc. is a Delaware corporation headquartered in Westlake Village, California. Homestore provides Internet real estate listings to consumers and sells products and services to real estate brokers. Since June 2000, Homestore has provided content for the "House and Home" channel on AOL's online service.

Homestore's stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and is quoted on the Nasdaq.

70.     During the third quarter of 2000 and the first quarter of 2001, the Company and Homestore entered into a series of purportedly unrelated transactions which resulted in both companies misstating their revenues. To conceal the true nature of these arrangements, AOL and Homestore entered into undisclosed side agreements and falsified documents to make it appear that third parties purchased online advertising. During the second and third quarters of 2001, AOLTW assisted in inflating Homestore's revenues through another series of transactions that effectively resulted in Homestore's buying its own revenues. AOL falsified documents to make it appear that third parties purchased Homestore online advertising.

71.     In total, the Company improperly inflated its online advertising revenue based on the Homestore-related transactions by at least $1.5 million in the fourth quarter of 2000 and $7 million in the first quarter of 2001. In its 2002 Restatement, AOLTW restated its financial results to reverse these amounts. For its part, Homestore materially overstated its reported financial results for the third quarter of 2000 and the first through third quarters of 2001 based on improperly recognizing the following amounts of revenue on AOL-related transactions: $1.5 million in the third quarter of 2000, $15 million in the first quarter of 2001, $18.5 million in the second quarter of 2001, and $3.3 million in the third quarter of 2001. Homestore has restated its financial results to reverse the amounts for 2001.

### E.    Improper Subscriber Counts

72.    In addition to AOL's online advertising revenue, the market evaluated AOL (both before and after its merger with Time Warner) based on, among other factors, the number of subscribers using AOL's Internet service as well as the growth of that subscriber base.  Senior Company executives set internal subscriber growth targets each quarter and pressured lower level executives and employees to meet the targets.

73.    In 2000, AOL began selling Internet account memberships in bulk at substantial discounts to corporations with which it had commercial relationships.  AOL counted these memberships as subscribers under the assumption that its corporate customers would offer these memberships to their employees and the employees would activate the memberships.

74.    In 2001, AOLTW used the bulk subscription program to inflate its AOL membership numbers by counting members AOLTW knew did not actually exist.  Specifically, AOLTW used bulk deals to "close the gap" between its actual AOL subscriber numbers and its targets.  The "attach rates"—the percentage of persons or entities that actually became AOL members—were exceptionally low for bulk deals.  Notwithstanding the low attach rates, which AOLTW tracked closely, AOLTW counted most of these bulk AOL subscription memberships in 2001 to meet its subscriber targets.

75.    Some businesses resisted AOLTW's pressure to buy bulk AOL subscriptions because they did not want to incur the cost.  These businesses only agreed to enter into contracts to "purchase" AOL subscriptions as an accommodation to AOLTW and upon AOLTW's agreement to fully fund these purchases.

76.   For example, in the second quarter of 2001, internal reports indicated that AOLTW would fall short of its AOL subscriber growth target for the quarter by approximately 250,000 members.  To meet its target, AOLTW pressed a major retail business to purchase 250,000 AOL subscriptions.  The retailer declined.  AOLTW then offered to reimburse the retailer for the cost of the subscriptions by increasing payments made to the retailer pursuant to another contractual arrangement.  The retailer again declined.  AOLTW finally prevailed upon the retailer to "purchase" the subscriptions by agreeing to inflate the payments under the other arrangement in such a way that, based upon historical experience, the retailer would receive more than 100% of the money it paid for the subscriptions.

77.   As the quarter drew to a close, the gap in AOL's subscriber numbers had increased to approximately 350,000 as other marketing efforts had underperformed.  To close the gap, AOLTW increased the number of AOL subscriptions in the bulk deal with the retailer from 250,000 to 350,000.  Because the transaction was economically neutral (or beneficial) to the retailer, AOLTW knew it would not object.  As a result, AOLTW met its AOL subscriber count goal that quarter.

78.   In four instances, AOLTW should not have counted AOL bulk subscribers in certain quarters because it failed to complete the transactions within the quarters.  Specifically, AOLTW failed to deliver by the end of the relevant quarter membership kits that met the specifications set forth in the respective contracts.  AOLTW shipped non-conforming membership kits prior to quarter end with the understanding that it would replace these materials in the following quarter with materials that conformed to the

contracts. AOLTW improperly included in its subscription counts the memberships in each bulk deal at the time of the initial shipment of non-conforming kits.

79.     AOLTW improperly counted these bulk subscription memberships to meet subscriber targets in the second, third, and fourth quarters of 2001 so it could report to the investment community that it had met its targets.

**F.     Failure to Consolidate AOL Europe**

80.     In addition to improperly recognizing as online advertising revenue payments it received from BAG for amendments to the Put/Call, AOL and AOLTW failed to properly consolidate the financial results of AOL Europe in their financial statements between March 2000 and January 2002. This resulted in material misstatements of AOL's and AOLTW's financial results, including overstatements of operating income and free cash flow in 2000 and 2001, overstatements of net income in 2000, understatements of net losses in 2001, and understatements of total debt in 2000 and 2001.

81.     Provisions of the Put/Call agreement specified that AOL would continue to hold no more than 50% of AOL Europe's voting securities, but BAG agreed it would have no contractual veto, consent, approval, voting, or similar rights with respect to AOL Europe and agreed to cause its own designated directors, steering committee members, or members of any similar governing body of AOL Europe to act in accordance with AOL's directions. By virtue of these provisions, AOL obtained broad and direct powers enabling it to control the operations and assets of AOL Europe. Also, AOL informed the European Commission (in the context of satisfying EC merger regulations) that BAG

relinquished essentially all control regarding the operations or management of AOL Europe.

82.    AOL's failure to properly report AOL Europe as a consolidated subsidiary commencing with the execution of the Put/Call agreement departed from GAAP.  GAAP requires consolidation when one entity has a controlling financial interest in another entity.

## FIRST CLAIM FOR RELIEF

### Violations of Commission Cease-and-Desist Order

83.    Paragraphs 1 through 82 are re-alleged and incorporated by reference.

84.    On May 15, 2000, the Commission ordered that AOL "cease and desist from causing any violations, and any future violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 13a-1 and 13a-13 thereunder." *In the Matter of America Online, Inc.,* Exchange Act Rel. No. 34-42781 (May 15, 2000).

85.   By reason of the foregoing, and as explained further in paragraphs 89 through 94, the Company committed violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Exchange Act Rules 13a-1 and 13a-13.  Accordingly, the Company has violated, and unless ordered to comply will violate, the Commission's May 15, 2000 order.

## SECOND CLAIM FOR RELIEF

### Fraud

Violations of Section 17(a) [15 U.S.C. § 77q(a)] of the
Securities Act, Section 10(b) of the Exchange Act [15
U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R.
§ 240.10b-5]

86.    Paragraphs 1 through 4 and 6 through 79 are re-alleged and incorporated by

reference.

87.    By reason of the foregoing, defendant directly or indirectly, acting intentionally, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the offer, sale, or purchase of securities: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; (c) obtained money or property by means of any untrue statement of a material fact or any omission of a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (d) engaged in transactions, acts, practices, or courses of business which operated as a fraud or deceit upon other persons.

88.    By reason of the foregoing, defendant violated, and unless restrained will violate, Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5.

### THIRD CLAIM FOR RELIEF

#### Reporting

Violations of Section 13(a) of the Exchange Act [15 U.S.C.
§ 78m(a)] and Exchange Act Rules 12b-20, 13a-1, 13a-11,
and 13a-13 [17 C.F.R. § 240.12b-20, § 240.13a-1, §
240.13a-11, and § 240.13a-13]

89.    Paragraphs 1 through 82 are re-alleged and incorporated by reference.

90.    The Exchange Act and Exchange Act rules require every issuer of registered securities to file reports with the Commission that accurately reflect the issuer's financial performance and provide other true and accurate information to the public.

91.    By reason of the foregoing, defendant violated, and unless restrained will violate, Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13.

## FOURTH CLAIM FOR RELIEF

### Record Keeping

Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1]

92.    Paragraphs 1 through 82 are re-alleged and incorporated by reference.

93.    The Exchange Act and Exchange Act rules promulgated thereunder require each issuer of registered securities to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the business of the issuer and to devise and maintain a system of internal controls sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit preparation of financial statements and to maintain the accountability of accounts.

94.    By reason of the foregoing, defendant violated, and unless restrained will violate, Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Exchange Act Rule 13b2-1.

## FIFTH CLAIM FOR RELIEF

### Aiding and Abetting Fraud

Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]

95.    Paragraphs 1 through 3, 6 through 22, 32 through 37, and 65 through 71 are re-alleged and incorporated by reference.

27

96.    By reason of the foregoing, defendant knowingly and substantially assisted PurchasePro, Homestore, and the company referenced in paragraph 32 in directly or indirectly, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) employing devices, schemes, or artifices to defraud; or (b) making untrue statements of material fact or omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

97.    By reason of the foregoing, defendant aided and abetted violations of, and unless restrained will aid and abet violations of, Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

## REQUEST FOR RELIEF

The Commission respectfully requests that the Court enter an Order:

(i)    Ordering defendant to comply with the Commission's May 15, 2000 order issued in *In the Matter of America Online, Inc.*;

(ii)    Permanently restraining and enjoining defendant from violating Section 17(a) of the Securities Act, Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, and 13b2-1;

(iii)    Permanently restraining and enjoining defendant, its subsidiaries, officers, directors, agents, servants, employees, and attorneys-in-fact, and all persons in active concert or participation with them, from aiding and abetting violations of any of the above-listed securities laws;

28

(iv)     Ordering defendant to disgorge ill-gotten gains, including pre-judgment and

post-judgment interest, resulting from the violations alleged in this Complaint;

(v)      Ordering defendant to retain an independent examiner, not unacceptable to the

Commission's staff, to determine whether defendant's historical accounting

treatment for certain transactions was in conformity with GAAP;

(vi)     Ordering defendant to pay a civil penalty; and

(vii)    Granting such other relief as the Court deems just and appropriate.

Dated:  March 21, 2005

Respectfully submitted,


_____/S/_____
James T. Coffman
Luis R. Mejia (DC Bar No. 417043)
Melissa A. Robertson (DC Bar No. 396384)
Gregory T. Lawrence
Jeffrey B. Finnell (DC Bar No. 441525)
Christopher K. Agbe-Davies (DC Bar No. 473727)
Thomas D. Manganello (DC Bar No. 481335)
Andrew B. Stevens

Attorneys for Plaintiff
Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, DC  20549-0911
(202) 942-4744 (Mejia)
MejiaL@sec.gov

# EXHIBIT 7
# TO TOPETZES DECLARATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE COMMISSION, :
450 Fifth Street, N.W.
Washington, DC 20549                    :        JURY DEMANDED
                                        :
                        Plaintiff,      :
                                        :
                v.                      :        C.A. No. __ - ____
                                        :
CHARLES JOHNSON, JR., CHRIS BENYO,      :
MICHAEL KENNEDY, JOHN TULI, AND         :
KENT WAKEFORD,                          :
                                        :
                        Defendants.     :
                                        :

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY

1.      This action arises from a series of fraudulent actions by defendants to materially and improperly inflate the announced and reported revenues of PurchasePro.com, Inc. ("PurchasePro"), and to otherwise misrepresent PurchasePro's business activities, for the last quarter of PurchasePro's 2000 fiscal year, which ended December 31, 2000 ("Q 4 2000") and the first quarter of PurchasePro's 2001 fiscal year, which ended on March 31, 2001 (hereinafter "Q1 2001"). Defendant Charles Johnson, Jr., PurchasePro's founder and former Chief Executive Officer, directed the overall fraudulent scheme while two former executives of PurchasePro— defendants Chris Benyo and Michael Kennedy—and two former executive-level employees of America Online, Inc. ("AOL")—John Tuli and Kent Wakeford—took knowing and deliberate steps in furtherance of the fraudulent scheme.

2.      As detailed below, each of the defendants engaged in conduct designed to cause or assist PurchasePro to issue public announcements of financial results, and reports filed with the Commission, that were false and misleading.  For example, PurchasePro included in its financial statements "revenues" that  the defendants knew or were reckless in not knowing could not legitimately be included as revenue in the relevant periods because such revenues derived from PurchasePro's "sales" of marketplace licenses (*i.e.* a license and software package to facilitate online business-to-business commerce) that were subject to and contingent upon undisclosed reciprocal agreements between PurchasePro and its customers, sales contracts that were executed after the close of the quarter, or fictitious contracts or transactions between PurchasePro and AOL.

3.      To facilitate these fraudulent efforts, the defendants also falsified or caused the falsification of PurchasePro books and records and misled or caused others to mislead PurchasePro's internal accountants or outside auditors.

4.      By reason of the foregoing fraudulent activities, the revenues announced or later reported by PurchasePro for Q4 2000 and Q1 2001 were materially misleading.  Thus, the Form 10-K for 2000 and Form 10-Q for Q1 2001 that PurchasePro filed with the Commission contained statements that were materially false or omitted material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

5.    By knowingly or recklessly engaging in the transactions, acts, omissions, practices, and courses of business alleged herein, the defendants violated, and are liable for the violations of, the federal securities laws and regulations as set forth below.  Unless enjoined, these defendants are likely to commit similar violations in the future.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].  The defendants directly or indirectly used the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, omissions, practices, and courses of business described herein.

7.    Venue lies in this district pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section 22 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77v(a)] because certain acts or transactions constituting the violations occurred in this district.

## THE DEFENDANTS

8.    Charles Johnson, Jr., age 43, formed PurchasePro in 1996 and was the company's CEO and Chairman of its Board of Directors until PurchasePro terminated his employment and he resigned from the Board in May 2001.  Johnson resides in Las Vegas, Nevada.

9.    Chris Benyo, age 43, was PurchasePro's Senior Vice President for Marketing and Network Development during the relevant period.  Benyo currently resides in Greer, South Carolina.

10.    Michael Kennedy, age 51, was PurchasePro's Chief Technology Officer during the relevant period.  Kennedy currently resides in Morristown, New Jersey.

3

11.    John Tuli, age 36, was Vice-President of Business Development for NetScape, a division of AOL, during the relevant period. Tuli currently resides in Weston, Massachusetts.

12.    Kent Wakeford, age 35, was AOL's Executive Director of Business Affairs during the relevant period. Wakeford currently resides in New York, New York.

## CORPORATE ENTITY

13.    During the relevant period, PurchasePro was a Nevada corporation, headquartered in Las Vegas, that provided Internet business-to-business electronic-commerce software and services. PurchasePro's signature product, the marketplace software license, allowed users to operate online, e-commerce business-to-business centers designed to facilitate faster and cheaper transactions among the marketplace host and its customers or suppliers.

14.    At all relevant times, PurchasePro's common stock was registered with the Commission pursuant to Exchange Act Section 12(g) and traded on the Nasdaq National Market. The company filed a voluntary Chapter 11 bankruptcy petition in September 2002, and has operated as a debtor-in-possession since then. In January 2003, the company changed its name to Pro-After, Inc. and, with the bankruptcy court's approval, sold substantially all its assets to a privately held company.

## FACTS

**I.    Financial Fraud and Improper Conduct - Q4 2000**

**A.    Johnson Materially and Artificially Inflated PurchasePro's Earnings for Q4 2000**

15.    On February 12, 2001, PurchasePro issued a press release and conducted an investor conference call announcing, among other things, that the company's revenues for Q4 2000 totaled $33.6 million. Later, on April 2, 2001, PurchasePro filed its fiscal year 2000 Form

4

10-K with the Commission, in which PurchasePro, among other things, confirmed its announcement and reported Q4 2000 revenues totaling $33.6 million.

16.      The $33.6 million in revenue announced and reported by PurchasePro was materially overstated. As detailed below, Johnson, along with others, all acting knowingly or recklessly, materially inflated PurchasePro's reported revenue for Q4 2000 by $3.92 million (over 11% of the reported revenues) by improperly recognizing revenue from end-of-the-quarter contracts with three customers—The Thread, ProfitScape, and V-Twin Holdings—that were the subject of contingent side agreements that were not disclosed to PurchasePro's auditors. Johnson used these side deals to induce these customers to buy software licenses they either did not want or for which they would have been unable to pay without such side deals. Recognizing revenue from each of these agreements was improper under generally accepted accounting principles (GAAP) and was otherwise fraudulent and misleading.

### i. The $720,000 Thread.com Transaction

17.      On December 30, 2000 a clothing company called The Thread.com—which had a poor credit history and a questionable ability to afford PurchasePro's software—bought a PurchasePro marketplace software license in the amount of $720,000 in exchange for PurchasePro's promise to invest $250,000 in its next round of financing — money it required to have any chance of paying PurchasePro. In or about December 2000, Johnson, among others, participated in the transaction negotiations and promised that PurchasePro would invest in The Thread's next round of financing. Johnson knew or was reckless in not knowing that PurchasePro's promised investment was designed to bolster the clothing company's creditworthiness and thereby enable it to pay for PurchasePro's marketplace software license.

5

Johnson knowingly or recklessly failed to disclose this relationship to PurchasePro's auditors. As a result, PurchasePro improperly included revenue from this sale in the quarterly revenue figure publicly announced on February 12, 2001 and reported in its Form 10-K filing with the Commission on April 2, 2001.

### ii. The $2.2 Million ProfitScape Transaction

18.    On December 29, 2000 a payment solutions company called ProfitScape.com bought two PurchasePro marketplace software licenses totaling $2.2 million, in exchange for a simultaneous $1 million loan from PurchasePro. Johnson knew or was reckless in not knowing that ProfitScape would not have bought at least one of the marketplace licenses for $1.1 million and in any event would not have been able to pay for it without the $1 million loan from PurchasePro.

19.    Later, during the year-end audit of PurchasePro's fiscal year 2000 financial statements, PurchasePro's auditors required payment of the loan before they would approve PurchasePro's recognition of at least $1 million in revenue. Johnson, among others, arranged for an outside third party to substitute for PurchasePro as the lender, by committing to reimburse the outside party. Johnson knowingly or recklessly failed to disclose this relationship to PurchasePro's auditors. As a result, PurchasePro improperly included $2.2 million from this sale in the quarterly revenue figure publicly announced on February 12, 2001 and reported in its Form 10-K filing with the Commission on April 2, 2001.

### iii. The $1 Million V-Twin Holdings Transaction

20.    On December 29, 2000 a motorcycle company called V-Twin Holdings, Inc.— which had cash flow problems and a questionable ability to pay—bought five marketplace

6

software licenses totaling $1 million, in exchange for Johnson's promise to personally invest in the company. Johnson knew or was reckless in not knowing that V-Twin would not have bought the software licenses and in any event would not be able to pay for them without his promised investment. Johnson knowingly or recklessly failed to disclose this relationship to PurchasePro's auditors. As a result, PurchasePro improperly included revenue from these sales in the quarterly revenue figure publicly announced on February 12, 2001 and reported in its Form 10-K filing with the Commission on April 2, 2001.

**B.    Johnson and Wakeford Caused PurchasePro to Improperly Issue $30 Million in Warrants to AOL in Q4 2000**

21.    In December 2000, as part of an overall restructuring of several agreements between PurchasePro and AOL, the two companies entered into an amended warrant agreement (the "Warrant Agreement"), under which AOL would earn warrants, *i.e.*, the right to purchase PurchasePro stock at a specified price, in exchange for AOL's referring to PurchasePro third-party customers who generated recognized revenue for PurchasePro. Specifically, for each dollar in revenue that PurchasePro recognized from a third-party customer that was referred by AOL, AOL would receive three dollars in warrants. Each warrant would permit AOL to purchase a share of PurchasePro stock for one cent, at a time when PurchasePro stock was trading at over $12 per share. The Warrant Agreement provided that AOL could earn a maximum of $30 million in warrants during Q4 2000, in exchange for referring to PurchasePro $10 million in recognized revenue from third-party sales.

22.    Initially, in or about December 2000, Johnson and Wakeford planned a revenue swap, whereby AOL directly would pay PurchasePro approximately $10 million for various products, including subscriptions, licenses, and advertising, and PurchasePro would forward $30

7

million worth of warrants to AOL, purportedly under the PurchasePro-AOL Warrant Agreement.

23.    Accordingly, in a letter dated December 21, 2000, Johnson stated to AOL that PurchasePro recognized over $10 million in revenue and that AOL earned $30 million in warrants. This letter was false and misleading in that, as Johnson knew or was reckless in not knowing, AOL had not made referrals that would qualify as recognized revenue under the Warrant Agreement, and AOL thus did not earn such warrants.

24.    Indeed, later in Q4 2000, Johnson and Wakeford realized that AOL's direct payments did not satisfy the definition of recognized revenue under the Warrant Agreement. Accordingly, Johnson and Wakeford knowingly or recklessly entered into a scheme to create the false appearance that AOL had referred over $10 million of recognized revenue from third-party sales to PurchasePro in Q4 2000, so that AOL could receive the $30 million in warrants. In exchange, Wakeford promised to deliver third party revenue to PurchasePro in Q1 2001 (and beyond) by means of an aggressive marketplace license sales campaign.

25.    Johnson and Wakeford, among others, acting knowingly or recklessly, created or caused others to create false, fictitious records to make it appear that AOL had made Q4 2000 referrals that did not in fact occur. In particular, Johnson directed others at PurchasePro to create referral forms, which falsely credited AOL for customer referrals it did not make. Wakeford either signed these forms or caused them to be signed.

26.    Ultimately, PurchasePro's annual report on Form 10-K falsely stated that AOL had referred $10.5 million in third-party sales to PurchasePro during Q4 2000. Not only was this false and deceptive, but given the importance of PurchasePro's strategic relationship with AOL and PurchasePro's desire to be perceived as a leader in the Internet business-to-business industry,

the misrepresentations regarding AOL's Q4 2000 third-party referrals was material.

**II.    Financial Fraud - Q1 2001**

      **A.    PurchasePro Materially and Artificially Inflated Its Announced Earnings for Q1 2000 by over 65%**

27.     On April 26, 2001, PurchasePro issued a press release and hosted a conference call with analysts and investors, announcing, among other things, that the company's revenues for Q1 2001 totaled $29.8 million. On May 29, 2001, PurchasePro filed its Q1 2001 Form 10-Q with the Commission, in which PurchasePro reported revenues of $16.02 million.

28.     PurchasePro's announced and subsequently reported revenues were both materially overstated.

29.     As detailed below, Johnson, with assistance from Benyo, Kennedy, Tuli, and Wakeford, all acting knowingly or recklessly, materially inflated PurchasePro's announced revenue total by $19.3 million, 65% of the total revenue, and the company's reported revenues by at least $6.02 million, 37% of its total. Specifically, both PurchasePro's announced and reported revenues included $6.02 million in "revenue" improperly recognized from marketplace software license sales by PurchasePro to YellowBrix, China.com and Garg Data International Inc. Recognizing the revenue from these sales was improper under GAAP and was otherwise fraudulent and misleading because, in the case of YellowBrix and Garg Data, the sales were contingent upon undisclosed reciprocal agreements and, in the case of Garg Data and China.com, the sales were executed after the close of the quarter. PurchasePro's announced earnings included an additional $13.3 million in "revenue" improperly recognized from PurchasePro's marketplace license sale to Bigstep, Inc. and from two transactions with AOL. Recognizing revenue from these transactions was improper under GAAP and was otherwise fraudulent and

9

misleading because, in the case of Bigstep, the sale was contingent upon undisclosed reciprocal agreements, and in the case of AOL, one of the transactions was executed after the close of the quarter while the other was entirely fraudulent.

**B.    PurchasePro Improperly Recognized
Q1 2001 Marketplace License Sales**

i. The $1.1 Million Bigstep Transaction

30.    In Q1 2001, a website services company called Bigstep, Inc. bought a marketplace license from PurchasePro for approximately $1.1 million in exchange for PurchasePro's promise to buy approximately $1.4 million of goods and services from Bigstep. As shown below, Johnson knew or was reckless in not knowing that, but for this reciprocal commitment and other simultaneous promises by AOL and its employees, Bigstep would not have bought this marketplace license.

31.    In or about March 2001, R. Geoffrey Layne, PurchasePro's Executive Vice President, informed Johnson of the contingent nature of the transaction and Bigstep's reluctance to proceed without PurchasePro's reciprocal commitment. Johnson directed Layne to execute this transaction, but instructed Layne to ensure that PurchasePro's cross commitment was not documented or otherwise disclosed. Johnson further instructed Layne to avoid following through on PurchasePro's commitment for at least two weeks after the date of the license sale.

32.    Johnson did not disclose this contingent agreement to PurchasePro's outside auditors, and, as noted above directed Layne to conceal its existence.

33.    After factoring in AOL's commission, a portion of which PurchasePro netted against its revenues, Johnson included $671,000 in "revenue" from the sale to Bigstep, Inc. in PurchasePro's April 26th earnings announcement.  PurchasePro's auditors, however,

subsequently became aware of information concerning the contingent side agreement, and did not permit inclusion of the revenue in the Form 10-Q that PurchasePro filed with the Commission on May 29, 2001.

ii. The $440,000 Yellowbrix Transaction

34. Also in Q1 2001, an information services company called YellowBrix bought a marketplace license from PurchasePro for approximately $440,000 in exchange for PurchasePro's promise to buy $390,000 of goods and services from YellowBrix. As shown below, Johnson knew or was reckless in not knowing that, but for this reciprocal commitment and other simultaneous promises by AOL and its employees, YellowBrix would not have bought this marketplace license.

35. In or about March, 2001, Layne informed Johnson of the reciprocal promises and YellowBrix's reluctance to proceed without PurchasePro's commitment. Similar to the instructions he provided regarding Bigstep, Johnson directed Layne to execute this transaction, but to make sure that PurchasePro's cross commitment was not documented or otherwise disclosed. Johnson again instructed Layne to avoid following through on PurchasePro's commitment for at least two weeks after the date of the license sale.

36. Johnson did not disclose this reciprocal commitment to PurchasePro's outside auditors, and, as noted above directed Layne to conceal its existence.

37. After factoring in AOL's commission, a portion of which PurchasePro netted against its revenues, Johnson included $268,400 in "revenue" from this contract in PurchasePro's April 26th earnings announcement and it was also reported as revenue in the Form 10-Q that PurchasePro filed with the Commission on May 29, 2001.

### iii.  The $3.7 Million China.com Transaction

38.      After the close of Q1 2001, in early April 2001, an e-commerce company called China.com faxed a signed, but undated $3.7 million marketplace license contract with PurchasePro to AOL's offices in New York.

