42

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# Form 10-K/A

### Amendment No. 1

---

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 31, 2005**

**Commission file number 001-15062**

---

# TIME WARNER INC.

*(Exact name of Registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **13-4099534** |
| *(State or other jurisdiction of* | *(I.R.S. Employer* |
| *incorporation or organization)* | *Identification No.)* |

**One Time Warner Center**
**New York, NY 10019-8016**
*(Address of Principal Executive Offices)(Zip Code)*

**(212) 484-8000**
*(Registrant's Telephone Number, Including Area Code)*

---

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐  No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days. Yes ☑  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

**Restatement of Prior Financial Information**

As previously disclosed by Time Warner Inc. ("Time Warner" or the "Company"), the Securities and Exchange Commission ("SEC") had been conducting an investigation into certain accounting and disclosure practices of the Company. On March 21, 2005, the Company announced that the SEC had approved the Company's proposed settlement, which resolved the SEC's investigation of the Company. Under the terms of the settlement with the SEC, the Company agreed, without admitting or denying the SEC's allegations, to be enjoined from future violations of certain provisions of the securities laws and to comply with the cease-and-desist order issued by the SEC to AOL LLC (formerly America Online, Inc., "AOL"), a subsidiary of the Company, in May 2000. The Company also agreed to appoint an independent examiner, who was to either be or hire a certified public accountant. The independent examiner was to review whether the Company's historical accounting for transactions (as well as any subsequent amendments) with 17 counterparties identified by the SEC staff, principally involving online advertising revenues and including three cable programming affiliation agreements with related online advertising elements, was appropriate, and provide a report to the Company's Audit and Finance Committee of its conclusions, originally within 180 days of being engaged. The transactions that were to be reviewed were entered into (or amended) between June 1, 2000 and December 31, 2001, including subsequent amendments thereto, and involved online advertising and related transactions for which the majority of the revenue was recognized before January 1, 2002.

The independent examiner began his review in June 2005 and, after several extensions of time, recently completed that review, in which he concluded that certain of the transactions under review with 15 counterparties, including three cable programming affiliation agreements with advertising elements, were accounted for improperly because the historical accounting did not reflect the substance of the arrangements. Under the terms of its SEC settlement, the Company is required to restate any transactions that the independent examiner determined were accounted for improperly. Accordingly, on August 15, 2006, the Company determined it would restate its consolidated financial results for each of the years ended December 31, 2000 through December 31, 2005 and for the six months ended June 30, 2006. The financial statements presented in this report reflect the impact of the adjustments being made in the Company's financial results.

The transactions being restated are principally transactions in which (i) AOL secured online advertising commitments from counterparties (and subsequently delivered on such commitments) at the same time that the Company entered into commitments with those same counterparties to purchase products or services or to make an investment in such counterparties and (ii) in the case of three counterparties, Time Warner Cable, a subsidiary of the Company, entered into cable programming affiliation agreements at the same time it committed to deliver (and did subsequently deliver) network and online advertising services to those same counterparties. Total advertising revenue recognized by the Company under these transactions was $584 million ($24 million in 2000, $378 million in 2001, $107 million in 2002, $67 million in 2003 and $8 million in 2004). Included in the $584 million is $37 million related to operations that have been subsequently classified as discontinued operations and $12 million of amounts that were reclassified to another revenue category (content or other) in connection with the restatement. In addition to reversing the recognition of revenue, based on the independent examiner's conclusions and as described more fully below, the Company has recorded corresponding reductions in the cost of the products or services that were acquired or investments that were made contemporaneously with the execution of the advertising agreements. In addition, the independent examiner concluded that approximately $119 million in marketing expenses were not recognized in the appropriate accounting period.

Included in the $584 million of restated advertising revenues is $310 million of advertising revenues in which the advertising arrangements were secured by AOL contemporaneously with the purchase of products or services or making an investment. In restating these transactions, the Company has reduced the cost of the related products, services or investment, which has had the effect of increasing earnings during certain of the periods. The remaining balance of the $584 million (or $274 million) consists of advertising arrangements that were secured contemporaneously with cable programming affiliation agreements. In restating these advertising arrangements, the Company is reducing cable programming costs over the life of the related cable programming affiliation arrangements (which range from 10 to 12 years), which has the effect of increasing earnings during certain of the periods restated and in future periods.

1

Table of Contents

In addition to the revenue impact, the net effect of restating these transactions is that the Company's net income has been reduced by $1 million in 2000 and $161 million in 2001 and has been increased by $62 million in 2002, $18 million in 2003, $30 million in 2004 and $16 million in 2005. Included in the 2002 incremental net income of $62 million is a $42 million decrease in the aggregate goodwill impairment charge recognized by the Company during 2002. While the restatement results in changes in the classification of cash flows, it has not impacted total cash flow during the periods.

Except for the information affected by the restatement and the elimination of the condensed consolidating financial statements discussed below, the Company has not updated the information contained herein for events or transactions occurring subsequent to the date the Company's Annual Report on Form 10-K for the year ended December 31, 2005 (the "2005 Form 10-K") was filed with the SEC. The Company therefore recommends that this Annual Report on Form 10-K/A be read in conjunction with the Company's reports filed subsequent to the filing date of the 2005 Form 10-K.

**Business Segment Results**

*AOL.* Revenues, Operating Income before Depreciation and Amortization and Operating Income of the AOL segment for the years ended December 31, 2005 and 2004 are as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2005 | 2004 | % Change |
| | | (restated, millions) | |
| Revenues: | | | |
| Subscription | $ 6,755 | $ 7,477 | (10%) |
| Advertising | 1,338 | 1,005 | 33% |
| Other | 190 | 210 | (10%) |
| Total revenues | 8,283 | 8,692 | (5%) |
| Costs of revenues [a] | (3,788) | (4,178) | (9%) |
| Selling, general and administrative [a] | (2,572) | (2,681) | (4%) |
| Gain on disposal of consolidated businesses | 10 | 20 | (50%) |
| Asset impairments | (24) | (10) | 140% |
| Restructuring costs | (10) | (50) | (80%) |
| Operating Income before Depreciation and Amortization | 1,899 | 1,793 | 6% |
| Depreciation | (548) | (652) | (16%) |
| Amortization | (174) | (176) | (1%) |
| Operating Income | $ 1,177 | $ 965 | 22% |

---

[a]   Costs of revenues and selling, general and administrative expenses exclude depreciation.

The reduction in Subscription revenues primarily reflects a decline in domestic Subscription revenues (from $5.725 billion in 2004 to $4.993 billion in 2005). Subscription revenues at AOL Europe were essentially flat. AOL's domestic Subscription revenues declined due primarily to a decrease in the number of domestic AOL brand subscribers and related revenues. AOL Europe's Subscription revenues were flat primarily as a result of a decline in subscribers and related revenues, essentially offset by the favorable impact of foreign currency exchange rates ($26 million).

The number of AOL brand domestic and European subscribers is as follows at December 31, 2005, September 30, 2005, and December 31, 2004 (millions):

| | December 31, 2005 | September 30, 2005 | December 31, 2004 |
|---|---|---|---|
| Subscriber category: | | | |
| AOL brand domestic [a] $15 and over | 13.7 | 14.7 | 17.5 |
| Under $15 | 5.8 | 5.4 | 4.7 |
| Total AOL brand domestic | 19.5 | 20.1 | 22.2 |
| AOL Europe | 6.0 | 6.1 | 6.3 |

---

[a]   AOL includes in its subscriber count individuals, households or entities that have provided billing information and completed the registration process sufficiently to allow for an initial log-on to the AOL service.

