368

1

1        UNITED STATES DISTRICT COURT

2        SOUTHERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - x

4   SECURITIES AND EXCHANGE          :

5   COMMISSION,                      :

6               Plaintiff,           :

7          vs.                       :   08 Civ. 4612-CM

8                                    :   (ECF Case)

9   JOHN MICHAEL KELLY, STEVEN E. :

10  RINDNER, JOSEPH A. RIPP, and  :

11  MARK WOVSANIKER,                 :

12                                   :

13               Defendants.    :

14  - - - - - - - - - - - - - - x

15

16               Washington, D.C.

17          Wednesday, December 23, 2009

18

19          VIDEOTAPED DEPOSITION OF

20          GARRET G. RASMUSSEN

21

22

14

1    Q.   And did there come a time in the late
2  1990s when you represented a company called
3  MovieFone?
4    A.   Yes.
5    Q.   Can you just tell me briefly a little bit
6  about MovieFone?
7    A.   MovieFone was a company that provided
8  reserved seats at movie theaters so that people
9  could call in advance, make sure that they could
10 have a seat at the movie before they actually went
11 out of their house or apartment and went to the
12 movie theater.
13   Q.   And can you tell me when you began
14 representing MovieFone?
15   A.   It was in the late -- mid -- mid to late
16 1990s.  It was the time that Pearl Jam had
17 complained about Ticketmaster's conduct to the
18 antitrust division.
19   Q.   Okay, and if you could tell me how
20 Ticketmaster ties into MovieFone's business, if at
21 all?
22   A.   Yeah, MovieFone entered into a joint

15

1  venture with a company called Pacer CATS.  Pacer
2  CATS had been owned by Wembley.  At the time the
3  joint venture was entered into, Wembley was the
4  parent of Pacer CATS.  Ticketmaster also, as you
5  know, sells tickets and is interested in all sorts
6  of ticket sales, so MovieFone considered
7  Ticketmaster to be a rival.  Ticketmaster acquired
8  Pacer CATS from Wembley after the joint venture was
9  formed and proceeded to poison the joint venture by
10 disrupting the performance of Pacer CATS.
11   Q.   Okay, and let's take a step back because I
12 didn't actually get the sort of foundational stuff
13 about MovieFone.  Tell me who you worked with at
14 MovieFone.
15   A.   Henry Jarecki, who was the chairman and
16 father of Andrew Jarecki.  Andrew Jarecki was the
17 president and CEO, and Adam Slutsky was the CFO, and
18 it was those three people that I interacted with.
19   Q.   And did there come a time when MovieFone
20 entered into some sort of business arrangement with
21 AOL?
22       MR. BENNETT:  I'm just going to interject

16

1  an objection here on behalf of AOL and Time Warner.
2  You're obviously welcome to answer the question with
3  any public information you have.  I'd like you to
4  not answer to the extent your answer would reflect
5  attorney-client communications or your own attorney
6  work product on behalf of AOL --
7       THE WITNESS:  Yeah.
8       MR. BENNETT:  -- or Time Warner.
9       THE WITNESS:  And I'll try to pay
10 attention to that, Edward.  Please object if --
11 because I may not be paying as close attention as I
12 should.
13       MR. BENNETT:  You've been doing a very
14 good job.
15       THE WITNESS:  Okay, okay, okay.
16       MR. BENNETT:  I just wanted to --
17       THE WITNESS:  Thanks.
18       BY MR. BOWERS:
19   Q.   Okay.  So actually, let's take a different
20 step back and talk about Pacer CATS for a moment.
21 If I got it correct -- if I got your -- if I
22 understood your testimony correctly, what you said

17

1  earlier is that MovieFone entered into a joint
2  venture with Wembley.
3    A.   No, with Pacer CATS.
4    Q.   I'm sorry, that's why I want to make sure
5  --
6    A.   Yes.
7    Q.   -- I had it right.
8    A.   With Pacer CATS.  Pacer CATS was owned by
9  Wembley.
10   Q.   Okay.
11   A.   So Wembley sold its interests subsequently
12 to Ticketmaster, so we found our joint venture
13 partner to be owned by our biggest rival.  We could
14 have lived with that but for the conduct of
15 Ticketmaster after that.
16   Q.   Okay, and let's -- again, let's step back
17 a little bit before Ticketmaster comes into the
18 picture and acquires the joint venture from Wembley.
19   A.   Right.  No, not acquired the joint
20 venture.
21   Q.   Pacer CATS from Wembley.
22   A.   Right.

5   (Pages 14 to 17)

369



## GUARANTEE

This Guarantee is being delivered by Wembley plc ("Wembley") to Promofone, Inc. ("MF") and The Teleticketing Company, L.P. ("TTC") pursuant to paragraph VIIIC of the Agreement, dated February 14, 1992, between PACER CATS CORPORATION ("PC") and MF (such Agreement, as it may be modified, amended, supplemented or restated from time to time, the "Agreement"). Capitalized terms used in this Guarantee without definition shall have the respective meanings given to them in the Agreement.

Wembley hereby unconditionally guarantees the full and timely performance by PC of its obligations under the Agreement. Wembley's guarantee hereunder is an unconditional guarantee of payment and performance and each of MF and TTC may enforce this Guarantee before, concurrently with, or after taking any action to enforce PC's obligations under the Agreement (or without taking any such action).

