## COUNT TWO

### Attempt to Monopolize Automated Teleticketing in Violation of Sherman Act § 2

47.    The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

48.    Ticketmaster has either monopoly power or a dangerous probability of acquiring monopoly power in the national and metropolitan markets for automated ticketing.

49.    The automated ticketing market includes services that sell tickets to multiple entertainment events utilizing telephone lines and remote outlets connected by telephone to a central computer.  According to Ticketmaster's prospectus filed earlier this year in connection with an initial public offering, automated ticketing excludes sales of tickets to individual events made at the box office.

50.    As stated above, Ticketmaster has reinforced its monopoly power with long-term exclusive-dealing contracts.  Ticketmaster' own prospectus acknowledges that Ticketmaster generally enters into three-to-five year exclusive contracts with entertainment venues pursuant to which it sells all tickets outside of the facility's box office.

51.    Barriers to entry in the automated ticketing market are high for the reasons stated in the preceding count.

52.    At the time of Ticketmaster's acquisition of PC's assets in April 1994, the MovieFone-PC venture was a competitor of Ticketmaster in automated ticketing.

53.    Ticketmaster has engaged in a pattern of exclusionary conduct, including but not limited to the acquisition of PC's assets, with the specific intent of maintaining and entrenching its

9AOL050022
CONFIDENTIAL TREATMENT
REQUESTED

monopoly power.  In addition to acquiring PC's assets, Ticketmaster has engaged in the following additional exclusionary conduct that has harmed competition in the automated ticketing market:

    a.  interfering with TTC's contracts with exhibitors, including Cineplex Odeon, Loews (now Sony Theatres), and City Cinemas;

    b.  interfering with MovieFone's initial public offering and otherwise raising MovieFone's costs;

    c.  filing sham litigation against MovieFone under a false name for the purpose of embroiling and distracting MovieFone in costly litigation; and

    d.  entering into unreasonably restrictive long-term exclusive contracts with venues and arenas in order to entrench its monopoly power.

54.    Ticketmaster's exclusionary conduct, both separately and collectively, has foreclosed competition, and deprived consumers of the opportunity to receive better service and lower prices.

55.    The foregoing conduct, both individually and collectively, constitutes an unlawful attempt to monopolize the national automated ticketing market in violation of Sherman Act § 2.

56.    As a result of Ticketmaster's unlawful and anti-competitive conduct, Plaintiffs have suffered antitrust injury and injury to their business and property as well as irreparable injury.

### COUNT THREE

### Unlawful Acquisition in Violation of the Clayton Act § 7

57.    The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

58.    Prior to Ticketmaster's acquisition of PC's assets on April 15, 1994, PC (by itself and through its joint venture with MovieFone) and Ticketmaster were competitors in national and metropolitan markets for automated ticketing.

9AOL050023
CONFIDENTIAL TREATMENT
REQUESTED

59.    On April 15, 1994, Ticketmaster acquired all of the assets of PC necessary to provide automated ticketing services in the United States.

60.    Ticketmaster's acquisition of PC has created a reasonable possibility of lessening competition and tended to create a monopoly in the automated ticketing market in violation of Clayton Act § 7.

61.    Because the acquisition deprived MovieFone of its automated ticketing joint venture partner, PC, and access to PC's box office equipment, the acquisition harmed competition by impeding and foreclosing MovieFone's ability to compete in the relevant markets.

62.    The foregoing conduct, both individually and collectively constitutes unlawful acquisition in violation of Clayton Act § 7.

63.    As a result of the foreclosure effects of Ticketmaster's acquisition, which is one of the reasons the acquisition is anti-competitive, Plaintiffs have suffered antitrust injury and injury to their business and property as well as irreparable injury.

## COUNT FOUR
### Conspiracy Between Ticketmaster and PC to Restrain Trade in Violation of Section One of the Sherman Act

64.    The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

65.    Prior to April 15, 1994, Ticketmaster and PC were direct competitors in the relevant automated ticketing markets.

66.    Between August 31,1993, and April 15, 1994, Ticketmaster and PC jointly agreed between themselves on the manner in which automated ticketing services were provided to customers, including the services and terms provided, thereby unreasonably restraining trade.

19

9AOL050024
CONFIDENTIAL TREATMENT
REQUESTED

Because of MovieFone's preexisting contractual relationship with PC, Plaintiffs were injured by the anti-competitive aspects of the joint Ticketmaster-PC conduct.

67.     Between August 31, 1993, and April 15, 1994, Ticketmaster and PC engaged in a boycott of Plaintiffs by agreeing to withhold services relating to automated ticketing from Plaintiffs and from Plaintiffs' customers, including, but not limited to, City Cinemas theaters.

68.     The foregoing conduct constitutes both a *per se* violation of Sherman Act § 1 and an unreasonable restraint of trade in the automated ticketing market in violation of Sherman Act § 1.

