374

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

MOVIEFONE, INC.,
and THE TELETICKETING COMPANY, L.P.,

                       Plaintiffs,              95 Civ 1861 (SHS)

       -against-                    AMENDED COMPLAINT

TICKETMASTER CORPORATION.         (Jury Trial Demanded)
                                  CONFORMED COPY
                                  ORIGINAL FILED

               Defendant.             MAR 0 4 1997

-------------------------------------------------------------x

                                      USDC SDNY

Plaintiffs MovieFone, Inc. ("MovieFone" or "MF") and The Teleticketing Company, L.P.

("TTC") (collectively "Plaintiffs"), by their attorneys, hereby amend their complaint as of right

pursuant to Fed. R. Civ. P. 15, alleging as follows:

## SUMMARY OF CLAIMS

    1.    Plaintiffs MovieFone and its wholly-owned subsidiary, TTC, are in the business of

providing movie information and automated ticketing services to consumers. Automated

ticketing is the sale of tickets to multiple entertainment events utilizing telephone lines and remote

outlets connected by telephone to a central computer. It is distinct from ticket sales at the box

office for individual entertainment events. Ticketmaster Corporation, by its own description, is

the dominant automated ticketing company in the United States. Ticketmaster has entrenched its

monopoly power by acquiring in a fraudulent transaction the assets of MovieFone's joint venture

partner, Pacer Cats Corporation ("PC"), and by engaging in other exclusionary conduct, including

                             1

9AOL050006
CONFIDENTIAL TREATMENT
REQUESTED



Rasmusen
EXHIBIT NO. 2
KY   12/23/09

(i) tortiously interfering with Plaintiffs' contracts and business relationships, including MovieFone's February 1992 Agreement with PC, (ii) tortiously interfering with MovieFone's initial public offering, (iii) maliciously filing a fraudulent lawsuit under PC's name that was not authorized by PC, (iv) fraudulently posing as an investigative reporter and surreptitiously manufacturing evidence for a frivolous libel action against MovieFone, which subsequently was dismissed, (v) maliciously publishing injurious falsehoods about MovieFone, and (vi) otherwise engaging in a pattern of fraudulent conduct that constitutes racketeering.

2.     Plaintiffs are amending their complaint at this time to preserve causes of action that otherwise might expire because of the running of certain statutes of limitations as well as to supplement MovieFone's original antitrust claim based on new information that has come to light during an arbitration proceeding between MovieFone and Pacer Cats and during Ticketmaster's initial public offering. That arbitration, brought by Plaintiffs against PC, concerns PC's breach of the February 1992 Agreement between MovieFone and PC. Although Ticketmaster formally rejected MovieFone's invitation to participate in the arbitration, Ticketmaster in fact controlled PC's defense in the arbitration. A number of the factual issues raised in this amended complaint may be resolved by that arbitration. The arbitration is expected to conclude sometime in mid-1997. None of the claims raised in this amended complaint waive or limit in any way MovieFone's contention in the arbitration that Ticketmaster is a successor to, and privy of, PC.

### JURISDICTION AND VENUE

3.     This Court has jurisdiction pursuant to 15 U.S.C. §§ 15, 22, and 26, 18 U.S.C. § 1964, 28 U.S.C. § 1337, and the principles of pendant jurisdiction.

2

9AOL050007
CONFIDENTIAL TREATMENT
REQUESTED

4.    The unlawful activities hereinafter alleged occurred, in significant part, within this District, and have had substantial effects on interstate commerce. The interstate commerce described herein was carried on, in part, within this District.

5.    Venue is properly in the Southern District of New York pursuant to 15 U.S.C. § 22, 18 U.S.C. § 1965, and 28 U.S.C. § 1391(b), (c).

## THE PARTIES AND OTHER ENTITIES

6.    Plaintiff MovieFone, Inc., ("MovieFone") is a publicly-held Delaware corporation with its principal place of business in New York City. Since 1989, MovieFone has offered a free service to moviegoers in major movie markets, whereby a moviegoer can call easy-to-remember local telephone numbers (*e.g.*, "777-FILM" in New York City) and hear automated showtime, location, and other information about movies playing in given markets.

7.    Plaintiff The Teleticketing Company, L.P. ("TTC") is a Delaware limited partnership with its principal place of business in New York City and is wholly-owned by MovieFone. It was formed as a result of a February 14, 1992 Agreement (the "1992 Agreement") between MovieFone and PC to perform teleticketing services. Pursuant to the 1992 Agreement, TTC entered into teleticketing contracts with Cineplex Odeon, Sony Theatres (formerly Loews), and City Cinemas.

8.    Defendant Ticketmaster Corporation ("Ticketmaster") is an Illinois corporation with its principal place of business in Los Angeles, California. Ticketmaster is the dominant provider of automated teleticketing services in the United States with over 3,500 clients, including many of the country's foremost entertainment facilities and promoters and 73 professional sports

3

9AOL050008
CONFIDENTIAL TREATMENT
REQUESTED

franchises. In fiscal 1996, Ticketmaster sold 53.1 million tickets, generating revenues from service charges to ticket purchasers of $241.3 million.

9.     Pacer Cats Corporation ("PC") is a Washington corporation with its last principal place of business at 355 Inverness Drive South, Englewood, Colorado. PC's ultimate parent entity is Wembley PLC ("Wembley") of the United Kingdom. Until its assets were acquired by a Ticketmaster-controlled entity on April 15, 1994, PC was the largest U.S. supplier of automated box office and motion picture theater management equipment and services, with an estimated market share exceeding 80%. Since April 15, 1994, PC has been an inactive shell corporation, holding as its only significant asset the 1992 Agreement between MovieFone and PC. On September 15, 1994, PC changed its name to PCC Management, Inc.

10.     Pacer/Cats/CCS -- A Wembley-Ticketmaster Joint Venture ("CCS") is a Delaware general partnership with its principal place of business in Los Angeles, California. It was formed by subsidiaries of Wembley PLC and Ticketmaster on or about April 15, 1994. It is the entity to which PC's assets other than it's 1992 Agreement with MovieFone, were transferred on April 15, 1994. Ticketmaster, through its wholly owned subsidiary, TM Cinema, took over Wembley's interest in the Pacer/Cats/CCS partnership in July 1996 and is now the sole proprietor of CCS.

## FACTUAL BACKGROUND

11.     On February 14, 1992, MovieFone, through a predecessor corporation, PromoFone, Inc., entered into a long-term agreement (hereafter "the 1992 Agreement") with PC to provide a state-of-the-art teleticketing service that would allow a movie patron to purchase movie tickets over the telephone to any one of a number of different movies playing at first-run theaters located in major markets. Under the terms of the 1992 Agreement, PC obligated itself to

9AOL050009
CONFIDENTIAL TREATMENT
REQUESTED

negotiate TTC teleticketing contracts with theaters and theater chains and to connect MovieFone's telephone lines to the box office computers of theaters that were willing to sign such contracts. TTC agreed to pay PC for the necessary upgrade equipment and installation costs to enable teleticketing at these theaters through MovieFone's telephone lines. MovieFone also agreed to market the venture to the movie-going public and to pay PC monthly fees to maintain and service certain installed equipment. The 1992 Agreement between MovieFone and PC was to remain in force as long as PC's teleticketing equipment was installed in teleticketing theaters in specified major cities covered by the 1992 Agreement.

12.     The MovieFone-PC relationship was a joint venture, and the parties regarded it as such, acknowledging that each owed the other a duty of good faith and fair dealing.

13.     The MovieFone-PC venture was ideally suited for success. At the time the 1992 Agreement was executed, PC's box office equipment was already installed in more than 80% of U.S. movie theaters, and PC controlled access to its computerized box office equipment because it retained sole ownership and knowledge of the software and source codes used in that equipment. MovieFone was already the leading supplier of movie showtime information over the telephone in the country's major movie markets, and its local telephone numbers, such as 777-FILM in New York City, were widely recognized and used on a regular basis by millions of avid moviegoers. Together, the two companies were able to achieve unique synergies.

