Mark J. Hulkower (admitted *pro hac vice*)
Jonathan C. Drimmer (admitted *pro hac vice*)
Patrick F. Linehan (admitted *pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795
(202) 429-3000

*Attorneys for Defendant*
*Steven E. Rindner*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 08 Civ. 4612 (CM) |
| | : | ECF Case |
| JOHN MICHAEL KELLY, STEVEN E. | : | |
| RINDNER, JOSEPH A. RIPP, and | : | |
| MARK WOVSANIKER, | : | |
| | : | |
| Defendants. | : | |

---

## DEFENDANT STEVEN E. RINDNER'S REPLY MEMORANDUM OF LAW IN
## SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ...........................................................................................................................1

ARGUMENT ................................................................................................................................1

I.   Summary Judgment Should Be Granted on the SEC's Claims for Primary
     Liability Under Section 10(b), Rule 10b-5, and Section 17(a) (*Counts 1 and 2*) .....................1

     A.  The SEC Has Failed to Establish that Rindner Acted with *Scienter* ...................................2

     B.  The SEC Has Failed to Establish that Rindner Engaged in Conduct Proscribed
         By Section 10(b), Rule 10b-5, and Section 17(a) ................................................................6

         1.  Rindner Made No Public Statement ............................................................................6

         2.  Rindner Did Not Participate in a Cognizable Fraudulent Scheme ...............................8

             a)  The SEC's Theory of Scheme Liability Is Legally Flawed.....................................8

             b)  The SEC Has Failed to Identify Evidence of a Scheme .........................................9

     C.  The Remainder of the SEC's Opposition Is Irrelevant to Primary Liability .....................10

II.  Summary Judgment on Aiding and Abetting Liability Under Exchange Act Section 10(b) and
     Rule 10b-5 (*Count 3*) Should Be Granted...............................................................................13

IV.  Summary Judgment Is Proper on the Books and Records Claims (*Counts 4 and 7*)..............14

V.   Summary Judgment Should Be Granted on the SEC's Request for Disgorgement ................15

CONCLUSION.............................................................................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005) ...................................................8

*In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005)..........................................................7

*In re Bristol-Myers Squib Sec. Litig.*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004) .............................2, 3

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)..........................................................9

*SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326 (S.D.N.Y. 2006) ...................6, 14

*SEC v. Espuelas*, 579 F. Supp. 2d 461 (S.D.N.Y. 2008) ................................................................14

*SEC v. Espuelas*, No. 06 Civ. 2435, 2010 U.S. Dist. LEXIS 31151
(S.D.N.Y. Mar. 30, 2010) ..................................................................................................6, 7

*SEC v. Jones*, 476 F. Supp. 2d 374 (S.D.N.Y. 2007)....................................................................15

*SEC v. KPMG, LLP*, 412 F. Supp. 2d 349 (S.D.N.Y. 2006) .................................................... 1-2, 8

*SEC v. Leslie*, No. C 07-3444, 2010 U.S. Dist. LEXIS 76826
(N.D. Cal. July 29, 2010)....................................................................................2, 5, 13, 15

*SEC v. PIMCO Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454 (S.D.N.Y. 2004) .............. 6-7, 8

*TCS Capital Mgmt., LLC v. Apax Partners, L.P.,* No. 06-CV-13447, 2008 U.S. Dist. LEXIS
19854 (S.D.N.Y. Mar. 7, 2008) ...............................................................................................9

*Wilson v. Grand Cent. Partnership, Inc.*, No. 03 Civ. 1299, 2004 U.S. Dist. LEXIS 11051
(S.D.N.Y. June 16, 2004)..........................................................................................................5

## INTRODUCTION

In its Opposition to Defendant Steven Rindner's Motion for Summary Judgment ("Motion"), the Securities and Exchange Commission ("SEC") undertakes a two-part approach to try to overcome its manifest lack of evidence to rebut the concise arguments raised in Rindner's Motion. First, the SEC drastically and repeatedly misrepresents the substantive content of the exhibits it has filed. Second, the SEC seeks to deter this Court from reviewing that evidence by bombarding it with nearly 1000 exhibits and some two hundred pages of irrelevant and frequently improper additional "facts."[1]

Those tactics cannot save the SEC's case. None of the SEC's additional facts or misrepresented exhibits even addresses – much less rebuts – the dispositive issues presented by Rindner's Motion: (1) the lack of evidence that Rindner was aware of the accounting principles or revenue recognized for the ten transactions at issue here, much less evidence that he knew that the accounting or revenue recognition was improper; (2) the lack of evidence that Rindner participated in, or was responsible for, any public statements; and (3) the lack of a legally cognizable scheme to defraud the investing public. Summary judgment should be granted.

