UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : : : |
| Plaintiff, | : 08-CV-4612 (CM) (GWG) : |
| v. | : : |
| JOHN MICHAEL KELLY, STEVEN E. RINDNER, and MARK WOVSANIKER, | : : : |
| Defendants. | : : |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' RENEWED MOTIONS FOR SUMMARY JUDGMENT**

John D. Worland, Jr. (JW-1962)
John J. Amberg
John J. Bowers

100 F Street, NE
Washington, DC 20549
Tel:  (202) 551-4438 (Worland)
Fax:  (202) 772-9246
E-mail:  worlandj@sec.gov

*Attorneys for Plaintiff
Securities and Exchange Commission*

Dated: July 25, 2011

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................................... 1

STATEMENT OF FACTS .............................................................................................................. 2

    A.    The AOL Round-trip Scheme ............................................................................... 2

    B.    The Court's Memorandum and Order ................................................................... 4

ARGUMENT .................................................................................................................................. 5

    A.    The Rule 10b-5(b) "Making Claim" ...................................................................... 5

    B.    The Rule 10b-5(a) and (c) "Scheme Liability" Claim ........................................... 7

        1.    "Scheme Liability" Applies to the AOL Round-Trip Transactions ........................ 7

        2.    The Defendants Substantially Participated in the Fraudulent AOL Round-Trip Scheme .................................................................................. 9

    C.    The Section 17(a) Claim ...................................................................................... 10

CONCLUSION ............................................................................................................................. 14

## TABLE OF AUTHORITIES

**Cases**                                                                                                                                          **Page(s)**

*Aaron v. SEC*, 446 U.S. 680 (1980) ................................................................................... 9, 12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................ 2

*In re AOL Time Warner, Inc. Securities and ERISA Litigation*,
    381 F. Supp. 2d 192 (S.D.N.Y. 2004) .......................................................................... 6, 9, 10

*Benzon v. Morgan Stanley Distributors, Inc.*, 420 F.3d 598 (6th Cir. 2005) ........................... 6

*Finkel v. Stratton Corp.*, 962 F.2d 169 (2d Cir. 1992) .......................................................... 11

*In re Global Crossing, Ltd. Securities Litigation*, 322 F. Supp. 2d 319
    (S.D.N.Y. 2004) ............................................................................................................ 6, 9

*Hooper v. Mountain States Securities Corp.*, 282 F.2d 195 (5th Cir. 1960) ......................... 12

*Janus Capital Group, Inc. v. First Derivative Traders*,
    131 S. Ct. 2296 (2011) ............................................................................................ *passim*

*Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............. 2

*Pacific Investment Management Co. LLC v. Mayer Brown LLP*,
    603 F.3d 144 (2d Cir. 2010) ............................................................................................. 6

*In re Scholastic Corp. Securities Litigation*, 252 F.3d 63 (2d Cir. 2001) ............................... 8

*SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477 (S.D.N.Y. 2007) ................................ 8

*SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450 (2d Cir. 1996) ............................ *passim*

*SEC v. Fraser*, No. CV-09-00443-PHX-GMS, 2010 WL 5776401
    (D. Ariz., Jan. 28, 2010) ................................................................................................ 13

*SEC v. KPMG, LLP*, 412 F. Supp. 2d 349 (S.D.N.Y. 2006) ............................................. 1, 8

*SEC v. Lee*, 720 F. Supp. 2d 305 (S.D.N.Y. 2010) ............................................................ 6, 9

*SEC v. Monarch Funding Corp.*, 192 F.3d 295 (2d Cir. 1999) ............................................ 12

*SEC v. Tambone*, 550 F.3d 106 (1st Cir. 2008) .................................................................. 13

*SEC v. Tambone*, 597 F.3d 436 (1st Cir. 2010) .................................................................. 13

*SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) ...................................................... 12

*SEC v. U.S. Environmental, Inc.*, 155 F.3d 107 (2d Cir. 1998) .................................................. 6, 9

*SEC v. Van Horn*, 371 F.2d 181 (7th Cir. 1966) ........................................................................ 12

*SEC v. Wolfson*, 539 F.3d 1249 (10th Cir. 2008) ...................................................................... 12

