Roger E. Warin (admitted *pro hac vice*)
Reid Weingarten (admitted *pro hac vice*)
Patrick F. Linehan (admitted *pro hac vice*)
Robert L. Moore (admitted *pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036-1795
(202) 429-3000

*Attorneys for Defendant*
*Steven E. Rindner*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> JOHN MICHAEL KELLY, STEVEN E. : <br> RINDNER, JOSEPH A. RIPP, and : <br> MARK WOVSANIKER, : <br> : <br> Defendants. : | No. 08 Civ. 4612 (CM) <br> ECF Case <br><br> ORAL ARGUMENT <br> REQUESTED |

**DEFENDANT STEVEN E. RINDNER'S REPLY MEMORANDUM OF LAW**
**IN SUPPORT OF HIS MOTION FOR JUDGMENT ON THE PLEADINGS,**
**OR ALTERNATIVELY FOR SUMMARY JUDGMENT**

As explained in Mr. Rindner's Motion, the Securities and Exchange Commission's ("SEC") claims against Mr. Rindner for primary liability under Securities Exchange Act Section 10(b), Exchange Act Rule 10b-5, and Securities Act Section 17(a) are fatally undermined by the recent United States Supreme Court decision in *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011). The SEC does not dispute that *Janus* precludes primary liability against Mr. Rindner under Rule 10b-5(b). Instead, the SEC attempts to salvage its claims against Mr. Rindner for primary liability with its vague "scheme" theory of liability.

The SEC's attempt, however, must fail because the purported scheme identified by the SEC is nothing more than an effort to recast its misstatement claim, now foreclosed by *Janus*. Consistent with the "clear line" distinction drawn by *Janus* between primary and secondary liability, courts within this Circuit have refused to permit the SEC and private plaintiffs to impose primarily liability under a scheme theory where the purported schemes are premised entirely upon alleged public misrepresentations. Indeed, such attempts to employ scheme liability as merely a "backdoor" into primary liability have been uniformly rejected. Counts I and II should therefore be dismissed.

## ARGUMENT

I. ***Janus* Precludes Primary Liability as to Mr. Rindner Under Rules 10b-5(a) and (c).**

    A. **The *Janus* Court's Distinction Between Primary and Secondary Liability Precludes "Scheme" Liability Under Rule 10b-5(a) and (c) Where the Purported Scheme Is Premised Upon Alleged Misrepresentations.**

Underlying the *Janus* Court's decision was an issue that has remained largely unresolved for decades: the "distinction between those who are primarily liable . . . and those who are secondarily liable." *Id.* at 2302 n.6 (citing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)). Indeed, the *Janus* decision was a logical expansion of *Central Bank's* proscription of private causes of action for aiding and abetting violations of Rule

10b-5. As the *Janus* Court explained, "[a] broader reading of 'make,' including persons or entities without ultimate control over the content of a statement, would substantially undermine *Central Bank*. If persons or entities without control over the content of a statement could be considered primary violators who 'made' the statement, *then aiders and abettors would be almost nonexistent*." *Id.* at 2302 (emphasis added).

As explained in Mr. Rindner's Motion,[1] although *Janus* did not explicitly address "scheme" liability under Rule 10b-5(a) or (c), the rationale underlying the decision – drawing a distinction between primary and secondary liability – lies at the core of a number of decisions in this Circuit barring primary liability under those Rules where the purported schemes are premised entirely upon alleged public misrepresentations. For example, in *PIMCO*, the SEC sought – as it does here – to impose primary liability upon one defendant for an alleged scheme that culminated in public misrepresentations made by another defendant and the PIMCO mutual fund entities. 341 F. Supp. 2d at 458-61. The PIMCO entities purportedly issued public misrepresentations, signed by one individual defendant as Chief Executive Officer, concerning their efforts to minimize market timing activity, while at the same time being heavily involved in such otherwise non-fraudulent activity. *Id.* Recognizing that the second individual defendant could not be held liable for "making" a misrepresentation for which he neither was responsible nor signed, the SEC instead sought to hold that defendant primarily liable for engaging in a scheme to mislead the public regarding the level of market timing activity the entities were engaged in. *Id.* The *PIMCO* court, however, rejected the SEC's attempt to invoke the mere mantra of a purported "scheme" as a backdoor to bypass the elements necessary to establish

---

[1] *See* Mot. at 15-17 (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005), *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 375 (S.D.N.Y. 2006), *SEC v. PIMCO Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 467 (S.D.N.Y. 2004), *SEC v. Lucent Tech., Inc.*, 610 F. Supp. 2d 342, 361 (D.N.J. 2009)).