39.      At Johnson's direction, a PurchasePro employee backdated the contract with China.com for inclusion in PurchasePro's Q1 2001 revenue total, by writing the date "3/30/01" under the signature block.  Also at Johnson's instruction, a PurchasePro employee altered the date of a fax machine, so as to make it appear, misleadingly, as if the contract was originally transmitted and received in Q1 2001.  The employee discussed altering the fax machine date with both Johnson and Wakeford, each of whom attempted to help alter and postdate the fax machine. In this way, Johnson and Wakeford knowingly or recklessly took steps to deceive PurchasePro's outside auditors concerning the timing of the China.com contract.

40.      Johnson did not disclose the true timing of this contract to PurchasePro's outside auditors, and, as noted above directed the PurchasePro employee to conceal this information.

41.      After factoring in AOL's commission, a portion of which PurchasePro netted against its revenues, Johnson included $2.257 million in "revenue" from this contract in PurchasePro's April 26th earnings announcement and it was also reported as revenue in the Form 10-Q that PurchasePro filed with the Commission on May 29, 2001.

### iv.  The $3.5 Million Garg Data International Transaction

42.      Also in early April 2001, Shawn McGhee, PurchasePro's Chief Operating Officer, at Johnson's direction, executed multiple and reciprocal transactions with Sushil Garg and Garg Data International, Inc., to obtain Garg Data's purchase of a $3.5 million marketplace

software license. In an effort to characterize this $3.5 million purported "sale" as having

occurred in Q1 2001, and with the knowledge or at the direction of Johnson, McGhee and Garg

signed a contract that, misleadingly, bore no date other than an "effective date" of March 30,

2001. The use of an "effective date" of March 30 for the transaction was designed to allow

PurchasePro to record the transaction, improperly, as a sale in the prior reporting period.

43.     Johnson knew or was reckless in not knowing that Garg's purchase was not

finalized or executed prior to the close of Q1 2001, and that Garg would not have purchased the

license without the contingent reciprocal agreements from PurchasePro.

44.     Johnson, acting knowingly or recklessly, did not disclose to PurchasePro's outside

auditors that this "sale" was executed in early April 2001, after the close of Q1 2001, and that the

sale was subject to contingent reciprocal agreements from PurchasePro. As a result,

PurchasePro's outside auditors did not detect PurchasePro's improper recognition of revenue

from this transaction in Q1 2001, and allowed the $3.5 million to be included in the company's

quarterly report on Form 10-Q, for the first quarter of 2001. This transaction alone inflated

PurchasePro's publicly announced revenues by over 10% and its reported revenues by over 20%.

**C.      The AOL Bulk Subscription Sales Agreement:
Johnson Improperly Included a $9 Million Contract
Executed in Q2 2001 as Revenue in Q1 2001**

45.     On April 5, 2001, AOL executed an amendment to a Bulk Subscriptions Sale

Agreement it had previously entered into with PurchasePro in December 2000. This

amendment, valued at $9 million, purportedly obligated PurchasePro to supply AOL with pre-

paid subscriptions to its on-line marketplace throughout Q1 2001. AOL delivered this

amendment to Johnson, by hand, along with a letter, also dated April 5, 2001, explaining that the

amendment was signed that day. Johnson presented this amendment to PurchasePro's accountants for inclusion in the company's Q1 2001 earnings, but Johnson excluded any evidence (such as the April 5, 2001 letter) that indicated that the amendment was executed in the second quarter of 2001. Johnson thus knowingly or recklessly took steps to conceal the true timing of the transaction from PurchasePro's internal accountants and outside auditors.

46.     PurchasePro included $9 million in revenue from this contract in its April 26th earnings announcement, but because the auditors subsequently became aware of information concerning the true timing of the contract, this $9 million was not included in the revenue figure reported in the Form 10-Q that PurchasePro filed with the Commission on May 29, 2001. This contract alone accounted for 30% of PurchasePro's Q1 2001 publicly announced revenues.

**D.    The AOL Statement of Work: Johnson, Wakeford, Tuli, Benyo and Kennedy Created a Sham Transaction to Close PurchasePro's Q1 2001 Revenue Gap**

47.     At the end of March 2001, Wakeford and Johnson, among others, discussed ways to generate additional Q1 2001 revenue for PurchasePro. Wakeford suggested that AOL would pay PurchasePro to improve AOL's internet technology for business-to-business transactions if PurchasePro created a document showing that the work had been completed. As detailed below, Johnson directed Layne, among others, to draft a contract. Tuli and Wakeford forwarded documents to Layne for use as templates in drafting a Statement of Work contract. By the close of the quarter, the final version of the contract, entitled PurchasePro AOL/Netbusiness Auction Integration Statement of Work (the "Statement of Work"), had not been created, agreed to, or signed and no substantive work had been performed.

i. <u>Johnson Falsified the Execution of the $3.65 Million Agreement</u>

48.     In early April 2001, Johnson directed Layne and Sholeff to falsify certain documents—including the Statement of Work—in an effort to bridge the gap between PurchasePro's actual quarterly revenues and it's publicly announced quarterly revenue expectations.  Pursuant to Johnson's direction, Layne obtained the latest draft of the Statement of Work, which had not yet been executed, and cut-and-pasted the signature of an AOL employee from an earlier piece of correspondence onto the signature page of the document.  Sholeff added the letters "SVP" under the pasted signature, to signify Senior Vice President.  At Johnson's direction, Sholeff made a copy of the newly forged document, and then repeatedly re-copied the document, in order to prevent detection of the forgery.  Johnson reviewed the newly "executed" Statement of Work, approved of its appearance, and provided a copy of it to PurchasePro management in mid-April for inclusion in PurchasePro's Q1 2001 revenues.

ii. Benyo and Kennedy Fraudulently Made It Appear That
<u>Tasks Under the Statement of Work Had Been Completed</u>

49.     Over the final weekend in March and into early April 2001, Benyo and Kennedy worked on drafting or caused others to draft the Statement of Work but quickly realized that the tasks required under the Statement of Work could not be completed.  Accordingly, Benyo proposed the creation of an illusory "link" — a secret transfer to a different website — specifically designed to create the false appearance, for PurchasePro's auditors, that the services described in the Statement of Work had actually been performed.  To complete the revenue-generating façade otherwise known as the Statement of Work, Kennedy signed the document in early April 2001, even though it misleadingly was dated February 5, 2001.

50. At all relevant times, Benyo and Kennedy knew or were reckless in not knowing that revenue from the Statement of Work could not be recognized in Q1 2001 unless the contract had been signed and performance completed before the end of that quarter, that those requirements had not been met, and that PurchasePro nonetheless was going to include revenues from that contract in its Q1 2001 results.

### iii. Tuli Falsely Confirmed the Statement of Work with PurchasePro's Auditors

51. In April 2001, Tuli knew, or was reckless in not knowing, that PurchasePro did not perform the services described in the Statement of Work by the close of Q1 2001. Nonetheless, on three separate occasions in that month, Tuli provided or caused others to provide PurchasePro's outside auditors with false confirmations that PurchasePro had performed those services, as described below.

52. First, Tuli directed a subordinate to draft and sign a letter addressed to PurchasePro, improperly confirming that all work under the Statement of Work was completed and accepted by March 30, 2001. Second, Tuli signed a similar letter, improperly confirming that the services described in the Statement of Work had been completed and accepted by the close of Q1 2001. Finally, Tuli participated in a conference call with PurchasePro's auditors and Layne in which—following the scripted questions and answers previously supplied to him by Layne—he confirmed that the services described in the Statement of Work had been performed by the close of Q1 2001.

53. As a result, PurchasePro included $3.65 million in "revenue" from this contract in its April 26th earnings announcement, but because the auditors subsequently became aware of information concerning the authenticity of the contract, this $3.65 million was not included in the

revenue figure reported in the Form 10-Q that PurchasePro filed with the Commission on May 29, 2001. This contract alone accounted for 12% of PurchasePro's Q1 2001 publicly announced revenues.

### III.     Other Falsifications of Books and Records, and Efforts to Mislead Auditors

54.     In addition to the foregoing fraudulent activities, Johnson and Wakeford engaged in other fraudulent falsifications of PurchasePro's books and records and other acts to deceive PurchasePro's auditors, as part of Johnson's and Wakeford's efforts to further boost PurchasePro's Q1 2001 revenues. The two particular activities described below, however, were unsuccessful in altering PurchasePro's announced and reported revenues.

### A.     Johnson Falsified a Check Stub

55.     At or around the end of Q1 2001, Johnson caused PurchasePro to pay AOL $12.2 million for commissions AOL purportedly earned in Q1 2001. In fact, AOL "earned" only $6.7 million in Q1 2001 commissions. Nonetheless, Johnson provided AOL with this inflated commission payment in exchange for AOL's promise to deliver additional revenue for the quarter. Johnson hand-delivered this check to Wakeford in his New York office.

56.     In early April, Johnson altered the text of the payment's check stub to reflect a lower commission payment as part of an effort to conceal from PurchasePro's internal accountants and outside auditors the true amount of commission paid to AOL. Johnson added handwritten notes that identified previously undisclosed payment categories in addition to commissions that were purportedly covered by the $12.2 million payment. By adding these amounts and categories, Johnson reduced the purported commission paid to AOL to $3.7 million, approximately 20% of each marketplace license sale.

17

57.    At Johnson's direction, in April 2001, Sholeff made a copy of this altered check stub, and then numerous and redundant copies of copies, in order to prevent detection of the forgery. Johnson provided one of the copies of the altered stub to PurchasePro's internal accountants. PurchasePro, in turn, provided this false record to its outside auditors.

        **B.**    **Johnson and Wakeford Induced Monster.com to Buy a $3 Million Marketplace License in Exchange for a Reciprocal Promise from PurchasePro and Backdated the Contract for Inclusion in Q1 2001**

58.    On April 6, 2001, an online recruitment and career management company called Monster.com bought a $3 million marketplace license from PurchasePro, in exchange for Johnson's commitment that PurchasePro would effectively reimburse Monster. But for this reciprocal commitment, and other promises by Wakeford and AOL and its employees (all of which Johnson concealed from PurchasePro's outside auditors), Monster would not have bought this marketplace license. On April 6, 2001, Wakeford faxed Monster a written confirmation of this arrangement, and Monster subsequently signed the $3 million sales agreement. Despite being executed in April, the contract bore a handwritten signature date of March 31, 2001.

59.    Johnson knew or was reckless in not knowing that this contract was (i) executed after the close of the quarter, (ii) improperly backdated, and (iii) subject to an undisclosed promise that effectively reimbursed Monster for its purchase, yet Johnson failed to disclose these facts from PurchasePro's outside auditors. For reasons unrelated to the timing or dating of this transaction, PurchasePro ultimately deferred this revenue to Q2 2001 and PurchasePro did not include the revenue from this transaction in its April 26, 2001 earnings announcement or in the Form 10-Q that PurchasePro filed with the Commission on May 29, 2001.

### IV.    Johnson Improperly Confirmed Inflated Numbers to PurchasePro's Board: Johnson, Benyo and Kennedy Received Substantial Bonuses

60.    Johnson had a loan or line of credit from a financial institution (the "Lender"), secured by Johnson's stock in PurchasePro. Under the terms of that loan agreement, the Lender was permitted to sell Johnson's stock if the market price of the stock fell below a certain level in relation to the outstanding loan amount. In March and April of 2001 – a period in which Johnson knowingly or recklessly orchestrated and participated in significant ongoing financial fraud in connection with PurchasePro – the Lender sold large quantities of Johnson's PurchasePro stock on Johnson's behalf, as the Lender was permitted to do under the terms of the loan agreement.

61.    In an effort to obtain loans or other financial assistance from PurchasePro, in order to pay down his loan from Lender and thus prevent Lender-directed sales of his PurchasePro shares, Johnson improperly assured PurchasePro's Board of Directors, prior to its April 10, 2001 meeting, that PurchasePro would post revenues totaling $42 million, and would thereby meet its first quarter public guidance about earnings. Johnson knew or was reckless in not knowing that this revenue figure was artificially and materially inflated, in that it included: (i) backdated agreements, (ii) marketplace sales subject to undisclosed side agreements or contingencies, and (iii) at least one fraudulent contract, as described above. Misled to believe that the company was on solid financial ground, the Board granted Johnson a $2 million retention bonus and an additional $1 million for reimbursement of travel related expenses. PurchasePro also authorized retention bonuses for its senior officers. Accordingly, Benyo and Kennedy each received bonus payments totaling $100,000.

19

### V.    Johnson Destroyed Documents to Hide Wrongdoing

62.    In or about April 2001, Johnson directed one of his subordinates, James Sholeff, to destroy all documents pertaining to PurchasePro's dealings with AOL.  In one instance, Johnson brought documents to Sholeff's home in Las Vegas and directed Sholeff to shred the documents and then burn the shreds.  Sholeff did as Johnson directed, and then Sholeff raked the ashes of the destroyed documents into his backyard.  Sholeff, again acting under Johnson's instructions to destroy documents, also shredded his own documents pertaining to PurchasePro's dealings with AOL and destroyed the hard-drive from his computer, and raked the remains into his backyard.

63.    In or about April 2001, Johnson destroyed or caused others at PurchasePro to destroy emails in PurchasePro's system that contained information about PurchasePro's dealings with AOL during the relevant timeframe.

### FIRST CLAIM
### [Securities Fraud]

### Violations of Exchange Act Section 10(b) and Rule 10b-5
### [Against Johnson]

64.    Paragraphs 1 through 63 are realleged and incorporated by reference.

65.    As described above, defendant Johnson, acting knowingly or recklessly, directly or indirectly, in connection with the purchase or sale of a security, by use of means or instrumentalities of interstate commerce, of the mails, or the facilities of a national securities exchange:

      a.    employed devices, schemes or artifices to defraud;

      b.    made untrue statements of material fact or omitted to state a material fact

20

necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading; or

    c.   engaged in acts, practices, or courses of business which operated or would

        operate as a fraud or deceit upon other persons.

66.     By engaging in the foregoing conduct, defendant Johnson violated Section 10(b)

of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SECOND CLAIM
### [Securities Fraud]

### Violations of Securities Act Section 17(a)
### [Against Johnson]

67.     Paragraphs 1 through 66 are realleged and incorporated by reference.

68.     As described above, defendant Johnson, acting knowingly or recklessly, in the

offer or sale of PurchasePro securities, by use of means or instruments of transportation or

communication in interstate commerce or by use of the mails, directly or indirectly employed

devices, schemes or artifices to defraud; obtained money or property by means of untrue

statements of a material fact or omitted to state material facts necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading;

or engaged in transactions, practices, or courses of business that operated or would operate as a

fraud or deceit upon the purchaser.

69.     By engaging in the foregoing conduct, defendant Johnson violated Section 17(a)

of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM
### [Securities Fraud]

**Aiding and Abetting PurchasePro's Violations of
Exchange Act Section 10(b) and Rule 10b-5
[Against Benyo, Kennedy, Tuli and Wakeford]**

70.     Paragraphs 1 through 69 are realleged and incorporated by reference.

71.     As described above, PurchasePro, acting knowingly or recklessly, directly or indirectly, in connection with the purchase or sale of a security, by use of means or instrumentalities of interstate commerce, of the mails, or the facilities of a national securities exchange:

      a.   employed devices, schemes or artifices to defraud;

      b.   made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

      c.   engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

72.     By engaging in the foregoing conduct, PurchasePro violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

73.     By engaging in the foregoing conduct, defendants Benyo, Kennedy, Tuli, and Wakeford knowingly provided substantial assistance to PurchasePro's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and, pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)], thereby aided and abetted those violations.

## FOURTH CLAIM
### [Falsification of Books and Records and Circumvention of Internal Controls]

### Violations of Exchange Act Section 13(b)(5) and Rule 13b2-1
### [Against Johnson and Benyo]

74.     Paragraphs 1 through 73 are realleged and incorporated by reference.

75.     As described above, defendants Johnson and Benyo knowingly circumvented or knowingly failed to implement a system of internal accounting controls, knowingly falsified books, records, or accounts and directly or indirectly falsified or caused to be falsified books, records, or accounts described in section 13(b)(2) of the Exchange Act.

76.     By engaging in the foregoing conduct, defendants Johnson and Benyo violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

## FIFTH CLAIM
### [Falsification of Books and Records and Circumvention of Internal Controls]

### Aiding and Abetting Violations of
### Exchange Act Sections 13(b)(5) and Rule 13b2-1
### [Against Kennedy, Tuli and Wakeford]

77.     Paragraphs 1 through 76 are realleged and incorporated by reference.

78.     As described above, PurchasePro personnel including Johnson and Benyo knowingly circumvented or knowingly failed to implement a system of internal accounting controls, knowingly falsified books, records, or accounts and directly or indirectly falsified or caused to be falsified books, records, or accounts described in section 13(b)(2) of the Exchange Act.

79.     By engaging in the foregoing conduct, PurchasePro personnel including Johnson and Benyo violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule

23

13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

80.     By engaging in the foregoing conduct, defendants Kennedy, Tuli, and Wakeford knowingly provided substantial assistance to the aforesaid violations of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1] and, pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)], thereby aided and abetted those violations.

### SIXTH CLAIM
### [Misleading an Accountant or Auditor]

### Violations of Exchange Act Rule 13b2-2
### [Against Johnson and Benyo]

81.     Paragraphs 1 through 80 are realleged and incorporated by reference.

82.     As described above, defendants Johnson and Benyo, directly or indirectly, and in connection with audits or examinations of the financial statements of PurchasePro and the preparation and filing of statements and reports required to be filed with the Commission, made or caused to be made materially false or misleading statements to accountants and omitted to state, or caused another person to omit to state to accountants, material facts necessary in order to make statements made to the accountants, in light of the circumstances under which such statements were made, not misleading.

83.     By engaging in the conduct described above, defendants Johnson and Benyo violated Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

**SEVENTH CLAIM**
**[Misleading an Accountant or Auditor]**

**Aiding and Abetting Violations of**
**Exchange Act Rule 13b2-2**
**[Against Kennedy, Tuli and Wakeford]**

84.    Paragraphs 1 through 83 are realleged and incorporated by reference.

85.    By engaging in the conduct described above, and in connection with audits or examinations of the financial statements of PurchasePro and the preparation and filing of statements and reports required to be filed with the Commission, certain PurchasePro officers, directly or indirectly, made or caused to be made materially false or misleading statements to accountants and omitted to state, or caused another person to omit to state to accountants, material facts necessary in order to make statements made to the accountants, in light of the circumstances under which such statements were made, not misleading.

86.    By engaging in the conduct described above, PurchasePro officers including Johnson and Benyo violated Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

87.    By engaging in the foregoing conduct, defendants Kennedy, Tuli, and Wakeford knowingly provided substantial assistance to the aforesaid violations of Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2], and, pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)], thereby aided and abetted those violations.

### EIGHTH CLAIM
**[False and Misleading Annual and Quarterly Reports]**

**Aiding and Abetting PurchasePro's Violations of
Exchange Act Section 13(a) and Rules 12b-20, 13a-1, and 13a-13
[Against Johnson and Wakeford]**

88.     Paragraphs 1 through 87 are realleged and incorporated by reference.

89.     PurchasePro violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1,

and 13a-13 thereunder, by filing with the Commission a materially false and misleading annual

report on Form 10-K for its 2000 fiscal year and a materially false and misleading quarterly

report on Form 10-Q for its first quarter of 2001.

90.     By engaging in the foregoing conduct, defendant Johnson and Wakeford

knowingly provided substantial assistance to PurchasePro's violations of Section 13(a) of the

Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R.

§§ 240.12b-20, 17 C.F.R. §§ 240.13a-1, and 240.13a-13], and, pursuant to Exchange Act

Section 20(e) [15 U.S.C. § 78t(e)], thereby aided and abetted those violations.

### NINTH CLAIM
**[Falsification of Books and Records]**

**Aiding and Abetting PurchasePro's Violations of
Exchange Act Sections 13(b)(2)(A) and (B)
[Against Johnson, Benyo, Kennedy, Tuli and Wakeford]**

91.     Paragraphs 1 through 90 are realleged and incorporated by reference.

92.     As described above, PurchasePro violated Section 13(b)(2)(A) of the Exchange

Act by failing to make or keep books, records and accounts that in reasonable detail accurately

and fairly reflected its transactions and disposition of its assets.

93.     As described above, PurchasePro violated Section 13(b)(2)(B) of the Exchange

26

Act by failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that PurchasePro's corporate transactions were executed in accordance with management's authorization and in a manner to permit the preparation of financial statements in conformity with GAAP.

94.     By engaging in the foregoing conduct, PurchasePro, directly or indirectly, falsified and caused to be falsified PurchasePro's books, records, and accounts subject to Section 13(b)(2)(A) of the Exchange Act.

95.     By engaging in the foregoing conduct, defendants Johnson, Benyo, Kennedy, Tuli, and Wakeford knowingly provided substantial assistance to PurchasePro's violations of Exchange Act Section 13(b)(2)(A) and (B) [15 U.S.C. § 78m(b)(2)(A) and (B)] and, pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)], thereby aided and abetted those violations.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Commission respectfully requests that this Court enter a judgment that:

(i)      permanently enjoins Johnson, Benyo, Kennedy, Tuli, and Wakeford from violating Exchange Act Section 10(b) [15 U.S.C. §§ 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5];

(ii)     permanently enjoins Johnson from violating Securities Act Section 17(a) [15 U.S.C. § 77q(a)];

(iii)    permanently enjoins Johnson, Benyo, Kennedy, Tuli, and Wakeford from violating Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] and Exchange Act Rules 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.13b2-1 and 240.13b2-2];

(iv)    permanently enjoins Johnson and Wakeford from aiding and abetting violations of Exchange Act Section 13(a) [15 U.S.C. §§ 78m(a)] and Exchange Act Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13];

(v)     permanently enjoins Johnson, Benyo, Kennedy, Tuli, and Wakeford from aiding and abetting violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and (B)];

(vi)    bars Johnson, Benyo, Kennedy, and Wakeford from acting as an officer or director of any public company pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

(vii)   orders Johnson, Benyo, Kennedy, Tuli, and Wakeford to pay civil penalties pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

28

(viii)    orders Johnson, Benyo, and Kennedy to disgorge, with prejudgment interest, any and all ill-gotten gains each received as a result of the conduct described herein; and

(ix)    grants such other relief as the Court deems just or appropriate.

Respectfully submitted,

_____/s/_____

David J. Gottesman (Trial Counsel)
(202) 942-4752
(202) 942-9569 (fax)
Email: gottesmand@sec.gov

Paul R. Berger
Robert B. Kaplan
J. Lee Buck, II
Andrew B. Stevens

U.S. SECURITIES AND
EXCHANGE COMMISSION
450 Fifth Street, N.W.
Washington, D.C. 20549-0911

Attorneys for Plaintiff

Dated: January 10, 2005

# EXHIBIT 8
# TO TOPETZES DECLARATION



**DIVISION OF
ENFORCEMENT**

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON. D.C. 20549

March 2, 2006

**By Fax to (202) 778-9100 and First-Class Mail**

Stephen G. Topetzes, Esq.
Kirkpatrick & Lockhart Nicolson Graham LLP
1601 K Street, N.W.
Washington, DC 20006

Re:    *In the Matter of AOL Time Warner*, **HO-09429**

Dear Mr. Topetzes:

This letter confirms our telephone conversation yesterday in which we advised you that the staff intends to recommend that the Securities and Exchange Commission bring a civil injunctive action against your client, Mark Wovsaniker, alleging that he (i) violated Section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1, 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, 240.13b2-2]; (ii) aided and abetted AOL Time Warner's violations of Section 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, 13a-13 and 13b2-1 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13 and 240.13b-2]; (iii) aided and abetted Veritas Software Corporation's violations of Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act; (iv) aided and abetted AOL Time Warner's violation of the Commission's May 15, 2000 cease and desist order; and (v) aided and abetted AOL Time Warner's violation of the Commission's August 13, 2002 Section 21(a)(1) Order. In accordance with Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 C.F.R. § 202.5(c), we are offering your client the opportunity to make a Wells Submission.

In connection with the contemplated action, the staff may seek an injunction, an officer and director bar, a civil penalty, disgorgement of trading profits and bonuses and an administrative order seeking to bar your client from practicing before the Commission as an accountant pursuant to Rule 102(e) of the Commission's Rules of Practice.

Stephen G. Topetzes, Esq.
March 2, 2006
Page Two


We enclose for your information a copy of Securities Act Release No. 5310 entitled "Procedures Relating to the Commencement of Enforcement Proceedings and Termination of Staff Investigations." If your client wishes to make a written or videotaped submission setting forth any reasons of law, policy or fact why he believes the civil injunctive action should not be brought, or bringing any facts to the Commission's attention in connection with its consideration of this matter, you should forward your submission to us no later than March 15, 2006. Any written submission should be limited to 40 pages, and any video submission should not exceed 12 minutes. Any submission should be sent to:

James T. Coffman
Assistant Director, Division of Enforcement
Securities and Exchange Commission
100 F Street, N.E.
Mail Stop 5010-B
Washington, DC 20549

In the event the staff makes an enforcement recommendation to the Commission on this matter, we will forward any submission you make to the Commission. Please be advised that the Commission may use the information contained in such a submission as an admission, or in any other manner permitted by the Federal Rules of Evidence, in connection with Commission enforcement proceedings, or otherwise. Please also be advised that any submission you make may be discoverable by third parties in accordance with applicable law.

If you have any questions, please contact me at (202) 551-4514 or Jim Coffman at (202) 551-4953.

Sincerely yours,

Jeffrey B. Finnell
Senior Counsel


Enclosure: Securities Act Release No. 5310

PROCEDURES RELATING TO THE COMMENCEMENT OF ENFORCEMENT
PROCEEDINGS AND TERMINATION OF STAFF INVESTIGATIONS

SECURITIES ACT OF 1933, Release No. 5310; SECURITIES
EXCHANGE ACT OF 1934, Release No. 9796; INVESTMENT COMPANY
ACT OF 1940, Release No. 7390; INVESTMENT ADVISORS ACT OF
1940, Release No. 336

September 27, 1972

The Report of the Advisory Committee on Enforcement Policies and Practices, submitted to the Commission on June 1, 1972, contained several recommendations designed to afford persons under investigation by the Commission an opportunity to present their positions to the Commission prior to the authorization of an enforcement proceeding.[1] These procedural measures, if adopted, would in general require that a prospective defendant or respondent be given notice of the staff's charges and proposed enforcement recommendation and be accorded an opportunity to submit a written statement to the Commission which would accompany the staff recommendation. The objective of the recommended procedures is to place before the Commission prior to the authorization of an enforcement proceeding the contentions of both its staff and the adverse party concerning the facts and circumstances which form the basis for the staff recommendation.[2]

The Commission has given these recommendations careful consideration. While it agrees that the objective is sound, it has concluded that it would not be in the public interest to adopt formal rules for that purpose. Rather, it believes it necessary and proper that the objective be attained, where practicable, on a strictly informal basis in accordance with procedures which are now generally in effect.