21

**TIME WARNER INC.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION — (Continued)**

The average monthly Subscription revenue per subscriber ("ARPU") for each significant category of subscribers, calculated as average monthly subscription revenue (including premium subscription services revenues) for the category divided by the average monthly subscribers in the category for the applicable period, is as follows:

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | 2005 | 2004 |
| Subscriber category: |  |  |
| AOL brand domestic $15 and over | $20.88 | $20.97 |
| Under $15 | 13.21 | 13.07 |
| Total AOL brand domestic | 18.97 | 19.44 |
| AOL Europe | 22.01 | 21.48 |

Domestic subscribers to the AOL brand service include subscribers during introductory free-trial periods and subscribers at no or reduced monthly fees through member service and retention programs. Total AOL brand domestic subscribers include free-trial and retention members of approximately 11% at both December 31, 2005 and September 30, 2005, and 13% at December 31, 2004. AOL has recently entered into agreements with high-speed Internet access providers to offer the AOL service along with high-speed Internet access. Since AOL's share of the revenues under these agreements is less than $15, subscribers will be included in the under $15 category price plans. In addition, during the first quarter of 2006, AOL announced price increases on certain AOL brand service price plans, including increasing the $23.90 plan to $25.90. The price increases are expected to have a temporary adverse impact on the number of AOL brand subscribers. The price increases and the recent agreements with high-speed Internet access providers are also expected to result in the further migration of subscribers from higher-priced to lower-priced AOL service plans in 2006 and, accordingly, a further decline in Subscription revenues and AOL brand domestic ARPU in 2006.

In 2005, the largest component of the AOL brand domestic $15 and over price plans was the $23.90 price plan, which provides unlimited access to the AOL service using AOL's dial-up network and unlimited usage of the AOL service through any other Internet connection. The largest component of the AOL brand domestic under $15 price plans is the $14.95 per month price plan, which includes ten hours of dial-up access and unlimited usage of the AOL service through an Internet connection not provided by AOL, such as a high-speed broadband Internet connection via cable or digital subscriber lines. AOL continues to develop, test, change and implement price plans, service offerings and payment methods to attract and retain members to its AOL service and, therefore, the composition of AOL's subscriber base is expected to change over time.

The decline in AOL brand domestic subscribers on plans priced $15 and over per month resulted from a number of factors, including declining registrations in response to AOL's marketing campaigns, competition from broadband access providers and reduced subscriber acquisition efforts. Further, during the year, subscribers migrated from the premium-priced unlimited dial-up plans, including the $23.90 plan, to lower-priced plans. The decline in AOL brand domestic subscribers overall, and specifically in the $15 and over per month price plans, is expected to continue in the foreseeable future.

Growth in AOL brand domestic subscribers on plans below $15 per month was driven principally by the migration of subscribers from plans $15 and over per month and, to a lesser extent, by new subscribers. AOL expects that the proportion of its subscribers on lower-priced plans will continue to increase. This trend is expected to be accelerated by the impact of the new agreements with high-speed Internet access providers. The growth in subscribers on plans below $15 per month is expected to benefit primarily from subscribers who are currently in the $25.90 (previously the $23.90) price plan.

Within the $15 and over per month category, the decrease in ARPU over the prior year was due primarily to a shift in the mix to lower-priced subscriber price plans, partially offset by an increase in the percentage of revenue generating customers. Premium subscription services revenues included in ARPU for the year ended December 31, 2005 and 2004 were $87 million and $92 million, respectively.

Within the under $15 per month category, the increase in ARPU over the prior year was due primarily to an improved mix of subscriber price plans and an increase in the percentage of revenue generating customers. Premium subscription services revenues included in ARPU for the year ended December 31, 2005 and 2004 were $32 million and $24 million, respectively.

AOL Europe offers a variety of price plans, including bundled broadband, unlimited access to the AOL service using AOL's dial-up network and limited access plans, which are generally billed based on actual usage. AOL Europe continues to actively market

Table of Contents

**TIME WARNER INC.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION — (Continued)**

bundled broadband plans, as AOL Europe's subscribers have been migrating from dial-up plans to bundled broadband plans, and this trend is expected to continue.

The ARPU for European subscribers increased due to a change in the mix of price plans, with broadband subscribers growing as a percentage of total subscribers, and an increase in premium subscription services revenues. The migration of AOL Europe subscribers to broadband plans is expected to continue to result in increases in ARPU for European subscribers. In addition, 2005 benefited from the positive effect of changes in foreign currency exchange rates. The total number of AOL brand subscribers at AOL Europe reflects a year-over-year decline in subscribers in France, Germany and the U.K.

In addition to the AOL brand service, AOL has subscribers to other lower-priced services, both domestically and internationally, including the Netscape and CompuServe brands. These other brand services are not a significant source of revenues.

Advertising revenues improved primarily due to increased revenues from sales of advertising run on third-party websites generated by Advertising.com, which was acquired in August 2004, and growth in paid-search and traditional advertising. Advertising.com contributed $259 million and $97 million of revenues for the year ended December 31, 2005 and 2004, respectively. Paid-search revenues increased $116 million during 2005. AOL expects Advertising revenues to continue to increase during 2006 due to expected growth in paid-search and traditional online advertising and contributions from Advertising.com's performance-based advertising. However, the rate of growth is expected to be less than experienced in 2005, because the growth rate in 2005 benefited from the absence in 2004 of a full year of Advertising.com's results.

Other revenues primarily include software licensing revenue, revenue from providing the Cable segment access to the AOL Transit Data Network ("ATDN") for high-speed access to the Internet and the sale of modems to consumers in order to support high-speed access to the Internet. Other revenues decreased slightly due primarily to a $32 million decrease in ATDN revenue from TWC Inc., reflecting lower pricing under the terms of a new agreement and lower network usage, partially offset by revenue at AOL Europe primarily from increased modem sales.

Costs of revenues decreased 9% and, as a percentage of revenues, decreased to 46% in 2005 from 48% in 2004. The declines related primarily to lower network-related expenses. Network-related expenses decreased 27% to $1.292 billion in 2005 from $1.760 billion in 2004. The decline in Network related expenses was principally attributable to improved pricing and network utilization, decreased levels of long-term fixed commitments and lower usage of AOL's dial-up network associated with the declining dial-up subscriber base. Network costs also benefited from the final refund of $26 million for a portion of service payments made in prior years at AOL Europe. The decline in network costs was partially offset by costs associated with Advertising.com, which was acquired in August 2004. Domestic network expenses are expected to continue to decline in 2006, although at a lower rate than in 2005. However, this decline is expected to be more than offset by increased network expenses at AOL Europe due to the continued migration of AOL Europe dial-up subscribers to bundled broadband plans for which network expenses per subscriber are significantly higher.

The decrease in selling, general and administrative expenses primarily related to a decrease in marketing costs and $23 million of benefits related to the favorable resolution of European value-added tax matters, partially offset by additional costs associated with Advertising.com, a $10 million charge related to a patent litigation settlement and higher general and administrative costs. The decrease in marketing costs primarily resulted from lower spending on member acquisition activities, partially offset by an increase in brand advertising. The year ended December 31, 2004 also included an approximate $25 million adjustment to reduce excess marketing accruals made in prior years, primarily related to AOL Europe.

As previously discussed under "Significant Transactions and Other Items Affecting Comparability," the 2005 results include $17 million in restructuring charges, primarily related to a reduction in headcount associated with AOL's efforts to realign resources more efficiently, partially offset by a $7 million reduction in restructuring costs, reflecting changes in estimates of previously established restructuring accruals. In addition, the 2005 results include an approximate $5 million gain on the sale of a building, a $5 million gain from the resolution of previously contingent gains related to the 2004 sale of Netscape Security Solutions and a $24 million noncash goodwill impairment charge related to AOLA. The 2004 results included a $55 million restructuring charge, partially offset by a $5 million reversal of previously-established restructuring accruals, reflecting changes in estimates, a $13 million gain on the sale of AOL Japan, a $7 million gain on the sale of Netscape Security Solutions and a $10 million impairment charge related to a building that was held for sale.