The obligations of Wembley under this Guarantee shall not be affected or impaired by reason of the happening of any of the following, although without notice to or the further consent of Wembley:

1. The extension, in whole or in part, of the time for payment by PC of any payment or of the time for performance by PC of any obligation under the Agreement.

2. The modification, amendment, supplementation or restatement of any of the obligations under the Agreement.

3. Any failure, omission, delay or lack on the part of either MF or TTC to enforce, assert or exercise any right, power, or remedy conferred on MF or TTC under the Agreement or otherwise.

4. The release of PC from the obligation to perform or comply with any agreement, covenant, representation, term or condition of the Agreement by operation of law.

9AOL050003
CONFIDENTIAL TREATMENT
REQUESTED

CONFIDENTIAL A 05092



This Guarantee shall be governed by internal laws of the State of New York.

This Guarantee shall expire upon the earlier of (i) TTC's achieving the Threshold Return in accordance with the terms of paragraph VB1 of the Agreement and (ii) provided that the Second Stage shall not have commenced, the expiration of the Second Stage Deadline.

Dated as of May    , 1992

WEMBLEY PLC

By

Name: ~~A C HCCRindis~~

Title: ~~Financial Director~~

— 2 —

9AOL050004
CONFIDENTIAL TREATMENT
REQUESTED

CONFIDENTIAL A 05093

370

1

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF NEW YORK

 3   - - - - - - - - - - - - - - x

 4   SECURITIES AND EXCHANGE        :

 5   COMMISSION,                    :

 6                  Plaintiff,     :

 7        vs.                      :   08 Civ. 4612-CM

 8                                 :   (ECF Case)

 9   JOHN MICHAEL KELLY, STEVEN E. :

10   RINDNER, JOSEPH A. RIPP, and  :

11   MARK WOVSANIKER,               :

12                                 :