69.     As a result of the anti-competitive foreclosure effects of the acquisition, Plaintiffs have suffered antitrust injury and injury to their business and property as well as irreparable injury.

### COUNT FIVE
#### Conspiracy Between Ticketmaster and Wembley to Restrain Trade in Violation of Section One of the Sherman Act

70.     The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

71.     At all relevant times, Ticketmaster and Wembley have been competitors or potential competitors for automated ticketing services.

72.     On April 15, 1994, Ticketmaster and Wembley agreed to limit competition among themselves and their affiliates with respect to automated ticketing.

73.     The April 15, 1994, agreement between Ticketmaster and Wembley not to compete was not reasonably ancillary to a legitimate joint venture. Rather it was intended to, and had the effect of, unreasonably foreclosing competition from MovieFone, and thus harming both MovieFone and competition.

20

9AOL050025
CONFIDENTIAL TREATMENT
REQUESTED

74.     The April 15, 1994 agreement between Ticketmaster and Wembley also unreasonably restrained trade by using improper means to cripple MovieFone and limit its ability to compete in the relevant markets.

75.     The April 15, 1994 agreement between Ticketmaster and Wembley constitutes an unreasonable restraint of trade in violation of Sherman Act § 1.

76.     As a result of Ticketmaster's anti-competitive conduct, Plaintiffs have suffered antitrust injury and injury to their business and property as well as irreparable injury.

## COUNT SIX

### Tortious Interference with MovieFone's 1992 Agreement with PC

77.     The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

78.     Ticketmaster had knowledge of the 1992 Agreement between PC and MovieFone prior to the time it acquired PC's assets.

79.     At all relevant times, the 1992 Agreement was valid and enforceable.

80.     Before Ticketmaster acquired PC's assets on April 15, 1994, Ticketmaster, without justification, intentionally induced and caused PC to breach its 1992 Agreement with MovieFone in numerous material ways including the following:

     a.  causing PC not to connect City Cinemas theaters in New York to MovieFone's telephone lines as required by the 1992 Agreement while at the same time deceptively telling MovieFone that the connection would be made;

     b.  causing PC to withhold from TTC enhancements to its movie teleticketing service that PC already had previously agreed to provide while at the same time deceptively misleading TTC to believe that the enhancements would be made;

21

9AOL050026
CONFIDENTIAL TREATMENT
REQUESTED

     c.  causing PC not to seek, or enter into, any new movie teleticketing agreements on behalf of the MOVIEFONE-PC joint venture while at the same time misleading MovieFone that PC would comply with the 1992 Agreement;

     d.  causing PC to surreptitiously provide to Ticketmaster trade secret information about the movie teleticketing agreements that the MovieFone-PC venture had entered into with theaters and about MovieFone's future automated ticketing plans that had been provided by MovieFone to PC in reliance on confidentiality provisions of the 1992 Agreement.

81.    On April 15, 1994, Ticketmaster tortiously interfered with the 1992 Agreement between MovieFone and PC by intentionally rendering PC's performance of the 1992 Agreement impossible. Ticketmaster did so by, among other means, fraudulently acquiring control over all of PC's assets necessary to perform the 1992 Agreement, thereby rendering PC an insolvent shell corporation, and by causing Wembley to agree that PC would no longer compete in movie teleticketing. The asset transfer constituted both a fraudulent conveyance and a violation of the federal antitrust laws.

82.    Subsequent to acquiring the assets of PC, and at a time when PC remained a wholly-owned subsidiary of Wembley, Ticketmaster interfered with the 1992 Agreement by, among other things, engaging in the following intentional conduct:

     a.  filing a fraudulent and unauthorized lawsuit under PC's name against MovieFone on October 26, 1994, alleging that MovieFone had breached the 1992 Agreement, and accusing MovieFone of fraudulent conduct;

     b.  announcing on the same day, at a major trade association luncheon before hundreds of movie-exhibitor representatives and through trade publications, that Ticketmaster had "purchased" "Pacer Cats" and would provide "[t]he first fully automated telephone reservation service revolutionizing the marketing and selling of movie tickets in America" and telling exhibitors to "accept no substitutes"; and

     c.  soliciting, with CCS employees who Ticketmaster deceptively identified as "Pacer Cats" employees, movie teleticketing business in markets

9AOL050027
CONFIDENTIAL TREATMENT
REQUESTED

where PC was obligated to provide such teleticketing services exclusively through MovieFone.

83.    Ticketmaster's interference and inducement of breaches of the 1992 Agreement was improper, unfair, and not justified by its own desire to provide movie teleticketing services because Ticketmaster's interference, as detailed herein, involved fraud, violations of the federal antitrust laws, and other illegal action.

84.    Ticketmaster's conduct constitutes tortious interference with MovieFone's contract with PC in violation of the common law of New York.

85.    As a direct and proximate result of Ticketmaster's misconduct, MovieFone has sustained significant and ongoing damages.