14.     The MovieFone-PC venture was successful at the outset. During its first six months, the venture signed teleticketing contracts with two major movie exhibitors, Cineplex Odeon and Loews Theatres (now Sony Theatres). The venture engaged in negotiations with

5

9AOL050010
CONFIDENTIAL TREATMENT
REQUESTED

other theaters.  Calls to MovieFone's teleticketing phone lines were increasing, as were teleticket sales.

15.     Building on their initial success, Plaintiffs and PC in 1993 made plans and took steps to expand their venture to live-event teleticketing at arenas and stadiums.  For example, an internal PC document, dated May 12, 1993, lists "Stadium and Arenas" as one of PC's markets, and identifies "Ticketmaster" as a competitor.  Furthermore, a September 1993 Confidential Offering Memorandum prepared by PC's parent stated, "the Company's management believes its fully automated systems could replace more expensive ticketing services provided by third parties (such as Ticketmaster in the United States), and that this market offers substantial potential for future system sales."

16.     Upon information and belief, Ticketmaster, the dominant provider of automated ticketing services in the United States, was concerned about the success of the MovieFone-PC teleticketing venture.  Ticketmaster had previously tried to acquire Pacer Corporation, a predecessor of PC, and later had attempted to enter into a teleticketing joint venture with MovieFone.  After learning of the MovieFone-PC Agreement, Ticketmaster itself entered movie teleticketing through a joint venture with General Cinemas.

17.     In recent years, Ticketmaster has acquired stock or assets of no less than 14 competitors or potential competitors.  These include its only national competitor at the time -- Ticketron -- acquired in May 1991, as well as numerous regional competitors, such as SEATS in Atlanta, Select-a-Seat in Denver, Capital Automated Ticketing in Kansas City, TicketWorld USA .in New York City and Detroit,  TicketPro in New England, Dayton's Ticketing in Minneapolis, Softix in Florida, Ticket Hub in Memphis, the Southland Corporation in Texas, and Bay Area

6

9AOL050011
CONFIDENTIAL TREATMENT
REQUESTED

Seating Service in San Francisco. As a result of these acquisitions, Ticketmaster has, in its own words, become "the largest automated ticketing company in the United States."

18.    In August 1993, Ticketmaster and Wembley secretly entered into a letter of intent pursuant to which Ticketmaster would gain control over PC's assets pursuant to forming a teleticketing joint venture with Wembley.

19.    The actual closing of this transaction did not take place until April 15, 1994. In the interim, however, Ticketmaster exercised control over PC and intentionally initiated a course of conduct intended to frustrate the performance of the 1992 Agreement and simultaneously to damage MovieFone. In particular, Ticketmaster interfered with MovieFone's 1992 Agreement with PC, TTC's contracts with Cineplex Odeon Theatres, Loews (Sony) Theatres, and City Cinemas Theatres, and with the prospective business relations of Plaintiffs.

20.    Beginning in December 1993, Ticketmaster prevented PC from connecting MovieFone to PC box office equipment at City Cinemas theaters in New York City, even though pursuant to the 1992 Agreement, City Cinemas had signed a teleticketing agreement with TTC.

21.    In March 1994, after Ticketmaster had agreed to acquire the assets of PC, but before the closing, Ticketmaster intentionally disrupted MovieFone's initial public offering, imposing significant additional costs on MovieFone. On or about March 8, 1994, the most senior executive of Ticketmaster told MovieFone's investment banker, Alex. Brown & Sons, Inc. that the 1992 Agreement between MovieFone and PC was unenforceable, that the relationship between MovieFone and PC is "going to change," and that "all their business must go through me." The Ticketmaster executive also said that Alex. Brown should "read between the lines," and declared that "[t]his is war." At approximately the same time, another Ticketmaster

7

9AOL050012
CONFIDENTIAL TREATMENT
REQUESTED

representative told MovieFone's other investment banker, Salomon Brothers, that PC could "[get] out of that contract [the 1992 Agreement with MovieFone] in a heartbeat" and that "[i]t will get very ugly." The Ticketmaster representative stated further that "[w]e mean to force them to abrogate their contract," referring to the 1992 Agreement. Ticketmaster also warned both investment banks that if they continued to work on behalf of MovieFone, Ticketmaster would remove them from the "short list" of investment banks being considered for a purportedly imminent Ticketmaster public offering.

22.    On April 15, 1994, all the assets and employees of PC, except PC's 1992 Agreement with MovieFone and a seven million dollar note payable from Wembley to PC (which was forgiven the following day) were transferred to a new entity, CCS, controlled and managed by Ticketmaster. Pursuant to the April 15, 1994, Joint Venture Agreement, Ticketmaster and Wembley expressly agreed that PC would not engage in any business that competed with CCS, including teleticketing. As a result of these actions, PC was permanently disabled from honoring its 1992 Agreement with MovieFone. PC was left an insolvent shell corporation, without employees or resources, whose only remaining asset and liability was the 1992 Agreement.

23.    The asset transfer constituted a fraudulent conveyance, and it crippled MovieFone's ability to compete in the teleticketing business. None of the consideration that Ticketmaster paid for PC's assets went to PC.

24.    For a period of almost two years, Ticketmaster affirmatively misled Plaintiffs into believing that the assets necessary to perform the 1992 Agreement had not been stripped away from the Agreement. Ticketmaster did not reveal that the 1992 Agreement had been separated from PC's other assets until January, 1996.

8

9AOL050013
CONFIDENTIAL TREATMENT
REQUESTED

25.   In late April 1994, immediately after acquiring the assets of PC, Ticketmaster officials met with the former PC executives -- now CCS executives -- in Los Angeles, California. At the meeting, the Ticketmaster officials informed the former PC employees that Ticketmaster intended to use the PC assets and personnel it had acquired to "f--k MovieFone" and to "wipe MovieFone out of the market in 18 months." In particular, Ticketmaster executives informed the former PC employees of its plans to reserve the telephone number "777-FLXS" (which is intentionally confusingly similar to MovieFone's "777-FILM" number) in major movie markets and instructed the former PC employees to try to change certain merchant identification numbers so that TTC's proceeds from teleticketing sales would be diverted to a Ticketmaster-controlled bank account. Ticketmaster also instructed the former PC employees to search their files for any evidence that could be used as a pretext for claiming that MovieFone had breached the 1992 Agreement with PC.

26.   Subsequent to the acquisition of PC's assets, Ticketmaster engaged in a pattern of fraudulent conduct designed to further harm MovieFone and strengthen the Ticketmaster-controlled movie-teleticketing entity, CCS. Ticketmaster caused money owed to PC for service to be paid to CCS. Ticketmaster also interfered with MovieFone's relationships with a number of movie exhibitors, including AMC, National Amusements, and United Artists.

27.   Subsequent to the PC asset acquisition, representatives of Ticketmaster and former PC employees, holding themselves out as PC employees, called on major movie exhibitors in an effort to usurp teleticketing opportunities that, under the terms of the 1992 Agreement, Pacer Cats was obligated to pursue on behalf of TTC. Ticketmaster and PC's former employees jointly visited exhibitors to solicit teleticketing business for Ticketmaster in markets where PC was

9

9AOL050014
CONFIDENTIAL TREATMENT
REQUESTED

contractually obligated to MovieFone to make good faith efforts to negotiate teleticketing

agreements for the MovieFone-PC venture and not to provide a competing teleticketing service.

28.     On October 6, 1994, MovieFone wrote to PC, informing PC that MovieFone

would initiate arbitration proceedings pursuant to the arbitration provision of the 1992 Agreement

if PC's breaches were not cured.