## ARGUMENT

I.      **Summary Judgment Should Be Granted on the SEC's Claims for Primary Liability Under Section 10(b), Rule 10b-5, and Section 17(a) (*Counts 1 and 2*).**

As Rindner's Motion explains, liability can be imposed under Section 10(b), Rule 10b-5 and Section 17(a) only if the SEC can establish that Rindner (1) with the requisite *scienter* (2) engaged in proscribed conduct, either by (a) making a material misrepresentation to the investing public, or (b) engaging in a scheme to defraud. *See* Mot. 11 (citing *SEC v. KPMG, LLP*, 412 F.

---

[1]     Of the more than 600 paragraphs in the SEC's Statement of Additional Material Facts Precluding Summary Judgment ("SEC SOF"), 465 are not cited in the SEC's Opposition.

Supp. 2d 349, 371 (S.D.N.Y. 2006)).  The SEC can satisfy neither the *scienter* nor the conduct

prongs of that test.

### A.     The SEC Has Failed to Establish that Rindner Acted with *Scienter*.

The SEC's fundamental inability to demonstrate that Rindner acted with *scienter* – that

he engaged in "knowing or intentional misconduct" or recklessness[2] – dooms its Section 10(b)

and Section 17(a)(1) misrepresentation and scheme claims.  *See* Mot. 17-21.  To sustain its

burden, the SEC must establish that Rindner knew "that the accounting . . . at issue was wrong

and, therefore, that the financials recognizing revenue . . . were wrong."  *In re Bristol-Myers*

*Squib Sec. Litig.*, 312 F. Supp. 2d 549, 568 (S.D.N.Y. 2004).  The SEC does not dispute that it

must meet that showing.  On the facts of this case, it cannot do so.

It is undisputed that Rindner is not an accountant, has no background in accounting and

finance, and was not part of the dedicated unit that made accounting and revenue recognition

decisions for AOL.  *See* Mot. 6-7; SEC Resp. to Def. Steven Rindner's Statement of Material

Facts as to Which There Is No Dispute ("SEC SOF Resp.") ¶¶ 33-39.  Nor does the SEC even

identify the key accounting principles at issue, much less evidence that Rindner knew what they

were, what revenue from any of the transactions in the Complaint was ultimately recognized by

that dedicated unit, or whether those accounting principles were somehow contravened.  *Cf. SEC*

*v. Leslie*, No. C 07-3444, 2010 U.S. Dist. LEXIS 76826, at **79-80 (N.D. Cal. July 29, 2010)

(SEC's failure to identify defendants' knowledge of "undeniably complex" accounting rules or

that such rules were violated led to dismissal of aiding and abetting claim).

Instead, in conclusory fashion and through overt misrepresentation, the SEC claims that

in 2000 and 2001, Rindner possessed sufficient accounting knowledge to understand the

---

[2]      In its Opposition, the SEC does not dispute that evidence of motive and opportunity is
insufficient to sustain the *scienter* requirement at the summary judgment stage.

complex rules governing multi-element transactions because he allegedly: (1) was a "primary contact" for AOL's Accounting Policy group and communicated with them "on a regular basis," (2) testified in the SEC's Homestore, Inc. inquiry regarding "round-trip" transactions, and (3) identified as a strength in a 2002 evaluation form his "understanding of the [accounting] rules." Opp. 3-4, 18.  These arguments, relying on unsupported and manufactured positions, cannot be stretched to satisfy the SEC's required *scienter* showing:  that Rindner knew the accounting rules related to the transactions at issue, what revenue was recognized for them, or that the ultimate accounting for those transactions was wrong. *See In re Bristol-Myers*, 312 F. Supp. 2d at 568.

*First*, taking dramatic liberties with its exhibits, the SEC claims repeatedly that Rindner was a "primary contact" between the Business Affairs group and "the Accounting Policy Group."  It cites as its sole support  prior testimony by Defendant Wovsaniker. *See* Opp. 3, 20. Contrary to the SEC's representation, Wovsaniker expressly testified that there was "no" primary interface with the Business Affairs group itself; he said Rindner was an interface on some of the transactions that a specific Business Affairs subunit negotiated. *See* SEC SJ Ex. 76.