*Singer v. Livoti*, 741 F. Supp. 1040 (S.D.N.Y. 1990) ................................................................ 12

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008) ............. 7-8

*Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522 (7th Cir. 1985) ................. 12

*United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008) ............................................................... 6

*United States v. Gayle*, 342 F.3d 89 (2d Cir. 2003) .............................................................. 11, 14

*United States v. Naftalin*, 441 U.S. 768 (1979) ......................................................................... 12

*Vivenzio v. City of Syracuse*, 611 F.3d 98 (2d Cir. 2010) ............................................................ 2

**Statutes**

15 U.S.C. § 77q(a) ................................................................................................................ *passim*

15 U.S.C. § 78j(b) ................................................................................................................. *passim*

**Regulations**

17 C.F.R. § 240.10b-5 ........................................................................................................... *passim*

**Miscellaneous**

3 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12.22 (6th ed. 2009) ......................................................................................................................... 12

Plaintiff U.S. Securities and Exchange Commission ("SEC") submits this memorandum of law in opposition to the renewed motions of defendants Steven E. Rindner and Mark Wovsaniker (collectively, the "Defendants") for summary judgment pursuant to Federal Rule of Civil Procedure 56.  *See* Dkt. Nos. 287-291.  For the reasons set forth below, the Defendants' motions should be denied.

## PRELIMINARY STATEMENT

Citing the Supreme Court's recent decision in *Janus Capital Group, Inc. v. First Derivative Traders,* 131 S. Ct. 2296 (2011), the Defendants seek summary judgment on that portion of the SEC's case alleging primary violations of Section 17(a) of the Securities Act of 1933 (Count I) and Section 10(b) of the Exchange Act of 1934 and Exchange Act Rule 10b-5 (Count II).  *Janus* held that, for purposes of a claim under Rule 10b-5(b), the person who "makes" a false statement is the person with "ultimate authority over the statement."[1]  *Id*. at 2302.  In light of *Janus*, the SEC elects no longer to pursue a "making" claim under subsection (b) of Rule 10b-5 against these Defendants in this instance.

The Defendants' attempt to use *Janus* to avoid primary liability under other provisions, however, finds no support in the law or the facts.  *Janus* did not address, and its holding did not alter, the long-recognized availability of "scheme liability" under Rule 10b-5(a) and (c) or Section 17(a)(1) and (3).  Defendants like Wovsaniker and Rindner – who participate in a scheme to defraud by negotiating, structuring, documenting or approving fraudulent round-trip transactions – can still be primarily liable under Rule 10b-5(a) and (c) as well as Section 17(a)(1) and (3).  *See*, *e.g.*, *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1471 (2d Cir. 1996) ("Primary

---

[1] Prior to *Janus*, the courts in this district held that a person "makes" a false statement for purposes of Rule 10b-5(b) if the person "caused the statement to be made."  *See*, *e.g.*, *SEC v. KPMG, LLP*, 412 F. Supp. 2d 349, 375 (S.D.N.Y. 2006).

1

liability may be imposed not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in the perpetration." (internal quotation marks omitted)). And because Section 17(a)(2) contains no requirement that a defendant "make" a misstatement, *Janus* does not limit the SEC's ability to pursue a claim against the Defendants under that subsection either.

## STATEMENT OF FACTS

### A. The AOL Round-trip Scheme.

Wovsaniker was the head of the Accounting Policy group at America Online, Inc. ("AOL") during the period in question. Dkt. No. 161, Wovsaniker's Rule 56.1 Statement of Undisputed Facts ("Wovsaniker's 56.1") ¶ 29. Rindner was an executive in AOL's Business Affairs unit. Dkt. No. 184, SEC's Rule 56.1 Statement of Additional Material Facts Precluding Summary Judgment ("SEC's 56.1") ¶ 51.