"misstatement" liability. As the court explained, permitting scheme liability "to attach to individuals who did no more than facilitate preparation of material misrepresentations or omissions actually communicated by others . . . would swallow" the bright-line test between primary and secondary liability altogether. *See PIMCO*, 341 F. Supp. 2d at 467.

In *KPMG,* the court similarly refused to permit the SEC to reach primary liability by recasting a straightforward "misstatement" claim into a "scheme" claim: "it would be improper to impose *primary liability* on [the defendant] by designating the alleged fraud a 'manipulative device' rather than a 'misstatement'" where "the core misconduct alleged is in fact a misstatement." 412 F. Supp. 2d at 378 (emphasis added); *see also Lentell*, 396 F.3d at 177 (rejecting scheme liability where "the sole basis for such claims is alleged misrepresentations or omissions"); *accord SEC v. Lucent Tech., Inc.*, 610 F. Supp. 2d 342, 361 (D.N.J. 2009) (rejecting scheme liability where "[t]he alleged deception . . . arose from the failure to disclose the real terms of the deal, which is nothing more than a reiteration of the misrepresentations and omissions that under lie plaintiffs [sic] disclosure claim").

In its Opposition, the SEC does not – because it cannot – distinguish any of these established precedents, each of which counsel dismissal of the SEC's claims against Mr. Rindner for primary liability under Rules 10b-5(a) and (c). Indeed, the SEC simply ignores them, instead relying heavily upon the Supreme Court's decision in *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008). *See* Opp. at 7-9. Citing the *Stoneridge* Court's general proposition that "[c]onduct itself can be deceptive," the SEC mistakenly theorizes that the *Stoneridge* Court would have permitted the SEC to impose primary scheme liability under the facts alleged in that case. *See* Opp. at 8 (quoting *Stoneridge*, 552 U.S. at 159). To the contrary, when read in context the *Stoneridge* decision actually held that the SEC may have been

3

able to pursue *secondary liability* against the defendants, drawing the very distinction between primary and secondary liability echoed in *Janus*. In stating that "the SEC enforcement power may [have reached] the culpable actors," the *Stoneridge* Court explained:

> Aiding and abetting liability is authorized in actions brought by the SEC but not by private parties. Petitioner's view of primary [scheme] liability makes any aidor and abettor liable under § 10(b) if he or she committed a deceptive act in the process of providing assistance. Were we to adopt this construction of § 10(b) . . . we would undermine Congress' determination that this class of defendants should be pursued by the SEC and not by private litigants.

*Id.* at 162-63. Thus, contrary to the SEC's assertions, *Stoneridge* is wholly consistent with the uniform decisions of courts in this Circuit that have held that the distinction between primary and secondary liability can only be preserved by precluding "scheme" liability where the alleged scheme is based solely upon alleged public misrepresentations.[2]

### B. The SEC's "Scheme" Liability Claims Under Rules 10b-5(a) and (c) Must Be Dismissed Because They Are Premised Upon Alleged Misrepresentations.

From the inception of this case, the SEC has consistently defined the nature of the purported scheme by explicit reference to the alleged public misrepresentations—the inflation of advertising revenue reported to the investing public in AOL's SEC filings from 2000 through 2003. In its Complaint, the SEC alleged that Mr. Rindner and the other Defendants "engineered, oversaw, and executed a scheme to artificially and materially inflate the Company's reported online advertising revenue . . . ." Compl. ¶ 1; *see also* Compl. ¶¶ 25, 48, 110. In opposing Mr.

---

[2] Mr. Rindner does not contend, as the SEC asserts, that "*Janus* insulates all executives who engage in fraudulent conduct that is accompanied or followed by public misrepresentations by their companies . . . ." Opp. at 9 n.4. To the contrary, such executives may remain secondarily liable for the companies' alleged public misrepresentations. *Janus*, and established precedent in this Circuit, serves only to prevent the SEC and private plaintiffs from invoking a "scheme" theory of liability as a backdoor to hold those executives primarily liable for nothing more than the companies' misrepresentations.