The Commission desires not only to be informed of the findings made by its staff but also, where practicable and appropriate, to have before it the position of persons under investigation at the time it is asked to consider enforcement action.

---

[1] See Report of the Advisory Committee on Enforcement Policies and Practices, June 1, 1972, page 31 et seq.

[2] It should be noted that the obtaining of a written statement from a person under investigation is expressly authorized by Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934. Section 21(a) of the Exchange Act provides as follows:

"The Commission may, in its discretion, make such investigations as it deems necessary to determine whether any person has violated or is about to violate any provision of this title or any rule or regulation thereunder, and may require or permit any person to file with it a statement in writing, under oath or otherwise as the Commission shall determine, as to all the facts and circumstances concerning the matter to be investigated. . . ."

2

The Commission, however, is also conscious of its responsibility to protect the public interest. It cannot place itself in a position where, as a result of the establishment of formal procedural requirements, it would lose its ability to respond to violative activities in a timely fashion.

The Commission believes that the adoption of formal requirements could seriously limit the scope and timeliness of its possible action and inappropriately inject into actions it brings issues, irrelevant to the merits of such proceedings, with respect to whether or not the defendant or respondent had been afforded an opportunity to be heard prior to the institution of proceedings against him and the nature and extent of such opportunity.

The Commission is often called upon to act under circumstances which require immediate action if the interests of investors or the public interest are to be protected. For example, in one recent case involving the insolvency of a broker-dealer firm, the Commission was successful in obtaining a temporary injunctive decree within 4 hours after the staff had learned of the violative activities. In cases such as that referred to, where prompt action is necessary for the protection of investors, the establishment of fixed time periods, after a case is otherwise ready to be brought, within which proposed defendants or respondents could present their positions would result in delay contrary to the public interest.

The Commission, however, wishes to give public notice of a practice, which it has heretofore followed on request, of permitting persons involved in an investigation to present a statement to it setting forth their interests and position. But the Commission cannot delay taking action which it believes is required pending the receipt of such a submission, and, accordingly, it will be necessary, if the material is to be considered, that it be timely submitted. In determining what course of action to pursue, interested persons may find it helpful to discuss the matter with the staff members conducting the investigation. The staff, in its discretion, may advise prospective defendants or respondents of the general nature of its investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing a submission. The staff must, however, have discretion in this regard in order to protect the public interest and to avoid not only delay, but possible untoward consequences which would obstruct or delay necessary enforcement action.

Where a disagreement exists between the staff and a prospective respondent or defendant as to factual matters, it is likely that this can be resolved in an orderly manner only through litigation. Moreover, the Commission is not in a position to, in effect, adjudicate issues of fact before the proceeding has been commenced and the evidence placed in the record. In addition, where a proposed administrative proceeding is involved, the Commission wishes to avoid the possible danger of apparent prejudgment involved in considering conflicting contentions, especially as to factual matters, before the case comes to the Commission for decision. Consequently, submissions by prospective defendants or respondents will normally prove most useful in connection with questions of policy, and on occasion, questions of law, bearing upon the question of whether a proceeding should be initiated, together with considerations relevant to a particular prospective defendant or respondent which might not otherwise be brought clearly to the Commission's attention.

3

Submissions by interested persons should be forwarded to the appropriate Division Director or Regional Administrator with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which it relates. In the event that a recommendation for enforcement action is presented to the Commission by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

It is hoped that this release will be useful in encouraging interested persons to make their views known to the Commission and in setting forth the procedures by which that objective can best be achieved.

The Advisory Committee also recommended that the Commission should adopt in the usual case the practice of notifying a person who is the subject of an investigation, and against whom no further action is contemplated, that the staff has concluded its investigation of the matters referred to in the investigative order and has determined that it will not recommend the commencement of an enforcement proceeding against him.[3]

We believe this is a desirable practice and are taking steps to implement it in certain respects. However, we do not believe that we can adopt a rule or procedure under which the Commission in each instance will inform parties when its investigation has been concluded. This is true because it is often difficult to determine whether an investigation has been concluded or merely suspended, and because an investigation believed to have been concluded may be reactivated as a result of unforeseen developments. Under such circumstances, advice that an investigation has been concluded could be misleading to interested persons.

The Commission is instructing its staff that in cases where such action appears appropriate, it may advise a person under inquiry that its formal investigation has been terminated. Such action on the part of the staff will be purely discretionary on its part for the reasons mentioned above. Even if such advice is given, however, it must in no way be construed as indicating that the party has been exonerated or that no action may ultimately result from the staff's investigation of that particular matter. All that such a communication means is that the staff has completed its investigation and that at that time no enforcement action has been recommended to the Commission. The attempted use of such a communication as a purported defense in any action that might subsequently be brought against the party, either civilly or criminally, would be clearly inappropriate and improper since such a communication, at the most, can mean that, as of its date, the staff of the Commission does not regard enforcement action as called for based upon whatever information it then has. Moreover, this conclusion may be based upon various reasons, some of which, such as workload considerations, are clearly irrelevant to the merits of any subsequent action.

By the Commission.

---

[3] Report, page 20.

# EXHIBIT 9
# TO TOPETZES DECLARATION

## TOLLING AGREEMENT

The Division of Enforcement ("Division") of the United States Securities and Exchange Commission ("Commission") and Mark Wovsaniker, through his counsel, with respect to the Commission's investigation entitled In the Matter of AOL Time Warner Inc. (the "investigation"), for their mutual benefit, hereby agree:

1.  any statute of limitations applicable to the filing of a civil enforcement action (the "proceeding") against Mark Wovsaniker or any other action or proceeding brought by or on behalf of the Commission or to which the Commission is a party arising out of the investigation ("any related proceedings"), including any sanctions or relief that may be imposed therein, is tolled for the period beginning on January 12, 2006 and ending at midnight on January 31, 2007 (the "tolling period");

2.  Mark Wovsaniker and any of his agents or attorneys will not assert that the Commission's failure to commence the proceeding or any related proceedings during the tolling period gives him any grounds for (a) asserting any statute of limitations as a defense to the proceeding or any related proceedings, or any sanctions or relief to be imposed therein, or (b) raising in any way any statute of limitations or any failure to commence the proceeding or any related proceedings during the tolling period as a defense to the proceeding or any related proceedings or to avoid or reduce any sanctions or relief to be imposed therein; and

3.  nothing in this agreement shall be construed as an admission by the Commission or Division relating to the applicability of any statute of limitations to the proceeding or any related proceedings, including any sanctions or relief that may be imposed therein, or to the length of any limitations period that may apply.

This instrument contains the entire agreement of the parties and may not be changed orally, but only by an agreement in writing.

SECURITIES AND EXCHANGE COMMISSION
DIVISION OF ENFORCEMENT

By: _____          Date: _____
       Assistant Director

Mark Wovsaniker

_____          Date: ___12/29/2006___

Approved as to Form:

_____          Date: ___December 29, 2006___
Stephen G. Topetzes, Esq.
Kirkpatrick & Lockhart Nicholson Graham LLP
1601 K Street, N.W.
Washington, D.C.  20006

Counsel to Mark Wovsaniker

# EXHIBIT 10
# TO TOPETZES DECLARATION



# TIME WARNER INC. (TWX)

ONE TIME WARNER CENTER
NEW YORK, NY 10019
212. 484.8000
http://www.timewarner.com

# 10–K

**AOL TIME WARNER INC.**
**Filed on 03/28/2003 – Period: 12/31/2002**
File Number 001–15062



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Table of Contents

# SECURITIES AND EXCHANGE COMMISSION

## WASHINGTON, D.C. 20549

## Form 10–K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 31, 2002**

**Commission file number 001–15062**

# AOL TIME WARNER INC.

*(Exact name of Registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **13–4099534** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

**75 Rockefeller Plaza**
**New York, NY 10019**
*(Address of Principal Executive Offices)*

**(212) 484–8000**

*(Registrant's Telephone Number, Including Area Code)*

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**

**None**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days. Yes ☒     No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S–K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10–K or any amendment to this Form 10–K. ☒

Indicate by check mark if the registrant is an accelerated filer (as defined in Exchange Act Rule 12b–2).     Yes ☒

As of the close of business on February 28, 2003, there were 4,312,505,667 shares of registrant's Common Stock and 171,185,826 shares of registrant's Series LMCN–V Common Stock outstanding. The aggregate market value of the registrant's voting securities held by non–affiliates of the registrant (based upon the closing price of such shares on the New York Stock Exchange on June 28, 2002) was approximately $61.24 billion.

**Documents Incorporated by Reference:**

| Description of document | Part of the Form 10–K |
|---|---|
| Portions of the Definitive Proxy Statement to be used in connection with the registrant's 2003 Annual Meeting of Stockholders | Part III (Item 10 through Item 13) |

Table of Contents

| Location | Principal Use | Approximate Square Feet Floor Space/Acres | Type of Ownership Expiration Date of Lease |
|---|---|---|---|
| Olyphant, PA East Lackawanna Ave. | Manufacturing, warehouses, distribution and office space (Music) | 1,012,850 | Owned and occupied by the Company. |
| Aurora, IL 948 Meridian Lake | Offices/warehouse (Music) | 602,000 | Owned and occupied by the Company. |
| Alsdorf, Germany Max–Planck Strasse 1–9 | Manufacturing, distribution and office space (Music) | 269,000 | Owned and occupied by the Company. |
| Terre Haute, Indiana 4025 3rd Pkwy. | Manufacturing and office space (Music) | 269,000 | Leased by the Company. Lease expires in 2011. |

## Networks — HBO, Filmed Entertainment and Cable

The following table sets forth certain information as of December 31, 2002 with respect to principal properties (over 250,000 square feet in area) owned or leased by the Company's Networks — HBO, Filmed Entertainment and Cable businesses, all of which the Company considers adequate for its present needs, and all of which were substantially used by the Company's subsidiaries and divisions:

| Location | Principal Use | Approximate Square Feet Floor Space/Acres | Type of Ownership Expiration Date of Lease |
|---|---|---|---|
| New York, NY 1100 and 1114 Ave. of the Americas | Business offices (HBO) | 350,000 sq. ft. and 275,600 sq. ft. | Leased by TWE. Leases expire in 2018. |
| Burbank, CA The Warner Bros. Studio | Sound stages, administrative, technical and dressing room structures, screening theaters, machinery and equipment facilities, back lot and parking lot and other Burbank properties (Filmed Entertainment) | 3,303,000 sq. ft. of improved space on 158 acres(a) | Owned by TWE. |
| Valencia, CA Undeveloped land | Location filming (Filmed Entertainment) | 232 acres | Owned by TWE. |

(a)    Ten acres consist of various parcels adjoining The Warner Bros. Studio, with mixed commercial, office and residential uses.

**Item 3.    *Legal Proceedings***

## Securities Matters

As of March 25, 2003, 30 shareholder class action lawsuits have been filed naming as defendants the Company, certain current and former executives of the Company and, in several instances, America Online, Inc. ("America Online"). These lawsuits were filed in U.S. District Courts for the Southern District of New York, the Eastern District of Virginia and the Eastern District of Texas. The complaints purport to be made on behalf of certain shareholders of the Company and allege that the Company made material misrepresentations and/or omissions of material fact in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b–5 promulgated thereunder, and Section 20(a) of the Exchange Act. Plaintiffs claim that the Company failed to disclose America Online's declining advertising revenues and that the Company and America Online inappropriately inflated advertising revenues in a series of transactions.

Table of Contents

Certain of the lawsuits also allege that certain of the individual defendants and other insiders at the Company improperly sold their personal holdings of AOL Time Warner stock, that the Company failed to disclose that the Merger was not generating the synergies anticipated at the time of the announcement of the Merger and, further, that the Company inappropriately delayed writing down more than $50 billion of goodwill. The lawsuits seek an unspecified amount in compensatory damages. All of these lawsuits have been centralized in the U.S. District Court for the Southern District of New York for coordinated or consolidated pretrial proceedings (along with the federal derivative lawsuits and certain lawsuits brought under the Employee Retirement Income Security Act ("ERISA") described below) under the caption *In re AOL Time Warner Inc. Securities and "ERISA" Litigation*. The Minnesota State Board of Investment has been designated lead plaintiff for the consolidated securities actions. The Company intends to defend against these lawsuits vigorously. The Company is unable to predict the outcome of these suits or reasonably estimate a range of possible loss.

As of March 25, 2003, eight shareholder derivative lawsuits are pending. Three were filed in New York State Supreme Court for the County of New York, one in the U. S. District Court for the Southern District of New York and four in the Court of Chancery of the State of Delaware for New Castle County. These suits name certain current and former directors and officers of the Company as defendants, as well as the Company as a nominal defendant. The complaints allege that defendants breached their fiduciary duties by causing the Company to issue corporate statements that did not accurately represent that America Online had declining advertising revenues, that the Merger was not generating the synergies anticipated at the time of the announcement of the Merger, and that the Company inappropriately delayed writing down more than $50 billion of goodwill, thereby exposing the Company to potential liability for alleged violations of federal securities laws. The lawsuits further allege that certain of the defendants improperly sold their personal holdings of AOL Time Warner securities. The lawsuits request that (i) all proceeds from defendants' sales of AOL Time Warner common stock, (ii) all expenses incurred by the Company as a result of the defense of the shareholder class actions discussed above and (iii) any improper salaries or payments, be returned to the Company. The four lawsuits filed in the Court of Chancery for the State of Delaware for New Castle County have been consolidated under the caption, *In re AOL Time Warner Inc. Derivative Litigation*. A consolidated complaint was filed on March 7, 2003. On December 9, 2002, the Company moved to dismiss the three lawsuits filed in New York State Supreme Court for the County of New York on *forum non conveniens* grounds. Those motions to dismiss were heard on February 11, 2003 and the decision is pending. In addition, these three lawsuits have been consolidated under the caption, *In re AOL Time Warner Inc. Derivative Actions*. The lawsuit filed in the U.S. District Court for the Southern District of New York has been centralized for coordinated or consolidated pre–trial proceedings with the securities actions described above and the ERISA lawsuits described below under the caption *In re AOL Time Warner Inc. Securities and "ERISA" Litigation*. The parties to the federal action have agreed that all proceedings in that matter should be stayed pending resolution of any motion to dismiss in the consolidated securities action described above. The Company intends to defend against these lawsuits vigorously. The Company is unable to predict the outcome of these suits or reasonably estimate a range of possible loss.

As of March 25, 2003 three putative class action lawsuits have been filed alleging violations of ERISA in the U.S. District Court for the Southern District of New York on behalf of current and former participants in the AOL Time Warner Savings Plan, the AOL Time Warner Thrift Plan and/or the Time Warner Cable Savings Plan (the "Plans"). Collectively, these lawsuits name as defendants the Company, certain current and former directors and officers of the Company and members of the Administrative Committees of the Plans. The lawsuits allege that the Company and other defendants breached certain fiduciary duties to plan participants by, *inter alia,* continuing to offer AOL Time Warner stock as an investment under the Plans, and by failing to disclose, among other things, that the Company was experiencing declining advertising revenues and that the Company was inappropriately inflating advertising revenues through various transactions. The complaints seek unspecified damages and unspecified equitable relief. The ERISA actions have been, or will be, centralized for coordinated or consolidated pre–trial proceedings as part of the *In re AOL Time Warner Inc. Securities and "ERISA" Litigation* described above. The Company intends to defend against these lawsuits vigorously. The Company is unable to predict the outcome of these cases or reasonably estimate a range of possible loss.

41

Table of Contents

On November 11, 2002, Staro Asset Management, LLC filed a putative class action complaint in the U.S. District Court for the Southern District of New York on behalf of all purchasers between October 11, 2001 and July 18, 2002, of Reliant 2.0% Zero-Premium Exchangeable Subordinated Notes due 2029, for alleged violations of the federal securities laws. Plaintiff is a purchaser of subordinated notes, the price of which was purportedly tied to the market value of AOL Time Warner stock. Plaintiff alleges that the Company made misstatements and/or omissions of material fact that artificially inflated the value of AOL Time Warner stock and directly affected the price of the notes. Plaintiff seeks compensatory damages and/or rescission. The Company has not yet responded to this complaint. The Company intends to defend against this lawsuit vigorously. Due to the preliminary status of this matter, the Company is unable to predict the outcome of this suit or reasonably estimate a range of possible loss.

On November 15, 2002, the California State Teachers' Retirement System filed an amended consolidated complaint in the U.S. District Court for the Central District of California on behalf of a putative class of purchasers of stock in Homestore.com, Inc. ("Homestore"). The plaintiffs alleged that Homestore engaged in a scheme to defraud its shareholders in violation of Section 10(b) of the Exchange Act. The Company and two former employees of its AOL division were named as defendants in the amended consolidated complaint because of their alleged participation in the scheme through certain advertising transactions entered into with Homestore. Motions to dismiss filed by the Company and the two former employees were granted on March 7, 2003 and the case was dismissed with prejudice. The Company is unable to predict if an appeal will be taken or the outcome of any such appeal.

## Update on SEC and DOJ Investigations

The Company has previously disclosed that the Securities and Exchange Commission ("SEC") and the Department of Justice ("DOJ") are conducting investigations into accounting and disclosure practices of the Company. Those investigations have focused on transactions involving the Company's America Online unit that were entered into after July 1, 1999.

In its quarterly report on Form 10-Q for the quarter ended June 30, 2002 (filed August 14, 2002, the "June 2002 Form 10-Q"), the Company disclosed that it had recently discovered information that provided a basis to reexamine the accounting for three transactions totaling $49 million in advertising revenue at the Company's America Online unit. Each of those transactions was a multi-element transaction. A multi-element transaction is one in which, at the same time or within a relatively short period of time, a third party agreed to purchase advertising from America Online and America Online agreed to purchase goods or services from the third party, make an equity investment in the third party, settle a pre-existing dispute with the third party, or exchange other consideration with the third party.

The information discovered in August 2002 did not call into question whether the advertisements purchased by the third party had in fact been run by America Online, nor did the information call into question whether America Online had in fact received payment associated with the advertisements that were run. Rather, in each case, the information discovered in August 2002 was specific evidence related to the negotiating history of the transaction that called into question whether each element of the multi-element transaction was supported as a separate exchange of fair value. In accounting for such multi-element transactions, it is the policy of the Company (consistent with generally accepted accounting principles) to recognize revenue in the full amount of advertising purchased by the third party only to the extent that both elements of the transaction (both the advertising purchase and the other element) are supportable as a separate exchange of fair value.

After discovering such information, the Company commenced an internal review under the direction of the Company's Chief Financial Officer into advertising transactions at the America Online unit ("CFO review"). As a result of the CFO review, the Company announced on October 23, 2002 that it intended to adjust the accounting for certain transactions. The adjustment had an aggregate impact of reducing the advertising and commerce revenues of the Company during the period from the third quarter of 2000 through the second quarter of 2002 by $190 million. At that time, the Company announced that it did not then anticipate that its CFO review would lead to any further restatement by the Company but disclosed that it

42

Table of Contents

could not predict the outcome of the separate SEC and DOJ investigations. Since that announcement in October 2002, there have been a number of developments relevant to these matters:

First, on January 28, 2003, the Company filed amendments to its Annual Report on Form 10–K/A for the year ended December 31, 2001, its quarterly report on Form 10–Q for the quarter ended March 31, 2002 and June 2002 Form 10–Q that included restated financial statements reflecting the adjustments announced on October 23, 2002.

Second, the Company has continued its CFO review of advertising transactions at the Company's America Online unit. Based on that review, the Company has not, to date, determined to make any further restatement.

Third, as part of the Company's ongoing discussions with the SEC, the staff of the SEC recently informed the Company that, based on information provided to the SEC by the Company, it was the preliminary view of the SEC staff that the Company's accounting for two related transactions between America Online and Bertelsmann, A.G. should be adjusted. Pursuant to a March 2000 agreement between the parties, Bertelsmann had the right at two separate times to put a portion of its interest in AOL Europe to the Company (80% in January 2002 and the remaining 20% in July 2002) at a price established by the March 2000 agreement. The Company also had the right to exercise a call of Bertelsmann's interests in AOL Europe at a higher price. Pursuant to the March 2000 agreement, once Bertelsmann exercised its rights, the Company had the option, at its discretion up to the day before the closing date, to pay the previously–established put price to Bertelsmann either in cash or in Company stock or a combination thereof. In the event the Company elected to use stock, the Company was required to deliver stock in a value equal to the amount of the put price determined based on the average of the closing price for the 30 trading days ending 13 trading days before the closing of the put transaction.

Prior to the end of March 2001, the Company and Bertelsmann began negotiations regarding Bertelsmann's desire to be paid for some or all of its interests in AOL Europe in cash, rather than in Company stock. During the negotiations throughout 2001, the Company sought to persuade Bertelsmann that a contractual amendment guaranteeing Bertelsmann cash for its interests in AOL Europe had significant value to Bertelsmann (in an estimated range of approximately $400–800 million), and that in exchange for agreeing to such an amendment, the Company wanted Bertelsmann to extend and/or expand its relationship with the Company as a significant purchaser of advertising. Because, for business reasons, the Company intended to settle in cash, the Company viewed it as essentially costless to forego the option to settle with Bertelsmann in stock. By agreeing to settle in cash, the Company also made it more likely that Bertelsmann would exercise its put rights, which were $1.5 billion less expensive than the Company's call option.

In separate agreements executed in March and December of 2001, the Company agreed to settle the put transactions under the March 2000 agreement in cash rather than in stock, without any change to the put price previously established in the March 2000 agreement. Contemporaneously with the agreements to pay in cash, Bertelsmann agreed to purchase additional advertising from the Company of $125 million and $275 million, respectively. The amount of advertising purchased by Bertelsmann pursuant to these two transactions was recognized by the Company as these advertisements were run (almost entirely at the America Online unit) during the period from the first quarter of 2001 through the fourth quarter of 2002. Advertising revenues recognized by the Company totaled $16.3 million, $65.5 million, $39.8 million and $0.5 million, respectively, for the four quarters ending December 31, 2001, and $80.3 million, $84.4 million, $51.6 million and $58.0 million, respectively, for the four quarters ending December 31, 2002. (The remaining approximately $3.6 million is expected to be recognized by the Company during 2003.) These two Bertelsmann transactions are collectively the largest multi–element advertising transactions entered into by America Online during the period under review.

Although the advertisements purchased by Bertelsmann in these transactions were in fact run, the SEC staff has expressed to the Company its preliminary view that at least some portion of the revenue recognized by the Company for that advertising should have been treated as a reduction in the purchase price paid by the Company to Bertelsmann rather than as advertising revenue. The Company subsequently provided the SEC a written explanation of the basis for the Company's accounting for these transactions and the reasons why, to

43

Table of Contents

date, both the Company and its auditors continue to believe that these transactions have been accounted for correctly. The Company is engaged in ongoing discussions with the SEC staff on this matter.

The SEC staff has also informed the Company that it is continuing to investigate a range of other transactions principally involving the America Online unit. The Company intends to continue its efforts to cooperate with both the SEC and the DOJ investigations to resolve these matters. The Company may not currently have access to all relevant information that may come to light in these investigations. It is not yet possible to predict the outcome of these investigations, but it is possible that further restatement of the Company's financial statements may be necessary.

**Other Matters**

On January 22, 2002, Netscape Communications Corporation ("Netscape"), a wholly–owned subsidiary of America Online, sued Microsoft Corporation ("Microsoft") in the U. S. District Court for the District of Columbia for antitrust violations under Sections 1 and 2 of the Sherman Act, as well as for other common law violations. Among other things, the complaint alleges that Microsoft's actions to maintain its monopoly in the market for Intel–compatible PC operating systems worldwide injured Netscape, consumers and competition in violation of Section 2 of the Sherman Act and continues to do so. The complaint also alleges that Microsoft's actions constitute illegal monopolization and attempted monopolization of a worldwide market for Web browsers and that Microsoft has engaged in illegal practices by tying its Web browser, Internet Explorer, to Microsoft's operating system in various ways. The complaint seeks damages for the injuries inflicted upon Netscape, including treble damages and attorneys' fees, as well as injunctive relief to remedy the anti–competitive behavior alleged. On June 17, 2002, the Judicial Panel on Multi–District Litigation transferred the case to the District Court for the District of Maryland for all pretrial proceedings. Due to the preliminary status of the matter, it is not possible for the Company at this time to provide a view on its probable outcome or to provide a reasonable estimate as to the amount that might be recovered through this action.

On May 24, 1999, two former AOL Community Leader volunteers filed *Hallissey et al. v. America Online*, Inc. in the U.S. District Court for the Southern District of New York. This lawsuit was brought as a collective action under the Fair Labor Standards Act ("FLSA") and as a class action under New York state law against America Online and AOL Community, Inc. The plaintiffs allege that, in serving as Community Leader volunteers, they were acting as employees rather than volunteers for purposes of the FLSA and New York state law and are entitled to minimum wages. On December 8, 2000, defendants filed a motion to dismiss on the ground that the plaintiffs were volunteers and not employees covered by the FLSA. The motion to dismiss is pending. A related case was filed by several of the Hallissey plaintiffs in the U.S. District Court for the Southern District of New York alleging violations of the retaliation provisions of the FLSA. This case has been stayed pending the outcome of the *Hallissey* motion to dismiss. Three related class actions have been filed in state courts in New Jersey, California and Ohio, alleging violations of the FLSA and/or the respective state laws. These cases were removed to federal court. The New Jersey and Ohio cases have been transferred to the District Court for the Southern District of New York for consolidated pretrial proceedings with *Hallissey*. The California action has been remanded to California state court.

On January 17, 2002, Community Leader volunteers filed a class action lawsuit in the U.S. District Court for the Southern District of New York against AOL Time Warner, America Online and AOL Community, Inc. under ERISA. Plaintiffs allege that they are entitled to pension and/or welfare benefits and/or other employee benefits subject to ERISA. This complaint was served on January 8, 2003. The Company is unable to predict the outcome of these cases, but intends to defend against these lawsuits vigorously.

On June 24, 1997, plaintiffs in *Six Flags Over Georgia LLC et al. v. Time Warner Entertainment Company, L.P. et al.*, filed an amended complaint in the Superior Court of Gwinnett County, Georgia, claiming that, inter alia, defendants, which include TWE, violated their fiduciary duties in operating the Six Flags Over Georgia theme park. On December 18, 1998, following a trial, a jury returned a verdict in favor of plaintiffs. The total awarded to plaintiffs was approximately $454 million in compensatory and punitive damages. The case was appealed to the Georgia Court of Appeals, which affirmed the trial court's judgment, and denied reconsideration. The Supreme Court of Georgia denied certiorari on January 18, 2001. On

44

Table of Contents

**AOL TIME WARNER INC.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION (Continued)**

interests in filmed entertainment and television production; *Networks*, consisting principally of interests in cable television and broadcast network programming; *Music*, consisting principally of interests in recorded music, music publishing and CD and DVD manufacturing; and *Publishing*, consisting principally of interests in magazine publishing, book publishing and direct marketing.