TIME WARNER INC.
MANAGEMENT'S DISCUSSION AND ANALYSIS
OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION — (Continued)

ARPU for subscribers in the below $15 per month category increased primarily due to growth in subscribers to the $14.95 price plan year over year, which resulted in a favorable impact as the portion of these subscribers grew in relation to the total membership in the below $15 per month category. Also contributing to the increase in ARPU was an increase in premium services revenues from subscribers in this category. In the below $15 per month category, premium services revenues included in ARPU for the years ended December 31, 2004 and 2003 were $24 million and $8 million, respectively.

AOL Europe offers a variety of price plans, including bundled broadband, unlimited access to the AOL service using AOL's dial-up network and limited access plans, which are generally billed based on actual usage.

ARPU for European subscribers increased primarily because of the positive effect of changes in foreign currency exchange rates related to the strengthening of the Euro and British Pound relative to the U.S. Dollar, as well as a change in the mix of price plans, with bundled broadband subscribers growing as a percentage of total subscribers. The total number of AOL brand subscribers reflects a year-over-year increase in subscribers in the U.K., offset by declines in France and Germany.

In addition to the AOL brand service, the Company has subscribers to lower cost services, both domestically and internationally, including the Netscape and CompuServe brands. These other brand services are not a significant source of revenue.

The increase in Advertising revenues primarily reflects an increase from domestic paid-search advertising contracts (from approximately $200 million in 2003 to $302 million in 2004), $97 million generated by Advertising.com from sales of advertising run on third-party websites and a $33 million increase at AOL Europe, including foreign exchange gains. These increases were partially offset by a decrease in intercompany sales of advertising to other business segments of Time Warner in 2004, as compared to 2003 (from $40 million in 2003 to $11 million in 2004).

Other revenues primarily include software licensing revenue, revenue from providing the Cable segment access to the AOL Transit Data Network for high-speed access to the Internet and merchandising revenue. Other revenues decreased due primarily to AOL's decision in the first quarter of 2003 to reduce the promotion of its merchandise business (i.e., reducing pop-up advertisements) to improve the member experience, partially offset by higher software licensing revenues.

Costs of revenues decreased 8% and, as a percentage of revenues, decreased to 48% in 2004 from 53% in 2003. The declines related primarily to lower network-related expenses, which decreased 28% to $1.760 billion in 2004 from $2.429 billion in 2003. The decline in network-related expenses was principally attributable to improved pricing and decreased levels of service commitments as well as increased amounts of network assets under capital leases (which are included within depreciation expense) versus operating leases. These declines were partially offset by an increase in other costs of service, which included higher domestic salary and consulting costs as well as higher broadband and member service costs at AOL Europe. In addition, there were incremental costs associated with the acquisition of Advertising.com and the consolidation of AOLA and AOL Japan during 2004 (AOL Japan was subsequently sold, effective July 1, 2004).

The increase in selling, general and administrative expenses is primarily related to an increase in marketing costs, additional costs resulting from the acquisition of Advertising.com and higher costs associated with the consolidation of AOLA and the consolidation of AOL Japan for the first half of 2004. The increase in marketing costs resulted from higher spending on member acquisition activities, partially offset by a decline in brand advertising. The increase in marketing expense was partially offset by an approximate $25 million adjustment to reduce excess marketing accruals made in prior years, primarily related to AOL Europe. Management does not believe that the understatement of prior years' results was material to any of the years' financial statements. Similarly, management does not believe that the adjustment made is material to the 2004 results. The overall increase in marketing costs was also partially offset by the change in the treatment of intercompany advertising barter transactions. During the second quarter of 2003, there was a change in the application of AOL's policy for intercompany advertising barter transactions, which reduced both the amount of intercompany advertising revenues and advertising expenses by $51 million for the year. This change, however, had no impact on the AOL segment's Operating Income or its Operating Income before Depreciation and Amortization. In addition, because intercompany transactions are eliminated on a consolidated basis, this change in policy did not impact the Company's consolidated results of operations.

As previously discussed under "Significant Transactions and Other Items Affecting Comparability," 2004 results included a $55 million restructuring charge partially offset by a $5 million reversal of previously-established restructuring accruals, reflecting changes in estimates, a $13 million gain on the sale of AOL Japan, a $7 million gain on the sale of Netscape Security Solutions and a

35

Table of Contents

**TIME WARNER INC.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION — (Continued)**

$10 million impairment charge related to a building that is held for sale. Included in 2003 results were $52 million of restructuring charges.

The increases in Operating Income before Depreciation and Amortization and Operating Income are due primarily to a modest increase in overall revenues and lower costs of revenues, offset in part by higher selling, general and administrative expenses.

*Restatement of Prior Financial Information, Description of Business and Basis of Presentation*

**Restatement of Prior Financial Information**

As previously disclosed by Time Warner Inc. ("Time Warner" or the "Company"), the Securities and Exchange Commission ("SEC") had been conducting an investigation into certain accounting and disclosure practices of the Company. On March 21, 2005, the Company announced that the SEC had approved the Company's proposed settlement, which resolved the SEC's investigation of the Company. Under the terms of the settlement with the SEC, the Company agreed, without admitting or denying the SEC's allegations, to be enjoined from future violations of certain provisions of the securities laws and to comply with the cease-and-desist order issued by the SEC to AOL LLC (formerly America Online, Inc., "AOL"), a subsidiary of the Company, in May 2000. The Company also agreed to appoint an independent examiner, who was to either be or hire a certified public accountant. The independent examiner was to review whether the Company's historical accounting for transactions (as well as any subsequent amendments) with 17 counterparties identified by the SEC staff, principally involving online advertising revenues and including three cable programming affiliation agreements with related online advertising elements, was appropriate, and provide a report to the Company's Audit and Finance Committee of its conclusions, originally within 180 days of being engaged. The transactions that were to be reviewed were entered into (or amended) between June 1, 2000 and December 31, 2001, including subsequent amendments thereto, and involved online advertising and related transactions for which the majority of the revenue was recognized before January 1, 2002.

The independent examiner began his review in June 2005 and, after several extensions of time, recently completed that review, in which he concluded that certain of the transactions under review with 15 counterparties, including three cable programming affiliation agreements with advertising elements, were accounted for improperly because the historical accounting did not reflect the substance of the arrangements. Under the terms of its SEC settlement, the Company is required to restate any transactions that the independent examiner determined were accounted for improperly. Accordingly, on August 15, 2006, the Company determined it would restate its consolidated financial results for each of the years ended December 31, 2000 through December 31, 2005 and for the six months ended June 30, 2006. The financial statements presented herein reflect the impact of the adjustments being made in the Company's financial results.

The transactions being restated are principally transactions in which (i) AOL secured online advertising commitments from counterparties (and subsequently delivered on such commitments) at the same time that the Company entered into commitments with those same counterparties to purchase products or services or to make an investment in such counterparties and (ii) in the case of three counterparties, Time Warner Cable, a subsidiary of the Company, entered into cable programming affiliation agreements at the same time it committed to deliver (and did subsequently deliver) network and online advertising services to those same counterparties. Total advertising revenue recognized by the Company under these transactions was $584 million ($24 million in 2000, $378 million in 2001, $107 million in 2002, $67 million in 2003 and $8 million in 2004). Included in the $584 million is $37 million related to operations that have been subsequently classified as discontinued operations and $12 million of amounts that were reclassified to another revenue category (content or other) in connection with the restatement. In addition to reversing the recognition of revenue, based on the independent examiner's conclusions and as described more fully below, the Company has recorded corresponding reductions in the cost of the products or services that were acquired or investments that were made contemporaneously with the execution of the advertising agreements. In addition, the independent examiner concluded that approximately $119 million in marketing expenses were not recognized in the appropriate accounting period.