13                  Defendants.    :

14   - - - - - - - - - - - - - - x

15

16               Washington, D.C.

17          Wednesday, December 23, 2009

18

19             VIDEOTAPED DEPOSITION OF

20             GARRET G. RASMUSSEN

21

22
```

**14**

1    Q.    And did there come a time in the late
2    1990s when you represented a company called
3    MovieFone?
4    A.    Yes.
5    Q.    Can you just tell me briefly a little bit
6    about MovieFone?
7    A.    MovieFone was a company that provided
8    reserved seats at movie theaters so that people
9    could call in advance, make sure that they could
10   have a seat at the movie before they actually went
11   out of their house or apartment and went to the
12   movie theater.
13   Q.    And can you tell me when you began
14   representing MovieFone?
15   A.    It was in the late -- mid -- mid to late
16   1990s. It was the time that Pearl Jam had
17   complained about Ticketmaster's conduct to the
18   antitrust division.
19   Q.    Okay, and if you could tell me how
20   Ticketmaster ties into MovieFone's business, if at
21   all?
22   A.    Yeah, MovieFone entered into a joint

**15**

1    venture with a company called Pacer CATS. Pacer
2    CATS had been owned by Wembley. At the time the
3    joint venture was entered into, Wembley was the
4    parent of Pacer CATS. Ticketmaster also, as you
5    know, sells tickets and is interested in all sorts
6    of ticket sales, so MovieFone considered
7    Ticketmaster to be a rival. Ticketmaster acquired
8    Pacer CATS from Wembley after the joint venture was
9    formed and proceeded to poison the joint venture by
10   disrupting the performance of Pacer CATS.
11   Q.    Okay, and let's take a step back because I
12   didn't actually get the sort of foundational stuff
13   about MovieFone. Tell me who you worked with at
14   MovieFone.
15   A.    Henry Jarecki, who was the chairman and
16   father of Andrew Jarecki. Andrew Jarecki was the
17   president and CEO, and Adam Slutsky was the CFO, and
18   it was those three people that I interacted with.
19   Q.    And did there come a time when MovieFone
20   entered into some sort of business arrangement with
21   AOL?
22   MR. BENNETT: I'm just going to interject

**16**

1    an objection here on behalf of AOL and Time Warner.
2    You're obviously welcome to answer the question with
3    any public information you have. I'd like you to
4    not answer to the extent your answer would reflect
5    attorney-client communications or your own attorney
6    work product on behalf of AOL --
7    THE WITNESS: Yeah.
8    MR. BENNETT: -- or Time Warner.
9    THE WITNESS: And I'll try to pay
10   attention to that, Edward. Please object if --
11   because I may not be paying as close attention as I
12   should.
13   MR. BENNETT: You've been doing a very
14   good job.
15   THE WITNESS: Okay, okay, okay.
16   MR. BENNETT: I just wanted to --
17   THE WITNESS: Thanks.
18   BY MR. BOWERS:
19   Q.    Okay. So actually, let's take a different
20   step back and talk about Pacer CATS for a moment.
21   If I got it correct -- if I got your -- if I
22   understood your testimony correctly, what you said

**17**

1    earlier is that MovieFone entered into a joint
2    venture with Wembley.
3    A.    No, with Pacer CATS.
4    Q.    I'm sorry, that's why I want to make sure
5    --
6    A.    Yes.
7    Q.    -- I had it right.
8    A.    With Pacer CATS. Pacer CATS was owned by
9    Wembley.
10   Q.    Okay.
11   A.    So Wembley sold its interests subsequently
12   to Ticketmaster, so we found our joint venture
13   partner to be owned by our biggest rival. We could
14   have lived with that but for the conduct of
15   Ticketmaster after that.
16   Q.    Okay, and let's -- again, let's step back
17   a little bit before Ticketmaster comes into the
18   picture and acquires the joint venture from Wembley.
19   A.    Right. No, not acquired the joint
20   venture.
21   Q.    Pacer CATS from Wembley.
22   A.    Right.

5 (Pages 14 to 17)

**22**

1  things for the record, I'd just note for the record
2  I sent a letter last night to counsel for the SEC,
3  counsel for the witness and counsel for AOL
4  outlining Mr. Kelly's reservation of the rights.
5  Should there be a waiver of the privilege today,
6  Mr. Kelly reserves the right to call Mr. Rasmussen
7  in order to go over with him any privileged
8  materials that might be produced subsequent to such
9  waiver.
10       MR. DRIMMER:  And we will note for the
11  record that we're joining in the reservation of
12  Mr. Kelly for Mr. Rindner.
13       MR. DUNCAN:  And just so everyone knows,
14  our position is Mr. Rasmussen's available today for
15  seven hours of deposition and we'll await further
16  court order for any further testimony.
17       MR. BENNETT:  Just so we have a completely
18  level playing field, and I hope this will be the
19  last time I'll have to talk at length on the record,
20  just so everybody understands the ground rules so if
21  there's any -- there are any questions later in the
22  day from the defendants for Mr. Rasmussen, AOL for

**23**

1  seven years has protected the attorney-client
2  privilege and the core work product of its attorneys
3  from disclosure, and we continue to keep to that
4  position.  We're more than happy to have
5  Mr. Rasmussen testify regarding communications he
6  had with third parties, but we're not inclined to
7  allow him to testify about his thoughts and
8  impressions as an attorney regarding documents or
9  strategies that were played.  We're also not
10  inclined to allow him to testify regarding any
11  communications he had with any persons internal to
12  his client, AOL or MovieFone or Time Warner.
13       MR. TOPETZES:  I want to note on the
14  record on behalf of Mr. Wovsaniker that we join with
15  counsel for the other defendants in reserving our
16  client's rights with respect to these privilege
17  issues.  I also want to note an administrative
18  matter with respect to today's deposition that,
19  John, I assume we have the same stipulation that
20  we've had in prior depositions that an objection for
21  one defendant is deemed to be an objection by all.
22       MR. BOWERS:  Yes, we do.

**24**

1       MS. LYNCH:  And counsel for Mr. Rupp joins
2  in the reservation of rights as well.
3       BY MR. BOWERS:
4       Q.   Is that everybody?  Great.  Okay,
5  Mr. Rasmussen, I apologize for the delay and let's
6  continue.  Can you tell me, with respect to Exhibit