## COUNT SEVEN

### Tortious Interference with TTC's Performance of Contracts with Theaters

86.    The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

87.    Pursuant to the 1992 Agreement between MovieFone and PC, TTC and PC entered into the following contracts with theaters to provide teleticketing services:

    a.    In June 1992, TTC and PC entered into an exclusive five-year contract with Loews (Sony) Theatres to provide teleticketing services at designated theaters.

    b.    In December 1993, pursuant to the 1992 Agreement between MovieFone and PC, TTC entered into an exclusive three-year contract with City Cinemas theaters to provide teleticketing services at designated City Cinemas theaters.

88.    In order to perform its obligations under these contracts, TTC needed the cooperation and assistance of PC, to which it was entitled pursuant to the 1992 Agreement.

23

9AOL050028
CONFIDENTIAL TREATMENT
REQUESTED

89. At all relevant times, Ticketmaster was aware of the existence of TTC's contracts with these theaters, and that each of those contracts was valid and enforceable.

90. Prior to April 15, 1994, Ticketmaster interfered with TTC's performance of its contract with City Cinemas by causing PC not to connect the PC box office equipment at City Cinemas with MovieFone's phone lines unless Ticketmaster was also allowed to teleticket at City Cinemas in violation of TTC's contract with City Cinemas.

91. On April 15, 1994, Ticketmaster intentionally interfered with TTC's performance of these contracts by fraudulently stripping PC of all assets necessary to assist TTC in performing the Loews (Sony) and City Cinemas contracts.

92. As a direct result of TTC's tortious interference, TTC breached its contract with City Cinemas and with Loews (Sony) and was required to undertake costly mitigation efforts.

93. Ticketmaster's interference was unjustified, improper, unfair, and not excused by its own desire to provide movie teleticketing services. Ticketmaster's interference involved a fraudulent transfer of assets and involved violations of the federal antitrust laws.

94. As a result of such conduct, Ticketmaster violated the common law of New York and caused substantial injury to Plaintiffs.

### COUNT EIGHT
#### Inducing and Participating in Breaches of Fiduciary Duties

95. The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

96. As MovieFone's joint venture partner under the 1992 Agreement, PC owed fiduciary duties to MovieFone.

24

9AOL050029
CONFIDENTIAL TREATMENT
REQUESTED

97.     Ticketmaster had knowledge of the 1992 Agreement, including the fiduciary nature of the relationship between MovieFone and PC.

98.     Notwithstanding its knowledge that PC owed fiduciary duties to MovieFone, Ticketmaster induced PC to breach those duties, and participated in that breach, by engaging in the conduct alleged above. Such conduct includes, among other things:

        a.  causing PC to transfer to CCS, an entity controlled and managed by Ticketmaster, all of the assets and employees necessary for PC to perform its obligations under the 1992 Agreement;

        b.  preventing PC from connecting MovieFone to PC box office equipment at City Cinemas theaters in New York City;

        c.  causing PC to conceal its movie teleticketing plans from MovieFone;

        d.  contractually agreeing with Wembley that PC would not engage in any business that competed with CCS, including movie teleticketing;

        e.  instructing the former employees of PC (now working for CCS) to try to change certain merchant identification numbers so that TTC's proceeds from teleticketing sales would be diverted to a Ticketmaster-controlled bank account;

        f.  instructing the former employees of PC (now working for CCS) to search their files for any evidence that could be used as a pretext for claiming that MovieFone had breached the 1992 Agreement with MovieFone;

        g.  causing an unauthorized lawsuit to be filed in the name of PC against MovieFone, alleging that MovieFone had breached the 1992 Agreement;

        h.  in conjunction with former employees of PC (now working for CCS), attempting to usurp movie teleticketing opportunities that belonged to the MovieFone-PC venture pursuant to the 1992 Agreement.

99.     As a direct and proximate result of Ticketmaster's participation in PC's breaches of its fiduciary duties, Plaintiffs have suffered and will continue to suffer substantial damages.

25

9AOL050030
CONFIDENTIAL TREATMENT
REQUESTED

## COUNT NINE
### Interference With Plaintiffs' Prospective Business Relations
### with Theaters

100.    The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

101.    Prior to Ticketmaster's tortious interference with the 1992 Agreement between MovieFone and PC, Plaintiffs were reasonably certain of entering into teleticketing contracts with the following theaters, among others:

      a.   National Amusements' Broadway Theater in Hicksville, Long Island;

      b.   AMC theaters in Dallas, including The Grand;

      c.   United Artists theaters on Long Island; and

      d.   Cineplex Odeon theaters in Washington, D.C.

Plaintiffs were reasonably certain of entering into contracts with these theaters because each had asked to do teleticketing through MovieFone, and MovieFone had preexisting relationships with these theaters.