29.     On October 26, 1994, Ticketmaster and CCS sponsored a lunch for more than a

thousand movie exhibitor representatives at the annual ShowEast Convention in Atlantic City.   At

this luncheon, Ticketmaster formally announced its new partnership with "Pacer Cats" to provide

"the first fully automated telephone reservation service revolutionizing the marketing and selling

of movie tickets in America," and told exhibitors to "accept no substitutes" for the Ticketmaster

partnership.   The Ticketmaster spokesman further stated at the luncheon:

> Pacer Cats is probably the largest ticketing company in the world serving movie
> theaters.   Their company has been invigorated with new ownership with the recent
> purchase by Ticketmaster Wembley.   Ticketmaster is the largest provider of tickets
> to the world entertainment market.

30.     On the same day, Ticketmaster caused a lawsuit to be filed in California Superior

Court under the name of PC against MovieFone, alleging, among other things, that MovieFone

had breached its 1992 Agreement with PC.   The lawsuit had never been authorized by PC.   Sir

Brian Wolfson, PC's sole director at the time the lawsuit was filed, revealed in sworn testimony on

January 23, 1997, that not only had PC never authorized this suit, he did not know the attorneys

who filed it and was unaware of any facts supporting numerous allegations in the complaint.   On

February 5, 1997, the suit was voluntarily dismissed by PC's purported counsel.

31.     On November 1, 1994, MovieFone initiated arbitration proceedings against PC for

breach of contract.   An amended demand was filed on December 8, 1994.   Evidentiary hearings

9AOL050015
CONFIDENTIAL TREATMENT
REQUESTED

started in September, 1996 and are expected to conclude in April, 1997. Ticketmaster was invited by MovieFone to participate in the arbitration, but it formally declined. Notwithstanding its formal rejection of the invitation, Ticketmaster in fact exercised control over PC's defense in the arbitration until at least mid-December 1996, causing significant delay and disruption. More than two months after the start of evidentiary hearings, PC's counsel disclosed to the arbitration panel that it had been taking direction from an entity controlled by Ticketmaster, and claimed that he had to withdraw from the proceedings because of a "conflict of interest" between Ticketmaster and PC. PC then asked for a two-month adjournment of the proceedings so that new counsel could learn the case. When the arbitration panel found no conflict and refused to adjourn the proceedings, the PC/Ticketmaster counsel announced he would no longer attend, claiming that his "client" had informed him that there was no more money available to pay his fees. New attorneys representing the "Wembley interests" took over PC's defense. Ticketmaster's attorneys, however, have continued to assist PC's new counsel in the defense of the arbitration, presumably on a paid basis.

32.     Upon information and belief, in late 1994 Ticketmaster hired, or caused to be hired, a private detective, Martin Bergman, who contacted MovieFone, fraudulently representing that he was a producer for the television news magazine "60 Minutes" working on an investigation of Ticketmaster. By and through this fraudulent representation, Martin Bergman, acting as Ticketmaster's agent, deceptively gained access to MovieFone and its principals. In the course of discussions with MovieFone, Mr. Bergman attempted to procure and did procure information regarding MovieFone that Ticketmaster (would not otherwise have known). Ticketmaster then used that information as well as information manufactured by Mr. Bergman to

11

9AOL050016
CONFIDENTIAL TREATMENT
REQUESTED

file a frivolous libel action against MovieFone, its principals, and its attorneys in their individual capacity. That suit is described is paragraph 34 below.

33.    In 1994 and 1995, Ticketmaster threatened to retaliate against MovieFone and its representatives and agents for providing information to the Antitrust Division of the United States Department of Justice, which was then conducting an antitrust investigation of Ticketmaster, and to members of the United States Congress, who also were investigating Ticketmaster's conduct. Ticketmaster's threats were consistent with the intimidation tactics it has used on other occasions, such as its baseless libel suits against lawyers who have complained about its anti-competitive practices, its threatened boycott of a third investment banking firm that had a close professional relationship with a law firm that had complained to the Justice Department on behalf of the rock group, Pearl Jam, and its threats to secure the termination of a Congressional investigator who had raised questions about Ticketmaster's conduct, including, but not limited to, its misleading testimony before Congress. Mr. Bergman, still in the guise of a television producer, warned a Congressional staff member involved in the Congressional investigation to "be careful" because "Ticketmaster means business."

34.    Consistent with its pattern of intimidation, on January 31, 1996, Ticketmaster filed a complaint seeking $60 million in damages in New York Supreme Court against MovieFone, two of its attorneys (in their personal capacity), and its Chairman and officers (in their individual capacity) based on information Mr. Bergman, working on behalf of Ticketmaster, fraudulently obtained from a public official. Ticketmaster argued that MovieFone had "libeled" Ticketmaster by opining to the public official that Ticketmaster might have violated criminal antitrust laws. The complaint was dismissed with prejudice in August, 1996.

12

9AOL050017
CONFIDENTIAL TREATMENT
REQUESTED

35.     Ticketmaster's obstructionist and harassing conduct has frustrated Plaintiffs' efforts to provide teleticketing services to movie theaters and thwarted MovieFone's plans to enter live-event teleticketing.

## COUNT ONE
### Attempt to Monopolize Automated Ticketing For Premier Live Events in Violation of Sherman Act § 2.

36.     The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

37.     Ticketmaster has monopoly power in the national and metropolitan markets for automated ticketing for premier live events. According to a report in *Seattle Weekly*, published on November 2, 1994, Ticketmaster sells 90% of all premier live event tickets. Ticketmaster has exercised its monopoly power by charging supracompetitive service fees -- in some cases as high as $10.50 per ticket and 55% of the ticket's face value. In 1994, a Ticketmaster representative reportedly told the operator of a chain of movie theaters that "[we] own entertainment teleticketing in this country."

38.     The automated ticketing market for premier live-events includes services that sell tickets to a number of different premier live events utilizing telephone lines and remote outlets connected by telephone to a central computer. According to a prospectus filed earlier this year by Ticketmaster as part of its initial public offering, automated ticketing excludes sales of tickets to individual events made at and accounted for directly at the venue box office.

39.     Ticketmaster has reinforced its monopoly power by entering into long-term exclusive-dealing contracts. Ticketmaster's own prospectus acknowledges that Ticketmaster generally enters into three-to-five year exclusive contracts with entertainment venues pursuant to

13

9AOL050018
CONFIDENTIAL TREATMENT
REQUESTED

which it has the right to sell all of a venue's tickets. Ticketmaster also typically enters into exclusive contracts with promoters and sports teams. According to a report in *The New York Times*, Ticketmaster has exclusive ticket distribution contracts with live-event venues representing 63.2% of the 9.9 million available seats in the United States. Ticketmaster has exclusive contracts at most of the country's major exhibition arenas, including such prominent New York venues as Madison Square Garden, the Meadowlands Sports Complex, and the Nassau Coliseum. For many premier live events, it is the only source of tickets other than scalpers (who, at least in some cities, are upon information and belief, supplied by Ticketmaster outlets). In a number of instances, the Ticketmaster contract with an arena precludes or severely limits box office sales. For example, Ticketmaster's contract with the Meadowlands in New Jersey requires that the box office be closed on the first day of premier live event ticket sales, which in many cases is the only relevant day since many premier live events sell out on the first day.

40.    Barriers to entry in the market for premier-live-event automated ticketing market are high. To compete effectively against Ticketmaster, a ticketing service must be capable of providing a fully integrated and tested ticket inventory management system with related capabilities such as tracking concession sales, controlling the payroll, scheduling personnel, reserved seating, and managing ticket inventory. The creation of such a full-service box office ticket inventory management system is both expensive and time consuming. Based on its own experience, MovieFone estimates that creation of a fully competitive system takes several years from inception and requires a total investment of millions of dollars. But the creation of a fully-functional automated ticketing system is only the first step. Automated ticketing requires a communications network capable of linking individual customers with the teleticketing provider

14

9AOL050019
CONFIDENTIAL TREATMENT
REQUESTED

and a distribution method. To successfully compete against Ticketmaster, a firm also must
establish widespread name recognition with the public, a reputation for reliability, and extensive
relationships with the entertainment industry. Even more important, a new entrant must be able
to overcome the entrenched base that Ticketmaster has established at numerous venues and has
reinforced through exclusive contracts.