The SEC's false portrayal aside, the mere fact that Rindner was one of many contact points with Accounting Policy hardly shows an advanced knowledge of accounting principles, or the requisite understanding of the accounting rules related to any of the ten transactions at issue. In fact, the SEC's Opposition itself quotes Rindner's testimony that he "would talk with accounting policy" when members of his subunit "had questions about a [deal] structure," affirmatively demonstrating Rindner's own lack of expertise in accounting principles as they relate to deal structures.  Opp. 3.  Nor is there any evidence that Rindner had discussions about the particular transactions in this case with the Accounting Policy group, was told by anyone in that group the accounting rules governing any of those transactions, or at any point was advised

or understood that the accounting or revenue for the transactions somehow was improper. The SEC likewise presents no evidence that the transactions in which Rindner acted as an interface had similar features to the challenged transactions here. That Rindner was one of many Business Affairs liaisons with Accounting Policy, without more, simply cannot establish *scienter*.[3]

*Second*, in the same vein, the SEC presents Rindner's prior testimony in the Homestore investigation in a most misleading fashion, as the actual testimony belies any suggestion that he understood the accounting principles at issue or otherwise acted with *scienter*. The SEC quotes Rindner's testimony regarding his general understanding of "round-trip" transactions: "'I understand round-tripping not to be a good thing'" and 'something to avoid.'" Opp. 4 (quoting SEC SJ Ex. 85). According to the SEC, Rindner understood a "round-trip" to be a deal where (a) there is a lack of "fair value" paid by a counterparty, and (b) both parties "recognize revenue on the deal." *Id.* That limited testimony, the SEC repeatedly proclaims, somehow demonstrates Rindner's knowledge about the accounting principles for the relevant transactions.

Yet the SEC selectively omits Rindner's critical testimony, just a few transcript lines later, sharply revealing its cherry-picking approach. Rindner expressly testified that he was unaware of the "many forms" of round-tripping, or "all the ways that they come up." Reply Ex. 1. Because he lacked such knowledge, Rindner relied upon AOL's accountants "to understand the transaction [and] discern whether there was an issue." *Id.* The Homestore testimony thus cannot plausibly be construed to indicate that he possessed independent knowledge of accounting rules, much less the rules related to the transactions in this case or that "there was an issue" with

---

[3] The responsibility for making revenue recognition determinations was borne by the separate Revenue Accounting Group. *See* Def. Steven Rindner's Statement of Material Facts as to Which There Is No Dispute ("Rindner SOF") ¶ 36. Though the SEC purports to deny this fact, it nowhere contests the public reporting function of the Revenue Accounting Group nor demonstrates that Accounting Policy had that responsibility. SEC SOF Resp. ¶ 36.

them.  In fact, the testimony indicates precisely the contrary:  Rindner lacked such accounting

knowledge but understood that "many forms" of round-trip transactions existed, and hence relied

on the expertise of AOL's accountants.  *See, e.g.*, *Wilson v. Grand Cent. Partnership, Inc.*, No.

03 Civ. 1299, 2004 U.S. Dist. LEXIS 11051, at *21 (S.D.N.Y. June 16, 2004) (criticizing on

summary judgment "cherry picking of particular facts" out of context).

Moreover, the SEC presents no evidence to suggest that Rindner understood that the ten

transactions at issue possessed the elements of a "round-trip transaction," as he defined the term.

The SEC at no point asserts that any counterparty to a transaction in this case paid other than

"fair value," or that Rindner understood as much.  It likewise provides no evidence that Rindner

knew whether a counterparty – much less AOL – recognized revenue from any given transaction.

Rindner's Homestore testimony, in selective part or in whole, simply fails to show *scienter*.

*Third*, the same is true of Rindner's 2002 statement that his "understanding of the

[accounting] rules" was a personal strength.  In 2000-2001, the accounting rules for multi-

element, barter-related transactions were starkly complex and continued to evolve – a conclusion

indisputably demonstrated by (1) the testimony of three experienced accountants from Ernst &

Young (SEC SOF Resp. ¶¶ 91-94), (2) contemporaneous documents from Ernst & Young (*see,

e.g., id.* ¶ 94), and (3) the findings in the recent summary judgment decision in the SEC's action

against former officers of Veritas based upon one of the transactions at issue in this case.  *See

Leslie*, 2010 U.S. Dist. LEXIS 76826, at **79-80 (the "accounting rules [at issue] are undeniably

complex").  In fact, given the complexity of those rules, one of the SEC's two proposed

accounting experts conceded that two accountants confronted with the exact same facts could

reach different accounting judgments – testimony that on its face would seem to render a finding

of *scienter* most tenuous.  *See* Reply Ex. 2.