The evidence, taken in the light most favorable to the SEC,[2] establishes that AOL engaged in a fraudulent scheme to manipulate AOL transactions in several broad categories (*i.e.*, vendor deals, finance deals and legal settlements) in order to generate artificial advertising revenue. *Id.* ¶¶ 9-16, 116, 157, 189, 228, 289, 339, 404, 514-15, 582. By foregoing discounts, contractual rights and settlements, AOL fraudulently funded its own online advertising revenue via "round-trip" transactions. *Id.* ¶¶ 11-16. The scheme was designed to misrepresent the true economic substance of business transactions, and involved creating incomplete or misleading

---

[2] The Defendants filed motions for reconsideration of this Court's prior denial of their motions for summary judgment (or for judgment on the pleadings under Rule 12(c)). In a minute order dated July 13, 2011, this Court advised that Wovsaniker's motion should be restyled as "a [R]ule 12(c) motion or preferably a Rule 56 motion" for summary judgment. Dkt. No. 292. The SEC assumes the same treatment applies to Rindner's motion. In ruling on a motion for summary judgment, this Court must "resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), and *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

documentation that concealed the true, contingent nature of the transactions. *Id*. The scheme created the illusion that AOL was generating *bona fide* advertising revenue, when in fact it was self-funding massive advertising purchases. *Id*.

The Defendants substantially furthered the scheme by planning and executing advertising agreements with no economic substance, by authorizing AOL to overpay for goods and services, by helping to conceal accurate and complete information from accountants and auditors, and by convincing those accountants and auditors to allow AOL to improperly recognize advertising revenue from the transactions. *Id.* ¶¶ 36-43, 56-66, 72-73, 102-04, 109-113, 130-34, 137-153, 162-65, 173-79, 181-84, 196-218, 224-28, 231-33, 263-65, 276-80, 283-85, 305, 311-12, 319, 323-338, 370, 382-83, 390-96, 405-06, 419-426, 438-445, 449-510, 520-21, 593-601, 611-15.

Wovsaniker provided advice to AOL's Business Affairs group, among others, on how to structure and document "multi-element" transactions in order to assure near-term advertising revenue recognition for AOL. *Id.* ¶ 14; Wovsaniker 56.1 ¶ 39. He was also a primary source of information and accounting guidance to AOL's Finance group, including AOL's Chief Financial Officer and Revenue Accounting group, and Ernst & Young ("E&Y"), AOL's outside auditors. SEC's 56.1 ¶¶ 39-40. Among other things, Wovsaniker recommended that AOL create separate documentation of each element of the multi-element deals, thereby masking the true substance of the transactions and withholding crucial information from those evaluating them. *Id.* ¶ 134. After some of these facts were revealed, E&Y concluded it could no longer rely on Wovsaniker, a former E&Y partner. *Id.* ¶¶ 41-42.

For his part, Rindner negotiated and structured certain deals knowing they would result in sham advertising revenue. *Id.* ¶¶ 195-208, 231-33, 311, 319, 382-83, 426-27, 449-50, 452, 457-58, 461, 465, 469, 473, 476, 484-85. In addition to interfacing directly with Wovsaniker on

3

revenue recognition issues, *id*. at ¶¶ 60-66, 138-44, 202-03, 462, 465, Rindner also took charge of carefully and methodically tracking the so-called Business Affairs Interactive Marketing "pipeline" of deals, including multi-element deals, during the relevant period, *id.* ¶¶ 56-58.  In this role, Rindner was frequently exposed to deal-specific information and revenue forecasts, and met with AOL's most senior finance and accounting personnel to discuss the deals and their implications for revenue targets.  *Id.* ¶¶ 58-62, 311, 319, 491-92, 611-15.  He was intimately involved in discussions concerning how to document certain deals, *id.* ¶¶ 142-43, 200-01, 426-27, 449-50, 452, 457-58, 461, 465, 469, 473, 476, 484-85, 491-92, and specifically instructed a junior Business Affairs executive to avoid cross-references between the advertising and non-advertising portions of the Telefonica deal, *id.* ¶¶ 200-201, 210-215.  Similarly, in the days after E&Y asked AOL to "substantiate" the legitimacy of the $20 million Veritas advertising order and the $50 million software license, Rindner reprimanded the same junior executive for having truthfully recorded (in an e-mail) that no advertising carriage plan was in place when the Veritas deals were signed.  *Id.* ¶¶ 138-144.  "[C]lean this up and take a second to think about the emails you send out," Rindner wrote.  *Id.* ¶¶ 142-43.