4

Rindner's motions to dismiss and for summary judgment, the SEC similarly stated that the scheme "alleged in the Complaint [is one to] . . . artificially inflate[] AOL's online advertising revenue." SEC Opp. to Def.'s Mot. to Dism. (Dkt. No. 55) at 56; *see also* SEC Opp. to Rindner's Mot. for Summ. Judg. (Dkt. No. 182) at 17. Even in opposing the instant Motion, the SEC concedes that the "fraudulent scheme . . . [was] to generate artificial advertising revenue" in AOL's public filings. Opp. at 2. To date, the SEC has not, because it cannot, distinguish the purported scheme in any meaningful manner from the alleged misstatements upon which it is based. As such, *KPMG*, *PIMCO*, and other decisions in this Circuit mandate dismissal of the SEC's claims under Rules 10b-5(a) and (c) in order to maintain the clear line between primary and secondary liability most recently echoed in *Janus*.

> C. **The SEC's Interpretation of "Scheme" Liability Cannot Be Reconciled with *Janus*.**

Unable to dispute or even to distinguish *PIMCO*, *KPMG*, or any of the other precedents in this Circuit that counsel dismissal of scheme liability claims premised upon public misrepresentations, the SEC instead vaguely asserts that an individual who "'substantially participates' in a fraudulent scheme may be held liable under subsections (a) and (c) of Rule 10b-5." Opp. at 9. Notably, the SEC makes no attempt to define what conduct amounts to "substantial participation," because any such definition would invariably run afoul of *Janus*'s clear distinction between primary and secondary liability. Indeed, in *Janus*, the Court employed the analogy of "the relationship between a speechwriter and a speaker," holding that only the speaker could be held primarily liable under Rule 10b-5(b). Yet according to the SEC, the speechwriter's presumably substantial participation in the "scheme" – the drafting of the speech – would render him both primarily liable under Rules 10b-5(a) and (c) and secondarily liable for assisting in the speaker's misstatements. Applying the SEC's flawed interpretation of "scheme"

5

liability to its logical end, *all* conduct which *Janus* has now held insufficient to establish primary liability under 10b-5(b) would nevertheless be sufficient to sustain primarily liability under Rules 10b-5(a) and (c) notwithstanding that alleged public misstatements represent the sole basis of that claim. The SEC's interpretation would thus effectively read the distinction between primarily and secondary liability under Rule 10b-5(b) – a distinction that lay at the heart of the *Janus* decision – out of the securities laws.

As the cases cited by the SEC reveal, however, scheme liability depends not on the level of one's participation but rather on the performance of inherently deceptive acts which are distinct from any alleged misstatements. In *SEC v. Lee*, the SEC's scheme claims under Rule 10b-5(a) and (c) were premised upon the alleged "u-turning" of commodity prices between brokerage houses: one broker would send his price to a second broker, which would then report that price back to the first as a purportedly "independent" quote. 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010). The *Lee* court permitted such allegations to withstand dismissal because such conduct was inherently deceptive when performed – it was not made deceptive only by subsequent public misrepresentations. The remaining cases relied upon by the SEC in its Opposition similarly involved inherently deceptive conduct which was wholly distinct from public misrepresentations. *See, e.g.*, *SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 112 (2d Cir. 1998) (holding trader could be held primarily liable for scheme involving the execution of manipulative stock trades); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1471-72 (2d Cir. 1996) (affirming scheme liability where defendant defrauded customers into paying prices that included excessive markups).

It is precisely this type of conduct that Rules 10b-5(a) and (c) were intended to prohibit, not conduct such as Mr. Rindner's. According to the SEC, Mr. Rindner participated "in the

negotiation and documentation of deals," Opp. at 10, which the SEC contends were "round-trip" transactions in that counterparties with which AOL conducted business would also purchase advertising from AOL. Opp. at 1-2. However, the SEC has conceded that the "policy of selling advertising to counterparties was considered within AOL to be typical in business and a matter of common sense." SEC Resp. to Rindner's Statement of Material Facts as to Which There Is No Dispute (Dkt. No. 181) ("SEC Resp. to Rindner's SUF") ¶ 87. Indeed, there is nothing inherently deceptive about engaging in such "round-trip" transactions with counterparties. In fact, AOL touted its common-sense policy and practice in the media. *See id.* ¶ 88 (such policy was "openly discussed in industry publications and mainstream news publications"). It is only the manner in which those transactions are accounted for and reported to the public – AOL's alleged "improper[] recogni[tion of] advertising revenue from" such transactions, Opp. at 3 – that was purportedly deceptive, not the act of engaging in such transactions itself. Therefore, because Mr. Rindner did not engage in any inherently deceptive conduct, the SEC's claim for scheme liability must fail even under its misguided interpretation of such liability.[3]