**Use of EBITDA**

AOL Time Warner evaluates operating performance based on several factors, including its primary financial measure of operating income (loss) before non–cash depreciation of tangible assets, amortization of intangible assets and impairment write–downs related to goodwill and intangible assets ("EBITDA"). AOL Time Warner considers EBITDA an important indicator of the operational strength and performance of its businesses, including the ability to provide cash flows to service debt and fund capital expenditures. In addition, EBITDA eliminates the uneven effect across all business segments of considerable amounts of non–cash depreciation of tangible assets and amortization of intangible assets recognized in business combinations accounted for by the purchase method. As such, the following comparative discussion of the results of operations of AOL Time Warner includes, among other factors, an analysis of changes in EBITDA. However, EBITDA should be considered in addition to, not as a substitute for, operating income (loss), net income (loss) and other measures of financial performance reported in accordance with accounting principles generally accepted in the U.S. In addition, EBITDA should not be used as a substitute for the Company's various cash flow measures (e.g., operating cash flow and free cash flow), which are discussed in detail under "Financial Condition and Liquidity."

**Recent Developments**

**Update on SEC and DOJ Investigations**

The Company has previously disclosed that the SEC and the DOJ are conducting investigations into accounting and disclosure practices of the Company. Those investigations have focused on transactions involving the Company's America Online unit that were entered into after July 1, 1999.

In its quarterly report on Form 10–Q for the quarter ended June 30, 2002 (filed August 14, 2002, the "June 2002 Form 10–Q"), the Company disclosed that it had recently discovered information that provided a basis to reexamine the accounting for three transactions totaling $49 million in advertising revenue at the Company's America Online unit. Each of those transactions was a multi–element transaction. A multi–element transaction is one in which, at the same time or within a relatively short period of time, a third party agreed to purchase advertising from America Online and America Online agreed to purchase goods or services from the third party, make an equity investment in the third party, settle a pre–existing dispute with the third party, or exchange other consideration with the third party.

The information discovered in August 2002 did not call into question whether the advertisements purchased by the third party had in fact been run by America Online, nor did the information call into question whether America Online had in fact received payment associated with the advertisements that were run. Rather, in each case, the information discovered in August 2002 was specific evidence related to the negotiating history of the transaction that called into question whether each element of the multi–element transaction was supported as a separate exchange of fair value. In accounting for such multi–element transactions, it is the policy of the Company (consistent with generally accepted accounting principles) to recognize revenue in the full amount of advertising purchased by the third party only to the extent that both elements of the transaction (both the advertising purchase and the other element) are supportable as a separate exchange of fair value.

F–3

Table of Contents

**AOL TIME WARNER INC.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION (Continued)**

After discovering such information, the Company commenced an internal review under the direction of the Company's Chief Financial Officer into advertising transactions at the America Online unit ("CFO review"). As a result of the CFO review, the Company announced on October 23, 2002 that it intended to adjust the accounting for certain transactions. The adjustment had an aggregate impact of reducing the advertising and commerce revenues of the Company during the period from the third quarter of 2000 through the second quarter of 2002 by $190 million. At that time, the Company announced that it did not then anticipate that its CFO review would lead to any further restatement by the Company but disclosed that it could not predict the outcome of the separate SEC and DOJ investigations. Since that announcement in October 2002, there have been a number of developments relevant to these matters:

First, on January 28, 2003, the Company filed amendments to its Annual Report on Form 10-K/A for the year ended December 31, 2001, its quarterly report on Form 10-Q for the quarter ended, March 31, 2002 and June 2002 Form 10-Q that included restated financial statements reflecting the adjustments announced on October 23, 2002.

Second, the Company has continued its CFO review of advertising transactions at the Company's America Online unit. Based on that review, the Company has not, to date, determined to make any further restatement.

Third, as part of the Company's ongoing discussions with the SEC, the staff of the SEC recently informed the Company that, based on information provided to the SEC by the Company, it was the preliminary view of the SEC staff that the Company's accounting for two related transactions between America Online and Bertelsmann, A.G. should be adjusted. Pursuant to a March 2000 agreement between the parties, Bertelsmann had the right at two separate times to put a portion of its interest in AOL Europe to the Company (80% in January 2002 and the remaining 20% in July 2002) at a price established by the March 2000 agreement. The Company also had the right to exercise a call of Bertelsmann's interests in AOL Europe at a higher price. Pursuant to the March 2000 agreement, once Bertelsmann exercised its put rights, the Company had the option, at its discretion up to the day before the closing date, to pay the previously-established put price to Bertelsmann either in cash or in Company stock or a combination thereof. In the event the Company elected to use stock, the Company was required to deliver stock in a value equal to the amount of the put price determined based on the average of the closing price for the 30 trading days ending 13 trading days before the closing of the put transaction.

Prior to the end of March 2001, the Company and Bertelsmann began negotiations regarding Bertelsmann's desire to be paid for some or all of its interests in AOL Europe in cash, rather than in Company stock. During the negotiations throughout 2001, the Company sought to persuade Bertelsmann that a contractual amendment guaranteeing Bertelsmann cash for its interests in AOL Europe had significant value to Bertelsmann (in an estimated range of approximately $400–800 million), and that in exchange for agreeing to such an amendment, the Company wanted Bertelsmann to extend and/or expand its relationship with the Company as a significant purchaser of advertising. Because, for business reasons, the Company intended to settle in cash, the Company viewed it as essentially costless to forego the option to settle with Bertelsmann in stock. By agreeing to settle in cash, the Company also made it more likely that Bertelsmann would exercise its put rights, which were $1.5 billion less expensive than the Company's call option.

In separate agreements executed in March and December of 2001, the Company agreed to settle the put transactions under the March 2000 agreement in cash rather than in stock, without any change to the put price previously established in the March 2000 agreement. Contemporaneously with the agreements to pay in cash, Bertelsmann agreed to purchase additional advertising from the Company of $125 million and $275 million, respectively. The amount of advertising purchased by Bertelsmann pursuant to these two transactions was recognized by the Company as these advertisements were run (almost entirely at the America Online unit) during the period from the first quarter of 2001 through the fourth quarter of 2002. Advertising revenues

F–4

Table of Contents

**AOL TIME WARNER INC.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION (Continued)**

recognized by the Company totaled $16.3 million, $65.5 million, $39.8 million and $0.5 million, respectively, for the four quarters ending December 31, 2001, and $80.3 million, $84.4 million, $51.6 million and $58.0 million, respectively, for the four quarters ending December 31, 2002. (The remaining approximately $3.6 million is expected to be recognized by the Company during 2003.) These two Bertelsmann transactions are collectively the largest multi-element advertising transactions entered into by America Online during the period under review.

Although the advertisements purchased by Bertelsmann in these transactions were in fact run, the SEC staff has expressed to the Company its preliminary view that at least some portion of the revenue recognized by the Company for that advertising should have been treated as a reduction in the purchase price paid by the Company to Bertelsmann rather than as advertising revenue. The Company subsequently provided the SEC a written explanation of the basis for the Company's accounting for these transactions and the reasons why, to date, both the Company and its auditors continue to believe that these transactions have been accounted for correctly. The Company is engaged in ongoing discussions with the SEC staff on this matter.

The SEC staff has also informed the Company that it is continuing to investigate a range of other transactions principally involving the America Online unit. The Company intends to continue its efforts to cooperate with both the SEC and the DOJ investigations to resolve these matters. The Company may not currently have access to all relevant information that may come to light in these investigations. It is not yet possible to predict the outcome of these investigations, but it is possible that further restatement of the Company's financial statements may be necessary.

*Investment in Time Warner Entertainment Company, L.P.*

A majority of AOL Time Warner's interests in the Filmed Entertainment and Cable segments, and a portion of its interests in the Networks segment, are held through Time Warner Entertainment Company, L.P. ("TWE"). Prior to the change in ownership relating to the exercise of an option held by AT&T Corp. ("AT&T") which is discussed below, AOL Time Warner owned general and limited partnership interests in TWE consisting of 74.49% of the pro rata priority capital ("Series A Capital") and residual equity capital ("Residual Capital"), and 100% of the junior priority capital ("Series B Capital"). The remaining 25.51% limited partnership interests in the Series A Capital and Residual Capital of TWE were held by subsidiaries of AT&T.

During the second quarter of 2002, AT&T exercised a one-time option to increase its ownership in the Series A Capital and Residual Capital of TWE. As a result, on May 31, 2002, AT&T's interest in the Series A Capital and Residual Capital of TWE increased by approximately 2.13% to approximately 27.64% and AOL Time Warner's corresponding interest in the Series A Capital and Residual Capital of TWE decreased by approximately 2.13% to approximately 72.36%. In accordance with Staff Accounting Bulletin No. 51, "Accounting for Sales of Stock of a Subsidiary", AOL Time Warner has reflected the pretax impact of the dilution of its interest in TWE of approximately $690 million as an adjustment to paid-in capital (Note 6). In addition, AT&T's interest in TWE was acquired by Comcast Corp. ("Comcast") upon consummation of the merger of Comcast and AT&T's broadband businesses in November 2002.

In August 2002, AOL Time Warner and AT&T announced that they had agreed to restructure TWE. The restructuring is expected to be completed on March 31, 2003. The TWE restructuring will result in the following: (i) AOL Time Warner will acquire complete ownership of TWE's content assets (including Warner Bros. and Home Box Office, which will become separate, wholly owned subsidiaries of the Company); (ii) all of AOL Time Warner's directly-owned cable television system interests will be contributed to a separate company which will become a majority-owned subsidiary of AOL Time Warner and will be renamed Time Warner Cable Inc. ("TWC Inc."); (iii) TWE will become a subsidiary of TWC Inc. and will continue to own the cable television system interests it previously owned; (iv) Comcast will receive $2.1 billion in cash,

F-5

Table of Contents

**AOL TIME WARNER INC.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION (Continued)**

and AT&T Worldnet and providers of broadband access such as cable and telephone companies who have greater access to and control of the methods used to provide Internet services to users.

Maintaining and growing the subscriber base has become more challenging as the popularity of broadband Internet access has increased. As more people switch to broadband, especially as offered by other providers, America Online will need to develop a compelling broadband product to attract members who are willing to pay additional amounts for the content and functionality provided by America Online. Since many of the premium services will be provided via broadband, a successful premium services strategy may be linked to success with its broadband strategies. It is also unclear how successful America Online will be in promoting and selling its new premium services to members generally. In addition, other Internet service providers may have more resources to devote to development and marketing of their services, or may be able to offer low–priced alternatives to the AOL service. To be successful in its broadband strategy, America Online will need to maintain and further its existing arrangements with certain cable and telephone companies, as well as develop successful business relationships with additional large broadband access providers. Further, changes in the current regulatory environment may adversely impact America Online's ability to provide broadband services at competitive prices.

*Ongoing investigations by the Securities and Exchange Commission and the Department of Justice and pending shareholder litigation could affect AOL Time Warner's operations.* The Securities and Exchange Commission (the "SEC") and the Department of Justice (the "DOJ") are investigating the Company's financial reporting and disclosure practices. As of March 25, 2003, there were thirty–eight putative class action and shareholder derivative lawsuits alleging violations of federal and state securities laws as well as purported breaches of fiduciary duties pending against AOL Time Warner, certain of its current and former executives, past and present members of its Board of Directors and, in certain instances, America Online. There are also three actions making allegations of ERISA violations. The complaints purport to be made on behalf of certain of the Company's shareholders and allege, among other things, that AOL Time Warner made material misrepresentations and/or omissions of material facts in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b–5 promulgated thereunder, and Section 20(a) of the Exchange Act. As noted, there are also related derivative actions and ERISA actions. The Company is unable to predict the outcome of the SEC and DOJ investigations and the pending shareholder litigation. The Company is incurring expenses as a result of the SEC and DOJ investigations and the shareholder litigation pending against the Company, and any costs associated with judgments in or settlements of these matters could adversely affect its financial condition and results of operations. See "Overview — Recent Developments — Update on SEC and DOJ Investigations."

*An inability to achieve the Company's debt–reduction goals could adversely affect the Company's common stock price.* The Company has announced a goal of decreasing its total consolidated debt (net of cash) over the period ending December 2004. If it is unable to achieve this goal, including by using free cash flow, completing the planned initial public offering of its cable business, selling non–core assets and using other de–leveraging initiatives, the price of its common stock could be adversely affected.

*Technological developments may adversely affect the Company's competitive position and limit its ability to protect its valuable intellectual property rights.* AOL Time Warner's businesses operate in the highly competitive, consumer–driven and rapidly changing media and entertainment industries. These businesses, as well as the industries generally, are to a large extent dependent on technological developments, including access to and selection and viability of new technologies, and are subject to potential pressure from competitors as a result of their technological developments. For example:

- The Company's cable business may be adversely affected by more aggressive than expected competition from alternate technologies such as satellite and DSL; by the failure to choose

F–54

Table of Contents

**AOL TIME WARNER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**CONTINGENCIES**

**Securities Matters**

As of March 25, 2003, 30 shareholder class action lawsuits have been filed naming as defendants the Company, certain current and former executives of the Company and, in several instances, America Online, Inc. ("America Online"). These lawsuits were filed in U.S. District Courts for the Southern District of New York, the Eastern District of Virginia and the Eastern District of Texas. The complaints purport to be made on behalf of certain shareholders of the Company and allege that the Company made material misrepresentations and/or omissions of material fact in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act. Plaintiffs claim that the Company failed to disclose America Online's declining advertising revenues and that the Company and America Online inappropriately inflated advertising revenues in a series of transactions. Certain of the lawsuits also allege that certain of the individual defendants and other insiders at the Company improperly sold their personal holdings of AOL Time Warner stock, that the Company failed to disclose that the Merger was not generating the synergies anticipated at the time of the announcement of the Merger and, further, that the Company inappropriately delayed writing down more than $50 billion of goodwill. The lawsuits seek an unspecified amount in compensatory damages. All of these lawsuits have been centralized in the U.S. District Court for the Southern District of New York for coordinated or consolidated pretrial proceedings (along with the federal derivative lawsuits and certain lawsuits brought under the Employee Retirement Income Security Act ("ERISA") described below) under the caption *In re AOL Time Warner Inc. Securities and "ERISA" Litigation*. The Minnesota State Board of Investment has been designated lead plaintiff for the consolidated securities actions. The Company intends to defend against these lawsuits vigorously. The Company is unable to predict the outcome of these suits or reasonably estimate a range of possible loss.

As of March 25, 2003, eight shareholder derivative lawsuits are pending. Three were filed in New York State Supreme Court for the County of New York, one in the U. S. District Court for the Southern District of New York and four in the Court of Chancery of the State of Delaware for New Castle County. These suits name certain current and former directors and officers of the Company as defendants, as well as the Company as a nominal defendant. The complaints allege that defendants breached their fiduciary duties by causing the Company to issue corporate statements that did not accurately represent that America Online had declining advertising revenues, that the Merger was not generating the synergies anticipated at the time of the announcement of the Merger, and that the Company inappropriately delayed writing down more than $50 billion of goodwill, thereby exposing the Company to potential liability for alleged violations of federal securities laws. The lawsuits further allege that certain of the defendants improperly sold their personal holdings of AOL Time Warner securities. The lawsuits request that (i) all proceeds from defendants' sales of AOL Time Warner common stock, (ii) all expenses incurred by the Company as a result of the defense of the shareholder class actions discussed above and (iii) any improper salaries or payments, be returned to the Company. The four lawsuits filed in the Court of Chancery for the State of Delaware for New Castle County have been consolidated under the caption, *In re AOL Time Warner Inc. Derivative Litigation*. A consolidated complaint was filed on March 7, 2003. On December 9, 2002, the Company moved to dismiss the three lawsuits filed in New York State Supreme Court for the County of New York on *forum non conveniens* grounds. Those motions to dismiss were heard on February 11, 2003 and the decision is pending. In addition these three lawsuits have been consolidated under the caption, *In re AOL Time Warner Inc. Derivative Actions*. The lawsuit filed in the U.S. District Court for the Southern District of New York has been centralized for coordinated or consolidated pre-trial proceedings with the securities actions described above and the ERISA lawsuits described below under the caption *In re AOL Time Warner Inc. Securities and "ERISA" Litigation*. The parties to the federal action have agreed that all proceedings in that matter should be stayed pending resolution of any motion to dismiss in the consolidated securities action described above.

F-123

Table of Contents

**AOL TIME WARNER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The Company intends to defend against these lawsuits vigorously. The Company is unable to predict the outcome of these suits or reasonably estimate a range of possible loss.

As of March 25, 2003 three putative class action lawsuits have been filed alleging violations of ERISA in the U.S. District Court for the Southern District of New York on behalf of current and former participants in the AOL Time Warner Savings Plan, the AOL Time Warner Thrift Plan and/or the Time Warner Cable Savings Plan (the "Plans"). Collectively, these lawsuits name as defendants the Company, certain current and former directors and officers of the Company and members of the Administrative Committees of the Plans. The lawsuits allege that the Company and other defendants breached certain fiduciary duties to plan participants by, *inter alia*, continuing to offer AOL Time Warner stock as an investment under the Plans, and by failing to disclose, among other things, that the Company was experiencing declining advertising revenues and that the Company was inappropriately inflating advertising revenues through various transactions. The complaints seek unspecified damages and unspecified equitable relief. The ERISA actions have been, or will be, centralized for coordinated or consolidated pre−trial proceedings as part of the *In re AOL Time Warner Inc. Securities and "ERISA" Litigation* described above. The Company intends to defend against these lawsuits vigorously. The Company is unable to predict the outcome of these cases or reasonably estimate a range of possible loss.

On November 11, 2002, Staro Asset Management, LLC filed a putative class action complaint in the U.S. District Court for the Southern District of New York on behalf of all purchasers between October 11, 2001 and July 18, 2002, of Reliant 2.0% Zero−Premium Exchangeable Subordinated Notes due 2029, for alleged violations of the federal securities laws. Plaintiff is a purchaser of subordinated notes, the price of which was purportedly tied to the market value of AOL Time Warner stock. Plaintiff alleges that the Company made misstatements and/or omissions of material fact that artificially inflated the value of AOL Time Warner stock and directly affected the price of the notes. Plaintiff seeks compensatory damages and/or rescission. The Company has not yet responded to this complaint. The Company intends to defend against this lawsuit vigorously. Due to the preliminary status of this matter, the Company is unable to predict the outcome of this suit or reasonably estimate a range of possible loss.

On November 15, 2002, the California State Teachers' Retirement System filed an amended consolidated complaint in the U.S. District Court for the Central District of California on behalf of a putative class of purchasers of stock in Homestore.com, Inc. ("Homestore"). The plaintiffs alleged that Homestore engaged in a scheme to defraud its shareholders in violation of Section 10(b) of the Exchange Act. The Company and two former employees of its AOL division were named as defendants in the amended consolidated complaint because of their alleged participation in the scheme through certain advertising transactions entered into with Homestore. Motions to dismiss filed by the Company and the two former employees were granted on March 7, 2003 and the case was dismissed with prejudice. The Company is unable to predict if an appeal will be taken or the outcome of any such appeal.

**Update on SEC and DOJ Investigations**

The Company has previously disclosed that the SEC and the DOJ are conducting investigations into accounting and disclosure practices of the Company. Those investigations have focused on transactions involving the Company's America Online unit that were entered into after July 1, 1999.

In its quarterly report on Form 10−Q for the quarter ended June 30, 2002 (filed August 14, 2002, the "June 2002 Form 10−Q"), the Company disclosed that it had recently discovered information that provided a basis to reexamine the accounting for three transactions totaling $49 million in advertising revenue at the Company's America Online unit. Each of those transactions was a multi−element transaction. A multi−element transaction is one in which, at the same time or within a relatively short period of time, a third party agreed to purchase advertising from America Online and America Online agreed to purchase goods or services

Table of Contents

**AOL TIME WARNER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

from the third party, make an equity investment in the third party, settle a pre–existing dispute with the third party, or exchange other consideration with the third party.

The information discovered in August 2002 did not call into question whether the advertisements purchased by the third party had in fact been run by America Online, nor did the information call into question whether America Online had in fact received payment associated with the advertisements that were run. Rather, in each case, the information discovered in August 2002 was specific evidence related to the negotiating history of the transaction that called into question whether each element of the multi–element transaction was supported as a separate exchange of fair value. In accounting for such multi–element transactions, it is the policy of the Company (consistent with generally accepted accounting principles) to recognize revenue in the full amount of advertising purchased by the third party only to the extent that both elements of the transaction (both the advertising purchase and the other element) are supportable as a separate exchange of fair value.

After discovering such information, the Company commenced an internal review under the direction of the Company's Chief Financial Officer into advertising transactions at the America Online unit ("CFO review"). As a result of the CFO review, the Company announced on October 23, 2002 that it intended to adjust the accounting for certain transactions. The adjustment had an aggregate impact of reducing the advertising and commerce revenues of the Company during the period from the third quarter of 2000 through the second quarter of 2002 by $190 million. At that time, the Company announced that it did not then anticipate that its CFO review would lead to any further restatement by the Company but disclosed that it could not predict the outcome of the separate SEC and DOJ investigations. Since that announcement in October 2002, there have been a number of developments relevant to these matters:

First, on January 28, 2003, the Company filed amendments to its Annual Report on Form 10–K/A for the year ended December 31, 2001, its quarterly report on Form 10–Q for the quarter ended March 31, 2002 and June 2002 Form 10–Q that included restated financial statements reflecting the adjustments announced on October 23, 2002.

Second, the Company has continued its CFO review of advertising transactions at the Company's America Online unit. Based on that review, the Company has not, to date, determined to make any further restatement.

Third, as part of the Company's ongoing discussions with the SEC, the staff of the SEC recently informed the Company that, based on information provided to the SEC by the Company, it was the preliminary view of the SEC staff that the Company's accounting for two related transactions between America Online and Bertelsmann, A.G. should be adjusted. Pursuant to a March 2000 agreement between the parties, Bertelsmann had the right at two separate times to put a portion of its interest in AOL Europe to the Company (80% in January 2002 and the remaining 20% in July 2002) at a price established by the March 2000 agreement. The Company also had the right to exercise a call of Bertelsmann's interests in AOL Europe at a higher price. Pursuant to the March 2000 agreement, once Bertelsmann exercised its put rights, the Company had the option, at its discretion up to the day before the closing date, to pay the previously–established put price to Bertelsmann either in cash or in Company stock or a combination thereof. In the event the Company elected to use stock, the Company was required to deliver stock in a value equal to the amount of the put price determined based on the average of the closing price for the 30 trading days ending 13 trading days before the closing of the put transaction.

Prior to the end of March 2001, the Company and Bertelsmann began negotiations regarding Bertelsmann's desire to be paid for some or all of its interests in AOL Europe in cash, rather than in Company stock. During the negotiations throughout 2001, the Company sought to persuade Bertelsmann that a contractual amendment guaranteeing Bertelsmann cash for its interests in AOL Europe had significant value to Bertelsmann (in an estimated range of approximately $400–800 million), and that in exchange for agreeing to such an amendment, the Company wanted Bertelsmann to extend and/or expand its relationship with the

F–125

Table of Contents

**AOL TIME WARNER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Company as a significant purchaser of advertising. Because, for business reasons, the Company intended to settle in cash, the Company viewed it as essentially costless to forego the option to settle with Bertelsmann in stock. By agreeing to settle in cash, the Company also made it more likely that Bertelsmann would exercise its put rights, which were $1.5 billion less expensive than the Company's call option.

In separate agreements executed in March and December of 2001, the Company agreed to settle the put transactions under the March 2000 agreement in cash rather than in stock, without any change to the put price previously established in the March 2000 agreement. Contemporaneously with the agreements to pay in cash, Bertelsmann agreed to purchase additional advertising from the Company of $125 million and $275 million, respectively. The amount of advertising purchased by Bertelsmann pursuant to these two transactions was recognized by the Company as these advertisements were run (almost entirely at the America Online unit) during the period from the first quarter of 2001 through the fourth quarter of 2002. Advertising revenues recognized by the Company totaled $16.3 million, $65.5 million, $39.8 million and $0.5 million, respectively, for the four quarters ending December 31, 2001, and $80.3 million, $84.4 million, $51.6 million and $58.0 million, respectively, for the four quarters ending December 31, 2002. (The remaining approximately $3.6 million is expected to be recognized by the Company during 2003.) These two Bertelsmann transactions are collectively the largest multi-element advertising transactions entered into by America Online during the period under review.

Although the advertisements purchased by Bertelsmann in these transactions were in fact run, the SEC staff has expressed to the Company its preliminary view that at least some portion of the revenue recognized by the Company for that advertising should have been treated as a reduction in the purchase price paid by the Company to Bertelsmann rather than as advertising revenue. The Company subsequently provided the SEC a written explanation of the basis for the Company's accounting for these transactions and the reasons why, to date, both the Company and its auditors continue to believe that these transactions have been accounted for correctly. The Company is engaged in ongoing discussions with the SEC staff on this matter.

The SEC staff has also informed the Company that it is continuing to investigate a range of other transactions principally involving the America Online unit. The Company intends to continue its efforts to cooperate with both the SEC and the DOJ investigations to resolve these matters. The Company may not currently have access to all relevant information that may come to light in these investigations. It is not yet possible to predict the outcome of these investigations, but it is possible that further restatement of the Company's financial statements may be necessary.

**Other Matters**

On January 22, 2002, Netscape Communications Corporation ("Netscape"), a wholly-owned subsidiary of America Online, sued Microsoft Corporation ("Microsoft") in the U. S. District Court for the District of Columbia for antitrust violations under Sections 1 and 2 of the Sherman Act, as well as for other common law violations. Among other things, the complaint alleges that Microsoft's actions to maintain its monopoly in the market for Intel-compatible PC operating systems worldwide injured Netscape, consumers and competition in violation of Section 2 of the Sherman Act and continues to do so. The complaint also alleges that Microsoft's actions constitute illegal monopolization and attempted monopolization of a worldwide market for Web browsers and that Microsoft has engaged in illegal practices by tying its Web browser, Internet Explorer, to Microsoft's operating system in various ways. The complaint seeks damages for the injuries inflicted upon Netscape, including treble damages and attorneys' fees, as well as injunctive relief to remedy the anti-competitive behavior alleged. On June 17, 2002, the Judicial Panel on Multi-District Litigation transferred the case to the District Court for the District of Maryland for all pretrial proceedings. Due to the preliminary status of the matter, it is not possible for the Company at this time to provide a view on its probable outcome or to provide a reasonable estimate as to the amount that might be recovered through this action.