Included in the $584 million of restated advertising revenues is $310 million of advertising revenues in which the advertising arrangements were secured by AOL contemporaneously with the purchase of products or services or making an investment. In restating these transactions, the Company has reduced the cost of the related products, services or investment, which has had the effect of increasing earnings during certain of the periods. The remaining balance of the $584 million (or $274 million) consists of advertising arrangements that were secured contemporaneously with cable programming affiliation agreements. In restating these advertising arrangements, the Company is reducing cable programming costs over the life of the related cable programming affiliation arrangements (which range from 10 to 12 years), which has the effect of increasing earnings during certain of the periods restated and in future periods.

Table of Contents

TIME WARNER INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

In addition to the revenue impact, the net effect of restating these transactions is that the Company's net income has been reduced by $1 million in 2000 and $161 million in 2001 and has been increased by $62 million in 2002, $18 million in 2003, $30 million in 2004 and $16 million in 2005. Included in the 2002 incremental net income of $62 million is a $42 million decrease in the aggregate goodwill impairment charge recognized by the Company during 2002.

Details of the impact of the restatement on the accompanying consolidated statement of operations are as follows:

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2005 | 2004 | 2003 |
|  | (in millions, except per share amounts) | | |
| Advertising Revenues — decrease | $ — | $ (8) | $ (67) |
| Cost of Revenues — decrease | 29 | 47 | 49 |
| Selling, general and administrative — decrease | — | 13 | 48 |
| Operating Income — increase | 29 | 52 | 30 |
| Other income, net — increase | 1 | 1 | 3 |
| Minority interest expense — increase | (4) | (4) | (4) |
| Income before income taxes, discontinued operations and cumulative effect of accounting change — increase | 26 | 49 | 29 |
| Income tax provision — increase | (10) | (19) | (11) |
| Net income — increase | $ 16 | $ 30 | $ 18 |
|  |  |  |  |
| Basic income per common share before discontinued operations and cumulative effect of accounting change — increase | $ 0.01 | $ 0.01 | $ 0.00 |
| Diluted income per common share before discontinued operations and cumulative effect of accounting change — increase | $ 0.00 | $ 0.01 | $ 0.00 |
| Basic net income per common share — increase | $ 0.01 | $ 0.00 | $ 0.00 |
| Diluted net income per common share — increase | $ 0.00 | $ 0.00 | $ 0.00 |

At December 31, 2004 and 2005, the impact of the restatement on Total Assets is a decrease of $9 million and an increase of $1 million, respectively, and the impact of the restatement on Total Liabilities is an increase of $43 million and $37 million, respectively. In addition, the impact of the restatement on the Accumulated Deficit at December 31, 2002 is an increase in the deficit of $100 million. While the restatement results in changes in the classification of cash flows, it has not impacted total cash flow during the periods. Certain of the footnotes that follow have also been restated to reflect the changes described above.

In June 2006, certain debt securities of one of the Company's subsidiaries, Time Warner Companies, Inc., that were guaranteed by the Company and certain subsidiaries of the Company were delisted from the New York Stock Exchange and deregistered under Section 12(b) of the Securities Exchange Act of 1934. As a result, the Company is no longer required to include the condensed consolidating financial statements required under Rule 3-10 of Registration S-X, and such supplementary data has not been restated or included herein.

## TIME WARNER INC.
### SELECTED FINANCIAL INFORMATION

The selected financial information set forth below for each of the three years in the period ended December 31, 2005, has been derived from and should be read in conjunction with the audited financial statements and other financial information presented elsewhere herein. The selected financial information set forth below for the years ended December 31, 2002 and 2001 has been derived from unaudited financial statements not included herein. Capitalized terms are as defined and described in the consolidated financial statements or elsewhere herein. Certain reclassifications have been made to conform to the 2005 presentation.

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2002 | 2001 |
| | | (restated, millions, except per share data) | | | |
| **Selected Operating Statement Information:** | | | | | |
| Revenues: | | | | | |
| Subscription | $ 22,222 | $ 21,605 | $ 20,448 | $ 18,959 | $ 16,466 |
| Advertising | 7,612 | 6,947 | 6,113 | 5,940 | 6,400 |
| Content | 12,615 | 12,350 | 11,446 | 10,216 | 8,660 |
| Other | 1,203 | 1,179 | 1,489 | 1,840 | 2,239 |
| Total revenues | 43,652 | 42,081 | 39,496 | 36,955 | 33,765 |
| Operating income (loss) (a) | 4,548 | 6,217 | 5,284 | (37,431) | (709) |
| Interest expense, net | (1,266) | (1,533) | (1,734) | (1,624) | (1,164) |
| Other income (expense), net (b) | 1,125 | 522 | 1,213 | (2,337) | (3,491) |
| Income (loss) before discontinued operations and cumulative effect of accounting change | 2,921 | 3,239 | 3,164 | (42,003) | (5,313) |
| Discontinued operations, net of tax | 121 | | (495) | (1,017) | (708) |
| Cumulative effect of accounting change (c) | — | 34 | (12) | (54,135) | |
| Net income (loss) | 2,921 | 3,394 | 2,657 | (97,155) | (6,021) |
| Per share of common stock: | | | | | |
| Basic income (loss) per common share before discontinued operations and cumulative effect of accounting change | $ 0.63 | $ 0.71 | $ 0.70 | $ (9.43) | $ (1.20) |
| Discontinued operations | — | 0.03 | (0.11) | (0.23) | (0.16) |
| Cumulative effect of accounting change | — | — | — | (12.15) | — |
| Basic net income (loss) per common share | $ 0.63 | $ 0.74 | $ 0.59 | $ (21.81) | $ (1.36) |
| Diluted income (loss) per common share before discontinued operations and cumulative effect of accounting change | $ 0.62 | $ 0.69 | $ 0.68 | $ (9.43) | $ (1.20) |
| Discontinued operations | — | 0.03 | (0.11) | (0.23) | (0.16) |
| Cumulative effect of accounting change | — | — | — | (12.15) | — |
| Diluted net income (loss) per common share | $ 0.62 | $ 0.72 | $ · 0.57 | $ (21.81) | $ (1.36) |
| Average common shares: | | | | | |
| Basic | 4,648.2 | 4,560.2 | 4,506.0 | 4,454.9 | 4,429.1 |
| Diluted | 4,710.0 | 4,694.7 | 4,623.7 | 4,454.9 | 4,429.1 |

---

(a) 2005 includes a $24 million noncash impairment charge related to goodwill associated with AOLA, an approximate $5 million gain related to the sale of a building, a $5 million gain from the resolution of a previously contingent gain related to the 2004 sale of NSS, an $8 million gain related to the collection of a loan made in conjunction with the Company's 2003 sale of Time Life, which was previously fully reserved due to concerns about recoverability, a $5 million gain related to the sale of a property in California and $3 billion in legal reserves related to securities litigation and $135 million in net recoveries related to securities litigation and the government investigations. 2004 includes a $10 million impairment charge related to a building that was held for sale, a gain of $13 million related to the sale of AOL Japan, a $7 million gain related to the sale of NSS, an approximate $7 million loss related to the sale of the winter sports team, an $8 million gain related to the sale of a building, $510 million legal reserves related to the government investigations and $26 million in net expenses related to securities litigation and the government investigations. 2003 includes a $43 million gain related to the sale of consolidated cinemas in the UK, a $29 million loss on the sale of Time Life and a noncash charge to reduce the carrying value of goodwill and other intangible assets of $318 million in 2003 and $42.511 billion in 2002. Also includes merger-related costs and restructurings of $117 million in 2005, $50 million in 2004, $109 million in 2003, $327 million in 2002 and $214 million in 2001. 2004 also includes

$53 million of costs associated with the relocation from the Company's former Corporate Headquarters. For the year ended December 31, 2005, the Company reversed approximately $4 million of this charge, which was no longer required due to changes in estimates.