7  1, which my understanding is Wembley's guarantee of
8  Pacer CATS's obligations in the joint venture that
9  you described between MovieFone and Pacer CATS, did
10  there come a time when you communicated your
11  understanding of this document to Wembley?
12       A.   Wembley's counsel, yes.
13       Q.   Tell me about that if you would please.
14       A.   I told Wembley's counsel, a lawyer at
15  Dechert Price, that this guarantee obligated Wembley
16  to pay the full arbitration award that we had gotten
17  against Pacer CATS.
18       Q.   Okay, and let's take a step back.  We seem
19  to be going backwards and forwards.
20       A.   That's all right.
21       Q.   And I apologize for that.
22       A.   Yeah.

**25**

1       Q.   But I'm somewhat trying to react to the
2  testimony that I get.  It sounds like you ultimately
3  ended up representing MovieFone in an arbitration
4  proceeding --
5       A.   Yes.
6       Q.   -- of some sort?  Can you tell me about
7  that?
8       A.   Well, we brought an arbitration action
9  against Pacer CATS pursuant to our contract with --
10  the joint venture contract with Pacer CATS, and that
11  was arbitrated in New York City over 81 days or so,
12  and we won a unanimous judgment for about $22
13  million, which was subsequently confirmed by the New
14  York Supreme Court.
15       Q.   And tell me what your understanding as you
16  communicated it to third parties was of the impact
17  of that arbitration award on Wembley.
18       MR. TUTTLE:  Objection to form and
19  foundation.
20       A.   We -- after winning that award and after
21  having it confirmed, I approached Wembley's counsel
22  and said that we wanted -- we -- we interpreted this

7 (Pages 22 to 25)

371

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

MOVIEFONE, INC.,
and THE TELETICKETING COMPANY, L.P.,

                              Plaintiffs,                 95 Civ 1861 (SHS)

          -against-                                       AMENDED COMPLAINT

TICKETMASTER CORPORATION.                                 (Jury Trial Demanded)
                                                          CONFORMED COPY
                                                          ORIGINAL FILED

                              Defendant.                  MAR 0 4 1997

-----------------------------------------------------------x
                                                          USDC SDNY

          Plaintiffs MovieFone, Inc. ("MovieFone" or "MF") and The Teleticketing Company, L.P.

("TTC") (collectively "Plaintiffs"), by their attorneys, hereby amend their complaint as of right

pursuant to Fed. R. Civ. P. 15, alleging as follows:

                              ## SUMMARY OF CLAIMS

          1.   Plaintiffs MovieFone and its wholly-owned subsidiary, TTC, are in the business of

providing movie information and automated ticketing services to consumers.  Automated

ticketing is the sale of tickets to multiple entertainment events utilizing telephone lines and remote

outlets connected by telephone to a central computer.  It is distinct from ticket sales at the box

office for individual entertainment events.  Ticketmaster Corporation, by its own description, is

the dominant automated ticketing company in the United States.  Ticketmaster has entrenched its

monopoly power by acquiring in a fraudulent transaction the assets of MovieFone's joint venture

partner, Pacer Cats Corporation ("PC"), and by engaging in other exclusionary conduct, including

                              1

9AOL050006
CONFIDENTIAL TREATMENT
REQUESTED



Rasmussen
EXHIBIT NO. 2
KY 12/23/09

(i) tortiously interfering with Plaintiffs' contracts and business relationships, including MovieFone's February 1992 Agreement with PC, (ii) tortiously interfering with MovieFone's initial public offering, (iii) maliciously filing a fraudulent lawsuit under PC's name that was not authorized by PC, (iv) fraudulently posing as an investigative reporter and surreptitiously manufacturing evidence for a frivolous libel action against MovieFone, which subsequently was dismissed, (v) maliciously publishing injurious falsehoods about MovieFone, and (vi) otherwise engaging in a pattern of fraudulent conduct that constitutes racketeering.

2.  Plaintiffs are amending their complaint at this time to preserve causes of action that otherwise might expire because of the running of certain statutes of limitations as well as to supplement MovieFone's original antitrust claim based on new information that has come to light during an arbitration proceeding between MovieFone and Pacer Cats and during Ticketmaster's initial public offering. That arbitration, brought by Plaintiffs against PC, concerns PC's breach of the February 1992 Agreement between MovieFone and PC. Although Ticketmaster formally rejected MovieFone's invitation to participate in the arbitration, Ticketmaster in fact controlled PC's defense in the arbitration. A number of the factual issues raised in this amended complaint may be resolved by that arbitration. The arbitration is expected to conclude sometime in mid-1997. None of the claims raised in this amended complaint waive or limit in any way MovieFone's contention in the arbitration that Ticketmaster is a successor to, and privy of, PC.

### JURISDICTION AND VENUE

3.  This Court has jurisdiction pursuant to 15 U.S.C. §§ 15, 22, and 26, 18 U.S.C. § 1964, 28 U.S.C. § 1337, and the principles of pendent jurisdiction.

2

9AOL050007
CONFIDENTIAL TREATMENT
REQUESTED

4.    The unlawful activities hereinafter alleged occurred, in significant part, within this District, and have had substantial effects on interstate commerce. The interstate commerce described herein was carried on, in part, within this District.

5.    Venue is properly in the Southern District of New York pursuant to 15 U.S.C. § 22, 18 U.S.C. § 1965, and 28 U.S.C. § 1391(b), (c).

### THE PARTIES AND OTHER ENTITIES

6.    Plaintiff MovieFone, Inc., ("MovieFone") is a publicly-held Delaware corporation with its principal place of business in New York City. Since 1989, MovieFone has offered a free service to moviegoers in major movie markets, whereby a moviegoer can call easy-to-remember local telephone numbers (*e.g.*, "777-FILM" in New York City) and hear automated showtime, location, and other information about movies playing in given markets.