102.    Prior to Ticketmaster's tortious interference with the 1992 Agreement, Plaintiffs were reasonably certain to enter into teleticketing contracts with other theaters listed on Exhibits A and B of the 1992 Agreement who had expressed interest in teleticketing and were already using PC box office equipment.  PC and MovieFone had prior relations with those theaters and PC had represented to MovieFone that it would be "a piece of cake" to obtain teleticketing contracts with these theaters.

103.    Prior to Ticketmaster's tortious interference with the 1992 Agreement, it was reasonably certain that TTC's contracts with Sony, Loews, and City Cinemas would be renewed.

9AOL050031
CONFIDENTIAL TREATMENT
REQUESTED

Ticketmaster's conduct has interfered with the renewal of the Sony and Loews contracts, and will interfere with the renewal of the Cineplex contract.

104.    Ticketmaster interfered with these prospective contracts by fraudulently acquiring the assets of PC and not allowing the assets to be used to help Plaintiffs to enter into additional teleticketing agreements.

105.    Ticketmaster's interference was unjustified, improper, unfair, and not excused by its own desire to provide movie teleticketing services.  As detailed herein, Ticketmaster's interference involved a fraudulent transfer of assets and involved violations of the federal antitrust laws.

106.    Ticketmaster's conduct constitutes tortious interference with Plaintiffs' prospective business relations in violation of the common law of New York.

107.    As a direct and proximate result of Ticketmaster's tortious conduct, Plaintiffs have suffered and will continue to suffer substantial damages.

COUNT TEN

Tortious Interference with MovieFone's Prospective Business
Relationship with PC

108.    The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

109.    At the time it acquired PC, Ticketmaster knew that PC and MovieFone were considering expanding the scope of their venture to premier live event automated ticketing.  But for Ticketmaster's interference, PC and MovieFone would today be jointly providing such services.

27

9AOL050032
CONFIDENTIAL TREATMENT
REQUESTED

110.    Ticketmaster's acquisition of PC interfered with the planned expansion of the relationship between PC and MovieFone.

111.    Ticketmaster's interference with the business relationship between PC and MovieFone was unfair and unjustified because it involved a fraudulent conveyance of PC's assets and a violation of the federal antitrust laws.

112.    As a result of Ticketmaster's misconduct, MovieFone has suffered and will continue to suffer damages.

## COUNT ELEVEN
### Interference With The Performance of MovieFone's Contracts
### With Its Investment Bankers

113.    The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

114.    In late 1993, MovieFone retained the investment banks Salomon Brothers ("Salomon") and Alex. Brown & Sons ("Alex. Brown") for the purpose of underwriting an initial public offering of MovieFone's stock.

115.    On March 3, 1994, MovieFone filed an S-1 registration statement with the SEC as a prelude to its initial public offering.

116.    Shortly after March 3, 1994, Ticketmaster learned that MovieFone had filed its S-1 registration statement with the SEC.  Ticketmaster was aware at the time that MovieFone had contractual relations with Salomon and Alex. Brown.

117.    On March 8, 1994, Ticketmaster issued a press release announcing that it had "agreed to acquire 50% of Pacer/CATS/CCS Group (Pacer/CATS) and enter into a joint venture

28

9AOL050033
CONFIDENTIAL TREATMENT
REQUESTED

as managing partner with Wembley PLC" and that the acquisition "allows Ticketmaster to further expand its operations and make closer strategic alliances with movie exhibitors."

118.    On March 8, 1994, Fredric D. Rosen, President and CEO of Ticketmaster, falsely told Drew Marcus and Chip Carey of Alex. Brown in a phone conversation that MovieFone's 1992 Agreement and its teleticketing contracts with theaters were in breach and that all of MovieFone's business from now on "has to go through me." He further declared, "This is war." He asked the investment bankers "to read between the lines" and said, "I think you know what I mean."

119.    Ticketmaster intended to interfere with MovieFone's relationships with its investment banker for the sole purpose of harming MovieFone.  On or about March 11, 1994, Charles Gerber, an attorney for Ticketmaster, falsely told Salomon that MovieFone was "not in compliance with their agreements" and that "[k]nowing what I know about the state of contracts, I would think long and hard before getting involved with MovieFone." Mr. Gerber further stated, "We have looked at the agreement [between MovieFone and PC] and spent extensive time on it and I am highly confident we will win in this mess."

120.    In another conversation at about the same time, Fredric Rosen told Salomon that "I don't think much of MovieFone" and MovieFone's contracts "are all in breach."

121.    As a result of the knowingly false representations, Ticketmaster harmed MovieFone's relationship with its investment bankers.  As a result of the statements made by Ticketmaster in these calls, the investment bankers required MovieFone to obtain legal opinions that MovieFone's agreements, including the 1992 Agreement, were not in breach and also required that the registration statement and subsequent prospectus be amended to add substantial

29

9AOL050034
CONFIDENTIAL TREATMENT
REQUESTED

disclosure about the Ticketmaster threats to MovieFone. The additional due diligence imposed significant costs on MovieFone.