    41.    At the time of Ticketmaster's acquisition of PC's assets in April 1994, the
MovieFone-PC venture was the most likely potential entrant into the relevant markets. Both
MovieFone and TTC were well managed and well capitalized, and each had established important
relationships in the market. The MovieFone-PC venture had the following advantages compared
to other potential entrants into the market:

- State-of-the-art automated teleticketing software and hardware, including advanced touch-tone driven technology and access to PC's software that has been successfully used in Europe to sell reserved seats over the telephone and to manage concession sales;

- A proven track record for all aspects of teleticketing, including software, hardware, and marketing;

- Extensive and established relationships with the entertainment industry, with credit card companies, with advertisers, and with other entities that are integral to successful teleticketing;

- National name recognition in major geographic markets;

- Ownership of easily recognizable national phone numbers;

- Access to movie theaters that could be used as remote ticketing outlets during non-peak hours for customers desiring to pay for their tickets in cash;

- Strong financial backing;

- An existing nationwide service and maintenance network;

- An extensive sales force geared to and experienced in relating to live event venues; and

- The ability to keep service fees low because of MovieFone's state-of-the-art automated system and its ability to generate revenue from selling advertising space.

15

9AOL050020
CONFIDENTIAL TREATMENT
REQUESTED

42.   Ticketmaster has engaged in a pattern of exclusionary conduct, including but not limited to the acquisition of PC's assets, with the specific intent of maintaining and entrenching its monopoly power.  In addition to acquiring PC's assets, Ticketmaster has engaged in the following additional exclusionary conduct that has harmed competition:

    a.   interfering with MovieFone's initial public offering and otherwise raising MovieFone's costs;

    b.   filing sham litigation against MovieFone under a false name for the purpose of delaying the arbitration and embroiling MovieFone in costly litigation;

    c.   attempting to delay the resolution of the arbitration proceeding between MovieFone and PC, and increasing MovieFone's litigation costs, by intentionally withholding relevant documents and disrupting the arbitration; and

    d.   entering into unreasonably restrictive exclusive contracts with venues and arenas in order to entrench its monopoly power.

43.   Upon information and belief, Ticketmaster never fully described the nature of its acquisition of PC's assets to the antitrust authorities when it made its pre-merger filings.

44.   Ticketmaster's exclusionary conduct, both separately and collectively, has foreclosed competition, and deprived consumers of the opportunity to receive better service and lower prices.

45.   The foregoing conduct, both individually and collectively, constitutes unlawful monopolization or attempt to monopolize in violation of Sherman Act § 2.

46.   As a result of Ticketmaster's unlawful and anti-competitive conduct, Plaintiffs have suffered antitrust injury and injury to their business and property as well as irreparable injury.

9AOL050021
CONFIDENTIAL TREATMENT
REQUESTED

## COUNT TWO

### Attempt to Monopolize Automated Teleticketing in Violation
### of Sherman Act § 2

47.     The factual allegations contained in the preceding paragraphs are incorporated by

reference and made a part hereof as if restated in full.

48.     Ticketmaster has either monopoly power or a dangerous probability of acquiring

monopoly power in the national and metropolitan markets for automated ticketing.

49.     The automated ticketing market includes services that sell tickets to multiple

entertainment events utilizing telephone lines and remote outlets connected by telephone to a

central computer.  According to Ticketmaster's prospectus filed earlier this year in connection

with an initial public offering, automated ticketing excludes sales of tickets to individual events

made at the box office.

50.     As stated above, Ticketmaster has reinforced its monopoly power with long-term

exclusive-dealing contracts.  Ticketmaster' own prospectus acknowledges that Ticketmaster

generally enters into three-to-five year exclusive contracts with entertainment venues pursuant to

which it sells all tickets outside of the facility's box office.

51.     Barriers to entry in the automated ticketing market are high for the reasons stated

in the preceding count.

52.     At the time of Ticketmaster's acquisition of PC's assets in April 1994, the

MovieFone-PC venture was a competitor of Ticketmaster in automated ticketing.

53.     Ticketmaster has engaged in a pattern of exclusionary conduct, including but not

limited to the acquisition of PC's assets, with the specific intent of maintaining and entrenching its

17

9AOL050022
CONFIDENTIAL TREATMENT
REQUESTED

monopoly power. In addition to acquiring PC's assets, Ticketmaster has engaged in the following additional exclusionary conduct that has harmed competition in the automated ticketing market:

    a.   interfering with TTC's contracts with exhibitors, including Cineplex Odeon, Loews (now Sony Theatres), and City Cinemas;

    b.   interfering with MovieFone's initial public offering and otherwise raising MovieFone's costs;

    c.   filing sham litigation against MovieFone under a false name for the purpose of embroiling and distracting MovieFone in costly litigation; and

    d.   entering into unreasonably restrictive long-term exclusive contracts with venues and arenas in order to entrench its monopoly power.

54.    Ticketmaster's exclusionary conduct, both separately and collectively, has foreclosed competition, and deprived consumers of the opportunity to receive better service and lower prices.

55.    The foregoing conduct, both individually and collectively, constitutes an unlawful attempt to monopolize the national automated ticketing market in violation of Sherman Act § 2.

56.    As a result of Ticketmaster's unlawful and anti-competitive conduct, Plaintiffs have suffered antitrust injury and injury to their business and property as well as irreparable injury.

## COUNT THREE
### Unlawful Acquisition in Violation of the Clayton Act § 7

57.    The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

58.    Prior to Ticketmaster's acquisition of PC's assets on April 15, 1994, PC (by itself and through its joint venture with MovieFone) and Ticketmaster were competitors in national and metropolitan markets for automated ticketing.

18

9AOL050023
CONFIDENTIAL TREATMENT
REQUESTED

59.     On April 15, 1994, Ticketmaster acquired all of the assets of PC necessary to provide automated ticketing services in the United States.

60.     Ticketmaster's acquisition of PC has created a reasonable possibility of lessening competition and tended to create a monopoly in the automated ticketing market in violation of Clayton Act § 7.

61.     Because the acquisition deprived MovieFone of its automated ticketing joint venture partner, PC, and access to PC's box office equipment, the acquisition harmed competition by impeding and foreclosing MovieFone's ability to compete in the relevant markets.

62.     The foregoing conduct, both individually and collectively constitutes unlawful acquisition in violation of Clayton Act § 7.

63.     As a result of the foreclosure effects of Ticketmaster's acquisition, which is one of the reasons the acquisition is anti-competitive, Plaintiffs have suffered antitrust injury and injury to their business and property as well as irreparable injury.

COUNT FOUR

Conspiracy Between Ticketmaster and PC to Restrain Trade in
Violation of Section One of the Sherman Act

64.     The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

65.     Prior to April 15, 1994, Ticketmaster and PC were direct competitors in the relevant automated ticketing markets.

66.     Between August 31, 1993, and April 15, 1994, Ticketmaster and PC jointly agreed between themselves on the manner in which automated ticketing services were provided to customers, including the services and terms provided, thereby unreasonably restraining trade.

19

9AOL050024
CONFIDENTIAL TREATMENT
REQUESTED

Because of MovieFone's preexisting contractual relationship with PC, Plaintiffs were injured by the anti-competitive aspects of the joint Ticketmaster-PC conduct.

67.    Between August 31, 1993, and April 15, 1994, Ticketmaster and PC engaged in a boycott of Plaintiffs by agreeing to withhold services relating to automated ticketing from Plaintiffs and from Plaintiffs' customers, including, but not limited to, City Cinemas theaters.

68.    The foregoing conduct constitutes both a *per se* violation of Sherman Act § 1 and an unreasonable restraint of trade in the automated ticketing market in violation of Sherman Act § 1.