Through his pipeline role, Rindner was exposed to thousands of deals; the SEC admits that during any given week, Rindner was tracking one hundred or more. *See* SEC SOF Resp. ¶ 25. Of those, a mere ten – involving particularly complex accounting principles – are at issue here. There can be no inference drawn from Rindner's highly-generalized 2002 statement that in prior years he understood all of the accounting principles associated with the thousands of deals to which he may have been exposed, much less the complex principles at issue for the deals in this case. Because the SEC does not identify those principles, cite evidence that Rindner knew them, or demonstrate that he knew those rules were contravened or what revenue was recognized for the relevant transactions, *scienter* cannot be shown. Summary judgment is appropriate.

### B.   The SEC Has Failed to Establish that Rindner Engaged in Conduct Proscribed By Section 10(b), Rule 10b-5, and Section 17(a).

#### 1.   *Rindner Made No Public Statement.*

In his Motion, Rindner set forth evidence conclusively establishing that, under the bright-line test applicable in this Circuit, he had no role in or responsibility for preparing, drafting, reviewing, or disseminating public statements about AOL's financials. *See* Mot. 12-13. The SEC does not dispute that evidence or identify evidence to the contrary. *See* Opp. 19-21. Instead, the SEC advances two legal arguments: that the bright-line test no longer applies in SEC enforcement actions, and that it can establish primary liability under the "group pleading doctrine." *See* Opp. 19-20. The SEC fundamentally misstates the law.

In SEC and private actions, courts in this circuit clearly have held that a defendant must be substantially responsible for a public misstatement – through preparing, drafting, reviewing, or disseminating the misstatement – to impose primary liability under Rule 10b-5(b). *See, e.g.*, *SEC v. Espuelas*, 06 Civ. 2435, 2010 U.S. Dist. LEXIS 31151, at **12-13 (S.D.N.Y. March 30, 2010); *SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 332 (S.D.N.Y. 2006); *SEC*

*v. PIMCO Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454 (S.D.N.Y. 2004).  Because the SEC

has not even attempted to satisfy that bright-line test, Rindner cannot be held liable for making a

public misrepresentation under 10b-5(b).  *See Espuelas*, 2010 U.S. Dist. LEXIS 31151, at *23

("Thus the SEC has conceded that it cannot and, indeed, will not seek to prove the factual

predicate for [the defendant's] liability for securities fraud:  that she bore some personal

responsibility for the misstatements such that they could be attributed to her.").

The SEC's fallback position – that the "group pleading doctrine" can save its claim under

Rule 10b-5(b) – fares no better.  Opp. 19.  The doctrine "permit[s] plaintiffs, for pleading

purposes only, to 'rely on a presumption that statements in prospectuses, registration statements,

annual reports, press releases, or other group-published information, are the collective work of

those individuals with direct involvement in the everyday business of the company.'"  *In re*

*BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005).  The doctrine, permissible "for

pleading purposes only," is inapplicable for summary judgment, as courts repeatedly have held.

For example, in *Espuelas*, the SEC sought to rely on the doctrine because, as here, the SEC could

"not prove [the defendant] had a role in drafting, reviewing, or approving the misstatements."

2010 U.S. Dist LEXIS 31151 at *15.  The court rebuffed the SEC's effort, noting that the SEC

"assume[d] that the doctrine is more than a pleading device, and the SEC has cited no authority

for that proposition."  *Id.*  To the contrary, the court stated it was "aware of no authority in this

Circuit for converting the pleading doctrine into a substantive ground for fraud liability."  *Id.*

The same is true here.  The group pleading doctrine is a mere pleading device,

inapplicable on summary judgment, and "no authority" exists otherwise.  *In re BISYS Sec. Litig.*,

397 F. Supp. 2d at 438.  Liability under Rule 10b-5(b) based on a public statement is foreclosed.

2.      *Rindner Did Not Participate in a Cognizable Fraudulent Scheme.*

a)  The SEC's Theory of Scheme Liability Is Legally Flawed.

As explained in Rindner's Motion, the SEC's scheme theory – premised upon alleged
misrepresentations in AOL's public statements – is not legally viable.  *See* Mot. 15-17.  Indeed,
courts repeatedly have rejected similar attempts by the SEC to pursue such a scheme theory
where the purpose and effect of the purported scheme was to make a public misrepresentation or
omission.  *See, e.g., KPMG*, 412 F. Supp. at 377-78; *PIMCO*, 341 F. Supp. 2d at 467; *In re
Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005).