  B. **The Court's Memorandum and Order.**

   On January 7, 2011, this Court issued a Memorandum and Order ("Order") denying in part and granting in part Rindner's motion for summary judgment, and denying Wovsaniker's motion for summary judgment in its entirety.  Dkt. No. 270.  The Court recognized what it called the "common thread" connecting the SEC's allegations concerning the "bona fides" of the ten transactions at issue: "in each case…AOL purportedly declined discounts or lower prices for goods, services or the settlement of disputes and instead paid inflated prices that were offset, dollar for dollar, by sums ostensibly paid for online advertising." Order at 4.  In describing the

4

relevant legal standard, the Court noted that a defendant's use of a "fraudulent device" could suffice to establish Section 10(b) liability. *Id.* at 26 (citing *First Jersey Sec.*, 101 F.3d at 1467). The Court did not, however, directly rule on the SEC's argument that summary judgment was inappropriate because the Defendants could be liable under subsections (a) and (c) of Rule 10b-5 as a result of their participation in the scheme to defraud even if they were found not to have "made" a misstatement. *Se id*. at 25-27.

## ARGUMENT

The Defendants claim that *Janus* precludes primary liability claims against them under all three subsections of both Rule 10b-5 and Section 17(a). *See* Wovsaniker Mem. at 1; Rindner Mem. at 1. In fact, *Janus* addressed only the scope of liability under subsection (b) of Rule 10b-5, and did not address subsections (a) and (c) of that rule. Nor did the *Janus* decision purport to address the scope of liability under Section 17(a), which is worded differently than Rule 10b-5 in at least one critical respect. Accordingly, *Janus* does not advance the Defendants' renewed motions for summary judgment, which should be denied.

### A. The Rule 10b-5(b) "Making" Claim.

Rule 10b-5 makes it unlawful to, in connection with the purchase or sale of securities,

>   (a) employ any device, scheme, or artifice to defraud;
>   (b) ***make*** any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>   (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5 (emphasis added).

The courts have recognized that Rule 10b-5 creates two bases for liability. First, a defendant may be liable under subsection (b) of that rule for "mak[ing]" a fraudulent statement in connection with the sale of securities. *Janus,* 131 S. Ct. at 2302; *First Jersey Sec. Inc.*, 101

5

F.3d at 1467. Second, subsections (a) and (c) of Rule 10b-5 create what the courts have dubbed "scheme liability" for those individuals who engage in deceitful conduct that misleads investors. *See SEC v. Lee*, 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010); *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008); *SEC v. U.S. Envtl., Inc.,* 155 F.3d 107, 111-12 (2d Cir. 1998); *First Jersey Sec.*, 101 F.3d at 1471-72; *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336-37 (S.D.N.Y. 2004); *In re AOL Time Warner, Inc. Sec. and ERISA Litig.,* 381 F. Supp. 2d 192, 217, 229 (S.D.N.Y. 2004).

A defendant can, in a given case, violate Rule 10b-5 under either or both of these theories. *See Lee*, 720 F. Supp. 2d at 334; *U.S. Envtl., Inc.,* 155 F.3d at 111-12; *see also Benzon v. Morgan Stanley Dist., Inc.,* 420 F.3d 598, 610 (6th Cir. 2005) (defendant "not liable under Rule 10b-5(b) for failure to disclose ... may still be held liable under Rule 10b-5(a) and 10b-5(c) as a participant in [an] allegedly fraudulent scheme" (internal quotation marks and citation omitted)); *cf. Pacific Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 151, 158-160 (2d Cir. 2010) (separately analyzing "whether the allegations in the complaint are sufficient to state a claim for 'scheme liability' under Rule 10b-5 (a) and (c)").

In *Janus*, the Supreme Court addressed only what constitutes "mak[ing]" a false statement in violation of subsection (b) of Rule 10b-5. *See* 131 S. Ct. at 2302. Looking to the dictionary definition of the term "make," the Supreme Court held that one "makes a statement by stating it," and that "the maker of a statement is the person or entity with ultimate authority over the statement including its content and whether and how to communicate it." *Id*. The *Janus* decision is silent about the scope of scheme liability under subsections (a) and (c) of Rule 10b-5. Thus, while the SEC will not attempt to prove at trial that Wovsaniker and Rindner had "ultimate

6

authority" over AOL's false financial statements as required under subsection (b) of Rule 10b-5, the SEC's primary fraud claims under subsections (a) and (c) remain strong.