**II.    *Janus* Precludes Primary Liability as to Mr. Rindner Under Section 17(a).**

    **A.    The Section 17(a)(1) and (3) Claims Must Be Dismissed.**

The SEC concedes in its Opposition, as it must, that its claims for scheme liability under both Section 17(a) and Rule 10b-5 should be adjudicated in the same manner. *See* Opp. at 13

---

[3] In its effort to avoid the logical ramifications of *Janus*, the SEC resorts to mischaracterizing the nature of what limited involvement Mr. Rindner had in the transactions alleged in the Complaint. Although Mr. Rindner addressed similar mischaracterizations in his previous submissions on summary judgment, *see, e.g.*, Rindner Rep. to SEC Resp. to Rindner's SUF (Dkt. No. 265), the SEC has in any event failed to show how any of Mr. Rindner's conduct was intended to result in AOL subsequently making the alleged public misstatements – *i.e.*, the improper recognition of revenue in its SEC filings.

7

n.8.  As explained in Mr. Rindner's Motion,[4] the language of Sections 17(a)(1) and (3) is virtually identical to that of Rule 10b-5(a) and (c), and "when Congress uses the same language in two statutes having similar purposes . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005).  As such, courts have analysed scheme liability claims brought under either Sections 17(a)(1) and (3) or Rule 10b-5(a) and (c) in an identical fashion.  *See, e.g.*, *SEC v. Fraser*, No. 09-cv-443, 2010 U.S. Dist. LEXIS 7038, at *23 (D. Ariz. Jan. 28, 2010) ("[s]cheme liability is derived from the first and third prongs in Section 17(a) and Rule 10b-5") (citation omitted).[5] Accordingly, because the SEC's claims against Mr. Rindner for primary scheme liability under Rules 10b-5(a) and (c) are now foreclosed for the reasons stated above, the identical claims for scheme liability under Section 17(a)(1) and (3) must also be dismissed.

### B. The Section 17(a)(2) Claim Must Be Dismissed.

Similarly, because the SEC also concedes that *Janus* precludes any claim for primary liability against Mr. Rindner for alleged false statements under Rule 10b-5(b), the analogue claim under Section 17(a)(2) must also be dismissed.  However, despite acknowledging the parallel construction and application of Rule 10b-5 and Section 17(a), the SEC maintains that the prohibition against false statements found in both Rule 10b-5(b) and Section 17(a)(2) should be treated differently in the wake of *Janus*.  *See* Opp. at 10-13.  But this position, as recognized by the SEC, is directly contrary to the long standing jurisprudence within this Circuit which holds

---

[4] *See* Mot. at 14-15.

[5] *See also SEC v. Coffey*, 493 F.2d 1304, 1313 (6th Cir. 1974) ("A Section 17(a)(1) and (3) or Rule 10b-5(1) and (3) violation depends on . . . [a] fraudulent scheme.").

8

that the statutes are "virtually identical" and should be treated as such.[6] *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 855 n.22 (2d Cir. 1968); *see also SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999); *First Jersey*, 101 F.3d at 1450 (2d Cir. 1996); *Zerman v. Ball*, 735 F.2d 15, 23 (2d Cir. 1984). Courts in this Circuit have repeatedly held that, under either provision, "the SEC must establish that the defendant *made* material false statements or omissions" for primary liability to attach. *SEC v. McGinn, Smith & Co.*, 752 F. Supp. 2d 194, 212-13 (N.D.N.Y. 2010) (emphasis added) (citing *SEC v. Global Telecom Servs., L.L.C.*, 325 F. Supp. 2d 94, 111 (D. Conn. 2004)); *see also SEC v. Espuelas*, 699 F. Supp. 2d 655, 659-63 (S.D.N.Y. 2010).