F-126

# EXHIBIT 11
# TO TOPETZES DECLARATION

11/15/2002 18:40 FAX 202 942 9668          ENF 7TH FL                                    ☒002/00



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Mail Stop 7-5
450 Fifth Street, N.W.
Washington, D.C. 20549-0705

DIVISION OF ENFORCEMENT

November 15, 2002

**VIA FACSIMILE**
**AND FEDERAL EXPRESS**

Gregory S. Bruch, Esq.
Foley & Lardner
3000 K Street, N.W.
Suite 500
Washington, D.C. 20007-5101

F. Whitten Peters, Esq.
Steven A. Steinbach, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901

Re:    *In the Matter of AOL Time Warner Inc.*, File No. HO-9429

Dear Messrs. Bruch, Peters, and Steinbach:

This letter responds to your letter to me dated November 8, 2002, regarding AOL Time Warner Inc.'s ("AOL") failure to comply with the Commission's Order Requiring the Filing of a Sworn Statement Pursuant to Section 21(a) of the Securities Exchange Act of 1934, issued on August 13, 2002 (the "Order"). I do not detail here every one of the many communications between the staff and AOL regarding this investigation both before and after the Commission issued the Order, but reserve the right to do so if future circumstances warrant.

<u>Background</u>

In May 2002, we began an informal investigation and invited AOL to meet with the staff to discuss certain transactions between AOL and Homestore.com, Inc. and PurchasePro.com, Inc. This began a voluntary dialogue between AOL and the staff that lasted several months.

COLLECTED                                    **2AOL098020888**
                                             *Confidential Treatment Requested*

11/15/2002 18:40 FAX 202 942 9868          ENF 7TH FL                                        003/00

Messrs. Bruch, Peters, and Steinbach
November 15, 2002
Page 2

At the first meeting, which took here place on May 13, 2002, AOL defended its
accounting treatment of the Homestore and PurchasePro transactions and stated it was unaware
of any similar transactions that might pose accounting or reporting problems. The staff
suggested that AOL conduct a thorough internal investigation to determine the existence and
accounting treatment of any other Homestore- or PurchasePro-type transactions and report its
findings to the staff. The staff also requested a more in-depth presentation concerning AOL's
accounting for its transactions with Homestore and PurchasePro. Shortly after the May 13
meeting, the staff learned information that raised issues concerning transactions AOL entered
into with Monster.com and Gateway, and the staff requested AOL to address those transactions
as well.

On June 12, 2002, AOL met with the staff to report the results of its investigation.
During this meeting, AOL made representations that later proved to be, at best, incomplete and
inaccurate. AOL represented to the staff that it concluded that its accounting treatment of
transactions with PurchasePro and Homestore was proper. AOL also asserted that AOL had not
entered into any other like transactions. At the June 12 meeting, AOL did not address the
Monster.com or Gateway transactions. Only after repeated requests from the staff, AOL sent a
July 11, 2002 letter reporting that the Monster.com transaction had been approved by top
management and was accounted for appropriately. In this letter, AOL further informed the staff
that AOL had improperly recognized revenue on the Gateway transaction, but that AOL had
identified this issue in 2001 and made an adjustment. Three months later, AOL announced its
restatement, and informed the staff that the restatement related to the PurchasePro, Homestore,
Monster.com, and Gateway transactions, as well as transactions involving nine other companies.

As the dialogue continued during and after the June 12 meeting, it appeared that, rather
than conduct its own investigation and make full and complete disclosure to the staff, AOL
adopted a strategy to respond only to issues already uncovered by the staff. In an effort to prompt
AOL to conduct a thorough and accurate examination of, and report on, the accounting issues
raised by the staff, the Commission issued the Order, which requires AOL to file a statement,
under oath, concerning specific transactions, categories of transactions, and corporate governance
issues. The Commission issued the Order on August 13, 2002, and the staff served it on AOL
that day.

On the following day, AOL publicly disclosed that it might have "improperly recognized"
$49 million of revenues in connection with three transactions. These transactions are materially
similar to the transactions the staff had been questioning since this investigation began in May.[1]
Yet the staff first learned of AOL's analysis and conclusions just hours before the announcement.

---

[1] In fact, AOL's deals with WorldCom, Hewlett-Packard, and Veritas were among the transactions questioned in the
Order, which was already issued by the Commission at that point.

**COLLECTED**

2AOL098020889
*Confidential Treatment Requested*

Messrs. Bruch, Peters, and Steinbach
November 15, 2002
Page 3

    On October 23, 2002, AOL announced a restatement of revenues, totaling $190 million for the quarters ended September 30, 2000 through June 30, 2002. AOL, in effect, admitted that it had improperly recognized the revenue in connection with transactions with thirteen companies. Moreover, AOL officials were quoted in the press saying that they believe no other transactions will be restated, suggesting that other transactions included in the Order have been examined and AOL has concluded that revenues were recognized in accordance with GAAP. Nonetheless, in spite of five months of nearly daily communications and frequent meetings with the staff, AOL did not advise the staff of its investigation into these deals and the conclusions it reached until hours before the restatement announcement. More importantly, while AOL has examined many, if not most of the transactions discussed in the Order and has announced its findings and conclusions to the financial press and to investors, it has failed and refused, with limited exceptions, to comply with the Order and pass its evidence and analysis on to the Commission.

## The Order

    The August 13 Order requires AOL to file a sworn statement responding to the specific questions relating to the investigation by August 30, 2002.

    AOL requested a meeting with the staff to discuss compliance with the Order, and a meeting was held here on August 21, 2002. During the meeting, AOL made requests for limitations on the scope of the Order, and the staff requested that AOL provide the staff with any reports of any internal investigation. AOL refused the staff's request. Nevertheless, by letter dated August 28, 2002, the staff agreed to most, if not all, of AOL's requested limitations. Most importantly, the staff agreed to limit the Order to transactions concerning AOL's online division and transactions over specified dollar amounts, and the staff agreed to extend the deadline to October 24, 2002. The August 28 letter also provides that AOL must file such interim statements according to a schedule acceptable to the staff. AOL proposed an interim schedule in a letter dated August 30, 2002. Without any waiver of rights, the staff agreed that the interim schedule was acceptable.[2]

    AOL soon abandoned its commitment to meet the deadlines it proposed and agreed to with the staff – a commitment on which the staff's willingness to limit the scope and extend the deadline rested. Nonetheless, the staff has continued its dialog with you based on AOL's purported willingness to complete its response within a reasonable time frame. During our latest conversation with you last week, we told you that if AOL did not finish its response by mid-December (three and a half months past the Order's deadline and one and three-quarters months past the date originally promised by AOL), we would proceed on the assumption that AOL did

---

[2] In the August 30 letter, subsequent interim reports, and otherwise, AOL has proposed additional modifications to the Order. The staff has not agreed, in writing or otherwise, to any modifications beyond those agreed to in the August 28 letter.

COLLECTED

2AOL098020890
Confidential Treatment Requested

2AOL098020890

Messrs. Bruch, Peters, and Steinbach
November 15, 2002
Page 4

not intend to fully comply with the Order. During the call, we gave you a list of priorities for completion and indicated that we were inclined to agree that AOL could put off for now responding to certain parts of the Order. We told you we would consider a proposed schedule for compliance that includes a date certain for AOL's full response to the Order.

Despite the staff's documented willingness to help AOL commit to a reasonable date to complete its response to the Order (by significantly limiting the scope of the Order, by extending deadlines, by indicating a willingness to excuse AOL, for now, from responding to parts of Order, and by indicating a willingness to agree to AOL's not certifying interim reports), we conclude from your letter to me dated November 8, 2002, that AOL is not willing to commit to *any* date for completing its response to the Order. As the staff made clear during our telephone conference last week, any proposal that does not contain an end date for completion is unacceptable.

While your letter details AOL's efforts to comply with the Order to date and cooperate with the staff's investigation, we note the following: On October 23, 2002, AOL reported its restatement of revenue with respect to transactions involving thirteen companies. Before the restatement, AOL presumably completed a thorough investigation into these transactions. However, to date, AOL has provided the staff with full reports as to only two of the thirteen companies and restatement-specific reports on three others. Moreover, while your letter states that the few AOL finance employees who are knowledgeable about the transaction are working intensely to provide information in response to the Order, several individuals outside of the finance department, who were directly involved in these transactions and are certainly the most knowledgeable about the transactions, have refused to cooperate in this investigation with AOL or the staff, but remain on AOL's payroll. These facts color the staff's view of AOL's repeated assertions that it has done everything possible to respond to the Order and cooperate with the staff's investigation.

I do not here set forth in detail the many instances that AOL failed to meet agreed upon deadlines, the deficiencies in the responses so far provided, or the extent to which AOL's response to date falls far short of full compliance with the Order.

AOL is in violation of the Commission Order and has been since October 24, 2002. While the staff is receptive to AOL's proposal regarding completion of priority items, we cannot accept any proposal that does not include a date for final completion of AOL's response to the Order. The staff cannot and will not agree to any open-ended extensions. The staff's willingness to discuss steps by which AOL may attempt to remedy its violation of the Order and complete the tasks prescribed by the Order is not intended, nor shall be construed, in any way as a waiver of

COLLECTED

2AOL098020891
*Confidential Treatment Requested*

Messrs. Bruch, Peters, and Steinbach
November 15, 2002
Page 5

the October 24, 2002 deadline. The staff and the Commission continue to reserve the right to take appropriate action at any time to enforce the Order.

We request that you provide a copy of this letter to the Audit Committee of AOL's Board of Directors.

Sincerely yours,

James Coffman
Assistant Director

**COLLECTED**

2AOL098020892
*Confidential Treatment Requested*

2AOL098020892

# EXHIBIT 12
# TO TOPETZES DECLARATION

Copyright 2002 The Washington Post

# The Washington Post

# washingtonpost.com

The Washington Post

July 18, 2002 Thursday
Final Edition

**SECTION:** A SECTION; Pg. A01

**LENGTH:** 5473 words

**HEADLINE:** Unconventional Transactions Boosted Sales;
Amid Big Merger, Company Resisted Dot-Com Collapse

**BYLINE:** Alec Klein, Washington Post Staff Writer

**BODY:**

First of two articles

In October 2000, a critical question confronted America Online Inc. as it sought to clinch the largest merger in U.S. history: Was it feeling the effects of an industry-wide slowdown in advertising?

AOL's president at the time, Robert W. Pittman, offered a resounding answer: "I don't see it, and I don't buy it," he told Wall Street stock analysts and the media.

Other AOL officials were less optimistic. While overall revenue from online ads continued to grow rapidly, internal company projections raised caution about one sector: dot-coms. Failures were accelerating among those Internet start-ups, which represented a significant amount of the company's ad business.

About two weeks before Pittman's declaration on Oct. 18, he and other executives were told in a meeting at Dulles headquarters that AOL faced the risk of losing more than $ 140 million in ad revenue the following year.

That would equal only about 5 percent of AOL's proceeds from advertising and commerce. AOL projected that most dot-com clients would still be able to pay their bills. But the internal warning came when investors were highly alert to any weakness in online advertising. Just a week before Pittman's public statements, for example, shares of AOL's key competitor, Yahoo Inc., plunged 21 percent after the company reported strong ad growth but acknowledged that the pace could not be sustained. A day before Pittman spoke, AOL shares dropped 17 percent on what analysts described as similar worries.

In such an atmosphere, and with its takeover of Time Warner Inc. imminent, AOL sought to maintain its breakneck growth in advertising and commerce revenue. Besides selling ads on its online service for cash, AOL boosted revenue through a series of unconventional deals from 2000 to 2002, before and after the merger, according to a Washington

Unconventional Transactions Boosted Sales; Amid Big Merger, Company Resisted Dot-Com Collapse The Washington Post July 18, 2002 Thursday

Post review of hundreds of pages of confidential AOL documents and interviews with current and former company officials and their business partners.

AOL converted legal disputes into ad deals. It negotiated a shift in revenue from one division to another, bolstering its online business. It sold ads on behalf of online auction giant eBay Inc., booking the sale of eBay's ads as AOL's own revenue. AOL bartered ads for computer equipment in a deal with Sun Microsystems Inc. AOL counted stock rights as ad and commerce revenue in a deal with a Las Vegas firm called PurchasePro.com Inc.

AOL also found ways to turn the dot-com collapse to its advantage, renegotiating long-term ad contracts it risked losing into short-term gains that boosted its quarterly revenue.

One AOL executive raised questions internally about some of the deals. Robert O'Connor, then vice president of finance for AOL's advertising division, said he outlined his concerns in a series of meetings last year and this year with Pittman, now in charge of the online division; David M. Colburn, who oversees its business affairs; J. Michael Kelly, chief operating officer of the online division; and other high-ranking company executives.

"Clearly, a lot of what they were living on was revenue that was not of the highest quality," said O'Connor, who resigned in March. "I don't know if they're still in denial, but there were some pretty big business issues they were not willing to face. For nine months, I tried to get these guys out of denial. I tried to take the perfume off the pig."

AOL said the deals were handled properly and the company "maintained a strict and effective system of internal controls." The company said the total revenue represented by all the deals reviewed by The Post was "truly microscopic" -- less than 2 percent of AOL's overall revenue, including subscriber fees -- and therefore immaterial to the company's business.

"The accounting for all of these transactions is appropriate and in accordance with generally accepted accounting principles," wrote Thomas D. Yannucci, a lawyer hired by AOL to respond to The Post's questions. "The disclosures in AOL's financial statements are appropriate and accurate. AOL's statements provide our investors with all appropriate material information about our business."

Further, he wrote, the company's outside auditor, Ernst & Young LLP, found the deals to be in accordance with generally accepted accounting principles. The auditor declined to discuss its review, citing the confidentiality of client matters, but H. Stephen Hurst, an Ernst partner, released a statement at AOL's request saying the firm stands by its original view that the accounting and disclosures were appropriate.

AOL officials declined to be interviewed on the record about the transactions.

The Post reviewed a number of AOL's advertising and commerce deals, focusing on several transactions that added up to $ 270 million. That represented a small portion of AOL's nearly $ 5 billion in ad and commerce revenue during the period reviewed, July 2000 through March 2002.

Without the unconventional deals, AOL would have fallen short of analysts' estimates of the company's growth in ad revenue (which is reported in a category that also includes revenue from commerce) in three quarters in 2000 and 2001.

Collectively, the deals helped AOL beat Wall Street analysts' expectations for earnings per share -- a crucial profit yardstick for investors -- by a penny per share in two quarters in 2000. At the time, investors punished companies whose earnings were off by even a cent. On the day AOL announced its earnings that October, Apple Computer Inc. said it missed Wall Street's reduced projections for its earnings by one cent, sending its shares down 6 percent a day later.

The driving force behind these deals was the powerful business affairs division within AOL, a hard-charging unit of 100 or so deal makers, including many lawyers, who helped negotiate and finalize most of AOL's largest

transactions. Inside AOL, the unit was known simply as "BA" and some of its deals were called "BA specials," an allusion to the aggressive ways the division generated revenue.

Former and current AOL employees said company executives were partly motivated to meet revenue targets by the pending $ 112 billion all-stock acquisition of Time Warner. Even though this merger deal contained no dissolution clause that would be triggered if either partner's stock fell too far, company sources said that some AOL officials feared that if AOL stumbled, Time Warner shareholders could begin clamoring to end it anyway. Time Warner under some circumstances could have backed out of the deal by paying a breakup fee of about $ 4.4 billion.

"The bubble had clearly burst, but senior management was under enormous pressure to hit the [financial] numbers and close the Time Warner transaction, which would diversify the revenue base and lower the risk profile of the company," said James Patti, a senior manager in AOL's business affairs division at the time.

Patti said he told senior executives he was uncomfortable with some of the transactions pushed by his unit. Shortly after receiving a merit promotion, Patti was laid off in 2001, a move he said he believes was directly related to his refusal to participate.

"I had been asked to paper many of these questionable deals and was unwilling to cooperate, making my concerns known to management," Patti said. "The layoff came exactly one week later. Ultimately, I was happy to leave the company with my integrity and professional ethics intact."

AOL declined to comment on the departures of Patti and O'Connor. It disputes their characterization that it resorted to questionable deals to maintain strong ad revenue growth in the fall of 2000. In its written responses to The Post, AOL said its ad and commerce growth rate was healthy by any measure -- 80 percent higher during the quarter that ended Sept. 30 than a year earlier. It added that failing dot-coms accounted for only a fraction of its overall business and that other, more stable companies were more than making up that revenue.

The company said that Pittman and other executives were accurate in their public statements. During AOL's Oct. 18, 2000, conference call with analysts, Stephen M. Case, then AOL's chairman and chief executive, said, "AOL's advertising growth is right on target." He added: "The current advertising environment benefits us because it will drive a flight to quality." And Kelly, then chief financial officer, called AOL's ad and commerce revenue growth "very healthy" and emphasized, "I can't say that strongly enough."

Some experts who reviewed the deals examined by The Post questioned whether some of the deals were accounted for properly. They also questioned whether investors could have adequately understood AOL's advertising business from the company's statements and other information AOL made available to the public.

"That's the whole purpose of financial statements -- for investors and others to understand the business," said James Cox, a Duke University law professor who is a member of the legal advisory board of the New York Stock Exchange and the National Association of Securities Dealers.

Yannucci, AOL's outside attorney, wrote June 21 that no expert could render a proper judgment on the company's accounting without "a full understanding of the agreements and transactions at issue, as well as their context as part of AOL's overall business."

In a separate letter yesterday, Yannucci added: "We believe such arm-chair speculation about AOL's accounting and financial disclosures by less than fully-informed 'experts,' directly contradicted by the fully-informed views of our outside auditors (Ernst & Young), is not only grossly unfair and unwarranted in light of the exhaustive facts we have presented to you, but is also reckless in the current highly-charged environment."

When the company eventually identified a downward trend in its advertising business, it properly disclosed it in the latter part of 2001, Yannucci wrote.

Unconventional Transactions Boosted Sales; Amid Big Merger, Company Resisted Dot-Com Collapse The Washington Post July 18, 2002 Thursday

Shares of AOL Time Warner Inc., as the company was renamed after the merger, have been in retreat ever since, closing at $ 13.11 yesterday, down 72 percent since the deal was consummated.

Wall Street has begun to question whether the AOL-Time Warner marriage ever made sense -- for Time Warner -- in light of the online unit's weakness. The company still possesses an array of powerful assets, such as HBO, Warner Bros. and Time magazine (a competitor of Newsweek, which is owned by The Washington Post Co.). But now, company officials are struggling to turn around the online unit.

The evolution of AOL from a small online service to a major advertising force began in late 1996.

Facing stiff price competition from other Internet service providers, AOL abandoned the hourly fee that it had been charging customers, replacing it with a flat-rate monthly charge. Users began to spend more time online, taxing AOL's network and eating into its profit margin. AOL set its sights on getting companies to buy ads to promote themselves on its vast online network.

Ad revenue was intended to keep the company growing at a fast clip after the growth of its basic business -- monthly subscriber fees -- began to ebb.

"Advertising was supposed to be the big thing to defray concerns about AOL plateauing," said Michael Bromley, a business development director for AOL consumer devices until he was laid off last year. "On Wall Street, it's not what you make, it's what you're perceived as."

By the fall of 2000, ad and commerce revenue had rocketed from virtually nothing to more than $ 2 billion a year -- about a third of the company's overall revenue. A prime reason was the emergence of dot-coms initially rich with venture capital and eager to promote themselves.

But the capital now was drying up and the Nasdaq Stock Market was in a free fall. Questions about ad revenue began to emerge on Wall Street just as AOL sought to complete its Time Warner merger.

Several analysts at the time took AOL's reports of a big jump in ad and commerce revenue in the Sept. 30 quarter as a sign of the company's strength in the face of a slowing ad market, and they encouraged investors to buy AOL shares as the merger neared.

In a research note a day after AOL's Oct. 18 conference call, analyst Youssef H. Squali, then of ING Barings LLC, reiterated his "strong buy" rating on AOL's stock. "Solid advertising revenues attest to AOL's hybrid subscription/advertising model, which so far has provided the company with more protection from the dotcom meltdown than other large new media companies," he wrote.

Mary Meeker, an analyst at Morgan Stanley Dean Witter & Co., was also encouraged by AOL's ad and commerce revenue results. "This has developed quickly into AOL's fastest growing revenue stream and a key element of growth going forward," she wrote in a research note a day after AOL released its numbers.

And analyst Christopher Dixon, then of PaineWebber Inc., wrote that AOL's strong ad and commerce revenue "should alleviate some concerns about the health of the Internet advertising environment."

What the analysts failed to note -- or didn't know -- was that many dot-coms no longer had the cash to pay for all the ads they had agreed to buy in their premium-priced long-term contracts with AOL.

At the company's Dulles offices, AOL was already holding weekly emergency meetings to discuss the status of failing dot-com ad deals, company sources said. AOL closely monitored the status of these ad deals, large and small, according to several company documents obtained by The Post.

The AOL documents gave a detailed report, week by week, of the health of the dot-coms, how much they owed

Unconventional Transactions Boosted Sales; Amid Big Merger, Company Resisted Dot-Com Collapse The Washington Post July 18, 2002 Thursday

AOL, what AOL was doing to get its money, how the dot-coms were responding and how much money AOL reckoned it could lose if the dot-coms didn't pay their bills.

One firm, Living.com, an online furniture business, owed AOL $ 1.2 million. "They are out of $, wanted to look at new deal but then backed out completely," AOL stated in a confidential summary of dozens of deal restructurings, dated Aug. 18.

AOL's conclusion: "Not solvable."

The company was right: Living.com shut down that month.

In another internal document, AOL stated that BigEdge.com, an online sporting goods retailer, "Demanded restructuring conversation with 3 options (including terminating deal outright)."

AOL figured its upcoming payment of $ 500,000 "may be in jeopardy."

BigEdge.com was a part of MVP.com, another struggling firm whose domain name, trademark and certain assets were sold off to SportsLine.com in January 2001.

There were dozens of other shaky deals of various sizes. They added up. AOL faced the risk of losing $ 23.2 million in revenue in the quarter ended Sept. 30, 2000, according to an internal company memo summarizing the situation.

In September, other internal company documents obtained by The Post said that AOL was "at risk" to lose more than $ 108 million in ad revenue in fiscal 2001, from July 2000 to June 2001, with most of that jeopardized revenue coming from dot-coms. In early October, O'Connor, the AOL advertising executive, said he briefed Pittman and other company executives about the weakness of AOL's dot-com advertisers two weeks before Pittman's October 2000 comments. O'Connor said he told them that the company risked losing more than $ 140 million in ad revenue in calendar year 2001.

AOL said that just because ad revenue was identified as "at risk" did not necessarily mean the company would fail to collect it. Yannucci, AOL's attorney, did not respond to The Post's question about how much dot-com revenue was lost in that period. He wrote that "one would hope" O'Connor's estimate was "a worst-case assessment."

Cox, the Duke professor, said he believed that AOL should have been more forthcoming about the dot-com restructurings. It appears that a significant part of AOL's ad business was in jeopardy and it should have said so publicly, Cox said. "They have an obligation to disclose what is happening to the present client base," he said.

AOL said it had no obligation to make such disclosures, asserting the amounts were too small. "It should be beyond reasonable dispute that these amounts do not remotely represent a material percentage of AOL's advertising and commerce revenues for these quarters," AOL's attorney wrote.

But Doug Carmichael, a professor of accounting and director of the Center for Integrity in Financial Reporting at the City University of New York's Baruch College, disagreed. In accordance with Securities and Exchange Commission requirements, he said, AOL should have disclosed "significant negative trends" that company officials knew about. "And certainly," Carmichael said, "the problems with dot-coms were material to them."

AOL sources who were familiar with these dot-com deals said the company considered taking the struggling firms to court to get them to pay for the ads that they had agreed to buy. But the sources said AOL determined that such a strategy wouldn't be fruitful because the public filings would show some weakness in its business.

So AOL advertising officials went to work. They strove to convert some of the risk to AOL's long-term ad contracts into a short-term gain, by getting one-time payments from clients who could no longer meet their obligations.

Unconventional Transactions Boosted Sales; Amid Big Merger, Company Resisted Dot-Com Collapse The Washington Post July 18, 2002 Thursday

That helped put off the day when the dot-com advertising swoon would be apparent in the company's quarterly results.

In some instances, AOL said in its written response to The Post, it would renegotiate a struggling dot-com's ad deal to shorten the term of the contract. The dot-com would pay AOL a fee for breaking the deal early, and that fee would be incorporated into the new, shorter-term ad deal, effectively creating a balloon payment. AOL would count all of the revenue, including the fee for renegotiating a shorter-term deal, as ad revenue.

AOL said it accounted for the deals properly. Amounts "earned by AOL under these types of long-term advertising agreements have always been advertising revenues and the restructurings do not change the character of those revenues, only the time frame over which they are measured and the amount that should be recognized," wrote Yannucci, AOL's attorney, in a letter to The Post.

From July 2000 through March 2001, AOL said, it booked $ 56 million from dot-com deals that were terminated or restructured, about 3 percent of its $ 2.1 billion in overall ad and commerce revenue during that time. In each quarterly earnings report during the period, the terminated and restructured deals ranged from 1.5 to 4.4 percent of AOL's advertising and commerce revenue.

Eventually, as the pattern of restructuring dot-com contracts repeated itself quarter after quarter, AOL reported the trend in the latter part of 2001. In its Nov. 14 SEC filing it said: "The growth in advertising and commerce revenues was driven by a general increase in advertising sales, including amounts earned in connection with the settlement of certain advertising contracts."

By the December quarter that year, online advertising had swung from growth to contraction, decreasing by 7 percent over the same period a year earlier.

In September 2000, AOL found another way to boost ad sales: from a legal dispute.

The origins of the legal case reach back to 1992, far removed from AOL, when MovieFone Inc., an online ticketing firm, and a former subsidiary of Wembley PLC, a big British entertainment company, set up a joint venture to develop hardware and services for automated movie-ticketing sales, according to U.S. legal filings and British public documents. The parties had a falling-out, the matter went to arbitration, and three years later MovieFone won an award against the former Wembley subsidiary.

When AOL purchased MovieFone a year later in 1999, it inherited the $ 22.8 million arbitration award, plus interest, which had not yet been paid.

AOL said it would have been costly to litigate with an overseas company. So AOL in September 2000 offered an alternative: Buy $ 23.8 million in online ads instead. That would also save the British firm money -- requiring Wembley to spend $ 3 million less than the arbitration award, including interest, according to sources familiar with the negotiations and confidential company documents summarizing the deal.

But AOL had to move fast, the sources said. The company was short of its targeted advertising and commerce revenue for the Sept. 30, 2000, quarter ending just days away.