(b) Includes net gains of $1.011 billion in 2005, $424 million in 2004 and $593 million in 2003 primarily related to the sale of investments and net losses of $2.075 billion in 2002 and $2.528 billion in 2001 primarily related to noncash pretax charges to reduce the carrying value of certain investments that experienced other-than-temporary declines in market value. In addition, 2005 includes a $53 million net gain related to the sale of the Company's option in WMG and 2004 includes a $50 million fair value adjustment related to the Company's option in WMG (Note 6).

(c) Includes a noncash benefit of $34 million in 2004 related to the cumulative effect of an accounting change in connection with the consolidation of AOLA in 2004 in accordance with FIN 46R, a noncash charge of $12 million in 2003 related to the cumulative effect of an accounting change in connection with the adoption of FIN 46 and a noncash charge of $54.235 billion in 2002 related to the cumulative effect of an accounting change in connection with the adoption of FAS 142 (Note 1).

129

**Table of Contents**

## TIME WARNER INC.
## SELECTED FINANCIAL INFORMATION (Continued)

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2002 | 2001 |
| | | (restated, millions, except per share data) | | | |
| **Selected Balance Sheet Information:** | | | | | |
| Cash and equivalents | $ 4,220 | $ 6,139 | $ 3,040 | $ 1,730 | $ 771 |
| Total assets | 122,476 | 123,149 | 121,748 | 115,508 | 209,429 |
| Debt due within one year | 92 | 1,672 | 2,287 | 155 | 675 |
| Mandatorily convertible preferred stock | — | 1,500 | 1,500 | — | — |
| Long-term debt | 20,238 | 20,703 | 23,458 | 27,354 | 22,792 |
| Shareholders' equity | 62,679 | 60,719 | 56,131 | 52,891 | 150,667 |
| Total capitalization | 83,009 | 84,594 | 83,376 | 80,400 | 174,134 |
| Cash dividends declared per share of common stock | 0.10 | — | — | — | — |

130

43

THE INDEPENDENT EXAMINER
WILLIAM K. LENHART, CPA, CFE, CTP, CIRA
330 Madison Avenue
New York, NY  10017

August 7, 2006

To the Audit and Finance Committee of Time Warner, Inc.:

Pursuant to the Consent Order between the Company and the United States Securities and Exchange Commission, enclosed please find the Report of the Independent Examiner, William K. Lenhart, to the Audit and Finance Committee of Time Warner, Inc.

Very truly yours,

William K. Lenhart

# Report of the Independent Examiner
# William K. Lenhart
# to the Audit and Finance Committee of
# Time Warner, Inc.

BDO SEIDMAN, LLP
Carl W. Pergola
Anthony M. Lendez

SAUL EWING LLP
Timothy E. Hoeffner
John F. Stoviak
Cathleen M. Devlin

**August 7, 2006**

# I.    EXECUTIVE SUMMARY

The Independent Examiner, William K. Lenhart, CPA, CFE, CTP, CIRA of BDO

Seidman, LLP (the "Independent Examiner"),[1] respectfully submits this Report of Investigation

to the Audit and Finance Committee of Time Warner, Inc. (the "Report").  In accordance with

the terms of the Consent Order (the "Consent Order") entered between Time Warner, Inc. (the

"Company") and the United States Securities and Exchange Commission (the "SEC" or

"Commission"), this Report sets forth the Independent Examiner's analysis and conclusions

regarding whether the Company's historical accounting for transactions involving online

advertising and related transactions (the "Transactions") entered into with 17 specified

companies (collectively referred to as the "Counterparties")[2] between June 1, 2000 and

December 31, 2001 was in conformity with generally accepted accounting principles ("GAAP").

In total, based on information provided by the Company, the Transactions with these 17

Counterparties reflect approximately $660 million in revenues recorded by the Company

---

[1] Lenhart and the BDO Seidman, LLP ("BDO Seidman") team, led by Carl W. Pergola and Anthony M. Lendez, and the Saul Ewing LLP ("Saul Ewing") team, led by Timothy E. Hoeffner, John F. Stoviak and Cathleen M. Devlin, who participated in the investigation under Lenhart's supervision, are collectively referred to throughout this Report as the "Independent Examiner." The Curriculum Vitae of Lenhart and a description of the BDO Seidman and Saul Ewing team leaders are attached hereto as Appendices B, C and D. The conclusions of the Independent Examiner set forth in this Report are, however, conclusions formed by Lenhart, with the assistance of the BDO Seidman and Saul Ewing teams who participated in the investigation.

[2] The 17 Counterparties are Aether Systems, Inc. ("Aether"); BuildNet, Inc. ("BuildNet"); Cendant Corp. (including Trilegiant-related transactions) ("Cendant"); Cisco Systems, Inc. ("Cisco"); Compaq Computer Corp. ("Compaq"); EMC Corp. ("EMC"); Foundry Networks, Inc. ("Foundry"); Gateway, Inc. ("Gateway"); Genuity Inc. ("Genuity"); Inktomi Corp. ("Inktomi"); Legend Holdings Limited ("Legend"); National Geographic Channel ("National Geographic"); Oxygen Media, LLC ("Oxygen"); Rainbow Media Holdings, Inc. ("Rainbow"); Qwest Communications Corp. ("Qwest"); Sun Microsystems, Inc. (including iPlanet-related online advertising transactions) ("Sun") and WorldCom, Inc. ("WorldCom").

between June 2000 and December 2004, and the Transactions with Trilegiant reflect approximately $119 million in expenses incurred on AOL's behalf during the relevant period and recorded by the Company in subsequent financial reporting periods. As set forth in detail below, the Independent Examiner has concluded that certain of the Company's Transactions with 15 of the 17 Counterparties were not recorded by the Company in conformity with GAAP.

By way of background, in July 2002, the SEC commenced a formal investigation into the the Company's accounting treatment, for certain advertising transactions involving AOL. In March 2005, the Company consented to the entry of final judgment on a civil Complaint to be filed by the SEC, as memorialized in the Consent Order. Among the terms of the Consent Order was the requirement that the Company engage an independent examiner to review the accounting for transactions involving online advertising and related transactions between the Company and the 17 Counterparties entered into between June 1, 2000 and December 31, 2001. The Independent Examiner was appointed on June 27, 2005.

Critical to the Independent Examiner's investigation was the standard of review to be applied to the Transactions pursuant to the Consent Order. The Consent Order directed the Independent Examiner to determine, based on his professional judgment, whether (a) sufficient and competent evidence exists to establish that the Company's accounting for the Transactions is in conformity with GAAP, and (b) the accounting for the Transactions reflects their substance. Specifically, the Consent Order provided that the Independent Examiner may, among other things:

- Examine the negotiating history of the Transactions and the Company's commercial relationships with the Counterparties to understand the context in which the Transactions and negotiations for the Transactions occurred;

- Consider the accuracy, reliability, and credibility of the Company's records and employee statements with respect to the Transactions, as well as the records and statements with respect to Transactions previously restated by the Company;

- Determine, based on the Independent Examiner's professional judgment, whether sufficient and competent evidence exists to establish that the Company's accounting treatment for the Transactions is in conformity with GAAP; and

- Perform such other procedures deemed necessary or appropriate to determine that the accounting for the Transactions reflects their substance.