7.    Plaintiff The Teleticketing Company, L.P. ("TTC") is a Delaware limited partnership with its principal place of business in New York City and is wholly-owned by MovieFone. It was formed as a result of a February 14, 1992 Agreement (the "1992 Agreement") between MovieFone and PC to perform teleticketing services. Pursuant to the 1992 Agreement, TTC entered into teleticketing contracts with Cineplex Odeon, Sony Theatres (formerly Loews), and City Cinemas.

8.    Defendant Ticketmaster Corporation ("Ticketmaster") is an Illinois corporation with its principal place of business in Los Angeles, California. Ticketmaster is the dominant provider of automated teleticketing services in the United States with over 3,500 clients, including many of the country's foremost entertainment facilities and promoters and 73 professional sports

3

9AOL050008
CONFIDENTIAL TREATMENT
REQUESTED

franchises. In fiscal 1996, Ticketmaster sold 53.1 million tickets, generating revenues from service charges to ticket purchasers of $241.3 million.

9.     Pacer Cats Corporation ("PC") is a Washington corporation with its last principal place of business at 355 Inverness Drive South, Englewood, Colorado. PC's ultimate parent entity is Wembley PLC ("Wembley") of the United Kingdom. Until its assets were acquired by a Ticketmaster-controlled entity on April 15, 1994, PC was the largest U.S. supplier of automated box office and motion picture theater management equipment and services, with an estimated market share exceeding 80%. Since April 15, 1994, PC has been an inactive shell corporation, holding as its only significant asset the 1992 Agreement between MovieFone and PC. On September 15, 1994, PC changed its name to PCC Management, Inc.

10.    Pacer/Cats/CCS -- A Wembley-Ticketmaster Joint Venture ("CCS") is a Delaware general partnership with its principal place of business in Los Angeles, California. It was formed by subsidiaries of Wembley PLC and Ticketmaster on or about April 15, 1994. It is the entity to which PC's assets other than it's 1992 Agreement with MovieFone, were transferred on April 15, 1994. Ticketmaster, through its wholly owned subsidiary, TM Cinema, took over Wembley's interest in the Pacer/Cats/CCS partnership in July 1996 and is now the sole proprietor of CCS.

<u>FACTUAL BACKGROUND</u>

11.    On February 14, 1992, MovieFone, through a predecessor corporation, PromoFone, Inc., entered into a long-term agreement (hereafter "the 1992 Agreement") with PC to provide a state-of-the-art teleticketing service that would allow a movie patron to purchase movie tickets over the telephone to any one of a number of different movies playing at first-run theaters located in major markets. Under the terms of the 1992 Agreement, PC obligated itself to

4

9AOL050009
CONFIDENTIAL TREATMENT
REQUESTED

negotiate TTC teleticketing contracts with theaters and theater chains and to connect

MovieFone's telephone lines to the box office computers of theaters that were willing to sign such

contracts. TTC agreed to pay PC for the necessary upgrade equipment and installation costs to

enable teleticketing at these theaters through MovieFone's telephone lines. MovieFone also

agreed to market the venture to the movie-going public and to pay PC monthly fees to maintain

and service certain installed equipment. The 1992 Agreement between MovieFone and PC was to

remain in force as long as PC's teleticketing equipment was installed in teleticketing theaters in

specified major cities covered by the 1992 Agreement.

12.    The MovieFone-PC relationship was a joint venture, and the parties regarded it as

such, acknowledging that each owed the other a duty of good faith and fair dealing.

13.    The MovieFone-PC venture was ideally suited for success. At the time the 1992

Agreement was executed, PC's box office equipment was already installed in more than 80% of

U.S. movie theaters, and PC controlled access to its computerized box office equipment because

it retained sole ownership and knowledge of the software and source codes used in that

equipment. MovieFone was already the leading supplier of movie showtime information over the

telephone in the country's major movie markets, and its local telephone numbers, such as

777-FILM in New York City, were widely recognized and used on a regular basis by millions of

avid moviegoers. Together, the two companies were able to achieve unique synergies.

14.    The MovieFone-PC venture was successful at the outset. During its first six

months, the venture signed teleticketing contracts with two major movie exhibitors, Cineplex

Odeon and Loews Theatres (now Sony Theatres). The venture engaged in negotiations with

5

9AOL050010
CONFIDENTIAL TREATMENT
REQUESTED

other theaters. Calls to MovieFone's teleticketing phone lines were increasing, as were teleticket sales.

15.    Building on their initial success, Plaintiffs and PC in 1993 made plans and took steps to expand their venture to live-event teleticketing at arenas and stadiums. For example, an internal PC document, dated May 12, 1993, lists "Stadium and Arenas" as one of PC's markets, and identifies "Ticketmaster" as a competitor. Furthermore, a September 1993 Confidential Offering Memorandum prepared by PC's parent stated, "the Company's management believes its fully automated systems could replace more expensive ticketing services provided by third parties (such as Ticketmaster in the United States), and that this market offers substantial potential for future system sales."

16.    Upon information and belief, Ticketmaster, the dominant provider of automated ticketing services in the United States, was concerned about the success of the MovieFone-PC teleticketing venture. Ticketmaster had previously tried to acquire Pacer Corporation, a predecessor of PC, and later had attempted to enter into a teleticketing joint venture with MovieFone. After learning of the MovieFone-PC Agreement, Ticketmaster itself entered movie teleticketing through a joint venture with General Cinemas.

17.    In recent years, Ticketmaster has acquired stock or assets of no less than 14 competitors or potential competitors. These include its only national competitor at the time — Ticketron — acquired in May 1991, as well as numerous regional competitors, such as SEATS in Atlanta, Select-a-Seat in Denver, Capital Automated Ticketing in Kansas City, TicketWorld USA in New York City and Detroit, TicketPro in New England, Dayton's Ticketing in Minneapolis, Softix in Florida, Ticket Hub in Memphis, the Southland Corporation in Texas, and Bay Area

6