122.    As a result of the additional disclosure that MovieFone made in reliance on Ticketmaster's misrepresentations, the price of MovieFone's IPO was reduced from $14 per share to $11.50 per share, causing substantial losses to MovieFone. In addition, MovieFone suffered other substantial out-of-pocket damages, including increased legal fees in connection with its initial public offering.

123.    The foregoing conduct constitutes tortious interference with the performance of the contracts between MovieFone and its investment bankers in violation of New York common law.

### COUNT TWELVE
### Injurious Falsehood

124.    The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

125.    Ticketmaster's conduct, as described in the preceding count constitutes the tort of injurious falsehood. Ticketmaster knowingly published false and misleading information to MovieFone's investment bankers with the intent to harm MovieFone's business and with the knowledge that damage to MovieFone would result. Moreover, Ticketmaster's conduct was maliciously intended to disrupt the relationship between MovieFone and its investment bankers, and it did disrupt that relationship, requiring MovieFone to incur substantial additional legal costs, including legal opinion letters, before the initial public offering could proceed.

30

9AOL050035
CONFIDENTIAL TREATMENT
REQUESTED

126.    As a result of Ticketmaster's conduct, MovieFone suffered special damages including the following:

    a.    $119,047 spent on additional legal fees necessary to provide assurance to the investment bankers that MovieFone was not in breach of its contracts.

    b.    $6,510,000 in reduced proceeds from the initial public offering that resulted because institutional investors, including specific investment firms identified in MovieFone's records, who had previously expressed interest, did not purchase the stock of MovieFone after the additional disclosures regarding Ticketmaster's threats.

### COUNT THIRTEEN
#### Malicious Prosecution

127.    The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

128.    On October 26, 1994, Ticketmaster caused a complaint to be filed in the Superior Court of the State of California captioned "PCC Management, Inc. v. MovieFone, Inc., PromoFone, Inc., The Teleticketing Company, L.P., and The Falconwood Corporation." The suit, bearing Case No. BC 115199, alleged that MovieFone had "breached" the 1992 Agreement and engaged in "fraudulent, deceptive and otherwise wrongful conduct." ·

129.    The California lawsuit was never authorized by PC. On January 23, 1997, Sir Brian Wolfson, the sole director of PC at the time the suit was filed, disclosed in sworn testimony at the arbitration proceeding between MovieFone and PC that he was unaware of the lawsuit, had not authorized it, and had no knowledge of facts that would support numerous allegations of the complaint.

31

9AOL050036
CONFIDENTIAL TREATMENT
REQUESTED

130.    Because the unauthorized lawsuit was filed without apparent consultation with, or the authorization of, PC and because its allegations were inconsistent with PC's actual understanding of the facts, the suit was filed without probable cause.

131.    Ticketmaster acted with malice toward MovieFone when it improperly filed the complaint. Ticketmaster caused the lawsuit to be filed in order to impose costs on MovieFone, deny MovieFone the benefits of a speedy arbitration process, and distract MovieFone from its teleticketing business.

132.    On February 5, 1997, shortly after Sir Brian Wolfson's testimony, PC's purported counsel voluntarily dismissed the California complaint.

133.    The unauthorized lawsuit caused MovieFone to incur substantial legal fees to obtain and uphold a court-ordered stay of the California lawsuit in favor of arbitration before the AAA as MovieFone and PC had agreed in the 1992 Agreement.

134.    Ticketmaster's conduct constitutes malicious prosecution in violation of the common law of California and injured Plaintiffs.

### COUNT FOURTEEN
### Racketeering

135.    The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

136.    Ticketmaster has violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961(c), by conducting the affairs of PC, CCS, and an association in fact composed of PC and CCS, through a pattern of racketeering activity, including numerous acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, extortion in violation of 18 U.S.C. §

9AOL050037
CONFIDENTIAL TREATMENT
REQUESTED

1951, and witness tampering in violation of 18 U.S.C. § 1512 -- all described with particularity in

the following paragraphs.

137.  .  The pattern of racketeering included the following acts of mail and wire fraud in

violation of 18 U.S.C. §§ 1341 and 1343 and in furtherance of a scheme to defraud MovieFone:

> a.  In January 1994, Ticketmaster caused PC to fraudulently conceal from
> MovieFone the fact that Ticketmaster had caused PC to suspend any
> efforts to enhance the teleticketing services that PC was to provide to
> MovieFone. As a result, PC engaged in a number of interstate
> telephone calls and mailings in January and February 1994, fraudulently
> misrepresenting to MovieFone that PC was in fact performing and/or
> intended to perform its obligations under the 1992 Agreement.  For
> example, on January 27, 1994, Israel Greidinger, the President of PC,
> used the interstate mails to send a letter to MovieFone stating that PC
> was committed to providing agreed-upon enhancements to TTC's
> teleticketing services, that it would provide the software necessary for
> an integrator disaster recovery plan, and that it would make a good
> faith effort to connect City Cinemas theaters to MovieFone for on-line
> teleticketing. Again, on February 3, 1994, Israel Greidinger
> represented to MovieFone that he was preparing a timetable to
> complete these projects, when in fact, at Ticketmaster's direction, PC
> had no intention of completing them.  In reliance on these fraudulent
> misrepresentations, MovieFone to its detriment continued to treat PC
> as partner and not as a rival, and accordingly suffered damages.
>
> b.  On March 8, 1994, Ticketmaster used the interstate wires to issue a
> press release stating that it had agreed "to acquire 50% of
> Pacer/CATS/CCS Group (Pacer/CATS) and enter into a joint venture
> as managing partner with Wembley PLC."  Neither Ticketmaster nor
> PC disclosed to MovieFone at the time that Ticketmaster already was
> conducting the affairs of PC.
>
> c.  Between March 8, 1994, and March 15, 1994, Ticketmaster, speaking
> for PC and itself, used the interstate wires on at least two occasions to
> tell MovieFone's investment bankers knowingly false information about
> MovieFone's 1992 Agreement with PC as well as about TTC's
> contracts with movie exhibitors, as part of its continuing scheme to
> disable MovieFone.
>
> d.  On March 11, 1994, Ticketmaster used the interstate mail to falsely
> represent to MovieFone that Ticketmaster had acquired control over
> the 1992 Agreement and that "Ticketmaster [looked] forward to an
> amicable relationship [with MovieFone]. . . ."  In fact, Ticketmaster's

33

9AOL050038
CONFIDENTIAL TREATMENT
REQUESTED

intention, as expressed in conversations with others during this time period, was to repudiate the 1992 Agreement and conduct the affairs of PC and CCS in a manner to harm and disable Plaintiffs. Plaintiffs relied on Ticketmaster's misrepresentations to their detriment and refrained from contacting antitrust enforcement authorities during the time they were reviewing Ticketmaster's pre-merger filing and from initiating litigation to protect their interests.

e.   Later in March 1994, Ticketmaster used the interstate wires to falsely represent to MovieFone in a telephone conversation that "once Ticketmaster takes control [of PC], [Ticketmaster's attorney] will be glad to sit down with you and try and clarify whatever differences of view exist or ambiguities exist [with respect to the 1992 Agreement.]" Ticketmaster's representative, Charles Gerber, further stated in the course of the conversation, "[W]e have historically honored our contractual relationships and we will continue to honor our contractual relationships, but if there was any ambiguity or differences of views we have to sort that out." In fact, Ticketmaster's intention, as expressed in conversations with others during this time period, was to repudiate the 1992 Agreement, conduct the affairs of PC and CCS in a manner to harm and disable Plaintiffs, and to "wipe MovieFone out of the market in 18 months." Plaintiffs relied on Ticketmaster's misrepresentations to their detriment and refrained from contacting antitrust enforcement authorities and initiating litigation to protect their interests.

f.   On or about April 15, 1994, Ticketmaster used the interstate wires in furtherance of the fraudulent transfer of all of PC's assets necessary for performance of its 1992 Agreement obligations to CCS, thereby allowing CCS to use those assets to harm and disable Plaintiffs. The only substantial asset not transferred to CCS was the 1992 Agreement. Ticketmaster structured the fraudulent conveyance so that the consideration it paid for the PC assets was not paid to PC and did not become an asset of PC. Thus, PC was left insolvent and unable to perform its contractual obligations to MovieFone pursuant to the 1992 Agreement. As a result of Ticketmaster's misrepresentations about the nature of its acquisition of PC's assets, MovieFone did not understand the full extent of its problem and did not take immediate action to protect its interests.

g.   After April 1994, Ticketmaster and CCS used the interstate wires and mails on a continuing basis to fraudulently represent to Plaintiffs and to exhibitors including Cineplex Odeon and Sony Theatres that Ticketmaster and CCS had assumed PC's obligations under the 1992 Agreement. Shortly after the asset transfer, CCS, acting, upon information and belief, at the direction of Ticketmaster, sent a facsimile to TTC directing TTC to send its monthly service fees payable to PC pursuant to the 1992 Agreement to CCS. In reliance on this further

34

9AOL050039
CONFIDENTIAL TREATMENT
REQUESTED

misrepresentation, indicating that CCS had in fact assumed the 1992 Agreement, TTC made repeated monthly payments to CCS to its detriment.

h.  On or about October 26, 1994, Ticketmaster used the interstate mail to serve a fraudulent complaint on Plaintiffs purportedly filed by PC. The complaint was in fact never authorized by PC and the allegations contained in the complaint were knowingly false and were intended to facilitate Ticketmaster's efforts to harm MovieFone. As a result of Ticketmaster's fraudulent lawsuit, MovieFone incurred significant legal expenses, totaling approximately $120,000.