69.    As a result of the anti-competitive foreclosure effects of the acquisition, Plaintiffs have suffered antitrust injury and injury to their business and property as well as irreparable injury.

## COUNT FIVE
### Conspiracy Between Ticketmaster and Wembley to Restrain Trade in Violation of Section One of the Sherman Act

70.    The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

71.    At all relevant times, Ticketmaster and Wembley have been competitors or potential competitors for automated ticketing services.

72.    On April 15, 1994, Ticketmaster and Wembley agreed to limit competition among themselves and their affiliates with respect to automated ticketing.

73.    The April 15, 1994, agreement between Ticketmaster and Wembley not to compete was not reasonably ancillary to a legitimate joint venture. Rather it was intended to, and had the effect of, unreasonably foreclosing competition from MovieFone, and thus harming both MovieFone and competition.

20

9AOL050025
CONFIDENTIAL TREATMENT
REQUESTED

74.   The April 15, 1994 agreement between Ticketmaster and Wembley also unreasonably restrained trade by using improper means to cripple MovieFone and limit its ability to compete in the relevant markets.

75.   The April 15, 1994 agreement between Ticketmaster and Wembley constitutes an unreasonable restraint of trade in violation of Sherman Act § 1.

76.   As a result of Ticketmaster's anti-competitive conduct, Plaintiffs have suffered antitrust injury and injury to their business and property as well as irreparable injury.

## COUNT SIX

### Tortious Interference with MovieFone's 1992 Agreement with PC

77.   The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

78.   Ticketmaster had knowledge of the 1992 Agreement between PC and MovieFone prior to the time it acquired PC's assets.

79.   At all relevant times, the 1992 Agreement was valid and enforceable.

80.   Before Ticketmaster acquired PC's assets on April 15, 1994, Ticketmaster, without justification, intentionally induced and caused PC to breach its 1992 Agreement with MovieFone in numerous material ways including the following:

   a.   causing PC not to connect City Cinemas theaters in New York to MovieFone's telephone lines as required by the 1992 Agreement while at the same time deceptively telling MovieFone that the connection would be made;

   b.   causing PC to withhold from TTC enhancements to its movie teleticketing service that PC already had previously agreed to provide while at the same time deceptively misleading TTC to believe that the enhancements would be made;

21

9AOL050026
CONFIDENTIAL TREATMENT
REQUESTED

    c.  causing PC not to seek, or enter into, any new movie teleticketing agreements on behalf of the MOVIEFONE-PC joint venture while at the same time misleading MovieFone that PC would comply with the 1992 Agreement;

    d.  causing PC to surreptitiously provide to Ticketmaster trade secret information about the movie teleticketing agreements that the MovieFone-PC venture had entered into with theaters and about MovieFone's future automated ticketing plans that had been provided by MovieFone to PC in reliance on confidentiality provisions of the 1992 Agreement.

81.    On April 15, 1994, Ticketmaster tortiously interfered with the 1992 Agreement between MovieFone and PC by intentionally rendering PC's performance of the 1992 Agreement impossible. Ticketmaster did so by, among other means, fraudulently acquiring control over all of PC's assets necessary to perform the 1992 Agreement, thereby rendering PC an insolvent shell corporation, and by causing Wembley to agree that PC would no longer compete in movie teleticketing. The asset transfer constituted both a fraudulent conveyance and a violation of the federal antitrust laws.

82.    Subsequent to acquiring the assets of PC, and at a time when PC remained a wholly-owned subsidiary of Wembley, Ticketmaster interfered with the 1992 Agreement by, among other things, engaging in the following intentional conduct:

    a.  filing a fraudulent and unauthorized lawsuit under PC's name against MovieFone on October 26, 1994, alleging that MovieFone had breached the 1992 Agreement, and accusing MovieFone of fraudulent conduct;

    b.  announcing on the same day, at a major trade association luncheon before hundreds of movie-exhibitor representatives and through trade publications, that Ticketmaster had "purchased" "Pacer Cats" and would provide "[t]he first fully automated telephone reservation service revolutionizing the marketing and selling of movie tickets in America" and telling exhibitors to "accept no substitutes"; and

    c.  soliciting, with CCS employees who Ticketmaster deceptively identified as "Pacer Cats" employees, movie teleticketing business in markets

9AOL050027
CONFIDENTIAL TREATMENT
REQUESTED

where PC was obligated to provide such teleticketing services
exclusively through MovieFone.

83.     Ticketmaster's interference and inducement of breaches of the 1992 Agreement

was improper, unfair, and not justified by its own desire to provide movie teleticketing services

because Ticketmaster's interference, as detailed herein, involved fraud, violations of the federal

antitrust laws, and other illegal action.

84.     Ticketmaster's conduct constitutes tortious interference with MovieFone's contract

with PC in violation of the common law of New York.

85.     As a direct and proximate result of Ticketmaster's misconduct, MovieFone has

sustained significant and ongoing damages.

## COUNT SEVEN

### Tortious Interference with TTC's Performance of Contracts
### with Theaters

86.     The factual allegations contained in the preceding paragraphs are incorporated by

reference and made a part hereof as if restated in full.

87.     Pursuant to the 1992 Agreement between MovieFone and PC, TTC and PC

entered into the following contracts with theaters to provide teleticketing services:

      a.  In June 1992, TTC and PC entered into an exclusive five-year contract
          with Loews (Sony) Theatres to provide teleticketing services at
          designated theaters.

      b.  In December 1993, pursuant to the 1992 Agreement between
          MovieFone and PC, TTC entered into an exclusive three-year contract
          with City Cinemas theaters to provide teleticketing services at
          designated City Cinemas theaters.

88.     In order to perform its obligations under these contracts, TTC needed the

cooperation and assistance of PC, to which it was entitled pursuant to the 1992 Agreement.

23

9AOL050028
CONFIDENTIAL TREATMENT
REQUESTED

89.     At all relevant times, Ticketmaster was aware of the existence of TTC's contracts with these theaters, and that each of those contracts was valid and enforceable.

90.     Prior to April 15, 1994, Ticketmaster interfered with TTC's performance of its contract with City Cinemas by causing PC not to connect the PC box office equipment at City Cinemas with MovieFone's phone lines unless Ticketmaster was also allowed to teleticket at City Cinemas in violation of TTC's contract with City Cinemas.

91.     On April 15, 1994, Ticketmaster intentionally interfered with TTC's performance of these contracts by fraudulently stripping PC of all assets necessary to assist TTC in performing the Loews (Sony) and City Cinemas contracts.

92.     As a direct result of TTC's tortious interference, TTC breached its contract with City Cinemas and with Loews (Sony) and was required to undertake costly mitigation efforts.

93.     Ticketmaster's interference was unjustified, improper, unfair, and not excused by its own desire to provide movie teleticketing services. Ticketmaster's interference involved a fraudulent transfer of assets and involved violations of the federal antitrust laws.

94.     As a result of such conduct, Ticketmaster violated the common law of New York and caused substantial injury to Plaintiffs.

## COUNT EIGHT
### Inducing and Participating in Breaches of Fiduciary Duties

95.     The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

96.     As MovieFone's joint venture partner under the 1992 Agreement, PC owed fiduciary duties to MovieFone.

9AOL050029
CONFIDENTIAL TREATMENT
REQUESTED

97.   Ticketmaster had knowledge of the 1992 Agreement, including the fiduciary nature of the relationship between MovieFone and PC.