The SEC does not contest those legal principles.  But it now claims that its scheme theory
– "to artificially inflate its advertising revenues," Opp. 17 – somehow is not premised on a public
misrepresentation.  For the first time in two years of litigation, the SEC asserts that Rindner
participated in "a scheme to make it more difficult for others who were not privy to the true
nature of the transactions to discover what was afoot."  Opp. 19.  No such scheme is alleged in
the Complaint; it provides that the alleged scheme was "to artificially and materially inflate the
Company's reported online advertising revenue."  Compl. ¶ 1; *see also id.* ¶¶ 25, 48, 110.
Similarly, no such scheme is referenced in any of the SEC's filings to date, or in its responses to
the discovery requests proffered by any defendant in this case.  *See, e.g.*, SEC Opp. to Def.'s
Mot. to Dism. 55-56 (the scheme "alleged in the Complaint [is one to] . . . artificially inflate[]
AOL's online advertising revenue through round-trip transactions with AOL's vendors"); Reply
Ex. 3 (identifying the scheme "set forth in the Complaint [as one] . . . to artificially and
materially inflate the Company's reported online advertising revenue and earnings").  Indeed, in
rejecting a prior SEC attempt to expand the nature of the alleged scheme beyond that in the
Complaint, Magistrate Gorenstein held that "the complaint is absolutely clear in my mind that
the scheme that's alleged consisted of the material inflation of revenue through the transactions

8

that are identified in the complaint." Reply Ex. 4. Furthermore, the SEC has failed, at any prior

point, to identify the "others who were not privy to the true nature of the transactions" such that

Rindner could take discovery of them. This newly minted "scheme" theory, concocted solely in

response to the dispositive arguments presented in Rindner's Motion, should not be considered.

Nor does the SEC's new theory cure its fundamental defect. An alleged scheme to hide

the nature of transactions whose revenue is reported to the public cannot be disaggregated from

an alleged scheme to make public misrepresentations regarding that very revenue. Indeed, in

*TCS Capital Mgmt., LLC v. Apax Partners, L.P.*, this Court recognized that an alleged scheme

under sections (a) and (c) of Rule 10b-5 could not be premised on public misrepresentations or

omissions. No. 06-CV-13447, 2008 U.S. Dist. LEXIS 19854, at **62, 66 (S.D.N.Y. Mar. 7,

2008). This Court then rejected the argument, as proffered by the SEC here, that the alleged

actions to conceal the conduct somehow constituted a distinct scheme:  the alleged cover-up was

"nothing more than a reiteration of the misrepresentations and omissions that underlie plaintiff's

disclosure claim." *Id.* at *63 (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177-78 (2d

Cir. 2005)). The SEC's new claim that Rindner engaged in efforts to hide the alleged scheme to

publicly misrepresent revenue is indistinct from an alleged scheme to make public

misrepresentations, and thus fails to alter the outcome.

b)  The SEC Has Failed to Identify Evidence of a Scheme.

As explained in Rindner's Motion, there is no evidence – testimonial, documentary, or

otherwise – to support a finding that the scheme posited by the SEC throughout this case existed.

*See* Mot. 14-15. Indeed, the SEC itself cannot identify the salient facts regarding this alleged

scheme, including when it began or ended, what transactions it encompassed, or any AOL

personnel who were aware of the purported scheme. *See id.*

9

The SEC's Opposition fails to cure those fundamental flaws. Instead, the SEC attempts to link the transactions together – including Telefonica, which was never restated and which the SEC's own accounting expert witness testified was not a round-trip transaction – with the conclusory assertion that Defendants sought to "artificially bloat [AOL's] advertising revenues by engaging in round-trips." Opp. 1. That assertion is patently insufficient. Although the transactions at issue were multi-element transactions, the SEC's experts concede that there is nothing inherently improper with such deal structures. *See* Mot. 5. Thus, the fact that those transactions – as well as many others entered into by AOL not challenged by the SEC – involved multiple elements cannot, without more, establish a scheme to defraud AOL's investors.