### B. The Rule 10b-5(a) and (c) "Scheme Liability" Claim.

The Defendants also argue that *Janus* precludes the SEC from pursuing primary scheme liability claims against them under subsections (a) and (c) of Rule 10b-5.  *See* Wovsaniker Mem. at 8-9; Rindner Mem. at 10-12.  This argument is without merit, as *Janus* did not address the scope of scheme liability under subsections (a) and (c) of that rule.  The settled law in this circuit holds that a defendant is liable for a fraudulent scheme in violation of subsections (a) and (c) of Rule 10b-5 if he substantially participates in that scheme.  The Defendants' conduct here easily satisfies that standard.

### 1. "Scheme Liability" Applies to the AOL Round-Trip Transactions.

The same five-member majority of the Supreme Court that decided *Janus* directly addressed the scope of scheme liability only three years ago in *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008) – a decision not cited by the Defendants.  The *Stoneridge* Court described the essence of the scheme at issue there as follows:

> Charter arranged to overpay [the counterparties] … , with the understanding that [the counterparties] would return the overpayment by purchasing advertising from Charter.
>
> \*          \*          \*
>
> To return the additional money from the [overpayments], [the counterparties] signed contracts with Charter to purchase advertising time for a price higher than fair value.
>
> \*          \*          \*
>
> Charter recorded the advertising payments to inflate revenue and operating cash flow by approximately $17 million. The inflated number was shown on financial statements filed with the Securities and Exchange Commission (SEC) and reported to the public.

7

*Id.* at 154-55. Expressly recognizing the availability of "scheme liability" under Rule 10b-5, even in the absence of "a specific oral or written statement," the *Stoneridge* Court noted that "[c]onduct itself can be deceptive." *Id.* at 159. The Court further noted that the facts alleged in *Stoneridge* were sufficient for the SEC to pursue an enforcement action. *See id.* at 161 ("It is true that if business operations are used, as alleged here, to affect securities markets, the SEC enforcement power may reach the culpable actors.").[3]

Defendants make no attempt to distinguish *Stoneridge* from the case at bar. Nor could they, as the AOL round-trip scheme here mirrors that in *Stoneridge*. The evidence in this case, taken in the light most favorable to the SEC, establishes that: AOL entered contracts with third parties (1) to exchange goods, services, or other consideration, (2) to settle disputes, or (3) to make or exit investments. At the same time, AOL entered contracts with the third parties who allegedly "bought" online advertising from AOL. In each case, adjustments to the consideration in the original contracts became a vehicle for AOL to fund the third-party's "purchase" of online advertising from AOL. In essence, AOL created "round-trip" exchanges of value from AOL to the third-party and then back to AOL. Based on these "round trips," AOL booked improper online advertising revenue.

The key to the scheme was the creation of deal documents that failed to reflect the true substance of the actual transactions. These bogus documents both hid the true substance of the underlying deals and created the illusion that there had been "sales" of online advertising. The scheme was concealed through efforts to mislead AOL's auditors. These facts fit comfortably within the scope of the "scheme liability" doctrine. *See Stoneridge*, 552 U.S. at 159-61; *In re*

---

[3] In *Stoneridge*, the Court held that private plaintiffs could not pursue claims for scheme liability because they could not establish the reliance element of the implied private right of action. *See* 552 U.S. at 160. But unlike private litigants, the SEC need not prove reliance. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001); *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 490 (S.D.N.Y. 2007); *KPMG, LLP*, 412 F. Supp. 2d at 375.

*Global Crossing*, 322 F. Supp. 2d at 336-37 ("Schemes used to artificially inflate the price of stocks by creating phantom revenue fall squarely within both the language of Section 10(b) and its broad purpose"); *In re AOL Time Warner,* 381 F. Supp. 2d at 217, 229 (allegation that defendant engineered a round-trip transaction between AOL and Veritas sufficient to state a claim under Rule 10b-5(c) even in the absence of a 10b-5(b) misstatement by defendant).[4]

### 2. The Defendants Substantially Participated in the Fraudulent AOL Round-trip Scheme.

The case law in this circuit makes clear that a person who "substantially participates" in a fraudulent scheme may be held liable under subsections (a) and (c) of Rule 10b-5:

> Section 10(b) and Rule 10b-5 impose primary liability on any person who *substantially participates* in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device (such as the creation or financing of a sham entity) intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market.