In its attempt to escape *Janus*, the SEC relies exclusively on a pre-*Janus* decision by the First Circuit, which held that Section 17(a)(2)'s literal terms do not necessarily require that a defendant "make" a statement. *See SEC v. Tambone*, 597 F.3d 436, 444 (1st Cir. 2010). Instead, the First Circuit reasoned that primary liability can attach under Section 17(a)(2) when a defendant "obtains money or property by means of" someone else's false statement. *Id.* at 444-45. Even setting aside the incorrect reasoning of the First Circuit, the SEC's reliance on *Tambone* is unavailing for two additional reasons. First, *Tambone's* reading of Section 17(a)(2) cannot be reconciled with this Court's repeated conclusion that Section 17(a)(2) requires the defendant to "make" a statement, and well-established Second Circuit precedent directly equating the elements of Section 17(a) with the elements of Rule 10b-5.

---

[6] As addressed in Mr. Rindner's Motion, the equal treatment of the two provisions is not based solely on the nearly identical statutory language, but rather is derived from the fact that Section 17(a) was the model for Rule 10b-5, which was enacted "only" to make Section 17(a)'s prohibitions applicable to both "purchasers" and "sellers." *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461, 463 (2d Cir. 1952); *see also Texas Gulf Sulphur*, 401 F.2d at 855. Thus, Congress intended the statutes to proscribe the exact same conduct.

9

Second, even assuming *arguendo* that the SEC's claim for primary liability under Section 17(a)(2) somehow survives *Janus*, the SEC's specific allegations against Mr. Rindner in this case cannot sustain a legally-cognizable claim based on the SEC's amended reading of the statute under *Tambone*. Ignoring the Supreme Court's clear intent to restrict primary liability for false statements, the SEC now asks this Court to premise Section 17(a)(2) liability against Mr. Rindner on his alleged use of false statements *made by others* to "obtain money or property" under the literal terms of Section 17(a)(2). The SEC, however, has never alleged – either in the Complaint (beyond its boilerplate recitation of the statute) or in its briefings – nor adduced any evidence that Mr. Rindner in fact used any false statement to "obtain money or property." Furthermore, as noted in Mr. Rinder's Motion, to the extent the SEC is relying on employment compensation as the requisite "money or property" obtained, this Court has already recognized that the SEC "has proffered no evidence" to "causally connect[]" Mr. Rindner's compensation to the alleged fraudulent conduct. *See SEC v. Kelly*, 765 F. Supp. 2d 301, 325 (S.D.N.Y. 2011). Thus, the SEC's Section 17(a)(2) claim against Mr. Rindner must fail even under *Tambone's* misguided reading of the statute.

Accordingly, because Mr. Rindner had no authority over, and did not obtain money or property from, the dissemination of the alleged misstatements, and because he did not participate in a scheme independent upon others' "making" of alleged misstatements, he cannot be primarily liable under Section 17(a) just as he cannot be primarily liable under Rule 10b-5. The SEC's attempt to circumvent the Supreme Court's important ruling in *Janus* as well as established Second Circuit precedent is without merit and should not be credited.

## **CONCLUSION**

For the foregoing reasons, Counts I and II against Mr. Rindner should be dismissed.

10

        Respectfully Submitted,

        /s/ Roger E. Warin
_____

Roger E. Warin (admitted *pro hac vice*)
Reid Weingarten (admitted *pro hac vice*)
Patrick F. Linehan (admitted *pro hac vice*)
Robert L. Moore (admitted *pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795
(202) 429-3000

*Attorneys for Defendant Steven E. Rindner*

Dated:  August 1, 2011

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 1, 2011, I caused a true and correct copy of the foregoing Defendant Steven E. Rindner's Reply Memorandum of Law in Support of His Motion for Judgment on the Pleadings, or Alternatively for Summary Judgment to be served via the Court's ECF filing system, upon the following counsel:

| | |
|---|---|
| Richard Hong | Stephen G. Topetzes |
| John J. Bowers | Glenn R. Reichardt |
| John D. Worland, Jr. | Erin Ardale Koeppel |
| U.S. SECURITIES AND EXCHANGE COMMISSION | Bethany M. Nikfar |
| 100 F Street, NE | K & L GATES LLP |
| Washington, DC 20549 | 1601 K Street, NW |
| *Attorneys for Plaintiff* | Washington, DC 20006 |
| | *Attorneys for Mark Wovsaniker* |

Bruce E. Yannett
Andrew J. Ceresney
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022

Jonathan Tuttle
Ada Fernandez Johnson
DEBEVOISE & PLIMPTON LLP
555 13th Street, NW
Suite 1100E
Washington, DC 20004
*Attorneys for John Michael Kelly*

                                               /s/ Robert L. Moore
                                                 Robert L. Moore