The British wondered what they had to advertise to AOL's users. Wembley was in the gambling business, operating greyhound race tracks in such places as Rhode Island and Colorado.

AOL's answer: 24dogs.com.

Wembley was preparing to launch 24dogs.com, an online greyhound-racing Web site. Still under construction, the Web site would allow gamblers to check the odds and place a bet on a dog.

AOL suggested it could run ads for the Web site. The British mulled the offer. But with the quarter closing fast,

Unconventional Transactions Boosted Sales; Amid Big Merger, Company Resisted Dot-Com Collapse The Washington Post July 18, 2002 Thursday

AOL could not afford to wait.

To book the revenue in the quarter, AOL needed to run the ads before Sept. 30 to conform with accounting rules. So, without Wembley's knowledge, AOL employees lifted art work -- a picture of a racing greyhound -- off the British company's 24dogs.com Web site, created banner and button ads out of it and started running them, said AOL sources familiar with the matter.

The greyhound banner and button ads ran on various AOL sites, including Spinner.com, its online radio service, the sources said. AOL ran as many as three or four Wembley ads on a single Web page.

The number of greyhound ads, however, got to be a little too much, even for some at AOL, the sources said. A Spinner official on the West Coast called an AOL official in Dulles, and complained, "Dude, my home page looks like a dog site," according to a source familiar with the conversation.

Within about an hour of posting the greyhound ads, Wembley's unfinished Web site crashed from an overload of customer traffic from AOL, sources said.

AOL got its deal. Wembley agreed to buy $ 23.8 million in AOL ads. The terms of the deal allowed AOL to dictate -- at its own "discretion" -- when and where the Wembley ads would run through AOL's vast network. Such a provision meant that Wembley's ads could have appeared at any time or place -- not necessarily targeting its core audience.

Wembley confirmed that it reached a confidential agreement with AOL but declined to discuss any of the specifics.

According to a copy of the Sept. 26, 2000, confidential settlement between the companies, AOL and Wembley released each other from all claims. It stipulated that "AOL will promote various Wembley USA websites with 1 billion [ad] impressions to run at AOL's discretion. Such promotion is: a) a good faith gesture by AOL to expeditiously and amicably settle the arbitration matter, and b) a way to demonstrate the potential of AOL's interactive properties to drive traffic to Wembley USA websites."

AOL ran enough ads to book $ 16.4 million in that quarter. In the same three-month period ended Sept. 30, 2000, AOL converted another unresolved legal action into ad revenue, a $ 13 million deal with Ticketmaster, a majority-owned unit of USA Interactive Inc., according to internal company documents and sources.

Ticketmaster declined to comment.

Several accounting experts took issue with the Wembley deal, saying money from an arbitration award owed to a company that AOL acquired should have been booked as something other than ad revenue.

"To say that was $ 23.8 million in ad revenue, I have to question that," said Walter P. Schuetze, the chief accountant at the SEC from 1992 to 1995 and the chief accountant of its enforcement division from 1997 to 2000. "That's pulling white rabbits out of black hats."

AOL said it booked the Wembley and Ticketmaster deals appropriately. "It is entirely common and appropriate to resolve litigation by creating or amending a business relationship -- even if that litigation has reached the point of a judgment," said AOL's attorney. ". . . Such resolutions are one way in which unproductive disputes are turned into productive, and hopefully continuing, business relationships."

After AOL and Wembley signed the ad deal, sources said a handful of business affairs officials gathered in a vice president's office at AOL and celebrated by blaring a popular song on a personal computer: "Who Let the Dogs Out."

When AOL closed its merger with Time Warner on Jan. 11, 2001, it quickly began touting the combined

Unconventional Transactions Boosted Sales; Amid Big Merger, Company Resisted Dot-Com Collapse The Washington Post July 18, 2002 Thursday

company's synergies, or its ability to generate growth in all areas of the business by cross-promoting properties and leveraging deals made by one unit across others.

One example involved a deal between AOL's Time Warner Cable division and the Golf Channel, a majority-owned unit of cable giant Comcast Corp.

According to sources familiar with the deal, the Golf Channel agreed in June 2001 to pay $ 200 million over five years to have its sports programming carried on Time Warner Cable, the nation's second-largest cable television provider. But once the deal was essentially in place, the online unit weighed in, asking Time Warner Cable to share a piece of the Golf Channel deal, the sources said.

Complying, Time Warner Cable told the Golf Channel to spend about $ 15 million of the $ 200 million transaction for advertising on AOL's online unit, according to sources.

Cable companies often use such negotiations to extract concessions out of programmers. AOL sources said the Golf Channel had few options -- if it wanted to be carried on Time Warner Cable. "We told them where and when" the ads ran, said a source familiar with the deal. "They didn't have a choice."

Golf Channel spokesman Dan Higgins confirmed his company agreed to buy the online ads because it wanted the cable deal.

"When you're trying to negotiate long-term deals with them [cable companies], there are certain things that matter to them," said Higgins, who would not discuss details of the negotiations. "If they want the money to go to certain places, as long as it's in line for us . . . you come to a deal that both can live with." He called the agreement "mutually beneficial."

Higgins said that while AOL stipulated that the Golf Channel buy online ads as part of the cable agreement, it benefited the Golf Channel. "AOL reaches a lot of people," he said. "From a branding perspective, it's good for us."

The $ 15 million ad deal also helped AOL's online division report better numbers in its third quarter, ended Sept. 30, 2001.

Yannucci, AOL's attorney, wrote that "it was perfectly sensible to advertise the Golf Channel on AOL."

On July 25, 2001, AOL found another way to generate ad dollars, this time through an agreement with eBay, the giant online auction site.

AOL was not only an advertising medium for other companies, it also served as an advertising broker, selling ads for other companies that lacked AOL's expertise and sales force. AOL agreed to serve in this capacity for eBay, hoping to sell a big chunk of the auction site's ad space, according to AOL's confidential executive summary of the deal. AOL said it was able to bundle advertising for different Web sites and offer package deals to advertisers.

In the eBay deal, AOL did not simply take the customary commission of an ad rep. AOL counted all of the eBay revenue as if it were AOL's own.

"AOL recognizes all revenue generated from eBay inventory sales on a topline basis," AOL said in its internal documents.

When asked about the financial arrangement, AOL declined to make any documents available but confirmed that it booked the sale of eBay's ads as AOL's own revenue, which it maintained is the proper accounting method. AOL said it booked $ 80 million in revenue in 2000 and 2001 and $ 15 million in the first quarter of 2002, the gross amounts from selling eBay's ads.

Unconventional Transactions Boosted Sales; Amid Big Merger, Company Resisted Dot-Com Collapse The Washington Post July 18, 2002 Thursday

With this accounting, AOL was able to report a larger amount of ad and commerce revenue. (The gross sales didn't change AOL's net income, because AOL counted the payments it forwarded to eBay -- minus its broker's fee -- as an expense elsewhere in its books.)

Under accounting standards, there are several factors to consider in determining which party can book the gross revenue from a transaction.

One way an agent can book the gross amount of revenue from the sale of a merchant's goods is if the agent first acquires the goods and then resells them to another party, accounting experts said.

Such is the case with Priceline.com Inc., for example, which buys airline tickets from the airlines before reselling them to customers. But AOL did not buy eBay's advertising inventory.

AOL said it was appropriate for it to book eBay's revenue as AOL's own in part because the advertiser contracted directly with AOL, AOL set the price and received payment directly from the advertiser. AOL said eBay's accounting for the deal -- booking only the net payments -- shows that the company also viewed AOL as a principal.

Several accounting experts, however, said that those factors may not be sufficient for AOL to properly book eBay's ad sales as AOL's own ad revenue. They said the appropriate accounting largely hinged on the amount of financial risk AOL assumed in the transaction.

An internal company document shows that AOL carried no financial penalty if it did not sell eBay's ads, and AOL confirmed this. According to the document, AOL had a nonbinding, informal commitment to reach certain ad sales targets for eBay over two quarters.

In the document, AOL projected it might have to pay eBay $ 40 million to $ 45 million in the second half of 2001 "if AOL makes ad purchases on eBay to reach the targets." AOL did not respond to The Post's question about how much of that amount it paid eBay.  AOL said that another factor that showed it was the principal in the deal was that it shared "credit risk" with eBay. AOL would not explain how it shared that risk.

Several experts said that sharing the credit risk may not be enough for AOL to be considered the principal in the transaction and properly book all of eBay's revenue as its own.

If AOL had been contractually obligated to pay eBay for the full price of the ads when an advertiser failed to pay, then AOL could have been considered the principal and booked eBay's revenue, these experts said. But in its letter, AOL said it was not contractually obligated in this way.

"It seems to me AOL is not taking any of the normal risks of a merchant and, therefore, the situation seems more similar to the agent model where you should only book the margin or the net rather than the gross," said Bala Dharan, a Rice University accounting professor.

Michael Sutton, the SEC's chief accountant from 1995 to 1998, said, "This sounds more like an agency relationship than a principal relationship." An agent should book a commission, he said, not the gross sale, as AOL did.

O'Connor, the AOL executive who left the company in March, said he told company officials he was concerned that the accounting might lead to an SEC investigation.

AOL, however, said that taking all the aspects of the deal into consideration, it was reasonable to conclude that it was the principal in the transaction and it rejected the experts' opinions, saying they didn't have all the information to make the proper determination. Ernst & Young, AOL's outside auditor, reviewed the transaction and confirmed its accounting.

The company also said the amounts of money involved were a fraction of the total ad and commerce revenue and

Unconventional Transactions Boosted Sales; Amid Big Merger, Company Resisted Dot-Com Collapse The Washington Post July 18, 2002 Thursday

not material to the company's business.

AOL's ad-repping deal continued into 2002. In exchange for the arrangement, according to sources and documents, eBay also agreed to extend from four to five years an agreement to buy ad space on AOL's service, a deal worth an additional $ 18.8 million, AOL confidential documents show. EBay declined to comment on the specifics of its business dealings with AOL.

Several accounting and legal experts said the way AOL treated the eBay deal and other transactions raised broader questions about how the company was explaining its business to the public.

As with other conglomerates, AOL has been under mounting scrutiny as investors have lost confidence in corporate America's books. AOL is now being pushed by Wall Street to disclose more about how it earns its revenue and accounts for its expenses.

Accounting experts said a public company has a fundamental obligation to do its best to offer a fully formed picture of its operations. Did AOL provide enough information when it began to identify weakness in its dot-com advertising business?

Dharan, the Rice University professor, said the company did not. "They were representing something to investors," he said, "that was different from what was going on inside."

**LOAD-DATE:** July 18, 2002

# EXHIBIT 13
# TO TOPETZES DECLARATION

Copyright 2002 The Washington Post

# The Washington Post

# washingtonpost.com

The Washington Post

July 19, 2002 Friday
Final Edition

**SECTION:** A SECTION; Pg. A01

**LENGTH:** 3172 words

**HEADLINE:** Creative Transactions Earned Team Rewards

**BYLINE:** Alec Klein, Washington Post Staff Writer

**BODY:**

Second of two articles

At noon on Dec. 21, 2000, David M. Colburn swaggered to the stage in black cowboy boots, sporting his trademark 5 o'clock shadow.

From the podium, Colburn, then president of business affairs at America Online Inc., beamed at his audience, about 100 employees assembled in the Seriff Auditorium at AOL headquarters in Dulles for the monthly all-hands meeting of his unit.

It was time to hand out the Bammy Awards.

A takeoff on television's Emmy Awards, the Bammys were given to the best performers in Colburn's division, a group of aggressive deal makers skilled in extracting maximum dollars from a prospective client. Business affairs -- "BA," as it was known around AOL -- was in the middle of many of the company's biggest and most complicated deals, which helped AOL reach or exceed its financial targets.

Theirs was a culture that grew increasingly important as America Online evolved from a Northern Virginia upstart into an online behemoth capable of taking over Time Warner Inc.

On this day, Colburn bestowed the Bammy's gold-star plaque on Kent Wakeford and Jason Witt, who had put together a complex transaction with PurchasePro.com Inc., a Las Vegas software maker.

According to several people at the meeting, Colburn praised the two men for what he called a "science fiction" deal to generate revenue, a reference some attendees took for the aggressive way the company constructed the transaction.

Creative Transactions Earned Team Rewards The Washington Post July 19, 2002 Friday

Colburn himself and several other attendees do not recall the statement, according to an attorney AOL hired to respond to The Post. The company declined to make Colburn or any other member of the business affairs unit available for comment.

Under terms of the agreement, AOL would sell software for PurchasePro and, in exchange, earn tens of millions of dollars in performance warrants -- a right to buy PurchasePro stock at a certain price. AOL would book the value of those warrants as advertising and commerce revenue. It was an unconventional arrangement, but one that AOL's attorney said did not violate any accounting rules.

Wakeford and Witt joined Colburn on stage and accepted the plaque. In his acceptance speech, Wakeford thanked someone who was not in attendance: "Junior," Charles E. Johnson Jr., PurchasePro's rambunctious founder and then-chief executive.

The crowd roared with laughter over the tongue-in-cheek remarks. But not everyone was amused.

"The sheer arrogance, the feeling of being untouchable, was amazing," said one attendee.

AOL's business affairs culture rewarded those who could be creative -- and those who knew how to close deals. Business affairs executives usually got involved in advertising transactions after the sales force had reached a general agreement with clients. Business affairs would draw up a list of proposed terms and talk to the company's accountants about how to structure the deal.

The unit's work was blessed by executives at the highest levels. Business affairs deal makers answered to Colburn, who reported to Robert W. Pittman, then AOL's president. Their deals also were reviewed by AOL's auditors, and were subject to what AOL said was a "strict and effective system of internal controls."

Sources said those controls were necessary to deal with a unit like business affairs, whose complex transactions were known as "BA specials" inside AOL. Typically, the unorthodox deals involved contracts that closed late in a fiscal quarter and helped AOL boost its financial results.

Though its deal makers may have been aggressive, AOL said they generally had little idea whether their efforts would produce favorable quarterly results. The company said too many deals were up in the air in the closing days of a quarter for anyone to be sure how the final tallies would turn out.

Pressure to close ad deals was particularly intense during much of 2000, when the company sought to complete its merger with Time Warner, the sources said.

"It was definitely part of everyday life. It was definitely out there," said Jonathan Salkoff, who served as a manager in business affairs and declined to discuss specific company matters. He was laid off in January 2001, just after the merger was approved.

After completing the Time Warner takeover, AOL sources said they continued to feel pressure to close deals. It was, they said, part of business affair's culture -- an unrelenting need to win.

When AOL announced its blockbuster takeover of Time Warner in January 2000, business affairs was at full throttle.

Start-ups lined up to strike a deal with AOL, a blue-chip Internet firm in a sea of untested wannabes searching for an IPO, the initial public offerings of stock that had already created mind-boggling personal wealth for many denizens of Silicon Valley.

The transactions, in turn, helped enrich AOL. Everyone, it seemed, was becoming an instant millionaire at the company's Dulles headquarters. There were a lot of Ferraris. And twentysomethings and secretaries retiring with

Creative Transactions Earned Team Rewards The Washington Post July 19, 2002 Friday

seven-figure bank accounts after a few years on the job, thanks to the incredible windfall from stock options.

At business affairs, almost anything seemed possible. Hard work begot wealth. Wealth begot parties. And parties, on occasion, became part of work.

That included a spontaneous excursion from Dulles to San Francisco by a handful of AOL officials on the corporate jet. They called it a "team-building trip."

It took place in the Gold Club topless bar on Howard Street, said sources who were present, and both men and women from AOL attended.

"The lavish parties, the crazy antics -- it really socialized you," said another AOL source. "You had to toe the line."

AOL declined to comment on such conduct, other than to say it does not condone activities that would be in violation of company policies.

The tone for the company's culture back in the heyday of 2000 was set by Colburn, then head of business affairs.

Colburn, now executive vice president and president of business affairs and development for AOL Time Warner's subscription services and its advertising and commerce businesses, was a larger-than-life figure.

A lawyer, former venture capitalist and former chief executive of a poster company, Colburn is athletic but carries a paunch. He is charismatic and rough-hewn. Tall and imposing, he speaks in a high-pitched, nasal tone.

By many accounts, Colburn also commanded respect as a brilliant corporate strategist, a smart lawyer who remembered every detail and was always thinking 10 steps ahead in every negotiation.

He burnished his imposing reputation on Sundays at 9 a.m. on the regulation basketball court outside his large, clapboard and stone country-style house in Potomac.

There, he gathered his loyalists -- a group of deal makers who wanted to move up the corporate ladder. Attendance was de rigueur. What he taught his disciples was his way of playing sports -- and doing business. He played a ferocious game, breaking down his opponents with rough elbows, blatant fouls and name-calling, attendees said.

"It's the way he gets people to love him and fear him," said an AOL official. "You don't go to play, you go there to be abused."

Colburn could be rougher on his troops at work, said several sources, many of whom declined to speak for attribution for fear it would hurt their career or jeopardize their benefits.

Once, Colburn beckoned Ted Rogers, then a new member of his team -- and a former Washington Redskins player -- and gave him a dressing down outside AOL's fifth-floor boardroom during a meeting of "Op Com," the operating committee of senior executives, chaired by Pittman.

Witnesses said Colburn screamed at Rogers for a paperwork mistake -- getting the wrong AOL executive's signature on a particular deal. The berating became water-cooler legend: If Colburn could decimate Rogers, a 250-pound, 6-foot-2 1/2 former linebacker, what about the rest of his crew?

When asked about the incident, Rogers said, "Maybe I deserved it. I don't know. I felt completely demoralized because it was my first deal."

Rogers said he realized that the company's "lifestyle and culture" wasn't for him, so after 14 months he left AOL of his own accord in May 2000.

Creative Transactions Earned Team Rewards The Washington Post July 19, 2002 Friday

Every couple of weeks, AOL sources said, Colburn would pick other people, poke fun at them, yell at them, break them apart, then build them back up.

"He'd put an arm around you, and say, 'Things are going to be all right, I really love you,' " said an AOL source. "He'd say a kind word, and it'd make your day. It's like an abusive father."

Colburn also bestowed financial rewards on his minions. He would send favored underlings and their spouses on weekend getaways to places like New York, all expenses paid, including limousine service and lavish dinners, AOL sources said.

Colburn helped decide who got stock options, another powerful incentive to keep employees in line, especially when AOL shares were on the rise, sources said. During the height of the Internet boom, employees recalled logging on to their computers in the morning, checking their portfolio and staring in amazement at their growing assets.

"It was like, 'Wow, I just made a few thousand dollars just by sleeping,' " said an AOL official.

But in exchange for such largess, Colburn demanded loyalty, AOL sources said, and never was that more clear than when AOL was at the pinnacle of its power.

"He created these foot soldiers who went to war for him," said an AOL source. "These were heady times."

AOL could make or break a company just by picking which one it decided to do business with. When AOL struck a deal with a dot-com, it often had the effect of giving the start-up instant credibility, a leg up on the competition and better prospects for launching an IPO.

"I would basically pick the winner of [an industry], their stock would go up, and they'd be instantly rich, and they'd do anything for me," said an AOL business official.

Just as Colburn exacted loyalty from his employees, AOL exacted steep terms from its partners. Sometimes, in a display of its clout, AOL would demand that a dot-com sign an ad deal within 24 hours or AOL would take the offer elsewhere, company sources said.

During the Internet bubble, AOL deal makers had another advantage: Frequently, they were bargaining with naive dot-commers in their twenties and thirties who had never negotiated a business deal in their lives.

AOL said its executives did not mistreat prospective clients. The company said it was common for its deal makers to seek out relationships with new business partners, and then leverage those relationships to generate additional revenue.

There was a perception within AOL that some business affairs executives acted as though there were no rules. AOL sources described a deal in which a junior financial analyst at the company had been directed by a BA official to alter an internal report steering more revenue to Homestore Inc., an online home and real estate service, sources said.

Homestore shared revenue with AOL from advertising sold on Homestore's house and garden areas within AOL's online network, the sources said.

Every month, AOL financial analysts would receive a report from operations, showing the level of ad revenue and an estimate of Homestore's share. Without explaining why, business affairs told the AOL financial analyst to change the report, inflating Homestore's ad revenue share by an additional $ 2 million, the sources said.

When AOL officials discovered the problem, the maneuver was short-circuited, and the company said it fixed the error. "[W]hile a report which erroneously attributed a revenue share from certain advertisers to Homestore was initially generated, the mistake was identified and the report was later corrected," AOL's attorney said in a letter to The Post.

Creative Transactions Earned Team Rewards The Washington Post July 19, 2002 Friday

AOL said that outcome demonstrated the effectiveness of its internal controls. Homestore officials declined to comment.

By August 2000, the business affairs bravado was beginning to deflate.

The tech-laden Nasdaq Stock Market was hemorrhaging, dot-coms were dropping like flies and grim senior deal makers at AOL convened emergency meetings around a long conference table in the boardroom, sandwiched between the offices of Stephen M. Case, then AOL's chairman and chief executive, and Pittman, then AOL's president.

Before them was a growing list of struggling start-ups pleading to restructure their advertising deals.

Colburn ran the meetings. Myer Berlow, his counterpart heading the interactive marketing division, which worked with business affairs on ad deals, would sit in or monitor the proceedings by speakerphone. Participants said many discussions were more like yelling matches. Colburn and Berlow would sometimes scream at their deal makers about the need to get AOL's business partners to pay up.

"Why can't you get this deal closed?" Colburn would shout, recalled someone in attendance. "Why can't you do this?"

The deal makers would throw up their arms in futility.

"Colburn was always reminding everybody what pressure we were in because of the merger," said an AOL official. "He'd say, 'Are you guys crazy? Are you forgetting what we have to accomplish?' "

The pressure inside AOL tightened like a vise: The stock was eroding, and the firm was engaged in tedious negotiations with federal regulators reviewing the merger. Enough failing dot-com advertisers could compound the problems.

For months, AOL managed to keep up its ad revenue from dot-coms by restructuring their deals into shorter-term arrangements. But by mid-December 2000, it became harder to find revenue. In at least one instance, business affairs pushed too far.

The unit brokered a deal to sell $ 15 million in online ads to Telefonica SA, the big Spanish telecommunications company. AOL needed to run the ads in the final days of December to book the revenue in that quarter.

But with so little time left, AOL had to place the ads in high-traffic areas of AOL, such as its welcome screen, the first Web page people see when they use the service. More consumers saw ads on the welcome screen and AOL could get faster credit for running the promotions.

AOL officials didn't care that the Telefonica link from AOL's English-language welcome screen took users to a Spanish-language site, said AOL sources familiar with the deal. Nor did it matter that Telefonica's computer servers couldn't handle all of the customer traffic from AOL, they said.

AOL succeeded in running the Telefonica ads fast to book the revenue before Dec. 31, as accounting rules required.

But after the deal was done, and January came along, AOL was still running the Telefonica ads. Under the deal, they were supposed to have stopped in December.

When some AOL officials noticed the ads were still running, they raised questions and learned it was happening at the behest of business affairs. The unit's officials had struck a verbal agreement with Telefonica to continue running hundreds of millions of ad impressions for months beyond December, as a bonus, the sources said.

Creative Transactions Earned Team Rewards The Washington Post July 19, 2002 Friday

The bonus, it turned out, was a key condition for Telefonica agreeing to spend $ 15 million on ads that would run in the December quarter, the sources said. Without the bonus, Telefonica would have insisted on running the $ 15 million in ads over several quarters, which would have forced AOL to book a smaller amount of revenue in the December period, the sources said.

In the end, AOL's internal accountant determined that the $ 15 million December ad deal was really part of a longer-term commitment, which included the ads that had run as part of the bonus deal, sources said. As a result, internal accountants moved about $ 5 million of the Telefonica revenue from AOL's December quarter to the next quarter.

AOL said the firm's action "highlights the rigor and integrity of AOL's internal accounting controls."

Telefonica declined to comment on the specific transaction, but in a statement it said, "Our relationship with AOL covers several areas and we at Telefonica are satisfied with all aspects of this relationship."

After the merger, the ad market continued to weaken in 2001, forcing down online ad rates. Robert O'Connor, then vice president of finance for AOL's advertising division, said he warned company executives last year and this year that the trend would eventually create a fundamental business problem.

As the price of online ads fell, AOL would be forced to sell more ads to reach its revenue targets, O'Connor told other company officials. There was a finite number of Web pages that AOL's users viewed in a given period. Eventually, AOL would run out of online space -- inventory -- to run ads where consumers would see them.

As it was, AOL was racing to run all the ads it was selling. In some cases, AOL resorted to what was known internally as "jackpotting." The term referred to gambling slot machines, where, for example, three cherries in a row wins.

In AOL's case, jackpotting meant it would run the same ad three times on a single Web page, often at the bottom of the screen, where it was less visible, sources said.

AOL also took advantage of its "ad rotation" to run more ads, sources said. When viewers look at a screen, the Web page automatically refreshes itself at a specific interval, sometimes from eight to 10 seconds.

But at the end of a quarter, when AOL was trying to meet its financial targets, it would increase the speed of the ad rotation to get credit for running more ads, sources said.

In late February this year, AOL executives informed O'Connor, who continued to raise questions about inventory, that he was not a team player and that he no longer had a bright future at the company, according to a company e-mail. O'Connor immediately said he would resign. AOL would not comment on O'Connor or his departure.

Berlow, later named president of global marketing solutions for the parent company, tried to persuade AOL officials to stop O'Connor from leaving. In a March 8 e-mail to Barry Schuler, then chairman and chief executive of the Internet division, Berlow defended O'Connor.

"The only reason you know that there is an inventory problem is that Bob [O'Connor] continued up the ladder with the inventory problem (Bobby-Ripp-Kelly-Mayo) and shot his career out the window," Berlow wrote to Schuler.

Berlow was referring to Robert Friedman, then head of AOL's interactive marketing division; Joseph A. Ripp, chief financial officer of the Internet unit; J. Michael Kelly, the chief operating officer; and Mayo Stuntz Jr., executive vice president of AOL Time Warner's cross-divisional initiatives.

O'Connor left the company on March 29 without negotiating a severance package. He said he was no longer comfortable working in an environment where officials didn't want to hear about internal business issues.

Creative Transactions Earned Team Rewards The Washington Post July 19, 2002 Friday

"Not only were they not willing to get out of denial," he said, "now they were going to actually punish those who were going to even raise issues."

Staff researcher Richard Drezen contributed to this report.

**LOAD-DATE:** July 19, 2002

# EXHIBIT 14
# TO TOPETZES DECLARATION

38 of 53 DOCUMENTS

Copyright 2002 The Washington Post

# The Washington Post

# washingtonpost.com

The Washington Post

July 19, 2002 Friday
Final Edition

**SECTION:** A SECTION; Pg. A17

**LENGTH:** 1963 words

**HEADLINE:** Unorthodox Partnership Produced Financial Gains;
Deals Allowed AOL, PurchasePro.com to Boost Revenue

**BYLINE:** Alec Klein, Washington Post Staff Writer

**BODY:**

At the height of the Internet boom, when America Online Inc. was king of the heap, it found an unlikely business partner: a former video store operator who had a penchant for blackjack.