Consistent with this standard, as part of the investigation, the Independent Examiner reviewed and analyzed over 17.5 million pages of documents collected from the SEC, the Company, and its independent auditors and advisors. In addition, the Independent Examiner utilized BDO Seidman's computer forensic specialists to review and analyze electronic evidence, including images of the personal computer hard drives of key Company personnel. In reaching conclusions, the Independent Examiner relied in large part upon documents that were created by the parties contemporaneously with the negotiation and finalization of the Transactions. This included the relevant final and draft contracts between the Company and the respective Counterparties, accounting records, and work papers and other documents provided by the Company's auditors, Ernst & Young LLP ("E&Y"), as well as documentary evidence relevant to the negotiating history preceding the execution of the agreements. In particular, contemporaneous email and instant messaging exchanges provided a useful source of information about the negotiating history and intent of the parties to the Transactions and, in many instances, raised issues with regard to the Company's accounting treatment for the Transactions.

Consistent with the Consent Order, the Independent Examiner also interviewed over 100 individuals, including current and former employees of the Company, and representatives of E&Y and PricewaterhouseCoopers ("PwC"). The Independent Examiner afforded interviewees

the opportunity to provide a reasonable explanation for contemporaneous documents and electronic communications that tended to conflict with the Company's accounting treatment for the Transactions. In considering such explanations, however, the Independent Examiner also considered the credibility of the interviewees and their ability to corroborate their statements with documentary evidence or through other means. The Independent Examiner also reviewed the testimony of witnesses before the SEC and testimony and pleadings from ongoing litigation involving the Company or in which Company employees testified.

The Independent Examiner additionally had the benefit of interviews of current or former employees of 13 of the 17 Counterparties, as well as extensive contemporaneous documentary evidence produced from the files of most of the Counterparties. Most of the Counterparty representatives were willing to openly discuss the negotiating history and substance of the Transactions, and in many cases, provided information indicating that the Company's accounting treatment was inconsistent with the substance of a given Transaction. Thus, the Independent Examiner had access to substantial and significant information that was not available to the Company or its auditors in connection with any prior Company review of the Transactions with the 17 Counterparties.

In assessing the reliability of the evidence supporting the Transactions, the Independent Examiner applied a heightened level of professional skepticism. This judgment was formed based upon a series of risk factors, including the following:

- The Company's history of previous accounting restatements, including the restatement of advertising transactions similar to many of the Transactions;

- E&Y's statement to the Company that it was unwilling to rely on the representations of AOL's Vice President of Accounting Policy and AOL's Controller, and questions about the credibility of certain personnel raised by the Company's CFO Review team;

- The involvement of Company personnel in the negotiation of the Transactions who were also involved in transactions that have been the subject of proceedings by the SEC or Department of Justice ("DOJ"), and the termination by the Company of personnel associated with the Transactions;

- The fact that several of the 17 Counterparties and their representatives, and other entities associated with the Transactions, have been the subject of proceedings by the SEC and DOJ, including guilty pleas and/or convictions of Bernard Ebbers and Scott Sullivan of WorldCom and Stuart Wolff and Peter Tafeen of Homestore.com, Inc. ("Homestore"); and

- The acknowledgement in E&Y's work papers that AOL engaged in significant, unusual, or highly complex transactions that made the determination of the effect of the transactions on the Company's financial statements difficult or highly subjective, or posed difficult "substance over form" questions.

In an effort to understand the context in which the Transactions and their negotiations occurred, the Independent Examiner also considered the environment both at the Company and in the industry in general during the relevant time period. In that regard, the period in which the Transactions occurred was one of significant change and turmoil. Prior to completion of the January 2001 merger with Time Warner, AOL was a market leader in the rapidly-developing Internet industry.[3] Soon after the merger was announced, the NASDAQ composite index reached its peak at 5,000 and promptly thereafter the economy and the advertising market began to soften. This negative trend continued after the merger closed as the "dot-com bubble" burst and traditional "brick and mortar" companies also began to question the effectiveness of online advertising, adversely impacting AOL and the online advertising market in general.

In connection with the merger, the Company prepared and publicly disclosed projections of approximately $40 billion in revenues and $11 billion in EBITDA for 2001. Throughout

---

[3]   For purposes of this Report, the term "industry" as it relates to AOL encompasses interactive services, Web brands, Internet technologies, and electronic commerce services, including online advertising.

2001, the Company experienced shortfalls in advertising and commerce revenues. As a result, the newly-merged Company operated throughout the year at a negative variance from budget. In an effort by AOL to "close the gap" between projected and actual advertising and commerce revenues for each quarter, many of the Company's transactions with the 17 Counterparties were closed near the end of fiscal reporting quarters. In addition, to achieve the Company's $11 billion EBITDA goal, the Company made significant efforts to reduce costs.

Also immediately after the completion of the merger, the Company focused on means for AOL and Time Warner to leverage their business relationships to enhance the revenues of the combined company. The Business Affairs group ("Business Affairs" or "BA"), which originated at AOL, was vested with significant authority and took the lead in negotiating the Company's various multiple-element transactions, including transactions involving the contemporaneous purchase of products and/or services by the Company and the sale of advertising to the counterparty. Business Affairs and, in particular, the group's President, David Colburn, who declined to be interviewed by the Independent Examiner, were described by several interviewees as "aggressive," "arrogant" and very short-sighted in their focus on closing transactions. As described by a representative of Cisco, "I have never ever dealt with a media company that has been this pushy, this unethical, this clueless about the customer, this ruthless in getting what they want." The practices of Business Affairs clashed in a significant way with the culture of Time Warner, which had historically focused on the development of long-term relationships with business partners.

The Business Affairs group sought to aggressively leverage the Company's various relationships for opportunities to generate revenues, often through the sale of online advertising. With respect to the Transactions, Business Affairs sought to secure advertising revenues in

connection with, among other things: (i) cable television programmer Counterparties seeking to run programming on Time Warner Cable ("TWC") systems; (ii) substantial purchases by the Company of products and/or services from Counterparties; and (iii) the resolution of disputes with Counterparties arising from preexisting business relationships. AOL's former Chief Financial Officer, Joseph Ripp, who moved to AOL from Time Warner in early 2001, questioned the sustainability of the revenues generated by these types of multiple-element transactions, due to the limited number of opportunities available to AOL to generate revenues through contemporaneous transactions with vendors.

In evaluating the Transactions with the Counterparties, it is significant to consider that many of the Counterparties desired to be associated with AOL's name due to AOL's prominent position in the Internet industry. These Counterparties further recognized that while there may have been some value to the advertising they received from the Company, the Counterparties were not negotiating the Transaction for the purpose of obtaining the advertising. Consistent with this view, one Counterparty to a Transaction involving the recharacterization of launch fees as advertising revenues described the advertising delivered by the Company as a "lagniappe," which is something that a person is not entitled to and does not expect, but receives gratuitously. Accordingly, many of the Counterparties treated their advertising purchases from an accounting standpoint as a reduction of revenue or a cost of sales, and as such, a reduction to their gross margins from sales.

Against this background, the Independent Examiner's conclusions may be summarized as follows. In most instances in which the Independent Examiner has concluded that the Company's historical accounting for a Transaction is not in conformity with GAAP, that conclusion was based upon the determination that the Company's accounting treatment for the

Transaction does not reflect its substance. These Transactions generally involved either a recharacterization of revenue received by the Company as advertising revenue or the establishment by AOL of an "offset" or "recoupment" mechanism to permit the Counterparty to recover funds paid for advertising through other elements of the business relationship. Although no analysis by the Independent Examiner of fair value was necessary in those instances to reach a conclusion, this Report also includes the Independent Examiner's observations on the fair value of certain elements of those Transactions, and on the advertising provided to the Counterparty. Where the substance of a Transaction was not conclusively determined to be inconsistent with the Company's accounting treatment, the Independent Examiner's analysis focused on whether there was sufficient and competent evidence of fair value for the elements of the Transaction.