Seating Service in San Francisco. As a result of these acquisitions, Ticketmaster has, in its own words, become "the largest automated ticketing company in the United States."

18.     In August 1993, Ticketmaster and Wembley secretly entered into a letter of intent pursuant to which Ticketmaster would gain control over PC's assets pursuant to forming a teleticketing joint venture with Wembley.

19.     The actual closing of this transaction did not take place until April 15, 1994. In the interim, however, Ticketmaster exercised control over PC and intentionally initiated a course of conduct intended to frustrate the performance of the 1992 Agreement and simultaneously to damage MovieFone. In particular, Ticketmaster interfered with MovieFone's 1992 Agreement with PC, TTC's contracts with Cineplex Odeon Theatres, Loews (Sony) Theatres, and City Cinemas Theatres, and with the prospective business relations of Plaintiffs.

20.     Beginning in December 1993, Ticketmaster prevented PC from connecting MovieFone to PC box office equipment at City Cinemas theaters in New York City, even though pursuant to the 1992 Agreement, City Cinemas had signed a teleticketing agreement with TTC.

21.     In March 1994, after Ticketmaster had agreed to acquire the assets of PC, but before the closing, Ticketmaster intentionally disrupted MovieFone's initial public offering, imposing significant additional costs on MovieFone. On or about March 8, 1994, the most senior executive of Ticketmaster told MovieFone's investment banker, Alex. Brown & Sons, Inc. that the 1992 Agreement between MovieFone and PC was unenforceable, that the relationship between MovieFone and PC is "going to change," and that "all their business must go through me." The Ticketmaster executive also said that Alex. Brown should "read between the lines," and declared that "[t]his is war." At approximately the same time, another Ticketmaster

7

9AOL050012
CONFIDENTIAL TREATMENT
REQUESTED

representative told MovieFone's other investment banker, Salomon Brothers, that PC could "[get] out of that contract [the 1992 Agreement with MovieFone] in a heartbeat" and that "[i]t will get very ugly." The Ticketmaster representative stated further that "[w]e mean to force them to abrogate their contract," referring to the 1992 Agreement. Ticketmaster also warned both investment banks that if they continued to work on behalf of MovieFone, Ticketmaster would remove them from the "short list" of investment banks being considered for a purportedly imminent Ticketmaster public offering.

22.     On April 15, 1994, all the assets and employees of PC, except PC's 1992 Agreement with MovieFone and a seven million dollar note payable from Wembley to PC (which was forgiven the following day) were transferred to a new entity, CCS, controlled and managed by Ticketmaster. Pursuant to the April 15, 1994, Joint Venture Agreement, Ticketmaster and Wembley expressly agreed that PC would not engage in any business that competed with CCS, including teleticketing. As a result of these actions, PC was permanently disabled from honoring its 1992 Agreement with MovieFone. PC was left an insolvent shell corporation, without employees or resources, whose only remaining asset and liability was the 1992 Agreement.

23.     The asset transfer constituted a fraudulent conveyance, and it crippled MovieFone's ability to compete in the teleticketing business. None of the consideration that Ticketmaster paid for PC's assets went to PC.

24.     For a period of almost two years, Ticketmaster affirmatively misled Plaintiffs into believing that the assets necessary to perform the 1992 Agreement had not been stripped away from the Agreement. Ticketmaster did not reveal that the 1992 Agreement had been separated from PC's other assets until January, 1996.

8

9AOL050013
CONFIDENTIAL TREATMENT
REQUESTED

25.     In late April 1994, immediately after acquiring the assets of PC, Ticketmaster officials met with the former PC executives -- now CCS executives -- in Los Angeles, California. At the meeting, the Ticketmaster officials informed the former PC employees that Ticketmaster intended to use the PC assets and personnel it had acquired to "f--k MovieFone" and to "wipe MovieFone out of the market in 18 months." In particular, Ticketmaster executives informed the former PC employees of its plans to reserve the telephone number "777-FLXS" (which is intentionally confusingly similar to MovieFone's "777-FILM" number) in major movie markets and instructed the former PC employees to try to change certain merchant identification numbers so that TTC's proceeds from teleticketing sales would be diverted to a Ticketmaster-controlled bank account. Ticketmaster also instructed the former PC employees to search their files for any evidence that could be used as a pretext for claiming that MovieFone had breached the 1992 Agreement with PC.

26.     Subsequent to the acquisition of PC's assets, Ticketmaster engaged in a pattern of fraudulent conduct designed to further harm MovieFone and strengthen the Ticketmaster-controlled movie-teleticketing entity, CCS. Ticketmaster caused money owed to PC for service to be paid to CCS. Ticketmaster also interfered with MovieFone's relationships with a number of movie exhibitors, including AMC, National Amusements, and United Artists.

27.     Subsequent to the PC asset acquisition, representatives of Ticketmaster and former PC employees, holding themselves out as PC employees, called on major movie exhibitors in an effort to usurp teleticketing opportunities that, under the terms of the 1992 Agreement, Pacer Cats was obligated to pursue on behalf of TTC. Ticketmaster and PC's former employees jointly visited exhibitors to solicit teleticketing business for Ticketmaster in markets where PC was

9

9AOL050014
CONFIDENTIAL TREATMENT
REQUESTED

contractually obligated to MovieFone to make good faith efforts to negotiate teleticketing

agreements for the MovieFone-PC venture and not to provide a competing teleticketing service.

28.      On October 6, 1994, MovieFone wrote to PC, informing PC that MovieFone

would initiate arbitration proceedings pursuant to the arbitration provision of the 1992 Agreement

if PC's breaches were not cured.

29.      On October 26, 1994, Ticketmaster and CCS sponsored a lunch for more than a

thousand movie exhibitor representatives at the annual ShowEast Convention in Atlantic City. At

this luncheon, Ticketmaster formally announced its new partnership with "Pacer Cats" to provide

"the first fully automated telephone reservation service revolutionizing the marketing and selling