i.  Between October 1994 and January 1997, Ticketmaster and its agents engaged in a continuing pattern of fraud by failing to disclose in numerous telephone and mail communications with MovieFone that the litigation purportedly filed by PC was in fact filed and directed by Ticketmaster.

j.  Upon information and belief, in early 1995, Ticketmaster's agent, Martin Bergman, used the interstate wires to fraudulently represent that he was a producer for "60 Minutes." As a result of this fraud, Ticketmaster was able to obtain information from MovieFone that MovieFone would not have otherwise disclosed to it .

k.  On or about July 5, 1995, Ticketmaster caused CCS to file suit in New York State Supreme Court against Plaintiffs making knowingly false allegations, including the allegation that Ticketmaster did not exercise any control over PC when at the time of the suit, Ticketmaster was in fact controlling PC's strategy in the litigation filed against Plaintiffs in California. Upon information and belief, Ticketmaster used interstate mail and wires to authorize and direct the New York litigation.

138.  The pattern of racketeering included the following acts of extortion in violation of

18 U.S.C. § 1951, including the following:

a.  Between March 8, 1994, and March 15, 1994, Ticketmaster threatened MovieFone's investment bankers with economic harm by urging that the investment bankers withdraw from underwriting MovieFone's initial public offering as a condition of doing business in the future with Ticketmaster.

b.  On or about April 5, 1994, Ticketmaster threatened that it would cause a breach of TTC's contract with City Cinema's theaters causing economic harm to Plaintiffs unless TTC modified its contract with City Cinemas to permit Ticketmaster to engage in teleticketing at those theaters.

35

9AOL050040
CONFIDENTIAL TREATMENT
REQUESTED

139. The pattern of racketeering included witness tampering in violation of 18 U.S.C. § 1512. In December 1996, MovieFone subpoenaed to testify as a witness in arbitration proceeding a former PC employee, Lori Cohen. Shortly before Ms. Cohen was scheduled to testify, Ticketmaster through its agents threatened to sue her if she testified. This threat was made to intimidate the witness and induce her to withhold relevant testimony or be absent from the proceeding.

140. The pattern of racketeering included the following acts of obstruction of proceedings in violation of 18 U.S.C. § 1505:

    a. In or about June 1994, the U.S. House of Representatives Subcommittee for Information, Justice, Transportation and Agriculture was investigating Ticketmaster and planning hearings concerning the anti-competitive effect of exclusive dealing arrangements between Ticketmaster and numerous live event venues throughout the United States. Ticketmaster, through its Chief Executive, Fred Rosen, and its agents Charles Gerber, Ned Goldstein, and Martin Bergman, illegally endeavored to influence, obstruct or impede the due and proper exercise of the subcommittee's investigational power by threatening the subcommittee staff member responsible for organizing and carrying out the hearings and attempting to get him fired. On information and belief, Ticketmaster further directed an agent or employee to attempt under false pretenses to secure access to the subcommittee's files relating to the investigation.

    b. In 1995, Ticketmaster threatened to retaliate against MovieFone and its representatives and agents for providing information to the Antitrust Division of the United States Department of Justice, which was conducting an antitrust investigation of Ticketmaster, and to members of the United States Congress, who also were investigating Ticketmaster's conduct. Ticketmaster's threats were intended to discourage MovieFone from providing further information related to those investigations.

    c. In January 1996, Ticketmaster filed a frivolous libel action against MovieFone and its attorneys in an effort to discourage them from providing information to public officials investigating Ticketmaster. Ticketmaster's suit was dismissed with prejudice in August 1996.

36

9AOL050041
CONFIDENTIAL TREATMENT
REQUESTED

141.     Ticketmaster also has violated the Racketeer Influenced and Corrupt
Organizations Act, 18 U.S.C. § 1961(a), by receiving income derived from a pattern of
racketeering activity in which Ticketmaster has participated as a principal and using or investing
some or all of such income in the operation of an enterprise engaged in interstate commerce.
Ticketmaster has used or invested in CCS, an enterprise engaged in interstate commerce, income
received from the pattern of racketeering activity set forth above.

142.     Plaintiffs have suffered and are continuing to suffer injury to its business and
property proximately caused by Ticketmaster's RICO violations.

**COUNT FIFTEEN**

**Fraud**

143.     The factual allegations contained in the preceding paragraphs are incorporated by
reference and made a part hereof as if restated in full.

144.     Ticketmaster conduct described in the preceding count constitutes common law
fraud in violation of the common law of New York.

145.     As a result of Ticketmaster's fraud, Plaintiffs suffered substantial injury, including
significant monetary damages.