98.   Notwithstanding its knowledge that PC owed fiduciary duties to MovieFone, Ticketmaster induced PC to breach those duties, and participated in that breach, by engaging in the conduct alleged above.  Such conduct includes, among other things:

    a.   causing PC to transfer to CCS, an entity controlled and managed by Ticketmaster, all of the assets and employees necessary for PC to perform its obligations under the 1992 Agreement;

    b.   preventing PC from connecting MovieFone to PC box office equipment at City Cinemas theaters in New York City;

    c.   causing PC to conceal its movie teleticketing plans from MovieFone;

    d.   contractually agreeing with Wembley that PC would not engage in any business that competed with CCS, including movie teleticketing;

    e.   instructing the former employees of PC (now working for CCS) to try to change certain merchant identification numbers so that TTC's proceeds from teleticketing sales would be diverted to a Ticketmaster-controlled bank account;

    f.   instructing the former employees of PC (now working for CCS) to search their files for any evidence that could be used as a pretext for claiming that MovieFone had breached the 1992 Agreement with MovieFone;

    g.   causing an unauthorized lawsuit to be filed in the name of PC against MovieFone, alleging that MovieFone had breached the 1992 Agreement;

    h.   in conjunction with former employees of PC (now working for CCS), attempting to usurp movie teleticketing opportunities that belonged to the MovieFone-PC venture pursuant to the 1992 Agreement.

99.   As a direct and proximate result of Ticketmaster's participation in PC's breaches of its fiduciary duties, Plaintiffs have suffered and will continue to suffer substantial damages.

25

9AOL050030
CONFIDENTIAL TREATMENT
REQUESTED

## COUNT NINE

### Interference With Plaintiffs' Prospective Business Relations
### with Theaters

100.    The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

101.    Prior to Ticketmaster's tortious interference with the 1992 Agreement between MovieFone and PC, Plaintiffs were reasonably certain of entering into teleticketing contracts with the following theaters, among others:

        a.  National Amusements' Broadway Theater in Hicksville, Long Island;

        b.  AMC theaters in Dallas, including The Grand;

        c.  United Artists theaters on Long Island; and

        d.  Cineplex Odeon theaters in Washington, D.C.

Plaintiffs were reasonably certain of entering into contracts with these theaters because each had asked to do teleticketing through MovieFone, and MovieFone had preexisting relationships with these theaters.

102.    Prior to Ticketmaster's tortious interference with the 1992 Agreement, Plaintiffs were reasonably certain to enter into teleticketing contracts with other theaters listed on Exhibits A and B of the 1992 Agreement who had expressed interest in teleticketing and were already using PC box office equipment. PC and MovieFone had prior relations with those theaters and PC had represented to MovieFone that it would be "a piece of cake" to obtain teleticketing contracts with these theaters.

103.    Prior to Ticketmaster's tortious interference with the 1992 Agreement, it was reasonably certain that TTC's contracts with Sony, Loews, and City Cinemas would be renewed.

26

9AOL050031
CONFIDENTIAL TREATMENT
REQUESTED

Ticketmaster's conduct has interfered with the renewal of the Sony and Loews contracts, and will interfere with the renewal of the Cineplex contract.

104.    Ticketmaster interfered with these prospective contracts by fraudulently acquiring the assets of PC and not allowing the assets to be used to help Plaintiffs to enter into additional teleticketing agreements.

105.    Ticketmaster's interference was unjustified, improper, unfair, and not excused by its own desire to provide movie teleticketing services. As detailed herein, Ticketmaster's interference involved a fraudulent transfer of assets and involved violations of the federal antitrust laws.

106.    Ticketmaster's conduct constitutes tortious interference with Plaintiffs' prospective business relations in violation of the common law of New York...

107.    As a direct and proximate result of Ticketmaster's tortious conduct, Plaintiffs have suffered and will continue to suffer substantial damages.

**COUNT TEN**

**Tortious Interference with MovieFone's Prospective Business
Relationship with PC**

108.    The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

109.    At the time it acquired PC, Ticketmaster knew that PC and MovieFone were considering expanding the scope of their venture to premier live event automated ticketing. But for Ticketmaster's interference, PC and MovieFone would today be jointly providing such services.

27

9AOL050032
CONFIDENTIAL TREATMENT
REQUESTED

110.    Ticketmaster's acquisition of PC interfered with the planned expansion of the relationship between PC and MovieFone.

111.    Ticketmaster's interference with the business relationship between PC and MovieFone was unfair and unjustified because it involved a fraudulent conveyance of PC's assets and a violation of the federal antitrust laws.

112.    As a result of Ticketmaster's misconduct, MovieFone has suffered and will continue to suffer damages.

**COUNT ELEVEN**

Interference With The Performance of MovieFone's Contracts
With Its Investment Bankers

113.    The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

114.    In late 1993, MovieFone retained the investment banks Salomon Brothers ("Salomon") and Alex. Brown & Sons ("Alex. Brown") for the purpose of underwriting an initial public offering of MovieFone's stock.

115.    On March 3, 1994, MovieFone filed an S-1 registration statement with the SEC as a prelude to its initial public offering.

116.    Shortly after March 3, 1994, Ticketmaster learned that MovieFone had filed its S-1 registration statement with the SEC.  Ticketmaster was aware at the time that MovieFone had contractual relations with Salomon and Alex. Brown.

117.    On March 8, 1994, Ticketmaster issued a press release announcing that it had "agreed to acquire 50% of Pacer/CATS/CCS Group (Pacer/CATS) and enter into a joint venture

28

9AOL050033
CONFIDENTIAL TREATMENT
REQUESTED

as managing partner with Wembley PLC" and that the acquisition "allows Ticketmaster to further

expand its operations and make closer strategic alliances with movie exhibitors."

118.    On March 8, 1994, Fredric D. Rosen, President and CEO of Ticketmaster, falsely

told Drew Marcus and Chip Carey of Alex. Brown in a phone conversation that MovieFone's

1992 Agreement and its teleticketing contracts with theaters were in breach and that all of

MovieFone's business from now on "has to go through me."  He further declared, "This is war."

He asked the investment bankers "to read between the lines" and said, "I think you know what I

mean."

119.    Ticketmaster intended to interfere with MovieFone's relationships with its

investment banker for the sole purpose of harming MovieFone.  On or about March 11, 1994,

Charles Gerber, an attorney for Ticketmaster, falsely told Salomon that MovieFone was "not in

compliance with their agreements" and that "[k]nowing what I know about the state of contracts,

I would think long and hard before getting involved with MovieFone."  Mr. Gerber further stated,

"We have looked at the agreement [between MovieFone and PC] and spent extensive time on it

and I am highly confident we will win in this mess."

120.    In another conversation at about the same time, Fredric Rosen told Salomon that

"I don't think much of MovieFone" and MovieFone's contracts "are all in breach."

121.    As a result of the knowingly false representations, Ticketmaster harmed

MovieFone's relationship with its investment bankers.  As a result of the statements made by

Ticketmaster in these calls, the investment bankers required MovieFone to obtain legal opinions

that MovieFone's agreements, including the 1992 Agreement, were not in breach and also

required that the registration statement and subsequent prospectus be amended to add substantial

9AOL050034
CONFIDENTIAL TREATMENT
REQUESTED

disclosure about the Ticketmaster threats to MovieFone. The additional due diligence imposed significant costs on MovieFone.

122.    As a result of the additional disclosure that MovieFone made in reliance on Ticketmaster's misrepresentations, the price of MovieFone's IPO was reduced from $14 per share to $11.50 per share, causing substantial losses to MovieFone. In addition, MovieFone suffered other substantial out-of-pocket damages, including increased legal fees in connection with its initial public offering.

123.    The foregoing conduct constitutes tortious interference with the performance of the contracts between MovieFone and its investment bankers in violation of New York common law.

## COUNT TWELVE
### Injurious Falsehood

124.    The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

125.    Ticketmaster's conduct, as described in the preceding count constitutes the tort of injurious falsehood. Ticketmaster knowingly published false and misleading information to MovieFone's investment bankers with the intent to harm MovieFone's business and with the knowledge that damage to MovieFone would result. Moreover, Ticketmaster's conduct was maliciously intended to disrupt the relationship between MovieFone and its investment bankers, and it did disrupt that relationship, requiring MovieFone to incur substantial additional legal costs, including legal opinion letters, before the initial public offering could proceed.