### C. The Remainder of the SEC's Opposition Is Irrelevant to Primary Liability.

The rest, and majority, of the SEC's Opposition effectively ignores the three narrow and fatal deficiencies that preclude a primary liability finding: (1) Rindner's lack of understanding of the accounting rules, (2) that no public misrepresentation is attributable to Rindner, and (3) the absence of a cognizable scheme. Instead, the SEC devotes most of its Opposition to wholly irrelevant arguments, citing a handful of e-mails that Rindner sent or received (often without replying), the content of which the SEC repeatedly misrepresents. *See, e.g.*, Opp. 5-16.

For instance, regarding the Telefonica transaction – never restated and not a round-trip transaction, according to the SEC's accounting expert, *see* SEC SOF Resp. ¶¶ 73, 74 – none of the evidence cited by the SEC bears upon the three fatal deficiencies in its brief. Instead, the SEC devotes its attention to a highly misleading portrayal of the evidence:

> ●Rindner was not a participant in the instant message exchange cited by the SEC between two members of AOL's Legal Department, as the SEC portrays. *Compare* Opp. 14 *with* SEC SJ Ex. 330; *see also* SEC SOF ¶ 226 (describing SEC SJ Ex. 330 as an "instant-messaging string between Rindner" and the two attorneys). Rindner was forwarded that exchange by e-mail, which he then forwarded to a third member of AOL's Legal Department. *See* SEC SJ Ex. 300. None of those three AOL attorneys were

sanctioned by AOL, or alleged to have engaged in wrongdoing by the SEC. While the SEC also contends that the exchange reflects knowledge by Rindner that the Telefonica website was misspelled, quoting a misspelling by one of the exchange participants, the SEC intentionally omits the very next line of the exchange where that participant appears to correct the misspelling. *See* SEC SJ Ex. 330.

● The SEC also states that James Patti, another AOL employee, "acknowledged there was no real economic benefit to deals like the Telefonica transaction." Opp. 15. In fact, in the testimony the SEC cites, Patti stated it was "unclear" to him whether the Telefonica transaction lacked an economic benefit because he was never "too involved with Telefonica." SEC SJ Ex. 334. Indeed, Mr. Patti later confirmed that the transaction with Telefonica had a "degree of economic substance." Reply Ex. 5.

●Implying that Rindner tried to hide alleged wrongdoing, the SEC asserts that Rindner instructed another AOL employee to not talk to "accounting" about the Telefonica transaction, purporting to quote an e-mail where Rindner says "do not talk to accounting - I will." Opp. 18. That is not what the e-mail states: Rindner says, "I have that covered" (not "I will"), that another AOL employee, Akbar, is "the lead for me" in dealing with accounting on the issue, and advised Akbar to keep the other employee "in the loop." SEC SJ Ex. 342. As the e-mail tells Akbar to keep the employee apprised, it cannot plausibly be construed as any effort to hide facts. That is particularly so since AOL's Finance Department and Accounting Policy Department were already "aware of" the issue being discussed and had "appropriately deferred revenue recognition." Reply Ex. 6.

Similarly, for the Veritas deal, the SEC concedes that Rindner was not "involved in negotiating" the transaction. Opp. 11. The SEC also concedes that there is no evidence that Rindner was involved in – or aware of – the underlying accounting problem asserted by the SEC: the alleged "last-minute change in price on the license agreement from $30 million to $50 million." Opp. 11-12. That would seem to foreclose liability based on Veritas, and no facts suggest that Rindner understood the alleged accounting flaws, that he made public statements, or that the transaction was part of a cognizable scheme. Yet the SEC then misleads again, stating:

●Rindner did not "ensure that [Ernst & Young] was provided" information regarding the lack of an online advertising carriage plan when the contracts were executed. Opp. 13. As the SEC knows, Ernst & Young possessed a copy of the advertising agreement in its files at the time of its initial audit, reviewed that agreement, and concluded that the revenue recognized was reasonable. *See* Reply Ex. 7. That contract made it clear that there was no carriage plan at the time of execution, expressly stating that the advertising to be provided by AOL was "TBD" – to be determined – and that the pricing would be at "rate card." See Reply Ex. 8.

Nor do the SEC's discussions of the other transactions relate to the narrow issues in

Rindner's Motion, similarly resorting to irrelevant and misleading citations to alleged evidence.

- Ticketmaster: The SEC misleadingly asserts that Rindner "participated in AOL's internal discussion about when and how to recognize advertising revenue from the Ticketmaster Settlement." Opp. 10. However, the lone e-mail cited by the SEC did not even mention the proposed Ticketmaster transaction, and nothing in its discussion bears upon *scienter*, a public statement or a cognizable scheme.