*Lee*, 720 F. Supp. 2d at 334 (emphasis in original); *see also U.S. Envtl., Inc.,* 155 F.3d at 111 (explaining that "a primary violator is one who participated in the fraudulent scheme" (internal quotation marks omitted)); *First Jersey Sec.*, 101 F.3d at 1471 (same); *In re Global Crossing*, 322 F. Supp. 2d at 336-37; *In re AOL Time Warner,* 381 F. Supp. 2d at 217, 229.

---

[4] As before, Rindner incorrectly claims that the SEC's scheme liability claims against him are "premised entirely upon alleged public misrepresentations" by AOL and that, as a result, he can only be liable as an aider-and-abettor.  Rindner Mem. at 10-12.  While it is true that Rindner's acts ultimately harmed investors, his conduct in negotiating and tracking improper round-trip transactions and creating (or instructing others to create) documents that hid the true nature of those transactions are themselves actionable, primary fraud "*even if a material misstatement by another person create[d] the nexus between the scheme and the securities market.*"  *Lee*, 720 F. Supp. 2d at 334 (emphasis added); *see also*  Dkt. No. 182, SEC's Opposition to Rindner's Motion for Summary Judgment, at 16-19 (addressing Rindner's fraudulent conduct in furtherance of the scheme).  By Rindner's logic, *Janus* insulates all executives who engage in fraudulent conduct that is accompanied or followed by public misrepresentations by their companies from violations of Rule 10b-5(a) and (c).  But the expansive terms of those subsections, which the Supreme Court would presumably interpret in the same "plain language" fashion it applied when interpreting "make" under Rule 10b-5(b), easily capture Rindner's conduct.  *See, e.g., Aaron v. SEC*, 446 U.S. 680, 696  n.13 (1980) (providing dictionary definitions for the terms "device," "scheme" and "artifice").

As detailed above and in the SEC's prior summary judgment submissions, the evidence in this case demonstrates that the Defendants substantially participated in the AOL scheme. Wovsaniker was the key accountant responsible for sanctioning the alleged misconduct. He directly advised AOL's Business Affairs and Finance groups, and various dealmakers, on how to structure and document the round-trip transactions at issue. He worked directly with E&Y, yet failed to advise them of the true nature of the transactions so that his improper accounting judgments could be uncovered. Wovsaniker also recommended the separate-documentation approach that obscured the deals' substance and delayed the discovery of the fraud. Similarly, Rindner substantially participated in the negotiation and documentation of deals while knowing that AOL was self-funding the very advertising being "purchased" by the counterparties. In addition, he advised others to avoid cross referencing the contingent Telefonica deals. Accordingly, the Defendants substantially participated in the fraudulent schemes here and are thus subject to scheme liability under subsections (a) and (c) of Rule 10b-5. *See In re AOL Time Warner*, 381 F. Supp. 2d at 217 (If "the defendants in fact 'engaged in a systemic scheme for more than 3 1/2 years to inflate AOL's reported advertising revenue by at least $1.7 billion based on various sham transactions and accounting improprieties,' then there can be little doubt that investors have been very seriously misled by the defendants' acts. Accordingly, plaintiff is permitted to proceed under both Rules 10b-5(a) and (c).").

    C.  **<u>The Section 17(a) Claim.</u>**

The Defendants also argue that the rule of *Janus* applies to the SEC's claim under Section 17(a). Wovsaniker Mem. at 5; Rindner Mem. at 4. The holding of *Janus*, however, turned on the use of the term "make" in Rule 10b-5(b) – language not found in any of the subsections of Section 17(a). *Janus* is therefore inapplicable to Section 17(a) claims.

10

As explained above, *Janus* interpreted the meaning of the term "make" "[f]or purposes of Rule 10b-5." 131 S. Ct. at 2302.  The Court based its interpretation of that term on two primary considerations.  First, the Court relied on the dictionary definition of the word "make" as used in the Rule 10b-5(b).  *Id.*  Second, the Court reasoned that applying a broader definition of the term "make" would expand the scope of liability in implied private rights of action under Rule 10b-5. *Id.* (explaining that "[c]oncerns with the judicial creation of a private cause of action caution against its expansion" (internal quotation marks omitted)); *see also id.* at 2303.