In the early days of his Las Vegas start-up, Charles E. Johnson Jr. said he would go down to the neon-bathed Strip, put big wads of money on the casino tables and find a way to meet payroll.

"Junior," as he liked to be called, played for the big payday. And for a couple of heady years, his company, PurchasePro.com Inc., was the archetypal dot-com, a software venture led by a swashbuckling executive who took it public during the Internet euphoria of 1999, struck a big deal with AOL a year later and hit it rich.

AOL also profited from the partnership.

In one unorthodox arrangement, AOL gave $ 9.5 million in cash to PurchasePro for $ 30 million in stock warrants in the firm, and AOL booked the difference -- $ 20.5 million -- as ad and commerce revenue. PurchasePro also bought advertising space from AOL, and it paid AOL commissions for selling PurchasePro software.

AOL earned its warrants under a marketing deal that included distributing PurchasePro software. The warrants, similar to stock options, gave AOL the right to buy shares in PurchasePro for a penny each, according to internal company documents. AOL calculated the value of the warrants and booked it as $ 20.5 million in advertising and commerce revenue in its December 2000 quarter and another $ 7 million in the March 2001 period.

The $ 28 million in PurchasePro deals represented just a fraction of AOL's overall revenue. But the partnership illustrates how AOL did business at the peak of the Internet bubble, using its corporate leverage to generate advertising and commerce revenue, a key growth engine, from a dot-com firm whose fortunes were tied to the online giant.

Unorthodox Partnership Produced Financial Gains; Deals Allowed AOL, PurchasePro.com to Boost Revenue The Washington Post July 19, 2002 Friday

Of AOL's many partners, PurchasePro was among the unlikeliest, led by a maverick who was inexperienced in the ways of technology.

Johnson is a barrel-chested former gym owner with a tuft of platinum-blond hair and a country-boy twang, by way of Lexington, Ky.

Before Johnson started PurchasePro in 1996, the 6-foot former point guard for the University of Cincinnati's basketball team said he didn't even know how to use e-mail.

His tech transformation began one day while he was working out at a gym in Las Vegas and he got to talking with casino impresario Steve Wynn.

Wynn's Mirage hotel and casino, a big operation, contracted out for many goods and services. Johnson reckoned the casino could set up a way to do its shopping on the Internet. He just needed a guy to figure out how to slap together the software to make it happen. The idea for PurchasePro.com was born.

The company soon was developing and marketing software for electronic-commerce transactions. Hotels, for example, could use the company's software to create a Web site to buy and sell bed linens and other goods and services. Hilton Hotels Corp., among others, became a customer.

It wasn't long before such online business-to-business transactions became the hot thing in 2000. AOL, always on the lookout for new opportunities, struck a deal with Johnson's start-up in March 2000.

AOL used PurchasePro's software to erect a small-business portal on AOL's Netscape site to which customers could subscribe for a monthly fee. AOL also earned a commission when it sold PurchasePro's software to other companies, which could create their own online marketplaces to buy and sell goods and services.

There was another way AOL made money: It earned $ 3 in performance warrants for each dollar of revenue it generated for PurchasePro under their marketing partnership. Under the agreement, the warrants gave AOL the right to buy shares in PurchasePro for $ 63 each. But with dot-com shares in decline, the two companies agreed to revise the deal in December 2000, according to a confidential AOL summary circulated to executives for their signatures.

As part of the revised arrangement, PurchasePro agreed to reduce the exercise price for each share of PurchasePro stock an AOL warrant could buy from $ 63 to a penny. AOL estimated it would earn $ 30 million in the quarter ended in December 2000 by exercising the warrants, according to internal company documents. AOL would buy PurchasePro stock for a penny per share and resell them at their market price.

The warrants were valuable to AOL because they were treated as ad and commerce revenue.

"$ 30MM [million] of revenue from performance warrants vesting in calendar Q4 [the December quarter] will be treated as advertising revenue," AOL stated in its executive summary of the deal.

For PurchasePro, a dot-com on the rise, the AOL partnership helped it to generate revenue and sell its software service.

Many cash-poor dot-coms paid for their online ads by giving AOL equity in their high-flying stock. Often such deals legitimized companies in the eyes of Wall Street because of AOL's status at the vanguard of the tech boom.

But the difference in this deal was that PurchasePro was not using its stock to buy ads to promote itself on AOL. Instead, AOL was earning warrants from selling PurchasePro software. The revenue was booked as commerce, which is reported in the same income line as advertising sales. AOL said it combines ad and commerce revenue because many of its deals are multifaceted and do not fall neatly in either of those categories.

Unorthodox Partnership Produced Financial Gains; Deals Allowed AOL, PurchasePro.com to Boost Revenue The
Washington Post July 19, 2002 Friday

In return for restructuring the agreement, which included reducing the warrants' exercise price, AOL agreed to give PurchasePro $ 10 million in revenue, according to AOL's internal documents.

PurchasePro got its $ 10 million this way: AOL paid it $ 4.9 million to cover the cost of giving 100,000 AOL customers a free month's subscription -- at $ 49 per user -- to PurchasePro's marketplace service, which was co-branded with AOL's Netscape portal. AOL also agreed to buy $ 4.6 million worth of PurchasePro's software, which AOL would distribute to some of its business partners. AOL would come up with another $ 500,000 by selling ad space on PurchasePro's online marketplace.

The bottom line: AOL essentially paid $ 9.5 million for $ 30 million in warrants, netting $ 20.5 million.

The deal helped AOL boost its income from ad and commerce. Though the category includes the two revenue streams, most Wall Street analysts generally regard the total as an indicator of how AOL's ad business is doing. Such assumptions could be misleading, said Johnson, the former PurchasePro chief executive.

"The warrants had nothing to do with ad revenue," Johnson said. "They were directly related to selling our marketplace software to our customers, suppliers and partners."

AOL declined to make available any officials for comment on the record. Thomas D. Yannucci, an attorney hired by AOL to answer The Post's questions, stated in a letter that the $ 28 million in revenue associated with the PurchasePro warrants "is de minimis when viewed against AOL's advertising and commerce revenues of $ 1.4 billion for the same period and AOL's total revenues of $ 4 billion." He said AOL had disclosed in its financial statements that it sometimes accepts various forms of equity, including warrants, as compensation for advertising and e-commerce services.

In addition, AOL's outside auditor, Ernst & Young LLP, reviewed the transaction and confirmed that AOL's accounting was in accordance with generally accepted accounting principles, Yannucci wrote.

Yannucci said the warrant revenue had been properly recognized in the ad and commerce category.

Under accounting standards, the proper treatment of the transaction depends on the details of the December restructuring that lowered the exercise price of AOL's warrants to a penny. If PurchasePro was setting a price for AOL warrants for future sales of software, the booking may have been correct.

But some accounting experts said that if PurchasePro were simply repricing AOL's existing warrants, the situation would be different. It may have been more appropriate for AOL to book that gain as "an equity investment or a completely independent investment transaction," said Bala G. Dharan, an accounting professor at Rice University.

Doug Carmichael, a professor of accounting and director of the Center for Integrity in Financial Reporting at the City University of New York's Baruch College, said, "Warrants would be an investment, whether they vested or not. If you recognize the gain on repricing, then that's an investment gain."

Yannucci said in a letter, "The change in the value of these warrants resulted from a transaction between the parties structured to increase the incentive to AOL to perform future services. In this instance, the warrants did not vest and were not owned by AOL until it had performed its obligations under the agreement."

AOL did not provide further details about the repricing.

As the months went by, AOL and PurchasePro found other ways to provide each other with quick infusions of revenue, often near the end of a quarter.

Under one small deal, PurchasePro would receive $ 1.8 million worth of advertising on the AOL service, according to an internal company document dated March 21, 2001. In return, AOL would receive $ 1.8 million worth of

Unorthodox Partnership Produced Financial Gains; Deals Allowed AOL, PurchasePro.com to Boost Revenue The Washington Post July 19, 2002 Friday

promotions that mentioned its Netscape brand when PurchasePro ran television ads on CNN and Headline News, which were now part of the merged company, AOL Time Warner Inc.

PurchasePro got little value from the ads it ran on the AOL service, according to sources and internal AOL documents that lay out where PurchasePro's ads would run.

The "carriage plan" showed that many of the PurchasePro ads would run on AOL's ICQ instant-messaging service. Instant messages allow users to converse by text in real time over the Internet. The ICQ service targets a largely teenage and international audience who would have little use for PurchasePro's business-to-business software. The ads appearing on ICQ's application also had "almost no click through," an AOL source said, meaning that few users actually clicked on the ads to find out more about the product being touted.

PurchasePro's ads also were to run on Winamp, AOL's music software player, another service that did not target PurchasePro's business clientele. A source familiar with PurchasePro's thinking said the company did not care where the ads ran. Each side was more interested in boosting its ad revenue, sources for both companies said.

Eventually, the partnership between AOL and PurchasePro fell apart. In May 2001, Johnson stepped down as PurchasePro's CEO after the company badly missed its financial targets. In November 2001, Arthur Andersen LLP resigned as PurchasePro's independent auditor after noting what it considered deficiencies in the design and operation of PurchasePro's internal controls.

About a month after Johnson left PurchasePro, Eric Keller, an AOL senior vice president, was placed on administrative leave, pending an internal investigation of the company's relationship with PurchasePro, sources said. AOL has not publicly disclosed the internal inquiry, Keller's status or his subsequent departure. Keller declined to comment.

AOL stopped reselling PurchasePro software in the first half of 2001, according to PurchasePro officials. AOL ceased using PurchasePro's technology as the backbone of AOL's small-business portal around this February, PurchasePro said.

Chris Benyo, PurchasePro's senior vice president, said the company now has a new management team, and a different approach to marketing its products.

"Some weird [expletive] happened, but it was a valid business approach," Benyo said. "The strategy was valid, the partner was valid. The question is whether the execution was what we would have hoped it would've been."

**LOAD-DATE:** July 19, 2002

# EXHIBIT 15
# TO TOPETZES DECLARATION



# TIME WARNER INC. (TWX)

ONE TIME WARNER CENTER
NEW YORK, NY 10019
212. 484.8000
http://www.timewarner.com

## 10–Q

**AOL TIME WARNER INC.**
**Filed on 08/14/2002 – Period: 06/30/2002**
File Number 001–15062



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

# SECURITIES AND EXCHANGE COMMISSION

### Washington, D. C. 20549

## FORM 10–Q

[X]  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT of 1934 for the quarterly period ended June 30, 2002**

**OR**

[ ]  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT of 1934 for the transition period from _____ to _____**

**1–15062**
Commission file number

# AOL TIME WARNER INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware**<br>(State or other jurisdiction of<br>incorporation or organization) | **13–4099534**<br>(I.R.S. Employer<br>Identification Number) |

**75 Rockefeller Plaza**
**New York, New York 10019**
**(212) 484–8000**
(Address, including zip code, and telephone number, including
area code, of registrant's principal executive offices)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes [x] No [ ]

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| Description of Class | Shares Outstanding<br>as of July 31, 2002 |
|---|---|
| Common Stock – $.01 par value | 4,292,109,290 |
| Series LMCN–V Common Stock – $.01 par value | 171,185,826 |

**AOL TIME WARNER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Unaudited)**

|  | June 30, 2002 Historical | December 31, 2001 Historical |
|---|---|---|
|  | (millions) | |
| **Assets** | | |
| AOL | $    40,372 | $    34,072 |
| Cable | 48,491 | 71,269 |
| Filmed Entertainment | 15,885 | 20,646 |
| Networks | 31,688 | 44,580 |
| Music | 7,337 | 12,399 |
| Publishing | 14,103 | 23,374 |
| Corporate | 2,232 | 2,219 |
| Total assets | $    160,108 | $    208,559 |

**12.    COMMITMENTS AND CONTINGENCIES**

**Securities Matters**

As of August 13, 2002, twenty class action lawsuits have been filed, naming as defendants the Company, certain current and former executives of the Company and, in three instances, America Online. Seventeen of these were filed in the United States District Court for the Southern District of New York, two were filed in the United States District Court for the Eastern District of Virginia and one in the United States District Court for the Eastern District of Texas (the "AOL Time Warner Shareholder Litigation"). The complaints purport to be made on behalf of certain shareholders of the Company and allege that the Company made material misrepresentations and/or omissions of material fact in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b–5 promulgated thereunder, and Section 20(a) of the Exchange Act. Plaintiffs claim that the Company failed to disclose America Online's declining advertising revenues and that the Company and America Online inappropriately inflated advertising revenues in a series of transactions. Certain of the lawsuits also allege that certain of the individual defendants and other insiders at the Company improperly sold their personal holdings of AOL Time Warner stock. Three of the lawsuits, in addition to the above allegations, allege that the Company failed to disclose that the Merger was not generating the synergies anticipated at the time of the announcement of the Merger and, further, that the Company inappropriately delayed writing down more than $50 billion of goodwill. The lawsuits seek an unspecified amount in compensatory damages. The Company intends to defend against the lawsuits vigorously. The Company is unable to predict the outcome of the cases or reasonably estimate a range of possible loss.

On July 23, 2002, *Pfeiffer v. Case et al.*, a shareholder derivative action, was filed in New York State Supreme Court for the County of New York, and on August 7, 2002, *Hall v. Case et al.*, also a shareholder derivative action, was filed in the United States District Court for the Southern District of New York. Both suits name the directors and certain officers of the Company as defendants, as well as the Company as a nominal defendant. The complaints allege that defendants breached their fiduciary duties by causing the Company to issue corporate statements that did not accurately disclose that America Online had declining advertising revenues, that the Merger was not generating the synergies anticipated at the time of the announcement of the Merger, and that the Company inappropriately delayed writing down more than $50 billion of goodwill, thereby exposing the Company to potential liability for alleged violations of federal securities laws. The lawsuits further allege that certain of the defendants improperly sold their personal holdings of AOL Time Warner securities. The lawsuits request that all proceeds from any improper sales of AOL Time Warner common stock and any improper salaries or payments be returned to the Company. The Company intends to defend against the lawsuits vigorously. The Company is unable to predict the outcome of the cases or reasonably estimate a range of possible loss.

50

**AOL TIME WARNER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Unaudited)**

In addition, the Securities and Exchange Commission and the Department of Justice are investigating the financial reporting and disclosure practices of the Company. The Company is cooperating in the investigations. The Company cannot predict the outcome of the investigations at this time.

During the week beginning August 5, 2002, the Company learned of information regarding three transactions involving its AOL division that, upon further review, may result in the Company concluding that the consideration received was recognized inappropriately as advertising and commerce revenues. The aggregate advertising and commerce revenues recognized in connection with these transactions were $12.7 million, $5.3 million, $5.3 million, $5.3 million, $11.8 million and $8.5 million, respectively, over the six quarters ending March 31, 2002, with corresponding expenses of approximately $1.25 million recorded in each of the respective quarters. The Company is continuing its review of these and other advertising transactions at the AOL division. When the Company has completed this review, it will determine whether its accounting for these transactions was inappropriate and, if so, what action, if any, is appropriate with respect to its reported financial results.

The Company cannot predict at this time what action will be determined to be appropriate in response to all of the foregoing, although one possible outcome is a restatement of prior periods' results.

**Other Matters**

On January 22, 2002, Netscape, a wholly-owned subsidiary of America Online, sued Microsoft Corporation ("Microsoft") in the United States District Court for the District of Columbia for antitrust violations under Sections 1 and 2 of the Sherman Act, as well as for other common law violations. Among other things, the complaint alleges that Microsoft's actions to maintain its monopoly in the market for Intel-compatible personal computer operating systems worldwide injured Netscape, consumers and competition in violation of Section 2 of the Sherman Act and continues to do so. The complaint also alleges that Microsoft's actions constitute illegal monopolization and attempted monopolization of a worldwide market for Web browsers and that Microsoft has engaged in illegal practices by tying its Web browser, Internet Explorer, to Microsoft's operating system in various ways. The complaint seeks damages for the injuries inflicted upon Netscape, including treble damages and attorneys' fees, as well as injunctive relief to remedy the anti-competitive behavior alleged. On March 29, 2002, Microsoft filed its answer to the complaint denying all claims and allegations. On June 17, 2002, the Judicial Panel on Multi-District Litigation transferred the case to the United States District Court for the District of Maryland for all pretrial proceedings. Due to the preliminary status of the matter, it is not possible for the Company at this time to provide a view on its probable outcome or to provide a reasonable estimate as to the amount that might be recovered through this action.

America Online has been named as defendant in several putative class action lawsuits brought by consumers and Internet service providers ("ISP"), alleging certain injuries to have been caused by installation of AOL versions 5.0 and 6.0 software. Subject to the final approval of the court, the parties have entered into settlement agreements covering the consumer and ISP AOL version 5.0 installation claims on terms that are not material to the Company's financial condition or results of operations. The claims related to AOL version 6.0 remain pending. The remaining cases are in preliminary stages, but the Company believes that they are without merit and intends to defend them vigorously. The Company is unable, however, to predict the outcome of these cases, or reasonably estimate a range of possible loss given their current status.

The Department of Labor has closed its investigation into the applicability of the Fair Labor Standards Act ("FLSA") to America Online's Community Leader program without taking any action against the Company. However, putative classes of former and current Community Leader volunteers have brought lawsuits in several states against America Online alleging violations of the FLSA and comparable state statutes on the basis that they were acting as employees rather than volunteers in serving as Community Leaders and are entitled to wages. An additional putative class action lawsuit has been filed against the Company, America Online and AOL Community, Inc. alleging violations of the Employee Retirement Income Security Act ("ERISA") on the basis that the plaintiffs were acting as employees rather than volunteers and are entitled to pension, welfare or other employee benefits under ERISA. Although the Company does not believe that these lawsuits regarding Community Leader volunteers have any merit and intends to defend against them vigorously, the Company is unable to predict the outcome of the cases, or reasonably estimate a range of possible loss due to the preliminary nature of the matters.

In *Six Flags Over Georgia LLC et al. v. Time Warner Entertainment Company et al.*, following a trial in December 1998, the jury returned a verdict for plaintiffs and against defendants, including TWE, on plaintiffs' claims for breaches of fiduciary duty. The jury awarded plaintiffs approximately $197 million in compensatory damages and $257 million in punitive damages, and interest began accruing on those amounts at the Georgia annual statutory rate of twelve percent. The Company paid the compensatory damages with accrued interest during the first quarter of 2001. Payment of

51

**AOL TIME WARNER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**
**(Unaudited)**

the punitive damages portion of the award with accrued interest was stayed by the United States Supreme Court on March 1, 2001 pending the disposition of a certiorari petition with that Court, which was filed by TWE on June 15, 2001. On October 1, 2001, the United States Supreme Court granted TWE's petition, vacated the decision by the Georgia Court of Appeals affirming the punitive damages award, and remanded the matter to the Georgia Court of Appeals for further consideration. The Georgia Court of Appeals affirmed and reinstated its earlier decision regarding the punitive damage award on March 29, 2002. On April 18, 2002, the defendants filed a petition for certiorari to the Georgia Supreme Court seeking review of the decision of the Georgia Court of Appeals and a decision on whether the court will hear the appeal is expected later in 2002.

On April 8, 2002, three former employees of certain subsidiaries of the Company filed *Henry Spann et al. v. AOL Time Warner Inc. et al.*, a purported class action, in the United States District Court for the Central District of California. Plaintiffs have named as defendants, among others, the Company, Time Warner Entertainment Company, L.P., Warner–Elektra–Atlantic Corporation, WEA Manufacturing Inc., Warner Bros. Records Inc., Atlantic Recording Corporation, various pension plans sponsored by the companies and the administrative committees of those plans. Plaintiffs allege that defendants miscalculated the proper amount of pension benefits owed to them and other class members as required under the plans in violation of ERISA. The Company believes the lawsuit has no merit and intends to defend against it vigorously. Due to its preliminary status, the Company is unable to predict the outcome of the case or reasonably estimate a range of possible loss.

The Company is subject to a number of state and federal class action lawsuits, as well as an action brought by a number of state Attorneys General alleging unlawful horizontal and vertical agreements to fix the prices of compact discs by the major record companies. Although the Company cannot predict the outcomes, the Company does not expect that the ultimate outcomes of these cases will have a material adverse impact on the Company's consolidated financial statements or results of operations.

The costs and other effects of pending or future litigation, governmental investigations, legal and administrative cases and proceedings (whether civil or criminal), settlements, judgments and investigations, claims and changes in those matters (including those matters described above), and developments or assertions by or against the Company relating to intellectual property rights and intellectual property licenses, could have a material adverse effect on the Company's business, financial condition and operating results.

52

## Part II. Other Information

**Item 1. Legal Proceedings.**

**Securities Matters**

As of August 13, 2002, twenty class action lawsuits have been filed, naming as defendants the Company, certain current and former executives of the Company and, in three instances, America Online. Seventeen of these were filed in the United States District Court for the Southern District of New York, three were filed in the United States District Court for the Eastern District of Virginia and one in the United States District Court for the Eastern District of Texas (the "AOL Time Warner Shareholder Litigation"). The complaints purport to be made on behalf of certain shareholders of the Company and allege that the Company made material misrepresentations and/or omissions of material fact in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b–5 promulgated thereunder, and Section 20(a) of the Exchange Act. Plaintiffs claim that the Company failed to disclose America Online's declining advertising revenues and that the Company and America Online inappropriately inflated advertising revenues in a series of transactions. Certain of the lawsuits also allege that certain of the individual defendants and other insiders at the Company improperly sold their personal holdings of AOL Time Warner stock. Three of the lawsuits, in addition to the above allegations, allege that the Company failed to disclose that the Merger was not generating the synergies anticipated at the time of the announcement of the Merger and, further, that the Company inappropriately delayed writing down more than $50 billion of goodwill. The lawsuits seek an unspecified amount in compensatory damages. The Company intends to defend against the lawsuits vigorously. The Company is unable to predict the outcome of the cases or reasonably estimate a range of possible loss.

On July 23, 2002, *Pfeiffer v. Case et al.* , a shareholder derivative action, was filed in New York State Supreme Court for the County of New York, and on August 7, 2002, *Hall v. Case et al.*, also a shareholder derivative action, was filed in the United States District Court for the Southern District of New York. Both suits name the directors and certain officers of the Company as defendants, as well as the Company as a nominal defendant. The complaints allege that defendants breached their fiduciary duties by causing the Company to issue corporate statements that did not accurately represent America Online had declining advertising revenues, that the Merger was not generating the synergies anticipated at the time of the announcement of the Merger, and that the Company inappropriately delayed writing down more than $50 billion of goodwill, thereby exposing the Company to potential liability for alleged violations of federal securities laws. The lawsuits further allege that certain of the defendants improperly sold their personal holdings of AOL Time Warner securities. The lawsuits request that all proceeds from any improper sales of AOL Time Warner common stock and any improper salaries or payments be returned to the Company. The Company intends to defend against the lawsuits vigorously. The Company is unable to predict the outcome of the case or reasonably estimate a range of possible loss.

In addition, the Securities and Exchange Commission and the Department of Justice are investigating the financial reporting and disclosure practices of the Company. The Company is cooperating in the investigations. The Company cannot predict the outcome of the investigations at this time.

During the week beginning August 5, 2002, the Company learned of information regarding three transactions involving its AOL division that, upon further review, may result in the Company concluding that the consideration received was recognized inappropriately as advertising and commerce revenues. The aggregate advertising and commerce revenues recognized in connection with these transactions were $12.7 million, $5.3 million, $5.3 million, $5.3 million, $11.8 million and $8.5 million, respectively, over the six quarters ending March 31, 2002, with corresponding expenses of approximately $1.25 million recorded in each of the respective quarters. The Company is continuing its review of these and other advertising transactions at the AOL division. When the Company has completed this review, it will determine whether its accounting for these transactions was inappropriate and, if so, what action, if any, is appropriate with respect to its reported financial results.

The Company cannot predict at this time what action will be determined to be appropriate in response to all of the foregoing, although one possible outcome is a restatement of prior periods' results.

**Other Matters**

Reference is made to *Netscape Communications Corporation v. Microsoft Corporation* described on page 37 of the Company's Annual Report on Form 10–K for the year ended December 31, 2001 (the "2001 Form 10–K"). On June 17, 2002, the Judicial Panel on Multi–District Litigation transferred the case to the United States District Court for the District of Maryland for all pretrial proceedings.

Reference is made to the class action lawsuits concerning AOL versions 5.0 and 6.0 software described on page 37 of the 2001 Form 10–K. The parties in the 5.0 software matter have entered into a settlement that is not material to the Company's financial condition or results of operations to resolve the ISP claims related to 5.0 installations. The settlement is subject to the final approval of the court.

# EXHIBIT 16
# TO TOPETZES DECLARATION



# TIME WARNER INC. (TWX)

ONE TIME WARNER CENTER
NEW YORK, NY 10019
212. 484.8000
http://www.timewarner.com

# 8-K

**AOL TIME WARNER**
**Filed on 10/23/2002 – Period: 10/23/2002**
File Number 001–15062



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, D.C. 20549

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the

Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): October 23, 2002

AOL TIME WARNER INC.
(Exact name of registrant as specified in its charter)

| Delaware | 001-15062 | 13-4099534 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

75 Rockefeller Plaza, New York, New York  10019
--------------------------------------------------
(Address of principal executive offices)  (zip code)

212 484-8000
------------
(Registrant's telephone number, including area code)

Not Applicable
--------------
(Former name or former address, if changed since last report)

Item 5.  Other Events

As a result of the restatement announced on October 23, 2002 by AOL Time Warner Inc. (the "Company"), the Company's financial statements for the affected periods should no longer be relied upon, including the audited financial statements for 2000 and 2001 contained in the Company's annual report on Form 10-K for the year ended December 31, 2001.

Item 9.  Regulation FD Disclosure.

On October 23, 2002, AOL Time Warner Inc. (the "Company") announced that, as a result of its previously reported review of certain advertising and commerce transactions at the America Online division, under the direction of the Company's Chief Financial Officer, the financial results for each of the quarters ended September 30, 2000 through June 30, 2002 will be restated. The total impact of the adjustments will be to reduce the Company's consolidated advertising and commerce revenues by $190 million over these eight quarterly periods, with a corresponding reduction in EBITDA for that same time period of $97 million. In addition, the total impact of these adjustments is to the Company's consolidated operating income and net income by $83 million and $46 million, respectively. For the America Online division, the impact of the adjustments will be to reduce advertising and commerce revenues by $168 million over these eight quarterly periods, with a corresponding reduction in EBITDA for that same time period of $97 million. The remaining $22 million represents a reduction in revenues from certain transactions related to the America Online Division in which the advertising was delivered by other AOL Time Warner divisions.