With regard to the advertising elements of the Transactions, given the wide range of premiums and discounts to the standard rate card in the delivery of online advertising, the wide variety of online advertising products provided to advertisers at significantly varying prices, and the lack of reliable, verifiable and objective evidence of fair value of the advertising delivered to the 17 Counterparties, the Independent Examiner determined that evidence of the pricing and quantity of the online advertising contracted for and ultimately delivered did not, in and of itself, provide sufficient and competent evidence of fair value. The Independent Examiner therefore sought to evaluate the fair value of the other elements of the Transaction, and also performed a qualitative assessment of the advertising negotiated with and provided to the Counterparties. The latter evaluation focused upon, among other things, whether the Counterparties were willing buyers of the advertising. The Independent Examiner considered, for example, whether the Counterparty actually sought to purchase the advertising or affirmatively communicated to the Company a lack of interest in the advertising, had meaningful involvement in the planning of, or

meaningful control over, the advertising, or expected to derive meaningful benefit from the advertising in terms of the Counterparty's marketing objectives.

For example, with regard to the Company's Transactions with the cable programmer Counterparties, interviews of the Counterparties and contemporaneous documentary evidence indicated that both AOL and the Counterparties placed minimal value on the advertising component of the Transactions. Indeed, members of the Business Affairs group described the advertising purchased by one cable programmer as "zero opportunity cost advertising" for which there was no other purchaser readily available, and for which there was minimal marginal cost for AOL to deliver. Similarly, in their interviews, representatives of the cable programmer Counterparties explained that the advertising provided to them by AOL was not consistent with their business models for introducing programming onto a cable system, which typically involved only very limited advertising.

It is also noteworthy that several of the Counterparties did not record the amounts paid to the Company pursuant to advertising agreements as advertising expenses. Instead, these Counterparties accounted for these Transactions as an expense (but not as an advertising expense), a reduction in revenue or, in the case of certain of the cable programmer Counterparties, as "launch fees" that were deferred and amortized over the multi-year term of the programming distribution agreement. Thus, the accounting treatment applied by the Counterparties in these instances suggested that they did not view the substance of these transactions as purchases of advertising. This accounting treatment by the Counterparties, although not in itself determinative, served to support all of the other evidence considered by the Independent Examiner in reaching a conclusion concerning these Transactions.

In addition to evaluating the advertising elements of the Transactions, the Independent Examiner also analyzed whether there was sufficient and competent evidence of fair value for the products and/or services purchased by the Company from the Counterparties in the Transactions. This evidence was analyzed with the understanding that the fair value of these products and/or services could fall within a wide range, given the complexities arising from the Company's position in the marketplace and domination of the Internet industry, its uniquely large-volume purchases of such products and/or services, and the specific nature of the products and/or services purchased from the Counterparties. For certain of the Transactions, the Company was not able to provide sufficient and competent evidence, such as competitive bidding information, estimated fair values of similar products and/or services acquired by the Company from other vendors, quoted market prices or independent appraisals, to support the fair value assessments made by the Company for the products and/or services purchased from the Counterparties.

The Independent Examiner's conclusions with regard to the Company's accounting treatment for the Transactions with the 17 Counterparties may be summarized as falling into the following six categories. Certain Transactions share characteristics with more than one category of Transactions.

First, there was significant commonality between the Company's Transactions, and accounting treatment for its Transactions, with the three cable programmers, National Geographic, Oxygen and Rainbow. Each of these Transactions was characterized by a common element: the payment of significant cash incentives, or launch fees, by the programmer in exchange for carriage on TWC's cable systems, in order to permit the programmer to gain access to TWC's subscribers. Despite this, the Company's accounting for these Transactions attributed

-10-

only a small portion or no value to this critical element of the Transaction, and instead recharacterized the payments received from the programmers as attributable to the sale of advertising to the Counterparty. At the same time, the cable programmer Counterparties confirmed that they typically did not make large advertising purchases to announce the launch of their programming, and consequently, they placed little value on this advertising. In addition, industry practices did not support the treatment of the payments made by the cable programmers as an advertising expense. Accordingly, the Company's accounting treatment for the cable programming Transactions did not accurately reflect the substance of the Transactions.

Second, Transactions with certain other Counterparties (Sun, Gateway and Inktomi) involved the recharacterization of amounts owed by the Counterparty to AOL as advertising revenues, through settlements of disputes or otherwise. To illustrate, in resolving certain disputes arising from the AOL/Sun iPlanet relationship, Sun negotiated a series of cash settlements with the Company. The settlements were then converted into advertising purchases. Although no additional consideration was paid by Sun for the advertising, the Company recorded the consideration received from these "special settlements" as advertising revenue.

Third, a series of Transactions with Counterparties involved the Company's contemporaneous sales of advertising and purchases of products and/or services from vendors. Although each Transaction was unique, the Transactions shared common characteristics. Specifically, for a number of these Transactions, the Independent Examiner reviewed statements in contemporaneous documentary evidence and/or learned from interviews that the purchase of advertising by certain Counterparties, or a component of the Transaction providing for payment of funds by the Company to the Counterparty, was perceived by Business Affairs personnel as a "kickback" (in the instance of Compaq), a means to "roundtrip" or "clawback" the

-11-

Counterparty's advertising purchases (in the instance of Gateway), a "quid pro quo" (in the instance of WorldCom), an "offset" (in the instance of Legend), or a method to recover the "withheld delta" in a dispute (in the instance of Genuity). The Independent Examiner was also made aware of "informal" and undocumented agreements (in the Legend, Gateway and Cisco Transactions) put in place to enable the Counterparties to "recoup" or "offset" the consideration paid by those Counterparties for advertising or as a "credit" to ensure satisfaction with the advertising. In addition, the Independent Examiner observed a lack of reliable, verifiable and objectively determinable evidence to demonstrate the fair value of the tens or even hundreds of millions of dollars of products and/or services purchased by the Company from the Counterparties.

One example is the Company's Transactions with Qwest, in which the Company paid $46 million in connection with the purchase of fiber routes, but was unable to definitively identify the fiber routes that were ultimately delivered, accepted, or activated or to provide sufficient contemporaneous documentary support for the value of those routes. Similarly, in connection with the Company's Transaction with EMC, the only evidence that the Company was able to produce in support of the value of a software license purchased from EMC for $3 million was a single, anonymous, non-contemporaneous email provided with "no assurance that it is accurate." Finally, certain of the Transactions, including Compaq and Cisco, involved an unwilling buyer of the advertising that paid for advertising only to preserve a business relationship with AOL.

Fourth, information obtained from other proceedings illuminated the Independent Examiner's conclusions regarding the propriety of the Company's accounting treatment for several of the Transactions. In particular, in the criminal trial of Stuart Wolff, the former chief

executive officer of Homestore, a former Homestore executive testified that Homestore's transactions with AOL typically consisted of Homestore funding vendor purchases of advertising from AOL and then AOL paying Homestore a referral fee for the same advertising purchased by the vendor. This practice occurred in the Transactions with BuildNet. The former Homestore executive described Homestore's transactions with AOL as "round-trip" transactions in his testimony, and noted that "the revenues generated under the AOL round-trip transactions were bogus."

Fifth, unlike the other Transactions reviewed by the Independent Examiner, the Transactions with Trilegiant (a Cendant affiliate) did not involve advertising revenues, but rather the Company's treatment of expenses incurred in marketing the AOL service to potential subscribers. Contemporaneous evidence indicates that AOL's use of a subsidiary of Trilegiant, Trilegiant Marketing Services ("TMS"), to perform marketing services traditionally performed by AOL was structured in a manner to eliminate any meaningful risk of loss to TMS. AOL at all times maintained control of the creation, design and implementation of these marketing plans and initially funded substantially all of the costs of marketing, despite the fact that TMS was purportedly obligated to perform those services, and incur the associated costs for AOL. As explained by William Apperson, manager of Marketing Accounting at AOL, during the term of the TMS relationship, AOL continued to perform all of the marketing services it had purportedly transferred to TMS and essentially "swept out" the related expenses after they were incurred. AOL and Trilegiant also developed and adjusted the inputs of a financial model providing for a 25% rate of return to TMS based on AOL's past experience in marketing to potential subscribers and then subsequently restructured the transaction on three occasions to help ensure that this rate of return would be achieved. Upon settlement, very favorable terms were provided to Cendant

and TMS resulting in the receipt of a substantial return. Because Trilegiant, based on the evidence analyzed and the actions of the Company, did not assume any meaningful risk in the Transaction, and the Company maintained substantial control over the marketing plans, the accounting treatment by the Company for the transfer of expenses by AOL to TMS was not in conformity with GAAP.