of movie tickets in America," and told exhibitors to "accept no substitutes" for the Ticketmaster

partnership. The Ticketmaster spokesman further stated at the luncheon:

> Pacer Cats is probably the largest ticketing company in the world serving movie
> theaters. Their company has been invigorated with new ownership with the recent
> purchase by Ticketmaster Wembley. Ticketmaster is the largest provider of tickets
> to the world entertainment market.

30.      On the same day, Ticketmaster caused a lawsuit to be filed in California Superior

Court under the name of PC against MovieFone, alleging, among other things, that MovieFone

had breached its 1992 Agreement with PC. The lawsuit had never been authorized by PC. Sir

Brian Wolfson, PC's sole director at the time the lawsuit was filed, revealed in sworn testimony on

January 23, 1997, that not only had PC never authorized this suit, he did not know the attorneys

who filed it and was unaware of any facts supporting numerous allegations in the complaint. On

February 5, 1997, the suit was voluntarily dismissed by PC's purported counsel.

31.      On November 1, 1994, MovieFone initiated arbitration proceedings against PC for

breach of contract. An amended demand was filed on December 8, 1994. Evidentiary hearings

9AOL050015
CONFIDENTIAL TREATMENT
REQUESTED

started in September, 1996 and are expected to conclude in April, 1997. Ticketmaster was invited by MovieFone to participate in the arbitration, but it formally declined. Notwithstanding its formal rejection of the invitation, Ticketmaster in fact exercised control over PC's defense in the arbitration until at least mid-December 1996, causing significant delay and disruption. More than two months after the start of evidentiary hearings, PC's counsel disclosed to the arbitration panel that it had been taking direction from an entity controlled by Ticketmaster, and claimed that he had to withdraw from the proceedings because of a "conflict of interest" between Ticketmaster and PC. PC then asked for a two-month adjournment of the proceedings so that new counsel could learn the case. When the arbitration panel found no conflict and refused to adjourn the proceedings, the PC/Ticketmaster counsel announced he would no longer attend, claiming that his "client" had informed him that there was no more money available to pay his fees. New attorneys representing the "Wembley interests" took over PC's defense. Ticketmaster's attorneys, however, have continued to assist PC's new counsel in the defense of the arbitration, presumably on a paid basis.

32.     Upon information and belief, in late 1994 Ticketmaster hired, or caused to be hired, a private detective, Martin Bergman, who contacted MovieFone, fraudulently representing that he was a producer for the television news magazine "60 Minutes" working on an investigation of Ticketmaster. By and through this fraudulent representation, Martin Bergman, acting as Ticketmaster's agent, deceptively gained access to MovieFone and its principals. In the course of discussions with MovieFone, Mr. Bergman attempted to procure and did procure information regarding MovieFone that Ticketmaster (would not otherwise have known). Ticketmaster then used that information as well as information manufactured by Mr. Bergman to

11

9AOL050016
CONFIDENTIAL TREATMENT
REQUESTED

file a frivolous libel action against MovieFone, its principals, and its attorneys in their individual capacity. That suit is described is paragraph 34 below.

33. In 1994 and 1995, Ticketmaster threatened to retaliate against MovieFone and its representatives and agents for providing information to the Antitrust Division of the United States Department of Justice, which was then conducting an antitrust investigation of Ticketmaster, and to members of the United States Congress, who also were investigating Ticketmaster's conduct. Ticketmaster's threats were consistent with the intimidation tactics it has used on other occasions, such as its baseless\libel suits against lawyers who have complained about its anti-competitive practices, its threatened boycott of a third investment banking firm that had a close professional relationship with a law firm that had complained to the Justice Department on behalf of the rock group, Pearl Jam, and its threats to secure the termination of a Congressional investigator who had raised questions about Ticketmaster's conduct, including, but not limited to, its misleading testimony before Congress. Mr. Bergman, still in the guise of a television producer, warned a Congressional staff member involved in the Congressional investigation to "be careful" because "Ticketmaster means business."

34. Consistent with its pattern of intimidation, on January 31, 1996, Ticketmaster filed a complaint seeking $60 million in damages in New York Supreme Court against MovieFone, two of its attorneys (in their personal capacity), and its Chairman and officers (in their individual capacity) based on information Mr. Bergman, working on behalf of Ticketmaster, fraudulently obtained from a public official. Ticketmaster argued that MovieFone had "libeled" Ticketmaster by opining to the public official that Ticketmaster might have violated criminal antitrust laws. The complaint was dismissed with prejudice in August, 1996.

9AOL050017
CONFIDENTIAL TREATMENT
REQUESTED

35.     Ticketmaster's obstructionist and harassing conduct has frustrated Plaintiffs' efforts to provide teleticketing services to movie theaters and thwarted MovieFone's plans to enter live-event teleticketing.

### COUNT ONE
### Attempt to Monopolize Automated Ticketing For Premier Live Events in Violation of Sherman Act § 2.

36.     The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

37.     Ticketmaster has monopoly power in the national and metropolitan markets for automated ticketing for premier live events.  According to a report in *Seattle Weekly*, published on November 2, 1994, Ticketmaster sells 90% of all premier live event tickets.  Ticketmaster has exercised its monopoly power by charging supracompetitive service fees -- in some cases as high as $10.50 per ticket and 55% of the ticket's face value.  In 1994, a Ticketmaster representative reportedly told  the  operator of a chain of movie theaters that "[we] own entertainment teleticketing in this country."