**COUNT SIXTEEN**

**Misappropriation of Trade Secrets**

146.     The factual allegations contained in the preceding paragraphs are incorporated by
reference and made a part hereof as if restated in full.

147.     In the course of performing the 1992 Agreement, MovieFone disclosed to PC
confidential business information and other trade secrets, including contracts and business
prospects, for PC to use solely in the implementation of the 1992 Agreement. The confidential

37

**9AOL050042**
CONFIDENTIAL TREATMENT
REQUESTED

business information and trade secrets included contracts, prospective customer lists, and

technological know-how.  MovieFone had provided the confidential information to PC in reliance

on the confidentiality provision contained in the 1992 Agreement.

148.    Prior to acquiring the assets of PC, Ticketmaster reviewed confidential business

information that MovieFone had provided to PC on a confidential basis.  Ticketmaster knew, or

should have known, the information was confidential and that MovieFone had not authorized the

disclosure of this information to Ticketmaster.  Ticketmaster thus acted improperly in obtaining

access to the confidential information.  Upon information and belief, confidential documents

concerning the MovieFone-PC relationship was shipped from PC's Colorado office to

Ticketmaster's headquarters in Los Angeles.

149.    At the time Ticketmaster acquired its interest in PC, Ticketmaster was aware of

the relationship between MovieFone and PC and knew that MovieFone had provided confidential

business information and other trade secrets to PC for use solely in connection with the 1992

Agreement.

150.    By virtue of its acquisition of PC's assets, Ticketmaster improperly gained access

to trade secret information and, upon information and belief, has used that information to compete

against MovieFone.

151.    Ticketmaster's conduct constitutes misappropriation of trade secrets in violation of

the common law of New York.

152.    As a result of Ticketmaster's conduct, Plaintiffs have suffered and will continue to

suffer damages as well as irreparable injury,

9AOL050043
CONFIDENTIAL TREATMENT
REQUESTED

## COUNT SEVENTEEN
### Unfair Competition

153.   The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

154.   The acts and practices set forth above, were carried out with the intent of injuring Plaintiffs, and have constituted and constitute unfair competition and unfair interference with Plaintiffs' advantageous business and commercial relationships.

155.   Both before and after Ticketmaster acquired control of PC, Ticketmaster sought to harm MovieFone and consumers by interfering with PC's performance of its contract with MovieFone and by, inter alia, misappropriating trade secret and other proprietary information, including contracts, technological business know-how, that MovieFone had provided to PC on a confidential basis for use under the 1992 Agreement.

156.   After Ticketmaster acquired control of PC, Ticketmaster usurped business opportunities for themselves that properly belonged to the MovieFone-PC joint venture.

157.   Ticketmaster unlawfully, knowingly, intentionally, willfully and maliciously interfered with Plaintiffs' rights in the 1992 Agreement by causing PC to breach the 1992 Agreement.

158.   Ticketmaster now stands to recoup substantial rewards for its misconduct and unfair competition.

159.   The foregoing conduct constitutes a violation of Section 340 of the New York General Business Law as well as the common law of New York. As a result of Defendants' misconduct, Plaintiffs have suffered and will continue to suffer damages.

39

9AOL050044
CONFIDENTIAL TREATMENT
REQUESTED

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

A.     That the Court order and direct that Ticketmaster and all entities under their control divest all former PC assets and cease controlling the affairs of PC;

B.     That the Court order Ticketmaster and its affiliated corporations to grant MovieFone a royalty free license to use all software and proprietary information now in the possession of Ticketmaster or any entity controlled by Ticketmaster that had previously been owned by PC, as the 1992 Agreement required PC to do in the event of a material change in the financial condition of PC;

C.     That the Court award damages in favor of Plaintiffs in an amount to be determined at trial, representing treble the amount of their actual damages to the date of the filing of this complaint sustained as a result of Ticketmaster's aforesaid acts and practices in violation of the federal antitrust laws and the federal racketeering laws.

D.     That in addition to treble damages, the Court award Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees;

E.     That in addition, the Court award Plaintiffs punitive damages;

F.     That the Court order such other, further and different relief as to the Court may appear just and proper, including specific performance; and

40

9AOL050045
CONFIDENTIAL TREATMENT
REQUESTED

G.    That the Court retain jurisdiction for the purpose of enabling Plaintiffs to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of any orders made in this action, for the modification of any such orders, for the enforcement of compliance therewith and the punishment of any violations thereof.

Dated:  March 4, 1997

PATTON BOGGS L.L.P.

By _____
Garret G. Rasmussen
C. Allen Foster
2550 M St. N.W.
Washington, D.C. 20037
(202) 457 6343

SHEREFF, FRIEDMAN, HOFFMAN &
GOODMAN, L.L.P.
Earl H. Nemser
Gary Mennitt
919 Third Ave,
New York,  N.Y.
(212) 758-9500

41

9AOL050046
CONFIDENTIAL TREATMENT
REQUESTED