9AOL050035
CONFIDENTIAL TREATMENT
REQUESTED

126.   As a result of Ticketmaster's conduct, MovieFone suffered special damages including the following:

    a.  $119,047 spent on additional legal fees necessary to provide assurance to the investment bankers that MovieFone was not in breach of its contracts.

    b.  $6,510,000 in reduced proceeds from the initial public offering that resulted because institutional investors, including specific investment firms identified in MovieFone's records, who had previously expressed interest, did not purchase the stock of MovieFone after the additional disclosures regarding Ticketmaster's threats.

### COUNT THIRTEEN
#### Malicious Prosecution

127.   The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

128.   On October 26, 1994, Ticketmaster caused a complaint to be filed in the Superior Court of the State of California captioned "PCC Management, Inc. v. MovieFone, Inc., PromoFone, Inc., The Teleticketing Company, L.P., and The Falconwood Corporation." The suit, bearing Case No. BC 115199, alleged that MovieFone had "breached" the 1992 Agreement and engaged in "fraudulent, deceptive and otherwise wrongful conduct." ·

129.   The California lawsuit was never authorized by PC. On January 23, 1997, Sir Brian Wolfson, the sole director of PC at the time the suit was filed, disclosed in sworn testimony at the arbitration proceeding between MovieFone and PC that he was unaware of the lawsuit, had not authorized it, and had no knowledge of facts that would support numerous allegations of the complaint.

9AOL050036
CONFIDENTIAL TREATMENT
REQUESTED

130.    Because the unauthorized lawsuit was filed without apparent consultation with, or the authorization of, PC and because its allegations were inconsistent with PC's actual understanding of the facts, the suit was filed without probable cause.

131.    Ticketmaster acted with malice toward MovieFone when it improperly filed the complaint. Ticketmaster caused the lawsuit to be filed in order to impose costs on MovieFone, deny MovieFone the benefits of a speedy arbitration process, and distract MovieFone from its teleticketing business.

132.    On February 5, 1997, shortly after Sir Brian Wolfson's testimony, PC's purported counsel voluntarily dismissed the California complaint.

133.    The unauthorized lawsuit caused MovieFone to incur substantial legal fees to obtain and uphold a court-ordered stay of the California lawsuit in favor of arbitration before the AAA as MovieFone and PC had agreed in the 1992 Agreement.

134.    Ticketmaster's conduct constitutes malicious prosecution in violation of the common law of California and injured Plaintiffs.

## COUNT FOURTEEN
### Racketeering

135.    The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

136.    Ticketmaster has violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961(c), by conducting the affairs of PC, CCS, and an association in fact composed of PC and CCS, through a pattern of racketeering activity, including numerous acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, extortion in violation of 18 U.S.C. §

32

9AOL050037
CONFIDENTIAL TREATMENT
REQUESTED

1951, and witness tampering in violation of 18 U.S.C. § 1512 — all described with particularity in the following paragraphs.

137.   The pattern of racketeering included the following acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 and in furtherance of a scheme to defraud MovieFone:

    a.   In January 1994, Ticketmaster caused PC to fraudulently conceal from MovieFone the fact that Ticketmaster had caused PC to suspend any efforts to enhance the teleticketing services that PC was to provide to MovieFone. As a result, PC engaged in a number of interstate telephone calls and mailings in January and February 1994, fraudulently misrepresenting to MovieFone that PC was in fact performing and/or intended to perform its obligations under the 1992 Agreement.  For example, on January 27, 1994, Israel Greidinger, the President of PC, used the interstate mails to send a letter to MovieFone stating that PC was committed to providing agreed-upon enhancements to TTC's teleticketing services, that it would provide the software necessary for an integrator disaster recovery plan, and that it would make a good faith effort to connect City Cinemas theaters to MovieFone for on-line teleticketing. Again, on February 3, 1994, Israel Greidinger represented to MovieFone that he was preparing a timetable to complete these projects, when in fact, at Ticketmaster's direction, PC had no intention of completing them.  In reliance on these fraudulent misrepresentations, MovieFone to its detriment continued to treat PC as partner and not as a rival, and accordingly suffered damages.

    b.   On March 8, 1994, Ticketmaster used the interstate wires to issue a press release stating that it had agreed "to acquire 50% of Pacer/CATS/CCS Group (Pacer/CATS) and enter into a joint venture as managing partner with Wembley PLC." Neither Ticketmaster nor PC disclosed to MovieFone at the time that Ticketmaster already was conducting the affairs of PC.

    c.   Between March 8, 1994, and March 15, 1994, Ticketmaster, speaking for PC and itself, used the interstate wires on at least two occasions to tell MovieFone's investment bankers knowingly false information about MovieFone's 1992 Agreement with PC as well as about TTC's contracts with movie exhibitors, as part of its continuing scheme to disable MovieFone.

    d.   On March 11, 1994, Ticketmaster used the interstate mail to falsely represent to MovieFone that Ticketmaster had acquired control over the 1992 Agreement and that "Ticketmaster [looked] forward to an amicable relationship [with MovieFone]. . . ."  In fact, Ticketmaster's

33

9AOL050038
CONFIDENTIAL TREATMENT
REQUESTED

intention, as expressed in conversations with others during this time period, was to repudiate the 1992 Agreement and conduct the affairs of PC and CCS in a manner to harm and disable Plaintiffs. Plaintiffs relied on Ticketmaster's misrepresentations to their detriment and refrained from contacting antitrust enforcement authorities during the time they were reviewing Ticketmaster's pre-merger filing and from initiating litigation to protect their interests.

e.  Later in March 1994, Ticketmaster used the interstate wires to falsely represent to MovieFone in a telephone conversation that "once Ticketmaster takes control [of PC], [Ticketmaster's attorney] will be glad to sit down with you and try and clarify whatever differences of view exist or ambiguities exist [with respect to the 1992 Agreement.]" Ticketmaster's representative, Charles Gerber, further stated in the course of the conversation, "[W]e have historically honored our contractual relationships and we will continue to honor our contractual relationships, but if there was any ambiguity or differences of views we have to sort that out." In fact, Ticketmaster's intention, as expressed in conversations with others during this time period, was to repudiate the 1992 Agreement, conduct the affairs of PC and CCS in a manner to harm and disable Plaintiffs, and to "wipe MovieFone out of the market in 18 months." Plaintiffs relied on Ticketmaster's misrepresentations to their detriment and refrained from contacting antitrust enforcement authorities and initiating litigation to protect their interests.

f.  On or about April 15, 1994, Ticketmaster used the interstate wires in furtherance of the fraudulent transfer of all of PC's assets necessary for performance of its 1992 Agreement obligations to CCS, thereby allowing CCS to use those assets to harm and disable Plaintiffs. The only substantial asset not transferred to CCS was the 1992 Agreement. Ticketmaster structured the fraudulent conveyance so that the consideration it paid for the PC assets was not paid to PC and did not become an asset of PC. Thus, PC was left insolvent and unable to perform its contractual obligations to MovieFone pursuant to the 1992 Agreement. As a result of Ticketmaster's misrepresentations about the nature of its acquisition of PC's assets, MovieFone did not understand the full extent of its problem and did not take immediate action to protect its interests.

g.  After April 1994, Ticketmaster and CCS used the interstate wires and mails on a continuing basis to fraudulently represent to Plaintiffs and to exhibitors including Cineplex Odeon and Sony Theatres that Ticketmaster and CCS had assumed PC's obligations under the 1992 Agreement. Shortly after the asset transfer, CCS, acting, upon information and belief, at the direction of Ticketmaster, sent a facsimile to TTC directing TTC to send its monthly service fees payable to PC pursuant to the 1992 Agreement to CCS. In reliance on this further

34

9AOL050039
CONFIDENTIAL TREATMENT
REQUESTED

misrepresentation, indicating that CCS had in fact assumed the 1992 Agreement, TTC made repeated monthly payments to CCS to its detriment.