- Wembley: The SEC relies heavily upon an e-mail that Rindner received four months after the transaction with Wembley ended, in which an AOL employee asserted that AOL had created the advertising for Wembley and linked it to "dummy pages." SEC SJ Ex. 534. The SEC concedes that accounting became aware of it around the same time as Rindner. While the SEC also asserts that Rindner did nothing "to correct [the] revenue recognition problem," Opp. 11, this issue was not the cause of AOL's decision to restate revenue, and there is no evidence that Rindner knew what revenue was recognized (much less that he knew that it needed "correct[ing]"), or had any authority to "correct ... AOL revenue recognition problem[s]."

- HP: While the SEC states that contemporaneous with the deal, Rindner knew that advertising and network transactions were linked, it admits that there is nothing inherently improper with reciprocal, multi-element transactions. *See* Mot. 5; SEC SOF Resp. SOF ¶ 90. The SEC then cites an e-mail dated a full year after the transaction was executed, and revenue had been recognized. *See* Opp. 15-16. While the SEC states there is no evidence Rindner sought to have the revenue restated, it also cites no evidence that Rindner had any such authority, or that Rindner was aware of the accounting issues. Nor is it clear that liability can attach based on a failure to restate previously reported revenue, or evidence that HP was part of a cognizable scheme or a public statement by Rindner.

- BAG: The SEC misleadingly cites a handful of e-mails suggesting that AOL ran advertising without Bertelsmann's prior approval, thereby creating a "horrible paper trail." Opp. 8. As an initial matter, the SEC concedes that AOL's contracts with Bertelsmann were "very flexible in terms of how [AOL] deployed" the advertising. Opp. 9. Furthermore, as the SEC is well aware, one e-mail's reference to the paper trail related to proposed advertising *that AOL never ran*. Regardless, nothing in the cited e-mails relates in any way to *scienter*, a public statement or a cognizable scheme.

- WorldCom: The SEC relies heavily upon an e-mail from a WorldCom representative that called the proposed transaction, as of early November 2001, a "money changing scheme," and Rindner's alleged involvement in drafting preliminary proposals for another AOL employee during the advertising contract negotiations. *See* Opp. 5-7, 17. However, the SEC omits mentioning that the e-mails edited by Rindner occurred months before the transaction was executed and reflect a wholly permissible deal structure. *Compare* SEC SJ Ex. 785 *with* SEC SJ Ex. 738. And the SEC fails to note that, in the

12

November e-mail – to which Rindner never responded while a lead AOL negotiator, not accused of wrongdoing by the SEC, refuted the characterization – explicitly stated that the transaction as proposed "*can't continue.*" SEC SJ Ex. 785. The SEC cites no evidence that it did continue, or that the final transaction, executed more than a month later, resembled the proposal cited in that e-mail.

While the liberties the SEC takes with its evidence are inexplicable, and often inexcusable, none pertain to the narrow points raised in Rindner's motion that show an absence of *scienter*, an attributable public statement, and a cognizable scheme. Summary judgment should be granted.

## II. Summary Judgment on Aiding and Abetting Liability Under Exchange Act Section 10(b) and Rule 10b-5 (*Count 3*) Should be Granted.

As explained in Rindner's Motion, to establish that Rindner aided and abetted a primary violation of Section 10(b) and Rule 10b-5, the SEC must show, *inter alia*, that Rindner possessed knowledge of and substantially assisted a primary violation of those rules. Mot. 21. The SEC makes no attempt to satisfy either prong, asserting only that "Rindner had more than a 'general awareness' of the fraudulent activity that gave rise to the overstatement of advertising revenues – he . . . was an active participant." Opp. 21. Such a conclusory assertion is insufficient.

Most obviously, the SEC has not, and cannot, identify evidence that Rindner was aware of a primary violation. As set forth in Rindner's Motion, there is no evidence he possessed knowledge of the relevant accounting rules, the application of those rules, or how they impacted the revenue recognition determinations made by others at AOL. *See* Mot. 22. Indeed, the same factual posture led to summary judgment for the defendants in the related SEC litigation against executives from Veritas in connection with one of the ten transactions at issue here. The court explained that "[t]he accounting rules are undeniably complex, and the SEC has not directed the Court's attention to any evidence showing that Defendants not only knew of the relevant accounting principles but also knew how to apply them correctly." *Leslie*, 2010 U.S. Dist. LEXIS 76826, at **79-80. Accordingly, the aiding and abetting claims were dismissed.