Neither of these considerations is applicable to the interpretation of Section 17(a). Liability under Section 17(a)(2) is not based on "making" a false statement.[5]  Rather, Section 17(a)(2) makes it unlawful to obtain money or property "by means of" any untrue statement or omission of material fact.  *See* 15 U.S.C. § 77q(a)(2).  Because the operative language of Section 17(a) does not contain the phrase "to make," the rule announced in *Janus* is inapplicable to Section 17(a) claims.  *See United States v. Gayle*, 342 F.3d 89, 92 (2d Cir. 2003) ("Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well.").  In addition, the policy concerns underlying *Janus* are absent here, as there is no implied private right of action under Section 17(a).  *Finkel v. Stratton Corp.*, 962 F.2d 169, 174 (2d Cir. 1992).

Despite the express textual differences between Rule 10b-5(b) and Section 17(a)(2), the Defendants cite several cases stating that the elements of a Section 17(a) claim are "virtually

---

[5] Section 17(a) makes it unlawful, in the offer or sale of securities,:
    (1) to employ any device, scheme, or artifice to defraud,
    (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
    (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
15 U.S.C. § 77q(a).

11

identical" to those of a Rule 10b-5 claim.  *See* Wovsaniker Mem. at 11-12; Rindner Mem. at 12-13.  Of course, the fact that the elements of the two claims are "virtually identical" does not mean that they are entirely identical.  Indeed, the Supreme Court recognized that, despite the similarities in language between the two provisions, the scienter element applicable to Section 17(a)(2) differs from that applicable to Rule 10b-5(b).  *Aaron*, 446 U.S. at 695-97 (1980).  And the Supreme Court earlier said that Section 17(a) and Rule 10b-5 prohibit only "***some*** of the same conduct."  *United States v. Naftalin*, 441 U.S. 768, 778 (1979) (emphasis added).  Moreover, the differences between the two provisions are so significant that, in contrast to Rule 10b-5, the courts have declined to recognize an implied private right of action under Section 17(a).  *Singer v. Livoti*, 741 F. Supp. 1040, 1045 (S.D.N.Y. 1990) (declining to recognize implied right of action under Section 17(a) because, "in light of *Aaron* . . . the elements of a claim under Section 17(a) of the 1933 Act may differ from those under Section 10(b) of the 1934 Act"); *see also* 3 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12.22 (6th ed. 2009) (noting several "principal differences between [Rule 10b-5] and Section 17(a)").

In the cases cited by the Defendants, the courts were not presented with, and thus did not consider, the argument that the reach of Section 17(a)(2) is broader than that of Rule 10b-5(b) given the former's lack of a "make" requirement.  *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 855 n.22 (2d Cir. 1968); *Monarch Funding Corp.*, 192 F.3d at 308; *First Jersey Sec.*, 101 F.3d at 1467.[6]  In the only decision to have explicitly considered that issue, the First Circuit held that, notwithstanding general references in prior decisions to the similarity of the two provisions, the text of Section 17(a) makes clear that, unlike Rule 10b-5, a defendant need not "make" a

---

[6] *See also SEC v. Wolfson*, 539 F.3d 1249, 1257 (10th Cir. 2008); *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 531 (7th Cir. 1985); *SEC v. Van Horn*, 371 F.2d 181, 184-86 (7th Cir. 1966); *Hooper v. Mountain States Sec. Corp.*, 282 F.2d 195, 201 n.4 (5th Cir. 1960).

statement in order to violate that provision. *SEC v. Tambone*, 550 F.3d 106, 127 (1st Cir. 2008).[7]

As the First Circuit explained:

> [Section 17(a)(2)] prohibits an individual from "obtain[ing] money or property by means of any untrue statement." It does not state, however, that the seller must himself make that untrue statement. Indeed, the text suggests that the opposite is true-that it is irrelevant for purposes of liability whether the seller uses his own false statement or one made by another individual. Liability attaches so long as the statement is *used* "to obtain money or property," regardless of its source.