The adjustments represent approximately 1% of the America Online segment's total revenues for that same two-year period, approximately 3.4% of its advertising and commerce revenues, and approximately 1.6% of its EBITDA. The largest impact of the adjustments is in the quarter ended September 30, 2000, for which advertising and commerce revenues will be reduced by $66 million and EBITDA will be reduced by $30 million. It is expected that the restated financial statements for the affected periods will be filed with the Securities and Exchange Commission in the fourth quarter.

The Company has furnished to the SEC as an exhibit to this Report schedules setting forth the impact of the adjustments to be reflected in the restated financial statements the Company intends to file. The information contained in this Current Report on Form 8-K, including the exhibit, has not been audited by the Company's outside auditors.

The information contained in Item 9 of this Current Report on Form 8-K, including the exhibit, shall not be deemed to be incorporated by reference into the Company's filings with the SEC under the Securities Act of 1933.

Exhibits.

The following exhibit is furnished as part of this Report:

| Exhibit | Description |
| ------- | ----------- |
| 99.1 | Unaudited Impact of Restatements (for the years ended December 31, 2000 and 2001, and the six months ended June 30, 2002); and Unaudited Restated Historical Consolidated Statements of Operations (for the years ended December 31, 2000 and 2001, and the six months ended June 30, 2002) |

AOL TIME WARNER INC.

SIGNATURE


        Pursuant to the requirements of the Securities Exchange Act of 1934,
the registrant has duly caused this report to be signed on its behalf by the
undersigned hereunto duly authorized.

                         AOL TIME WARNER INC.
                              (Registrant)



                         By:  /s/ Wayne H. Pace
                              ----------------------------------------
                         Name:   Wayne H. Pace
                         Title:  Executive Vice President and
                                 Chief Financial Officer




Dated:     October 23, 2002

```
                          EXHIBIT INDEX
              Pursuant to Item 601 of Regulations S-K


Exhibit              Description
-------              -----------


99.1                 Unaudited Impact of Restatements (for the years ended
                     December 31, 2000 and 2001, and the six months ended
                     June 30, 2002); and Unaudited Restated Historical consolidated
                     Statements of Operations (for the year ended December 31, 2000
                     and 2001, and the six months ended June 30, 2002)
```

Impact of Restatement on Consolidated Statements of Operations

The following schedules reflect the unaudited impact resulting from AOL Time Warner Inc.'s ("AOL Time Warner") internal review of certain advertising and commerce transactions at its AOL segment on certain significant financial metrics for each of the affected periods of the restatement. Specifically, the impact of the restatement on certain significant financial metrics related to the historical results of the AOL segment and AOL Time Warner (for 2000, the impact on America Online, Inc., predecessor to AOL Time Warner) have been reflected. Although there was no impact from the restatement on the first two quarters of 2000, such quarterly information has been included in the schedules in order to provide a more complete depiction of the impact of the restatement on the year ended December 31, 2000. In addition to the restatement impact schedules, unaudited AOL Time Warner historical statements of operations for the affected periods, reflecting the impact of the restatement, are presented.

The schedules also reflect the impact of the restatement on certain significant financial metrics related to the AOL Time Warner Pro Forma results for the year ended December 31, 2001, that had been included in the trending schedules previously posted on AOL Time Warner Inc.'s web site. The pro forma amounts prior to the restatement took into account the following:

o     New Accounting Standard for Goodwill and Other Intangible Assets. During 2001, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards No. 142 "Goodwill and Other Intangible Assets" ("FAS 142"), which requires that, effective January 1, 2002, goodwill, including the goodwill included in the carrying value of investments accounted for using the equity method of accounting, and certain other intangible assets deemed to have an indefinite useful life, cease amortizing. FAS 142 does not require retroactive restatement for all periods presented, however, the accompanying pro forma information for 2000 and 2001 assumes that FAS 142 was in effect beginning January 1, 2000.

o     Consolidation of AOL Europe, S.A. ("AOL Europe"). On January 31, 2002, AOL Time Warner acquired 80% of Bertelsmann AG's ("Bertelsmann") 49.5% interest in AOL Europe for $5.3 billion in cash and on July 1, 2002 acquired the remaining 20% of Bertelsmann's interest for $1.45 billion in cash. As a result of the purchase of Bertelsmann's interest in AOL Europe, AOL Time Warner has a majority interest in and began consolidating AOL Europe, retroactive to the beginning of 2002. The pro forma information for 2000 and 2001 assumes the interests in AOL Europe were acquired on January 1, 2000.

o     Consolidation of IPC Group Limited ("IPC"). In October 2001, AOL Time Warner's Publishing segment acquired IPC, the parent company of IPC Media, from Cinven, one of Europe's leading private equity firms, for approximately $1.6 billion. The pro forma information for 2000 and 2001 assumes that IPC was acquired on January 1, 2000.

o     Restructuring of Time Warner Entertainment-Advance/Newhouse Partnership ("TWE-A/N"). AOL Time Warner and the Advance/Newhouse Partnership ("Advance/Newhouse") agreed to restructure TWE-A/N whereby Advance/Newhouse assumed management responsibilities for certain cable systems of TWE-A/N (the "Advance/Newhouse Systems") to the extent permitted under applicable governmental regulations, beginning August 1, 2002 (the "TWE-A/N Restructuring"). The TWE-A/N Restructuring is anticipated to be completed by the end of 2002, upon receipt of certain regulatory approvals. As required under generally accepted accounting principles, AOL Time Warner has deconsolidated the results of the Advance/Newhouse Systems and has classified the results of those systems, net of the portion of TWE-A/N's results historically attributable to Advance/Newhouse, as minority partners in TWE-A/N, and net of tax, as discontinued operations for all periods presented. The pro forma information for 2000 and 2001 assumes that the deconsolidation of the Advance/Newhouse Systems occurred on January 1, 2000.

o     Consolidation of Road Runner. In August 2002, AOL Time Warner's Cable segment acquired Advance/Newhouse's 17% indirect ownership in Road Runner, increasing AOL Time Warner fully attributed ownership to approximately 82%. As a result of the termination of Advance/Newhouse's minority rights in Road Runner, AOL Time Warner has consolidated the financial position and results of operations of Road Runner with the financial position and results of operations of AOL Time Warner's Cable segment. As permitted under generally accepted accounting principles, AOL Time Warner has consolidated the results of Road Runner retroactive to the beginning of 2002. The pro forma information for 2000 and 2001 assumes that Road Runner was consolidated as of January 1, 2000.

o   Reimbursement of "Out-of-Pocket" Expenses. In November 2001, the FASB Staff issued as interpretive guidance Emerging Issues Task Force ("EITF") Topic No. D-103, "Income Statement Characterization of Reimbursements Received for 'Out-of-Pocket' Expenses Incurred" ("Topic D-103"). Topic D-103 requires that reimbursements received for out-of-pocket expenses be classified as revenue on the income statement. This change in revenue classification impacts AOL Time Warner's Cable and Music segments.

o   Emerging Issues Task Force Issue No. 01-09. In April 2001, the FASB's EITF reached a final consensus on EITF Issue No. 00-25, "Vendor Income Statement Characterization of Consideration Paid to a Reseller of the Vendor's Products," which was later codified along with other similar issues, into EITF 01-09, "Accounting for Consideration Given by a Vendor to a Customer or a Reseller of the Vendor's Products" ("EITF 01-09"). EITF 01-09 clarifies the income statement classification of costs incurred by a vendor in connection with the reseller's purchase or promotion of the vendor's products, resulting in certain cooperative advertising and product placement costs previously classified as selling expenses to be reflected as a reduction of revenues earned from that activity. The new guidance impacts AOL Time Warner's AOL, Music and Publishing segments.

The attached historical information through December 31, 2001 reflects the information reported in the AOL Time Warner's filings with the SEC and therefore does not include the impact of Topic D-103 and EITF 01-09 which were required to be retroactively adopted for all periods presented beginning in the first quarter of 2002. The historical information for all periods presented in the attached schedules does not reflect the impact of the deconsolidation of the Advance/Newhouse Systems pursuant to the TWE-A/N Restructuring that was announced in June 2002 and will be reflected as a discontinued operation beginning in the third quarter of 2002.



# TIME WARNER INC. (TWX)

ONE TIME WARNER CENTER
NEW YORK, NY 10019
212. 484.8000
http://www.timewarner.com

# EX–99

**EXHIBIT 99.1**
**8–K Filed on 10/23/2002 – Period: 10/23/2002**
File Number 001–15062



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

AOL TIME WARNER INC.
Impact of Restatements
(Unaudited)

| | For the Three Months Ended | | | | Year Ended |
|---|---|---|---|---|---|
| | 3/31/00 | 6/30/00 | 9/30/00 | 12/31/00 | 12/31/00 |
| | (millions, except per share amounts) | | | | |
| **America Online Inc. (predecessor to AOL Time Warner Inc.)** | | | | | |
| Revenues | $1,814 | $1,885 | $1,945 | $2,059 | $7,703 |
| Restatement | - | - | (66) | (22) | (88) |
| Restated Revenues | $1,814 | $1,885 | $1,879 | $2,037 | $7,615 |
| Advertising & Commerce Revenues | $528 | $561 | $594 | $686 | $2,369 |
| Restatement | - | - | (66) | (22) | (88) |
| Restated Advertising & Commerce Revenues | $528 | $561 | $528 | $664 | $2,281 |
| EBITDA | $484 | $554 | $592 | $631 | $2,261 |
| Restatement | - | - | (30) | (22) | (52) |
| Restated EBITDA | $484 | $554 | $562 | $609 | $2,209 |
| Operating Income | $376 | $456 | $482 | $503 | $1,817 |
| Restatement | - | - | (30) | (21) | (51) |
| Restated Operating Income | $376 | $456 | $452 | $482 | $1,766 |
| Net Income | $433 | $338 | $344 | $37 | $1,152 |
| Restatement | - | - | (18) | (13) | (31) |
| Restated Net Income | $433 | $338 | $326 | $24 | $1,121 |
| Diluted Income per Common Share | $ 0.17 | $ 0.13 | $ 0.13 | $ 0.01 | $ 0.45 |
| Restatement | - | - | - | - | (0.02) |
| Restated Diluted Income per Common Share | $ 0.17 | $ 0.13 | $ 0.13 | $ 0.01 | $ 0.43 |
| **AOL Time Warner (Pro Forma)** | | | | | |
| Revenues | $8,426 | $9,026 | $8,896 | $10,377 | $36,725 |
| Restatement | - | - | (66) | (22) | (88) |
| Restated Revenues | $8,426 | $9,026 | $8,830 | $10,355 | $36,637 |
| Advertising & Commerce Revenues | $1,899 | $2,299 | $2,074 | $2,634 | $8,906 |
| Restatement | - | - | (66) | (22) | (88) |
| Restated Advertising & Commerce Revenues | $1,899 | $2,299 | $2,008 | $2,612 | $8,818 |
| EBITDA | $1,581 | $1,893 | $1,821 | $2,051 | $7,346 |
| Restatement | - | - | (30) | (22) | (52) |
| Restated EBITDA | $1,581 | $1,893 | $1,791 | $2,029 | $7,294 |
| Operating Income | $1,087 | $1,403 | $1,310 | $1,493 | $5,293 |
| Restatement | - | - | (30) | (21) | (51) |
| Restated Operating Income | $1,087 | $1,403 | $1,280 | $1,472 | $5,242 |
| Net Income (Loss) | $ (40) | $ 493 | $ 516 | $ 234 | $1,203 |
| Restatement | - | - | (18) | (13) | (31) |
| Restated Net Income (Loss) | $ (40) | $ 493 | $ 498 | $ 221 | $1,172 |
| Diluted Income (Loss) per Common Share | $(0.01) | $ 0.11 | $ 0.12 | $ 0.05 | $ 0.28 |
| Restatement | - | - | (0.01) | - | (0.01) |
| Restated Diluted Income (Loss) per Common Share | $(0.01) | $ 0.11 | $ 0.11 | $ 0.05 | $ 0.27 |

AOL TIME WARNER INC.
Impact of Restatements
(Unaudited)

| | For the Three Months Ended | | | | Year Ended |
| | 3/31/01 | 6/30/01 | 9/30/01 | 12/31/01 | 12/31/01 |
|---|---|---|---|---|---|
| | (millions, except per share amounts) | | | | |
| **AOL Segment (Historical)** | | | | | |
| Revenues | $2,125 | $2,138 | $2,196 | $2,259 | $8,718 |
| Restatement(1) | (13) | (28) | (16) | (17) | (74) |
| Restated Revenues | $2,112 | $2,110 | $2,180 | $2,242 | $8,644 |
| Advertising & Commerce Revenues | $721 | $706 | $624 | $637 | $2,688 |
| Restatement | (13) | (28) | (16) | (17) | (74) |
| Restated Advertising & Commerce Revenues | $708 | $678 | $608 | $620 | $2,614 |
| EBITDA | $684 | $801 | $742 | $718 | $2,945 |
| Restatement(1) | (1) | (7) | (6) | (17) | (31) |
| Restated EBITDA | $683 | $794 | $736 | $701 | $2,914 |
| Operating Income | $548 | $669 | $602 | $554 | $2,373 |
| Restatement | | (5) | (2) | (15) | (22) |
| Restated Operating Income | $548 | $664 | $600 | $539 | $2,351 |
| **AOL Time Warner (Historical)** | | | | | |
| Revenues | $9,080 | $9,201 | $9,320 | $10,632 | $38,234 |
| Restatement(1) | (14) | (42) | (16) | (18) | (90) |
| Restated Revenues | $9,066 | $9,160 | $9,304 | $10,614 | $38,144 |
| Advertising & Commerce Revenues | $2,053 | $2,278 | $1,934 | $2,222 | $8,487 |
| Restatement | (14) | (42) | (16) | (18) | (90) |
| Restated Advertising & Commerce Revenues | $2,039 | $2,236 | $1,918 | $2,204 | $8,397 |
| EBITDA | $2,075 | $2,537 | $2,329 | $2,715 | $9,656 |
| Restatement(1) | (1) | (7) | (6) | (17) | (31) |
| Restated EBITDA | $2,074 | $2,530 | $2,323 | $2,698 | $9,625 |
| Operating Income (Loss) | $ (147) | $ 276 | $ 29 | $ 295 | $ 453 |
| Restatement(2) | | (5) | (2) | (15) | (22) |
| Restated Operating Income (Loss) | $ (147) | $ 271 | $ 27 | $ 280 | $ 431 |
| Net Loss | $(1,369) | $ (734) | $ (996) | $(1,822) | $(4,921) |
| Restatement | | (3) | (1) | (9) | (13) |
| Restated Net Loss | $(1,369) | $ (737) | $ (997) | $(1,831) | $(4,934) |
| Diluted Loss per Common Share | $(0.31) | $(0.17) | $(0.22) | $(0.41) | $ (1.11) |
| Restatement | | | | | |
| Restated Diluted Loss per Common Share | $(0.31) | $(0.17) | $(0.22) | $(0.41) | $ (1.11) |
| **AOL Time Warner (Pro Forma)** | | | | | |
| Revenues | $9,186 | $9,349 | $9,433 | $10,624 | $38,592 |
| Restatement | (14) | (42) | (16) | (18) | (90) |
| Restated Revenues | $9,172 | $9,307 | $9,417 | $10,606 | $38,502 |
| Advertising & Commerce Revenues | $2,075 | $2,317 | $1,953 | $2,206 | $8,551 |
| Restatement | (14) | (42) | (16) | (18) | (90) |
| Restated Advertising & Commerce Revenues | $2,061 | $2,275 | $1,937 | $2,188 | $8,461 |
| EBITDA | $1,730 | $2,234 | $2,059 | $2,335 | $8,358 |
| Restatement(2) | (1) | (7) | (6) | | (14) |
| Restated EBITDA | $1,729 | $2,227 | $2,053 | $2,335 | $8,344 |
| Operating Income | $1,137 | $1,612 | $1,438 | $1,639 | $5,826 |
| Restatement(2) | | (5) | (2) | 2 | (5) |
| Restated Operating Income | $1,137 | $1,607 | $1,436 | $1,646 | $5,821 |
| Net Income (Loss) | $ (51) | $ 596 | $ 396 | $ (466) | $ 475 |
| Restatement(2) | | (3) | (1) | | (3) |
| Restated Net Income (Loss) | $ (51) | $ 593 | $ 395 | $ (466) | $ 472 |
| Diluted Income (Loss) per Common Share | $(0.01) | $ 0.13 | $ 0.09 | $(0.11) | $ 0.10 |
| Restatement | | | | | |
| Restated Diluted Income (Loss) per Common Share | $(0.01) | $ 0.13 | $ 0.09 | $(0.11) | $ 0.10 |

(1) Difference between AOL Segment and AOL Time Warner restatement relates to certain transactions for which the advertising was delivered by other AOL Time Warner divisions.

(2) Difference in historical and pro forma restatement relates to the impact of AOL Europe, which was not consolidated into the historical results of AOL Time Warner until January 1, 2002.

AOL TIME WARNER INC.
Impact of Restatements
(Unaudited)

| | For the Three Months Ended | | For the Six Months Ended |
|---|---|---|---|
| | 3/31/02 | 6/30/02 | 6/30/02 |
| | (millions, except per share amounts) | | |
| **AOL Segment (Historical)** | | | |
| Revenues........................................... | $2,297 | $2,266 | $4,563 |
| Restatement(1)..................................... | (6) | – | (6) |
| Restated Revenues ................................. | $2,291 | $2,266 | $4,557 |
| | | | |
| Advertising & Commerce Revenues................... | $501 | $412 | $913 |
| Restatement(1)..................................... | (6) | – | (6) |
| Restated Advertising & Commerce Revenues......... | $495 | $412 | $907 |
| | | | |
| EBITDA............................................. | $433 | $473 | $906 |
| Restatement........................................ | (15) | 1 | (14) |
| Restated EBITDA.................................... | $418 | $474 | $892 |
| | | | |
| Operating Income.................................. | $262 | $271 | $533 |
| Restatement........................................ | (13) | 3 | (10) |
| Restated Operating Income......................... | $249 | $274 | $523 |
| | | | |
| **AOL Time Warner (Historical)** | | | |
| Revenues........................................... | $9,764 | $10,575 | $20,339 |
| Restatement(1)..................................... | (12) | – | (12) |
| Restated Revenues ................................. | $9,752 | $10,575 | $20,327 |
| | | | |
| Advertising & Commerce Revenues................... | $1,825 | $2,070 | $3,895 |
| Restatement(1)..................................... | (12) | – | (12) |
| Restated Advertising & Commerce Revenues......... | $1,813 | $2,070 | $3,883 |
| | | | |
| EBITDA............................................. | $1,943 | $2,463 | $4,406 |
| Restatement........................................ | (15) | 1 | (14) |
| Restated EBITDA.................................... | $1,928 | $2,464 | $4,392 |
| | | | |
| Operating Income.................................. | $1,209 | $1,662 | $2,871 |
| Restatement........................................ | (13) | 3 | (10) |
| Restated Operating Income......................... | $1,196 | $1,665 | $2,861 |
| | | | |
| Net Income (Loss)................................. | $(54,240) | $ 394 | $(53,846) |
| Restatement........................................ | (4) | 2 | (2) |
| Restated Net Income (Loss)........................ | $(54,244) | $ 396 | $(53,848) |
| | | | |
| Diluted Income (Loss) per Common Share........... | $(12.25) | $ 0.09 | $(12.12) |
| Restatement........................................ | – | – | – |
| Restated Diluted Income (Loss) per Common Share.. | $(12.25) | $ 0.09 | $(12.12) |

(1)  Difference between AOL Segment and AOL Time Warner restatement relates
     to certain transactions for which the advertising was delivered by other
     AOL Time Warner divisions.

AOL TIME WARNER INC.
HISTORICAL CONSOLIDATED STATEMENT OF OPERATIONS
(Unaudited)

|  | For the Three Months Ended | | | | Year Ended |
|  | 3/31/00 | 6/30/00 | 9/30/00 | 12/31/00 | 12/31/00 |
|---|---|---|---|---|---|
|  | (millions, except per share amounts) | | | | |
| **Revenues:** | | | | | |
| Subscriptions | $1,153 | $1,185 | $1,206 | $1,233 | $4,777 |
| Advertising and commerce | 528 | 561 | 528 | 664 | 2,281 |
| Content and other | 133 | 139 | 145 | 140 | 557 |
| Total revenues | 1,814 | 1,885 | 1,879 | 2,037 | 7,615 |
| Costs of revenues | (987) | (924) | (958) | (1,007) | (3,876) |
| Selling, general and administrative | (432) | (476) | (443) | (513) | (1,864) |
| Amortization of goodwill and other intangible assets | (19) | (19) | (26) | (35) | (99) |
| Merger and restructuring costs | - | (10) | - | - | (10) |
| Operating income | 376 | 456 | 452 | 482 | 1,766 |
| Interest income, net | 58 | 73 | 80 | 64 | 275 |
| Other income (expense), net | 280 | 7 | 9 | (504) | (208) |
| Minority interest income (expense) | (1) | 1 | - | - | - |
| Income before income taxes | 713 | 537 | 541 | 42 | 1,833 |
| Income tax provision | (280) | (199) | (215) | (18) | (712) |
| Net income applicable to common shares | $ 433 | $ 338 | $ 326 | $ 24 | $1,121 |
| Basic net income per common share | $ 0.19 | $ 0.15 | $ 0.14 | $ 0.01 | $ 0.48 |
| Diluted net income per common share | $ 0.17 | $ 0.13 | $ 0.13 | $ 0.01 | $ 0.43 |
| Average basic common shares | 2,298.0 | 2,312.0 | 2,325.0 | 2,356.0 | 2,323.0 |
| Average diluted common shares | 2,608.0 | 2,599.0 | 2,600.0 | 2,575.0 | 2,595.0 |

AOL TIME WARNER INC.
HISTORICAL CONSOLIDATED STATEMENT OF OPERATIONS
(Unaudited)

| | For the Three Months Ended | | | | Year Ended |
|---|---|---|---|---|---|
| | 3/31/01 | 6/30/01 | 9/30/01 | 12/31/01 | 12/31/01 |
| | (millions, except per share amounts) | | | | |
| Revenues: | | | | | |
| Subscriptions............................ | $ 3,857 | $ 4,058 | $ 4,190 | $ 4,438 | $16,543 |
| Advertising and commerce................. | 2,039 | 2,236 | 1,918 | 2,204 | 8,397 |
| Content and other........................ | 3,170 | 2,866 | 3,196 | 3,972 | 13,204 |
| Total revenues........................... | 9,066 | 9,160 | 9,304 | 10,614 | 38,144 |
| Costs of revenues............................ | (4,998) | (4,784) | (5,026) | (5,839) | (20,647) |
| Selling, general and administrative......... | (2,370) | (2,325) | (2,323) | (2,572) | (9,590) |
| Amortization of goodwill and other intangible assets.................................... | (1,774) | (1,780) | (1,794) | (1,878) | (7,226) |
| Merger and restructuring costs................. | (71) | – | (134) | (45) | (250) |
| Operating income (loss)..................... | (147) | 271 | 27 | 280 | 431 |
| Interest expense, net........................... | (319) | (352) | (347) | (361) | (1,379) |
| Other expense, net............................. | (872) | (233) | (437) | (1,997) | (3,539) |
| Minority interest expense....................... | (104) | (76) | (66) | (64) | (310) |
| Loss before income taxes...................... | (1,442) | (390) | (823) | (2,142) | (4,797) |
| Income tax provision........................... | 73 | (347) | (174) | 311 | (137) |
| Net loss applicable to common shares............ | $(1,369) | $ (737) | $ (997) | $(1,831) | $(4,934) |
| Basic net loss per common share................. | $ (0.31) | $ (0.17) | $ (0.22) | $ (0.41) | $ (1.11) |
| Diluted net loss per common share............... | $ (0.31) | $ (0.17) | $ (0.22) | $ (0.41) | $ (1.11) |
| Average basic common shares..................... | 4,412.7 | 4,434.9 | 4,439.9 | 4,428.8 | 4,429.1 |
| Average diluted common shares................... | 4,412.7 | 4,434.9 | 4,439.9 | 4,428.8 | 4,429.1 |

AOL TIME WARNER INC.
HISTORICAL CONSOLIDATED STATEMENT OF OPERATIONS
(Unaudited)

|  | For the Three Months Ended | | For the Six Months Ended |
|---|---|---|---|
|  | 3/31/02 | 6/30/02 | 6/30/02 |
|  | (millions, except per share amounts) | | |
| Revenues: | | | |
| Subscriptions................................ | $4,740 | $5,028 | $9,768 |
| Advertising and commerce.................... | 1,813 | 2,070 | 3,883 |
| Content and other........................... | 3,199 | 3,477 | 6,676 |
| Total revenues.............................. | 9,752 | 10,575 | 20,327 |
| Costs of revenues............................... | (5,833) | (6,167) | (12,000) |
| Selling, general and administrative.............. | (2,451) | (2,567) | (5,018) |
| Amortization of goodwill and other intangible assets.................................... | (165) | (176) | (341) |
| Merger and restructuring costs................... | (107) | | (107) |
| Operating income................................ | 1,196 | 1,665 | 2,861 |
| Interest expense, net............................ | (379) | (444) | (823) |
| Other expense, net............................... | (698) | (376) | (1,074) |
| Minority interest expense........................ | (126) | (147) | (273) |
| Income (loss) before income taxes and cumulative effect of accounting change................. | (7) | 698 | 691 |
| Income tax provision............................. | (2) | (302) | (304) |
| Income (loss) before cumulative effect of accounting change........................... | (9) | 396 | 387 |
| Cumulative effect of accounting change........... | (54,235) | - | (54,235) |
| Net income (loss) applicable to common shares | $(54,244) | $396 | $(53,848) |
| Basic income (loss) per common share before cumulative effect of accounting change...... | $ - | $ 0.09 | $ 0.09 |
| Cumulative effect of accounting change........... | (12.25) | - | (12.21) |
| Basic net income (loss) per common share......... | $(12.25) | $ 0.09 | $(12.12) |
| Diluted income (loss) per common share before cumulative effect of accounting change...... | $ - | $ 0.09 | $ 0.09 |
| Cumulative effect of accounting change........... | (12.25) | - | (12.21) |
| Diluted net income (loss) per common share....... | $(12.25) | $ 0.09 | $(12.12) |
| Average basic common shares..................... | 4,429.3 | 4,454.1 | 4,441.7 |
| Average diluted common shares................... | 4,429.3 | 4,528.2 | 4,531.2 |