Sixth, in some instances, sufficient and competent evidence existed to determine that the Company's accounting treatment for the Transactions is in conformity with GAAP and reflects the substance of the Transactions. Specifically, this was the case for the Company's Transactions with Foundry and Aether. Notably, in these instances, there was some contemporaneous documentary evidence suggesting that individuals at the Company were reluctant to purchase the contracted amount of equipment or common stock from the Counterparty, respectively, and the Counterparty pushed back on AOL's efforts to include advertising as part of the multiple-element transactions. Even so, representatives of Foundry and Aether were willing buyers of the advertising and articulated valid business reasons for their purchases of advertising.

The evidence that is described above is only representative of the information reviewed by the Independent Examiner to reach conclusions, and is included for illustrative purposes. No one fact was determinative in the Independent Examiner's analysis, and a review of the detailed factual information and standard of review described in the body of this Report is necessary for a complete understanding of the basis for the Independent Examiner's conclusions.

After considering all of the available evidence along with the relevant GAAP and specific risk factors that led to the Independent Examiner's heightened sense of skepticism, the Independent Examiner applied his professional judgment, on a Transaction-by-Transaction basis,

to make a determination as to whether the accounting for the Transactions reflected its substance

and whether there was sufficient and competent evidence to establish that the accounting

treatment was in conformity with GAAP.  For the reasons detailed in this Report, the Company

shall restate its historical accounting treatment for certain of the Transactions with the following

counterparties: BuildNet, Cendant, Cisco, Compaq, EMC, National Geographic, Gateway,

Genuity, Inktomi, Legend, Oxygen, Rainbow, Qwest, Sun and WorldCom.  These Transactions

represent substantially all of the revenues and expenses reviewed by the Independent Examiner.

In accordance with the terms of the Consent Order, the Company shall make the determination,

for purposes of its financial statements, of the amounts, effect and periods of the restatement.

## II.   BACKGROUND OF THE APPOINTMENT OF THE INDEPENDENT EXAMINER

### A.   The Consent Order Executed Between the Company and the SEC

#### 1.   Precipitating Events

In July 2002, the SEC commenced a formal investigation into the Company's business relationships with certain entities, including Bertelsmann AG ("Bertelsmann"), PurchasePro.com ("PurchasePro") and Homestore, among others, captioned *In the Matter of AOL Time Warner Inc.*, File No. HO-9429.  The investigation focused on the Company's accounting treatment for advertising transactions with these entities.  The DOJ opened an investigation of the Company shortly thereafter.  The SEC and DOJ investigations proceeded throughout 2003 and 2004, and involved, among other things, the production of a voluminous collection of documents by the Company and interviews of and taking of testimony from numerous Company officers, employees and outside accountants.  These investigations, and the history of the accounting issues at the Company generally, are described in detail in Section VI below.

#### 2.   The SEC Complaint and the Terms of the Consent Order

On March 11, 2005, the Company consented to the entry of final judgment on a civil Complaint to be filed by the SEC, as memorialized in the Consent Order.[4]  The Complaint, which was filed on March 21, 2005, alleged, among other things, that the Company artificially inflated its reported online advertising revenues by engaging in "round-trip" transactions.  According to the Complaint, these "round-trip" transactions took several forms, including: (1) vendor transactions, in which the Company agreed to pay inflated prices for, or forego discounts on, goods and services it purchased in exchange for the vendor's purchases of online advertising in the same amount as the markup or foregone discount; (2) conversion of settlements of legal

---

[4]     A copy of the Consent Order is attached as Appendix A to this Report.

claims into online advertising revenue; (3) business acquisitions, in which the Company increased the purchase price in exchange for the seller's purchase of online advertising in the same amount as the price increase; and (4) referral transactions, in which the Company falsely created and reported advertising revenues through referral relationships with third parties.

The final judgment to which the Company agreed pursuant to the Consent Order: (1) directed the Company to comply with a Cease-and-Desist Order previously issued by the SEC on May 15, 2000; (2) permanently restrained the Company from violating or aiding and abetting violations of various securities laws; (3) directed the Company to pay disgorgement in the amount of $1; and (4) imposed a civil penalty on the Company of $300 million. The Company further agreed pursuant to the Consent Order to restate its historical financial results to correct its accounting:  (1) for $20 million of advertising revenue recognized by the Company in connection with certain PurchasePro transactions in the fourth quarter of 2000; (2) for $29.5 million of advertising revenue recognized by the Company in 2001 and the first quarter of 2002 in connection with advertising transactions with two unnamed counterparties;[5] (3) for $451 million of advertising revenue recognized by the Company in connection with certain advertising transactions with Bertelsmann between the fourth quarter of 2000 and the fourth quarter of 2001; and (4) to properly reflect the consolidation of AOL Europe, S.A. in 2000 and 2001.

3.   The Independent Examiner Mechanism in the Consent Order

The Company additionally agreed in the Consent Order to engage an independent examiner to review transactions involving online advertising and related transactions, and any amendments thereto, between the Company and the Counterparties, entered into between June 1,

---

[5]   The two unnamed counterparties were Portal Software, Inc. and Vivendi Universal SA.

-17-

2000 and December 31, 2001 (the "Transactions").[6]  The 17 Counterparties identified in the

Consent Order were National Geographic, Oxygen, Rainbow, Inktomi, BuildNet, Cisco,

Compaq, EMC, Gateway, Legend, Qwest, Sun (including iPlanet-related online advertising

transactions), Cendant (including Trilegiant-related transactions), Genuity, Aether, Foundry and

WorldCom.  The Consent Order charged the independent examiner to determine, based on his

professional judgment, whether (a) sufficient and competent evidence exists to establish that the

Company's accounting for the Transactions is in conformity with GAAP, and (b) the accounting

for the Transactions reflects their substance.

Pursuant to the Consent Order, the independent examiner was to be, or was authorized to

hire, a certified public accountant "not unacceptable" to the SEC.  On June 27, 2005, after

interviews with the SEC and with counsel for the Company, William K. Lenhart, CPA, CFE,

CTP, CIRA, a partner and a national practice leader at BDO Seidman, was selected, and BDO

Seidman was engaged to conduct the investigation.[7]  BDO Seidman engaged the law firm of Saul

Ewing to assist in the performance of the investigation.[8]  Lenhart and the BDO Seidman and

Saul Ewing teams who participated in the investigation under his supervision are collectively

referred to throughout this Report as the "Independent Examiner."[9]  In accepting the

engagement, in accordance with the terms of the Consent Order, Lenhart, BDO Seidman and

---

[6]     The Company's transactions with certain of the Counterparties, such as Genuity, were
        finalized and executed after the relevant time period in early 2002.  These transactions
        were nonetheless included as part of the Independent Examiner's Investigation, at the
        direction of the SEC, because they were negotiated during the relevant time period.

[7]     Lenhart's Curriculum Vitae and a summary description of BDO Seidman are included as
        Appendices B and C, respectively.

[8]     A summary description of Saul Ewing is included as Appendix D to this Report.

[9]     The conclusions of the Independent Examiner set forth in this Report are, however,
        conclusions formed by Lenhart, with the assistance of the BDO Seidman and Saul Ewing
        teams who participated in the Investigation.