38.     The automated ticketing market for premier live-events includes services that sell tickets to a number of different premier live events utilizing telephone lines and remote outlets connected by telephone to a central computer.  According to a prospectus filed earlier this year by Ticketmaster as part of its initial public offering, automated ticketing excludes sales of tickets to individual events made and accounted for directly at the venue box office.

39.     Ticketmaster has reinforced its monopoly power by entering into long-term exclusive-dealing contracts.  Ticketmaster's own prospectus acknowledges that Ticketmaster generally enters into three-to-five year exclusive contracts with entertainment venues pursuant to

9AOL050018
CONFIDENTIAL TREATMENT
REQUESTED

which it has the right to sell all of a venue's tickets. Ticketmaster also typically enters into exclusive contracts with promoters and sports teams. According to a report in *The New York Times*, Ticketmaster has exclusive ticket distribution contracts with live-event venues representing 63.2% of the 9.9 million available seats in the United States. Ticketmaster has exclusive contracts at most of the country's major exhibition arenas, including such prominent New York venues as Madison Square Garden, the Meadowlands Sports Complex, and the Nassau Coliseum. For many premier live events, it is the only source of tickets other than scalpers (who, at least in some cities, are upon information and belief, supplied by Ticketmaster outlets). In a number of instances, the Ticketmaster contract with an arena precludes or severely limits box office sales. For example, Ticketmaster's contract with the Meadowlands in New Jersey requires that the box office be closed on the first day of premier live event ticket sales, which in many cases is the only relevant day since many premier live events sell out on the first day.

40.    Barriers to entry in the market for premier-live-event automated ticketing market are high. To compete effectively against Ticketmaster, a ticketing service must be capable of providing a fully integrated and tested ticket inventory management system with related capabilities such as tracking concession sales, controlling the payroll, scheduling personnel, reserved seating, and managing ticket inventory. The creation of such a full-service box office ticket inventory management system is both expensive and time consuming. Based on its own experience, MovieFone estimates that creation of a fully competitive system takes several years from inception and requires a total investment of millions of dollars. But the creation of a fully-functional automated ticketing system is only the first step. Automated ticketing requires a communications network capable of linking individual customers with the teleticketing provider

14

9AOL050019
CONFIDENTIAL TREATMENT
REQUESTED

and a distribution method. To successfully compete against Ticketmaster, a firm also must establish widespread name recognition with the public, a reputation for reliability, and extensive relationships with the entertainment industry. Even more important, a new entrant must be able to overcome the entrenched base that Ticketmaster has established at numerous venues and has reinforced through exclusive contracts.

41.    At the time of Ticketmaster's acquisition of PC's assets in April 1994, the MovieFone-PC venture was the most likely potential entrant into the relevant markets. Both MovieFone and TTC were well managed and well capitalized, and each had established important relationships in the market. The MovieFone-PC venture had the following advantages compared to other potential entrants into the market:

- State-of-the-art automated teleticketing software and hardware, including advanced touch-tone driven technology and access to PC's software that has been successfully used in Europe to sell reserved seats over the telephone and to manage concession sales;

- A proven track record for all aspects of teleticketing, including software, hardware, and marketing;

- Extensive and established relationships with the entertainment industry, with credit card companies, with advertisers, and with other entities that are integral to successful teleticketing;

- National name recognition in major geographic markets;

- Ownership of easily recognizable national phone numbers;

- Access to movie theaters that could be used as remote ticketing outlets during non-peak hours for customers desiring to pay for their tickets in cash;

- Strong financial backing;

- An existing nationwide service and maintenance network;

- An extensive sales force geared to and experienced in relating to live event venues; and

- The ability to keep service fees low because of MovieFone's state-of-the-art automated system and its ability to generate revenue from selling advertising space.

15

9AOL050020
CONFIDENTIAL TREATMENT
REQUESTED

42.     Ticketmaster has engaged in a pattern of exclusionary conduct, including but not limited to the acquisition of PC's assets, with the specific intent of maintaining and entrenching its monopoly power.  In addition to acquiring PC's assets, Ticketmaster has engaged in the following additional exclusionary conduct that has harmed competition:

    a.   interfering with MovieFone's initial public offering and otherwise raising MovieFone's costs;

    b.   filing sham litigation against MovieFone under a false name for the purpose of delaying the arbitration and embroiling MovieFone in costly litigation;

    c.   attempting to delay the resolution of the arbitration proceeding between MovieFone and PC, and increasing MovieFone's litigation costs, by intentionally withholding relevant documents and disrupting the arbitration; and

    d.   entering into unreasonably restrictive exclusive contracts with venues and arenas in order to entrench its monopoly power.

43.     Upon information and belief, Ticketmaster never fully described the nature of its acquisition of PC's assets to the antitrust authorities when it made its pre-merger filings.

44.     Ticketmaster's exclusionary conduct, both separately and collectively, has foreclosed competition, and deprived consumers of the opportunity to receive better service and lower prices.

45.     The foregoing conduct, both individually and collectively, constitutes unlawful monopolization or attempt to monopolize in violation of Sherman Act § 2.

46.     As a result of Ticketmaster's unlawful and anti-competitive conduct, Plaintiffs have suffered antitrust injury and injury to their business and property as well as irreparable injury.

9AOL050021
CONFIDENTIAL TREATMENT
REQUESTED