h.   On or about October 26, 1994, Ticketmaster used the interstate mail to serve a fraudulent complaint on Plaintiffs purportedly filed by PC. The complaint was in fact never authorized by PC and the allegations contained in the complaint were knowingly false and were intended to facilitate Ticketmaster's efforts to harm MovieFone. As a result of Ticketmaster's fraudulent lawsuit, MovieFone incurred significant legal expenses, totaling approximately $120,000.

i.   Between October 1994 and January 1997, Ticketmaster and its agents engaged in a continuing pattern of fraud by failing to disclose in numerous telephone and mail communications with MovieFone that the litigation purportedly filed by PC was in fact filed and directed by Ticketmaster.

j.   Upon information and belief, in early 1995, Ticketmaster's agent, Martin Bergman, used the interstate wires to fraudulently represent that he was a producer for "60 Minutes." As a result of this fraud, Ticketmaster was able to obtain information from MovieFone that MovieFone would not have otherwise disclosed to it.

k.   On or about July 5, 1995, Ticketmaster caused CCS to file suit in New York State Supreme Court against Plaintiffs making knowingly false allegations, including the allegation that Ticketmaster did not exercise any control over PC when at the time of the suit, Ticketmaster was in fact controlling PC's strategy in the litigation filed against Plaintiffs in California. Upon information and belief, Ticketmaster used interstate mail and wires to authorize and direct the New York litigation.

138.   The pattern of racketeering included the following acts of extortion in violation of

18 U.S.C. § 1951, including the following:

a.   Between March 8, 1994, and March 15, 1994, Ticketmaster threatened MovieFone's investment bankers with economic harm by urging that the investment bankers withdraw from underwriting MovieFone's initial public offering as a condition of doing business in the future with Ticketmaster.

b.   On or about April 5, 1994, Ticketmaster threatened that it would cause a breach of TTC's contract with City Cinema's theaters causing economic harm to Plaintiffs unless TTC modified its contract with City Cinemas to permit Ticketmaster to engage in teleticketing at those theaters.

35

9AOL050040
CONFIDENTIAL TREATMENT
REQUESTED

139.    The pattern of racketeering included witness tampering in violation of 18 U.S.C. §

1512. In December 1996, MovieFone subpoenaed to testify as a witness in arbitration proceeding

a former PC employee, Lori Cohen. Shortly before Ms. Cohen was scheduled to testify,

Ticketmaster through its agents threatened to sue her if she testified. This threat was made to

intimidate the witness and induce her to withhold relevant testimony or be absent from the

proceeding.

140.    The pattern of racketeering included the following acts of obstruction of

proceedings in violation of 18 U.S.C. § 1505:

  a. In or about June 1994, the U.S. House of Representatives
     Subcommittee for Information, Justice, Transportation and Agriculture
     was investigating Ticketmaster and planning hearings concerning the
     anti-competitive effect of exclusive dealing arrangements between
     Ticketmaster and numerous live event venues throughout the United
     States. Ticketmaster, through its Chief Executive, Fred Rosen, and its
     agents Charles Gerber, Ned Goldstein, and Martin Bergman, illegally
     endeavored to influence, obstruct or impede the due and proper
     exercise of the subcommittee's investigational power by threatening the
     subcommittee staff member responsible for organizing and carrying out
     the hearings and attempting to get him fired. On information and
     belief, Ticketmaster further directed an agent or employee to attempt
     under false pretenses to secure access to the subcommittee's files
     relating to the investigation.

  b. In 1995, Ticketmaster threatened to retaliate against MovieFone and its
     representatives and agents for providing information to the Antitrust
     Division of the United States Department of Justice, which was
     conducting an antitrust investigation of Ticketmaster, and to members
     of the United States Congress, who also were investigating
     Ticketmaster's conduct. Ticketmaster's threats were intended to
     discourage MovieFone from providing further information related to
     those investigations.

  c. In January 1996, Ticketmaster filed a frivolous libel action against
     MovieFone and its attorneys in an effort to discourage them from
     providing information to public officials investigating Ticketmaster.
     Ticketmaster's suit was dismissed with prejudice in August 1996.

36

9AOL050041
CONFIDENTIAL TREATMENT
REQUESTED

141.   Ticketmaster also has violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961(a), by receiving income derived from a pattern of racketeering activity in which Ticketmaster has participated as a principal and using or investing some or all of such income in the operation of an enterprise engaged in interstate commerce. Ticketmaster has used or invested in CCS, an enterprise engaged in interstate commerce, income received from the pattern of racketeering activity set forth above.

142.   Plaintiffs have suffered and are continuing to suffer injury to its business and property proximately caused by Ticketmaster's RICO violations.

## COUNT FIFTEEN
### Fraud

143.   The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

144.   Ticketmaster conduct described in the preceding count constitutes common law fraud in violation of the common law of New York.

145.   As a result of Ticketmaster's fraud, Plaintiffs suffered substantial injury, including significant monetary damages.

## COUNT SIXTEEN
### Misappropriation of Trade Secrets

146.   The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

147.   In the course of performing the 1992 Agreement, MovieFone disclosed to PC confidential business information and other trade secrets, including contracts and business prospects, for PC to use solely in the implementation of the 1992 Agreement. The confidential

37

9AOL050042
CONFIDENTIAL TREATMENT
REQUESTED

business information and trade secrets included contracts, prospective customer lists, and technological know-how. MovieFone had provided the confidential information to PC in reliance on the confidentiality provision contained in the 1992 Agreement.

148.    Prior to acquiring the assets of PC, Ticketmaster reviewed confidential business information that MovieFone had provided to PC on a confidential basis. Ticketmaster knew, or should have known, the information was confidential and that MovieFone had not authorized the disclosure of this information to Ticketmaster. Ticketmaster thus acted improperly in obtaining access to the confidential information. Upon information and belief, confidential documents concerning the MovieFone-PC relationship was shipped from PC's Colorado office to Ticketmaster's headquarters in Los Angeles.

149.    At the time Ticketmaster acquired its interest in PC, Ticketmaster was aware of the relationship between MovieFone and PC and knew that MovieFone had provided confidential business information and other trade secrets to PC for use solely in connection with the 1992 Agreement.

150.    By virtue of its acquisition of PC's assets, Ticketmaster improperly gained access to trade secret information and, upon information and belief, has used that information to compete against MovieFone.

151.    Ticketmaster's conduct constitutes misappropriation of trade secrets in violation of the common law of New York.

152.    As a result of Ticketmaster's conduct, Plaintiffs have suffered and will continue to suffer damages as well as irreparable injury,

38

9AOL050043
CONFIDENTIAL TREATMENT
REQUESTED

## COUNT SEVENTEEN
### Unfair Competition

153.    The factual allegations contained in the preceding paragraphs are incorporated by reference and made a part hereof as if restated in full.

154.    The acts and practices set forth above, were carried out with the intent of injuring Plaintiffs, and have constituted and constitute unfair competition and unfair interference with Plaintiffs' advantageous business and commercial relationships.

155.    Both before and after Ticketmaster acquired control of PC, Ticketmaster sought to harm MovieFone and consumers by interfering with PC's performance of its contract with MovieFone and by, inter alia, misappropriating trade secret and other proprietary information, including contracts, technological business know-how, that MovieFone had provided to PC on a confidential basis for use under the 1992 Agreement.

156.    After Ticketmaster acquired control of PC, Ticketmaster usurped business opportunities for themselves that properly belonged to the MovieFone-PC joint venture.

157.    Ticketmaster unlawfully, knowingly, intentionally, willfully and maliciously interfered with Plaintiffs' rights in the 1992 Agreement by causing PC to breach the 1992 Agreement.

158.    Ticketmaster now stands to recoup substantial rewards for its misconduct and unfair competition.

159.    The foregoing conduct constitutes a violation of Section 340 of the New York General Business Law as well as the common law of New York. As a result of Defendants' misconduct, Plaintiffs have suffered and will continue to suffer damages.

39

9AOL050044
CONFIDENTIAL TREATMENT
REQUESTED