13

The same is true here. There is no evidence that Rindner knew the complex accounting rules. Nor is there evidence he knew how to apply them. Summary judgment should be granted on Count 3. *See SEC v. Espuelas*, 579 F. Supp. 2d 461, 484 (S.D.N.Y. 2008); *Cedric Kushner*, 417 F. Supp. 2d at 335.

## III.   Summary Judgment Is Proper on the Books and Records Claims (*Counts 4 and 7*).

As explained in Rindner's Motion, primary violations of 13b2-1 are "predicated on standards of reasonableness," while aiding and abetting violations of Sections 13(a) and 13(b) require a showing that Rindner had actual knowledge of such a violation by a primary wrongdoer. *See* Mot. 23. The SEC has failed to satisfy either element of *scienter*.

With respect to primary liability, the SEC cites to Rindner's limited role in "negotiating certain transactions" and his involvement in the preparation and review of deal summaries. Opp. 22. The SEC does not contend, however, that such conduct was unreasonable, much less specify the manner in which it could be deemed unreasonable. The SEC's single-sentence description of Rindner's role is therefore insufficient to impose primary liability.

The SEC's attempt to impose aiding and abetting liability on Rindner is even more tenuous. As explained in Rindner's Motion, there is no evidence that Rindner had actual knowledge of a primary violation – the falsification of a book or record at AOL by someone else or the circumvention of internal controls. *See* Mot. 23. The SEC's Opposition does not assert to the contrary, failing to even allege that Rindner possessed the requisite knowledge of a primary violation. Instead, the SEC merely references "his close ties to the activities that led to massive restatements of advertising revenue, and his role as liaison between Business Affairs and Accounting Policy." Opp. 22. Regardless of its characterization of the nature of Rindner's actions, the SEC has not, and cannot, identify evidence of actual knowledge by Rindner of a primary violation. Summary judgment should therefore be granted on Counts 4 and 7.

14

**IV.    Summary Judgment Should Be Granted on the SEC's Request for Disgorgement.**

To seek disgorgement the SEC must show that ill-gotten gains were "causally connected to . . . alleged violations." Mot. 24 (quoting *SEC v. Jones*, 476 F. Supp. 2d 374, 386 (S.D.N.Y. 2007)). The SEC has not identified any evidence causally connecting the requested disgorgement to the transactions at issue, a fact the SEC does not dispute. SEC SOF Resp. ¶ 18.

Instead, the SEC asserts that Rindner's disgorgement claim is "premature," citing cases from other courts. Opp. 22. In this court, however, that is not the law. *See Jones*, 476 F. Supp. at 386; *SEC v. Norton*, 21 F. Supp. 2d 361, 365-66 (S.D.N.Y. 1998)). Nor, as the SEC knows, is it the law in the Northern District of California. In the related case against former corporate officers of Veritas, the court *sua sponte* granted the defendants summary judgment as to the SEC's request for disgorgement where, as here, there was "no evidence that [the defendants] have received profits in connection with their alleged misrepresentations." *Leslie*, 2010 U.S. Dist. LEXIS 76826, at **112-16. The same result should be reached in this case.

## CONCLUSION

For the above reasons, and those of Rindner's co-Defendants as applicable, summary judgment should be granted.

Respectfully Submitted,

_/s/ Jonathan C. Drimmer_____
Mark J. Hulkower (admitted *pro hac vice*)
Jonathan C. Drimmer (admitted *pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795
(202) 429-3000
*Attorneys for Defendant Steven E. Rindner*

Dated: September 10, 2010

15

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2010, I caused a true and correct copy of the

foregoing Defendant Steven E. Rindner's Reply Memorandum of Law in Support of His Motion

for Summary Judgment to be served via the Court's ECF filing system, upon the following

counsel:


Richard Hong
John J. Bowers
John D. Worland, Jr.
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549
*Attorneys for Plaintiff*

Bruce E. Yannett
Andrew J. Ceresney
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022

Jonathan Tuttle
Ada Fernandez Johnson
DEBEVOISE & PLIMPTON LLP
555 13th Street, NW
Suite 1100E
Washington, DC 20004
*Attorneys for John Michael Kelly*

Stephen G. Topetzes
Glenn R. Reichardt
Erin Ardale Koeppel
Bethany M. Nifkar
K & L GATES LLP
1601 K Street, NW
Washington, DC 20006
*Attorneys for Mark Wovsaniker*


_/s/ Jonathan C. Drimmer_____
Jonathan C. Drimmer