*Id.* at 127. The court went on to explain that Section 17(a)(2) applies more broadly than Rule 10b-5:

> [Section 17(a)(2)] covers conduct that may not be prohibited by section 10(b) and Rule 10b-5. Specifically, primary liability may attach under section 17(a)(2) **even when the defendant has not himself made a false statement** in connection with the offer or sale of a security.

*Id.* at 128 (emphasis added). Applying the same logic here, since primary liability under Section 17(a)(2) does not depend on a defendant "making" a misstatement, *Janus*'s interpretation of the term "make" as used in Rule 10b-5(b) is irrelevant to claims under Section 17(a). Under the plain language of Section 17(a), the Defendants can be held liable for violating that provision regardless of whether they personally made a false statement.[8]

*    *    *

---

[7] The First Circuit initially vacated, but later reinstated the portions of *Tambone* regarding Section 17(a)(2), among other points. *See SEC v. Tambone,* 597 F.3d 436, 450 (1st Cir. 2010). Wovsaniker attempts to dismiss the holding of *Tambone* as dicta because the Section 17(a) claim "was 'not before the en banc court.'" Wovsaniker Mem. at 12. But the discussion of the distinctions between Section 17(a) and Rule 10b-5 appears in the panel decision of the circuit court, *see Tambone*, 550 F.3d at 125-28, and the issue was unquestionably before the panel.

[8] The SEC's scheme liability claim under Section 17(a)(1) and (3), *SEC v. Fraser*, No. CV-09-00443-PHX-GMS, 2010 WL 5776401, at *7 (D. Ariz. Jan. 28, 2010) (holding that "scheme liability is derived from the first and third prongs in Section 17(a) and Rule 10b-5"), also remains intact for the same reasons stated above with respect to Rule 10b-5(a) and (c). *See supra* at 7-10.

In sum, if *Janus* teaches anything, it is that the particular words used by a statute or rule and the definitions of those words are of vital importance in the interpretation of the federal securities laws.  *See Janus*, 131 S. Ct. at 2302 (parsing the dictionary definition of the term "make"); *Gayle*, 342 F.3d at 92 ("Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well.").  By their plain terms, neither Section 17(a) nor subsections (a) and (c) of Rule 10b-5 require that a defendant "make" a false statement.  Thus, *Janus* does not warrant a grant of summary judgment in favor of these Defendants on those claims.

## **CONCLUSION**

For the reasons set forth above, the renewed motions for summary judgment should be denied.

Respectfully submitted this 25th day of July, 2011.

By:     s/John D. Worland, Jr.
        John D. Worland, Jr. (JW-1962)
        John J. Amberg
        John J. Bowers

        100 F Street, NE
        Washington, DC 20549
        Tel:  (202) 551-4438 (Worland)
        Fax:  (202) 772-9246
        E-mail:  worlandj@sec.gov

        *Attorneys for Plaintiff*
        *Securities and Exchange Commission*

CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that a copy of Plaintiff Securities And Exchange Commission's Opposition to Defendants' Renewed Motions for Summary Judgment was served via the Court's ECF system on July 25, 2011 to the following:

<u>Attorneys for J. Michael Kelly</u>

Bruce E. Yannett, Esq.
Andrew J. Ceresney, Esq.
Eric Bierbauer, Esq.
Debevoise & Plimpton LLP (NYC)
919 Third Avenue
New York, New York 10022

Jonathan R. Tuttle, Esq.
Ada Fernandez Johnson, Esq.
Debevoise & Plimpton LLP (DC)
555 13th Street, N.W.
Washington, DC 20004

<u>Attorneys for Steven E. Rindner</u>

Reid Weingarten, Esq.
Steptoe & Johnson, LLP (NYC)
750 Seventh Avenue
Suite 1900
New York, NY 10019

Roger E. Warin, Esq.
Patrick F. Linehan, Esq.
Steptoe & Johnson, LLP (DC)
1330 Connecticut Avenue, N.W.
Washington, DC 20036

<u>Attorneys for Mark Wovsaniker</u>

Steven Topetzes, Esq.
Erin Koeppel, Esq.
K&L Gates LLP
1601 K Street, NW
Washington, DC  20006-1600

<u>s/John D. Worland, Jr.</u>
Attorney for Plaintiff
Securities & Exchange Commission